**IN THE UNITED STATES COURT DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS (SHERMAN DIVISION)**
CASE NO.   4:13-CV-67-LED

KOSOUL CHANTHAKOUMMANE, Petitioner

V.

BRAD LIVINGSTON,
Director, Texas Department of
Criminal Justice,
Institutional Division, Respondent

**WRIT OF HABEAS CORPUS
(DEATH PENALTY CASE)**

Carlo D'Angelo
State Bar No. 24052664
100 East Ferguson, Suite 1210
Tyler, Texas 75703
Tel. 903.595.6776
Fax 903.407.4119
carlo@dangelolegal.com
Attorney for Petitioner

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. State Court Trial Counsel for the Defendant: Steven R. Miears, P.O. Box 736, Bonham, Texas 75418 and B. Keith Gore, 2301 W. Virginia Parkway, McKinney, Texas 75071

2. State Court Trial Counsel for the Prosecution: John Roach, Gregory Davis, Curtis T. Howard, and Andrea Westerfeld, Collin County District Attonrey's Office, 2100 Bloomdale Rd, McKinney, Texas 75071

3. State Court Appellate Counsel for the Appellant: C. Wayne Huff, P.O. Box 2334, Boerne, Texas 78006

4. State Court Appellate Counsel for Appellee: John R. Rolater, Jr., Collin County District Attonrey's Office, 2100 Bloomdale Rd, McKinney, Texas 75071

5. State Habeas Counsel for Petitioner: Catherine Clare Bernhard, P.O. Box 2817, Red Oak, Texas 75154

6. State Habeas Counsel for Respondent: John Richard Rolater, Jr. and Curtis T. Howard, Collin County District Attonrey's Office, 2100 Bloomdale Rd, McKinney, Texas 75071

7. Federal Habeas Counsel for Petitioner: Carlo D'Angelo, 100 East Ferguson, Suite 1210, Tyler, Texas 75702

8. Federal Habeas Counsel for Respondent: Assistant Attorney General Fredericka Sargent, P.O. Box 12548, Capital Station Austin, Texas 78711

This certificate is presented so that this Court may evaluate possible disqualification or recusal.

/s/ Carlo D'Angelo
Carlo D'Angelo
*Attorney for Petitioner*

**REQUEST FOR EVIDENTIARY HEARING**

Petitioner in the above-styled and numbered cause requests an evidentiary hearing. Petitioner submits that an evidentiary hearing would be beneficial to the Court's understanding of the issues in this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS …………………………….……………........ii

STATEMENT REGARDING EVIDENTIARY HEARING….…………...………………iii

TABLE OF AUTHORITIES ……..……………….……………………………...…..……..vii

STATEMENT OF JURISDICTION ……..………….…………………..….…………..1

PROCEDURAL BACKGROUND …………………………………………………..……1

STATEMENT OF FACTS …………………….……………………………………………..3

STATEMENT OF AEDPA RELIEF………………………………………………………14

CLAIM ONE: Trial counsel was ineffective for failing to sufficiently investigate, develop and present significant mitigating evidence in violation Petitioner's Sixth Amendment right to counsel and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. …………..……………………………………………………………………………………..17

CLAIM TWO: By conceding guilt as to the issue of whether a robbery occurred in this case, trial counsel rendered ineffective assistance of counsel in violation Petitioner's Sixth Amendment right to counsel and the Due Process Clause of the Fourteenth Amendment to the United States Constitution ……………………………………………………………………………………..51

CLAIM THREE:  Petitioner's Due Process Rights under the Fourteenth Amendment and his Sixth Amendment Right to an impartial jury were violated when a juror committed misconduct by discussing the case with his spouse ……………………………………………...…………62

CLAIM FOUR:  A juror's improper consideration of Petitioner's failure to testify at trial violated his Fifth, Sixth and Fourteenth Amendments rights ……………………………………………72

CLAIM FIVE:  Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the Untied States Constitution by failing to challenge the admissibility of the State's gang affiliation witness ………………………………78

CLAIM SIX:  Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the Untied States Constitution by failing to challenge the sufficiency of the evidence regarding Petitioner's future dangerousness ……………………85

CLAIM SEVEN:   Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the Untied States Constitution by failing to challenge the admissibility of A.P. Merillat's testimony …………………………………………93

CLAIM EIGHT: Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth Amendment and 14th Amendments to the Untied States Constitution by failing to challenge the denial of Petitioner's Motion to Suppress his statement ……………...…98

CLAIM NINE: Petitioner's trial counsel rendered ineffective assistance of counsel contrary to the Sixth Amendment and 14th Amendments to the Untied States Constitution by failing to lodge a specific objection to the voluntariness of his *Miranda* waiver during the suppression hearing………………………………………………………………………………………105

CLAIM TEN: The refusal of the Texas courts to properly define the terms and phrases in the future dangerousness special issue was a decision contrary to, and an unreasonable application of clearly established constitutional law in that Petitioner was: 1) deemed eligible for the imposition of death as a penalty by the use of an unconstitutionally vague aggravator; and 2) Petitioner was selected for the death penalty without giving full consideration and effect to record evidence of his mitigating circumstances ………………………………………………………………...107

CLAIM ELEVN: Petitioner's appeal counsel rendered ineffective assistance of counsel contrary to the Sixth Amendment and 14th Amendments to the Untied States Constitution by failing to brief the unconstitutionality of Texas Death Penalty scheme because it is based upon vague statutory terms and does not properly channel the jury's discretion ………………………….116

CLAIM TWELVE: The Trial Court Violated the Eighth and Fourteenth Amendments to the United States Constitution by Failing to Instruct the Jury That the a "No" Vote by a Single Jury Member Would Result in a Life Sentence Instead of Death Despite the Statutory Requirement of 10 Votes for a "No" Answer to Article 37.071 § 2(b)(1) or for a "Yes" Vote to Article 37.071 § 2(e) ……………………………………………………………………………………...117

CLAIM THIRTEEN: Petitioner's appeal counsel rendered ineffective assistance of counsel contrary to the Sixth Amendment and 14th Amendments to the Untied States Constitution by failing to brief the "10-12" Texas Penalty Scheme ……………………………………………121

CLAIM FOURTEEN: The Texas Capital Punishment Scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because the mitigation special issue does not allocate a burden of proof ……………………………………………………. 122

CLAIM FIFTEEN: Petitioner's appeal counsel rendered ineffective assistance of counsel contrary to the Sixth Amendment and 14th Amendments to the Untied States Constitution by failing to brief that the Texas Death Penalty scheme does not allocate a burden of proof for mitigation special issues …………………………………………………..…………………………128

CLAIM SIXTEEN: The trial court's grossly impartial comments to the assembled jury venire praising the prosecution subjected Petitioner to cruel and unusual punishment and a deprivation of his rights to a fair trial, the presumption of innocence, and the effective assistance of counsel in violation of the 6th, 8th and 14th Amendments to the Untied States Constitution ……………129

PRAYER FOR RELIEF …………………………………………………………………135

STATEMENT OF COUNSEL ……………………………………………………135

CERTIFICATE OF SERVICE ……………………………………………………135

# TABLE OF AUTHORITIES

**Cases**

*Addington v. Texas*, 441 U.S. 418 (1979) …………………………………………………127

*Anderson v. State*, 901 S.W.2d 946 (Tex. Crim. App. 1995) …………………………………82

*Apprendi v. New Jersey,* 530 U.S. 466 (2000) ……………………………………………127

*Austin v. Bell,* 126 F.3d 843 (6th Cir. 1997) ……………………………………………..23

*Banda v. State*, 890 S.W.2d 42 (Tex. Crim. App. 1994) ………...………………………79, 94

*Baxter v. Thomas,* 45 F.3d 1501 (11th Cir. 1995) …………………………………………40

*Bean v. Calderon,* 163 F.3d 1073 (9th Cir.1998) …………………………...………………29

*Beasley v. State*, 902 S.W.2d 452 (Tex. Crim. App. 1995) ……………………………………82

*Bell v. Cone,* 535 U.S. 685 (2002) …………………………………………………………58

*Berghuis v. Thompkins,* 560 U.S. 370 (2010) …...…………………………………………102

*Blanco v. Singletary,* 943 F.2d 1477 (11th Cir. 1991) ………………………………………40

*Blake v. Kemp,* 758 F.2d 523 (11th Cir. 1985) ……………………………………………40

*Blakely v. Washington*, 542 U.S. 296 (2004) …………………………………………… 127

*Blue v. State*, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003) ……………………...…… 110

*Blue v. State* 125 S.W.3d 491 (Tex. Crim. App. 2003) ………………….……………………111

*Bollenbach v. United States*, 326 U.S. 607 (1946) ……………………………………………133

*United States v. Blumeyer,* 62 F.3d 1013 (8th Cir.1995) …………………………………………65

*Boyd v. State*, 811 S.W.2d 105, 113 (Tex. Crim. App. 1991) …………………………………110

*United States v. Bradford,* 528 F.2d 899 (9th Cir. 1975) …………………………………………55

*United States v. Bray,* 546 F.2d 851 (10th Cir. 1976) ……………………………………...133

*Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996) ………………………………………………95

*Brooks v. Dretke,* 444 F.3d 328 (5th Cir .2006) …………………………………………70, 71

*Brown v. State,* 122 S.W.3d 794 (Tex. Crim. App. 2003) …………………………………………132

*United States v. Butler,* 249 F.3d 1094 (9th Cir. 2001) ..………………………………………100

*Caldwell v. State*, 818 S.W.2d 790, 798 (Tex. Crim. App. 1991) …………………………110

*Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. App. 1997) …………………………………………129

*Carter v. Bell*, 218 F.3d 581 (6th Cir. 2000) ………………………………………………23

*Cave v. Singletary,* 971 F.2d 1513 (11th Cir. 1992) …………………………………………40

*Coleman v. Johnson*, __ U.S. _, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012) ….…..……91

*Coleman v. Mitchell,* 268 F.3d 417 (6th Cir. 2001) ………………………………………………23

*Colorado v. Connelly,* 479 U.S. 157 (1986) ………………………………………………100, 101

*United States v. Cronic*, 466 U.S. 648 (1984) ………………………………………………58

*Crutsinger v. State*, 206 S.W.3d 607 (Tex. Crim. App. 2006) …………………………………129

viii

*Cuevas v. State*, 742 S.W.2d 331 (Tex. Crim. App. 1987) …………………………………… 110

*Cunningham v. Zant,* 928 F.2d 1006 (11th Cir. 1991) ……………………………………….40

*Davis v. State,* 119 S.W.3d 359 (Tex. App.-Waco 2003, pet. ref'd) …………………………..74

*Dawson v. Delaware*, 503 U.S. 159 (1992) ………………………………………………82,84

*Dickerson v. Bagley,* 453 F.3d 690 (6th Cir. 2006) ………………………………………… 23

*Dickson v. Quarterman*, 462 F.3d 470 (5th Cir. 2006) ……………………………………...16

*Douglas v. Wainwright,* 714 F.2d 1532 (11th Cir. 1983) ……………………………………..40

*Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007) ………………………………110

*Duffy v. Foltz,* 804 F.2d 50 (6th Cir. 1986) ………………………………………………….56

*Ex parte Dunham,* 650 S.W.2d 825 (Tex. Crim. App.1983) ………………………………….106

*E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex. 1995) …………… 97

*Ellason v. State*, 815 S.W.2d 656 (Tex. Crim. App. 1991) …………………………………….109

*Estelle v. McGuire,* 502 U.S. 62 (1991) ……………………………………………………...65

*Estrada v. State*, 313 S.W.3d 274 (Tex. Crim. App. 2010) ……………………………………97

*Evitts v. Lucey*, 469 U.S. 387, 394 (1985) …………………………………………………...83

*Fare v. Michael C.,* 442 U.S. 707 (1979) ……………………………………………………104

*Felder v. State*, S.W.2d 85 (Tex. Crim. App. 1992) …………………………………………...109

*Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002) ……………………………….…………15

*Foster v. Schomig,* 223 F.3d 626 (7th Cir. 2000) …………………………………………… 56

*Florida v. Nixon,* 543 U.S. 175 (2004) ……………………………………………...57, 58

*United States v. Frady,* 456 U.S. 152 (1982) ………………………………………105

*Fuller v. State*, 829 S.W.2d 191 (Tex. Crim. App. 1992) ……………………………82

*Furman v. Georgia*, 408 U.S. 238 (1972) …………………………………………124

*Gardner v. Florida* 430 U.S. 349 (1977) …………………………………………126

*Glenn v. Tate,* 71 F.3d 1204 (6th Cir. 1995) ……………………………………… 23

*Gochicoa v. Johnson,* 238 F.3d 278 (5th Cir. 2000) ………………………………59

*Goodwin v. Johnson,* 132 F.3d 162 (5th Cir.1997) ………………………………59

*Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1998) ……………………….……… 83

*Graham v. Collins*, 506 U.S. 461 (1993) …………………………………………...126

*Ex parte Green*, 159 S.W.3d 925 (Tex. Crim. App. 2004) ……………………………..77

*Gregg v. Georgia*, 428 U.S. 153 (1976) …………………………………………125

*Hamblin v. Mitchell,* 354 F.3d 482 (6th Cir. 2003) ………………………………23

*Harries v. Bell,* 417 F.3d 631 (6th Cir. 2005) ……………………………………23

*Harris v. State,* 465 S.W.2d 175 (Tex. Crim. App.1971) …………………………… 106

*Harrington v. Richter,* 562 U.S. ____, _____, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2013) … 62

*United States v. Harrison,* 34 F.3d 886, 890 (9th Cir. 1994) …………………………101

*Hart v. State,* 15 S.W.3d 117 (Tex. App.-Texarkana 2000, pet. ref'd) ………………………… 74

*Haynes v. Cain,* 298 F.3d 375 (5th Cir. 2002) ………………………………………...58

*Hicks v. State,* 15 S.W.3d 626 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd) ................ 74

*Hines v. State,* 3 S.W.3d 618, 620-23 (Tex. App.-Texarkana 1999, pet. ref'd) ................... 74

*Hughes v. State*, 878 S.W.2d 142 (Tex. Crim. App. 1993) ..........................................109

*Hyde v. United States,* 225 U.S. 347 (1912) ................................................................76

*Irvin v. Dowd*, 366 U.S. 717, (1961) ..................................................................... 64

*Jackson v. Herring,* 42 F.3d 1350 (11th Cir. 1995) ..................................................... 40

*Jackson v. State*, 17 S.W.3d 664 (Tex. Crim. App. 2000) ......................................79, 94

*Jackson v. Virginia,* 443 U.S. 307 (1979) ...............................................................90

*United States v. Jaswal,* 47 F.3d 539 (2d Cir.1995) ..................................................102

*United States v. Jenkins,* 958 F.2d 934 (9th Cir. 1991) ..............................................101

*Johnson v. Texas*, 509 U.S. 350 (1993) ...................................................................123

*Jurek v. Texas*, 428 U.S. 262 (1976) .....................................................................108

*Kansas v. Marsh*, 548 U. S. 163 (2006) .................................................................126

*Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987) .......................................90

*United States v. Kelley,* 953 F.2d 562, 564 (9th Cir. 1992) .........................................101

*Kittelson v. Dretke,* 426 F.3d 306 (5th Cir. 2005) .....................................................93

*Lawton v. State*, 913 S.W.2d 542 (Tex. Crim. App. 1995) ......................................... 129

*Lego v. Twomey,* 404 U.S. 477 (1972) ..................................................................100

*Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003) ……………………………………………..18

*Martinez v. Ryan*, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012) …………………………51, 61, 62

*Lingar v. Bowersox,* 176 F.3d 453 (8th Cir.1999) ………………………………………..59

*Lombard v. Lynaugh*, 868 F.2d 1475, 1479 (5th Cir. 1989) …………………………………… 83

*Loyd v. Whitley*, 977 F.2d 149 (5th Cir. 1992) …………………………………………………16

*Mattox v. United States,* 146 U.S. 140 (1892) …………………………………………………76

*Mayfield v. Woodford,* 270 F.3d 915 (9th Cir.2001) …………………………………………29

*Maynard v. Cartwright*, 486 U.S. 356 (1988) …………………………………………………109

*Massey v. State* 933 S.W.2d 141 (Tex. Crim. App. 1996) …………………………………79, 94

*McCleskey v. Kemp*, 481 U.S. 279 (1987) …………………………………………………… 30

*McDonald v. Pless,* 238 U.S. 264 (1915) ………………………………………….…………76, 77

*McNeal v. Wainwright,* 722 F.2d 674 (11th Cir.1984) …………………………………………60

*McNeill v. State,* 650 S.W.2d 405 (Tex. Crim. App. 1983) …………………………………106

*Miranda v. Arizona,* 384 U.S. 436 (1966) …………………………………………………100

*Monroe v. Collins,* 951 F.2d 49 (5th Cir. 1992) …………………………………………………75

*Moore v. Johnson*, 194 F.3d 586 (5th Cir.1999) …………………………………………………16

*Moore v. State,* No. 12-01-00089-CR, 2002 WL 253818, *1-2 (Tex. App.-Tyler 2002, no pet. h.)

………………………………………………………………………………………………74

*Morales v. State*, 32 S.W.3d 862 (Tex. Crim. App. 2000) …………………………………..……95

*Moran v. Burbine*, 475 U.S. 412 (1986) …………………………………………………103

*Newbury v. State*, 135 S.W. 22, 45 (Tex. Crim. App. 2004) …………………………………110

*North Carolina v. Butler,* 441 U.S. 369 (1979) …………………………………………… 102, 103

*O'Bryan v. State,* 591 S.W.2d 464 (Tex. Cr. App. 1979) ……………………………………92

*Page v. State,* 614 S.W.2d 819 (Tex. Crim. App. 1981) …………………………………… 106

*Papalia v. United States,* 243 F.2d 437 (5th Cir. 1975) ……………………………………...132

*Parker v. Gladden,* 385 U.S. 363 (1966) …………………………………………………….76

*Parker v. Gladden,* 385 U.S. 363 (1966) …………………………………………………….64

*Penry v. Lynaugh,* 492 U.S. 302 (1989) ……………………………………………………108

*Pondexter v. Quarterman*, 537 F.3d 511 (5th Cir. 2008) ……………………………………15

*Powell v. Collins,* 332 F.3d 376v(6th Cir. 2003) ……………………………………………23

*Prieto v. Dretke,* 386 F.Supp.2d 767 (W.D. Tex.  2005) ……………………………………75

*Preyor v. Stephens*, 12-70024, 2013 WL 3830160 (5th Cir. July 25, 2013) …………………62

*Prystash v. State*, 3 S.W.3d 522 (Tex. Crim. App. 1999) …………………………………...129

*Rayford v. State*, 125 S.W.3d 521 (Tex. Crim. App. 2003) …………………………………129

*Remmer v. United States*, 347 U.S. 227 (1954)  ………………………………………70, 71

*Remmer v. United States,* 347 U.S. 227, 654 (1954) ………………………………………76

*Richardson v. Marsh*, 481 U.S. 200 (1987)  ……………………………………………...111

*Roney v. State,* 632 S.W.2d 598 (Tex. Cr. App. 1982) ……………………………………91

*Rompilla v. Beard*, 545 U.S. 374 (2005) ……………………………………………………18, 78

*Roper v. Simmons*, 543 U.S. 551 (2005) ……………………………………………………111

*Ross v. State*, 678 S.W.2d 491 (Tex. Crim. App. 1984) …………………………………106

*Russeau v. State*, 171 S.W.3d 871 (Tex. Crim. App. 2005) …………………………….....129

*Salazar v. Dretke,* 419 F.3d 384  (5th Cir. 2005) ……………………………………….....75

*Salazar v. State*, 38 S.W.3d 141 (Tex. Crim. App. 2001) ……………………………….....74

*Schneckloth v. Bustamonte,* 412 U.S. 218 (1973) ……………………………………….....101

*United States v. Scott,* 854 F.2d 697, 699 (5th Cir. 1988) ………………………………..70

*Seidel v. Merkle,* 146 F.3d 750 (9th Cir. 1998) ……………………………………………29

*Sells v. State*, 121 S.W.3d 748 (Tex. Crim. App. 2003) ………………………………….....96

*Shelton v. State*, 41 S.W.3d 208 (Tex. App. – Austin 2001, pet. ref'd) ………………….83

*United States v. Short,* 181 F.3d 620 (5th Cir. 1999) …………………………………….....59

*Starr v. United States*, 153 U.S. 614 (1894) …………………………………......…………133

*Shultz v State*, 957 S.W.2d 52 (Tex. Crim. App. 1997) …………………………………....96

*United States v. Simone,* 931 F.2d 1186 (7th Cir. 1991) …………………………………..56

*Smith v. Phillips,* 455 U.S. 209 (1982) ……………………………………………………70

*Smith v. Phillips,* 455 U.S. 209 (1982) ……………………………………………………76

*Smith v. Robbins,* 528 U.S. 259 (2000) ……………………………………………………93

*Sneed v. State,* 670 S.W.2d 262 (Tex. Crim. App. 1984) ……………………………………… 73

*Solis v. Cockrell,* 342 F.3d 392 (5th Cir. 2003) ……………………………………………...72

*Stansbury v. California,* 511 U.S. 318 (1994) ……………………………………………...101

*Strickland v. Washington,* 466 U.S. 668 (1984) …………………………………16, 18, 62, 83

*Stringer v. Black,* 503 U.S. 222 (1992) …………………………………………………109

*United States v. Swanson,* 943 F.2d 1070 (9th Cir. 1991) ………………………………….59

*Tanner v. United States,* 483 U.S. 107 (1987) ……………………………………….…..75

*Thompson v. Keohane,* 516 U.S. 99 (1995) …………………………………………...100

*Trevino v. Thaler,* 133 S. Ct. 1911 (U.S. 2013) …………………………………51, 61, 62

*Thomas v. Kemp,* 796 F.2d 1322 (11th Cir. 1986) ………………………………….....40

*Turner v. Duncan,* 158 F.3d 449 (9th Cir. 1998) ………………………………………29

*Turner v. State,* 87 S.W.3d 111, 118 (Tex. Crim. App. 2002) …………………………110

*Underwood v. Clark,* 939 F.2d 473, 474 (9th Cir. 1991) …………………………………..59

*Vela v. State,* 209 S.W.3d 128 (Tex. Crim. App. 2006) …………………………………80, 94

*Velez v. State,* AP-76,051, 2012 WL 2130890 (Tex. Crim. App. 2012) ………………………98

*United States v. Walker,* 24 F. App'x 57 (2d Cir. 2001) …………………………………56

*Wallace v. Stewart,* 184 F.3d 1112 (9th Cir. 1999) …………………………………………29

*Walton v. Arizona,* 497 U.S. 639 (1990) ………………………………………………123

*Walton v. Arizona*, 497 U.S. 639 (1990) …………………………………………………123, 126

*White v. State*, 440 S.W.2d 660 (Tex. Crim. App. 1969) …………………………………… 117

*Wiggins v. Smith*, 539 U.S. 510 (2003) …………………………………………………18, 23, 78

*Wiley v. Sowders,* 647 F.2d 642 (6th Cir. 1981) …………………………………………56

*Williams v. Taylor*, 529 U.S. 362 (2000) …………………………………………15, 20, 23

*In re Winship*, 397 U.S. 358 (1970) …………………………………………………127

*Wilson v. Butler,* 813 F.2d 664 (5th Cir. 1987) …………………………….…………56

*Wright v. Van Patten*, 552 U.S. 120 (2008) ……………………………………………58

*Zant v. Stephens*, 462 U.S. 862 (1983) …………………………………………………113

| | | |
|---|---|---|
| KOSOUL CHANTHAKOUMMANE,§ | | Case No: 4:13CV67-LED |
| Petitioner, | | The Honorable Leonard E. Davis |
| | § | |
| v. | | |
| | § | Death Penalty Case |
| | § | |
| BRAD LIVINGSTON, | | |
| Director, Texas Department of | § | |
| Criminal Justice, | | |
| Institutional Division, | § | |
| | | |
| Respondent. | § | |

_____ /

## PETITION FOR HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

COMES NOW, Petitioner, KOSOUL CHANTHAKOUMMANE, by and

through the undersigned attorney, and files the above-styled Petition for Habeas Corpus

pursuant to 28 U.S.C. § 2254.

## STATEMENT OF JURISDICTION

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and amendments

five (due process clause), eight (cruel and unusual punishment clause), and fourteen (due

process and equal protection clauses), of the United States Constitution, and section nine,

clause two of the United States Constitution (habeas corpus).

## PROCEDURAL BACKGROUND

On September 21, 2006, a Collin County Grand Jury indicted Petitioner for the

offense of Capital Murder under Texas Penal Code § 19.03(a)(2) (I CR 212). Petitioner

was thereafter re-indicted on August 21, 2007 (I CR 7).  The original indictment alleged

that on or about July 8, 2006, while in the course of committing or attempting to commit the offense of robbery of the deceased, Petitioner intentionally and knowingly caused the death of Sarah Walker by "stabbing and cutting deceased with a knife, a deadly weapon" (I CR 212). The subsequent indictment added that Petitioner caused the death of Sarah Walker "by stabbing and cutting deceased with an object, a deadly weapon, whose exact nature and identity is unknown to the grand jurors, and by striking deceased with a plant stand, a deadly weapon" (I CR 7).

After a jury was selected and empanelled, Petitioner was tried before the 380th District Court, Collin County, Texas (I CR 142). On October 2007, the jury returned a unanimous verdict of guilt as to the indictment (I CR 161-64). On October 17, 2007, the jury returned a unanimous verdict answering Special Issue Number One "Yes", Special Issue Number Two "No" (I CR 155-56). The trial court thereafter adopted the jury's findings and adjudged Petitioner guilty of capital murder and assessed punishment by penalty of death (I CR 161-64).

Petitioner's appellate counsel, C. Wayne Huff, filed a brief with the Texas Court of Criminal Appeals on April 22, 2009 (PRE 1). Petitioner's state habeas counsel, Catherine Bernhard, filed an 11.071 Writ of Habeas Corpus on April 1, 2010 (PRE 2). *See Ex Parte Kosoul Chanthakoummane*, Texas Court of Criminal Appeals No. WR-78107. On April 28, 2010, the Texas Court of Criminal Appeals affirmed the trial court's judgment as it related to Petitioner's conviction, judgment and sentence. *See Chanthakoummane v. State*, 2010 WL 1696789 (Tex. Crim. App. 2010). On September 20, 2012, the trial court issued findings of fact and conclusions of law recommend denial of Petitioner's State habeas claims (PRE 3). On January 30, 2013, the Texas Court of Criminal Appeals ("CCR") adopted the trial court's findings and conclusions of law and

denied Petitioner's request for habeas relief. *See Ex Parte Kosoul Chanthakoummane*, 2013 WL 363124 (Tex. Crim. App. 2013).

STATEMENT OF FACTS

On the morning of July 8, 2006, Randy Tate, the ex-husband of Sarah Walker, went to Sarah's residence to pick up their son Joshua (XXI RR at 31-36). While there, Sarah showed Randy a brand new Rolex watch that she had just purchased the day prior (XXI RR at 39). Sarah was a licensed realtor at the time. Later that afternoon, Randy was notified that something terrible had happened to Sarah (XXI RR at 42). Randy immediately went to the model home where he knew Sarah was working (XXI RR at 43). There, Randy learned that Sarah had been murdered (XXI RR at 44).

Sarah's cousin, Jessica Allen, testified that she and Sarah had been talking on the phone around 12:30 PM on the afternoon of July 8, 2006 (TK). Sarah ended their phone call when she told Jessica someone had just walked in to the model home where she was working (XXI RR at 52). Jessica told the jury about finding an empty Rolex box and receipt in Sarah's house after the murder (XXI RR at 56). Jessica also described some of ornate rings that Sarah wore, known as Yurman rings (XXI RR at 55).

Andy Lilliston, a manager in the information technology department at FedEx, testified that he and his wife were out looking at model homes on the morning of July 8, 2006 (XXI RR at 57). At about 1:20 PM, he and his wife discovered the lifeless body of Sarah Walker in the kitchen of a model home (XXI RR at 62). They immediately called 911 (XXI RR at 62).

Mamie Sharpless, a realtor with Keller Williams (XXI RR at 87) told the jury that she and her husband, Nelson Villavicencio, were near the scene where Sarah had been murdered on July 8, 2006 (XXI RR at 102). She received a call from a man who

3

identified himself as Chan Lee who told her he wanted to look at a home that was for sale (XXI RR at 89). Although, the call dropped before they could arrange a time to meet, Sharpless and her husband went to the home, in the hope of finding Chan Lee (XXI RR at 95). While parked on the street, Sharpless and her husband observed an Asian male in a white Mustang. They asked him if he was Chan Lee and the Asian male responded "no" (XXI RR at 99-100). In the courtroom, Sharpless identified Kosoul as the Asian male she saw that morning (XXI RR at 102).

Nelson Villavicencio next testified that he accompanied Sharpless to meet with Chan Lee on the morning of July 8, 2006 (XXI RR at 110). He too relayed the encounter with the Asian man who denied being Chan Lee (XXI RR at 113). The next day, after learning of Sarah's murder, Nelson and his wife contacted the police (XXI RR at 120). Texas Ranger Richard Shing testified outside of the jury's presence, that he hypnotized Sharpless and Villavicencio (XXI RR at 66-70). While under hypnosis, Sharpless and Villavicencio described the suspect they saw on the morning of July 8, 2006. Officer Shing was trained in hypnotic procedures and claimed that he followed all of the proper procedures and safeguards in this case (XXI RR at 68-69). Nelson later met with a sketch artist who produced a drawing of the Asian man (XXI RR at 120). Nelson explained that the sketch was made <u>after</u> he was hypnotized by Shing (XXI RR at 121). At trial, Nelson also identified Kosoul as the Asian man he saw that morning (XXI RR at 123).

Texas Ranger Allen Davidson testified that when he arrived at the crime scene he observed a great deal of blood around the victim and evidence of a struggle (XXI RR at 138-140). Although the nature of Sarah's injuries suggested numerous stab wounds, no

weapon was found at the crime scene (XXI RR at 153). At the time investigators examined her body, Sarah's new Rolex watch was not on her wrist (XXI RR at 156). Later that evening, Ranger Davidson searched Sarah's home and found an empty Rolex box (XXI RR at 159). Ranger Davidson's investigation revealed that Sarah Walker had visited a bank on the morning of July 8, 2006 (XXI R. R. at 170). Surveillance video obtained from the bank confirmed that at 11:45 AM on July 8, 2006, Sarah Walker was wearing a watch and a ring (XXI RR at 171-72).

A comparison of the biological materials collected from the crime scene against the national offender DNA database revealed a possible match for a suspect, Kosoul Chanthakoummane (XXI RR at 182). Investigators thereafter learned that Kosoul drove a white Mustang (XXI RR at 183). Investigators obtained and warrant and arrested Kosoul at his home. (XXI RR at 192).

Officer Joe Ellenburg testified that he was involved in the arrest of Kosoul. (XXII RR at 63). He transported Kosoul to the McKinney Police Department. Officer Ellenburg was instructed not to tell Kosoul anything about why he had been arrested. (XXII RR at 65). When they arrived at the McKinney Police Department, Officer Ellenburg read Kosoul his *Miranda* warnings. (XXII RR at 68). Kosoul said he understood his rights. (XXII RR at 68).

McKinney Officer Randall Norton and Sergeant Riley conducted a post-arrest an interview of Kosoul (XXII RR at 76). Officer Norton testified that his strategy during the interrogation was to get "a series of … base hits rather than trying to go in and hit a home run" (XXII RR at 82). As a consequence, Officer Norton never directly asked Kosoul if he killed Sarah Walker (XXII RR at 83). At first, Kosoul told Officer Norton

that the only time he had ever been to McKinney was when he made work related deliveries (XXII RR at 85). In response, Officer Norton told Kosoul that his personal vehicle, the White Mustang, was spotted by witnesses in McKinney (XXII RR at 86). Confronted with this fact, Kosoul eventually admitted that his car broke down in front of a model home; the model home where Sarah was murdered. *Id.* He admitted entering the model home to try and use a phone to call for assistance (XXII RR at 88). Kosoul also told Officer Norton after he entered the home he went as far as the kitchen to get a drink of water from the sink. *Id.* Kosoul said that he then left the home because the faucet did not work. *Id.* Kosoul stated that he did not see anyone else in the home and that nothing was out of place (XXII RR at 88-89). When confronted by investigators about wounds on his hands, Kosoul told Norton that he cut his hand on the job and might have bled a little on the sink when he tried the faucet (XXII RRR. at 89-90). Finally, Kosoul stated that after he exited the model home, a couple stopped him and asked if he was Chan Lee (XXII RR at 90).

Dr. William Rohr's autopsy of Sarah Walker revealed several blunt force injuries to her head and 33 stab wounds (XXII RR at 215). He testified that at least ten of these stab wounds were "immediately fatal" (XXII RR at 222). Dr. Rohr also noted what appeared to be a bite mark on Sarah's neck (XXII RR at 225).

After Kosoul's arrest, Untied States Secret Service Agent Jeff Shaver conducted a forensic analysis of his cell phone and discovered a photograph depicting him holding his mouth up to a small dog as if to bite the dog (XXI RR at 246, State's EX. 75). Forensic dentist Dr. Bret Hutson examined the bite mark on Sarah's neck (XXII RR at 239) and later conducted a forensic dental exam on Kosoul's mouth (XXII RR at 247). Dr.

Hutson concluded "within reasonable dental certainty beyond a doubt" that Kosoul was the source of the bite mark on Sarah's neck (XXII RR at 259).

Dr. Stacy McDonald testified that she conducted DNA analysis on numerous items of evidence collected in this case (XXII RR at 264). She found DNA profiles consistent with Kosoul's on numerous items (XXII RR at 273-279). The statistical strength of these "matches" ranged from one in 280,000 to one in 635 trillion (XXII RR at 280-284).

At trial, defense counsel conducted little if any cross-examination of most of the State's witnesses during the guilt-innocence phase (XXI RR at 45, 56, 65, 109, 123, 201, 236, XXII RR at 73, 234, 261, 285). The defense rested without calling any witnesses (XXII RR at 285). The jury found Kosoul guilty as charged in the indictment.

At the punishment phase, the State called North Carolina Detective Susan Sarvis who testified that back in October 1995 she investigated an assault involving Kosoul at Eastway Middle School (XXIV RR at 23). A boy by the name of Shawn Bank was assaulted in some woods near the school by a group of juveniles. *Id.* He sustained a fractured arm and various other injuries (XXIV RR at 26). Detective Sarvis testified that Kosoul admitted to being part of the group that had assaulted Shawn (XXIV RR at 30).

Detective Robert Rollins testified at trial to an incident involving Kosoul in North Carolina back in July 1997. Detective Rollins told the jury hat he initially was called out to investigate a stolen vehicle in which two boys and a girl ran were seen running away from the car (XXIV RR at 47). The girl quickly stopped running and came back to talk to the police (XXIV RR at 48). Several hours later, Det. Rollins responded to the scene of a burglary. *Id.* Two elderly women reported that they returned home, only to find two

boys in their home. The boys robbed the women at gunpoint, and left them tied up, as the two boys escaped in the women's vehicle (XXIV RR at 51-53). One of the boys was later identified as Kosoul (XXIV RR at 57).

Lawrence Smith testified that when he was about 15 or 16 years old, he knew Kosoul and described him as having a reputation as a "bad kid" (XXIV RR at 80). Back in 1995, while Lawrence was out riding his bicycle, Kosoul approached him, punched him in the face, and took his bike (XXIV RR at 81-82). Smith suffered six fractured ribs and a concussion as a result of that incident (XXIV RR at 83).

Paul Brian Conner testified that he had been Kosoul's juvenile probation officer or "court counselor" back in North Carolina (XXIV RR at 115). As part of his job, he would make a recommendation to the court about the sentence a juvenile should receive (XXIV RR at 116). Kosoul was instructed by Conner to stay away from certain street gangs due to information that associated with these gangs (XXIV RR at 125). Conner also testified that Kosoul was disrespectful to his parents (XXIV RR at 130). Conner ultimately recommended that Kosoul's probation be revoked and recommended he be sent to a "training school" (XXIV RR at 133). Conner testifed that after he sent Kosoul to the training school a received a letter littered with gang symbols (XXIV RR at 138).

Barbara Johnson was a realtor who in May of 2006 worked with Petitioner to help him find an apartment in Texas (XXIV RR at 179). On July 7, 2006, Kosoul knocked on Johnson's door and told her his car had broken down and that he needed to use her phone (XXIV RR at 183). Johnson did not recognize him as a client at that time (XXIV RR at 183), but let him use her phone and gave him a drink of water (XXIV RR at 185). When he Petitioner would not leave, Johnson became frightened and called the police

(XXIV RR at 187). Officers responded and helped Kosoul get his car started (XXIV RR at 188). Petitioner left without any incident being reported.

Petitioner's Texas parole officer, Tedrick Gardner, testified that on the morning of July 8, 2006 he conducted a home visit at Kosoul's apartment (XXIV RR at 196-97). He noticed nothing unusual about Kosoul's appearance or demeanor (XXIV RR at 199). He further testified that on the day of the murder, July 10, 2008, Petitioner did not report to the parole office (XXIV RR 217).

That concluded the State's punishment case-in-chief.

The defense called the director of Restoration House Ministries, Domingus Duarte (XXV RR at 7). During the late 1990s, Mr. Duarte counseled Kosoul after he had been released from the Union County Jail in North Carolina (XXV RR at 10). At the time, Kosoul reported he was having problems with his family who would not come to visit him in jail (XXV RR at 10). Duarte also recalled that Kosoul had an extraordinary talent for drawing and that he still had some of the artwork (XXV RR at 20). Finally Duarte testified that Kosoul Chanthakoummane he knew was not a violent person but was instead very meek and humble (XXV RR at 20-21).

North Caroline Prisons Assistant Superintendent Lawrence Parsons testified that while he previously supervised Kosoul while he was serving a sentence in a minimum custody prison (XXVI RR at 22). Parsons remembered Kosoul as being sort of a loner (XXVI RR at 24) and that he never had any disciplinary issues (XXVI RR at 25). On cross-examination, Parsons acknowledged that Kosoul at the time he supervised him nearing the end of his sentence and that any disciplinary problems might have delayed his

eligibility for parole (XXVI RR at 29). Parsons also agreed generally that inmates sometimes commit violent acts while in prison (XXVI RR at 31).

North Carolina Corrections Officer Michael Pitman testified he remembered Kosoul as being "an excellent inmate" and that he was "always respectful to staff, obeyed their orders, never gave any problems" (XXVI RR at 52). Pitman never considered Kosoul to be dangerous throughout the time he worked with him (XXVI RR at 54). North Carolina Corrections Officer Bruce Chabot also recalled that Kosoul was not a dangerous inmate or someone who caused problems (XXVI RR at 59).

The defense also called a former North Carolina inmate, Tony Shank, who had served prison time with Kosoul (XXVI RR at 63). He remembered Kosoul as being a very "low key" inmate who never caused any trouble (XXVI RR at 73). Mr. Shank participated in a work release program with Kosoul and recalled that good conduct was required of the inmates in the program or they would lose their job (XXVI RR at 74).

North Carolina Corrections Officer Kevin Tuttle testified that Kosoul was never a problem inmate (XXVI RR at 89) and the he never knew him to disobey orders, cause fights, or try to escape.(XXVI RR at 93). Another North Carolina Correctional Officer, Jessie McDonald, also dealt with Kosoul and never knew him to be a problem of any kind (XXVI RR at 95).

The defense also called a forensic clinical psychologist who specialized in inmate classifications and risk assessment, Dr. Brad Fisher who testified that although violence occurs in prisons, extreme violence is very rare (XXVI RR at 116-124). Dr. Fisher added that the best predictor of future behavior was past behavior (XXVI RR at 127). In support of his expert findings, Dr. Fisher testified that reviewed Kosoul's incarceration

records (XXVI RR at 133). He noted that Kosoul had been incarcerated for most of his life, starting at age 15. *Id.* He added that during these periods of incarceration, Kosoul did have a few disciplinary infractions, but that was typical of most all inmates. *Id.* Dr. Fisher recalled that in one of these incidents, Kosoul was found with a (XXVI RR 142). A In another incident, Kosoul turned in a shank to a prison guard (XXVI RR at 136). Dr. Fisher was also aware of an incident where Kosoul had been released on a furlough to his parents and did not return to the prison (XXVI RR at 150). There was also another incident where Kosoul had been allowed to attend a festival with other inmates, but did not return at the appointed time (XXVI RR at 152). Dr. Davis testified that Kosoul had been placed in disciplinary segregation four times, and in administrative segregation two times while he was incarcerated in North Carolina (XXVI RR at 153-54).

In Dr. Fisher's opinion, Kosoul did not have any infractions on his prison record that indicated violent behavior (XXVI RR at 140). Dr. Fisher added that there was little probability that Kosoul would commit criminal acts of violence while incarcerated for a term of life imprisonment that would constitute a continuing threat to society (XXVI RR at 142). On the contrary, Dr. Fisher acknowledged that if Kosoul were not in prison, he would constitute a threat to society (XXVI RR at 147).

On cross-examination, Dr. Fisher agreed that Kosoul also fit the criteria for a diagnosis of anti-social personality disorder (XXVI RR at 170). Dr. Fisher also conceded that the classification system that he helped design had been in effect in Texas when the "Texas Seven" escaped from prison (XXVI RR at 154). Dr. Fisher added, however, that Texas classification system was revised after the Texas Seven escape. *Id.* The system now has five levels – G1 through G5 with the lowest being G1 was the minimum custody level

(XXVI RR at 156). Dr. Fisher could not say what Kosoul's level of classification would be if he were sentenced to life without parole (XXVI RR at 157). Dr. Fisher was also aware of a recent escape by two Texas inmates who were serving lengthy sentences and that this attempted escape resulted in the death of a prison guard (XXVI RR at 159-60).

Phyllis Kornfeld was a prison art expert who had published on the subject of offender art and had also taught art in numerous prisons (XXVI RR at 195-97). She believed that art in prison was a positive thing for everyone involved because it was a way for inmates to relate to each other that was "non-threatening and peaceful" (XXVI RR at 205). Kornfeld added that she reviewed some of Kosoul's artwork, thought that it was a positive thing for him to do others and that others would enjoy it (XXVI RR at 209-211).

Pamela Allen testified that she was Kosoul's case manager when he was in prison in North Carolina (XXVII RR at 11). She remembered Kosoul as being "very quiet, very polite" (XXVII RR at 12). Kosoul first worked in the prison as a dishwasher and then later as a janitor for the superintendent (XXVII RR at 13). Eventually, Kosoul was awarded a work release job outside of the prison at CMH Flooring. *Id.* Allen testified that she met with Kosoul once a week while he was in the work release program (XXVII RR at 15). She recalled that Kosoul always got "raving reviews" from his supervisor on the job (XXVII RR at 16) and that he was "an exemplary inmate" (XXVII RR at 17).

In rebuttal, the State called an investigator with the Texas prison's special prosecution unit, A.P. Merillat (XXVII RR at 61). Merillat explained that when an inmate first arrives in prison, he goes through a diagnostic process to determine his ultimate placement (XXVII RR at 67). Merillat added that because this decision is made by prison officials, no outside person or agency can tell the prison where an inmate is to

be placed (XXVII RR at 71). During this diagnostic process, the inmate is classified. The L or Line designation determines an inmate's good time accumulation. L-1 is the best because it earns the most time-credits (XXVII RR at 69). Merillat added that an inmate serving life without parole is not eligible for an L designation (XXVII RR at 70). The G designation determines an inmates custody status. Merillat ranked G-1 as the least restrictive G-5 as the most restrictive. Merillat testified that an inmate with a life without parole sentence would enter prison with a G-3 designation (XXVII RR at 71). An inmate with a G-3 classification was entitled to live in general population, work and go to school (XXVII RR at 72). A G-3 inmate, however, cannot go outside the prison (XXVII RR at 94).

Merillat further testified that inmates convicted of capital murder are not automatically placed in administrative segregation, otherwise known as solitary confinement (XXVII RR at 76). He added that although some offenders are permanently placed in administrative segregation due to gang membership, other inmates placed in administrative segregation receive a status review every six months or so (XXVII RR at 77). Merillat testified that even inmates in administrative segregation have an opportunity to commit acts of violence and that there have been many violent offenses committed in prison. Finally he added some of these violent acts have been committed by death row inmates (XXVII RR at 79).

Jackie Mull testified that she was Sarah Walker's sister (XXVII RR at 112). She testified that Sarah had been a good mother to her son, Josh, and a good sister to Jackie (XXVII RR at 114-115). Mull added that Sarah's death had been very hard on the her entire family (XXVII RR at 117). Randy Tate's mother, Dawn Tate, cared for Sarah

Walkers son Josh (XXVII RR at 118). She testified that Josh was having a hard time dealing with his mother's murder (XXVII RR at 120).

The defense then presented the testimony of a Texas prison clinical psychologist ,Dr. Walter Quijano, who testified that a person convicted of capital murder and sentenced to life without parole would be in what was called "close custody" (XXVII RR at 137). He added that although there was still violence in Texas prisons, the current classification system has significantly reduced it (XXVII RR at 141). On cross-examination, Dr. Quijano explained the concept of "incremental aggravation in the seriousness of offenses." He acknowledged that Kosoul's criminal history demonstrated progressively more violent offenses and that younger male offenders were more violent than older inmats and females (XXVII RR at 146). He agreed that Kosoul met the criteria for anti-social personality disorder based on his criminal history (XXVII RR at 149) and that an offender who targets a random victim more dangerous (XXVII RR at 150). He added that an offender who shows no remorse and does not surrender immediately is also more dangerous (XXVII RR at 153).

The jury answered the special issues in such a manner that Kosoul Chanthakoummane was sentenced to death.

RELIEF UNDER THE ANTITERRORISM AND
EFFECTIVE DEATH PENALTY ACT; 28 U.S.C. §2254

This Court's review of a habeas petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. §§ 2241, *et seq.* Under the AEDPA, a federal court may grant a habeas petition on a claim that was adjudicated on the merits in a state court proceedings only if the state court's decision was "contrary to or involved an

unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A federal court may also grant habeas petition on the adjudication of a claim that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(2); *Pondexter v. Quarterman*, 537 F.3d 511, 519 (5th Cir. 2008).

The phrases "contrary to" and "unreasonable application of" federal law created two different categories in which a prisoner can obtain federal habeas relief on claims adjudicated on the merits in state court. *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002), citing *Williams v. Taylor*, 529 U.S. 362, 391 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is "contrary to clearly established Federal law" if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's decisions or the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Id.* A state court's decision is "an unreasonable application of clearly established Federal law" if the state court correctly identifies the governing law but applies it unreasonably to the facts of the Petitioner's case. *Id.* The inquiry into unreasonableness is an objective one and the application of clearly established Federal law must be incorrect and unreasonable to warrant federal habeas relief. *Id.*

To establish federal habeas relief on the ground that the state court's decision was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," a Petitioner must rebut by clear and convincing evidence the factual determinations by the state court even though the state court's finding are

presumptively correct and given deference by the federal court. *Dickson v. Quarterman*, 462 F.3d 470, 476-477 (5th Cir. 2006).

Most all of Petitioner's state habeas claims complain of his state trial and appeal counsel rendering ineffective assistance of counsel as guaranteed by the Sixth Amendment. Thus, "clearly established federal law" for most all of Petitioner's claims in the instant federal writ will concern the state court's decision contrary to or an unreasonable application of his right to effective assistance of counsel pursuant to the Sixth Amendment. *See Williams v. Taylor*, 529 U.S. 362, 391 (2000) (holding that the standard governing claims of ineffective assistance of counsel established in *Strickland v. Washington* qualifies as clearly established Federal law, as determined by the Supreme Court of the United States for the purpose of federal habeas review under 28 U.S.C. §2254(d)).

For Petitioner to establish a violation of his Sixth Amendment right to effective assistance of counsel, he must show (1) that his counsel's performance fell below an objective standard of reasonableness and (2) there was a reasonable probability that but for his counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 692-694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Courts are "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir.1999); *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992) (noting that "whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny" and that this "crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this

court").

**(1)** **GROUND FOR REVIEW ONE:** Trial counsel was ineffective for failing to sufficiently investigate, develop and present significant mitigating evidence in violation Petitioner's Sixth Amendment right to counsel and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**A.** **This Issue was Properly Preserved for Review and Exhausted in the State Courts.**

This issue was properly preserved for federal review. Petitioner raised the violation of federal constitutional rights in his State habeas writ (PRE 2 at 18). The trial court signed Findings of Fact and Conclusions of Law ("F&Cs") denying relief as to this claim PRE 3 at ¶66-73). The Texas Court of Criminal Appeals ("CCA") agreed with the trial court's findings.

Kosoul's trial counsel did hire a mitigation specialist in this case, however, the investigation conducted by that specialist was not much more than a collection of juvenile delinquency and adult prison records (PRE 2 at 18). Although the mitigation specialist contacted some of Petitioner's family, the interviews were too brief and cursory to produce any meaningful mitigation evidence. As a consequence of these deficient investigative efforts, not a single member of Kosoul's family testified at his trial. This is despite the fact that they were available and willing to testify. Regrettably, defense counsel declined to call them.

As a consequence of defense counsels' deficient performance, the jury was not presented with any information about Kosoul's childhood prior to his descent into criminality. And what came before was significant and compelling. Kosoul was the product of a family that had been ravaged by war and associated trauma. The failure of his attorneys to explore and present: 1) North Carolina Department of Social Services records documenting Kosoul's dysfunctional family life and history of abuse; 2) school

records establishing his hearing impairment and the impact it had upon his childhood development; 3) the cultural impact his Laotian immigration story had upon his upbringing; and 4) the failure of counsel to call any of his family members during his punishment trial violated Kosoul's Sixth Amendment right to effective assistance of counsel. *See* U.S. Const. amend. VI, VIII, XIV; *Strickland v. Washington*, 466 U.S. 668 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003) (holding that the decision of counsel not to expand their investigation of petitioner's life history for mitigating evidence beyond presentence investigation (PSI) report and department of social services records fell short of prevailing professional standards, and prejudiced petitioner); *Rompilla v. Beard*, 545 U.S. 374 (2005) (holding defense counsel was ineffective in failing at sentencing phase of capital murder trial to examine mitigating evidence including statement by corrections counselor outlining defendant's upbringing in a slum environment, disclosing test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling); and *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003) (holding that counsel's performance in failing to adduce evidence of petitioner's abusive childhood at penalty phase was deficient and prejudicial).

The trial court summarily dismissed Kosoul's IAC mitigation claim finding that trial counsel "put forth a compelling picture to the jury that presented the best possible interpretation of Petitioner's violence-riddled past" (PRE 3 at 7). The trial court ruled that the Laos immigration facts discussed supra were investigated by counsel and determined to not be relevant to Petitioner's mitigation case. *Id.* The trial court also concluded that counsel's deficiency in failing to raise these issues was justified as a "strategic decision" because it would not have been mitigating and could have been

aggravating. *Id.* at 9. The trial court was equally dismissive of the issue of Kosoul's childhood hearing impairment finding that "the results of the proceedings would not have been different had counsel presented this evidence … [because of its] minimal mitigating value to the jury." *Id.* at 10.

As for counsel's incompetence in failing to find, develop and utilize Kosoul's DSS records, the trial court concluded that trial counsel's version of the events credible and that DSS records custodian Freeburn's affidavit was incredible. *Id.* at 12 (noting that Freeburn's affidavit was deemed "not credible to the extent [it] conflict[ed] with Miears' and Gore's affidavits" due to the court's finding that trial counsel's "version of the events is consistent with the other evidence before the court of counsel's extensive investigations of the case"). The trial court reasoned that it was "diligent and in keeping with local standards of appropriate investigation" for defense counsel to stop looking for available DSS records under the last name "Chanthakoummane" after finding none under the first name "Kosoul" *Id.* The court found this lapse by counsel reasonable ruling that "no further investigation into possible childhood abuse was necessary." *Id.*

Finally, the trial court concluded that counsel was not deficient in failing to call any of Kosoul's family members during the mitigation phase because of the "potential harm" that would come from that testimony. *Id.* at 13. The court was especially concerned about testimony regarding "Petitioner's criminal activities from a very young age, even before his involvement in the juvenile justice system, and that his association with gangs would significantly undermine counsel's strategy of attacking the future dangerousness special issue." *Id.* The trial court also found that the testimony of Petitioner's own family—most especially his mother that "he deserved the death penalty would be highly prejudicial." *Id.*

**A.    The trial court's findings and conclusions are both an unreasonable determination of the facts in light of the evidence presented in the State court proceedings and an unreasonable application of clearly established federal law. Trial Counsel's Failure to Discover DSS Records fell below the *Strickland* standard**

Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 *et. seq.* (hereinafter AEDPA), provides, in pertinent part that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d)

In the present case, Kosoul had a Constitutionally protected right to present mitigating evidence that his trial counsel either failed to discover or failed to offer. The trial court's findings as to this issue are unreasonable in as much as it failed to evaluate the totality of, and accord appropriate weight to, the available mitigation evidence. Counsels' failure to discover and present this and other significant mitigating evidence was below the range expected of reasonable, professional competent assistance of counsel. Counsels' performance thus "did not measure up to the standard required under the holding of *Strickland.* As noted by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 389, 120 S. Ct. 1495, 1511, 146 L. Ed. 2d 389 (2000):

> [t]he statute directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after

carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody-or, as in this case, his sentence of death-violates the Constitution, that independent judgment should prevail.

In addition to falling below professional standards, counsels' ineffective mitigation work invites a "reasonable probability" that at least one juror would have been moved to spare Petitioner's life had he heard the mitigation evidence developed by State habeas counsel. Both of the alternate jurors in this case were asked what effect this mitigating evidence might have had on the jury and both said it might have made a difference in answering the second special issue (PRE 2 at 51). The failure of trial counsel to discover and present this mitigating evidence deprived Petitioner of his Sixth Amendment right to the effective assistance of counsel.

### C. It was unreasonable for the State court to conclude that trial counsel's performance in this case satisfied the *Strickland* test

As stated supra, to demonstrate a *Strickland* violation Petitioner must prove: 1) that counsel's representation fell below professional norms; and 2) there is a reasonable probability that but for counsel's deficiency, the result of the trial would have been different. Counsel's mitigation work in this case fell well below the A.B.A. Guidelines discussed above. Counsel had an ethical obligation to thoroughly investigate:

> **Family and social history (including physical, sexual, or emotional abuse**; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; **poverty, familial instability**, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one, or a natural disaster; **experiences of racism or other social or ethnic bias**; cultural or religious influences; **failures of government or social intervention** (e.g., failure to intervene or p rovide necessary services, placement in poor quality foster care or juvenile detention facilities).

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases Guideline 10.7(2) (2003) (emphasis added).

**D. Trial Counsel's Failure to Discover DSS Records fell below the *Strickland* standard**

If trial counsel had bothered to pull DSS records under the last name "Chanthakoummane" as opposed to simply stopping their inquiry at the first name "Kosoul", they would have discovered a wealth of mitigation information. Instead of acknowledging this lapse, trial counsel passes blame on the DSS for failing to suggest that they should dig deeper under the last name "Chanthakoummane". Given what a unique last name this is, any records discovered under "Chanthakoummane" would have surely been linked to Petitioner and his family. As noted by State habeas counsel's mitigation investigator, these records were easily located upon request and contained an abundance of favorable mitigation evidence. (PRE 2 at 42-47).

According to Freeburn's Affidavit, she told defense counsel that there were no records under Kosoul's name, but that there were **"several records with the last name of Chanthakoummane and that Mr. Chanthakoummane's record could also be listed under a parent name."** (PRE 2 at 33). The letter sent to defense counsel by Freeburn simply confirms that she found no records under the name "Kosoul Chanthakoummane". *Id.* This letter makes no mention of any request by counsel to search for records under the last name "Chanthakoummane". Miears also received a letter from Youth and Family Services Division employee, Brenda McCray, who advised that no records existed for the "above mentioned claimant [Kosoul Chanthakoummane]". (PRE 4). This letter also makes no mention of any request to search for records under the last name "Chanthakoummane".

Miears maintains in his affidavit that since both Freeburn and McCray assured him that no records existed under the name "Kosoul Chanthakoummane", "there was no

further need to explore this particular area for mitigation evidence" (PRE 4 at 21). Counsel was "shocked" to learn of the records "somehow uncovered" by State habeas counsel and claims these records were withheld from him by DSS. *Id.* at 21-22. Counsel claims he asked DSS to search under all possible names and different spellings of the "first and last name". *Id.* at 22. Counsel thereby acknowledges that he did not ask DSS to search for records under just the last name "Chanthakoummane". It is frankly inexcusable for counsel to blame DSS for his failure to thoroughly and competently instigate the existence of these records. *See Wiggins*, 539 U.S. at 527-28 (noting that "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentence strategy impossible").[1]

---

[1] *See also Williams v. Taylor,* 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (finding counsel's performance deficient where counsel failed to investigate or otherwise prepare for mitigation until a week before trial and failed to "conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood"); *Harries v. Bell,* 417 F.3d 631, 638 (6th Cir. 2005) (finding that counsel failed to conduct an adequate investigation where counsel limited their investigation to contacting by telephone the petitioner's mother and brother, sent requests for information to some institutions in which the petitioner had been confined, interviewed only four witnesses-the petitioner, his co-defendant, and two state witnesses, and declined to seek the assistance of a mental health expert or to conduct a thorough investigation into the petitioner's history of mental health or family background); *Hamblin v. Mitchell,* 354 F.3d 482, 488 (6th Cir. 2003) (adopting the 1989 and 2003 standard for attorneys representing death penalty prisoners in 1982 and holding that counsel's failure to adhere to those guidelines constituted ineffective assistance of counsel; finding that had counsel investigated the case, counsel would have found a large body of mitigating evidence including fact that the petitioner grew up in a poor and unstable environment and likely suffered from a mental disability or disorder); *Powell v. Collins,* 332 F.3d 376, 399 (6th Cir. 2003) (holding that trial counsel's failure to construct the defendant's social history through access to background records and interviews with family and friends constituted deficient performance); *Coleman v. Mitchell,* 268 F.3d 417, 452 (6th Cir. 2001) (holding that trial counsel were ineffective for failing to investigate and present the petitioner's highly traumatic childhood, two head injuries, psychological history showing a borderline retarded range IQ and mixed personality disorder); *Carter v. Bell,* 218 F.3d 581, 597, 599 (6th Cir. 2000) (finding deficient performance because counsel failed to investigate and present at mitigation evidence of the defendant's illegitimacy, family history, limited education, low IQ, mental condition and positive relationships with children); *Austin v. Bell,* 126 F.3d 843, 849 (6th Cir. 1997) (holding that counsel's failure to investigate and present mitigation "because he didn't think it would do any good" rendered death sentence unreliable); *Glenn v. Tate,* 71 F.3d 1204, 1208-11 (6th Cir. 1995) (holding that counsel's investigation was deficient where the attorneys presented some, but failed to uncover more convincing mitigating evidence, including evidence of the petitioner's mental retardation, his neurological impairment, and his need for attention and susceptibility to the influence of his brother). Counsel's failure to investigate is not excused by the fact that Poindexter could have provided much of this information. *Cf. Hamblin,* 354 F.3d at 492 (noting that "ABA and judicial standards do not permit the courts to excuse counsel's failure to investigate or prepare because the defendant so requested"; and cases cited therein). *See also Dickerson v. Bagley,* 453 F.3d 690 (6th Cir. 2006).

The DSS records obtained by Kosoul's State habeas team revealed a wealth of mitigation evidence. Through no effort at all, State habeas mitigation investigators learned that when Kosoul was in fifth grade, his thirteen year old sister, Sopha began running away from home (PER 2 at 42). On June 15, 1992, Sopha was picked up by the police in Cherokee County, South Carolina. *Id.* Sopha gave the police and DSS a fake name and told them that she didn't know where her parents were. *Id.* They had supposedly gone to California, but Sopha did not know where, or if they would return. Sopha told the police that her parents would "pull her hair, kick her, slap her, and on one occasion tried to suffocate her with the covers." *Id.* at 43. DSS investigated and found her complaints "unsubstantiated". *Id.* DSS workers spoke to Sopha's parents. Komonh denied abusing Sopha, stating the "[he knew] about American laws." *Id.* DSS concluded that Sopha was "rebellious and her parents [were] at a loss as to how to control her actions." *Id.* DSS found that "the conflict between the parents and [Sopha was] due to cultural differences and expectations." *Id.*

On October 16, 1992, DSS opened an investigation regarding Kosoul (PRE 2 at 43-44). Kosoul had "complained that his parents would hit him with shoes, sticks, electrical wire, coat hangers, belts, or with their hands." *Id.* Kosoul had a visible lump on his arm that the DSS worker observed. *Id.* Kosoul told the DSS worker that the beatings would occur at night and on weekends so that the marks would be gone before Kosoul went to school. *Id.* Kosoul stated that he was afraid of his parents. *Id.* He reported that Sopha had been beaten after the previous DSS investigation involving her. *Id.* at 43. After the initial interview with Kosoul, he subsequently told the DSS worker that Sopha had asked him "why he told 'those people' that mom and dad were beating him." Kosoul

told the worker that his sister "advised him to not reveal anything that went on in the house any more". *Id.* When the worker interviewed Kosoul's parents, they admitted to frequent beatings, by hitting Kosoul on the legs with electrical wire. *Id.* His parents told the worker that in Laos, children were expected to be afraid of their parents and they found nothing wrong with that. *Id.* at 44. Kosoul's parents told the worker that they were very frustrated by Kosoul's behavior and saw no other alternative besides beating him, to get him to behave as they wanted. *Id.* On a later visit, the DSS worker asked his parents to sign a "protection plan" agreeing not to beat Kosoul with objects. *Id.* His parents refused to sign the agreement "as they believe[d] that they [might] at some point, need to hit [Kosoul] with objects again to control his behavior". *Id.* The worker ultimately substantiated the complaint of inappropriate discipline and noted that Kosoul's parents held "unrealistic expectations" regarding Kosoul's behavior. *Id.* The family was referred for counseling. *Id.* at 44-45.

The follow-up treatment consisted of the social worker conducting several more visits to the family. *Id.* The family was provided with literature on discipline. *Id.* There is no indication that an interpreter was used or that the literature was in the Lao language. *Id.* The worker found the parents "cordial but obviously disinterested in disclosing information about their private lives." *Id.* at 45. When the worker met with Kosoul and Sopha, they too, seemed "secretive and reluctant to discuss family life." *Id.* On a subsequent visit, the family told the worker that the children's behavior had improved and corporal punishment had ceased. *Id.* They also told the worker that Sopha was getting married soon. *Id.* Sopha would have been fourteen at the time. The case was closed, as DSS found the "risks were significantly reduced". *Id.*

By this time Kosoul had started middle school. Perry Owen was the school social worker. He remembered both Kosoul and Sopha. Kosoul was "a real kind hearted and loving kid". Sopha was "quite bright and very beautiful". *Id.* Mr. Owen also remembered Kosoul's father, Komonh. Komonh was "concerned that his children were becoming too Americanized. He was frustrated with the route that they were going." *Id.* Mr. Owen was never contacted by Kosoul's trial attorneys and was surprised to learn that he had gotten into trouble. In his affidavit to State habeas counsel, Owen recalls that Kosoul was "very kind, very innocent, and very gentle". *Id.* at 45-46.

Sopha continued to have her own problems growing up. *Id.* This information would have been of critical importance to the jury because Kosoul lived with Sopha at the time of the murder. In an affidavit provided by Kosoul's brother, Kominh, to State habeas counsel, he described his siblings as follows:

> Neither my brother [Kosoul] nor sister [Sopha] ever seemed to have self-discipline. They both have real problems with setting or following any kind of goals. My sister has a really hard time holding down a job. I have tried lecturing her but it goes in one ear and out the other. My sister has had more new cars that I can count. My mom and dad would help her or cosign and then she wrecked or lost them all. She has a car now, but she has the ability to get things but does not have the ability to follow through with them. She is almost helpless. She cannot seem to support herself. She would get a boyfriend and then organize her life around that. My sister lacks independent living skills. She has always relied upon my parents and they have always backed her up. My dad gave her a big amount of money from the sale of our home and she went through all of it.
>
> My sister was not a stable person for my brother to go and live with. Developmentally, she is much more like a fifteen or sixteen year old. She is always changing friends, falling out with them. She is not stable at all. Her son, my nephew, stays with our father. She can talk my parents into anything. Her main reason for going to Texas was a new start. She even tried to talk me into moving there. My brother Kosoul said she talked him into coming out to Texas saying that he did not need to be around any of his old friends in Charlotte.

*See id.* at 46-47.

Kosoul's parents divorced in 2000. There were allegations that Komonh was physically abusive with Phong. *Id.* at 47. Had defense counsel understood Kosoul's childhood experiences, they most certainly would have further investigated and developed the psychological damage these experiences had upon his upbrining.

State habeas counsel also consulted with Dr. Shelley Riggs, a psychologist who specializes in family attachment issues. *Id.* Dr. Riggs reviewed the affidavits of Kosoul's family members and teachers, school records, and DSS records. Dr. Riggs concluded that "Kosoul's parents may have suffered a variety of post-traumatic conditions that were linked to the Laos experience. *Id.* These included depression, angry outbursts, somatic and dissociative reactions, as well as other anxiety-related symptoms." *Id.* at 47. The trauma experienced by Komonh and Phong affected their ability to parent. Dr. Riggs noted that:

> [The children of traumatized parents] often develop insecure-disorganized attachment, which manifests in incoherent coping strategies and paradoxical approach-avoidance behaviors. Research evidence suggests that infant disorganized attachment is related to insecure attachment and a variety of maladaptive behaviors in later childhood and adolescence, including internalizing (e.g., depression, anxiety) and externalizing (e.g., anger, aggression, hyperactivity) problems, social difficulties, controlling behaviors, and dissociative symptomatology.

*Id.* Regarding Kosoul, Dr. Riggs states:

> Kosoul's early development occurred in the context of a chaotic family life, marked by multiple relocations, parental unemployment and financial strain, and little social support that appeared to lead to some degree of child neglect. Parent-child role reversal may also have been present due to the need to rely on older siblings to care for younger ones, as well as parental difficulties with the English language and the children's role in translating. **After the family settled in North Carolina, documents suggest that the Chanthakoummane family environment remained disorganized and unstructured, with inadequate child supervision and inconsistent disciplinary practices characterized by either harsh physical punishment or little to no consequences for misbehavior.** Family cohesion, which protects young boys from behavioral problems, appeared to be lacking. Instead as

the children grew older, there seemed to be increasing parent-child conflict due to acculturative dissonance created by a mismatch between immigrant parents, who adhere to traditional cultural values and behaviors, and their more acculturated teenagers, who adopt individualistic American attitudes. Across diverse groups of immigrants, differences in acculturation between parents and children often result in an erosion of parental hierarchy and authority, which has significant mental health consequences for all family members. **Intergenerational conflict and the inability of parents to control or monitor child behavior places Asian youth at risk for academic difficulties, depression, and behavior problems, which increase their vulnerability for association with delinquent peers/gangs and violence.** Adverse psychosocial environments during childhood undermine the development of coherent internal representations of self and other and limit the capacity to understand the psychological states of others, an important criterion for empathy. **Parental trauma and their poor mental and physical health, as well as immigration-related stressors jeopardized Kosoul's early attachment bonding process.** In combination with hearing loss and language deficiencies, this may have contributed to inadequate coping strategies, emotional distress, and poor social skills. Kosoul exhibited mild emotional difficulties in early elementary school, initially demonstrating some signs of depression and anxiety, with can be manifested in either sad/withdrawn affect or anger and irritability in children. By late elementary and early middle school, Kosoul's behavioral profile shifted to externalizing symptoms, such as anger, oppositionality (e.g., disrespect, breaking curfew), lying and stealing from family members.

*Id.* at 47-49 (emphasis added).

Dr. Riggs concluded that these "multiple individual, family, peer and cultural factors placed Kosoul at substantial risk for maladaptive development." *Id.* at 49.

None of these risk factors were presented to the jury during Kosoul's punishment trial. The only circumstances the jury knew about Kosoul's prior to imposing his death sentence were the aspects of his life that occurred after his first arrest. Defense counsel's deficient performance deprived the jury of the opportunity to know any of the trauma that Kosoul's parents and older siblings endured and how that impacted his development. The A.B.A. Guidelines noted supra instruct death penalty counsel to investigate a client's early life experiences in order to find such mitigating facts that might influence a jury at

the punishment phase.  Counsel was duty-bound to thoroughly investigate and develop issues relating to Kosoul's childhood in preparation for the mitigation case. Such investigation was critically important given counsel's concession of guilt at the guilt-innocence phase.  No strategic reasoning can justify counsel's failure to find and present this evidence to the jury.

*See Wiggins,* 539 U.S. at 523-26 (concluding that counsel's failure adequately to investigate prior to deciding not to introduce mitigation evidence constituted ineffective assistance, since the evidence in counsel's possession was suggestive of an abusive background and "counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless").[2]  "This Eight Amendment right to offer mitigating evidence 'does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present, and insist on the consideration of those compassionate or

---

[2] *See Mayfield v. Woodford,* 270 F.3d 915, 927 (9th Cir.2001) (en banc) (counsel billed only 40 hours in preparation for guilt and penalty phases, only substantively met with the client once, and on the day trial commenced, failed to obtain relevant material records, spent less than half the allowed budget and failed to consult relevant experts despite being alerted to "evidence of diabetes and substance abuse ..."); *Lambright v. Stewart,* 241 F.3d 1201 (9th Cir. 2001) (counsel failed to obtain psychiatric evaluation despite knowing of petitioner's traumatic wartime experience and extensive drug abuse); *Bean v. Calderon,* 163 F.3d 1073, 1078 (9th Cir. 1998) (completely unprepared attorney presented only "disorganized and cursory" penalty phase); *Turner v. Duncan,* 158 F.3d 449, 456 (9th Cir. 1998) (counsel's failure "to arrange a psychiatric examination or utilize available psychiatric information also falls below acceptable performance standards"); *Seidel v. Merkle,* 146 F.3d 750 (9th Cir. 1998) (counsel was ineffective for failing to conduct any investigation into defendant's psychiatric history despite evidence that defendant had been treated for mental illness); *Caro,* 165 F.3d at 1228 (counsel's performance was deficient because, although aware of his acute and chronic exposure to toxic chemicals, counsel did not acquire any experts on the effects of chemical poisoning, did not provide the experts who did examine Caro with the information that he had, and failed to properly consult experts); *Wallace v. Stewart,* 184 F.3d 1112, 1118 (9th Cir. 1999) (petitioner stated prima facie case for ineffective assistance during penalty phase where there was complete failure to investigate family or background despite evidence suggesting petitioner had mental problems); *Jennings v. Woodford,* 290 F.3d , 1006, 1014 (9th Cir. 2002) (counsel was ineffective where he failed to inquire into possible child abuse in the family, failed to appoint additional experts to evaluate Jennings's mental state or the possible effects of methamphetamine on a heavy, long-time user, despite the fact that he knew that Jennings had been "strung out" for over a year, did not discuss the effects of Jennings's drug use with Jennings himself, nor did he follow up on a report that Jennings had attempted suicide, that Jennings was schizophrenic, and that his ex-wife believed that he was crazy).

mitigating factors stemming from the diverse frailties of humankind.'" Kosoul's story
should have been unearthed and presented. *McCleskey v. Kemp*, 481 U.S. 279, 304, 107 S.
Ct. 1756, 1773, 95 L. Ed. 2d 262 (1987).

State habeas team member Deborah Grey very effectively recounts trial counsel's
deficient mitigation investigation in this case:

> It is my understanding that the pre-trial mitigation investigator spent
> minimal time with the defendant, Mr. Chanthakoummane. It is further
> my understanding that he did not interview members of the clients' family
> prior to trial, that any interviews were done by other members of the team.
> The mitigation investigator did not obtain the school records that outline
> the history of the client's hearing impairment and attendant academic
> difficulties. He made no effort to locate or talk to the client's teachers,
> health professionals or social workers, all of who were available and willing
> to talk. There is no indication that any research was done on the impacts
> of the exposure to war, violence, poverty, terror, malnutrition upon Mr.
> Chanthakoummane's parents in the time period immediately preceding
> his conception and early childhood. There is no indication that a careful
> and detailed history was taken around prenatal care, birth, infancy and
> attachment issues. There is no indication that investigation was performed
> on the impact of refugee status upon this family's life cycle throughout Mr.
> Chanthakoummane's infancy and early childhood. **This information
> represents a critical piece of Mr. Chanthakoummane's
> developmental history. This information, too, is readily
> available and investigation of this would be a standard part of
> any mitigation investigation.** Because of the lack of written
> documentation, it is difficult to know exactly what this mitigation
> investigator did.

> Information was presented in the sentencing phase of this trial regarding
> Mr. Chanthakoummane's lengthy history of juvenile arrests and
> incarcerations. This information was presented to the jury without any
> information whatsoever about Mr. Chanthakoummane's background; **the
> issues around mother child attachment and early child neglect
> and abuse; the refugee status of his family; the cultural
> differences encountered by children of refugees; the difficulties
> encountered by a child with special needs being raised by
> parents physically, culturally and linguistically ill equipped to
> recognize and address these needs. The record of his juvenile
> arrests was presented totally out of context; the jury had no
> knowledge whatsoever of Mr. Chanthakoummane's complex
> and multilayered history of abuse, neglect, physical and
> attendant cognitive deficits.**

(PRE 2 at 50-51) (emphasis added).

Equally appalling is the fact that according to Collin County Jail visitation records, trial counsel's mitigation investigator, Vince Gonzales, only visited Kosoul one time during the entire pendency of the case. *Id.* at 51.

Counsel's conduct in this regard fell well below the standard set forth under the first prong of *Strickland*. The trial court's contrary reasoning as to this issue was the product of an unreasonable application of the facts to *Strickland*.

### E. Trial counsel's deficient conduct also satisfies the second prong of *Strickland*

By counsel's own acknowledgment:

> Had I been provided these records I would have, and would have, taken a completely different approach to presenting mitigating evidence in Kosoul's case. All of the workers identified in those records would have ben interviewed, brought to Texas, and called to testify at trial. These social workers would have provided **invaluable insight into Kosoul's family background and experience**. The **over-the-top discipline tactics of his parents would have been examined**. Appropriate experts would have been employed to evaluate this evidence and how it affected Kosoul's life and character. I would have been able to interview Kosoul's father, mother, sister, and brother with the benefit of the information contained in these records. I could have confronted them with this information, and their denials. It **may have led to the discovery of additional probative evidence**. Appropriate direction could have been given to Mr. Gonzales to investigate these issues. If I had know this information existed **I would have made all of his family members testify to the abuse, and how it most likely affected their family unit in general, and Kosoul in particular**. In conclusion, I can affirm that these records, and the information contained therein, would have been vital to the adequate preparation of a mitigation case.

*Id.* at 22-23 (emphasis added).

Counsel concedes that this evidence was powerful, highly probative and would have had a huge impact on how in presented his mitigation case to the jury. This concession by counsel when coupled with the juror affidavits discussed supra noting that such evidence might have made a difference in answering the second special issue reinforces the impact these facts would have had on the outcome of this case. It is clear therefore that counsel's deficient performance in following through and finding the DSS information would have changed the outcome of the punishment trial as required under the second prong of *Strickland*. The State's failure to see how this deficient performance by counsel affected the outcome of this case is therefore the result of an unreasonable application of *Strickland* to the facts of this case.

### F. Trial counsel were ineffective in failing to investigate, develop and present the impact of the Laos Immigration Experience to the jury

The trial court also concluded that counsel's deficiency in failing to raise the impact of the Laos immigration experience was justified as a "strategic decision" because it would not have been mitigating and could have been aggravating. This conclusion by the trial court is also an unreasonable application of the facts to *Strickland*. The first obvious flaw in the court's reasoning is the fact that it runs contrary to trial counsel's own affidavit. Trial counsel acknowledged that he initially felt the immigration information had a mitigating value, but that "as the investigation progressed … it became clear that, **as it applied to Kosoul's life**, it was not mitigating … [and] could easily been seen as an aggravating factor (PRE 4 at 15). Defense counsel later vacillates that had he know of the DSS records, then he would have "made all of his family members testify to the abuse, and how it most likely affected their family unit in general, and Kosoul in particular." *Id.* at 22. The cultural information gathered during the Laos immigration

investigation would have been essential to showing the jury the root causes of the "over-the-top discipline tactics of his parents". *Id.* Because trial counsel failed to thoroughly investigate Kosoul's history of abuse as noted in the DSS records, he failed to see the value of the Laos immigration story and quickly abandoned this information instead regarding it as a possibly aggravating.

State habeas counsel engaged the services of a specialist how reported the following findings about Kosoul's family and upbringing (PRE 2 at 23). Kosoul's father, Komonh Chanthakoummane, was born and raised in Laos. He was the second of seven children born to a family of farmers. In 1966, he joined the Lao army. This was during the time of the Vietnam War when the United States recruited Lao troops to help disrupt the supply routes of the North Vietnamese. However, the Geneva Accords had dictated that Laos was to remain neutral, so the United States did not acknowledge its involvement in Laos until much later. As a result, the conflict came to be known as the "Secret War in Laos". Despite its "secrecy", over two million tons of ordnance were dropped on Laos, making it "the most heavily bombed nation in the history of warfare". Paul Wiseman, *USA Today*, December 11, 2003, at http://www.usatoday.com/news/world/2003-12-11-loas-bombs_x.htm.

Kosoul's father, Komonh was part of a troop whose job was "to watch for Communists". During this time, Komonh was frequently exposed to "gunfire and bombing" (PRE 2 at 23). When the Communists finally took over Laos in 1975, Komonh, along with many other Lao military men, was sent to a "re-education" camp. Before Komonh was sent to the "camp", his first wife became pregnant. While at the "camp", Komonh was granted a two-week leave to go and visit his first wife. Komonh never returned to the camp. However, the Communists came searching for Komonh and

eventually he had to flee to Thailand because "if the Communists found [him] they would kill [him]." Komonh never saw his first wife or his child again. Petitioner's State (**PRE** 2 at 24).

Komonh met Kosoul's mother, Phongsamout Tongpu (Phong) in Thailand, where she also had sought refuge from the Communists in Laos. Phong was the second oldest of fifteen children. The Communists controlled the area where her family lived and everything had to be "shared" with the Communists. Her father was in the Lao army and the family moved a lot. Phong only attended school until the third grade. She never learned to read or write. After leaving school, she helped the family make a living by cooking food and selling it in front of the house. Phong learned from an early age that "you were not allowed to talk about your own problems from inside the house on the outside." *Id.*

Phong's family lived near a military base, Camp 42, and she witnessed many horrors as a young child. She described life near Camp 42 as follows:

> I saw people being shot. I saw truckloads of bodies. We all went and hid when the Communists came looking for my father. You would hear the bombs falling at night, mostly at night it was not safe. From 1961 to 1964, especially, we had to hide in our trenches. During the day, we would go to get supplies. We had to dig in the dirt and we dug trenches outside. You had to eat early because you were afraid that the Communists would come – if you wait, they will come and shoot you, so you have to go and hide in your trench. Around three or four o'clock we would have to start to go to the trenches. We would have to stay in the trenches at night and stay very quiet in the dark. You would only leave your trench to go to the bathroom. Later on, I remember being in the trenches with my baby. The soldiers would also come and they would shoot people. I had friends who were shot. On rainy days, the soldiers would not come and we would not be so scared. Also, the soldiers put these landmines in the ground all around where we lived. They put these there to try to kill our soldiers, but we had to be careful, they were all around our town.

(**PRE** 2 at 24-25).

Phong married her first husband and had her first child, Viengkhan, when she was sixteen. By the time she was twenty, the couple had "drifted apart". When she was twenty-one, Phong married a police officer from another village. Her second son, Chanh, was born in 1970. In 1972, she had a child that "was born with a birthmark that meant he would not drink milk and he died when he was only one and a half years old." Phong lived with her family "in a town where [you] could hear the bombs and hear the fighting, but [they] were not in the middle of it. It was safer there."

In 1974, when Phong was pregnant with another son, Phonsavanh, her husband, who was "about thirty" died of a heart attack while in bed. Phong called for help. She says that "[t]hey tried bringing peppers to put in his mouth, they tried biting his toes, but he was dead".

Phong, now alone with three young children, soon took up with another man who was a soldier. She became pregnant with her son Kominh. The soldier had managed to escape to Thailand and was coming back for Phong and the children, when he was shot and killed by the Communists while crossing the river. Believing that it was no longer safe for her in Laos, Phong, pregnant and with three young children, decided to try to escape to Thailand herself. Phong described her journey as follows:

> I was going to escape across the river, by boat. The boat was not large enough for me to take all of my children. I had to choose which child to take with me. My mother did not want me to take my oldest child with me, she wanted to keep him. She said my youngest was too little to fend for himself, he could not even walk. So I decided that I would take Chanh and I had to leave my other two children behind. I had to pay money to cross the Mekong River and go to Thailand and I knew that it was very dangerous. You could only cross at night and once you made it safely across the river, then there were the Thai guards in the water waiting and looking. When I arrived in Thailand I had only a few little clothes and some jewelry I hoped to be able to sell for money. Chanh did not even have shoes. He got all scratched up by the bushes coming in and the red ants were biting his feet. There were no shoes, no shirt, we had nothing and he was only five or six years old.

(**PRE** 2 at 26-27).

Shortly after Phong arrived in Thailand, she gave birth to Kominh. Soon after that, she was arrested for being in Thailand illegally. The authorities put her and her children in jail. They stayed in jail for almost six weeks and then were taken to a refugee camp. There, she met Kosoul's father, Komonh. Phong and Komonh decided to get married. They all lived in a small hut that Phong described as follows:

> The house had a dug out place to go to the bathroom but it was right there in the house. It was stinky. The reason for this was because it was not safe to go out of the house at night to go to the outhouse. People would get robbed or hurt if they went out at night. The Camp was not a safe place. Everyone lived very close together. You could smell what everyone was cooking. People would go to the bathroom in their house and just leave it there. It smelled. You could not go out at night.

(**PRE** 2 at 27).

In 1979, Sopha was born. A short time later, the family was approved to immigrate to America. Petitioner's State Habeas Writ at 28. They were sent to Gothenburg, Nebraska. The family's living expenses were paid for several months by their sponsor. However, Phong soon started feeling very sick. The sponsor would not take her to see a doctor, just bought her some aspirin instead. The family started to hear "about other areas that had better schools, had better jobs and maybe more people from Laos." So in search of a better life, the family moved to Rock Island, Illinois.

When they arrived in Illinois, Komonh found out where a Hmong person lived. Komonh went to the man's house and knocked on his door. Komonh described his arrival in Illinois as follows:

> I did not know this person and they did not know that I was coming. He opened the door and just looked at me. He asked how did I get here and I told him the story of how another Hmong person had connected us, that I wanted to stay with a Lao person. He asked if I had any cousins and when

> I said no, he said I could come in and stay with them. Then I told him that
> I had a wife and three children.

(PRE 2 at 28).

Remarkably, the man let the whole family stay with him.

Phong was now pregnant with Kosoul and still feeling very sick. A doctor told her that she had a problem with her spleen. She was also feeling depressed and angry. When Kosoul was born in 1980, Phong described that "[Kosoul] had his cord wrapped around his neck three times and he was very blue." She said that "[t]here is a Laos saying that when that happens, it can be either very good or very bad." She thought that it "was a foreshadowing" (PRE 2 at 28-29).

One month after giving birth to Kosoul, Phong had to have surgery. She describes this time as follows:

> They told me not to lift anything over five pounds and Kosoul weighed
> around seven pounds at birth. So I could not lift him from the time he was
> born until about seven months.[3] My husband would go to work and the
> kids would be at school and I would be at home with Kosoul and [Sopha].
> Because I could not lift him, all I could do was to prop him up and keep
> feeding him and change his diaper. He got so fat it was even harder to do
> anything. I could not hold him, could not do anything for him. I would get
> so tired sometimes that it was hard to breathe, I would feel like I would
> suffocate. I thought a lot about Laos, about my mom and dad, about my
> siblings. It was a very difficult year.

*Id.*

After about a year, the family moved again. They lived for a short time in Ohio, and then went to New York. By the time they were in New York, Phong felt well enough to start working. Komonh worked during the day and Phong worked at night. It wasn't long before the family moved again. They spent several months in Spartanburg, South

---

[3] It certainly would have been a compelling for the jury to know that Kosoul's mother could not pick him up and hold him for the first six months of his life.

Carolina, and finally ended up in Charlotte, North Carolina. The family moved about seven times before Kosoul started school in Charlotte.

Trial counsel failed to present any of this to the jury during Petitioner's punishment trial. As a consequence, the jury never learned of the trauma that Kosoul's parents endured in their journey to America and more importantly, how that trauma influenced his childhood.

Trial counsel claims it was a tactical decision not to offer this evidence. He was concerned by the potential for an argument by the State that Kosoul "had been rescued by his parents from that experience, but in return he had not taken advantage of this opportunity by his decision to join gangs" (PRE 4 at 16). This comment by counsel again ignores the powerful impact that this evidence would have had when coupled with the records of abuse that he failed to discover ("I would have been able to interview Kosoul's father, mother, sister, and brother with the benefit of the information contained in these records. I could have confronted them with this information, and their denials"). *Id.* This information would have taken all the wind out of the State's claim that Kosoul had a stable upbringing due to his parent rescuing him from the Laos experience. To the contrary, the Laos experience would have been a strong mitigating factor because it would have shown the jury the harsh cultural experience his parents endured and how they contributed to his dysfunctional and highly abusive upbringing.

This deficient performance by trial counsel seriously calls into question the reasonableness of the trial court's application of *Strickland* and its conclusion that the failure to present the Laos immigration story was a sound tactical decision. Moreover, the Laos evidence when coupled with Kosoul's history of abuse noted supra in the DSS

records would have most certainly had an influence on the outcome of the punishment trial thereby satisfying the second prong of the *Strickland* test.

**G. Trial counsel were ineffective in failing to investigate, develop and present the impact of the Kosoul's hearing impairment to the jury**

The trial court was equally dismissive of the issue of Kosoul's childhood hearing impairment finding that "the results of the proceedings would not have been different had counsel presented this evidence … [because of its] minimal mitigating value to the jury." Trial counsel recalls:

> Kosoul "revealed that he did have an incident at a young age when a bug was removed from his ear that relieved an inability to hear some things. While this seemed an interesting story to me, at the time it did not seem to have any relevance for mitigation. Nor did it seem to relate to any hearing impairment as a child since he did not connect the event to any hearing loss.

(PRE 4 at 6).

Counsel follows up that had he ever suspected that Kosoul had any hearing problems, he would have had this issue explored and examined. Counsel's affidavit is fixated upon Kosoul's ability to hear during the pendency of the death penalty case and not upon how this impairment during his childhood had a mitigation value. ("I did not see any information that indicated that he currently has any loss, or had any hearing loss at the time of his trial"). *Id.*

Trial counsel once again passes blame for failing to discover records upon the State of North Carolina. He claims that records relating to Kosoul's hearing impairment were also withheld from him. ("this leads me to believe that some of the school records were not produced in response to our request"). *Id.* Counsel displays a consistent pattern throughout his affidavit of deflecting responsibility for his failure to conduct a thorough

and complete investigation of this case. He claims that he does not recall seeing the records contained in the State habeas writ concerning any hearing impairments Kosoul had as a child being produced to him. *Id.*

Equally troubling is the fact that none of Kosoul's school records were obtained by trial counsel. Rather than retrieving school records and interviewing his teachers, defense counsel focused its mitigation case on what a model prisoner Kosoul would make. Such deficient conduct runs contrary to well-established A.B.A guidelines governing what defense counsel should investigate in preparation for the punishment phase of a death penalty case. The A.B.A. Guidelines that that:

> Counsel needs to explore:
>
>  (3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases Guideline 10.7 (2003) (emphasis added).

Trial counsel's failure to collect Kosoul's school records or talk to any of his teachers in an effort to develop the extent to which his hearing impairment impacted his childhood is yet another example of deficient performance that falls well below A.B.A. Guidelines. Counsel is under a clear duty to thoroughly investigate a client's background in preparation for a capital penalty phase, and the failure to do so precludes a finding that the absence of a penalty phase investigation was strategic.[4]  Had counsel bothered to

---

[4] *See, e.g., Baxter v. Thomas,* 45 F.3d 1501 (11th Cir. 1995) (finding counsel ineffective for failing to request state hospital records, school records, social service records, and failed [sic] to contact the defendant's sister, neighbor, or social worker); *Cave v. Singletary,* 971 F.2d 1513 (11th Cir. 1992) (finding that the complete failure to investigate and prepare for the penalty phase rendered counsel's assistance ineffective and required a new penalty phase); *Cunningham v. Zant,* 928 F.2d 1006 (11th Cir. 1991) (failure to put on evidence of defendants [sic] disadvantaged background, the death of defendant's father when the defendant was six, and evidence of defendant's mild retardation deprived the defendant of the constitutionally mandated individual sentence determination); *Thomas v. Kemp,* 796 F.2d 1322 (11th Cir. 1986), *cert. denied,* 479 U.S. 996, 107 S.Ct. 602, 93 L.Ed.2d 601 (1986) (finding ineffective assistance of

review these records, they might have learned that Kosoul failed his hearing test in kindergarten (PRE 2 at 38). Testing showed that he had a "moderate high frequency hearing loss bilaterally with normal hearing through 1500-2000 Hz. *Id.* His ability to understand speech at a soft conversational level was poor in the right ear and fair in the left ear…." *Id.* The school recommended that Kosoul be evaluated by an Ear, Nose and Throat physician (PRE 2 at 39). However, Kosoul's hearing loss went untreated. This was again most likely due to his dysfunctional upbringing and the cultural issues noted in the Laos immigration story cited supra. By the second grade he was referred to "Exceptional Children Services". *Id.* Kosoul was below average in hearing, receptive language, expressive language and articulation. *Id.* One teacher noted that due to his pronunciation problems, "sometimes he [could not] be understood." *Id.* It is plainly obvious that this information would have been of a tremendous value to Kosoul's mitigation case and would have surely impacted the outcome of his punishment trial.

When Kosoul was in the third grade, the family moved to Alabama because Komonh thought he could make better money catching crabs. However, Komonh had no "crabbing" experience and did not do very well. *Id.* Komonh thought that the "crabbing" might be better somewhere else, so the family moved to a trailer park in Louisiana. When that didn't work out, the family moved back to Charlotte, North Carolina.

---

counsel where little effort was made to investigate possible sources of mitigation evidence); *Blanco v. Singletary,* 943 F.2d 1477 (11th Cir. 1991), *cert. denied,* 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992) (criticizing counsel who did not attempt to contact family members or prepare for the penalty phase until the trial was underway, and who failed to put on any mental health mitigating evidence); *Jackson v. Herring,* 42 F.3d 1350 (11th Cir. 1995) (finding that the failure of counsel to investigate family history and background of client is inexplicable, could not be considered strategic, and required reversal); *Blake v. Kemp,* 758 F.2d 523 (11th Cir. 1985) (finding a presumption of prejudice where trial counsel made no effort to prepare for the penalty phase of a capital trial); *see also Douglas v. Wainwright,* 714 F.2d 1532, 1556 (11th Cir. 1983) ("Permissible trial strategy can never include the failure to conduct a reasonably substantial investigation.").

When Kosoul's family returned to Charlotte, Kosoul was in the fourth grade. One of his teachers was Constance Lesesne. She remembers Kosoul as being "calm and quiet". *Id.* He "did not seem to interact much with the other children." She worried about him because he was "unusually quiet" and "children like that often have things going on that they don't talk about". *Id.* Kosoul's hearing problems still had not been addressed. Marty Sloan-Clontz was the audiologist for the Charlotte Mecklenburg School system. She remembers Kosoul and had this to say:

> The records show that Kosoul has a bilateral sensori-neural hearing loss that is moderate to severe in the higher frequencies. There are two types of hearing loss: conductive and sensorineural. The conductive type is in the middle ear and most frequently come from having numerous ear infections or fluid in the ears. Sensorineural hearing loss is in the inner ear, is often associated with aging and usually has nothing to do with ear infection. Once you have this type of hearing loss you will have it forever. This type of hearing loss can be genetic. It can come from exposure to extremely loud noises. It can occur in people who have had chemotherapy. Less likely, it could come from numerous ruptures of his eardrum. I see from my notes in his record that the otological exam showed reddened and scarred tympanic membranes. This would indicate a history of ruptures.
> The type of hearing loss that Kosoul had would have caused difficulties picking up on high frequency sounds like "s" and "th". The "s" gives you both plurality and possession, which has bearing on being able to hear and therefore understand these concepts. Of course, it also has a bearing on learning how to form and use these words when learning language. Kosoul was also learning a second language, which could potentially create further difficulties. The hearing loss could cause problems with learning the language as well as delaying speech. Language in turn affects how we understand the world and how we connect with the world. It certainly affects a child's self-esteem when it comes to feeling different from class mates. Among the ways children are effected is being ridiculed or teased for speech that is hard to understand or different; for not being able to understand things; and from not being able to hear and therefore not being able to learn at the same speed as classmates. For Kosoul, these difficulties would have been compounded by English being a second language on top of his hearing impairment.
> In my years of working with children from different countries, I have also seen that there are differing cultural responses to deafness. There is sometimes a fear that leads parents to refuse services. Among Asian populations, parents often do not want to hear that there is a hearing loss from the belief it makes you less of a person.

I remember Kosoul well. One of the main reasons I remember him is that the school people could not pronounce his name and so they changed it to John. Neither he nor his parents were consulted about this and I felt horrible about it, it made me furious. That sort of thing would never happen these days. I made an effort to learn how to pronounce both of his names and to call him by name.

**I remember Kosoul as a very shy and very unhappy boy. I think I remember him because he was such a pitiful little guy.** The first intervention that we tried with Kosoul was an FM system. This involved Kosoul wearing an FM monitor around his neck with earphones and the teacher wearing a microphone. The device was big, obvious – it made him stand out. Kosoul seemed to hate it and I think he was very unhappy about having to wear that monitor. Now the monitors are tiny but back then they were great big old things. Kosoul would withdraw or pull back when he saw me coming. I think he associated me with having to wear the device.

While I did audiograms on Kosoul, I could not recommend hearing aids so I referred him to an ENT who did recommend the hearing aids. Back then, hearing aids were bigger and more obvious than they are now. It is not at all uncommon for children to not want to wear their hearing aid. Children don't want to do anything that will make them stand out as different.

I remember Kosoul for another reason. **I examined his ears on one occasion and one of the ears appeared to be quite packed with blackened wax. The wax was so hardened that I couldn't get it out. I remember that I tried to get the parents to take him to the doctor and they wouldn't do it.** I had to initiate a referral for the school to take him to the doctor, which would have taken weeks. **I later learned after he had been taken to the doctor that he had had a dead cockroach in his ear. Most likely the roach was alive when it crawled into his ear and then couldn't back its way out.** It likely would have scrabbled around in his ear trying to get out. It would have been painful as well as scary for the child. The dead roach then stayed there and the wax grew all around it. I have been an audiologist for twenty years and I can remember something like this happened maybe once in all those years.

(PRE 2 at 40-42) (emphasis added).

When Kosoul was in the fifth grade, the school finally intervened and arranged for Kosoul to get hearing aids. *Id.* He had to leave the hearing aids at school and could not wear them home. It was also around that same time, that the school began to notice that there appeared to be some problems in Kosoul's home. *Id.* **When Kosoul was in sixth grade, it was noted that "there [was] substantiated familial**

**dysfunction that…frequently resulted in [Kosoul] experiencing emotional difficulties.** *Id.* (emphasis added).

Defense counsel acknowledge that that this information would have been investigated and developed as part of the mitigation case if they would have been in possession of the DSS records discussed supra. ("I would have viewed the limited information I did have about a hearing impairment from a different perspective … [and] would have followed up on that issue with more intensity to determine what relationship may have existed between the two events") (PRE 4 at 8). Trial Counsel Gore buttresses this position in his affidavit noting that the "withheld social services records could and **would have explained and/or given a different meaning to the other types of mitigating evidence we would have put before the jury had we known about the records, for example, Kosoul's hearing impairment** and the **Laotian refugee story** of his parents and siblings." (PRE 5 at 9) (emphasis added).

The trial court again was unreasonable in failing to apply the facts stated supra to *Strickland*. Trial Counsels' failure to investigate and develop the hearing impairment issue based upon the information that they had at their ready disposal amounts to deficient conduct that impacted the outcome of this case. This deficient performance when coupled with counsels' failure to discover the DSS records and develop the Laotian refugee story had a significant impact on the outcome of the punishment trial in this case.

### H. Trial counsel were ineffective in failing to call Kosoul's family during the punishment trial

In closing argument at the punishment phase, the prosecutor told the jury that Kosoul had no problems in his family and that he came from an intact home (XXVIII RR at 20, 53). State habeas counsel conducted a thorough investigation of Petitioner's family history and discovered facts that if presented at trial, would have had painted a

much different picture of Kosoul's family and childhood that would have had a significant impact at the punishment trial.

As noted in Petitioner's State habeas writ, his family was far from intact. (PRE 2 at 23-51). Kosoul's family members were traumatized war refugees from Laos. Defense counsel failed to thoroughly investigate these events and as a consequence, the jury never learned this side of Kosoul's family history.

The trial court concluded that counsel was not deficient in failing to call any of Kosoul's family members during the mitigation phase because of the "potential harm" that would come from that testimony (PRE 3). The court was especially concerned about testimony regarding "Petitioner's criminal activities from a very young age, even before his involvement in the juvenile justice system, and that his association with gangs would significantly undermine counsel's strategy of attacking the future dangerousness special issue" and that the testimony of Petitioner's own family—most especially his mother that "he deserved the death penalty would be highly prejudicial."

Trial counsel claims that he "endeavored to understand Kosoul's background and experiences that would be relevant to the issues of mitigation" by interviewing his parents and siblings (PRE 4 at 13). Miears described his interview with Kosoul's mother as "disappointing to say the least". *Id.* He noted that "while her English was limited, it was made clear to me by her that she would not be a good witness to present to the jury. She had no difficulty in communicating to me her opinion that, while she loved Kosoul, she believed that if he had indeed committee the crime charged, he deserved to die." *Id.* Counsels' mitigation investigator Gonzalez followed up with a second meeting with Kosoul's mother. Rather than employing a qualified and neutral interpreter to conduct

either of these meetings, counsel elected to go with no interpreter during the first meeting and utilize a family member to translate the second meeting. *Id.* at 13 and 17.

Based upon these interviews defense counsel concluded that "putting her, and other family members, on the stand would open the door to their knowledge of his [Kosoul's] gang affiliation, and his crimes committed against them." *Id.* Based upon the findings of State habeas counsel's mitigation specialist, only two conclusions can be logically drawn from this line of reasoning by trial counsel. Either counsel failed to get the complete story from Kosoul's family, or they flat-out failed to recognize the mitigating potential of this evidence. This was likely due to counsel's failure to employ a qualified translator to conduct the interviews or spend sufficient time with Kosoul's family to thoroughly investigate these mitigating factors. Such conduct amounts to ineffective assistance by trial counsel and was prejudicial to the outcome of this case. An improper interview technique such as using a friend or family member to translate invites a cultural reluctance to share "family business" with outsiders (PRE 2 at 32).

If trial counsel had bothered to spend sufficient time with Kosoul's parents during the investigatory stages of this case, these facts would have been discovered and likely had an impact upon the jury's punishment deliberations. Komonh only met with trial counsel for about an hour when they came to talk with him in Charlotte (PRE 2 at 30). It is impossible for counsel to have understood and developed this issue after such a brief encounter. To compound the deficient performance in this case, defense counsel used Kosoul's sister to help translate the meeting. *Id.* According to Kosoul's State habeas mitigation investigator, Deborah Grey:

> Certain cases present special cultural issues that must be researched and considered at every step of the process, including: **impact of refugee experiences on family and parents' ability to provide for and**

**nurture the client; the method of communication with the client and family**; assessment of the client's conduct in the offense, with law enforcement, and during incarceration and presentation of evidence in the penalty phase and at sentencing. **As a general standard, interpreters must be located and used with those witnesses unable to fully understand the nature of questions and to facilitate more complex answers from those individuals unable to fully express themselves in English.** Due to the sensitive nature of the questions being asked in a traditional mitigation investigation, **under no circumstances is it acceptable to use a family member or family friend to interpret.**

(PRE 2 at 32-33) (emphasis added).

Komonh came to Texas to attend his son's trial, but the very night he arrived, he learned that his father had died. *Id.* Komonh was torn between staying to help his son or returning to Charlotte to bury his father. Trial counsel did not discuss Komonh's testimony with him or why it might be important for him to stay and testify. *Id.* Equally shocking is the fact that defense counsel did not raise this issue to the court as grounds to continue the trial until after Komonh could bury his father. *Id.* In a his post-conviction affidavit, Komonh stated that he was willing to testify and would have done so, had he been asked. He says that "Even if I was dead, I would come back to testify." *Id.*

Kosoul's sister Sopha also made the trip to Texas for his trial and she also left with her father and brother when they learned that her grandfather had died. In her post-conviction affidavit, she noted that:

> The attorneys did not ask me if I would come back to testify. If they had asked me, of course I would have come back. They finished the case without me. I don't understand to this day why they did that. I tried calling the lawyers from North Carolina. I needed to talk to them about testifying. They never returned any of my phone calls. I think I called five times and no one called me back.

(PRE 2 at 30-31).

Kosoul's mother, Phong also recounted a similar lack of contact with the trial attorneys (PRE 2 at 31). She recalls a visit of about two hours. Once again, rather than

47

secure a qualified translator, trial counsel elected to use a close family friend to interpret interview. *Id.* Defense counsel never once asked her about testifying in her son's trial. *Id.* Because Phong was Kosoul's primary caregiver during his early formative years, it should have been obvious to trial counsel that her story was absolutely critical to their mitigation case.

During jury selection, defense counsel explained mitigating evidence to the jury as being anything as simple as learning that a defendant's mother smiled when she saw him. *Id.* This example was used with nine of the jurors who ultimately served on Kosoul's case. (VI RR at 127; VIII RR at 156, 253; IX RR at 53; XII RR at 61; XV RR at 52, 134; XVI RR at 267; XVIII RR at 147). To repeatedly use this example to explain mitigating evidence, primed the majority of Kosoul's jury to expect to hear something from Kosoul's mother. Trial counsel's failure to follow up this jury selection theme with the actual testimony of Kosoul's mother at the punishment phase of the trial illustrates grossly deficient performance by counsel that prejudiced the outcome of this case.

Trial counsel also failed to consult with a cultural expert in the Laotian refugee experience who would have surely assisted in spotting the mitigating factors discussed supra. If counsel had insight into the Lao cultural issues prior to interviewing Kosoul's family, they would have understood how these issues would have influenced the jury during the punishment trial. Such an expert would have also assisted the jury understanding Kosoul's dysfunctional family story.

Dr. Bailey Raleigh is the director of an organization in North Carolina that assists immigrants and refugee and has extensive experience with Lao refugee experience. State habeas counsel consulted with Dr. Bailey about the Chanthakoummane's experience and Dr. Bailey had this to say:

It is important to understand that the refugee experience is different from immigration: immigrants chose to leave their country while refugees did not. Refugees were driven from their homeland. They and their children have been exposed to war, violence and suffering. Refugees are displaced persons uprooted by war and violence. They arrive in a new country and, back in 1979, their arrival would have been without major support systems or much assistance in becoming assimilated. They cannot return home and in a sense they are without a country. These families have survived the horrors of war, dangerous escape attempts, crowded refugee camps and then resettlement into a Western culture/country with the pressures of adjustment. These families experienced multiple losses, including non-normative losses that come from children assimilating to western culture through language development at a more rapid rate than their parents.

The Chanthakoummane family entered the United States in 1979 at a time before the United States offered any formal settlement services. In 1980 the United States passed the Refugee Resettlement Act to provide uniform services to the refugee community. Prior to that time, individuals such as the Chanthakoummanes were brought into this country through other organizations such as Lutheran Immigrant and Refugee Services with minimal governmental support or coordination. Enthusiastic churches on local levels would make a commitment to sponsor a family. The ethnic Laotians were the smallest group of refugees amongst the Southeast Asian refugee populations who were resettled in the US. I have been told that the Chanthakoummanes were brought into Gothenburg Nebraska. It is highly likely that they were the only Laotians in the town. They would have been completely culturally isolated with no one who spoke their language or was familiar with their culture. When they left that town, they left their sponsor behind and they left whatever services were being offered to them in that area. They would no longer have had that personal relationship with a sponsor or refugee support systems to help them navigate their way through the various cultural and legal requirements expected of them in this new land, nor would there have been any form of ongoing services with portability to the various locations.

Corporal punishment is common in their home country of Laos and many of these families end up being referred to child protective services because of harsh discipline. When things do not go well with the children, they discipline the way that they were disciplined when they were little. When that does not work, they may escalate the intensity of that discipline. In Laotian families, the rule would be not to talk about your family business outside of the home. A social worker would not be viewed as a friend, someone to confide in. I understand that the social worker visiting the Chanthakoummanes brought them written materials, likely in English, and talked to the parents without an interpreter. That would not be uncommon but also would not be that productive: most likely, the parents

would be unable to read the materials or fully comprehend what was being said to them.

…

The children of Lao refugees are in a transitional situation. They are given American values at school and in the community but given Laotian values and language at home. They often have a sense that they do not fit in either environment. Any additional "difference" such as physical impairment or disfigurement would only further that sense of alienation, of not fitting in.  Sadly, many of these youth find that gangs offer a sense of belonging, community, acceptance and support.

…

The Lao community is small and the sense of privacy is intense. It is extremely difficult for family members to talk about private and shameful matters and they do not want anyone in their community to know their business. They are hesitant to disclose and that need for privacy may take a priority over offering assistance (in the way of information) that might help a family member. **I have seen many Laotian families disintegrate here, not just between parents and children, but divorces- which are uncommon in Laos- and conflicts between siblings and as each chooses a different path in their attempts to adjust to life here.**  I know this only because I have had the opportunity to know some families quite personally as well as professionally. These conflicts are not discussed with the broader community.

(PRE 2 at 33-38) (emphasis added).

Trial counsel failed to grasp the nuances that the Laotian cultural experience had upon the interviews conducted with Kosoul's family. As a consequence, they turned their back on a wealth of helpful mitigation evidence and sent Kosoul's family home without ever calling them to testify at trial.

Trial counsel instead opted for a strategy at the punishment phase of establishing that "that Kosoul was not a danger while in prison." *Id.*  Miears went so far as to state that North Carolina prison guards and officials "were the people who, in my view, knew his background and character the best. It was my view that **they were his true**

**'family'** and they all supported him" (PRE 4 at 19).  This strategy was the direct result and consequence of counsels' failure to adequately investigate Kosoul's  social and cultural circumstances discussed supra.  Miears concedes in his affidavit that had he known of this information at the time of trial, he would not have released the family and would have instead forced them to stay and testify during the punishment trial.

Trial counsels' failure to thoroughly and properly interview Kosoul's family constitutes deficient performance that falls well below the first prong established in *Strickland*.  These deficiencies caused counsel to ignore and utilize valuable mitigation evidence that surely would have had an impact upon the outcome of this case.  The trial court's finding that these actions by trial counsel were reasonable and based upon sound strategy was the product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of *Strickland*.

**(2)**    **GROUND FOR REVIEW TWO:** By conceding guilt as to the issue of whether a robbery occurred in this case, trial counsel rendered ineffective assistance of counsel in violation Petitioner's Sixth Amendment right to counsel and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Due to the ineffective assistance of State habeas counsel, this claim was not adjudicated in the State courts.   State habeas counsel failed to raise this issue in Petitioner's State habeas writ. As a consequence, counsel raises this unexhausted and procedurally defaulted claim under the Supreme Court's holding in *Trevino*.  Recently, in *Trevino v. Thaler,* the Supreme Court held that the holding of *Martinez* applies to Texas: "[A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Trevino v. Thaler*, 133 S. Ct. 1911 (U.S. 2013) (*citing Martinez v. Ryan*, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012)).

Petitioner submits that State habeas counsel was ineffective for failing to present this claim in his State writ of habeas corpus.

In his opening statement, defense counsel told the jury that when Kosoul entered the model home and met Sarah Walker that "he wanted to rob her and it didn't go the right way, and he killed her" (XXI RR at 29). Despite the fact that Walker's Rolex watch and ring were never recovered, trial counsel conceded that her murder was the result of a robbery gone-bad. As a consequence, no effort was made by trial counsel during the guilt-innocence phase to refute that a robbery occurred in this case. The robbery was the only aggravated felony offense alleged by the State to justify its capital murder charge. Because the evidence that a robbery occurred in this case was purely circumstantial, defense counsel's concession of guilt as to this issue amounted to ineffective assistance of counsel.

At trial the State called Walker's former husband, Randy Tate, who testified that on the morning of the murder he noticed that Walker had purchased a new Rolex watch (XXI RR 39). The State next called Walker's friend, Jessica Allen, who testified that Walker owned and often wore several ornate rings, known as Yurman rings (XXI RR 54-55). Allen was not aware that prior to her murder, Walker had purchased a new Rolex. *Id.* Shortly after the murder, Allen found an empty Rolex box and receipt in Walker's closet. *Id.* Texas Ranger Allen Davidson testified that while executing a search warrant at Walker's home, he found the empty Rolex watch box and receipt (XXI RR 153-163). The Rolex watch, however, was never recovered. Davidson's investigation revealed that Walker visited a Bank of America in Frisco on the morning of the murder (XXI RR 170). Davidson obtained surveillance footage from the bank confirming that Walker was wearing a watch and ring on the morning of the murder (XXI RR 172-73). The State

also called Andy Lilliston who testified that on the day of the murder he and his wife were out looking at model homes (**XXI RR 57-59**). Lilliston discovered Walker's body in one of the model homes he visited and advised his wife to call 911 (**XXI RR 62**). When investigators processed the crime scene, they found no watch or ring on Walker's body (**XXI RR 156**). The State also offered evidence that at the time of the offense, Kosoul's bank account was overdrawn in an effort to prove that Walker's was motivated by Petitioner's need for money (**XXI RR 201**).

After conceding in its opening statement that Kosoul murdered Walker during the commission of a robbery, defense counsel did an about-face during closing and argued that the State may have failed to prove beyond a reasonable doubt that the robbery occurred because no watch or ring were ever recovered (**XXXIII RR at 30**). Trial counsel told the jury that "you've got to satisfy yourselves that they proved a robbery in the course of this murder … [occurred] … [and if] they didn't, you're free to turn that verdict form over and write down that they should prosecute him just for murder". *Id*.

The only problem with trial counsels' argument, however, is that they failed to raise any doubt at all in the jury's mind as to whether a robbery occurred in this case. During the guilt-innocence phase, defense counsel only cross-examined 1 of the 12 witnesses called to testify by the State.

| State Witness | Cross-Examination by Defense Counsel |
|---|---|
| Randy Tate: Walker's former spouse who testified he saw her new Rolex watch on the morning of the murder | None |
| Jessica Allen: Walker's friend who testified she wore ornate rings, but was | None |

| | |
|---|---|
| not aware she had recently purchased a Rolex | |
| <u>Andy Lilliston</u>: found Walker's dead body in the model home | None |
| <u>Mamie Sharpless</u>: realtor who received a call from "Chan Lee" about wanting to see a home in the subdivision where the murder occurred | None |
| <u>Nelson Villavicencio</u>: Sharpless' husband who accompanied her to the meeting with Chan Lee, met Chan Lee who he testified drove a white Mustang and also saw a white Mustang parked in front of the model home where Walker was found murdered | None |
| <u>Texas Ranger A.P. Davidson</u>: Responded to the crime scene, searched Walker's home and found the empty Rolex box and receipt and obtained the bank surveillance video from the morning of the murder depicting Walker wearing a wrist watch and ring on her finger. | None |
| <u>McKinney Police Detective Pete Copin</u>: Photographed and processed the crime scene, present during Kosoul's arrest and collected his cell phone, and took DNA samples from Kosoul | None |
| <u>United States Secret Service Special Agent Jeff Shaffer</u>: Recovered a photograph from Kosoul's cell phone depicting him with his mouth open as if he were about to bite a dog | None |
| <u>McKinney Police Officer Joe Ellenburg</u>: Arrested Kosoul at his home and Mirandized him at the police station | None |
| <u>McKinney Police Detective Randall Norton</u>: Conducted videotaped post-arrest interview of Kosoul at the police | Kosoul mentioned during his post-arrest interview that he'd needed money and pawned a Kenneth Cole |

| | |
|---|---|
| station | wristwatch. This wristwatch registered a positive hit on www.leadsonline.com. Officer Norton agreed that the McKinney PD uses this website to track down pawned items. (XXII RR at 194-97).<br><br>The State thereafter established on re-direct that leadsonline.com would have no record of whether Kosoul sold the Rolex to someone other than a pawnshop agent (XXII RR 1t 198). |
| <u>Brent Hutson, M.D.</u>: Forensic dental expert who testified concerning a match between Kosoul's dental imprint and the bite mark on Walker's neck | None |
| <u>Dr. William Rohr, M.D.</u>: Collin County Medical Examiner who conducted Walker's autopsy | None |
| <u>Stacy McDonald</u>: SWIFS expert witness who processed DNA samples collected from Walker, Kosoul and the crime scene | None |

As noted supra, defense counsel elected not to cross-examine Ranger Davidson who found the empty Rolex box and receipt at Walker's home (XXI RR at 201). Defense counsel also declined to cross-examine Ranger Davidson concerning the bank surveillance video. Although the defense briefly cross-examined Officer Norton concerning his corroboration that Kosoul had indeed pawned a Kenneth Cole wrist watch because he needed money (XXII RR 197), counsel thereafter abruptly passed the witness without any mention that there was no record found on leadsonline.com of Walker's Rolex having been pawned by Kosoul.

In some cases a trial attorney may find it advantageous to his client's interests to concede certain elements of an offense or his guilt of one of several charges. *See United States v. Bradford,* 528 F.2d 899, 900 (9th Cir. 1975) (counsel's assistance was not deficient where he conceded that the evidence identifying the defendants as the perpetrators was overwhelming, but argued that other elements of the crime were not proved in an attempt to persuade the jury to find the defendants guilty only of a lesser offense) and *Duffy v. Foltz,* 804 F.2d 50, 52 (6th Cir. 1986) (finding that counsel employed a reasonable trial tactic by admitting that his client committed the acts alleged but arguing that he was not guilty by reason of insanity)). Other courts, including the Sixth Circuit, similarly have found that the practice of conceding certain points or elements in order to maintain credibility with the jury or to focus the jury's attention toward a contested issue about which there is the greatest chance for reasonable doubt is a sound trial strategy. *See Wiley v. Sowders,* 647 F.2d 642, 649 (6th Cir. 1981) (recognizing that while an "attorney may not stipulate to facts which amount to the 'functional equivalent' of a guilty plea," there are situations in which "[c]ounsel may believe it tactically wise to stipulate to a particular element of a charge or to issues of proof"); *United States v. Walker,* 24 F. App'x 57, 60 (2d Cir. 2001) (where there was overwhelming evidence against a defendant charged with unlawful possession of firearm and wire and mail fraud, defense counsel's strategic decision to try to maintain credibility with the jury by acknowledging during closing argument that the voice making inculpatory admission on tape recording was that of the defendant could not be considered ineffective assistance of counsel); *Foster v. Schomig,* 223 F.3d 626, 638 (7th Cir. 2000) (defense counsel did not commit ineffective assistance by conceding during closing argument that the defendant had killed his girlfriend as defense counsel made that concession in order to steer the jurors' attention toward the element of

intent, the element on which he hoped to prevail); *United States v. Simone*, 931 F.2d 1186, 1196 (7th Cir. 1991) ("[W]hen the admissions concern only some of the charges to be proven, or when they do not actually concede guilt, counsel's concessions have been treated as tactical retreats and deemed to be effective assistance."); *Wilson v. Butler*, 813 F.2d 664, 670–71 (5th Cir. 1987) (defense counsel in a homicide prosecution was not ineffective for stating during closing argument that he thought the defendant was guilty along with co-participants where evidence of the defendant's complicity in the killing was overwhelming and, taken in context, the statement was part of strategy to cast doubt on whether defendant was trigger man in order to avert a conviction of first degree murder).

Here, Kosoul's trial counsel conceded the aggravated robbery issue despite the fact it was supported by mere circumstantial proof. That strategy proved to not only be unsuccessful, but also outside the bounds of objective reason, particularly given the fact that neither the Rolex watch nor ring were ever recovered in this case. Although there was overwhelming evidence that Kosoul murdered Walker, there was doubt that could have been raised by defense counsel that he committed the murder during the commission of an aggravated robbery. Defense counsel could have conceded the murder, raised doubt as to the commission of the robbery, and still maintained credibility with the jury at the penalty stage of the trial. *See Florida v. Nixon*, 543 U.S. 175, 191–92 (2004) (holding that counsel's strategic decision to concede guilt and focus on the penalty phase was not ineffective assistance of counsel under the *Strickland* standard notwithstanding the absence of defendant's explicit consent).

Although *Strickland* ordinarily applies to claims of ineffective assistance of counsel, *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) also recognizes

a narrow exception to *Strickland's* holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense." *Nixon,* 543 U.S. at 190 (discussing *Cronic*). The *Cronic* Court held that a Sixth Amendment violation may be found "without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial," *Bell v. Cone,* 535 U.S. 685, 695, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), when "circumstances [exist] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," *Cronic, supra,* at 658, 104 S.Ct. 2039. *Cronic,* not *Strickland,* applies "when ... the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial," 466 U.S., at 659-60 and one circumstance warranting the presumption is the "complete denial of counsel," that is, when "counsel [is] either totally absent, or prevented from assisting the accused during a critical stage of the proceeding," *id.,* at 659, and n. 25, 104 S.Ct. 2039. *See Wright v. Van Patten*, 552 U.S. 120, 124-25, 128 S. Ct. 743, 746, 169 L. Ed. 2d 583 (2008). Kosoul's trial counsel failed "... to subject the prosecution's case to meaningful adversarial testing ..." thereby committing per se IAC under *Cronic. Cronic,* 466 U.S.at 659. Given the mere circumstantial nature of the State's evidence that Walker was murdered during the commission of a robbery, Kosoul was constructively denied his right to counsel because defense counsel not only conceded his guilt to Walker's murder, but also conceded his guilt as to capital murder during the commission of an aggravated felony.

Whether looked at under the *Cronic* or the *Strickland* analysis, Defense counsels' performance in the present case amounts ineffective assistance of counsel. Counsel

conceded the only factual issue in dispute at trial in this case, whether Kosoul took Walker's Rolex and ring during the commission of her murder. As noted supra, trial counsel told the jury in opening that Kosoul murdered Walker as part of a robbery gone-bad ("he wanted to rob her and it didn't go the right way, and he killed her") (XXI RR at 29). This was not a situation in which defense counsel made a tactical decision to concede only a lesser-included offense. Defense counsel in this case elected to concede both the murder and the aggravated robbery. If this were presumably a tactical decision due to the strength of the State's case, then it confounds logic that trial counsel would then turn around in closing argument and ask the jury to find a reasonable doubt as to whether the State proved the robbery (trial counsel told the jury that "you've got to satisfy yourselves that they proved a robbery in the course of this murder … [occurred] … [and if] they didn't, you're free to turn that verdict form over and write down that they should prosecute him just for murder") (XXXIII RR at 30).

A. **Under the *Strickland* analysis, counsels' performance was deficient and impacted the outcome of this case.**

Defense counsels' decision to concede the robbery in opening and then argue the State failed to prove the robbery in closing cannot be justified as a reasonable tactical decision.[5] This deficiency by counsel was only compounded by the fact that no

---

[5] *But see*, *Haynes v. Cain*, 298 F.3d 375, 380-81 (5th Cir. 2002), (noting that where petitioner was charged with First Degree Murder and faced the death penalty. In the face of overwhelming evidence of the defendant's guilt, his attorneys made the strategic decision to concede petitioner's guilt with respect to the predicate felonies (kidnapping, rape, and armed robbery) and contest the single issue of whether the defendant possessed the specific intent to kill his victim; *Gochicoa v. Johnson*, 238 F.3d 278, 285 (5th Cir. 2000) (holding that '[w]hen the defendant receives at least some meaningful assistance, he must prove prejudice in order to obtain relief for ineffective assistance of counsel' (quoting *Goodwin v. Johnson*, 132 F.3d 162, 176 n. 10 (5th Cir.1997))); *United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir.1991) (holding that '[a] lawyer who informs the jury that it is his view of the evidence that there is no reasonable doubt regarding the only factual issues that are in dispute has utterly failed to subject the prosecution's case to meaningful adversarial testing'); *United States v. Short*, 181 F.3d 620, 624-5 (5th Cir. 1999) (holding that counsel's statements, which did not admit guilt, but which implicated the defendant, were reasonable in light of the overwhelming evidence presented at trial); *Lingar v. Bowersox*, 176 F.3d 453, 458 (8th Cir.1999) (stating that 'the decision to concede guilt of the lesser charge of second-degree murder was a reasonable tactical retreat

meaningful cross-examination was conducted to raise doubt as to the commission of the robbery.  Whatever conceivable favor trial counsel may have presumably gained with the jury in conceding guilt during opening was undone by his comment in closing.  Additionally, trial counsel's tactical decision prejudiced the outcome of the trial.  By conceding guilt as to both the murder and robbery, and failing to test the State's circumstantial case as to the robbery, trial counsel pre-determined the jury's verdict of guilt as to capital murder.

As discussed supra, there are two elements to an ineffective assistance of counsel claim.  "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense."  *Strickland*, 466 U.S. at 687.  In this case, the prejudice of trial counsels' conduct is presumed under the *Cronic* analysis set forth supra.  In the alternative, counsels' performance prejudiced the outcome of this case under the two-prong analysis set forth in *Strickland*.

### B.     State habeas counsel was ineffective for failing to investigate, develop and raise this claim

State habeas counsel should have discovered and raised this claim.  As a consequence, State habeas counsel's performance was deficient. The State Bar of Texas has identified the "Duties of Habeas Corpus Counsel" in the State Bar of Texas' Guidelines     and     Standards     for     Texas     Capital     Counsel.

---

rather than a complete surrender'); *Underwood v. Clark*, 939 F.2d 473, 474 (9th Cir. 1991) (concluding that defense counsel's concession during closing arguments of a lesser included offense was 'a sound tactic when the evidence is indeed overwhelming ... and when the count in question is a lesser count, so that there is an advantage to be gained by winning the confidence of the jury'); *McNeal v. Wainwright*, 722 F.2d 674, 676 (11th Cir.1984) (finding that McNeal's attorney's statements conceding manslaughter during a murder trial were tactical and strategic and did not constitute a forced guilty plea).

http://www.texasbar.com/Content/NavigationMenu/ForLawyers/Committees/Texas
CapitalGuidelines.pdf).

The Texas State Bar, in identifying the duties of capital habeas counsel, identified one duty as follows: Habeas corpus counsel cannot rely on the previously compiled record, but must conduct a thorough and independent investigation. Specifically, habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation. Counsel must not assume that the trial record presents either a complete or accurate picture of the facts and issues in the case. Further, the State Bar has also stated that state habeas "counsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place." *Id.*

Defense counsels' tactic of conceding the robbery in opening and thereafter arguing in closing that there was doubt as to whether the State proved the robbery should have been readily apparent to State habeas counsel as a viable ineffective claim. Thus, under the principles established in *Trevino*, this claim, at least as it applies to the ineffectiveness of trial counsel, is not barred from this court's review.

However, the principles established in *Trevino* and *Martinez* are also applicable to this claim as a whole, including the Due Process arguments. *Trevino* pointed out that generally, "if a convicted state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." *Trevino*, 133 S. Ct. at 1911. Of course there are many traps for the unwary defendant, one being the general requirement that claims first be presented to the state courts, this is referred to as procedural default. *Id.* However, the Supreme Court has pointed out that "the doctrine barring procedurally defaulted claims from being heard is not without exceptions. A

prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Id.* (internal quotations omitted).

To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, Kosoul must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez,* 132 S.Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.; Trevino,* 133 S.Ct. at 1921. *See Preyor v. Stephens*, 12-70024, 2013 WL 3830160 (5th Cir. July 25, 2013). State habeas counsel's failure to raise trial counsels' concession as to the Robbery issue resulted in a total deprivation of Kosoul's right to counsel under the Sixth Amendment. This claim therefore meets the "substantial" requirement set forth in *Martinez* because such a fundamental deprivation of counsel at both the trial and habeas level shakes the very "bedrock" of our justice system.

To demonstrate prejudice, Kosoul must also show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. _____, _____, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2013). In the present case, Kosoul meets this very high burden of prejudice. By conceding guilt as to both the murder and robbery, and failing to test the State's circumstantial case as the robbery, trial counsel pre-determined the jury's verdict of guilt as to capital murder. State habeas counsel further compounds this inequity by failing to raise this issue in Kosoul's State writ.

Accordingly, Kosoul has established that the cause for the default of his ineffective assistance of trial counsel was the result of his State habeas counsel's ineffectiveness. He is therefore entitled to consideration by this Court of the merits of this otherwise procedurally defaulted claim. *Martinez,* 132 S.Ct. at 1320.

**(3)     GROUND FOR REVIEW THREE:** Petitioner's Due Process Rights under the Fourteenth Amendment and his Sixth Amendment Right to an impartial jury were violated when a juror committed misconduct by discussing the case with his spouse.

This issue was properly preserved for federal review. Petitioner raised the violation of federal constitutional rights in his State habeas writ (PRE 2 at 51). The trial court signed F&Cs denying relief as to this claim (PRE 3 at 76-77). The CCA agreed with the trial court's findings.

This claim is based upon juror bias and misconduct. When considered in its totality, the record testimony discussed below confirms that Juror Number Nine had improper third party contact that influenced the verdict in this case. The trial court's denial of this claim is a contrary and unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States. Moreover, the trial court's denial of relief as to this issue is based on an unreasonable determination of the facts in light of the evidence presented in the State                    court                    proceeding.

The trial court erred in concluding that Kosoul failed to raise a claim of juror misconduct that is cognizable on habeas review (PRE 3 at ¶76-77). The trial court claimed that Petitioner failed to raise a proper constitutional challenge because he did "not claim that the juror was biased against him or that a state actor wrongly communicated with the juror." *Id.* at ¶75. The trial court's

reasoning, however, is flawed and the result of a misapplication of well established federal law to the facts of this claim.

Under the Sixth Amendment, a criminal defendant is guaranteed the right to an impartial jury. "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted). The Supreme Court has made clear that private communications between an outside party and a juror raise Sixth Amendment concerns. *Parker v. Gladden*, 385 U.S. 363, 364 (1966). "[P]rivate talk, tending to reach the jury by outside influence" is constitutionally suspect because it is not subject to "full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* Extrajudicial remarks directed at influencing a juror's resolution of an issue under deliberation, even if the remarks are isolated, may contravene the constitutional guarantee of a fair trial. *Id.* at 363-65. **And, if even a single juror's impartiality is overcome by an improper extraneous influence, the accused has been deprived of the right to an impartial jury**. *Id.* at 366 (emphasis added) ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.").

In its findings, the trial court suggests that Juror Number Nine's discussion of the trial with his wife during its pendency and viewing and discussing news reports about the trial with his wife during its pendency somehow does not rise to the level of an improper extraneous influence upon the jury's verdict. It is well

established that when a juror exposes himself to factual matters not in evidence, a presumption of prejudice attaches, requiring the government to prove beyond a reasonable doubt that the misconduct did not harm the defendant. *United States v. Blumeyer,* 62 F.3d 1013, 1016-17 (8th Cir.1995), *cert. denied,* 516 U.S. 1172, 116 S.Ct. 1263, 134 L.Ed.2d 212 (1996). The trial court ignores this obvious Sixth Amendment federal claim and instead implies that Petitioner simply raised a State procedural matter (PRE 3 at ¶76) ("Petitioner raises only a violation of Article 36.22 of the Code of Criminal Procedure, the statutory rule prohibiting contact with jurors"). This analysis, however, is incorrect completely misplaced. State habeas counsel did not raise an Article 36.22 claim. State hebaes counsel raised a Sixth Amendment Claim.

In order for the trial court's reasoning to stand, then it must have concluded that Petitioner raised no violation of the Fifth or Sixth Amendments to the Untied States Constitution in his juror misconduct claim. *See Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. This is of course not the case. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States"). This line of reasoning does not hold water. State habeas counsel alleged that Juror Number Nine's discussion of the case with his spouse violated Kosoul's Sixth Amendment right to an impartial jury. Contrary to the trial court's take, there is no mention in Kosoul's State habeas writ of an Article 36.22 violation. His writ instead is clearly focused on the Sixth Amendment deprivation inherent in the juror's misconduct.

The trial court next makes an alternative finding that Petitioner failed to demonstrate any showing of juror misconduct (PRE 3 at ¶78-83). The trial court based this finding upon the conclusion that "no credible evidence suggests that Juror Number Nine improperly communicated with his wife or … that any juror was privy to any outside information …." *Id.* at 82. The trial court's finding, however, ignores the facts on record in this case.

While law students at the SMU Dedman School of Law, Raechel Parolisi and Denise Santa Ana, participated in a death penalty seminar course (PRE 6). As part of the course, Parolisi and Santa Ana were assigned to assist Kosoul's defense team. *Id.* After Kosoul was sentenced to death, Parolisi and Santa Ana were assigned the task of interviewing the jurors and writing a paper discussing the factors that influenced the jury's verdict. *Id.* Parolisi and Santa Ana utilized a questionnaire during their juror interviews. On November 9, 2007, Santa Ana interviewed Juror Number Nine at his home. Because Parolisi could not join her for the interview, Santa Ana brought her boyfriend with her. Santa Ana's boyfriend videotaped the interview with Juror Number Nine. *Id.*

In her sworn affidavit, Parolisi recounts that Santa Ana admitted to recording the entire interview. *Id.* The two met at a Starbucks after the interview and Santa Ana showed Parolisi a portion of the recorded interview. *Id.* Santa Ana told Parolisi that Juror Number Nine admitted during the interview that he discussed Kosoul's case throughout the trial. *Id.* Santa Ana also told Parolisi that Juror Number Nine's wife had also been following the trial in the news while it was ongoing. *Id.* Santa Ana added that Juror Number Nine acknowledged that he was not to discuss the case while impaneled, but

stated he could not be expected to refrain from discussing the case with his wife. *Id.*

Parolisi told Santa Ana that this amounted to juror misconduct that had to be brought to

the attention of Kosoul's counsel. *Id.* Santa Ana was upset by this because she thought

Juror Nine was sweet and she did not want to get him in trouble. *Id.* Santa Ana

thereafter refused to give Parolisi a copy of the recording. *Id.* Santa Ana instead prepared

a partial transcript of the interview. *Id.* Santa Ana next changed her story and told

Parolisi that she only recorded part of the Juror Nine interview and that explained why

the transcript she prepared was incomplete. *Id.* When pressed about the issue, Santa Ana

told Parolisi that the admission's by Juror Number Nine of juror misconduct came up

while they chatted off-camera. *Id.*

At the State habeas evidentiary hearing on this claim, Parolisi testified that Santa

Ana also later told her that the video recording "didn't work and she couldn't find it"

(State Habeas Evidentiary Hearing of 11-1-2010 at 116). Parolisi further testified that

Santa Ana did not want her to have the video for fear she would turn it over to the

defense team. *Id.* at 121. Parolisi added that Santa Ana refused to get Juror Number

Nine in trouble because "he invited her to a Christmas party that she wanted to attend

and felt that coming forward with that information would cause him problems. *Id.*

Santa Ana testified that when she interviewed Juror Number Nine, his wife was

present. Santa Ana also testified that Juror Nine discussed the trial with his wife. *Id.* at

161. She added that:

> [H]is wife was there when I first got there, so she was very welcoming, and
> we talked about her little village for Christmas. She sat with us during the
> interview and offered us, you know, drinks and ice cream, I believe. And I
> noticed that he would look at her, and she knew what he was talking
> about. And **I think he mentioned that he had discussed it with**

**her. I don't recall if it was during deliberations. I don't remember if they were sequestered or not, or after. But I think my assumption was that it was after the trial.**

*Id.*

Santa Ana does not deny that Juror Number Nine discussed the trial with his wife during the course of juror deliberations. She simply assumes that the two had their discussions after the trial. Santa Ana added that although should took the time to transcribe the recording, she "honestly doesn't know what happened to the tape" of the interview. *Id.* at 163. Santa Ana also recounted that she and Palorisi were upset that "the juror had spoken to his wife about it". *Id.* at 165. When pressed by the trial court, Santa Ana reiterated that she was "**pretty sure … [she] thought** that he spoke to her after the trial." *Id.* (emphasis added). Santa Ana also recalled that she read the paper that she and Palorisi turned in as a part of this project. *Id.* at 170. The paper, written primarily by Palorisi, confirmed that Juror Number Nine committed juror misconduct. When confronted on cross-examination about the paper, Santa Ana again had a memory lapse claiming "I don't remember whether I knew that or not or saw that or not. I don't remember." *Id.* Santa Ana also claims that when she met Palorisi at the Starbucks, she asked her if she wanted to transcribe the recording, but Palorisi declined. *Id.* at 172. She also doesn't remember if she even showed Palorisi the video. *Id.*

Juror Number Nine testified that he only discussed the trial with his wife after the trial was over. *Id.* at 19. Later in his testimony, Number Nine clarified that "after the case was over, **and we were given the instructions in guilty or innocence and the penalty, I felt that it was over, and we could**

**talk"** . *Id.* at 20 (emphasis added). Number Juror Nine thereby conceded that after the close of the evidence, but prior to the beginning his deliberations, he believed the case was over and that he was free to discuss it with others. When asked on cross-examination whether he mentioned to his wife that it was surprising that the defense conceded guilt at the start of the trial, Juror Number Nine acknowledged that it was **"it's possible** … but I don't think so". *Id.* (emphasis added). As for the videotaped interview, Schwarz could not recall whether or not he was asked about discussing the trial with his wife. *Id.* at 25. On re-cross examination, Juror Number Nine testified that after the guilty verdict was returned, "**there might have been [discussion**, but he] … can't say for sure". *Id.* at 29 (emphasis added). He added that he was **"pretty sure … [he] told her what had happened,"** but that was the end of it because his wife didn't want to talk about it with him. *Id.* (emphasis added).

Juror Nine's wife testified that her husband did not talk to her about the trial while it was ongoing. *Id.* at 144 (it is of course open to debate when Juror Nine regarded the trial as being over). She acknowledged that she followed the trial in the news, but she could not remember if she ever discussed those reports with her husband during the pendency of the trial. *Id.* at 145. She was then asked if she discussed the trial with her husband after it was over. *Id.* She stated that she discussed "how hard it **would be**—how hard it could have been to decide someone's fate." *Id.* (emphasis added). Juror Nine's wife immediately tried to recover from this lapse by insisting that this discussion occurred after the trial was all done. *Id.* When asked whether she was in the room during her husband's interview, she contradicted Santa Ana's testimony stating that she was not in the

room when he was interviewed. *Id.* at 147.  Santa Ana testified that Juror Nine's wife "sat with us during the interview and … I noticed that he would look at her, and she knew what he was talking about". *Id.* at 161.  On cross-examination, she also contradicted herself by acknowledging that her husband did in fact see news stories about the trial while it was ongoing ("I don't—if I did, it would have been, oh, there was this news story, and he might have said, that's the case I'm on."). *Id.* at 151.

The above factual recitation confirms that the trial court had at its disposal ample presumptive proof that Juror Nine was exposed to outside influences during the pendency of the trial.  In *Remmer v. United States*, 347 U.S. 227 (1954), the Supreme Court held that in criminal cases, any *ex parte* communication with a juror is per se prejudicial.

The Fifth Circuit has stated that "juror bias can come to light in two ways: 'by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed.' " *United States. v. Scott*, 854 F.2d 697, 699 (5th Cir.1988) (citing *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir.1976)). In the instant case, Petitioner has established implied juror bias.  The landmark case addressing the implied bias doctrine is *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).  In *Smith*, "the Court ... held that in most cases the remedy for claims of juror bias is a post-event hearing, in which the trial judge can examine the juror and obtain assurances that, despite the event leading to the claim of bias, the person is able to continue serving as an impartial juror." *Brooks v. Dretke*, 444 F.3d 328, 330 (5th Cir .2006) (citing *Smith*, 455 U.S. at 217–18)). However, in an oft-cited concurring opinion in *Smith*,

Justice O'Connor expressed her concern that there may be certain situations in which "a hearing may be inadequate for uncovering a juror's biases, leaving serious question whether the trial court had subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice." *Smith*, 455 U.S. at 222.

Despite the trial court's effort to negate the existence of juror bias in this case, the record most certainly demonstrates "serious question[s]" as to whether a miscarriage of justice has occurred in this case. Based on Justice O'Connor's concurrence, the Fifth Circuit has stressed that the implied bias doctrine is "clearly established Federal law as determined by the Supreme Court." *Brooks v. Dretke*, 418 F.3d 430, 329 (5th Cir.2005). Therefore, the key inquiry in a case involving a claim of implied juror bias is " 'whether [the juror's] conduct is of the genre of cases Justice O'Connor pointed to in ... *Phillips*: juror conduct not salvageable by post event hearings.' " *Id.* at 330 (quoting *Brooks v. Dretke*, 418 F.3d 430, 434 (5th Cir.2005)).

In *Brooks v. Dretke*, a juror was arrested for carrying a gun into the courthouse on the day the defendant's death penalty sentencing hearing began. *Dretke*, 418 F.3d at 431. Because the juror could have been charged with a felony by the same prosecutor seeking the death penalty in the trial, the Fifth Circuit concluded that these facts warranted a finding of implied juror bias. *Id.* at 434–35. The *Brooks v. Dretke* panel also cited to *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1956), in which bias was alleged based on the fact that a juror was offered a bribe during the trial. *Id.* at 433–34. In *Remmer*, the Supreme Court concluded that neither "the juror nor anyone else could say that he was not affected in his freedom of action as a juror." *Remmer*, 350 U.S. at 381. According to the *Brooks* court, "*Remmer* illustrates that there are certain factual circumstances, as illuminated by Justice O'Connor's concurring opinion in *Smith*, in which

no reasonable person could not be affected in his actions as a juror and in which the Constitution refuses to accept any assurances to the contrary." *Brooks,* 444 F.3d at 331.

In the instant case, the trial court made a finding that Petitioner failed to demonstrate any showing of juror misconduct because "no credible evidence suggests that Juror Number Nine improperly communicated with his wife or … that any juror was privy to any outside information …." (PRE 3 at ¶82). The trial court presumed that there was no misconduct and therefore failed to conduct any analysis of whether the juror was at all biased. The juror misconduct at issue in this case raises the same intolerable risk of an irreparably impartial jury discussed supra by Justice O'Conner. As a consequence, the state trial court's finding of neither implied bias nor prejudice were objectively unreasonable. *Id.* at 332; *see also Solis v. Cockrell*, 342 F.3d 392 (5th Cir. 2003) (noting that in cases of juror bias, a defendant may show that a trial court's attempts to determine whether the juror is actually biased inadequately protect the defendant's right to a fair trial, because the allegedly prejudicial circumstances may be affecting the juror in ways the juror may not realize or may cause the juror to knowingly withhold the truth from the inquiring court). The trial court's failure to consider the prejudicial nature of this juror misconduct on the verdict violates the clearly established Supreme Court authority set forth supra and was a clear misapplication of the facts of this case to well established federal law.

**(4)**     **GROUND FOR REVIEW FOUR:** A juror's improper consideration of Petitioner's failure to testify at trial violated his Fifth, Sixth and Fourteenth Amendments rights.

This issue was properly preserved for federal review. Petitioner raised the violation of federal constitutional rights in his State habeas writ (PRE 2 at 55-56). The trial court

signed F&Cs denying relief as to this claim (PRE 3 at ¶86). The CCA agreed with the trial court's findings.

Juror Number Nine admitted that he took Petitioner's failure to testify into consideration in reaching his verdict (PRE at 55-56). This admission was also made in the presence of the SMU law student, Santa Ana, that interviewed him at his home. When asked about this, the juror stated "to say that it didn't would be a lie, but in my heart, I felt that if he had something to say, he should say it, and he didn't so there probably wasn't anything that he could have said that could help him." *Id.* He continued, "when you don't defend yourself, it's not a good thing." *Id.* This improper conduct violated Mr. Chanthakoummane's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. U.S. Const. amends. V, VI, XIV.

The trial court denied Petitioner's claim noting that the "sole evidence in support of his claim is an affidavit form Parolisi, a law student recounting another law student's [Santa Ana's] description of an interview with Juror Number Nine. This evidence is inadmissible as a statement regarding the jury's deliberations and will not be considered for any purpose. Tex. R. Evid. 606(b)" (PRE 3 at 10). The trial court's conclusion that Petitioner failed to offer any admissible evidence in support of his claim of juror misconduct is contrary to well settled federal law and the result of an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Sneed v. State*, 670 S.W.2d 262 (Tex. Crim. App. 1984), the Court of Criminal Appeals held that a juror's misconduct constitutes reversible error when a defendant shows (1) a misstatement of the law; (2) asserted as a fact; (3) by one professing to know the law; (4) which is relied upon by other jurors; (5) who for that reason changed their

vote to a harsher punishment. *Sneed*, 670 S.W.2d at 266. Current Rule 606(b), amended after the decision in *Sneed*, provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

A number of Texas courts of appeals have concluded that the 1998 amendment of Tex. R. Evid. 606(b) abrogated the test for jury misconduct articulated in *Sneed* because the rule now bars the introduction of evidence necessary to satisfy the above five-factor test. *See Hart v. State*, 15 S.W.3d 117, 123-24 (Tex. App.-Texarkana 2000, pet. ref'd) (explaining that the new rule limits jurors to "testifying only about outside influences that affected their decision or testimony rebutting a claim that a juror was not qualified" and therefore prevents a defendant from meeting the *Sneed* factors, which were developed under a previous version of the rule that allowed jurors to testify more broadly about the validity of the verdict) (quoting Tex. R. Evid. 606(b)); *see also Moore v. State*, No. 12-01-00089-CR, 2002 WL 253818, *1-2 (Tex. App.-Tyler 2002, no pet. h.) (per curiam) (not designated for publication); *Hines v. State*, 3 S.W.3d 618, 620-23 (Tex. App.-Texarkana 1999, pet. ref'd). Indeed, the Texas Criminal Court of Appeals on Salazar's direct appeal noted the apparent conflict between Texas Rule 606(b) and *Sneed*, but it declined to resolve the issue. *Salazar*, 38 S.W.3d at 148 n. 3. As a consequence, *Sneed* is no longer viable in light of Rule 606(b). *See Davis v. State*, 119 S.W.3d 359, 365 (Tex. App.-Waco 2003, pet. ref'd); *see also Hart v. State*, 15 S.W.3d 117, 123 (Tex. App. Texarkana 2000, pet.

74

refd); *Hicks v. State,* 15 S.W.3d 626, 630 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd). The Court of Criminal Appeals has yet to decide the issue. *See Davis,* 119 S.W.3d at 365; *see also Salazar v. State,* 38 S.W.3d 141, 148 n. 3 (Tex. Crim.App.2001), *cert. denied,* 534 U.S. 855, 122 S.Ct. 127, 151 L.Ed.2d 82 (2001). In light of Rule 606(b), defendants seeking relief in State court "may no longer establish jury misconduct except for outside influence being improperly brought to bear upon a juror." *Davis,* 119 S.W.3d at 365; *see* Tex. R. Evid. 606(b).

The Fifth Circuit, however, has explained that the factors identified by the Texas Court of Criminal Appeals in *Sneed* for analyzing a claim of jury misconduct arising from alleged discussions of parole are relevant exclusively to *State-law* claims of jury misconduct and do not govern the disposition of analogous federal due process claims. *See Salazar v. Dretke,* 419 F.3d 384, 395-99 (5th Cir. 2005) (recognizing the *Sneed* factors set forth the test for jury misconduct under applicable state law but do not control the disposition of an analogous federal due process claim), *cert. denied,* --- U.S. ----, 126 S.Ct. 1467, 164 L.Ed.2d 252 (2006); *Monroe v. Collins,* 951 F.2d 49, 52 n. 7 (5th Cir.1992)(recognizing the *Sneed* factors set forth the test for evaluating state-law jury misconduct claims).

Accordingly, the question before this Court is not whether Petitioner is entitled to a new trial under applicable State-law principles but, rather, whether his *federal* constitutional rights were violated. *Prieto v. Dretke,* 386 F.Supp.2d 767, 812 (W.D. Tex. 2005). To prevail on this federal due process claim, Petitioner must first overcome the well-established federal common-law principle that, absent a showing that an external or extraneous influence was brought to bear on the jury's deliberations, the testimony of a juror about that juror's personal thought process or the jury's discussions during deliberations is incompetent to impeach a jury verdict: By the beginning of this century, if

not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict.

Exceptions to the common-law rule were recognized only in situations in which an "extraneous influence" was alleged to have affected the jury. *Tanner v. United States,* 483 U.S. 107, 117, 107 S.Ct. 2739, 2745-46, 97 L.Ed.2d 90 (1987) (citations omitted).

Consistent with this principle, the Supreme Court has refused to permit consideration of juror testimony regarding alleged instances of jury misconduct occurring during deliberations absent a showing that some external or extraneous influence was brought to bear on the jury. *See Tanner,* 483 U.S. at 118-27, 107 S.Ct. at 2746-51 (holding "long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry" and precluded consideration of allegations that some jurors abused alcohol or took illegal drugs during the trial); *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982) (proper to consider evidence showing a juror in a criminal trial had applied for employment with the District Attorney's office); *Parker v. Gladden,* 385 U.S. 363, 364-66, 87 S.Ct. 468, 469-71, 17 L.Ed.2d 420 (1966) (proper to consider testimony some but not all jurors had overheard a bailiff's negative comments about the defendant); *Remmer v. United States,* 347 U.S. 227, 228-30, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) (considering testimony from a juror that he was offered a bribe by a third-party); *McDonald v. Pless,* 238 U.S. 264, 265-69, 35 S.Ct. 783, 783-85, 59 L.Ed. 1300 (1915) (juror testimony regarding a quotient verdict was inadmissible for the purpose of impeaching the verdict); *Hyde v. United States,* 225 U.S. 347, 384, 32 S.Ct. 793, 808, 56 L.Ed. 1114 (1912) (improper to consider juror testimony that a bargain had been struck between jurors deliberating to convict one defendant in exchange for acquitting another); *Mattox v. United States,* 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892) (holding it

was appropriate to consider juror affidavits regarding statements about the defendant's criminal history allegedly made to the jurors during deliberations by a court bailiff because those alleged statements constituted a potential extraneous influence on the jury's deliberations).

Although *Tanner* might potentially bar Petitioner's claim in federal court absent some proof of an extraneous influence, *see e.g.*, *Tanner,* 483 U.S. at 126-27, the State trial court's use of Rule 606(b) to block any consideration whatsoever of this claim is intolerable and a due process violation. A similar concern was raised in at least one Texas State court opinion:

> While the impulse that produced that rule may be good, the prohibition sometimes results in improper conduct in the jury room that impermissibly affects the verdict. Here it was improper speculation about parole. In another case, it may be a juror using personal experience, unrelated to the case at bar, to influence the vote of other jurors, such as a juror who has been burglarized talking about the sense of violation that such victims feel and urging conviction or severe punishment based not on the burglary, but on the juror's own emotional distress in response to a different burglary. **We should not invade the jury room for little purpose, but due process demands that there be a way to address blatant misconduct. Rule 606(b) bars any examination of the process. A trial cannot be fair if jury deliberations are tainted.**

*Ex parte Green*, 159 S.W.3d 925, 926 (Tex. Crim. App. 2004) (Johnson, J., statement dissenting to the dismissal of the writ application) (emphasis added).

By foreclosing consideration of this issue under Rule 606(b), the trial court infringed upon fundamental constitutional protections that are well established under federal law. *See Pless*, 238 U.S. at 268-69 (noting that "it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without 'violating the plainest principles of justice.' This might occur in the gravest and most important cases"). There is no disputing that a death penalty case is just the sort "grave and important case" contemplated by *Pless*. To permit

an inflexible rule such as 606(b) to bar consideration of obvious and prejudicial juror bias such as that raised in Petitioner's writ violates the "plainest principles of justice."  It was therefor unreasonable for the trial court to have denied Petitioner's due process claim under the 606(b) because this finding runs contrary to well-settled Supreme Court precedent.

The State court failed to adequately consider Petitioner's claim under the rationale that 606(b) precluded admissibility of such juror bias evidence. The Texas Court of Criminal Appeals never addressed the merits of Petitioner's *federal*-due-process jury-misconduct claim on either direct appeal or in the course of Petitioner's State habeas corpus proceeding. Therefore, in the alternative, this Court should review the merits of Petitioner's federal constitutional jury-misconduct claim *de novo See Rompilla,* 545 U.S. at 390 (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins,* 539 U.S. at 534, (holding the same).

**(5)**     **GROUND FOR REVIEW FIVE:**    Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the Untied States Constitution by failing to challenge the admissibility of the State's gang affiliation witness.

This issue was properly preserved for federal review. Petitioner raised the violation of federal constitutional rights in his State habeas writ (PRE 2 at 59-62). The trial court signed F&Cs denying relief as to this claim (PRE 3 at ¶96) . The CCA agreed with the trial court's findings.

At trial the State offered the expert testimony of Kosoul's juvenile court counselor in North Carolina, Brian Conner (XXIV RR at 115).  Conner testified that Kosoul was a

member of the violent street gang known as the "Crips" (XXIV RR at 125).  Conner based his opinion on conversations he'd had with Kosoul and his family. The State admitted this testimony into evidence despite the defense's objection that Conner could not recall any specifics of why he thought Kosoul was a Crip (XXIV RR at 105) ("What did he say that indicated he was a gang member? I don't remember sir").  Equally troubling was the fact that Conner acknowledged at trial that he could not communicate with Kosoul's parents because they did not speak English (XXIV RR at 100 and 105) ("What did his family say that indicated he was a gang member? I can't tell you exactly what they said, I don't remember"); ("No, they had very little English, say Hello, thank you, yes, no, as far as – I can't remember much other English that they knew); (XXIV RR at 106) ("What did anybody say, tell you, that indicated he was a gang member? I can't tell you specifically, no, but I remember him being a gang member").  As further alleged evidence of gang affiliation, Conner also produced a letter that Kosoul sent him back when he was 16 years old (XXIV RR at 106).  Conner opined that the letter was littered with gang symbols. (XXIV RR at 138-140).

The defense objected to this testimony on the basis that Conner was not properly qualified as an expert under the Texas Rules of Evidence because he could not recall any of the underlying facts that supported his opinion (XXIV RR at 110-13).  The defense also objected that this testimony was not relevant or admissible under Rule 403 of the Texas Rules of Evidence (XXIV RR at 110-11).  Also the defense objected to the State's failure to provide proper notice under the trial court's pretrial order of their intent to offer such expert testimony (XXIV RR at 113).  These objections were overruled (XXIV RR at 112).  Despite being properly preserved for review, appellate counsel failed to raise any of these issues. This amounted to ineffective assistance of appellate counsel.

## A. Improper Opinion Testimony Under Texas Rules of Evidence 701, 702 and 703

Connor's opinion testimony was inadmissible under Rule 403 and failed to qualify as proper opinion testimony under Rules 701, 702, and 703. Mr. Conner's testimony about gang affiliation was presumably expert testimony covered under Rule 702 of the Texas Rules of Evidence. Rule 702 places the burden upon the proponent of evidence to establish by clear and convincing evidence that it should be admitted. *Jackson v. State*, 17 S.W.3d 664 (Tex. Crim. App. 2000); *Massey v. State* 933 S.W.2d 141 (Tex. Crim. App. 1996). The decision to admit or exclude expert testimony lies within the sound discretion of the trial court and upon appellate review is reviewed for abuse of discretion. *Banda v. State*, 890 S.W.2d 42 (Tex. Crim. App. 1994).

Under Rule 702, an expert witness must first be qualified to render a particular opinion. Qualification is a two-step inquiry. *See Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006) (observing that "[a] witness must first have a sufficient background in a particular field, but a trial judge must then determine whether that background 'goes to the very matter on which [the witness] is to give an opinion'").

Although Conner testified that he had received 120 hours of "gang specific training", he repeatedly stated that he was not a "gang expert" (XXIV RR at 103). Conner himself acknowledged, "gangs change everyday", and someone who is a gang expert one day, may not be one the next day (XXIV RR at 103-104). Therefore, his training and experience at the time of his testimony may not have been sufficient to render his opinion reliable. Nevertheless, the trial court allowed him to opine about Kosoul's supposed gang affiliations. This testimony was admitted despite the fact that Conner could not recall any specific facts upon which this opinion was based (XXIV RR

at 101-102; 105-106).  Although wrongly perceived by the jury as being authoritative on the subject of gangs, Conner's testimony was based upon little more than speculation.

Conner's lay opinion was also irrelevant and inadmissible under Rules 403 and 701 of the Texas Rules of Evidence because it was not the product of his firsthand observations.  As a consequence, his testimony was prejudicial and confused the jury. Rule 701 provides that if a witness "is not testifying as an expert, the witness' testimony in the form of opinion or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to clear understanding of the witness' testimony or the determination of a fact issue" Texas R. Evid. 701. Accordingly, lay opinion **must be the product of reasoning processes familiar to the average person in everyday life**. *See* Advisory Committee Notes to 2000 Amendments Federal Rules of Evidence (explaining that "lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field'".

The purpose of this foundation requirement is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in Texas Rule Evidence 705. Thus, when considering the prerequisite for lay opinion testimony, a court must focus on "the reasoning process" by which a witness reached his proffered opinion. 4 *Weinstein's Federal Evidence* § 701.03[1].  If the opinion rests "in any way" upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701.  In the present case, the State failed to provided notice under Rule 705, and the trial court's pretrial order, of their intent to offer gang opinion testimony.  The district

court made no specific ruling qualifying Conner as an expert and presumably instead allowed him to testify strictly as a lay witness.

Rule 701 requires lay opinion testimony to be based on the witness's **personal perceptions**. *See* Texas R. Evid. 701(a) (emphasis added). The traditional objective of the rule is, after all, to afford the trier of fact "an accurate reproduction of the event" at issue. *Id.*, Advisory Committee Notes on 1972 Proposed Federal Rules of Evidence. Recognizing that eyewitnesses sometimes find it difficult to describe the appearance or relationship of persons, the atmosphere of a place, or the value of an object by reference only to objective facts, the law permits such witnesses to testify to their personal perceptions in the form of inferences or conclusory opinions. *See* Advisory Committee Notes on 1972 Proposed Rules and on 2000 Amendments; *see also* 4 *Weinstein's Federal Evidence* § 701.03[4][b] (detailing subjects on which lay opinion testimony has been received). In short, Rule 701 represents no departure from Texas R. Evid. 602: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Rather, Rule 701 simply recognizes lay opinion as an acceptable "shorthand" for the "rendition of facts that the witness personally perceived." 4 *Weinstein's Federal Evidence* § 701.03[1]. In the present case, Conner could not specifically base his opinion of gang affiliation on anything with which he had firsthand knowledge, other than the letter from Kosoul he deciphered.

Moreover, the gang evidence offered against Petitioner by the State was irrelevant and highly prejudicial under Rule 403. In order to prove the relevance of a defendant's membership in an organization or group, the State must show: (1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization. *See Dawson v. Delaware*, 503 U.S. 159 (1992); *Fuller v. State*, 829 S.W.2d 191, 196 n.2 (Tex.

Crim. App. 1992) *cert. denied* 508 U.S. 941 (1993) *overruled on other grounds by Castillo v. State*, 913 S.W.2d 529, 534 (Tex. Crim. App. 1995). The State failed to offer any such evidence in the present case. In *Anderson v. State*, the Court of Criminal Appeals held that before evidence of gang affiliation may be admissible at the punishment phase of trial, the State must established that the defendant: (1) was a member of the "Canine Posse" gang; (2) the "Canine Posse" gang had a bad reputation; and (3) the gang was involved in the distribution of narcotics in the apartment complex where the crime took place. *Anderson v. State*, 901 S.W.2d 946, 950 (Tex. Crim. App. 1995) (noting that gang affiliation is not a *pre se* method of proving character); *see also Beasley v. State*, 902 S.W.2d 452, 457 (Tex. Crim. App. 1995) (holding that evidence of gang affiliation is relevant and admissible to show the character of the accused, **if evidence of the gang's activities is also presented**) (emphasis added).

In the present case, the State failed to meet the *Anderson* test. There was no evidence whatsoever offered concerning the violent and illegal activities of the Crips street gang. The State simply offered the opinion testimony of Conner that Kosoul was a member of the Crips and that he associated with other street gangs. Although Conner offered some testimony concerning the structure and relationships of these gangs, (XXVI RR at 126) he offered nothing relevant to the special issues before the jury or to rebut any mitigating evidence presented by the defense. Trial counsel's relevancy objection to Conner's testimony should have therefore been sustained and appellate counsel should have raised this issue on appeal. The failure to do so was clearly deficient performance that resulted in prejudice. The trial court's denial of relief at the State habeas level was an unreasonable Petitioner of clearly established federal law under *Strickland* to the facts of this case.

The State failed to properly qualify Conner as either an expert or lay opinion witness on the subject of gangs. Trial counsel made a timely objection to Conner's gang testimony both on the grounds of admissibility and relevance, but appellate counsel failed to raise either of these issues on appeal. The failure to do so amounted to deficient performance. The trial court denied relief stating that "Appellate counsel was not ineffective for declining to raise the issue of Connor's qualifications on appeal because he would not have prevailed" (PRE 3 at ¶93). The court concluded that the State established Connor was an expert and even if he was not, that his testimony was nevertheless admissible as lay opinion testimony. *Id. at* ¶91-92. The trial court's denial of relief as to this issue was an unreasonable and erroneous application of the facts to federal law.

A criminal defendant is entitled to constitutionally effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 394 (1985); *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1998); *Lombard v. Lynaugh*, 868 F.2d 1475, 1479 (5th Cir. 1989). The failure to provide effective assistance of counsel on direct appeal violates a defendant's rights to due process under the Fourteenth Amendment. U.S. Const. amends. VI, XIV; *Evitts*, 469 U.S. at 396. In order to prove ineffective assistance of counsel, a petitioner must first show that his attorney's performance was deficient and, second, demonstrate that such deficiency caused him prejudice. *Strickland*, 466 U.S. at 687.

Had this issue been raised on appeal, the Texas Court of Criminal Appeals would have found error in the admission of Conner's testimony about Kosoul's gang membership. Error in the improper admission of gang testimony amounts to constitutional error under Tex. R. App. P. 44.2(a). *See Shelton v. State*, 41 S.W.3d 208, 218 (Tex.App. – Austin 2001, pet. ref'd) (holding that State clearly offered considerable

evidence indicating Shelton's association with various Klan groups, but failed to offer proof of the group's violent and illegal activities). Here, as in *Shelton*, the State did not prove that the violent gang that Petitioner was alleged to be a member of, had committed any unlawful or violent acts or had endorsed such acts during the relevant period of time. *See Dawson*, 503 U.S. at 166 (holding that that it was constitutional error to admit stipulation of defendant's membership in white racist prison gang where that evidence was not relevant to any issue being decided at the punishment phase).

The trial court's failure to exclude the gang testimony in the present case was not harmless error and in fact affected the outcome of the punishment phase. Conner's testimony was the only evidence that the jury heard about any gang ties Kosoul may have had. Had this issue been raised on appeal by appellate counsel, there is a reasonable probability that the result of the punishment trial would have been different. Accordingly, Petitioner has satisfied both prongs of the *Strickland* test with respect to this claim. The trial court's failure to grant relief in the State habeas proceedings is contrary to well-settled federal law and the result of an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

**(6)** **GROUND FOR REVIEW SIX:** Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the Untied States Constitution by failing to challenge the sufficiency of the evidence regarding Petitioner's future dangerousness.

This issue was properly preserved for federal review. Petitioner raised the violation of federal constitutional rights in his State habeas writ (PRE 2 at 65-66). The trial court signed F&Cs denying relief as to this claim (PRE 3 at 102). The CCA agreed with the trial court's findings.

Appellate counsel failed to raise on direct appeal the legal sufficiency of the evidence of future dangerousness offered by the State at trial. Failure to raise this issue on direct appeal is ineffective assistance of appellate counsel.

At trial, defense counsel offered evidence of Petitioner's good conduct while incarcerated (XXV RR at 7-21; XXVI RR at 7-95; XXVII RR at 11-17). A number of prison guards who dealt with Petitioner while he was incarcerated in the North Carolina prison system testified during the punishment trial. North Carolina Department of Corrections Officer Lawrence Parsons testified concerning inmate classification in the North Carolina prison system (XXVI RR at 6-20). Parsons also testified that he met Kosoul when he was an inmate at the Anson Correctional Center. *Id.* at 22. At that time, Kosoul worked in the prison's administrative building. *Id.* at 23. He testified that while there, Petitioner had no disciplinary issues or gang affiliations. *Id.* at 25-26.

Defense counsel next called former North Carolina Corrections Officer Michael Pitman (XXVI RR 47). Pitman testified that in all his dealings with Kosoul at the Anson Correctional Center, he never knew him to carry out any acts of violence against other inmates. *Id.* at 52. In fact, Pitman testified that Petitioner was "an excellent inmate … always respectful to staff, obeyed their orders, [and] never gave any problems …." *Id.* The defense then called North Carolina Corrections Sergeant Bruce Chabot (XXVI RR 56). Chabot was the officer in charge of Petitioner's unit at Anson. *Id.* at 57. He recalled that he had no problems whatsoever with Kosoul during his stay at Anson. *Id.* at 59. North Carolina Corrections Officer Kevin Tuttle testified that in all his dealings with Kosoul, he'd never known him to disobey any orders, cause any fights, attempt to escape, or cause any discipline problems whatsoever (XXVI RR 93). Anson Corrections Officer

Jessie McDonald testified that in all his dealings with Kosoul, he was never a problem to staff or other inmates (XXVI RR 102).

Additionally, the defense called a North Carolina inmate who had served time with Petitioner to testify as to his good conduct while in custody. *Id.* Tony Shank testified that he pled guilty to manslaughter and was sentenced to serve 60 to 81 months imprisonment. *Id.* at 66. Shank first met Kosoul in December of 2004 while they served time together at Anson. *Id.* at 72. Shanks testified that Petitioner was never a troublemaker in prison. *Id.* at 73 (he was "very low key, … I've never seen him in an altercation or anything of that nature").

The defense also called Restoration House Ministries Director Dominquez Duarte who testified that while Petitioner was part of his program, he was very humble and meek and did not cause any problems (XXV RR 5-30). The defense also called an expert witness is prison art, Phyllis Kornfeld, who testified that she examined Petitioner's artwork and was of the opinion that art would be helpful to him in adjusting to prison life (XXVI RR 193-217). Kornfeld added that the Petitioner's artwork was neither violent nor pornographic in nature. *Id.* Pamela Allen testified that she was Kosoul's case manager when he was in prison in North Carolina (XXVII RR at 11). Allen testified that Kosoul was "an exemplary inmate." *Id.* at 17.

The defense also called a forensic psychologist, Dr. Brad Fisher, to testify as an expert witness on the subject of prison behavior and classification XXVI RR at 116). The defense's expert testified that he reviewed Petitioner's North Carolina prison records (XXVI RR at 141). These records included two serious disciplinary infractions, one for a tattoo needle and one instance where Kosoul reported a shank in his cell. *Id.* Fisher also met with all the above-referenced prison officials who testified for the defense to support

his conclusions on the issue of dangerousness (XXVI RR 142). Based upon this information, Fisher concluded that if counsel were sentenced to life imprisonment, he "will likely to continue to behave as he's been behaving and that his behavior has not been violent" (XXVI RR 143).

The State called one witness with respect to victim impact, Dawn Tate, who was the caretaker of Walker's child (XXVII RR 118-23). The State predominately offered evidence of Petitioner's prior criminal conduct during the punishment trial. The State first called North Carolina Detective Susan Sarvis (XXIV RR 21). Detective Sarvis testified that while working in the juvenile crimes unit, she investigated an assault that Petitioner was charged with committing. *Id.* at 21-43. The State next called Union County Sheriff's Deputy Robert Rollins who testified regarding Petitioner's prior conviction for home invasion and kidnapping (XXIV RR 43-78). Lawrence Smith testified that when he was a teenager, Petitioner and some other juveniles assaulted him and stole his bicycle (XXIV RR 78-88). The State next called their gang "expert", Brian Conner, who testified about Petitioner's alleged gang affiliations while he was a youth (XXIV RR 114-177). Barbara Johnson, a realtor in the McKinney, Texas area, testified that days prior to the murder in this case, Petitioner came to her front door complaining of vehicle problems and put her in fear for her safety (XXIV RR 178-92). The police were called out and Petitioner left the scene without incident. *Id.* Tedrick Gardner, Petitioner's Texas Parole Officer, testified that two days after Walker's murder, July 10, 2006, Petitioner did not report to the parole office as required (XXIV RR 192-217). In rebuttal, the State called A.P. Merillat to testify regarding G-3 classification of inmates sentenced to life without parole. He testified that even an inmate in G-3 administrative segregation has opportunities to commit acts of violence (XXVII RR at 78). Merillat

added that there have been many violent offenses committed in prison, including some committed by inmates on death row. *Id.* at 79.

In rebuttal, defense counsel called Walter Quijano, an expert in prison classification to testify that there were sufficient administrative procedures in place in the Texas prison system to control the conduct of inmates sentenced to life without parole (**XXVII RR 133-161**).

This was the extent of the State's evidence of future dangerousness. None of the evidence offered by the State alleged specifically that Petitioner would be dangerous while incarcerated or that he would present a future danger if incarcerated for life. Appellate counsel's failure to raise this issue on direct appeal is inexcusable neglect that amounts to ineffective assistance of counsel.

As study sponsored by the United States Department of Justice confirms that past community violence is not strongly or consistently associated with prison violence. *See* Alexander, Jack & Austin, James, HANDBOOK FOR EVALUATING OBJECTIVE PRISON CLASSIFICATION SYSTEMS, United States Department of Justice, National Institute of Corrections (June, 1992) (noting that prison violence does not predictably follow from pre-confinement violence or the capital offense of conviction). The State's evidence of future dangerousness relied heavily upon prior criminal conduct to suggest that Petitioner would be a future danger if sentenced to life without parole. This evidence is in direct contradiction with the available scientific data. *See* Smith, S.M., The Prediction of Dangerous Behavior, in P.J. Resnick (ed.), FORENSIC PSYCHIATRY REVIEW COURSE 539 (American Academy of Psychiatry and Law 1993) (noting that in a capital sentencing proceeding, assessments of future dangerousness must examine whether the defendant will be a future danger if he is sentenced to life

rather than death. Thus, the "base rate" that is relevant for such assessments looks to the frequency of violent behavior in the population of people who have been sentenced to life instead of death in capital trials).[6]  The State offered no such evidence at trial to support the likelihood that Petitioner would present a danger if sentenced to life without parole.

The trial court stated in its F&C that evidence offered by the State during the punishment trial "overwhelmingly support a finding of future dangerousness" (PRE 3 at ¶98) (finding that the factors set forth in *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987) were established by the fact that: 1) Petitioner acted alone in committing the crime; 2) the crime was calculated, premeditated and deliberate; 3) during the commission of the robbery, Petitioner stabbed Walker more than thirty times, hit her in the face with a plant stand and bit her shoulder; 4) Petitioner's criminal history was extensive and fraught with violence; 5) Petitioner was twenty-five years old at the time of the murder; 6) Petitioner did not show any remorse for the crime; and 7) there was no psychiatric testimony indicated Petitioner suffered from any mental health issues or impairments).

The trial court characterized Petitioner's mitigation evidence that he was not violent when incarcerated as "not so strong that the jury could not reasonably conclude Petitioner would be a future danger" and therefore legally sufficient to sustain the jury's finding of future dangerousness.  *Id.* at ¶¶99-100.  The court also noted that State habeas counsel failed to demonstrate that a reasonable probability that Petitioner would have

---

[6] The established and accepted method for estimating the risk of dangerousness of a particular capital convict, therefore, must begin with establishing the base rate of similar prisoners' and parolees' violence. Once that has been done, there is also an established method for individualizing the risk assessment of the individual. This involves examining prisoners within the cohort of convicted murderers who do commit violence and "identifying particular characteristics of [these] research subjects who subsequently engaged in violent behavior." Grisso, T. & Appelbaum, P.S., Is It Unethical to Offer Predictions of Future Violence?, 16 LAW AND HUMAN BEHAVIOR 621, 628 (1992). With these characteristics identified, the characteristics of the person whose risk of dangerousness is being assessed can then be compared and an estimate made – taking this and the base rate into account – of the risk that this person will be dangerous in the future. *Id.*

prevailed on appeal if this issue were raised. *Id.* at 101.

In evaluating the sufficiency of the evidence supporting a future dangerousness determination, the Texas Court of Criminal Appeals applies the standard of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In reviewing the sufficiency of the evidence at punishment, courts must look at the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have believed beyond a reasonable doubt that appellant would probably commit criminal acts of violence that would constitute a continuing threat to society. *Id.* The Court of Criminal Appeals has also listed a number of non-exclusive factors appropriate for consideration in reviewing the sufficiency of the evidence to support a finding of future dangerousness: 1) the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties; 2) the calculated nature of the defendant's acts; 3) the forethought and deliberateness exhibited by the crime's execution; 4) the existence of a prior criminal record, and the severity of the prior crimes; 5) the defendant's age and personal circumstances at the time of the offense; 6) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; 7) psychiatric evidence; and 8) character evidence.

The trial court's findings are the product of an incorrect and unreasonable application of the facts to well settled Supreme Court law. *See Coleman v. Johnson,* __ U.S. _____, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012) (*per curiam*) (noting that a State-court decisions rejecting a challenge based upon insufficiency may be overruled on habeas review only if the decision was objectively unreasonable). In the present case, the State court unreasonably applied the *Jackson* standard in determining that the jury's verdict finding Petitioner would constitute a future danger was supported by the evidence.

While the court was correct in noting that the *Keeton* factors permit the jury to consider the circumstances set forth supra, those factors must nevertheless be present to the extent that they support the jury's affirmative finding. *See id.* (noting that when deciding whether there was sufficient evidence to support a jury's finding that a defendant will constitute a continuing threat of violence to society, the court must view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Art. 37.071(b)(2), supra, beyond a reasonable doubt).

The fact that this case involved a murder during the commission of a robbery does not in-and-of-itself satisfy the *Keeton* factors summarized by the trial court in its F&C. In *Roney v. State,* 632 S.W.2d 598 (Tex. Cr. App. 1982), the defendant was found guilty of capital murder, specifically, murder committed in the course of robbery. The defendant and two other men went into a convenience store and the clerk was shot after money was taken from the register. The defendant had participated in a different robbery minutes before the capital murder occurred. The evidence also showed that the defendant had laughed about the murder. In finding that the facts of the case did not support an affirmative finding to the second special issue regarding future dangerousness, the CCA stated:

> "Although this was a senseless murder, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a 'calculated and cold-blooded crime,' such as appeared in *O'Bryan v. State*, 591 S.W.2d 464, 480 [Tex.Cr.App.1979], where the defendant for months planned the candy poisoning of his own child to collect life insurance. To support a 'yes' answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a *continuing* threat to society. To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled

decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition."

*Id.* at 603

Although the Petitioner in the present case, unlike the defendant in *Roney*, has a prior criminal record, prior criminal conduct is a poor predictor of future dangerousness as discussed supra.

The State court also unreasonably applied the *Strickland* standard to the present case in concluding that appellate counsel's failure to brief this issue was not objectively unreasonable and would not have affected the outcome of the proceedings. The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins,* 528 U.S. 259, 285, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000) (holding a petitioner arguing ineffective assistance by his appellate counsel must establish both (1) his appellate counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal).

In the present case, appellate counsel's failure to challenge the legal sufficiency of the State's future dangerousness evidence was deficient performance under current legal standards. Petitioner was most certainly prejudiced by this deficient performance. The Fifth Circuit has stated that under Texas law, a prisoner cannot seek habeas corpus review of a sufficiency of the evidence claim that was available but not raised on direct appeal. *Kittelson v. Dretke,* 426 F.3d 306, 317 n. 26 (5th Cir. 2005). There is a reasonable probability that given the overwhelming evidence offered by defense counsel demonstrating Petitioner's conduct while in custody, that the outcome of Petitioner's case

would have been different had this issue be raised.

**(7)    GROUND FOR REVIEW SEVEN:**  Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the Untied States Constitution by failing to challenge the admissibility of A.P. Merillat's testimony.

This issue was properly preserved for federal review. Petitioner raised the violation of federal constitutional rights in his State habeas writ (PRE 2 at 67-73). The trial court signed F&Cs denying relief as to this claim (PRE 3 at ¶111).  The CCA agreed with the trial court's findings.

In the punishment phase of Mr. Chanthakoummane's trial, the State presented the testimony of A.P. Merillat, an investigator with the Special Prosecution Unit, an independent agency financed by the Texas governor's office to investigate and prosecute crimes that occur in Texas prisons.  Merillat testified about the classification system in the Texas penitentiary and the occurrence of violence in prison (XXVII RR at 30-31).  The defense objected to Mr. Merillat testimony because he was not properly qualified as an expert in this area and his testimony was therefore unfairly prejudicial under Rule 403 (XXVII RR at 59-60).  The court overruled the defense objections and Merillat testified that capital murder inmates who receive life without parole nevertheless have the potential to be a danger to the community.

Although the issue of the admissibility of Merillat's testimony was properly preserved, appellate counsel did not raise this issue on appeal. The failure to do so amounted to ineffective assistance. U.S. Const. amends. VI and XIV.

A.P. Merillat[7] was presented as an expert with respect to the TDCJ classification system (XXVII RR at 58).  The admissibility of Merillat's testimony is governed by Rule

---

[7] "Merillat—a go-to expert for prosecutors seeking the death penalty—has been condemned by the state's highest criminal court, after judges determined that Mr. Merillat gave false testimony in two death penalty

702 of the Texas Rules of Evidence. Rule 702 places the burden upon the proponent of evidence to establish by clear and convincing evidence that it should be admitted. *Jackson v. State*, 17 S.W.3d 664 (Tex. Crim. App. 2000); *Massey v. State* 933 S.W.2d 141 (Tex. Crim. App. 1996). The decision to admit or exclude expert testimony lies within the sound discretion of the trial court and upon appellate review is reviewed for abuse of discretion. *Banda v. State*, 890 S.W.2d 42 (Tex. Crim. App. 1994).

Under Rule 702, an expert witness must first be qualified to render a particular opinion. Qualification is a two-step inquiry. *See Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006) (observing that "[a] witness must first have a sufficient background in a particular field, but a trial judge must then determine whether that background 'goes to the very matter on which [the witness] is to give an opinion").

At trial the State failed to establish that Merillat's work with the Texas Special Prosecutions Unit qualified him as an expert on the issue the TDCJ prisoner classification system. The record confirms that Merillat never worked in the TDCJ prison system (XXVII RR at 32-33). Moreover, Merillat did not possess any sort of specialized degree (XXVII RR at 32-33). Nothing in the records suggests that Merillat had any role in the development of the TDCJ prison classification system or in any capacity whatsoever in the formulation or management of the Texas prisoner classification system (XXVII RR at 34). The only presumptively authoritative body of work that Merillat is credited with in this field is a TDCJ prisoner classification book, *Future Danger?*, which he authored on behalf of the Texas and County District Attorney's Association. *See* http://books.google.com/books/about/Future_Danger.html?id=lCQSPAAACAAJ. Most troubling is the fact that Merillat has not authored a single article on the subject of prison

trials." http://www.nytimes.com/2012/09/28/us/in-texas-a-p-merillat-deals-with-false-testimony-ruling.html?_r=0

classification that has been subject to a shred of peer review (XXVII RR at 42). As a consequence, none of his theories have been tested outside of the State prosecution's bubble.

The trial courts abused its discretion in finding that Merillat was qualified as an expert on prisoner classification. As the Texas Supreme Court pointed out in *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996), the proponent of expert testimony must establish that the expert has "knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." There was no such showing in this case.

In addition to a Rule 702 objection, trial counsel also objected to Merillat's testimony on the basis of Rule 403, arguing that the probative value of his testimony was substantially outweighed by the danger of unfair prejudice (XXVII RR at 60). In making the decision to admit or exclude expert testimony, the trial court must perform a Rule 403 analysis. *See Morales v. State*, 32 S.W.3d 862 (Tex. Crim. App. 2000). Expert testimony should be excluded if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *See Shultz v State*, 957 S.W.2d 52 (Tex. Crim. App. 1997).

In this case *sub judice*, Merillat offered no specific opinion concerning whether Petitioner would be a danger to the community if sentenced to life without parole (XXVII RR at 52). Because his testimony was not individualized to Petitioner's case, it had little real probative value. In *Sells v. State*, 121 S.W.3d 748 (Tex. Crim. App. 2003), the court found that a video tape depicting life in administrative segregation in one of the prison units, was inadmissible under Rule 403. The court stated that:

> The videotape was not offered as information about the individual defendant or about how the individual defendant might be handled.

> Rather, as the judge noted, it portrayed only one aspect of an entire system and offered only general information about some procedures used in that system. That others have been controlled in the prison system or that certain procedures are in place without specifically connecting those procedures to appellant was not evidence of consequence to the jury's factual determination of whether appellant would pose a continuing threat to society.

*Id.* at 766.

The trial court ruled in its F&Cs that Merillat's testimony was admissible and that he was qualified to testify as an expert based on his nineteen years of experience in the SPU, as well as his writings and teachings on the subject (PRE 3 at ¶¶108-09). Additionally, the trial court concluded that Petitioner failed to show that appellate counsel was ineffective for failing to raise this issue because the testimony was admissible and there was no demonstrated prejudice. *Id.* The State court's findings are the result of an unreasonable application of the *Strickland* standard to the facts of this case.

There are many factors that a trial court may consider in making the threshold determination of admissibility under Rule 702. These factors include, but are not limited to: 1) the extent to which the theory has been or can be tested; 2) the extent to which the technique relies upon the subjective interpretation of the expert, 3 Weinstein & Berger, *supra,* ¶ 702[03]; 3) whether the theory has been subjected to peer review and/or publication; 4) the technique's potential rate of error; 5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and 6) the non-judicial uses which have been made of the theory or technique.

The factors mentioned above are non-exclusive and trial courts may consider other factors that are helpful to determining the reliability of the scientific evidence. *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). The factors a trial court will find helpful in determining whether the underlying theories and techniques

of the proffered evidence are scientifically reliable will differ with each particular case. *Id.* If the trial judge determines that the proffered testimony is relevant and reliable, the court must then determine whether to exclude the evidence because its probative value is outweighed by the "danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." *Id.* (quoting) Tex. R. Crim. Evid. 403.

In the present case, nothing was offered by the State demonstrating that Merillat's theories have been tested. Because Merillat's findings are not subject to any peer review, they are purely the result of his subjective findings. As noted supra at footnote 4, two prior death convictions have been overturned as a consequence of misapplication of Merillat's techniques. *See Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2010) cert. denied, 131 S. Ct. 905, 178 L. Ed. 2d 760 (2011); *Velez v. State*, AP-76,051, 2012 WL 2130890 (Tex. Crim. App. 2012), reh'g denied (Sept. 12, 2012) (Merillat testified falsely in at least two other capital cases, both have since been reversed on the basis of his false testimony and new punishment hearings have been granted). Finally, Merillat's only published writing was for the Texas and County District Attorney's Association. "That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science." *Daubert*, 43 F.3d at 1317 (upon remand) (citing Huber, Galileo's Revenge 206–09 (1991)). Merillat's only published work, sponsored by the TCDAA, can hardly be regarded as an objected piece of good scientific work. To conclude, Merillat's speculative conclusions on the future dangerousness of Texas death row inmates falls far short of the sort of expert testimony permissible under Rule 702. Based upon these obvious shortcomings in

Merillat's "expert" testimony, appellate counsel's failure to brief this issue amounts to ineffective assistance of counsel which satisfies the first prong of *Strickland*.

With respect to the second prong of *Strickland*, prejudice, the record clearly demonstrates that Merillat's testimony was important to the jury. During its deliberations, the jury returned a note to the trial court requesting a read-back of Merillat's testimony (I CR at 157). Despite the fact that the trial court declined to grant the jury's request for a read-back, it is nevertheless obvious that this was a critical point of contention for the jury. Consequently, Merillat's testimony had a powerful influence on the outcome of the punishment trial. Appellate counsel's failure to raise this issue was therefore prejudicial because there is a reasonable probability that the result of the proceedings would have been different.

**(8)** **GROUND FOR REVIEW EIGHT:** Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth Amendment and 14th Amendments to the Untied States Constitution by failing to challenge the denial of Petitioner's Motion to Suppress his statement.

This issue was properly preserved for federal review. Petitioner raised the violation of federal constitutional rights in his State habeas writ (PRE 2 at 74-75). The trial court signed F&Cs denying relief as to this claim (PRE 3 at ¶116). The CCA agreed with the trial court's findings.

Petitioner was arrested and transported to the McKinney Police Department for questioning (XXII RR at 63). McKinney Officer Joe Ellenburg placed Petitioner in an interview room and read him his *Miranda* warnings. *Id.* at 68. McKinney Officer Norton and Sergeant Riley thereafter conducted a videotaped interrogation of Petitioner. *Id.* at 76. During the interrogation, Petitioner admitted: 1) that his car broke down in front of the model home where Walker was found murdered; 2) that he entered the model home to try and call for assistance; 3) that he went into the kitchen and tried to get a drink of

water from the sink, but could not because the faucet didn't work; 4) that he then left and did not see anyone else in the home; 5) that his blood was likely found on the sink because his hand had a cut on it that may have shed blood on the faucet; and 6) that as he left the home, a couple approached him and asked if he was "Chan Lee" (XXII RR at 88-90).

Trial counsel filed a pretrial motion to suppress this statement challenging the voluntariness of Petitioner's confession and the adequacy of the *Miranda* warnings he received (III CR at 475; II RR at 14). The trial court held an evidentiary hearing on the motion and subsequently denied relief (II RR at 69). Appellate counsel neglected to raise the suppression claim on direct review. Appellate counsel's failure to do so is ineffective assistance of counsel.

The trial court denied relief as to Petitioner's State habeas claim on the basis that "mere silence [alone] is not an invocation of a defendant's waiver of his right to remain silent, and such a waiver may be inferred after a defendant receives *Miranda* warnings, understands them, and responds to questioning from an officer (PRE 3 at ¶113). The State court went on to reason that because Petitioner received *Miranda* warnings, acknowledged he understood them, and answered every question asked by detectives, appellate counsel was not deficient in failing to raise this point of error. *Id.* at ¶¶114-15. The court added that Petitioner failed to demonstrate any prejudice as a consequence of this allegation of ineffective assistance of appellate counsel. *Id.* at ¶115. The State court's findings and conclusions are an unreasonable application of *Miranda* and *Strickland*, and their respective progeny, to the facts of this case.

The State has the burden of proving, by a preponderance of the evidence, whether a confession is voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). The State must also establish, by a preponderance of the evidence, that a defendant waived his

protection against self-incrimination under *Miranda*. *Colorado v. Connelly*, 479 U.S. 157, 158 (1986).

## 1. The Requirement for *Miranda* Warnings

*Miranda* warnings are necessary when a suspect in custody is interrogated by police. *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or deprived of his freedom. *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir.2001) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). In determining whether a suspect was in custody for the purposes of determining whether *Miranda* warnings were required, the court determines whether there was a formal arrest or restraint on freedom of movement to the degree associated with formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). In the present case, there is no question that Petitioner was in custody at the time of his questioning.

For a statement to be voluntary, it must be "one that is the product of a rational intellect and free will." *United States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992) (citing *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)). In examining the voluntariness of a confession, the court must consider "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Derrick v. Peterson*, 924 F.2d 813, 817 (9th Cir. 1991). In addition, the Supreme Court has determined that coercive police activity is a necessary predicate to a finding that a confession is not voluntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). It is the government's burden to prove that a confession was voluntary by a preponderance of the evidence. *United States v. Jenkins*, 958 F.2d 934, 937 (9th Cir. 1991) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)); *see also Connelly*, 479 U.S. at 168.

The court must examine the totality of the circumstances and "determine whether 'the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne.' " *United States v. Harrison*, 34 F.3d 886, 890 (9th Cir. 1994) (quoting *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988)).  The court should consider the characteristics of the accused and the details of the interrogation. *Kelley*, 953 F.2d at 565 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).  In *Kelley*, the court found that even though the defendant was going through heroin withdrawal, began experiencing chills, shaking and trembling, and told Agents they needed to hurry if they wanted to continue the interrogation, Kelley was still able to think rationally. The personal characteristics of the accused are "constitutionally irrelevant absent proof of [police] coercion." *Derrick*, 924 F.2d at 818 (quoting *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir.1987) (citations omitted)).

## 2. Requirements for Valid *Miranda* Waiver

To establish a valid waiver, the government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir.1995) (citing *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).  The law "does not impose a formalistic waiver procedure that a suspect must follow to relinquish [his *Miranda* rights;] ... the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis v. Thompkins*, 560 U.S.

370, 130 S.Ct. 2250, 2262, 176 L.Ed.2d 1098 (2010).[8] Thus, the government need not "obtain an express waiver of [*Miranda* rights] before proceeding with the interrogation." *Id.* (alteration in original) (quoting *North Carolina v. Butler,* 441 U.S. 369, 379, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (Brennan, J., dissenting)). Instead, an implicit waiver may be inferred from the defendant's conduct. *See id.* (waiver may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver") (quoting *North Carolina v. Butler,* 441 U.S. at 373). To demonstrate the adequacy of a waiver, the government must do more than provide evidence that a *Miranda* warning was given and that the defendant thereafter made an un-coerced statement. *See Berghuis v. Thompkins,* 130 S.Ct. at 2261. The government "must make the additional showing that the accused **understood** the[ ] rights." *See id.* (emphasis added).

In the present case, Petitioner's *Miranda* waiver was invalid. The record confirms that after Officer Ellenburg read the *Miranda* warnings, he requested Petitioner initial the form, simply acknowledging he understood his rights ("I don't believe I asked him if he desired to waive them. I just asked him to signify comprehension") (II RR at 20). When asked prior to commencement of the interrogation by Petitioner if he would get to go home after questioning, Officer Ellenburg responded "oh yeah" (II RR at 36 and 49). This was clearly impossible, due to the fact that Elleburg arrested Petitioner on a capital murder warrant. *Id.*

While reading Petitioner his *Miranda* warnings, Officer Ellenburg deviated from the statutory script and told him that he was not waiving his rights, but simply acknowledging he understood his rights (II RR at 38) ("Okay, yes, I'm telling him to read

---

[8] It should be noted that at the time Petitioner's appeal was pending, *Berghuis* was pending a cert grant by the United States Supreme Court. *Berghuis v. Thompkins*, No. 08-1470. (cert pet. filed May 26, 2009, cert granted September 30, 2009).

over them himself. He's not signing away his rights. He's signing if he understands them")
(II RR at 39). Officer Ellenburg also went so far as to tell Petitioner that he would
unhand-cuff him if he signed the rights waiver (II RR at 40). After Officer Ellenburg
made this offer to un-cuff him, Petitioner signed the waiver form (II RR at 41).

At no time during the reading of these *Miranda* rights, did Officer Ellenburg ask
Petitioner if he understood the rights and was agreeing to waive them and speak with
officers (II RR at 42). The record establishes that Petitioner's statement was the product
of deceptive practices by law enforcement and therefore an invalid waiver of his *Miranda*
rights. *See Moran v. Burbine*, 475 U.S. 412, 454, 106 S. Ct. 1135, 1158, 89 L. Ed. 2d 410
(1986) (noting that "*Miranda* 's condemnation of trickery and cajolery requires that an
assessment of police conduct figure importantly in the assessment of a suspect's decision to
waive his fundamental constitutional rights"). Although *Burbine* involved the worst kind
of deception by law enforcement, misleading a suspect about the presence of counsel
during interrogation, the practice of misrepresenting  information that would be useful to
a suspect's decision whether to waive his *Miranda* rights is also a troubling tactic.

In light of the above trickery by law enforcement, it was an unreasonable strategy
choice for appellate counsel to not raise this issue on direct appeal. Counsel's failure to
do so satisfies the first prong of *Strickland* because no reasonable attorney under the
circumstances would neglect to raise the voluntariness of Petitioner's confession under the
circumstances.

The inquiry whether a waiver is coerced has two distinct dimensions:

First the relinquishment of the right must have been voluntary in the sense
that it was the product of a free and deliberate choice rather than
intimidation, coercion, or deception. Second, the waiver must have been
made with a full awareness both of the nature of the right being
abandoned and the consequences of the decision to abandon it. Only if the
'totality of the circumstances surrounding the interrogation' reveal both an

uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Ibid.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)).

Contrary to the State court's finding, counsel's conduct also satisfies the second prong of *Strickland*. Petitioner's "confession" was an important part of the State's case. Both prosecutors repeatedly emphasized Petitioner's statement in their closing arguments (XXIII RR at 23-25, 38). Petitioner's statement also was relied upon by the State during the punishment trial to support the State's argument that he lacked remorse (XXIII RR at 38). Accordingly, there is no doubt that the admission of the confession was highly prejudicial as it impacted both the guilt-innocence and punishment phases of Petitioner's trial. *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1595, 71 L.Ed.2d 816 (1982) (discussing that the test for "prejudice" requires the petitioner to show that the error of which he is complaining on habeas "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions").

If raised at the direct appeal level, the issue of the invalidity of Petitioner's *Miranda* waiver and the involuntariness of his confession would have likely changed the outcome of this case. The State court's failure to grant relief on this issue on the basis of ineffective assistance of appellate counsel was therefore an unreasonable and erroneous application of well-settled federal law to the facts of this case.

**(9)**     **GROUND FOR REVIEW NINE:**    Petitioner's trial counsel rendered ineffective assistance of counsel contrary to the Sixth Amendment and 14th Amendments to the Untied States Constitution by failing to lodge a specific objection to the voluntariness of his *Miranda* waiver during the suppression hearing.

This issue was properly preserved for federal review. Petitioner raised the violation of federal constitutional rights in his State habeas writ (PRE 2 at 77-78). The trial court signed F&Cs denying relief as to this claim (PRE 3 at ¶116). The CCA agreed with the trial court's findings.

Counsel failed to make a specific objection at the suppression hearing to the validity of the *Miranda* waiver (II RR at 37-41 and 67-68). Although counsel's line of questioning of Officer Ellenburg at the suppression hearing was sufficient to put that State on notice that counsel was challenging the invalidity of the *Miranda* waiver (II RR at 37-41 and 67-68), the record lacks a specific legal objection on that ground. Such conduct by trial counsel amounts to ineffective assistance of counsel. The State court's failure to grant relief on this issue was an unreasonable and erroneous application of *Strickland* to the facts of this case. The undersigned hereby incorporates by reference the arguments and authorities set forth supra in Claim 8 in support of this claim.

The procedure for challenging the voluntariness of a statement or confession is contained in Tex. Code Crim. Proc. Ann. art. 38.22, § 6 (Vernon 2012). Pursuant to *Jackson v. Denno* and article 38.22, a hearing on the voluntariness is to be held when the issue is raised. *McNeill v. State*, 650 S.W.2d 405, 406 (Tex. Crim. App. 1983). If the issue is not timely raised, the court is not obligated to hold the hearing. A specific request for a hearing is not necessary; it is enough to invoke the court's duty to hold a hearing that an objection be made to the voluntariness of a confession. *McNeill v. State*, 650 S.W.2d at 407; *Page v. State*, 614 S.W.2d 819, 821 (Tex. Crim. App.1981). Failure to timely raise the issue of voluntariness waives the accused's constitutional right to a determination thereof and, further, precludes appellate review of the question. *Ross v. State*, 678 S.W.2d 491, 493 (Tex. Crim. App. 1984); *Harris v. State*, 465 S.W.2d 175, 177 (Tex. Crim. App.1971).

The record in the present case demonstrates a failure on the part of trial counsel to adequately raise the issue of the voluntariness of Petitioner's *Miranda* waiver. Consequently, the waiver of Petitioner's constitutional and statutory rights were jeopardized by counsel's ineffectiveness. It is inconceivable that such an omission can be attributed to trial strategy. "[A]bdication of a basic threshold responsibility ... is the antithesis of a considered strategy." *Ex parte Dunham*, 650 S.W.2d 825, 827 (Tex. Crim. App.1983). In *Dunham*, trial counsel persuaded the accused to waive his right to a jury trial. The Court of Criminal Appeals found it "unthinkable that a reasonably effective trial attorney would, as a matter of tactics in any case, persuade his client to waive his constitutional right to a jury trial, knowing that such a waiver was not in his client's best interests." *Id.*

The failure by trial counsel to make this specific objection on the record is ineffective assistance of counsel that cannot be justified under any strategic decision. Accordingly, counsel's failure to adequately preserve the issue for appellate review satisfies the first prong of the *Strickland* test. Counsel's ineffectiveness also satisfies the second prong of *Strickland*. If this objection had been made, Petitioner's confession would have been suppressed for the reasons set forth supra in Claim 8. There can be no doubt that counsel's ineffectiveness, and the State court's failure to grant relief on this issue, prejudiced the outcome of both phases of Petitioner's trial.

**(10)** **GROUND FOR REVIEW TEN:** The refusal of the Texas courts to properly define the terms and phrases in the future dangerousness special issue was a decision contrary to, and an unreasonable application of clearly established constitutional law in that Petitioner was: 1) deemed eligible for the imposition of death as a penalty by the use of an unconstitutionally vague aggravator; and 2) Petitioner was selected for the death penalty without giving full consideration and effect to record evidence of his mitigating circumstances.

Petitioner's trial counsel objected to the court's failure to define certain terms in the future dangerousness special jury issue (V CR at 897) (Defendant's Motion No. 14 challenging the unconstitutionally vague statutory definitions of the terms "probability", "society", "continuing threat" and "criminal acts of violence") (V CR at 967) (Defendant's Motion No. 22 challenging the "future dangerousness" jury issue); XXVIII RR at 4-5). The trial court denied the above pretrial motions (I CR at 25; XXVIII RR at 6). On State habeas review, the trial court rejected Petitioner's IAC claim as to appellate counsel's failure to brief this issue. In its F&Cs, the trial court ruled that "Petitioner's complaints [to various constitutional challenges to the Texas death penalty scheme] have been repeatedly rejected by the Supreme Court of the United States and the Texas Court of Criminal Appeals" (PRE 3 at ¶118). The CCA thereafter denied relief and adopted the trial judge's findings and conclusions of law. *See Ex Parte Chanthakoummane*, 2013 WL 363124 (Jan. 30, 2013).

The refusal of the Texas courts to properly define the terms and phrases in the future dangerousness special issue was a decision contrary to, and an unreasonable application of clearly established constitutional law in that Petitioner was 1) deemed eligible for the imposition of death as a penalty by the use of an unconstitutionally vague aggravator, and 2) Petitioner was selected for the death penalty without giving full consideration and effect to record evidence of his mitigating circumstances.

Special Issue Number 1 of the Court's charge asked the jury: "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Kosoul Chanthakoummane, would commit criminal acts of violence that would constitute a continuing threat to society?" (I CR at 155). The jury charge continued that: "If your answer to this Special Issue is "No", and is not unanimous, then the 10 or more

jurors who agree should sign individually below (I CR at 155). The jury returned a unanimous "yes" to this question.

Special Issue Number 2 asked the jury: "Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the evidence, the defendant's character and background, and the personal moral culpability of the defendant, Kosoul Chanthakoummane, that there is sufficient mitigating circumstances or circumstances to warrant a sentence of life imprisonment without parole rather than a death sentence be imposed?" (I CR at 156). The jury answered "No" to this question.

Petitioner will demonstrate that Texas has broken the promises it made to the Supreme Court in oral argument in *Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950 (1976)[and later recognized by Justice O'Connor in *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*)], and that, as a result, the application of the undefined terms and phrases of the Texas future dangerousness inquiry offended the constitutional principles that underlay *Jurek* under the facts and circumstances of Petitioner's case.

Article 37.071 § 2(b)(1) of the Texas Code of Criminal Procedure, the future dangerousness issue, is unconstitutional because the aggravating factors it uses are vague and do not properly channel the jury's discretion in violation of the Eighth and Fourteenth Amendments to the United States Constitution. U.S. Const. amends. VI, VIII, XIV. *See Maynard v. Cartwright*, 486 U.S. 356 (1988). Since the jury is not provided with definitions of such terms as "probability", "continuing threat to society" and "criminal acts of violence", the statute violates the constitutional requirement that each statutory aggravating circumstance genuinely narrows the class of persons eligible for the death penalty and reasonably justifies the imposition of the death penalty. *Stringer v. Black*, 503 U.S. 222, 235 (1992).

The words "probability" and "society" are certainly capable of definition in such a way as to provide meaning to the jury and relevance to the issues to be decided, i.e. "probability" can be defined to mean "more likely than not", "continuing" can be defined to mean "uninterrupted"; and "society" can be defined to mean "prison society". In fact, when the Court of Criminal Appeals reviews the legal sufficiency of the evidence of future dangerousness, it has applied such definitions. *See, e.g. Ellason v. State*, 815 S.W.2d 656, 659 (Tex. Crim. App. 1991)("probability" means "more than a bare chance"); Muniz v. State, 851 S.W.2d 238, 250 (Tex. Crim. App. 1993). It is also true that a juror with a "faulty understanding" of these terms is challengeable for cause. *Hughes v. State*, 878 S.W.2d 142, 148 (Tex. Crim. App. 1993). And a prosecutor errs if he defines those terms improperly in argument. *Felder v. State*, S.W.2d 85, 97 (Tex. Crim. App. 1992).

Nevertheless, the Court of Criminal Appeals has repeatedly held that the terms "probability", "society", "criminal acts of violence", and "continuing threat" need not be defined for the jury, *see, e.g., Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Newbury v. State*, 135 S.W. 22, 45 (Tex. Crim. App. 2004); *Blue v. State*, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003); *Turner v. State*, 87 S.W.3d 111, 118 (Tex. Crim. App. 2002); *Caldwell v. State*, 818 S.W.2d 790, 798 (Tex. Crim. App. 1991), *Boyd v. State*, 811 S.W.2d 105, 113 (Tex. Crim. App. 1991). The rationale for such holdings has always been that because the legislature provided no statutory definition of these terms, the terms should be taken and understood in their usual meaning in common language. And jurors are "presumed to know and apply such meaning[s]". *See, e.g., Cuevas v. State*, 742 S.W.2d 331 (Tex. Crim. App. 1987). But presuming that jurors know and understand these terms is an unconstitutional risk.

It would seem that if the court goes to the trouble of defining these terms for itself when it analyzes the sufficiency of the evidence, the jury should be given the same tools. If potential jurors and prosecutors, on occasion, apply improper definitions of these terms, why should we presume that the seated jurors do not? Certainly, if a juror answered the first special issue "yes" because he thought there was a "bare chance" that the defendant would be a future danger, such a verdict could not stand. Allowing jurors to apply whatever they believe to be the common definition of a term, results in a statute that fails to sufficiently channel a sentencer's discretion in violation of the constitution.

In *Jurek*, the Texas special issue system survived a facial attack made on vagueness grounds. In *Penry I*, the Supreme Court found that the Texas system was unconstitutional only as it applied to the facts of that case. A few years later, in *Johnson v. Texas* and *Graham v. Collins*, (1993) the Supreme Court rejected "as applied" claims that record evidence of youthfulness required a separate vehicle for consideration of that mitigating factor for its mitigating effect. Jurors are presumed to follow their instructions. *Richardson v. Marsh*, 481 U.S. 200 (1987). Petitioner argues that a reviewing court must conclude that the sentencing jurors in his case considered his mitigation evidence in the way that *Johnson v. Texas* and *Graham v. Collins* said they would, as factors tending to show that he would not be a continuing threat to society. Since the jury returned an affirmative finding on the future dangerousness special issue, this Court must presume that the jury rejected Petitioner's argument that his tendencies toward criminal acts of violence would diminish during incarceration, such that he would not qualify as a continuing threat to society. The Court should note that a finding of future dangerousness is a punishment phase aggravator in Texas, one that must be established before the jury considers mitigating circumstances. *Blue v. State* 125 S.W.3d 491 (Tex. Crim. App. 2003), cert. denied,

U.S.L.W. (U.S. October 4, 2004) (No. 03-10832). Thus, Petitioner would not be on Texas' death row but for this finding.

Although the Supreme Court in *Jurek* rejected facial claims that the terms and phrases of the Texas future dangerousness special issue are too vague to support any death sentence, Petitioner will demonstrate that they are nonetheless too vague to support the jury's finding in this case. Under the present case, it is difficult for the jury to have predicted that Petitioner's juvenile crimes of violence justified labeling him a "continuing threat to society". *See Roper v. Simmons*, 543 U.S. 551 (2005).

Applying the above terms and phrases of the Texas future dangerousness special issue to Petitioner's case is a difficult fit when viewed against the back drop of *Roper*. In three areas, the *Rope*r Court found sufficient evidence that our society views juveniles up to age 18 as less culpable than the average criminal. First, the *Roper* Court noted that a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions. *Id.* It has been noted that adolescents are overrepresented statistically in virtually every category of reckless behavior. Arnett, Reckless Behavior in Adolescence: A Developmental Perspective, 12 Developmental Review 339 (1992). *Id.* The *Roper* Court found a second area of difference, that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. *Eddings*, supra, at 115 (Youth is more than a chronological fact).

The *Roper* Court identified a third broad difference. The character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. *Id.* Citing, generally E. Erikson, Identity: Youth and Crisis (1968).

The *Roper* Court found these differences sufficient to render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult. *Roper, supra, citing* Thompson, *supra*, at 835 (plurality opinion). Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. *Id. (citing) Stanford v. Kentucky*, 492 U. S., at 395 (Brennan, J., dissenting). The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor s character deficiencies will be reformed. Indeed, [t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside. *Roper*, citing *Johnson v. Texas*, supra, at 368; *see also* Steinberg & Scott, supra. at 1014 ( For most teens, [risky or antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood).

The fact that most all of the aggravating evidence offered against Appellant came in the form of juvenile crimes demands that the Texas courts grant the modest relief that the meaning of a "continuing threat to society" be clearly defined.

As applied to Petitioner's case, the word "continuing" could, in the mind of a reasonable, law-abiding juror, encompass such a short time that the mitigating effect of

the circumstance of near-exempt youthfulness can be entirely avoided. Without a proper definition of the phrase "continuing threat to society, a juror that is inclined to find future dangerousness may not be looking far enough into the future to give proper consideration to Petitioner's juvenile crimes. He can literally find a threat continuing if he believes it will last five minutes, five hours or five days. On the other hand, a juror who would be inclined to decline to find future dangerousness does not have any place to hang his hat on the barebones instructions the State court issued him to follow.

Moreover, the use of the undefined terms of the future dangerousness question as a way of establishing an aggravating factor offends the principles of *Zant v. Stephens*, 462 U.S. 862, 877 (1983). Aggravating factors must "genuinely narrow the class of death-eligible persons" in a way that reasonably "justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder." On their face, and as applied, aggravating circumstances must permit the sentencer to make a "principled distinction between those who deserve the death penalty and those who do not." In *Maynard v. Cartwright*, *supra*, the Supreme Court unanimously set out the legal principles which control vagueness claims directed at an aggravator. In addressing the validity of a death sentence based solely on the statutory aggravating circumstance that the murder was "especially heinous, atrocious and cruel," the *Maynard* court reasoned that an Eighth Amendment vagueness challenge to an aggravating factor in a capital case may not be analyzed under the "as-applied" approach used in vagueness challenges to criminal statutes under the Due Process Clause. 486 U.S. at 361.

An Eighth Amendment challenge requires this Court to conduct its review in several steps. First, evaluate the challenged aggravating circumstance on its face, entirely apart from the facts of the particular case in which it was applied. An overbroad

aggravating circumstance vests in sentencing courts the "open-ended discretion" to impose the death penalty which the Supreme Court condemned in *Furman v. Georgia*. Where a death sentence is imposed under a system that permits unbridled discretion, the State may not save the sentence by demonstrating that the outcome would have been the same even if the sentencer's discretion had been properly narrowed and guided.

Secondly, even if the text of a statutory aggravating circumstance does not provide meaningful guidance to a capital sentencing jury, such an aggravating circumstance can nevertheless support a death sentence if the state courts have narrowed its scope to a constitutionally sufficient degree. Finally, the reviewing court must determine whether such a narrowing construction actually guided the sentencing jury in the case under review.

The Court has also recognized that aggravating circumstances cannot encompass factors "that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness." If the aggravating circumstance at issue is invalid for reasons such as these, due process of law requires that the jury's decision to impose death be set aside. *Id.* Petitioner argues that, in the case of an offender with a predominately juvenile record at the time of their capital offense permits jurors to return an affirmative finding of future dangerousness because of the frailties of youth. The refusal to define terms offended the principles *Maynard v. Cartright*, supra.

Petitioner's jury likely considered youthfulness—a classic mitigating circumstance--under the future dangerousness special issue as illustrated in *Johnson v. Texas* and *Graham v. Collins*. Reasonable jurors would likely regard the more specific inquiry to supplant the more general language of the mitigation inquiry. The failure to define terms so as to require that the "continuing threat" to actually continue over a substantial period of time

in incarceration had the practical effect of preventing or impairing the jurors' full consideration of youthfulness for its mitigating effect.

This offends the constitutional principles recognized in *Nelson v. Quarterman*, *supra* and the Supreme Court cases cited therein. The important principle that Petitioner takes from *Nelson*, *supra* is that a capital sentencing system must permit full consideration of the capital defendant's mitigation case for its mitigating effect. Texas, by taking the positions that it did in *Johnson v. Texas* and *Graham v. Collins*, has elected to handle youthfulness with its future dangerousness special issue. That issue, without proper definition of terms, is not, post-*Nelson*, adequate to meet the demands of the capital sentencing jurisprudence of the Fifth Circuit or the Supreme Court.

For several reasons, Texas cannot take resort in its so-called *Penry* issue. First, the most reasonable reading of the charge given to Petitioner's jury is that youthfulness is to be considered in the future dangerousness inquiry. Without some sort of encouragement to re-visit that issue in the mitigation inquiry, there is no reason to believe that the jurors believed they could again consider Petitioner's age at the time of his prior criminal conduct. Even if they did think so, youthfulness is the sort of circumstance that many jurors will not regard as reducing moral blameworthiness.

For evidence of the tendency of many reasonable people to disregard or greatly discount youthfulness as a reason to grant mercy in capital cases, we need look no further than the vigorous dissents in *Roper v. Simmons*. Texas jurors are much more likely to think like the dissenters, Justices Scalia, Thomas, Reinquist and O'Connor did. Not many Texas jurors will think like Justices Kennedy, Ginsburg, Souter, Breyer and Stevens, who made the majority in *Roper*. Petitioner argues that the punishment charge was constitutionally flawed for failure to define these terms under the principles of *Maynard v.*

*Cartright* and *Eddings*, supra.

**(11)**     **GROUND FOR REVIEW ELEVN:**   Petitioner's appeal counsel rendered ineffective assistance of counsel contrary to the Sixth Amendment and 14th Amendments to the Untied States Constitution by failing to brief the unconstitutionality of Texas Death Penalty scheme because it is based upon vague statutory terms and does not properly channel the jury's discretion.

This issue was properly preserved for federal review. Petitioner raised the violation of federal constitutional rights in his State habeas writ (PRE 2 at 79-105). The trial court signed F&Cs denying relief as to this claim (PRE 3 at ¶¶122-26).  The CCA agreed with the trial court's findings.

In support of this issue, Petitioner hereby incorporates by reference the arguments and authorities set forth supra in Claim No. 10.  Petitioner's trial counsel preserved this issue by requesting definitions of the terms in the future dangerousness special issue.  This was done in a pretrial motion and again on the record when the jury was charged.

Although trial counsel preserved the issue, appellate counsel failed to raise it on appeal.  This amounted to ineffective assistance of counsel.  Such failure amounted to deficient performance. Even though this claim has been repeatedly rejected on appeal, the fact that it continues to be raised supports a finding that raising the claim is part of the prevailing professional norm for reasonably competent capital appellate counsel.

This failure to raise this issue on appeal also resulted in prejudice to Petitioner. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The failure to define these vague terms, effectively renders the statute unconstitutional.   An indictment based on an unconstitutional statute should be quashed. *See White v. State*, 440 S.W.2d 660, 667 (Tex. Crim. App. 1969). Appellate counsel's failure to raise this properly preserved issue deprived Petitioner of his due process rights.

**(12)**     **GROUND FOR REVIEW TWELVE:** The Trial Court Violated the Eighth

and Fourteenth Amendments to the United States Constitution by Failing to Instruct the Jury That the a "No" Vote by a Single Jury Member Would Result in a Life Sentence Instead of Death Despite the Statutory Requirement of 10 Votes for a "No" Answer to Article 37.071 § 2(b)(1) or for a "Yes" Vote to Article 37.071 § 2(e).

Trial counsel filed a pretrial motion to declare Article 37.071 § 2(b)(1) unconstitutional (I CR at 1004). The trial court denied the requested relief. On State habeas review, the trial court rejected Petitioner's IAC claim as to appellate counsel's failure to brief this issue. In its F&Cs, the trial court ruled that "Petitioner's complaints [to various constitutional challenges to the Texas death penalty scheme] have been repeatedly rejected by the Supreme Court of the United States and the Texas Court of Criminal Appeals" (Trial Court's Findings of Fact and Conclusions of Law at ¶118). The CCA thereafter denied relief and adopted the trial judge's findings and conclusions of law. *See Ex Parte Chanthakoummane*, 2013 WL 363124 (Jan. 30, 2013). This claim has been exhausted.

In response to the Supreme Court decision in *Penry I*, the Texas legislature provided for a special inquiry into mitigating circumstances. Instead of just taking the straightforward step of enacting a special issue in the terms suggested by *Lockett v. Ohio* and progeny, the legislature engrafted a series of amendments that serve to diminish, or even outright defeat the ability of Texas sentencing jurors to fully consider and give mitigating effect to the capital defendant's mitigation case. This claim is directed at the portion of the Texas statute that ostensibly requires ten jurors to return a life verdict based on mitigating circumstances, but secretly, so far as the jury is concerned, allows for a life verdict in the event of a single holdout juror for life.

Petitioner argues that this particular crippling amendment is analogous to the similarly crippling "nullification instruction" that has recently been condemned in several

Supreme Court cases[9] and in *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006), (en banc) cert denied *Quarterman v. Nelson*, 127 S.Ct. 2974, 75 USLW 3512, 75 USLW 3674, 75 USLW 3678 (U.S. Jun 18, 2007) (NO. 06-1254). At trial, Petitioner timely and properly complained about this feature of the Texas mitigation inquiry by written motion. The trial court denied his motion and request for jury instructions to cure the constitutional defects outlined in the motion just before the charge was read to the jury.

Trial counsel argued that the 12-10 rule of Article 37.0711, section 3(a)(d)(2), which requires ten votes for the jury to return a negative answer to the first or second special issue and at least ten votes for the jury to return an affirmative answer to the second special issue, violates the Eighth and Fourteenth Amendments to the United States Constitution. Texas courts have repeatedly rejected identical claims. Citing *Johnson v. State*, 68 S.W.3d 644, 656 (Tex. Crim. App. 2002); *Wright v. State*, 28 S.W.3d 526, 537 (Tex. Crim. App. 2000), cert. denied, 531 U.S. 1128 (2001); *Chamberlain*, 998 S.W.2d at 238. The Fifth Circuit has also rejected attacks on the Texas 12-10 rule. See *Alexander v. Johnson*, 211 F.3d 895, 897, n. 5 (5th Cir. 2000).

The Fifth Circuit has also held that any ruling that "the 12-10 rule" violated the federal Constitution would be a new constitutional rule of criminal procedure as defined in *Teague v. Lane*, 489 U.S. 288, 311-13, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and therefore could not form the basis for federal habeas-corpus relief. See *Hughes v. Dretke*, 412 F.3d 582 (5th Cir.2005); *Davis v. Scott*, 51 F.3d 457, 467 (5th Cir.1995); *Webb v. Collins*, 2 F.3d 93 (5th Cir.1993).

Petitioner argues that the precedential value of the Fifth Circuit cases cited above

---

[9] See *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001)(Penry II); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007); *Brewer v. Quarterman*, 550 U.S. 286, 127 S. Ct. 1706, 167 L. Ed. 2d 622 (2007); *Smith v. Texas*, 550 U .S. 297, 127 S. Ct. 1686, 167 L. Ed. 2d 632 (2007).

has diminished in light of the *en banc* ruling in *Nelson v. Quarterman*, supra, which simply followed and enforced the principles of *Penry II*. Petitioner takes from the *Penry II* line of cases the principle that a capital sentencing system must afford the sentencing jurors a vehicle with which to give full consideration and full mitigating effect to a capital defendant's mitigation case.

When the Texas 12-10 rule is viewed against this principle, the conclusion is inescapable that the 12-10 rule must give way to *Nelson* and the cases upon which it relies. It is beyond serious dispute that this rule is designed to discourage lone or minority jurors from holding to their convictions, and to encourage them to "cave in" and join the majority to form a unanimous verdict. Further, this end is accomplished by withholding material facts from the minority jurors. This introduces an element of dishonesty into the capital sentencing process. A jury system that operates dishonestly commands little of the respect for the law that is essential for accurate fact-finding and proper sentencing decisions.

This odd and frankly dishonest feature of the Texas 12-10 rule bears great similarity to the former "nullification instruction" condemned in *Penry II* and progeny. The trouble with the nullification instruction as a vehicle for handling mitigating circumstances was that, in a fairly wide range of circumstances, it required jurors who were sworn to return a true verdict according to the law and the evidence, to disregard that oath, and sign a false verdict in order to give effect to record evidence of mitigating circumstances. The 12-10 rule also encourages jurors to lie about their true response to the special issue, and to sign a false verdict form in order to go along with the majority on the jury. Further, the 12-10 rule explicitly requires the judge and the attorneys to withhold material information; that a failure to reach a unanimous verdict

amounts to a life verdict after all. Thus the common thread that runs within the nullification instruction and the 12-10 rule is reliance on the jurors' violation of their oaths to produce a verdict.

The 12-10 rule is actually somewhat worse because it not only encourages jurors to violate their oaths, it also requires officers of the court and the court itself to withhold from the jurors the truth about how the system actually works. Petitioner argues that the 12-10 rule is another one of the Texas crippling amendments that destroyed or greatly diminished the ability of his sentencing jury to fully consider and give effect to his mitigation case. The crippling of the statutory vehicle for the consideration of mitigating circumstances has placed the jury charge before this Court in a posture very similar to the one before the Supreme Court in *Penry I*: childhood abuse and mental health evidence cannot be fully considered or given effect in the deliberation or future dangerousness special issues. A properly functioning mitigation inquiry is required to meet the demands of *Penry I*. The Supreme Court has never issued an opinion that approves the present Texas capital sentencing system that was overhauled in the wake of *Penry I*. Thus, the controlling principles of capital sentencing law are those laid down in *Furman*, supra. requiring the discretion of the jury to be properly guided by the trial court. As justice Rehnquist put it in *Boyde v. California*, 494 U.S. 370 (1990),"... States are free to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty." Id., citing *Franklin v. Lynaugh*, 487 U. S. 164, 487 U. S. 181 (1988) (plurality opinion).

The encouragement of dishonesty on the part of jurors, judges and lawyers hardly qualifies as an effort to achieve rationality and equity in capital sentencing. Instead, it offends the principles of rational guided discretion announced in *Furman*, and confirmed

in *Penry I*. The refusal by the Texas CCA to remove this crippling amendment from its capital sentencing system was objectively unreasonable. The writ must issue.

**(13)**     **GROUND FOR REVIEW THIRTEEN**:    Petitioner's appeal counsel rendered ineffective assistance of counsel contrary to the Sixth Amendment and 14th Amendments to the Untied States Constitution by failing to brief the "10-12" Texas Penalty Scheme.

This issue was properly preserved for federal review. Petitioner raised the violation of federal constitutional rights in his State habeas writ (PRE 2 at 79-105). The trial court signed F&Cs denying relief as to this claim (PRE 3 at ¶¶122-26).  The CCA agreed with the trial court's findings.

The undersigned hereby incorporates by reference the arguments and authorities set forth in Claim 12 in support of this claim. Trial counsel raised the issue in a pretrial motion that the Texas death penalty statute is unconstitutional because the "10-12" provision is misleading and inaccurate. The statutory prohibition on informing the jury of the consequences of a single "hold out" juror further confuses the issue. (IV CR at 773-74; V CR at 946). This motion was overruled by the trial court. (I CR at 25). Although this issue was properly preserved by trial counsel, appellate counsel failed to raise it in his brief. This amounted to ineffective assistance.

Although this issue has been repeatedly rejected by the appellate courts, <u>see</u>, <u>e.g.</u> *Crutsinger v. State*, 206 S.W.3d 607, 613 (Tex. Crim. App. 2006); *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *Rayford v. State*, 125 S.W.3d 521, 532 (Tex. Crim. App. 2003); *Prystash v. State*, 3 S.W.3d 522, 536-37 (Tex. Crim. App. 1999);  *Cantu v. State*, 939 S.W.2d 627, 644 (Tex. Crim. App. 1997); *Lawton v. State*, 913 S.W.2d 542, 559 (Tex. Crim. App. 1995), the fact that it continues to be raised, supports a finding that raising this issue is within the prevailing norms of reasonable competent capital appellate counsel. The failure to raise this issue was deficient performance.

This failure to raise this issue on appeal also resulted in prejudice to Petitioner. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The misleading and inaccurate jury instructions on the "10-12" provision, effectively renders the statute unconstitutional. An indictment based on an unconstitutional statute should be quashed. *See White v. State*, 440 S.W.2d 660, 667 (Tex. Crim. App. 1969). Appellate counsel's failure to raise this properly preserved issue deprived Petitioner of his due process rights.

(14)     **GROUND FOR REVIEW FOURTEEN**:   The Texas Capital Punishment Scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because the mitigation special issue does not allocate a burden of proof.

Trial counsel filed two pretrial motions arguing that the Texas death penalty statute is unconstitutional because it fails to allocate a burden of proof as to the mitigation special issue (VI CR at 1028, 1100). Defense counsel's motions were denied by the trial court (I CR at 25). On State habeas review, the trial court rejected Petitioner's IAC claim as to appellate counsel's failure to brief this issue. In its F&Cs, the trial court ruled that "Petitioner's complaints [to various constitutional challenges to the Texas death penalty scheme] have been repeatedly rejected by the Supreme Court of the United States and the Texas Court of Criminal Appeals" (PRE at ¶118). The CCA thereafter denied relief and adopted the trial judge's findings and conclusions of law. *See Ex Parte Chanthakoummane*, 2013 WL 363124 (Jan. 30, 2013).

The statutory "mitigation" special issue is unconstitutional because it fails to place the burden of proof on the state regarding aggravating evidence. The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. *See, e.g., Walton v. Arizona*, 497 U.S. 639, 650 (1990) (noting the state's method of allocating burdens of proof during capital sentencing phase cannot lessen the State's burden to prove the existence of aggravating

circumstances).  In order to understand why *Walton* applies to the statutory "mitigation" special issue, the Court must recognize that this special issue is a conduit for aggravating (as well as mitigating) factors.  By asking jurors to determine whether there are "sufficient…mitigating circumstances", the statutory special issue in effect tells jurors to consider any possible aggravating factors that may outweigh the mitigating factors present in the case.  Although the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute. *Cf. Johnson v. Texas*, 509 U.S. 350, 370-71 (1993) (describing jurors' determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances).  Because the statute is silent about whether the state or the defense has the burden of proof on aggravating factors, and moreover, because the language of the special issue implies that the burden to disprove aggravating circumstances is on the defense, the statute is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

The original Texas special issue capital sentencing system was constructed in response to the Supreme Court decision in *Furman v. Georgia*, 408 U.S. 238 (1972). The lack of a vehicle to permit consideration of a good many types of mitigating circumstances was quickly noticed, but it took some 17 years for the Supreme Court to mandate the use of a vehicle that would permit sentencing jurors to fully consider and give effect to mitigating circumstances. *See Penry I*.  The Texas legislative response to *Penry I* was a grudging one.  Here is a list and description of what this writer calls the "crippling amendments" that were enacted with the legislation providing for the special issue set forth above. First, in a departure from the long accepted practice that prevailed in Texas as of the date of the *Penry* amendments, the Texas legislature relieved the prosecutors

from the burden of proving the lack of sufficient mitigating circumstances beyond a reasonable doubt. *See e.g. Steadham v. State*, 119 Tex.Crim. 475, 43 S.W.2d 944 (1931). Second, in the face of *Skipper v. South Carolina*, supra, the Texas legislature enacted a mandatory supplemental instruction limiting Texas capital sentencing jurors, in deciding the mitigation inquiry, to the consideration of evidence that they believe to reduce "moral blameworthiness." Intended or not, this instruction directs many jurors away from consideration of mitigating facts other than the circumstances of the offense, especially background facts like abuse as a child or mental illness less severe than insanity, where the nexus to the crime is not present or less pronounced.

Third, the Texas legislature provided that jurors must be told that a life verdict requires 10 votes, and not told the practical result of a failure to reach a unanimous verdict, when the law actually only requires that 1) a life verdict results if there is one vote dissenting from a death verdict, and 2) no mistrial or new trial will result from a failure to reach a unanimous verdict. The result of these crippling amendments is to deny full consideration of mitigating evidence, especially the kind Petitioner presented to his sentencing jury.

A reasonable, law abiding Texas capital sentencing juror after hearing the horrific crime facts, and the evidence of extraneous misconduct, might well decide to place the burden of proving facts in mitigation of sentence upon Petitioner. Absent a proper jury instruction, such a juror could very well require proof *beyond all doubt* that Kosoul was badly and consistently abused and neglected as a child. A Texas capital sentencing juror that placed such an impossibly high burden of proof and persuasion on Petitioner in the mitigation inquiry would not be violating his oath as a juror to render a true verdict based on the law and the evidence. Such a Texas capital sentencing juror would not be in

violation of any law given him by the trial court because the charge does not purport to set any burden of proof or persuasion on any fact for any party. This feature of the charge, even considered alone, demonstrates an egregious violation of the principles of *Furman v. Georgia*. While the *Furman* Court "did not hold that the infliction of the death penalty per se violates the Constitution's ban on cruel and unusual punishments," *Gregg v. Georgia*, 428 U.S. 153, 188 (1976), it did recognize that "the penalty of death is different in kind from any other punishment imposed under our system of criminal justice." *Id.* Because of its uniqueness, the death penalty can not be imposed under sentencing procedures that "create a substantial risk that it [will] ... be inflicted in an arbitrary and capricious manner." *Id.* Because the Court found that the capital sentencing procedures then being utilized did create such a risk, the *Furman* Court invalidated those procedures as incompatible with contemporary standards of decency.

There is another feature of the failure to assign a burden of proof or persuasion in the mitigation inquiry that leads directly to the arbitrary and capricious infliction of death as a penalty that *Furman* forbids. The state will often offer evidence of its own that tends to rebut the defense mitigation case. A reasonable law-abiding Texas capital sentencing juror, exposed to the horrific crime facts and the extraneous misconduct, might well decide to believe that Petitioner is a future danger. Again, such a Texas capital sentencing juror would not violate his or her oath to render a true verdict according to the evidence and the law because the court's charge, the only law the jurors are to follow, leaves the evidentiary threshold for consideration of facts adverse to the defendant completely up to the sentencing juror.

The Texas mitigation inquiry simply does not provide the guided discretion required in *Furman* that saved the Texas system from facial attack in *Jurek* or the vehicle

for reasoned moral response that the Supreme Court required in *Penry I.* Whether a sentencing juror will conclude that a mitigating circumstance exists or whether life or death is "warranted" depends heavily on how the court channels his or her thought processes.

Petitioner argues that the constitutional principles, derived from *Furman*, and more recently acknowledged by the Supreme Court in *Kansas v. Marsh*, 548 U. S. 163 (2006) are offended by the Texas CCA's refusal to grant relief from the constitutional frailties of the Texas capital sentencing system, and the mitigation inquiry in particular. The *Marsh* opinion, authored by Justice Thomas, acknowledged that the high court had long required due process in the capital sentencing process, citing to the concurrence by Justice Thomas in *Graham v. Collins*, 506 U.S. 461 (1993), which, in turn cited *Gardner v. Florida* 430 U.S. 349 (1977)[due process required that the capital defendant be afforded an opportunity to rebut and explain the evidence adduced to support the state's death aggravators] and *Walton v. Arizona*, 497 U.S. 639, 672 (Scalia, J., concurring in part and concurring in judgment). Other Supreme Court cases have upheld the notion that the right to present mitigating evidence and to rebut aggravating evidence can only be vindicated with a rational process, one that will permit a reasoned moral response to the body of evidence before the jury.

As Justice Thomas noted in his concurrence in *Graham*, supra, the major emphasis of our Eighth Amendment jurisprudence has been on "reasoned" sentencing. The Supreme Court has continually sought to verify that States' capital procedures provide a "rational basis" for predictably determining which defendants shall be sentenced to death. States may satisfy *Furman*'s demands--providing objective standards to ensure that the sentencer's discretion is "guided and channeled by . . . examination of specific factors."

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact-finding, is to 'instruct the fact-finder concerning the degree of confidence our society thinks he [or she] should have in the correctness of the factual conclusions for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S. 418, 423 (1979) (quoting *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring)). With respect to guilt phase elements, the beyond a reasonable doubt standard is "indispensable" to due process, because "it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." *In re Winship*, 397 at 364 (internal quotation marks and citation omitted). The same principle applies to aggravating factors in death penalty cases. See *Ring v. Arizona*, supra., *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004).

The principles of *Ring*, derived from *Furman*, require that the same rule must apply to the prosecution's facts offered to rebut the defense mitigation case. Applying these principles to Petitioner's case, the Court can readily see that Kosoul explained his misconduct as the product of Laos childhood experience and neglect he suffered as the hands of his parents, whereas the prosecutors argued to the contrary, that he was a remorseless antisocial personality.

To decide these issues without the application of a burden of proof to any party at all is a clear violation of our traditional notions of due process that all members of the *Marsh* court acknowledge are applicable in capital sentencing. Though Petitioner does claim that the constitution requires the state to prove its basic, underlying facts used to rebut the defense mitigation case beyond a reasonable doubt, he does not go so far as to demand that the overall burden of proof and persuasion on the ultimate mitigation inquiry be placed on the prosecution in this case. What Petitioner asks the Court to

require the prosecution to prove beyond a reasonable doubt is just the truth of the adverse facts the state presented in rebuttal to his mitigation case. As to the ultimate mitigation issue, Petitioner merely asks for our usual adversarial process, the traditional means of assuring reliability and due process of law in the resolution of important disputes.

(15)     **GROUND FOR REVIEW FIFTEEN**:  Petitioner's appeal counsel rendered ineffective assistance of counsel contrary to the Sixth Amendment and 14th Amendments to the Untied States Constitution by failing to brief that the Texas Death Penalty scheme does not allocate a burden of proof for mitigation special issues.

This issue was properly preserved for federal review. Petitioner raised the violation of federal constitutional rights in his State habeas writ (PRE 2 at 79-105). The trial court signed F&Cs denying relief as to this claim (PRE 3 at ¶¶122-26).  The CCA agreed with the trial court's findings.

The undersigned hereby incorporates by reference the arguments and authorities raised in Claim No. 14 in support of this claim. Although this issue has been repeatedly rejected by the appellate courts, *see, e.g. Crutsinger v. State*, 206 S.W.3d 607, 613 (Tex. Crim. App. 2006); *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *Rayford v. State*, 125 S.W.3d 521, 532 (Tex. Crim. App. 2003); *Prystash v. State*, 3 S.W.3d 522, 536-37 (Tex. Crim. App. 1999);  *Cantu v. State*, 939 S.W.2d 627, 644 (Tex. Crim. App. 1997); *Lawton v. State*, 913 S.W.2d 542, 559 (Tex. Crim. App. 1995), the fact that it continues to be raised, supports a finding that raising this issue is within the prevailing norms of reasonable competent capital appellate counsel. The failure to raise this issue was deficient performance.

This failure to raise this issue on appeal also resulted in prejudice to Petitioner. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The misleading and inaccurate jury

instructions on the "10-12" provision, effectively renders the statute unconstitutional. An indictment based on an unconstitutional statute should be quashed. *See White v. State*, 440 S.W.2d 660, 667 (Tex. Crim. App. 1969). Appellate counsel's failure to raise this properly preserved issue deprived Mr. Chanthakoummane of his due process rights.

(16)     **GROUND FOR REVIEW SIXTEEN**: The trial court's grossly impartial comments to the assembled jury venire praising the prosecution subjected Petitioner to cruel and unusual punishment and a deprivation of his rights to a fair trial, the presumption of innocence, and the effective assistance of counsel in violation of the 6th, 8th and 14th Amendments to the Untied States Constitution.

In the presence of the entire assembled venire of prospective jurors in this case, the trial court delivered a seemingly endless shower of praise upon the prosecution team and their respective families (V RR at 24-26). These gratuitous comments by the trial court unleveled the playing field at trial and improperly enhanced the State in the eyes of the jury. Below is an excerpt of the trial judge's opening remarks to the jury venire:

It's my privilege to introduce you to your elected district attorney, Judge John Roach.

JUDGE ROACH: Good morning.

THE VENIRE PANEL: Good morning.

THE COURT: **Judge Roach is a very distinguished jurist in his own right**. Some of you probably know that not only is he serving now as your district attorney, but **prior to that he was the presiding judge of the 199th District Court here in Collin County for quite a number of years**. And also I think, **Judge Roach, weren't you a justice on the court of appeals in Dallas for some time?**

JUDGE ROACH: Yes, sir.

THE COURT: **So he's had a very distinguished career**. Not only that but **Judge Roach raises his kids right. They're all lawyers.** In fact, he has a daughter and a son that are both attorneys and **his son just recently was elected to the 296th District Court here in Collin County as its judge**, and he took office January 1 of this year and just has really had a good time and really doing a good job in the 296th. **So we're glad to have Judge Roach up there. But my favorite Roach that's a lawyer, Judge,**

**is your daughter-in-law**.

JUDGE ROACH:  Yes, sir, I'm sure.

THE COURT:  John Jr.'s wife Laura.  **She is a delight.  I always look forward to having her in court**.

(V RR at 24-26) (emphasis added).

After heaping compliment upon compliment on the elected District Attorney and his progeny, the trial court then lauded its praise of his first assistant district attorney:

Okay, sitting next to **Judge Roach there is his very able first assistant, Greg Davis**.

MR. DAVIS:  Good morning.

THE COURT:  **Greg is a very accomplished -- excuse me**, Greg.  I'll call you Mr. Davis.  **I'll be a little more formal.  I'm familiar with him because we've tried a lot of cases together.  In fact, we tried a murder case just about three weeks ago; wasn't it?**

MR. DAVIS:  Yes, sir.

THE COURT:  **You'll find that he's a very, very professional and very good prosecutor.  I always enjoy trying cases with him.**

*Id.* (emphasis added).

By contrast the introduction of Petitioner's trial counsel, while polite and appropriate, lacked any of the glowing accolades and endorsements served up to the prosecution from the bench:

Seated to the counsel table to my left over here and now your right is Mr. Steve Miears.

MR. MIEARS:  Morning, ladies and gentlemen.

THE VENIRE PANEL:  Good morning.

131

> THE COURT: Mr. Miears and I have also tried cases together, and he will be lead counsel in this case, and then seated at the end of the table and assisting Mr. Miears is Mr. Keith Gore.
>
> MR. GORE: Good morning.
>
> THE VENIRE PANEL: Good morning.
>
> THE COURT: A very fine young criminal defense lawyer. In fact, Mr. Gore and Mr. Davis and I all tried that murder case together. You did a very fine job, Keith.

*Id.*

To compound this unabashed favoritism, the trial court continued to refer to District Attorney Roach as "Judge" throughout the proceedings before the general panel (V RR 177 and 179). It was only after Petitioner's trial counsel made a formal written objection to the trial court's remarks, that the trial court ceased in referring to the prosecutor as "Judge" (VI RR 5-7).

The trial court overruled and denied Petitioner's motion to instruct the jury to disregard these comments and his motion for mistrial and/or to quash the jury panel. *Id.* On direct appeal, the CCA denied relief on the basis that trial counsel failed to raise a timely objection. *See Chanthakoummane v. State*, 2010 WL 1696789 (Tex. Crim. App. Apr. 28, 2010) (A contemporaneous objection was required to preserve error, and appellant failed to make one. Tex. R. App. P. 33.1. Point of error one is overruled). The CCA went on in its opinion, however, to hold that: "Here, Judge Parker complimented both the prosecutors and defense counsel when he introduced them to the jury. And his reference to the district attorney as 'Judge John Roach' did not go so far as to taint the presumption of innocence." *Id.* The State court's holding is the result of an unreasonable misapplication of well-settled federal constitutional law to the facts of this claim.

In Texas, a trial judge must refrain from making any remark calculated to convey to the jury his opinion of the case. *Brown v. State,* 122 S.W.3d 794, 798 (Tex. Crim. App. 2003). Article 38.05 of the Texas Code of Criminal Procedure provides:

> In ruling on the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.

*Id.*

This is so because jurors are prone to readily seize upon the conduct or language of the trial judge and interpret the same as shedding some light upon his view of the merits of the issues involved. *Id.; Papalia v. United States,* 243 F.2d 437, 442 (5th Cir. 1975) (holding that trial judges "**must not only refrain from actions which are prejudicial but as well those which do or might give such impression to a jury of laymen whose awesome respect for the institution of the judge leads them to accord great and perhaps, decisive significance to his every word or intimation….**") (emphasis added).

In *Bollenbach v. United States*, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350, 354, (1946) the Supreme Court noted that "jurors are ever watchful of the words that fall from him (the trial judge). Particularly in a criminal trial, the judge's last word is apt to be the decisive word." (quoting) *Starr v. United States*, 153 U.S. 614, 626, 14 S. Ct. 919, 923, 38 L. Ed. 841 (1894). The Supreme Court added in *Starr* that "[i]t is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." *Starr,* 153 U.S. at 626 (citing *Hicks v. United States,* 150 U.S. 442, 452, 14 S.Ct. 144, 147–48, 37 L.Ed. 1137 (1893)).

In *United States v. Bray*, 546 F.2d 851 (10th Cir. 1976), the United States Court of Appeals for the Tenth Circuit addressed the issue of whether it was plain error for district judge to make comments about the defendant during trial which damaged the presumption of innocence: "A trial judge has both great responsibility and discretion in conducting the trial of a case. He should be the exemplar of dignity and impartiality. He must exercise restraint over his conduct and statements in order to maintain an atmosphere of impartiality."*Id.* at 859. While *Bray* may be distinguishable because the trial judge's prejudicial comments were in direct response to the defendant's show of disrespect and insulting comments to the court, it nevertheless stands for the guiding principle that courts should not show open bias or favoritism to a party in the presence of the jury. *Id.* at 859.

In the present case, the State judge's comments cannot be viewed as fair and impartial. The court's introductory comments, gratuitous praise of the district attorney and his children and constant reference to him as "Judge Roach" vitiated the presumption of innocence before the venire, adversely affecting Petitioner's right to a fair trial. These comments by the judge demonstrated an obvious bias in favor of the State that came from an "extrajudicial source which rendered his trial participation unfair in that it results in an opinion formed by the judge on the merits on some basis other than that learned from his participation in the case." *Bray*, 546 F.2d at 859 (citing *United States v. Grinnell Corporation*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). The trial court's glowing praise of the prosecution enhanced the State's image before the jury panel and deprived Petitioner his rights to the effective assistance of counsel and the presumption of innocence. Moreover, the comments of the trial court clearly conveyed to potential jurors that Petitioner's case must be a death worthy case. Otherwise a former

judge, held in such high esteem by the actual judge, would not be seeking the death penalty in this case.  These comments by the court therefore subjected Petitioner to cruel and unusual punishment and a violation of his due process rights under the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, petitioner prays that the Court grant petition or relief to which he may be entitled to in this proceeding.

## STATEMENT OF COUNSEL

My name is Carlo D'Angelo. I am an attorney licensed by the State of Texas and in this Court. I am the attorney for the Petitioner.  Because of the time limitations imposed on filing this petition for writ of habeas corpus, I am unable to transmit this petition to Petitioner for his signature before filing.  I have reviewed the Petitioner's state court file

and done as much investigation as time has allowed since my appointment, and have read the foregoing Petition for Writ of Habeas Corpus and based upon my investigation of this case said petition is true and correct, to the best of my knowledge and belief.

Respectfully submitted this 26th day of January 2014.

Respectfully submitted,

Carlo D'Angelo, P.C.
Attorney at Law
100 East Ferguson, Suite 1210
Tyler, Texas 75702
903.595.6776
903.407.4119 Fax
carlo@dangelolegal.com

By:     /s/ Carlo D'Angelo
        Carlo D'Angelo
        Texas Bar No. 24052664

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of January 2014, a true and correct copy of the foregoing Petition was delivered via ECF filing and/or US Mail to the following.

Office of the Attorney General of Texas
Assistant Attorney General Fredericka Searle Sargent
fredericka.sargent@oag.state.tx.us

and

Inmate: Mr. Kosoul Chanthakoummane
TDCJ No.: 00999529
Texas Department of Criminal Justice
Polunsky Unit
3872 FM 350 South
Livingston, Texas 77351

/s/ Carlo D'Angelo
Carlo D'Angelo