**IN THE**                    **ORAL ARGUMENT**

**IS REQUESTED**

**COURT OF CRIMINAL APPEALS**

**OF TEXAS**

_____

**TRIAL COURT CAUSE NO. 380-81972-07**

**COURT OF CRIMINAL APPEALS NO. 75,794**

_____

**KOSOUL CHANTHAKOUMMANE,**

**Appellant**

**VS.**

**THE STATE OF TEXAS**

**Appellee**

_____

**ON APPEAL FROM THE 380 th DISTRICT COURT**

**OF COLLIN COUNTY, TEXAS**

_____

**APPELLANT'S BRIEF**

_____

*Counsel of Record:*

**C. WAYNE HUFF**

**P.O. BOX 2334**

**BOERNE, TEXAS 78006**

**BAR CARD NO. 10180600**

**(210) 488-4440**

**FACSIMILE (830) 230-5567**

**ATTORNEY FOR APPELLANT**

**<u>IDENTITY OF PARTIES AND COUNSEL</u>**

**PARTIES TO THE JUDGMENT:**

**Appellant:     Kosoul Chanthakoummane #**

**Polunsky Unit**

**12002 FM 350 South**

**Livingston, TX   77351**

**Appellee:     John Roach, Collin County Criminal District Attorney**

**2100 Bloomdale Road**

**McKinney, TX 75071**

**PRESIDING JUDGE:     Janice Warder**

**DEFENSE TRIAL COUNSEL:**

**Steven Richard Miears               Keith Gore**

**P.O. Box 736               2301 W. Virginia Parkway**

**Bonham, TX 75218               McKinney, TX 75071**

**TRIAL PROSECUTORS:**

**Gregory S. Davis**

Curtis T. Howard

**APPELLATE COUNSEL FOR APPELLANT:**

C. Wayne Huff

P.O. Box 2334

Boerne, TX 78006

**APPELLATE COUNSEL FOR DEFENSE:**

John R. Rolater

2100 Bloomdale Road

McKinney, TX 75071

<u>**TABLE OF CONTENTS**</u>

**IDENTITY OF PARTIES AND COUNSEL    i**

**TABLE OF CONTENTS    ii**

**INDEX OF AUTHORITIES    iv**

**RECORD CITATIONS    1**

**STATEMENT OF THE CASE    1**

**STATEMENT CONCERNING ORAL ARGUMENT    1**

**ISSUES PRESENTED    2**

**STATEMENT OF THE FACTS    4**

**SUMMARY OF THE ARGUMENT    15**

**ISSUE NO. 1    17**

**ISSUE NO. 2    22**

**ISSUE NO. 3   27**

**ISSUE NO. 4   30**

**ISSUE NO. 5   33**

**ISSUE NO. 6   37**

**ISSUE NO. 7   39**

**ISSUE NO. 8   45**

**ISSUE NO. 9   47**

**ISSUE NO. 10   50**

**ISSUE NO. 11   53**

**ISSUE NO. 12   56**

**ISSUE NO. 13   77**

**ISSUE NO. 14   82**

**ISSUE NO. 15   82**

**PRAYER   83**

**CERTIFICATE OF SERVICE   84**

## INDEX OF AUTHORITIES

## CASES    PAGE

*Anderson v. State* , 202 S.W. 944, 946 (Tex. Crim. App. 1918)    20

*Almanza v. State* , 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)    39

*Barnes v. State,* 876 S.W.2d 316, 326 (Tex. Crim. App. 1994)    54

*Bell v. State* , 724 S.W.2d 780 (Tex. Crim. App. 1986)    49

*Bignall v. State* , 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)     35

*Blue v. State* , 41 S.W.3d 129, 131 (Tex. Crim. App.     60, 77

*Bordenkircher v. Hayes* , 434 U.S. 357, 365 (1978)     68

*Boyde v. California,*
    494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990)     79

*Bush v. Gore* , 531 U.S. 98 (2000)     56,57,58,63,66,67,69,70,72,74

*Castillo v. State* , 913 S.W.2d 529 (Tex. Crim. App. 1995)     49

*Cobb v. State* , 85 S.W.3d 258 (Tex. Crim. App. 2002)     21,30

*Cook v. State* , 884 S.W.2d 485, 491 (Tex. Crim. App. 1994     38

*Davis v. State* , 195 S.W.3d 311, 315-317 (Tex.App.–Houston [14 th Dist] 2006)     26

*Deck v. Missouri* , 544 U.S. 622 (2005)     27

*De Garmo v. Texas* , 474 U.S. 973, 975 (1985)     72

*Eddings v. Oklahoma* , 455 U.S. 104, 110 (1982)     78

*Ellason v. State* , 815 S.W.2d 656, 660 (Tex. Crim. App. 1991)     77

*Elledge v. Dugger* , 823 F.2d 1439, 1450     25,26

*Emery v. State,* 881 S.W.2d 702, 710 (Tex. Crim. App. 1994), *cert. denied,* 513 U.S. 1192, 115 S. Ct. 1257, 131 L. Ed. 2d 137 (1995) )     54

*Estelle v. Williams* , 425 U.S. 501, 503-04, 96 S. Ct. 1691, 1692-93, 48 L. Ed. 2d 126 (1976)     26

*Ex parte McClelland* , 588 S.W.2d 957, 959 (Tex. Crim. App. 1979)     35

*Furman v. Georgia* , 408 U.S. 238, 359 (1972)     60,71

*Gardner v. Florida,* 430 U.S. 349 (1977)     30

*Geesa v. State* , 820 S.W.2d 154 (Tex. Crim. App. 1991     49

*Gilmore v. Taylor* , 508 U.S. 333 (1993)     30

*Gray v. State* , 99 Tex. Crim. 305, 268 S.W. 941 (1924)      24

*Gregg v. Georgia* , 428 U.S. 153, 190 (1976)      72,73,77

*Hardin v. Estelle* , 365 F. Supp. 39, 47 (W.D. Tex.1973)      26

*Havard v. State* , 800 S.W.2d 195, 216 (Tex. Crim. App. 1989).      35

*Hernandez v. State,* 757 S.W.2d 744, 753 (Tex.Cr.App.1988) (Plurality opinion)      48

*Herrin v. State,* 124 S.W.3d 436 (Tex. Crim. App. 2002)      32,33

*Hicks v. United States* , 150 U. S. 442, 452, 14 S. Ct. 144, 147-48, 37 L. Ed. 1137 (1893)      20

*Hinds v. State,* 970 S.W.2d 33 (Tex. App. – Dallas 1998, no pet.)      55

*Holbrook v. Flynn* , 475 U.S. 560, 106 S. Ct. 1340, 1345, 89 L. Ed. 2d 525, 534 (1986)      25

*Holmes v. New York City Housing Authority* , 398 F.2d 262 (2d Cir.N.Y.1968)      76

*Hornsby v. Allen* , 326 F.2d 605 (5th Cir. 1964).      *75*

*Hughes v. State* , 897 S.W.2d 285, 295 (Tex. Crim. App. 1994)      38

*Illinois v. Allen* , 397 U.S. 337, 344, 90 S. Ct. 1057, 1061, 25 L. Ed. 2d 353 (1970)      26

*Jackson v. State,* 17 S.W.3d 664, 670 (Tex. Crim. App. 2000)      42

*Jackson v. Virginia,*
      443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 570 (1974)      32

*Jurek v. Texas* , 428 U.S. 262, 270 (1976)      71,78

*Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App. 1992)      42

*King v. State,* 953 S.W.2d 266, 270 (Tex. Crim. App. 1997)      55

*LaGrone v. State* , 209 S.W. 411, 415 (1919)      19

*Lankford v. Idaho* , 500 U.S. 110 (1991)      30

*Livingston v. State* , 739 S.W.2d 311, 336 (Tex. Crim. App. 1987)      34

*Lockett v. Ohio* , 438 U.S. 586, 604 (1978) )     78,80

*Long v. State,*
     823 S.W.2d 259 (Tex. Crim. App. 1991)     24,54

*Marin v. State* , 851 S.W.2d 275, 278 (Tex. Crim. App. 1993)     21

*Marquez v. Collins* , 11 F.3d 1241 (5th Cir. 1994)     24

*Matamoros v. State,* 901 S.W.2d 470, 476 (Tex. Crim. App. 1995)     54

*Medina v. State* , 7 S.W.3d 633, 639-40 (Tex. Crim. App. 1999)     38

*McCleskey v. Kemp* , 481 U.S. 279 (1987)     58,73

*Montgomery v. State,* 810 S.W.2d 372, 392 (Tex. Crim. App. 1991)     54

*Moore v. State* , 535 S.W.2d 357, 358 (Tex. Crim. App. 1976)     24

*Moore v. State,* 969 S.W.2d at 8,     34,35

*Nader v. Saxbe* , 497 F.2d 676, 679 n. 19 (1974)     69

*Niemotko v. Maryland* , 340 U.S. 268, 273 (1951)     75

*Oyler v. Boles* , 368 U.S. 448 (1962)     68

*Paulson v. State* , 28 S.W.3d 570 (Tex. Crim. App. 2000)     49

*Papalia v. United States* , 243 F.2d 437, 442 (5 th Cir. 1957)     20

*Penry v. Lynaugh* , 492 U.S. 302, 319 (1989)     79

*Ross v. State* , 861 S.W.2d 870 (Tex. Crim. App. 1992)     36

*Rousseau v. State* , 855 S.W.2d 666, 672-73 (Tex. Crim. App.)     34

*Royster v. State* , 622 S.W.2d 442 (Tex. Crim. App. 1975)     34

*Rush v. State* , 301 So. 2d 297, 300 (Miss. 1974)     24

*Russeau v. State* , 171 S.W.3d 871, Tex. Crim. App. 2005)     42

*Schweinle v. State* , 915 S.W.2d 17, 18 (Tex. Crim. App. 1996)     34

*Simmons v. State* , 117 S.W. 141, 143 (Tex. Crim. App. 1909)      22

*Skinner v. Oklahoma* , 316 U.S. 535, 541 (1942)      67,70

*Skipper v. South Carolina* , 476 U.S. 1, 4 (1986)      79

*Spence v. Fenchler* , 107 Tex. 443, 457 (Tex. 1915)      80

*Starr v. United States* , 153 U.S. 614, 626, 14 S. Ct. 919, 923, 38 L. Ed. 841 (1894)      20

*State v. Koedatich* , 548 A.2d 939, 955 (1988)      66,74

*State v. Marshall* , 613 A.2d 1059, 1112 (1992)      74

*Tennard v. Dretke* , 159 L. Ed. 2d 384, 395, 124 S. Ct. 2562, 2570 (2004)      30

*Thompson v. Oklahoma* , 487 U.S. 815 (1988)      30

*Tibbs v. Florida*,
     457 U.S. 31, 102 S. Ct. 2211, 72 L. Ed. 2d 652 (1982)      33

*Turner v. State*,
     805 S.W.2d 423 (Tex. Crim. App.), *cert. denied*,
     502 U.S. 870, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991)      32

*United States v. Armstrong* , 517 U.S. 456 (1996)      68,69

*United States v. Batchelder* , 442 U.S. 114, 125 (1979)      68

*United States v. Chemical Foundation, Inc.* , 272 U.S. 1, 14-15 (1926)      69

*United States v. Cox* , 342 F.2d 167 (5th Cir.Miss. 1965)      69

*United States v. Shaw* , 226 A.2d 366, 368 (D.C. 1967)      69

*Wayte v. United States* , 470 U.S. 598 (1985)      68,70

*Weatherred v. State,* 15 S.W.3d 540, 542 (Tex. Crim. App. 2000)      42

*Witherspoon v. Illinois* , 391 U.S. 510, 519 (1968)      81

*Woodson v. North Carolina* , 429 U.S. 280 (1976)      30,76

*Yglesias v. State* , 252 S.W.3d 773 (Tex.App.–Houston [14 th Dist] 2008)      26

*Yick Wo v. Hopkins* , 118 U.S. 356 (1886)        68

## CONSTITUTIONS

U.S. C onst. amend. V     60,82

U.S. C onst. amend. VI     21,30

U.S. C onst. amend.  VIII     21,27,30,71,74,76,78,79

U.S. C onst. amend. XIV     21,27,30,60,75,78

Tex. Const . art. I, § 3    27,30

Tex. Const . art. I, § 10     21,30,41

Tex. Const . art. I, § 13     21,27,30,42

Tex. Const . art. I, § 15     21,27,42

Tex. Const . art. I, § 19     21,27,30,40,75,78

T ex. C onst . art. I, § 29     27,30

## STATUTES

T ex. C ode C rim. P roc. A nn. art. 35.16 (b)(3)     49

T ex. C ode C rim. P roc. A nn. art. 37.071     72,77

T ex. C ode C rim. P roc. A nn. art. 37.071, § 2(e)     78,80

Tex. Code C rim. P roc. A nn. art. 37.071, § 2(f)(4)     78,79,80

T ex. C ode C rim. P roc. A nn. art. 37.09     33,34

T ex. P en. C ode A nn. § 19.03(a)(2)     31,37

T ex. P en. C ode A nn. § 19.02(b)(1)     31,37

T ex. P en. C ode A nn. § 29.02 (a)(1)     31,37

## RULES

T ex. R. A pp. P. 44.2(b)      55

T ex. R. E vid. 402    54

T ex. R. E vid. 403    44,54

T ex. R. E vid. 701    41

T ex. R. E vid. 702    41,42,44

T ex. R. E vid. 703    41

T ex. R. E vid. 704    41

T ex. R. E vid. 705    41

**TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

COMES NOW, Kosoul Chanthakoummane, Appellant, and respectfully submits this brief urging error from a conviction for the offense of capital murder, a capital felony.

## RECORD CITATIONS

Record citations to the Clerk's record are designated CR: (page numbers).  Record citations to the Court Reporter's (Statement of Facts) are designated RR(volume number): (page numbers)

## STATEMENT OF THE CASE

On September 21, 2006 Appellant was indicted for the offense of capital murder in violation of T ex. P en. C ode A nn. § 19.03(a)(2) (Vernon 1994). (CR: 212)  On August 21, 2007, Appellant was reindicted. (CR: 7).  The offense allegedly occurred on July 8, 2006.  (CR: 7).  Appellant entered a plea of not guilty.  (RR21: 15).  A jury found him guilty as charged in the indictment.  (CR-5; RR23: 42). At the punishment phase of trial,

the special issues prescribed by Tex. Code Crim. Proc. Ann. art. 37.071, §§ 2(b)(1), 2(e) (Vernon Supp. 1998) were presented to the jury. The jury answered special issue number one in the affirmative and special issue number two in the negative.  (CR: 161-164).  On October 18, 2007, the trial court entered a judgment imposing the death penalty. (CR: 161-164).

## STATEMENT CONCERNING ORAL ARGUMENT

Appellant requests oral argument and believes that it would provide both sides a better opportunity to explain and clarify the issues raised on appeal.

## ISSUES PRESENTED

### ISSUE NO. 1

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO INSTRUCT THE JURY TO DISREGARD, MOTION FOR MISTRIAL, OR IN THE ALTERNATIVE, MOTION TO QUASH THE JURY PANEL DUE TO THE TRIAL COURT'S REMARKS TO THE GENERAL VENIRE WHICH PREJUDICED APPELLANT'S RIGHT TO A FAIR TRIAL

### ISSUE NO. 2

THE TRIAL COURT ERRED IN ALLOWING APPELLANT TO BE VISIBLY AND UNNECESSARILY RESTRAINED IN THE PRESENCE OF THE JURY OVER HIS TIMELY OBJECTION

### ISSUE NO. 3

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTIONS TO QUASH THE INDICTMENT OR IN THE ALTERNATIVE MOTIONS FOR

CONTINUANCE

## ISSUE NO. 4

THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S VERDICT

THAT APPELLANT  COMMITTED THE MURDER OF COMPLAINANT IN THE

COURSE OF COMMITTING OR ATTEMPTING TO COMMIT ROBBERY

## ISSUE NO. 5

THE TRIAL COURT ERRED BY DENYING APPELLANT'S REQUESTED JURY                INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF MURDER

## ISSUE NO. 6

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S TIMELY

OBJECTION TO THE COURT'S DEFINITION OF THE CULPABLE MENTAL

STATE APPLICABLE TO THE AGGRAVATING OFFENSE OF ROBBERY

## ISSUE NO. 7

THE TRIAL COURT ERRED IN ADMITTING EXPERT TESTIMONY LINKING

APPELLANT TO BITE MARK EVIDENCE FOUND ON THE COMPLAINANT

OVER HIS TIMELY OBJECTIONS

## ISSUE NO. 8

THE TRIAL COURT ERRED IN ADMITTING DNA TESTIMONY LINKING APPELLANT                TO THE OFFENSE OVER APPELLANT'S TIMELY OBJECTION

## ISSUE NO. 9

THE TRIAL COURT ERRED IN GRANTING THE STATE'S CHALLENGE FOR CAUSE AGAINST THE VENIREPERSON WILLIAM MANIA

**ISSUE NO. 10**

THE TRIAL COURT ERRED IN GRANTING THE STATE'S CHALLENGE FOR
CAUSE AGAINST THE VENIREPERSON ROBERTO DELACRUZ

**ISSUE NO. 11**

THE TRIAL COURT ERRED IN ADMITTING AN INFLAMMATORY
PHOTOGRAPH

OF APPELLANT OVER HIS TIMELY OBJECTION WHICH HAD NO CONNECTION

TO THE OFFENSE WITH WHICH HE WAS CHARGED

**ISSUE NO. 12**

THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS

PURSUANT TO THE EQUAL PROTECTION CLAUSE OF THE 14 TH
AMENDMENT

TO THE UNITED STATES CONSTITUTION

**ISSUE NO. 13**

THE TEXAS DEATH PENALTY STATUTE VIOLATES THE EIGHTH AND
FOURTEENTH

AMENDMENTS TO THE UNITED STATES CONSTITUTION BY IMPERMISSIBLY

RESTRICTING A JURY'S CONSIDERATION OF MITIGATING EVIDENCE

**ISSUE NO. 14**

THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED
CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE PROCESS
OF LAW IN VIOLATION OF THE FIFTH AND FOURTEENTH
AMENDMENTS OF THE UNITED STATES CONSTITUTION.

**ISSUE NO. 15**

THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL
VIOLATIONS DENIED APPELLANT DUE COURSE OF    LAW UNDER ARTICLE I,
SECTION 19 OF THE TEXAS CONSTITUTION.

## STATEMENT OF THE FACTS

<u>Testimony of Randy Tate</u>

Tate testified that he was the former husband of the complainant Sarah Walker, that the two had one child together and that they divorced in February of 2006. (RR-21: 32-35)  He testified that on July 8, 2006 he went to his former wife's house at 40 Secluded Pond in Frisco, TX to pick up their son.  While waiting for his son he noticed that complainant had purchased a new Rolex watch.  He then borrowed his wife's Lexus because it had his son's car seat installed and left the Porsche he was driving at her house.  (RR-21: 39-41)  He later learned that his ex-wife had been found dead in the Craig Ranch development in West McKinney where she had been working as a realtor.  (RR-21: 40-45)

<u>Testimony of Jessica Allen</u>

Allen is the complainant's cousin who lived with her and her then husband, Tate, for about a year when she was in college.  She lived about a block from Walker at the time of the offense and was also a real estate agent.  (RR-21: 45-47)   She testified that Walker was not dating anyone at the time of the offense and had not dated anyone in several months.  (RR-21: 48)   Allen testified that she last saw Walker the evening before and talked to her by phone on the day of the offense.  (RR-21: 50-53) Allen testified that Walker was athletic and would be expected to fight an attacker.   Allen was also aware that Walker owned and often wore several ornate rings, known as Yurman rings, but did not know that she had recently purchased a Rolex watch which she later found the box and receipt for in Walker's closet after her death.  (RR-21: 54-55)

## Testimony of David Andrew Lilliston

Lilliston, a manager in the information technology department at Federal Express, testified that he and his wife were looking at model homes in the area where Walker worked. He testified that after entering one of the model homes he noticed blood in the living room and later discovered a body in the kitchen and instructed his wife to call 911. He then flagged down the driver of an SUV who lived in the area and went back into the town house with him. Lilliston testified that Walker's body was covered with blood and he observed no signs of life. He believed that he found the body around 1:20 in the afternoon. After the police arrived he was interviewed and later gave a statement to the police. (RR-21: 56-65)

## Testimony of Richard Shing

Shing testified in a hearing outside the presence of the jury that he is a hypnotist with the Texas Department of Public Safety. After testifying to his training and qualifications he described hypnotic sessions which he undertook with regard to the witnesses Mamie Sharpless and Nelson Villavicencio. (RR-21: 66-70)

## Testimony of Mamie Sharpless

Sharpless, a realtor for Keller Williams, testified that on Saturday, July 8, 2006 at around 9:45 in the morning she received a telephone call from a person she believed to be a potential client who identified himself as Chan Lee. The caller told Sharpless that he

was calling from a pay phone, that he was employed at Texas Instruments and that he was interested in a home in the Craig Ranch development.  (RR-21: 87-91) Though the witness was suspicious of the caller she did give him directions to the subdivision and later tried to confirm that he was staying at the hotel he had described, but was unable to do so.  Sharpless then went with her husband to the subdivision and arrived around noon.  (RR-21: 91-95)

After arriving at the location they noticed a white Ford Mustang driven by a man that parked on the street.  They drove to where the man had gotten out of the car and asked whether he was Chan Lee, to which the man replied "no."  The witness later identified the defendant as the man driving the white Mustang.  ((RR-21: 92-102)

Sharpless testified that they then went to the house that the caller was interested in and made telephone calls to the owner and two other prospective buyers.  During this time she observed from the window that Walker's black Porsche was parked across from the offense location and the white Mustang was parked in front.  She estimated that she made this observation shortly before one in the afternoon.  (RR-21: 103-106)

<u>Testimony of Nelson Villavicencio</u>

Villavicencio, the husband of Sharpless, testified that he went with her to the Trolley Trail address in McKinney to meet the man identified as Chan Lee.  He also testified that they saw the white Mustang park in the neighborhood, and the driver whom he later identified as the Defendant get out of the vehicle.  The witness also, testified that he saw Walker come to the location in the black Porsche and also saw the Mustang parked

in front of the offense location before leaving with his wife.  Villavicencio helped police prepare a sketch of the driver of the Mustang.  (RR-21: 106-123)

<u>Testimony of Allen P. Davidson</u>

Davidson, a sergeant with the Texas Rangers, testified that his assistance was requested in the investigation of complainant's death.  He went to the crime scene at 5700 Coach Train on the afternoon of Walker's death.  He testified that he found no evidence of forced entry and no weapon left at the scene.  He also observed Walker's Porsche parked outside of the location and did not observe any signs that it had been disturbed.  (RR-21: 124-132)

He testified that there were small droplets of blood from the entry way of the offense location into the dining room.  He observed a large smear of blood on the dining room floor and there were signs of a struggle in the dining room.  He noticed that the blood in the dining room led into the kitchen where Walker's body lay.  (RR-21: 132-153)

In addition, Davidson obtained a search warrant for Walker's house where they discovered a Rolex watch box and a receipt for the purchase of the watch; he did not find the watch.  (RR-21: 153-163)   After discovering that Walker had gone to a Bank of America on the morning of the offense he was able to determine that she had been wearing a watch and ring shortly before noon on the date of the offense.  (RR-21: 170-172)

After talking with witness Sharpless and her husband, Davidson obtained a vehicle and suspect description.   He went to the location of the pay phones that Chan Lee called from and determined that they were 12.9 miles from the offense location and about 20 minutes

driving time.  After receiving a DNA match from the crime lab he obtained the name of the Defendant and determined that he lived at 3613 Frankford in Dallas.  (RR-21: 172-182)

Davidson testified that surveillance was conducted on the defendant and he was arrested on September 5, 2006 and that about the same time his white Mustang was also secured and taken into custody.  (RR-21: 182-193)

### Testimony of Peter Copin

Copin, a McKinney police officer, testified that he processed the crime scene on the date of the offense arriving at approximately 3:30 in the afternoon.  Copin videotaped and photographed the crime scene, and processed it for blood and fingerprints.  (RR-21: 203-229)   The witness was also present during Defendant's arrest and collected a cell phone from his person.  The witness also later took a buccal swab from the Defendant and took photos of him to document any tattoos or wounds.  He observed healed injuries to the defendant's fingers, hands and arms.   (RR-21: 230-232)

### Testimony of Jeff Shaffer

Shaffer testified that he is a special agent for the Secret Service that he recovered a photograph from a cellular phone which depicted the defendant with his mouth open as though he were going to bite a dog.   (RR-21: 241-246)

### Testimony of Officer Joe Ellenburg

Ellenburg testified that he took custody of Appellant after his September, 2006 arrest at his apartment, and that thereafter he transferred him to the McKinney police

department, placed him in an interview room and advised him of his Miranda rights.
RR22: 61-72.

### Testimony of Officer Randall Norton

Norton testified that he interviewed Appellant at the McKinney police department after his arrest.  Norton testified that Appellant admitted he was at the crime scene bu denied involvement in the killing.  RR22: 73-93.  A video of the interview with Appellant was admitted into evidence and showed to the jury.   RR22: 93-194.

### Testimony of Dr. William Rohr

Rohr is a medical examiner for Collin county.  He testified that he performed an autopsy on the deceased the day after her murder.  Rohr testified that the deceased suffered blunt force injuries to her face which caused a broken nose and teeth.  In addition, he testified that death was caused by stabbing with a sharp instrument which caused 33stab wounds, of which 27 were separate and 6 were blended.  He also testified that Walker had defensive wounds on her hands and arms. RR22: 199-235.

### Testimony of Brett Hudson

Hudson testified that he is a dentist who consults with the Collin County medical examiner in the field of forensic dentistry.  Hudson was called to the autopsy of the deceased and asked to preserve an apparent bite mark on her neck.  He took photographs and ultimately made a mold of mark.

After Appellant was arrested he photographed and made a mold of Appellant's

teeth. After using a computer to compare the bite mark to Appellant's teeth Hudson concluded that Appellant made the mark on the deceased within reasonable medical certainty.  RR22: 235-261.

### Testimony of Stacy McDonald

McDonald is a DNA expert employed by the Southwest Institute of Forensic Sciences.  She testified that a genetic profile was established for both the deceased and Appellant.  She testified that on exhibits and swabs taken from the crime scene she found genetic material that included both Appellant and the deceased, including fingernail clippings taken from the deceased at autopsy.   RR22: 261-285

### Punishment Phase

*State Case in Chief*

### Testimony of Susan Sarvis

Sarvis testified that she worked for the Charlotte-McMirth Police Department in N.C.  and had previously worked in juvenile crimes.  On October 10, 1995 she was dispatched to Eastway Middle School where a student had been transported to the hospital with a broken arm and bruises.  She stated that Appellant admitted to being part of a group of six people involved in the assault.  RR24: 21-43

### Testimony of Robert Rollins

Rollins testified that he was an investigator for the Union County, North Carolina

sheriff's department.  On July 17, 1997 he investigated a reported auto theft and later became aware of a home invasion and kidnaping in the same area.  The complainants in the latter case were two elderly females whose car had been taken.  The recovery of the vehicle led to the arrest of Appellant and an accomplice.  Appellant pled guilty to the above offense and received a sentence of 51 to 71 months.  RR24: 43-78

### Testimony of Lawrence Smith

Smith testified that when he was a teenager Appellant and some other boys attacked him, beat him and stole his bicycle.  RR24: 78-88

### Testimony of Ryan Conner

Conner testified that Appellants's juvenile court counselor, and that his probation was ultimately revoked and he was sent to a juvenile camp.  He stated that he received a letter from Appellant from the camp which contained gang symbols.  RR24: 114-177.

### Testimony of Barbara Johnson

Johnson, a realtor, testified that she helped Appellant find an apartment, but that she never told him where she lived.  She testified that on July 7 when she was at home by herself, Appellant, whom she did not immediately recognize, came to her front door wanting to use the telephone because of mechanical problems with her car.  She testified that she became uncomfortable with his presence and called police.   After the police arrived he left without incident.  RR24: 178-192.

Testimony of Tedrick Gardner

Gardner testified that he supervised Appellant's parole from North Carolina during the time Appellant was a resident of Texas.  He visited Appellant at his apartment on the day of the offense concerning his reporting requirements.  Appellant did report to his probation officer on July 10, 2006.  RR24: 192-217.     *Defense Case in Chief*

Testimony of Dominquez Duarte

Duarte, testified that he ran a transition house facility in Monroe, North Carolina and later became director of Restoration House Ministries.  Appellant was part of a program he worked at in the Union County jail.  He remembered Appellant appeared very humble and meek during his stay in jail, that he did not cause problems, and was talented at art.  RR25: 5-30.

Testimony of Lawrence Parsons

Parsons testified that he worked at the Anson Correctional Facility in North Carolina.  The testified that he got to know Appellant before he was released from prison. Appellant worked in the prison, had no disciplinary issues and no gang affiliation. RR26: 7-47.

Testimony of Michael Pittman

Pittman testified that he was a program supervisor at the Department of Corrections and was assigned to the Anson unit when Appellant was confined there.  Pittman thought that Appellant had been an excellent inmate who was not known to be violent.  RR26: 47-

56.

### Testimony of Bruce Shabot

Shabot testified that he was a correction officer at the Anson unit where Appellant was confined and that Appellant was not a disciplinary problem nor was he violent while confined at that unit.    RR26: 56-62.

### Testimony of Tony Shank

Shank testified that he was confined as a prisoner at the Anson unit with Appellant, having been convicted of Manslaughter.  He stated that he met Appellant in 2004; that Appellant did well in confinement and was not a troublemaker.  RR26: 62-88.

### Testimony of Kevin Tuttle

Tuttle was correctional supervisor at the Anson unit.  He knew Appellant as one of the inmates he supervised.  He testified that Appellant was assigned to work details which he satisfactorily completed, was not a disciplinary problem and was not violent while in confinement.  RR26: 88-95.

### Testimony of Jessie McDonald

McDonald another Anson corrections officer testified that Appellant worked as a janitor in the unit and was not a discipline problem.   RR26: 95-102.

### Testimony of Brad Fisher

Fisher, who holds a Ph.D. in clinical forensic psychology, testified that he had done considerable work in the area of prison classifications.  He testified that after reviewing the records in Appellant's case he was of the opinion that Appellant would not constitute any kind of threat in the prison system.  RR26: 116-173.

## Testimony of Phyllis Kornfeld

Kornfeld testified that she had become an expert in prison art and had published a book on the subject.  She testified that she had examined Appellant's drawings and that she believed his art would be helpful to him in adjusting to prison life and that the art she examined was not violent or pornographic.  RR26: 193-217.

## Testimony of Pamela Allen

Allen testified that she was a case management supervisor at the Anson unit when Appellant was there.  At Anson Appellant always got very good reviews for his work and behavior.  She testified that Appellant actually worked outside of the prison at a flooring company during a portion of his confinement and that he volunteered part of his time to make drawings for prison activities.

*State Rebuttal*

## Testimony of A.P. Merillat

Merillat is a criminal investigator for the special investigation unit for the Texas prison system.  Merillat testified that if Appellant received a life sentence he would receive a G-3 classification from the prison system and would not automatically be placed in

administrative segregation simply because he was convicted of capital murder.  Merrillat testified that G-3 is a medium level classification.  RR27: 61-97.

## Testimony of Jackie Mull

Mull, the sister of the deceased, testified for the State as a victim impact witness. RR27: 112-118.

## Testimony of Dawn Tate

Tate, who had become the caretaker of the deceased child also testified for the State as a victim impact witness. RR27: 118-123.

### *Defense Rebuttal*

## Testimony of Walter Quijano

Quijano, an expert in prison classifications and a Ph. D. in clinical psychology, testified in rebuttal to the State's expert.  Quijano in addition to testifying about classifications also testified concerning the administrative procedures in the Texas prison system designed to control inmates.  RR27: 133-161.

## **SUMMARY OF THE ARGUMENT**

Issue No. 1: The trial court's introductory remarks to the general panel from which Appellant's jury was selected were so slanted in the State's favor that they deprived Appellant of due process and constituted fundamental error.

Issue No 2: Appellant was restrained both by his legs being shackled and the presence of uniformed deputies in a manner obvious to jurors and in violation to his due process rights.

Issue No. 3: Appellant's indictment was amended just prior to the beginning of jury selection and alleged two new means by which the complainant died.  The trial court denied Appellant sufficient time to alter his trial strategy in response to the State's new allegations.

Issue No. 4: No evidence was presented during trial that Appellant took any property either from the deceased or during the robbery.

Issue No. 5: Since there was no evidence that Appellant acquired any property during the murder of the deceased the Court should have instructed the jury concerning the lesser included offense of murder.

Issue No. 6: The trial court's definition of robbery, which is a result of offense crime, allowed the jury to convict Appellant if it found that he knowingly or intentionally engaged in conduct.     Issue No. 7: The State failed to satisfy the *Kelly/Daubert* test for admissibility of scientific evidence when their expert was allowed to identify a bite mark on complainant's body as having come from the defendant.

Issue No. 8: The State failed to satisfy the *Kelly/Daubert* test for admissibility of scientific evidence either in whole or in part as to DNA evidence admitted against Appellant which linked him to the crime scene due the States expert's failing to follow standard operating procedure.

Issues No. 9 & 10:   The trial court improperly granted the State's challenge for cause as to two prospective juror which claimed that the venirepersons would hold the State to a higher legal standard of proof than beyond a reasonable doubt, when both were simply expressing a degree of care appropriate in a death penalty case and agreed that they could follow the Trial court's instructions with regard to the standard of proof.

Issue No. 11: The Trial court admitted an inflammatory photograph of defendant apparently in the act of biting or pretending to bite a dog recovered from his cell phone claiming as a pretext that it was necessary to show that he could have bitten the victim.

Issue No. 12: Appellant contends that Texas death penalty statute fails to provide equal protection of its citizens because of the lack of consistency provided by the statute itself and by its application as to which persons receive the death penalty.

Issue No. 13: Appellant claims that because mitigating evidence in Texas is defined as evidence that would reduce a defendant's moral blameworthiness it unconstitutionally restricts the mitigating evidence that a jury can consider on his behalf.

Issues No. 14 & 15: The cumulative effect of the Trial court errors deprived Appellant of his rights under the U.S. and Texas constitutions even if no single error alone rose to that level.

## ISSUE NO. 1

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO INSTRUCT THE JURY TO DISREGARD, MOTION FOR MISTRIAL, OR IN THE ALTERNATIVE, MOTION TO QUASH THE JURY PANEL DUE TO THE TRIAL

COURT'S REMARKS TO THE GENERAL VENIRE WHICH PREJUDICED

APPELLANT'S RIGHT TO A FAIR TRIAL

*FACTS*

The entire panel was assembled on September 7, 2007 to receive the general instructions from the trial court required by law prior to commencement of individual voir dire by the parties.  During voir dire, while introducing the panel, the trial court made the following introduction of the elected District Attorney of Collin County:

It's my privilege to introduce you to your

elected district attorney, Judge John Roach.

JUDGE ROACH:  Good morning.

THE VENIRE PANEL:  Good morning.

THE COURT:  Judge Roach is a very

distinguished jurist in his own right.  Some of you

probably know that not only is he serving now as your

district attorney, but prior to that he was the presiding

judge of the 199th District Court here in Collin County

for quite a number of years.  And also I think, Judge

Roach, weren't you a justice on the court of appeals in

Dallas for some time?

JUDGE ROACH:  Yes, sir.

THE COURT:  So he's had a very distinguished

career.  Not only that but Judge Roach raises his kids

right.  They're all lawyers.  In fact, he has a daughter
and a son that are both attorneys and his son just
recently was elected to the 296th District Court here in
Collin County as its judge, and he took office January 1
of this year and just has really had a good time and
really doing a good job in the 296th.  So we're glad to
have Judge Roach up there.  But my favorite Roach that's a
lawyer, Judge, is your daughter-in-law.

     JUDGE ROACH:  Yes, sir, I'm sure.

     THE COURT:  John Jr.'s wife Laura.  She is a
delight.  I always look forward to having her in court.

     After heaping commendations upon the elected District Attorney the trial court was
only slightly less laudatory in its praise of his first assistant District Attorney:

Okay, sitting next to Judge Roach there is
his very able first assistant, Greg Davis.

     MR. DAVIS:  Good morning.

     THE COURT:  Greg is a very accomplished --
excuse me, Greg.  I'll call you Mr. Davis.  I'll be a
little more formal.  I'm familiar with him because we've
tried a lot of cases together.  In fact, we tried a murder
case just about three weeks ago; wasn't it?

     MR. DAVIS:  Yes, sir.

THE COURT:  You'll find that he's a very,
very professional and very good prosecutor.  I always
enjoy trying cases with him.

By contrast the introduction of Appellant's counsel, while polite and professional
was accompanied by far fainter praise than the trial Court's ringing endorsement of the
prosecutors:

Seated to the counsel table to my left over
here and now your right is Mr. Steve Miears.

MR. MIEARS:  Morning, ladies and gentlemen.

THE VENIRE PANEL:  Good morning.

THE COURT:  Mr. Miears and I have also tried
cases together, and he will be lead counsel in this case,
and then seated at the end of the table and assisting Mr.
Miears is Mr. Keith Gore.

MR. GORE:  Good morning.

THE VENIRE PANEL:  Good morning.

THE COURT:  A very fine young criminal
defense lawyer.  In fact, Mr. Gore and Mr. Davis and I all
tried that murder case together.  You did a very fine job,
Keith.

RR5: 24-26.

The trial court continued to refer to the elected District Attorney as "Judge" Roach throughout the proceedings before the general panel.  RR5: 177, 179.

On September 10, 2007 Appellant filed his written objections to the trial court's remarks and moved that the jurors be instructed to disregard the remarks and that a mistrial be granted, or that panel be quashed.  CR:38-44.  The trial court considered Appellant's motion and denied it prior to the commencement of individual voir dire.  RR6: 5-7.

## ARGUMENT AND AUTHORITIES

It is customary and even courteous to address a former judge as "Judge" in a social setting.  No criminal trial, particularly one that decides the life or death of another human being is such a setting.  The title "Judge" is conveyed by legal professionals and courthouse personnel on most attorneys who have achieved but no longer enjoy that title.  The appellation has a far different meaning to lay persons who are potential jurors.  "Judge" connotes to the layperson an aura of objectivity, tempered by experience, enhanced by erudition.   The District Attorney may have been all of these things when he functioned as a judicial officer, but he represented none of these attributes in the prosecution Appellant's case.  Instead, he was an active advocate for the execution of Appellant.      In *Blue v. State* , 41 S.W.3d 129, 131 (Tex. Crim. App. 2000) this Court noted that more than eighty years ago it stated:

too much caution cannot be exercised in the effort to avoid impressing the jury with the idea that the court entertains any impressions of the case which he wishes them to know, and putting before them matters which should not enter into or affect their deliberations . . . should in all cases be avoided.  To the jury the language and conduct of the trial court have a special and peculiar weight.  The law contemplates that the trial judge shall maintain an attitude of impartiality throughout the trial.  Jurors are prone to seize with

alacrity upon any conduct or language of the trial judge which they may interpret as shedding light upon his view of the weight of the evidence, or the merits of the issues involved.  The delicacy of the situation in which he is placed requires that he be alert in his communications with the jury, not only to avoid impressing them with any view that he has, but to avoid in his manner and speech things that they may so interpret.

citing *LaGrone v. State* , 209 S.W. 411, 415 (1919).

It was not enough that the trial court conveyed to the general panel the impression that the prosecution was guided by a seasoned judicial hand, it went further and praised Mr. Roach's entire family of lawyers as well as his acumen as an employer by hiring such a stellar advocate as Mr. Davis.

This is exactly the kind of comment condemned by the United States Supreme Court more than a century ago when it declared:

[i]t is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling."   *Starr v. United States* , 153 U.S. 614, 626, 14 S. Ct. 919, 923, 38 L. Ed. 841 (1894) (citing *Hicks v. United States* , 150 U. S. 442, 452, 14 S. Ct. 144, 147-48, 37 L. Ed. 1137 (1893))

This Court has long concurred.   In *Anderson v. State* , 202 S.W. 944, 946 (Tex. Crim. App. 1918) it reasoned that [t]he law contemplates that the trial judge shall maintain an attitude of impartiality throughout the trial, and it has been often held that his views or impressions of the weight of the evidence or upon the issues in the case may be conveyed to the jury as effectively by other means as by charge of the court.

The comments of the trial court clearly conveyed to potential jurors that Appellant's case had been already reviewed by a judge; not only did this undermine the presumption of innocence  in Appellant's case, but it also was a clear statement that

Appellant was death worthy or a former judge, held in such high esteem by the actual judge, would not be seeking the death penalty.   In *Papalia v. United States* , 243 F.2d 437, 442 (5 th Cir. 1957) the fifth circuit concluded that trial judges "must not only refrain from actions which are prejudicial but as well those which do or might give such impression to a jury of laymen whose awesome respect for the institution of the [j]udge leads them to accord great and perhaps, decisive significance to his every word or intimation."

It is true that Appellant's counsel did not object immediately to the trial court's remarks, but rather, presented the Court with written objections prior to the beginning of individual voir dire. However, an instantaneous objection was not required.  The only remedy available to Appellant was a mistrial or the quashing of the panel.  The objection was presented in time for the trial court to grant either.

In addition, the trial court's remarks which damaged the presumption of innocence constituted fundamental error.   *Blue* at 133;   *United States v. Bray* , 546 F.2d 851 (10 th Cir. 1976).  This Court has held that pursuant to Texas Rule of Evidence 103(d), we are authorized to "tak[e] notice of fundamental errors affecting substantial rights although they were not brought to the attention of the court."  As we have previously stated, "Some rights are widely considered so fundamental to the proper functioning of our adjudicatory process as to enjoy special protection in the system.  A principle characteristic of these rights is that they cannot be forfeited.  That is to say, they are not extinguished by inaction alone.  Instead, if a defendant wants to relinquish one or more of them, he must do so expressly."  *Marin v. State* , 851 S.W.2d 275, 278 (Tex. Crim. App. 1993).

The Trial court's glowing praise of the prosecution enhanced the State's image before the jury panel, while simultaneously undermining their impression of Appellant and his trial counsel. This deprived Appellant of effective assistance of counsel, the presumption of innocence subjected him to cruel and unusual punishment and due process of law in violation of the 6 th , 8 th and 14 th Amendments to the U.S. Constitution.  In addition, Appellant was deprived of due course of law pursuant to the Texas Constitution and to corresponding rights contained in Article 1, Sec. 10, 13, 15 & 19.  *Cobb v. State* , 85 S.W.3d 258 (Tex. Crim. App. 2002)

"The trial judge is to the jury the Lord's anointed.  His language and his conduct have to them a special and peculiar weight." *Simmons v. State* , 117 S.W. 141, 143 (Tex. Crim. App. 1909).  In all criminal proceedings our law recognizes that there should be only one such august figure in the courtroom at a time and contemplates that his or her place is on the bench overseeing and refereeing the participants not seated next to the jury as an advocate for a defendant's incarceration, let alone his death.

## ISSUE NO. 2

THE TRIAL COURT ERRED IN ALLOWING APPELLANT TO BE VISIBLY AND UNNECESSARILY RESTRAINED IN THE PRESENCE OF THE JURY OVER HIS TIMELY OBJECTION

### *FACTS*

Appellant filed his Motion To Preclude Mr. Chanthakoummane from being Shackled in Public prior to trial.  CR: 526-527.  Trial counsel also made it clear that in addition to shackles he was also addressing the need for the Defendant not to appear as though he were in custody:

MR. MIEARS:  Well, I just -- yes, I mean I

think that's what the law requires.  But I think, Judge,

we're asking for some extra precautions be made that at

any time that he's brought in and out of the courtroom

that it be done at least with the appearance that he's not

in custody for purposes of the jurors believing that at

that particular time.

       The trial court granted Appellant's Motion.  RR2: 86-87.

       Appellant reurged this motion when the general jury panel was summoned on September 7, 2007, noting that although Appellant's an attempt had been made to hide  the actual restraints from public view the fact that Appellant was restrained would be obvious to a jury panel as a whole because his freedom of movement would be obviously impaired.  The Court denied this motion.  RR5: 13-19.

       Later in these same proceedings Appellant's counsel again urged the objection noting that he sat in the chairs occupied by members of the general panel and could actually see Appellant's leg restraints.  Counsel noted:

(Mr. Gore) So then our objection would be for what's already

occurred then, because if the Court can take note that

this first group of chairs that I'm describing in the

first group of a hundred to the Court's left people have

occupied those chairs in these first two rows.

      May the Court take notice of that?

THE COURT:  Yes, I will take judicial notice of that.

Trial counsel even took the unusual step of inviting the trial judge to come sit in the place that he had observed Appellant's shackles.  In declining the offer the trial court stated "I'll take your word for it."  RR5: 144-147.

Shacking was not the only show of restraint against Appellant during his trial. Trial Counsel on the second day of individual voir dire again addressed the Court on this subject.  Counsel observed that, in addition to the shackling, throughout the proceedings against Appellant there had been four uniformed Collin County deputy sheriff's in the Courtroom.  The trial court again took judicial notice of this fact and  noted that these deputies were stationed at the perimeters of the Courtroom.  Counsel reurged the objections to show of restraint against Appellant and was again overruled by the trial court.  RR7: 80-84.

## *ARGUMENTS AND AUTHORITIES*

A trial court commits reversible error if it allows a jury to be exposed to any vestige of the accused's incarceration-shackles, handcuffs or other manacles.  The right of a person being tried "to be free of all manner of shackles or bonds" is a common law right. *Rush v. State* , 301 So. 2d 297, 300 (Miss. 1974).  The principle behind the right was explained by the Fifth Circuit in *Marquez v. Collins* , 11 F.3d 1241 (5th Cir. 1994):

[T]he appearance of a defendant in shackles and handcuffs before a jury in a capital case requires careful scrutiny. Shackling carries the message that the state and the judge think the defendant is dangerous, even in the courtroom. It is not that shackling signals the prosecutor's opinion--indeed, there is nothing subtle about the prosecutor's view.... Apart

from the risk of prejudice to the defendant, the indecorous appearance of a shackled defendant in an American trial demands close scrutiny of the practice. Solemnity and that indefinable but knowable ambiance of evenhanded judicial disinterest and respect for the dignity of individuals are components of a fair trial. Rules will not alone create them but rules can maintain the conditions in which they flourish.

*Marquez* , 11 F.3d at 1243-44.

Because of the fact that when a defendant is viewed by the jury in handcuffs or shackles, his presumption of innocence is seriously infringed, the Court of Appeals has made it clear in a long line of cases that without sound justification, the law abhors allowing a defendant to be seen by the jury wearing handcuffs or shackles. See *Long v. State* , 823 S.W.2d 259, 282 (Tex. Crim. App. 1991); *Clark v. State* , 717 S.W.2d 910, 918-9 (Tex. Crim. App. 1986); *Moore v. State* , 535 S.W.2d 357, 358 (Tex. Crim. App. 1976) (overruled on other grounds); *Gray v. State* , 99 Tex. Crim. 305, 268 S.W. 941 (1924).  In *Gray* , the court stated:

We desire to make it perfectly plain that we regard a trial with the prisoner in irons as obnoxious to the spirit of our laws and all ideas of justice, and it is only when the record brings the case clearly within one of the rare exceptions that we would consent for a conviction to stand. Before a judge should permit a case to proceed under such circumstances he should be very sure of his ground.

269 S.W. at 950

Obviously the same prejudicial effect results whether this shackling occurs before the prospective jury in the courtroom, or before the prospective jurors in the media prior to trial.  Steps should be taken, then, to close that particular stable door before the horse escapes.

Even after the defendant stands as a convicted felon--and the presumption of innocence deserts him--"a jury might view the shackles as first-hand evidence of future dangerousness and uncontrollable behavior which if unmanageable in the courtroom may also be unmanageable in prison, leaving death as a proper decision."  *Elledge v. Dugger* , 823 F.2d 1439, 1450.  The Court in *Marquez* also identified the danger of having the jury view the defendant shackled at the penalty phase of a trial:

When the complained of restraint comes only in the sentencing phase of a capital charge, a jury has just convicted of a violent crime… At the  same time, the defendant's life turns on the same jury's answer to the question of future dangerousness, so the risk, although less, is not eliminated.  Restraint at trial may carry a message that a defendant continues to be dangerous.

11 F.3d at 1244.

The accused has the right to be tried without the obvious trappings of dangerous criminality and the perception that the defendant is a dangerous "animal" may not be given by the extensive and obvious security measures of the sheriff's department.  The Supreme Court has characterized shackling as an "inherently prejudicial practice."  *Holbrook v. Flynn* , 475 U.S. 560, 106 S. Ct. 1340, 1345, 89 L. Ed. 2d 525, 534 (1986).

Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of the technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.  *Illinois v. Allen* , 397 U.S. 337, 344, 90 S. Ct. 1057, 1061, 25 L. Ed. 2d 353 (1970).

When shackling occurs, it must be subjected to "close judicial scrutiny. . . ."  *Estelle v. Williams* , 425 U.S. 501, 503-04, 96 S. Ct. 1691, 1692-93, 48 L. Ed. 2d 126 (1976).  *Elledge* , 823 F.2d at 1451 (footnote omitted) (citing *Woodard v. Perrin* , 692 F.2d 220,

221 (1st Cir. 1982);   *Hardin v. Estelle*, 365 F. Supp. 39, 47 (W.D. Tex.1973), *aff'd* on other grounds, 484 F.2d 944 (5th Cir. 1973)).

In Appellant's case the shackling of Appellant's legs was compounded by the presence of an inordinate amount of uniformed deputies surrounding him during the trial.  In addition, it is uncontroverted that Appellant's shackles were visible to the members of the general panel from which his jury was selected.

In addition, the fact that Appellant was charged with capital murder did not warrant the trial court to sanction this prejudicial show of security in his case.  Restraints cannot be routinely ordered based on general security concerns or the type of offense charged. *Davis v. State* , 195 S.W.3d 311, 315-317 (Tex.App.–Houston [14 th Dist] 2006).  Though requested to do so the trial court made no specific findings of fact that would have justified the shackling and enhanced security in Appellant's case.  Its failure to do so was an abuse of discretion.   *Yglesias v. State* , 252 S.W.3d 773 (Tex.App.–Houston [14 th Dist] 2008)  *Davis,* at 316 .

In a death penalty case the harm of unnecessary restraint is even more egregious.  Not only do such measures convey the unsubtle message to the jury that the defendant is likely guilty, but also that he poses a danger to the community.

For these reasons Appellant was denied due process of law, and his right to be presumed innocent spared cruel and unusual punishment pursuant to the Eighth and Fourteenth Amendment to the United States as well as his rights pursuant to Article 1, Sections 3,10, 13, 19 and 29 of the Texas Constitution. *Deck v. Missouri* , 544 U.S. 622

(2005).

## ISSUE NO. 3

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTIONS TO

QUASH THE INDICTMENT OR IN THE ALTERNATIVE MOTIONS FOR

CONTINUANCE

### *FACTS*

Appellant was originally indicted for the capital murder of Sarah Walker on September 21, 2006 in Cause Number 380-82629-06.  This indictment alleged that Appellant killed Walker by "cutting and stabbing with a knife".   CR:212.  The State's Notice of Intent to Seek the Death Penalty was filed under this cause number.  CR:237-238

The bulk of the parties' pretrial motions were filed pursuant to this indictment; the Defendant having filed most of his on June 22, 2007.  CR: 463-1100.  A hearing was held on Defendant's pretrial motions on July 23, 2007 RR3: 12-159.

On August 21, 2007, the State filed another indictment under which Appellant was ultimately tried.  The new indictment alleged that Appellant caused Walker's death by "by stabbing and cutting deceased with a knife, a deadly weapon, and by stabbing and cutting deceased with an object, a deadly weapon, whose exact nature and identity is unknown to the grand jurors, and by striking deceased with a plant stand, a deadly weapon."  CR: 7. The new indictment was filed exactly ten days prior to the beginning of trial as jury selection was scheduled to commence on August 31, 2007.  CR: 249.

On August 27, 2007 Appellant filed <u>Defendant's Motion to Quash the Indictment</u>

or in the Alternative First Motion for Continuance .  The motion alleged that absent the

requested relief Appellant would be denied his rights pursuant to the fifth, sixth, eighth and

fourteenth amendments to the United States constitution and Article 1, Sections 3,10,13,19

and 29 of the Texas Constitution.  CR: 12-16.  The trial court conducted a hearing on

Appellant's motion on August 28, 2007.   RR3: 4-23.

     At the hearing Appellant's counsel articulated his complaint concerning the

indictment as follows:

  ( Mr. Miears) Our position is that the State has had ample

time to have explored and investigated the manner and

means of the cause of death in this case for almost a year

now, that this indictment or new indictment, it's not an

amendment, it's a brand new indictment, brand new charge,

brand new case, brand new grand jury heard whatever it is

they presented, brand new indictment came down and in

effect what we're being asked to do is to prepare and try

a death penalty case with 10 days' notice or thereabouts,

10 days' notice of what the allegations are.

      RR3: 5.

     The Court granted Appellant only limited relief, by postponing the beginning of the

the trial until September 7, 2007.  On September 7 Appellant filed Defendant's Motion to

Quash the Indictment or in the Alternative Second Motion for Continuance raising the

same issues and objections as in the first motion.   In this motion Appellant requested a continuance of 90 days or that the new indictment be quashed.   CR: 30-35.   The Court denied Defendant's motion.   RR5: 13.

In addition, Appellant filed a <u>Motion for New Trial</u> on November 16, 2007, again complaining about the Trial court's refusal to grant him a continuance.   The Trial court did not grant a hearing, and the Motion was overruled by operation of law after seventy-five days.   CR: 194-209.   Tex. R. App. Proc., *Rule 21.8.*

## <u>ARGUMENTS AND AUTHORITIES</u>

The record is quite clear that for nearly a year the State had committed itself to proving that the deceased was killed with a knife.   For that same lengthy period of time the defense had operated under the assumption that the State would attempt to prove at trial that particular manner and means of causing death.   As Appellant's trial counsel pointed out to the Court:

Those two allegations were never contained

in the former indictment.  All of our defensive pretrial

pleadings were filed in relation to the former indictment,

all of our pretrial discovery has been done in regards to

the allegations contained in the former indictment.  All

of our mitigation investigation has been done in view or

with a goal towards defending the allegations contained

only in the former indictment.

RR3: 7

Counsel went on to point out that a forensic pathologist had been hired and had proceeded on the assumption that the State would attempt to prove that the cause of death was that alleged in the first indictment, and that in addition, nearly all of Appellant's pretrial motions which had been filed and ruled on prior to the filing of the second indictment were also based upon the original indictment.  RR3: 7.

Given the amount of time the State had allowed Appellant and his counsel to be misled concerning its theory of the case, a request for a ninety day continuance would be reasonable in any felony proceeding.   Particularly in a case where the State has fundamentally altered its allegation about the cause of death.

In a death penalty case such a reasonable request becomes constitutionally required.

The Eighth Amendment to the United States Constitution requires a much greater degree of accuracy when the State is attempting to execute an accused.   *Gilmore v. Taylor* , 508 U.S. 333 (1993).  Specifically, the United States Supreme Court has ruled that a defendant must have adequate time to respond to new information to be presented by the prosecution.  *Gardner v. Florida,* 430 U.S. 349 (1977).  It has also held that a capital defendant is entitled to fair notice of issues to be presented at trial so that an adequate response can be prepared.  *Lankford v. Idaho* , 500 U.S. 110 (1991).

The failure of the Trial court to allow Appellant a little over one fourth of the time to prepare to challenge the new indictment against him that he had to prepare for the first

one is fundamentally unfair and is contrary to the requirement that mandates a heightened since of reliability in death penalty litigation. *Woodson v. North Carolina* , 429 U.S. 280 (1976) Appellant was thereby denied due process of law, his right to effective assistance of counsel, and his right to be spared cruel and unusual punishment pursuant to the Sixth, Eighth and Fourteenth Amendment to the United States *Thompson v. Oklahoma* , 487 U.S. 815 (1988).

In addition, he was denied his rights pursuant to Article 1, Sections 3,10, 13, 19 and 29 of the Texas Constitution. *Cobb v. State* , 85 S.W.3d 258 (Tex. Crim. App. 2002)

## ISSUE NO. 4

THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S VERDICT

THAT APPELLANT  COMMITTED THE MURDER OF COMPLAINANT IN THE

COURSE OF COMMITTING OR ATTEMPTING TO COMMIT ROBBERY

### *FACTS*

Appellant was charged with capital murder pursuant to Texas Penal Code Section 19.03(a)(2) which provides:

(a) A person commits an offense if he commits murder as defined under Section 19.02(b)(1) and:

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnaping, burglary, robbery , aggravated sexual assault, arson, or obstruction or retaliation;

T ex. P en. C ode A nn. § 19.03(a)(2).

The indictment alleges, in pertinent part, that Appellant did:

. . .cause the death of Sarah Walker . . . . while the defendant was in the course of committing or attempting to commit the offense of robbery of the deceased,

(CR: 7).

A person commits the offense of robbery if, in the course of committing theft and with the intent to obtain and maintain control of the property, he intentionally or knowingly causes bodily injury to another.  T ex. P en. C ode A nn. § 29.02(a)(1)

In the instant case, the evidence fails to prove that at the time of the complainant's death that Appellant was in the course of committing robbery.  The evidence shows that Walker's body was discovered at around 1:20 P.M. on July 8, 2006 by the witness Lilliston.  RR21: 56-65 .  Walker was seen on the morning of that date by her ex-husband who observed that she was wearing a Rolex watch.    RR21: 39.   She was observed on a bank video introduced into evidence at 11:49 A.M. of the same day and appeared to be wearing a watch and ring.  The watch and ring were not located on Walker's person and were not found at the crime scene.  A watch and several rings were found at Walker's residence but the Rolex watch she was believed to be wearing was not found there.  A watch box for the Rolex, some extra links for the watch band, sales receipts and instruction manuals were found at her residence. RR21: 164-165.

The watch and ring were not found when Appellant's house and car were searched and were, in fact, never recovered.  In addition, there is no evidence that Appellant ever took, sold or otherwise disposed of the deceased's property.    RR-21: 218.

ARGUMENTS AND AUTHORITIES

To evaluate the legal sufficiency of the evidence, this Court must review the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 570 (1974); *Turner v. State,* 805 S.W.2d 423, 427 (Tex. Crim. App.), *cert. denied,* 502 U.S. 870, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991).  This standard applies in both direct and circumstantial evidence cases.  *Id.*  The jury is the sole judge of the credibility of a witness and may accept or reject any portion of a witness' testimony.  *Bonham v. State,* 680 S.W.2d 815, 819 (Tex. Crim. App. 1984), *cert. denied,* 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985).

In this case there is simply no evidence of what happened to the deceased's Rolex watch and ring from the time she was last seen.  In the video at the bank she was seen wearing a watch and a ring but neither are identified as the watch and ring her ex-husband had seen her with earlier.  Assuming that these were the same Rolex and ring she had been seen with earlier, over two and one-half hours passed from the time the bank video was taken and her body was discovered.  The disposition of the watch and ring in the interim are a matter of pure conjecture.  There was no other property taken from the crime scene.  That a robbery of the victim occurred at all is speculation not an element of the offense that was ever proved beyond a reasonable doubt.

The facts in this case are similar to those in *Herrin v. State,* 124 S.W.3d 436 (Tex. Crim. App. 2002).  In *Herrin* the State alleged that the defendant was in the course of

kidnaping and robbery at the time he killed the deceased.  This court after rejecting the kidnaping nexus likewise found that the State had failed to prove a robbery connection as well.  As in this case, the property, a wallet, went missing after the murder and never recovered and there was no link between the defendant and the property.  *Herrin* , at 442.

In *Herrin* the court observed that while the alleged aggravating offense need not be proved by direct evidence ". . . if the evidence at trial raised only a suspicion of guilt, even a strong one, then that evidence is insufficient.    *Herrin* at 443, citing *Urbano v. State* , 837 S.W.2d 114 (Tex. Crim. App. 1992)  In this case as in *Herrin* a suspicion of robbery is all the State was able to raise.

Due process requires that this case be reversed and Appellant be acquitted of the offense of capital murder.    *Tibbs v. Florida,* 457 U.S. 31, 41-42, 102 S. Ct. 2211, 72 L. Ed. 2d 652 (1982).

## ISSUE NO. 5

THE TRIAL COURT ERRED BY DENYING APPELLANT'S REQUESTED JURY                        INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF MURDER

### *FACTS*

The record reflects that prior to submitting the court's charge on guilt / innocence, Appellant requested that the jury be instructed on the lesser included offense of Murder. The trial court denied Appellant's request. (RR23: 7-8).

### *ARGUMENTS AND AUTHORITIES*

Whether an offense is a lesser included offense is determined by application of *TEX. CODE CRIM. PROC. ANN.* art. 37.09, which states:

An offense is a lesser included offense if:

(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

When deciding whether to submit an instruction on a lesser-included offense, a trial court must employ the two-step analysis set forth in *Royster v. State* , 622 S.W.2d 442 (Tex. Crim. App. 1975). The first prong of the *Royster* test requires that the lesser-included

offense be within the proof necessary to establish the offense charged. *Royster* at 446. This traditional statement of the rule is a paraphrase of the language of Article 37.09(1), which describes the kind of lesser included offense most frequently encountered. Of course, one of the additional definitions of lesser included offense found in Subdivisions (2), (3), or (4) of Article 37.09 may apply as well in the first step of a given case.   *Moore v. State,* 969 S.W.2d 4, 8 (Tex. Crim. App. 1998), *citing Schweinle v. State* , 915 S.W.2d 17, 18 (Tex. Crim. App. 1996).

The second prong of the test requires that the record contain 'some evidence' that would permit a jury rationally to find that, if a defendant is guilty, he is guilty only of the lesser offense. *Rousseau v. State* , 855 S.W.2d 666, 672-73 (Tex. Crim. App.), *cert. denied* , 510 U.S. 919 (1993) (clarifying *Royster* as to the rational findings of the jury). The determination of whether an act bears such a relationship to the offense charged as to constitute a lesser-included offense must be made on a case-by-case basis, because a lesser-included offense is defined in terms of the facts of the case as well as the terms of the offense charged. *TEX. CODE CRIM. PROC. ANN. art.* 37.09; *Livingston v. State* , 739 S.W.2d 311, 336 (Tex. Crim. App. 1987), *cert. denied* , 487 U.S. 1210 (1988); *Ex parte McClelland* , 588 S.W.2d 957, 959 (Tex. Crim. App. 1979). A trial court should not consider whether the evidence which raises the lesser included offense is credible. *Havard v. State* , 800 S.W.2d 195, 216 (Tex. Crim. App. 1989). In fact, the credibility of the evidence and whether it is controverted or conflicts with other evidence in the case may not be considered in determining whether an instruction on a lesser included offense should be given to the jury. *Moore v. State* , 574 S.W.2d 122, 124 (Tex. Crim. App. 1978). When evidence from any source raises an issue that a lesser included offense may have

been committed and a jury charge on the issue is properly requested, the issue must be submitted. It is then the jury's duty, under the proper instructions, to determine whether the evidence is credible and supports the lesser included offense. *Id.* The test is whether there is "some evidence" from which a rational jury could acquit the defendant of the greater offense while convicting the defendant of the lesser included offense. *Moore v. State,* 969 S.W.2d at 8, *citing Bignall v. State* , 887 S.W.2d 21, 23 (Tex. Crim. App. 1994). Any evidence that a defendant is guilty only of the lesser included offense is sufficient to entitle a defendant to a jury charge on the lesser included offense. *Moore v. State,* 969 S.W.2d at 8 *; Bignall v. State* , 887 S.W.2d at 23 (anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge).

In the instant case, the record contains more than a "scintilla" of evidence upon which the jury could have reasonably relied in deciding that the killing of the deceased was not committed in the course of committing robbery.

In this case there is simply no evidence that Appellant acquired any of the deceased's property.  In the video at the bank she was seen wearing a watch and a ring but neither are identified as the watch and ring her ex-husband had seen her with earlier.  Assuming that these were the same Rolex and ring she had been seen with earlier, over two and one-half hours passed from the time the bank video was taken and her body was discovered.  The disposition of the watch and ring in the interim are a matter of speculation and it is not clear that they were taken from her at the time of her death.  There was no other property taken from the crime scene.

The jury, therefore could have concluded from the evidence that at the time of the

attack on Walker, Appellant was not in the "course of committing theft" and therefore could not have been in the "course of committing robbery", and thereby have had a reasonable doubt whether Appellant was guilty of capital murder while being convinced that he had, nevertheless, committed murder.

The evidence, however credible or incredible, should have resulted in a jury determination as to whether Appellant was guilty only of the lesser included offense of murder. Appellant's conviction should be reversed. *Ross v. State* , 861 S.W.2d 870 (Tex. Crim. App. 1992).

## ISSUE NO. 6

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S TIMELY

OBJECTION TO THE COURT'S DEFINITION OF THE CULPABLE MENTAL

STATE APPLICABLE TO THE AGGRAVATING OFFENSE OF ROBBERY

### *FACTS*

Appellant was charged with capital murder pursuant to Texas Penal Code Section 19.03(a)(2) which provides:

(a) A person commits an offense if he commits murder as defined under Section 19.02(b)(1) and:

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnaping, burglary, <u>robbery</u> , aggravated sexual assault, arson, or obstruction or retaliation;

T ex. P en. C ode A nn. § 19.03(a)(2).   The indictment alleges, in pertinent part, that Appellant did:

. . .cause the death of Sarah Walker . . . . while the defendant was in the course of

committing or attempting to commit the offense of robbery of the deceased,

(CR: 7).

A person commits the offense of robbery if, in the course of committing theft and with the intent to obtain and maintain control of the property, he intentionally or knowingly causes bodily injury to another.  T ex. P en. C ode A nn. § 29.02(a)(1)

With respect to the offense of capital murder the trial court instructed the jury that:

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.  CR:145.

With respect to the offense of robbery the trial court provided the jury with the general definitions of knowledge and intent which were not limited to result oriented crimes but also nature of conduct crimes as well.  CR:145.

Appellant timely objected to the Court's charge for this reason, and the trial court overruled this objection.  RR23: 6.

## *ARGUMENTS AND AUTHORITIES*

This court has held that capital murder is "result of conduct" offense and that a jury charge which defines "intentionally" as it relates to the nature of conduct as well as the result of conduct is, therefore, incorrect.  *Cook v. State* , 884 S.W.2d 485, 491 (Tex. Crim. App. 1994).  This also applies when "knowingly" is defined in a "result of conduct crime".  *Medina v. State* , 7 S.W.3d 633, 639-40 (Tex. Crim. App. 1999).

This court has also held that the general definitions of intent and knowledge may be

appropriate if the aggravating offense or offenses contain "component parts" which encompass nature of conduct elements.   *Hughes v. State* , 897 S.W.2d 285, 295 (Tex. Crim. App. 1994).  In Appellant's case, however, the only aggravating offense alleged was robbery.

The offense of robbery requires intentionally "causing" bodily injury; a "result of conduct" offense.  It also requires appropriation, another "result of conduct" element.  Likewise "intent to deprive" means intending that the owner lose property permanently or for such an extended period of time that a major portion of the value or enjoyment of the property is lost to the owner; another "result of conduct" element.  CR: 144

The Court's charge which supplied the jury with the general definitions of "knowingly" and "intentionally" as to robbery only allowed the jury to make nature of conduct applications to all of the elements of the offense of robbery. CR:145. Worse, the trial court compounded the error by separating the two offenses of capital murder and robbery for the purposes of culpable mental state determination.  Capital murder is not a complete offense without some aggravating circumstance or offense.  Since the trial court did not inform the jury that the "result oriented" determination applied to causing the death of the complainant (specific intent to kill) the jury could easily have applied a "nature of conduct" to that element as well.

It is clear that the inappropriate and confusing charge given to the jury with regard to culpable mental states caused harm to Appellant.   *Almanza v. State* , 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

**ISSUE NO. 7**

THE TRIAL COURT ERRED IN ADMITTING EXPERT TESTIMONY LINKINING
APPELLANT TO BITE MARK EVIDENCE FOUND ON THE COMPLAINANT
OVER HIS TIMELY OBJECTIONS

*FACTS*

The State attempted to offer evidence that a bite mark found on the deceased body could be matched to defendant using dental analysis.  Prior to admitting this evidence the trial court conducted a *Daubert* hearing to determine its admissibility.  RR22: 9

At the hearing the State called Dr. Robert Hudson, testified that he is a dentist who received his degree in 1993; that he has taught at Baylor College of Dentistry since 1995, and that he is adjunct to the office of the Medical Examiner for Collin County.  Hutson was asked to consult in the autopsy of the deceased.

He testified that he went to the medical examiner's office on July 9, 2006 and met Dr. William Schell, another dental consultant with that office.   RR22: 9-11.  He identified what appeared to be a bite mark on the left posterior aspect of the deceased's neck.  He photographed and measured the mark and then fabricated a custom acrylic tray to fit over the bite mark area and took a putty-type material impression; he later made a stone model of the impression and then had a master epoxy mold made.  RR22: 12-14.

On September 14, 2006 he met Dr. Schell at the Collin County Detention Center where he conducted a full dental examination of Appellant.  Photographs and impressions were taken of Appellant's mouth and teeth.  RR22: 14-17.

After comparing the casts taken at autopsy and from Appellant and performing

computer overlays, Hudson formed the opinion that Appellant's teeth caused the bite mark to the deceased.  RR22: 17-19.

On cross-examination Hudson admitted that he is not certified by the American Board of Forensic Odontology as a forensic odontologist.  He also stated that he had not compared the bite mark impression from autopsy with any other person and that in his report he stated that he was unable to exclude Appellant as being the cause of the injury. RR22: 26-28.

The defense called Dr. David Senn at the hearing.  Senn testified that he is a dentist and had practiced for twenty-three years, that he is board certified in forensic dentistry by the American Board of Forensic Odontology, that he is a consultant to the Bexar County Medical Examiner, and that he has published articles in the field of forensic dentistry and testified in both state and federal court.  RR22: 33-35.

Senn testified that he did not believe the autopsy injury was a very clear bite.  In addition, he testified that the State's experts' photographs of the injury were questionable because their method did not insure that the photographs were in the same plane as the injury.   Further, he testified that because Dr. Hudson did not see how the neck tissue was removed there was no way to tell if the skin tissue shrunk as it has a tendency to do.  Also, Senn was concerned that the State's expert did not eliminate bias from his comparison by having a different person examine and take the impression from Appellant's teeth, and thereafter have several unknown impressions, in addition to the suspect's impression, compared with the autopsy impression.  RR22: 32-45.    Senn,  in addition to comparing the molds of Appellant's teeth also selected impressions and photographs from four other

people at random to compare to the autopsy mark.  He concluded that of the four random selections three could not be excluded as persons who could have made the bite mark found at autopsy.  RR22: 45-50.

Based on his observations and testing Senn concluded that the autopsy bite mark was of very low evidentiary value, that the methodology used to compare the bite mark to Appellant was flawed and that Hudson's opinion that the bite mark was made by Appellant to a reasonable degree of certainty was scientifically unsupportable.  RR22: 52-54.

Appellant objected to the introduction of this testimony as follows:

MR. GORE:

Your Honor, we object under Texas

Rules of Evidence, 4.03 and the balancing test there.  We

argue that it fails there, that its prejudicial nature and

value outweighs any probative value that it might have.

We also object under Texas Rules of Evidence, 7.01, 7.02,

7.03, 7.04 and 7.05.

We also object under the United State's

Constitution's Fifth Amendment, guarantee to the due

process of law, the Sixth Amendment's right to an

impartial jury and the right to effective assistance of

counsel, the Eighth Amendment's prohibition against cruel

and unusual punishment, the Fourteenth Amendment's due

process and equal protection guarantees, and the
corresponding rights contained in the Texas Constitution,
Article 1, Section 19, the right to due course of law, the
rights contained in Article 1, Section 10 to an impartial
jury, the rights contained in Texas Constitution, Article
1, Section 15, the right of trial by jury shall remain
inviolate.  The Legislature shall pass laws to maintain
its purity and efficiency.  And Texas Constitution,
Article 1, Section 13's prohibition against cruel and
unusual punishment.

And also, Your Honor, the testimony is not
relevant in that Dr. Senn has testified that it's of low
evidentiary value, that while he says he's in agreement,
you can't exclude Mr. Chanthakoummane, you also can't
exclude lots and lots of other people.  And the fact that
that exists, it makes it not helpful to the fact finder,
it makes it not relevant.  And the technique that was used
by the State's expert is invalid, Your Honor.

In Kelly_vs._State and Daubert and Robinson,
Your Honor, we would object under the law contained in
those cases.

RR22: 58-59.

Thereafter Hudson testified to the jury concerning his opinions, including that he found the bite mark to belonged to Appellant "within reasonable dental certainty beyond a doubt."  RR22: 258-259.

*ARGUMENTS AND AUTHORITIES*

The standard for admissibility of scientific testimony is governed by *Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App. 1992).  This Court succinctly reiterated this standard in *Russeau v. State* , 171 S.W.3d 871, Tex. Crim. App. 2005)

"Texas Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Under Rule 702, it is the trial court's responsibility to determine whether proffered scientific evidence is sufficiently reliable and relevant to assist the jury. *Jackson v. State,* 17 S.W.3d 664, 670 (Tex. Crim. App. 2000). A trial court's ruling on the admissibility of scientific expert testimony is reviewed under an abuse of discretion standard. *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

The proponent of scientific evidence must demonstrate to the trial court, by clear and convincing evidence, that the scientific evidence is reliable. *Id* . The proponent of "hard" scientific evidence must satisfy three criteria to demonstrate reliability: (1) the underlying scientific theory is valid; (2) the technique applying the theory is valid; and, (3) the technique was properly applied on the occasion in question. *Kelly,* 824 S.W.2d at 573. Other non-exclusive factors that could affect a trial court's determination of reliability include: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *Ibid.* "

It is clear that the trial court failed  in its role as gatekeeper in admitting this

evidence before the jury.    Indeed, the record is devoid of the trial court making any findings that the State's proffered evidence met the criteria of Kelly.    The Court's only ruling was "I'll find that Dr. Hutson's testimony is in the nature of circumstantial evidence and we'll let it in".   Thus, the trial court's ruling merely stated the obvious, that like DNA, fingerprints, tire marks and many other forms of evidence, bite marks are circumstantial evidence.  This, however, issue is was it "reliable" circumstantial evidence.

First, the State failed to show the Court that positive identification of a suspect by a bite mark to the exclusion of everyone else is supported by valid scientific theory.  Assuming that it is, however, there was also no showing that the technique applying the theory was valid; in other words that the methods used by Hudson were valid.  The third criteria is perhaps the weakest link of all, because the evidence clearly shows that the techniques used to identify Appellant were fatally flawed.    Consideration of the *Kelly* factors that should have affected the Court's decision reveal the unreliability of the State's bite mark evidence.

Second, and perhaps most revealing, when tested objectively by a qualified expert against a blind sample of four unknown persons three of those persons could not be excluded as having left the bite mark.  A blind test of a theory that reveals false positives seventy five percent of the time can hardly be considered scientifically reliable.

Third, the skill of the State's expert is questionable.  Dr. Senn clearly demonstrated that the photographs taken were done incorrectly and Hudson was not even aware of the methodology used by the medical examiner to excise the tissue around the bite that was used for comparison.

Fourth, the comparison was biased.  The State's expert only compared the autopsy bite mark with the dental impressions of the defendant.  This procedure was comparable to conducting an eyewitness lineup containing only the main suspect's picture.

Fifth, Dr. Senn was clearly more qualified that the State's expert to render an opinion concerning the reliability of the comparison.  Senn has practiced dentistry ten more years than Hudson, and is board certified in forensic dentistry, whereas the State's expert is not.

For these reasons, the State did not establish by clear and convincing evidence that the bite mark evidence should be admitted. The trial court failed it its role as gatekeeper by admitting it.     The trial court's ruling violated rules 702 and 403 of the Texas Rules of Evidence. Appellant was harmed by the admission of the testimony because if believed by the jury it tended to show that he was in direct contact with the deceased at or near the time of her death.

## **ISSUE NO. 8**

THE TRIAL COURT ERRED IN ADMITTING DNA TESTIMONY LINKING APPELLANT TO     THE OFFENSE OVER APPELLANT'S TIMELY OBJECTION

### *FACTS*

Prior to trial the trial court held a Daubert hearing regarding the admissibility of the results of DNA testing of evidence at the crime scene and its comparison with the DNA of Appellant.

The State's expert, Stacy McDonald, testified that she is deputy chief of physical

evidence for the Southwestern Institute of Forensic Sciences (SWIFS) and that she has a Ph.D. in genetics.  She testified that the process of comparing unknown DNA to the known DNA of a supect for the purposes of including or excluding him as a contributor of the unknown sample is a theory and technique accepted in the scientific community. RR20: 6-12.

She testified that she DNA tested 26 evidence samples and 17 known standards. RR20: 15.

She stated that since Appellant was of Laotian descent she attempted to locate a database to compare the frequency of Appellant's DNA being present in the Asian population group.  However, she was unable to find such a database and so she used one involving Chinese and Vietnamese populations as the next best population for comparison. RR20: 19-20.

In rebuttal Appellant called Casey Dupont a geneticist employed at Orchid Cellmark, an accredited DNA testing laboratory.  She reviewed the DNA analysis done by SWIFS in Appellant's case.  She first found fault with the statistical calculations based upon the database McDonald received concerning Chinese and Vietnamese as not following standard operating procedures (SOP).  She believed that general Asian statistics should have been performed when the initial statistical calculation was performed.  She indicated that following SOP's was extremely important and that licensing and credentialing of labs is based on SOP's.  RR20: 54-56.

With regard to specific samples she determined that the likelihood ratio reported

for the stain from the deceased fingernail sample contained an anomoly which involved the DNA being from multiple contributors and this was not included in the statistical calculations.  This made the reported statistical values incorrect.  She also challenged the analysis of samples form the pull cords because it did not include the possibility that two unknown people could have potentially contributed to the stain, and there was also a discrepancy in the number of genetic markers used.   RR20: 55-60.

Based on these facts Appellant moved to suppress all of the DNA evidence to be offered against Appellant which were recovered from the crime scene.  The trial court denied this motion.  RR20: 55-60.  The testimony was later admitted before the jury.  RR22: 261-285

### ARGUMENTS AND AUTHORITIES

Appellant would incorporate by reference the authorities cited in Issue No. 7.

In addition, Appellant, would show the Court that the State failed the third prong of the *Kelly* test because the evidence cast doubt on the scientific technique that was relied upon was in Appellant's case.  The evidence shows that SWIFS did not follow their own standard operating procedure by utilizing a combined Chinese-Vietnamese data base and attempting to apply it to Appellant who is Laotian.

Second, Appellant would show the Court that based on the *Daubert* hearing testimony the trial court should have at least excluded the testimony of Appellant's DNA being found on Appellant's fingernail clippings because of the failure of SWIFS to include an anomaly in the DNA found which indicated that it came from multiple contributors in

its calculation.

Third, Appellant would urge that the trial court should have at least excluded the testimony concerning the DNA found on the pull cords because the errors on the report which showed a lesser number of genetic markers found than the State's expert testified to.

Based on the authorities previously cited all of these factors negate the requirement that proper techniques were employed by the State's DNA expert and are cause for reversal.

## ISSUE NO. 9

### THE TRIAL COURT ERRED IN GRANTING THE STATE'S CHALLENGE FOR CAUSE AGAINST THE VENIREPERSON WILLIAM MANIA

#### *FACTS*

The trial court granted the State's challenge for cause over Appellant's timely objection against venireperson William Mania based upon the following motion from the State:

I asked this juror very clearly without any

leading questions or any indoctrination whether or not he

would hold the state to a higher burden of proof, and he

indicated very clearly he would for two reasons.

First of all, the gravity of the decision

being a death penalty and, secondly, because of his

underlying feelings and bias against the way the death

penalty has been applied in the State of Texas, and he

cited several examples out of Dallas County which caused

him great concern about the level of proof necessary and

cites these cases. . . .

RR7: 128

Mania expressed the view, when questioned by the State, that he had no problem with existence of the death penalty, but was disturbed by the manner in which it is implemented against minorities and the poor.  He voiced no opposition to inflicting the death penalty against Appellant due to his Asian heritage.  RR7: 98

When questioned about the burden of proof and advised by the State that beyond a reasonable doubt meant the same in a traffic ticket case as in a death penalty case he indicated that in his mind for a death penalty the proof necessary would be somewhere between beyond a reasonable doubt and not having any lingering doubts.  RR7: 100. Importantly, he stated that he did not believe that all people could be rehabilitated, and thought that the death penalty might well be appropriate for a murder committed in the course of a robbery.  RR7: 101-102.

When questioned by the defense Mania indicated that he did not have a problem with beyond a reasonable doubt being the standard of proof and particularly if the court instructed him that it was the standard.  RR7: 120.  Mania's final position on the matter after being requestioned by both sides was that he would follow the Court's instructions and the law and hold the State to proving Appellant's guilt beyond a reasonable doubt. RR7: 125-126.

## *ARGUMENTS AND AUTHORITIES*

It is the burden of the challenging party to demonstrate that the venireman he seeks to challenge is in fact incapable of, or at least substantially impaired from, following the law. *Hernandez v. State,* 757 S.W.2d 744, 753 (Tex.Cr.App.1988) (Plurality opinion).

Nothing in the record shows that Mania would not follow the law; to the contrary he exhibited a clear and responsible understanding of the law and even agreed that the offense Appellant was charged with was the type of offense for which the death penalty should be available.   Mania's only problem was with the application of the law, but he voiced no opposition which would have deterred him from applying the law against Appellant if warranted.

This Court has rejected the notion that the phrase "beyond a reasonable doubt" should be defined by the Court.   *Paulson v. State* , 28 S.W.3d 570 (Tex. Crim. App. 2000) overruling *Geesa v. State* , 820 S.W.2d 154 (Tex. Crim. App. 1991).   This principle allows jurors to determine the meaning of the phrase for the themselves as this Court observed in *Castillo v. State* , 913 S.W.2d 529 (Tex. Crim. App. 1995):

Finally, we reject the court of appeals' punishment-phase-versus-guilt-phase dichotomy as the proverbial distinction without a difference. Whether it is deliberating upon a defendant's guilt or deciding how to answer the special issues at the punishment phase, a jury is authorized by law to make a finding detrimental to the accused only if the evidence is convincing to a level of confidence beyond a reasonable doubt. In either context it is up to the individual juror to decide for himself his own understanding of proof beyond a reasonable doubt, within the tolerances of the law. A venireman who indicates he will set his threshold for reasonable doubt higher than the minimum allowed by law does not thereby demonstrate an inability to follow the law. This is true irrespective of the character of evidence presented or the nature of the issues involved in the respective proceedings.

*Castillo,* at 534

Clearly the State failed in its burden to show that Mania had a "bias or prejudice

against any phase of the law upon which the State is entitled to rely for conviction or punishment.   *Tex. Code Crim. Proc. Ann.* art. 35.16(b)(3) (Vernon, 2006).   The venireperson clearly stated that he would follow the law, apply the correct legal standard, and convict Appellant and impose the death penalty if the State met its burden; he demonstrated no more that responsible and conservative approach to his duties as a juror.   The trial court's improper granting of the State's challenge requires reversal.   *Bell v. State*, 724 S.W.2d 780 (Tex. Crim. App. 1986).

### ISSUE NO. 10

THE TRIAL COURT ERRED IN GRANTING THE STATE'S CHALLENGE FOR CAUSE AGAINST THE VENIREPERSON ROBERTO DELACRUZ

*FACTS*

The trial court granted the State's challenge for cause over Appellant's timely objection against venireperson Roberto Delacruz based upon the following motion from the State:

MR. HOWARD:  Yes, Your Honor, based on the

fact that he'd hold the state to a higher burden of proof

of beyond a reasonable doubt.

He talked about it during my voir dire with

him.  In fact, he used a certainty and even during Mr.

Miears he even made the comment a little bit more when

discussing reasonable doubt.

RR12: 184-185.

The defense objected to this challenge being granted.  RR12: 185-186.

The State' challenge was based upon certain of Delacruz's statements during their voir dire:

Q    Some people will say, you know what, if it's a

death case, if the state is seeking the death penalty,

then I would require just a little bit more than beyond a

reasonable doubt than I would in a burglary case or a

driving while intoxicated or a speeding case.

Some people will say, you know, because of

the finality of the decision in this case, you just need

that little extra.

Is that something that you subscribe to?

A    Yeah, I would think so.  I mean, something as big

as death, I mean I think you have to prove your case a

little bit more than, you know, us having like some doubts

about it.

Q    Or even beyond -- I mean the standard is beyond a

reasonable doubt but because it's a death case you've got

to have that little extra.

A    Yeah, I feel like y'all should be proving it just

a little bit more.

Q    Some people will say beyond a shadow of a doubt.

Have you ever heard that?

  A  No, I've never heard that.

      RR12: 168-169

Q  Earlier you said you'd hold the state to a little

bit higher burden than beyond a reasonable doubt; is that

right?

  A  Yes.

  Q  Tell me about why that is.

  A  Why I would hold you to higher?

  Q  A higher burden.  The law says that we have to

prove our case beyond a reasonable doubt, and when we

talked earlier you said that you'd hold us to a bit of a

higher burden.  Why was that?

  A  Just because, I mean, if you're going to take

someone's else's life, I mean, then I think you should

prove everything that they've done to commit that crime.

  Q  By a certainty?

  A  Yeah.

  Q  Okay.

  A  Like -- not exactly but, you know.

  Q  Mr. Delacruz, thank you very much for your time.

      RR12: 180

When questioned by Appellant's counsel it became clear that Delacruz was simply expressing a responsible reluctance to rush to judgment in a case which might lead to the death of another human being:

Q    And just because it's a death penalty case, I mean, yeah, the quality of evidence may be different but the standard of proof is the same beyond any reasonable doubt.

I mean, you're not going to require them to prove it beyond all doubt, right?

A    No, there's no way they could do that.

Q    Okay.  So you would have them just prove it beyond any reasonable doubt, right?

A    Yeah.

Q    You would make them follow the law.  The Judge would tell you the law that requires them to prove it beyond a reasonable doubt, and that's the only standard you would hold them to, right?

A    Well, yeah.  I mean, I guess you know with all -- like you said, it's the max of reasonable doubt.  I mean, if that's that -- you know, if that's that little bit more, I mean like the maximum reasonable doubt.

Q    Beyond a reasonable doubt, okay.  And I don't

want to put words in your mouth and lead you down some

road.  If you're going to hold them to prove something

beyond all doubt then you're just not a good juror for

this case.

   A   Yeah.  I mean, I know they cannot prove it beyond

all doubt.  Because like you said, I'd have to be a

witness or something like that.

   Q   But you'll make them prove it beyond all

reasonable doubt?

   A   Yes.

           RR12: 182-183.

## *ARGUMENTS AND AUTHORITIES*

      Appellant incorporates the authorities cited in <u>Issue No. 9</u> and reurges and realleges them in support of this issue.  Delacruz's opinion was much the same as Mania's; he would not hold the State to a higher burden but would simply exercise due diligence in disposing of another man's life.

## **ISSUE NO. 11**

THE TRIAL COURT ERRED IN ADMITTING AN INFLAMMATORY
PHOTOGRAPH

OF APPELLANT OVER HIS TIMELY OBJECTION WHICH HAD NO CONNECTION

TO THE OFFENSE WITH WHICH HE WAS CHARGED

### *FACTS*

The State offered before the jury a photograph which was recovered from Appellant's cell phone by an agent for the secret service, which depicted Appellant with his mouth open apparently acting as though he were about to bite a dog.  RR30: Exhibit 75.  The state attempted to justify this prejudicial depiction of Appellant by claiming that it was necessary to show the jury how wide he could open his mouth so that the jury could be satisfied that he could have inflicted the bite on the complainant, and to show the jury his appearance at the time of the offense.  RR21: 237.

Appellant objected to the photograph on the grounds that the State's bite mark expert was scheduled to testify the next day concerning the condition of Appellant's mouth and whether the bite mark found on the deceased was made by Appellant, and because any possible probative value was outweighed by the danger of unfair prejudice pursuant to Rule 403 of the Texas Rules of Evidence.  ____  The trial court overruled Appellant's objection.  RR21: 238-240. ___

### *ARGUMENTS AND AUTHORITIES*

Relevant evidence is generally admissible and irrelevant evidence is excluded.  T ex. R. E vid. 402.  Trial courts may, nevertheless, exclude relevant evidence if the danger of unfair prejudice substantially outweighs its probative value.  T ex. R. E vid. 403.  Rule 403 governs the admission of allegedly inflammatory photographs.  *Emery v. State,* 881 S.W.2d 702, 710 (Tex. Crim. App. 1994), *cert. denied,* 513 U.S. 1192, 115 S. Ct. 1257, 131 L. Ed. 2d 137 (1995).  Appellate courts determine only if the danger of unfair prejudice, confusion of the issues, misleading of the jury, undue delay, or the needless presentation of cumulative evidence substantially outweighed the probative value of the

photos.  *Barnes v. State,* 876 S.W.2d 316, 326 (Tex. Crim. App. 1994), *cert. denied,* 513 U.S. 861, 115 S. Ct.  174, 130 L. Ed. 2d 110 (1994).  Reversal occurs only if the trial court committed a clear abuse of discretion by admitting the photographs into evidence.  *Matamoros v. State,* 901 S.W.2d 470, 476 (Tex. Crim. App. 1995); *Montgomery v. State,* 810 S.W.2d 372, 392 (Tex. Crim. App. 1991).  Factors used to balance the probative value of photographs versus their prejudicial effect include the gruesomeness of the exhibits, their detail, size, color, and distance of the subject from the camera, nakedness of the bodies, and the availability of other means of proof.   *Long v. State,* 823 S.W.2d 259, 272 (Tex. Crim. App. 1991), *cert. denied,* 505 U.S. 1224, 112 S. Ct. 3042, 120 L. Ed. 2d 910 (1992).

State's exhibit 75, which apparently shows Appellant acting as though he were going to bite a dog resolves no factual issue in the State's case.  One of the state's excuses for displaying Appellant in such an unfavorable light was that it showed the jury his appearance around the time of the offense.   However, neither the photograph nor the testimony of the sponsoring witness contain any information about when the photograph was taken.    RR30: Exhibit 75.  RR21: 241-246.  The other explanation, that it showed how wide Appellant could open his mouth is equally spurious, since the State already planned to bring expert testimony to that effect before the jury the very next day; and in fact intended to show that the bite mark could be linked to Appellant.  RR22: 235-260.

The state's reasons for admission amounted to no more than justification for distributing a prejudicial photograph of Appellant before the jury; therefore, the exhibit had virtually no probative value.

Appellate courts must disregard nonconstitutional errors that do not affect substantial rights of the accused.  T ex. R. A pp. P. 44.2(b).  An error affects a substantial right only if there exists a reasonable possibility of prejudice.  *King v. State,* 953 S.W.2d 266, 270 (Tex. Crim. App. 1997); *Hinds v. State,* 970 S.W.2d 33 (Tex. App. – Dallas 1998, no pet.).  A matter is deemed harmless if, after viewing the entire record, the appellate court determines that the error had no, or only a slight influence on the jury's verdict.  *Id* . at 35.  The appellate court must attempt to gauge what effect the error actually had, or may reasonably have had, on the jury's decision.  *Id* . at 33.  The appellate court must disregard errors that had no, or only a very slight effect on the jury.  *Id* . at 35.

Clearly State's Exhibit 75 had the effect on the jury that the State intended; one of extreme prejudice.

## **ISSUE NO. 12**

THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS

PURSUANT TO THE EQUAL PROTECTION CLAUSE OF THE 14 TH AMENDMENT

TO THE UNITED STATES CONSTITUTION

*FACTS*

Prior to trial Appellant filed his Motion to Preclude Death Penalty as a Sentencing Option due to Equal Protection Violations .  CR: 828-850.  This motion as well as all other Constitutional challenges raised by Appellant were overruled by the Trial court.  CR: 24. RR2: 140.

*ARGUMENTS AND AUTHORITY*

<u>Analysis</u>

A.      <u>Facially Unconstitutional: No Uniform and Specific Standards in Place</u>

There are no uniform, statewide standards to guide prosecutors in deciding when they should seek the death penalty, as required by the Equal Protection Clause and, therefore, Article 37.071 of the Texas Code of Criminal Procedure is unconstitutional on its face.  In *Bush v. Gore* , 531 U.S. 98 (2000), the United States Supreme Court held that when fundamental rights are involved, the Equal Protection Clause of the Fourteenth Amendment requires that there be "uniform" and "specific" standards to prevent the arbitrary and disparate treatment of similarly situated people.  *Bush* , 531 U.S. at 102.  The Court, applying this principle, concluded that the Florida Supreme Court's opinion ordering a recount in the 2000 presidential election was unconstitutional because the standard –  "intent of the voter" – was too vague and thus would not respect the "equal dignity owed to each voter."  *Id.* at 104.

As a prerequisite to implementing death penalty systems, States must establish mechanisms to ensure that the lives of all of its citizens are treated equally. As the Supreme Court noted with respect to voting, "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush* , 531 U.S. at 104-05.  By the same reasoning, since the Constitution has ensured both the right to life and to the equal protection of the laws, a state may not, by arbitrary and disparate treatment, value one person's life over that of another.  In the period since *Bush* was handed down, several commentators have taken notice of this result.  *See* Laurence Benner et. al., Criminal Justice in the Supreme Court:

An Analysis of United States Supreme Court Criminal and Habeas Corpus Decisions (October 2, 2000 - September 30, 2001), 38 Cal. W. L. Rev. 87, 91 (2001) ("Certainly the *Bush v. Gore* equal protection principle ought to be no less applicable when a state permits 'disparate treatment' of death eligible defendants because county prosecutors use differing standards for electing which defendants they will seek to execute."); Michael P. Seng, Commentary:  Reflections on when "We, the People" Kill , 34 J. Marshall L. Rev. 713, 717 (2001) ("Certainly, if a state or its courts cannot arbitrarily dilute or deny a person's right to vote because of the Equal Protection clause, then human life must also be given equal protection."); Cass R. Sunstein, Symposium:   *Bush v Gore* : Order Without Law, 68 U. Chi. L. Rev. 737, 758 (2001) (noting that the *Bush* holding might require that "methods be in place to ensure against the differential treatment of those subject to capital punishment").

Texas' lack of standards to ensure non-arbitrary treatment with regard to the fundamental right to life is enough in itself to establish an Equal Protection violation; a showing of intentional discrimination against a protected class is not required. *Bush* , 531 U.S. at 106.   Unlike traditional Equal Protection claims of intentional discrimination against a protected class, claims like this one and the one in *Bush* are not based on an individual act of discrimination, but rather challenge a system in which unchecked official discretion makes arbitrary and unequal treatment inevitable.   *Cf. McCleskey v. Kemp* , 481 U.S. 279 (1987) (holding superseded by statute in part).

If the Equal Protection clause requires guidelines to ensure that localities do not treat "identical types of ballots used in identical brands of machines and exhibiting

identical physical characteristics" differently, *Bush* , 531 U.S. at 134 (Souter, J., dissenting) (agreeing with per curium that the lack of standards for the statewide recount violated the Equal Protection Clause but disagreeing as to the proper remedy), then it must require guidelines to ensure that localities do not treat similarly situated offenders committing the same types of crimes differently with respect to their lives.  While the *Bush v. Gore* opinion declares that its "consideration is limited to the present circumstances," *id.* at 109, suggesting that the principle announced might not apply to any other situations, the fundamental nature of the right to life requires that the principle also apply, as logically appropriate, to the death penalty system.  The per curium opinion in *Bush* explains the narrow scope of its holding by distinguishing the somewhat unusual situation of a court-ordered statewide recount from an ordinary election.  In ordinary elections, the Court says, the Equal Protection Clause does not prohibit counties from developing "different systems for implementing elections."  *Bush* , 531 U.S. at 109.  One reason for this distinction is that once ballots have been cast, the "fact finder confronts a thing, not a person," and thus "[t]he search for intent can be confined by specific rules designed to ensure uniform treatment."  *Id.* at 106.  Also, individual counties may have "expertise" that justifies letting them choose their own methods of conducting elections.  *Id.* at 109.  Another explanation is that "local variety (in voting machines and procedures) can be justified by concerns about cost, the potential value of innovation, and so on" whereas a "different order of disparity" occurs when, after ballots have been cast, physically identical ballots are hand-counted according to different rules.  *Id.* at 134 (Souter, J., dissenting).  Finally, of course, voting is different than capital punishment, and arguably the differences between the two might justify different constitutional analyses.

These distinctions, however, do not diminish the relevance of the *Bush* Equal Protection rule to Texas' death penalty system.  Just as Florida counties can use different voting machines in their elections, Texas counties can certainly have separate prosecutors and can structure those prosecutors' offices differently; this allows the flexibility demanded by limited budgets and justified by local expertise, and takes into account the potential for innovation inherent in a system of local control.  With regard to the Court's distinction between a "thing" and a "person," although it is true that prosecutors charged with deciding when to seek the death penalty confront people and not things, this does not diminish the Equal Protection Clause's requirement of non-arbitrariness.  In fact, written standards are already in use in other jurisdictions to guide prosecutors in the decision making process with regards to when the death penalty should be sought.  *See* , *e.g.* , United States Attorneys' Manual §9-10.010 et. seq. (1995) (laying out "federal protocol" for capital cases); U.S. Department of Justice, The Federal Death Penalty System:  Supplementary Data, Analysis and Revised Protocols for Capital Case Review (2001), http://www.usdoj.gov/dag/pubdoc/deathpenaltystudy.htm.

B.    Right to Life is a Fundamental Right

The United States Constitution requires safeguards to ensure the equal treatment of all persons in the context of death penalty prosecutions.  Whereas the right to vote is "fundamental" because of historical trends and legislative decisions, the right to life at stake in Texas' system of capital punishment is the most fundamental of all rights.  In contrast to the implied constitutional right to vote, the right to life is contained in the text of the Constitution.  The Fifth and Fourteenth Amendments provide that neither the federal

government nor the states shall deprive any person of "life, liberty, or property" without due process of law.  U.S. Const. amend. V; amend. XIV, §1; *cf.* Bush v. Gore, 531 U.S. at 104 ("the individual citizen has no federal constitutional right to vote for electors for the President of the United States." Instead, "[h]istory has favored the voter," and since every state now chooses its electors through a statewide election, "the right to vote as the legislature has prescribed is fundamental.").  The Supreme Court has long recognized the fundamental nature of the right to life, particularly in the context of the death penalty.  *See Furman v. Georgia* , 408 U.S. 238, 359 (1972) ("because capital punishment deprives an individual of a fundamental right [ *i.e.* , the right to life], . . . the State needs a compelling interest to justify it").

C.    Arbitrary and Disparate Treatment of Similarly Situated Texas Defendants

The lack of standards to guide local prosecutors in their decisions as to whether to seek the death penalty inevitably leads to the arbitrary and disparate treatment of similarly situated defendants.  Prosecutors in each of Texas' 254 counties make such decisions on their own, according to unwritten and widely varying standards.   Tex. Code Crim. Proc . *passim* ; Tex. Penal Code *passim* .  The result is that whether a person charged with a capital crime will face the death penalty depends largely on arbitrary factors such as the county in which the crime occurred and, even more disturbingly, the race of accused and the victim.  While under the *Bush* standard it is not necessary to show that a standardless system has, or will have, a disparate or discriminatory impact, the evidence of such an impact in Texas underlines the arbitrariness inherent in such a system.  Even within Rusk County, similarly situated defendants are not treated the same.  Statewide standards would

remedy this blatant violation of the Equal Protection Clause.

Texas' system, or lack of system, for determining who will face the death penalty creates levels of disparity and arbitrariness that dwarf the problems addressed by the Supreme Court in the Florida election recount.  As in the Florida recount, standards vary from county to county, and even within a county the standards may change dramatically when a new district attorney takes office.   Whether a life-and-death decision is made according to legally relevant criteria, financial considerations, moral judgments, insistence of the deceased's family or by whim is often impossible to determine, since there are generally no written standards for prosecutors to consult as a guide to making such a decision.  Longtime Harris County District Attorney John Holmes,  stated Harris County's policy when he said that, "the decision [whether to seek the death penalty] is mine unilaterally."  Armando Villafranca, A Man of Conviction:  For Securing Death Penalty, Offering Blunt Views, Few Top District Attorney, Houston Chronicle, November 29, 1998, LEXIS.   In other Texas counties, differing systems are used.   In Travis County, committees of assistant prosecutors assist the district attorney when making decisions in potentially capital cases.  Richard Willing, Prosecutor Often Determines Which Way A Case Will Go, USA Today, Monday, December 20, 1999, at 1A.  Meanwhile, in Dallas County, for many years the District Attorney's first assistant, Norman Kinne, made the decisions himself.  Holly Becka, Vance Retiring With Legacy Of Helping Crime Victims; Attorneys Note Ethical Standards Set by DA, Assistant, Dallas Morning News, December 31, 1998, LEXIS.

When a District Attorney decides who will face the death penalty, the importance

of that person's personal philosophy should not be underestimated.   "Indeed, the willingness of the local prosecutor to seek the death penalty seems to play by far the most significant role in determining who will eventually be sentenced to death."   Richard Willing and Gary Fields, Geography of the Death Penalty, USA Today, December 20, 1999, at 1A.   When John Holmes retired as District Attorney for Harris County, a debate between the two candidates competing to succeed him revealed the utter lack of consensus as to how life-and-death decisions should be made.   Chuck Rosenthal, Holmes' hand-picked successor and now former District Attorney for Harris County, stated that the county's system of seeking and obtaining death sentences (unilateral decision by the D.A.) "works great."   Rosenthal's opponent in that election Jim Dougherty, however, was more circumspect.   Dougherty questioned both the eagerness with which the Harris County District Attorney's office seeks the death penalty and the arbitrariness underlying that decision, saying, "[w]e need to be conscious of the fact that there is great disproportionality in the system" and that "[i]f you push hard enough you can get the death penalty in most of these cases, but is that the right thing to do every time?"   Julie Mason, Candidates for D.A. Draw Differences; Pair Disagree on State's Death-Sentence System, Houston Chronicle, October 26, 2000, LEXIS.

Indeed Harris County, with its lack of standards for determining which individual defendants will face death, provides the most glaring example of the resultant disparities in Texas' system.   The approach of District Attorneys Holmes and Rosenthal has been not to consider criteria such as the relative moral culpability of the defendant or the heinousness of the crime, but rather, as Rosenthal said, to seek the death penalty whenever prosecutors judge there is a "better than average chance" of a jury returning a death sentence.   Mike

Tolson and Steve Brewer, Harris County is a Pipeline to Death Row, Houston Chronicle, February 2, 2001, LEXIS.  This approach has been roundly criticized, not only by defense attorneys and death penalty opponents but also by other prosecutors and judges.  As state District Judge Doug Shaver, himself a former prosecutor, said in regard to Harris County, "It seems to me that there are cases going through that are not necessarily death cases.  It is no longer reserved for the special cases it ought to be reserved for."  *Id.*  Former District Attorney Holmes acknowledged but dismissed the fact that different counties employ different standards in deciding whether or not to seek the death penalty, commenting, "I'd rather be tried for horse theft in Houston than in West Texas, where I'm going to get a harsher sentence, but what does that prove?"  Willing and Fields, *supra* .  What it proves is that when it comes to capital punishment, which, unlike horse theft, involves the fundamental right to life, the lack of statewide standards as to when prosecutors should seek the death penalty has led to a system lacking the "minimum requirement for non-arbitrary treatment," *Bush* , 531 U.S. at 105, that the Equal Protection Clause commands.

The lack of standards in Texas' death penalty prosecution system leads to glaring disparities in the number of people sent to death row in different counties.  Just as the more lenient standards for counting ballots in Broward County as compared to Palm Beach County led to a "markedly disproportionate" number of new votes being discovered in Broward County, *Bush* , 531 U.S. at 107, the different standards employed by prosecutors in Texas' 254 counties leads to people being sentenced to death at rates markedly disproportionate to their counties' populations and murder rates.  For instance, in 1999 Harris County had 140 people on death row, while Dallas County, whose population is about two-thirds that of Harris County's had only 37.  This is despite the fact that Dallas

County's murder rate is higher than Harris County's. [1] Willing and Fields, *supra*, at 6A. Indeed, if Dallas County and Bexar County were combined into one, they would have a population greater than Harris County's, but would have less than half the number of people on death row. [2] While Harris County had 26% of the state's murders from 1988-1997, it was responsible for 31% of the people on death row in the state. Dallas County, with 19% of the state's murders, was responsible for contributing only 9% to the population on death row. *Id.* Meanwhile, 138 (more than half) of Texas' 254 counties have never sentenced anyone to death. Tolson and Brewer, *supra*.    Current statistics show no more uniformity than former ones. Bexar and Dallas Counties combined are now the source of 166 persons given the death penalty since its reinstatement, while Harris County alone accounts for 280. http://www.tdcj.state.tx.us/stat/countysentenced.htm.  Of inmates actually executed a total of 71 have been from Bexar and Dallas County.  Harris County   has   had   108   actually   executed.  http://www.tdcj.state.tx.us/stat/countyexecuted.htm.  In addition, a wide disparity exists between the types of murders and defendants that are likely to warrant the death penalty.  http://www.tdcj.state.tx.us/stat/offendersondrow.htm

Even more disturbing than the differences among county prosecutors' approaches to deciding whether to seek the death penalty are the racial disparities evident in those decisions. Researchers have concluded [3] that all other things being equal, a Texan who murders a white person [4] is twice as likely to be charged with capital murder than one who murders a Hispanic person, and almost five times more likely to be charged with capital murder than one who murders an African-American. [5] Jonathan R. Sorensen and James W. Marquart, Prosecutorial And Jury Decision-Making in Post-Furman Texas Capital

Cases, 18 N.Y.U. Rev. L. & Soc. Change 743, 765 (1990/91). Some legally relevant criteria also increase the chance that an offender will be charged with capital murder; for instance, those who commit murder-rapes and those who kill multiple people are more likely to be charged with capital murder than are other death-eligible offenders. [6] *Id* . at 764-65. The fact that a murder victim is white increases an offender's chance of being charged with capital murder *more* than if he is charged with multiple killings. [7] *Id.*

Racial disparity is a problem not just in Texas, but across the nation. A study by the General Accounting Office found that 82% of studies conducted nationwide reported that the race of the victim increased the likelihood that a defendant would be charged with capital murder or receive the death penalty. That is, "those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks." United States General Accounting Office, Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities, GDD-90-57, 5 (1990), www.gao.gov/docdblite/summary. The "evidence for the race of the victim influence was stronger for the earlier stages of the judicial process ( *e.g.* , prosecutorial decision to charge defendant with a capital offense, decision to proceed to trial rather than plea bargain) than in the later stages." *Id.* It is evidence like this that has led the New Jersey Supreme Court to "strongly recommend" that the state adopt "guidelines for use throughout the state by prosecutors in determining the selection of capital cases." *State v. Koedatich* , 548 A.2d 939, 955 (1988); *State v. Marshall* , 613 A.2d 1059, 1112 (1992) (aff'd in part, rev'd in part by *Marshall v. Hendricks* , 307 F.2d 36). Guidelines would not only help to ensure uniformity, but would "be able to screen out any possible effects of race or socioeconomic status in the charging and selection process." *Marshall* , 613 A.2d at 1112. The *Bush* Equal Protection

principle makes such a system not just beneficial, but constitutionally required.

Although some portions of the *Bush v. Gore* decision are vulnerable to criticism, its core Equal Protection holding is neither implausible nor unsupportable.   While many judges and commentators have questioned parts of the ruling, that criticism has focused solely on the Court's remedy.   *Bush* , 531 U.S. at 127 (Stevens, J., dissenting), 135 (Souter, J., dissenting), 143 (Ginsburg, J., dissenting), 147 (Breyer, J., dissenting); David A. Strauss, Symposium:   *Bush v. Gore* :  What Were They Thinking?, 68 U. Chi. L. Rev. 737 (2001); Cass R. Sunstein, Order Without Law, 68 U. Chi. L. Rev. 737 (2001).   As the per curium opinion noted, seven Justices were in agreement on the basic premise that the Florida Supreme Court's recount order violated the Equal Protection Clause because it lacked standards to ensure the non-arbitrary treatment of voters.   *Bush* , 531 U.S. at 111 (referring to Justices Souter and Breyer and the five Justices who signed the per curium opinion).   Similarly, even critics who lambasted the decision allowed that the Equal Protection reasoning in the opinion, while not dictated by the Court's prior precedents, was reasonable and even praiseworthy.   Thus, erstwhile critics commented that the Court's interpretation of the Equal Protection clause "has considerable appeal," Sunstein, *supra* , at 773, and "can be seen both as an extension of the Warren Court's vision of democracy and as a logical implication of the view, seriously proposed a generation ago, that the Constitution limits the degree to which discretion can be vested in executive officials of both the state and federal governments."   *Strauss* , *supra* , at 740.   The closeness of the election and the political implications of the Court's decision do not mean that the principle upon which its ruling was based can be ignored.

To the extent that the Equal Protection principle in *Bush v. Gore* conflicts with the Court's declaration that the holding only applies to the particular circumstances of the 2000 Presidential election, the principle must take precedence.  It is not only appropriate, but wise for courts to limit their holdings to the facts of the particular case with which they are confronted.  However, in a legal system based on precedent, a legal principle cannot be valid on one day and not the next.  The reasoning of *Bush v. Gore* , like that of any of the Court's rulings, must apply to all other situations to which it logically extends.  The Equal Protection Clause mandates that when a fundamental right is threatened, states must establish standards to ensure that localities do not treat its citizens in an arbitrarily disparate manner.  Thus, Texas' death penalty prosecution scheme, which provides no standards to ensure the non-arbitrary treatment of capital offenders by prosecutors, is unconstitutional.

D.    Invoking prosecutorial discretion does not excuse unconstitutional statute

The need for non-arbitrary standards in the application of the death penalty outweighs any benefits of unbounded prosecutorial discretion.   No argument for prosecutorial discretion can justify a system that contains no safeguards to ensure that the lives of similarly situated offenders are treated with equal dignity.  Because the right to life is fundamental, if Texas is to maintain such a system, its justifications for that system would have to pass strict scrutiny.   *Skinner v. Oklahoma* , 316 U.S. 535, 541 (1942) (reversing an order to sterilize a felon because the law allowing for sterilization did not pass strict scrutiny, as it treated larceny and embezzlement differently despite their being essentially the same crime).  In order to pass strict scrutiny, the state would have to show that allowing prosecutors the unbridled discretion to decide when to seek the death penalty

is necessary to achieve a compelling governmental interest and narrowly tailored.  Our constitutional structure does not bar courts from evaluating the Constitutionality of the system by which prosecutors decide whether or not to seek the death penalty.  Neither do the arguments in favor of prosecutorial discretion that have been made over the years justify the arbitrary seeking of death.

The separation of powers doctrine does not bar courts from requiring some restraint on prosecutorial discretion.  Courts can and do evaluate particular prosecutorial decisions for Equal Protection violations.   *See* , *e.g.* , *United States v. Armstrong* , 517 U.S. 456 (1996) (declining to allow discovery on defendant's selective prosecution claim but acknowledging that such discovery would be allowed if petitioner had shown that the Government declined to prosecute similarly situated persons of other races); *Wayte v. United States* , 470 U.S. 598 (1985) (reviewing the prosecution of a man for refusing to register with the Selective Service System under a "selective prosecution" Equal Protection analysis); *United States v. Batchelder* , 442 U.S. 114, 125 (1979) (noting that while it is broad, prosecutorial discretion is nonetheless "subject to constitutional constraints"); *Bordenkircher v. Hayes* , 434 U.S. 357, 365 (1978) (same); *Oyler v. Boles* , 368 U.S. 448 (1962) (same); *Yick Wo v. Hopkins* , 118 U.S. 356 (1886) (ordering the release of Chinese petitioners who were prosecuted and jailed for operating laundries without a permit while similarly situated Caucasian laundry operators were not prosecuted).   In selective-prosecution and vindictive prosecution cases, courts are deferential to prosecutorial decisions and require "clear evidence" to rebut the presumption that prosecutors have acted legally.   *Armstrong* , 517 U.S. at 464 (quoting *United States v. Chemical Foundation, Inc.* , 272 U.S. 1, 14-15 (1926)).  Because of separation of powers

concerns, courts refuse to force district attorneys and U.S. Attorneys to prosecute particular offenders, as doing so would "encroach on the prerogatives of another department of the Government." *United States v. Shaw*, 226 A.2d 366, 368 (D.C. 1967); *see also Newman v. United States*, 382 F.2d 479 (1967); *United States v. Cox*, 342 F.2d 167 (5th Cir.Miss. 1965). However, "there is an enormous difference between, on the one hand, forcing a prosecutor to charge or stripping him of authority to charge and, on the other, regulating that authority . . ." James Vorenberg, Decent Restraint of Prosecutorial Power, 94 Harv. L. Rev. 1521, 1546 (1981). This analysis is neither attacking a particular decision of an individual prosecutor as vindictive or selective, nor is it asking the courts to force prosecutors to file charges in particular cases. Rather, it is alleging that the laws of Texas violate the Equal Protection Clause by failing to establish standards by which prosecutors are to decide whether to seek the death penalty in a potentially capital case. "The law has long recognized the distinction between judicial usurpation of discretionary authority and judicial review of the statutory and constitutional limits to that authority." *Nader v. Saxbe*, 497 F.2d 676, 679 n. 19 (1974). After conducting such a review, courts can only conclude that Texas' lack of a system to guide prosecutors in the decision whether certain offenders will face the death penalty violates the Constitutional guarantee of equal protection. As the Court noted in *Bush v. Gore*, despite the "limits on judicial authority" imposed by the Constitution, when Constitutional violations are brought to the attention of the courts, "it becomes our unsought responsibility to resolve the federal and constitutional issues the judicial system has been forced to confront." *Bush*, 531 U.S. at 111. When faced with a Constitutional violation, courts cannot wait for the Legislature to take action.

The frequently cited reasons for allowing prosecutors broad discretion as to what charges to bring cannot justify a system which allows some defendants' lives to be arbitrarily valued less than others'.  Because of the fundamental nature of the right to life, such rationale would have to pass strict scrutiny. *Skinner v. Oklahoma* , 316 U.S. at 541.  The primary justification for judicial noninterference with prosecutorial decision-making is that judicial review of individual prosecutorial decisions would be difficult or inefficient. *Wayte v. United States* , 470 U.S. at 607.  One reason that courts may have difficulty reviewing prosecutors' decisions as to whether to seek the death penalty is that there are no clearly articulated, uniform standards by which those decisions are made.  If such standards were in place, judicial review would be much more feasible.  Further, the existence of statewide standards would not mean that courts would have to begin micro-managing prosecutors' offices; they could remain fairly deferential to prosecutors' decisions so long as prosecutors are able to justify their decisions according to the standards.  *See Vorenberg* , *supra* , at 1546-47.  Concerns about the increased burden on courts and prosecutors that could result from statewide standards cannot justify ignoring a constitutional mandate.  Standards to guide a prosecutor's discretion as to when to seek the death penalty would not constitute a mandatory death penalty, nor would they completely eliminate a prosecutors' discretion or ability to consider the individual circumstances of each case.  Statewide standards would simply provide "some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." *Bush* , 531 U.S. at 109.

Other rationales for broad prosecutorial discretion are similarly unable to excuse the disparities and arbitrariness of Texas' current system.  Such considerations as the need

for flexible use of prosecutorial resources based on changing enforcement priorities, or the loss of deterrence which might result from revealing prosecutorial motives, are not "compelling governmental interests" sufficient to overcome the need for non-arbitrariness when the state decides whether to seek to take a defendant's life.   While such considerations may justify broad discretion in the criminal justice system in general, they are incapable of providing justification when life is at stake.   Allowing the decision whether to seek the death penalty to be made based on the unfettered discretion of an individual prosecutor allows an unconstitutional degree of arbitrariness, inconsistency and unpredictability.   Further, even if the reasons for allowing broad prosecutorial discretion were "compelling" by themselves, they cannot justify the risk that life-or-death decisions might be made on the basis of mere caprice or, worse, racial prejudice.

E.   Statewide Standards Required by the Eighth Amendment

Requiring standards to ensure that prosecutors do not, through the exercise of unfettered discretion, arbitrarily value some peoples' lives more than others' would not only ensure that the Texas death penalty system complies with the Equal Protection clause, but would further the Eighth Amendment's mandate of reliability and consistency in the imposition of the death penalty.   In 1972, the Supreme Court invalidated the death penalty in part on the grounds that the standardless death penalty statutes then in effect allowed the ultimate punishment to be applied "wantonly and ... freakishly," *Furman v. Georgia* , 408 U.S. 238, 310 (1972) (Stewart, J., concurring), and that in practice there was no meaningful basis for distinguishing between the cases in which it was applied and those in which it was not.   *Id.* at 313 (White, J., concurring).   Four years later, when the court

approved revised death penalty statutes, it held that state legislatures confronted these problems by drafting statutes that provided the sentencer with guidance in determining the appropriate sentence and narrowed the sentencer's discretion to impose the death penalty. *Jurek v. Texas* , 428 U.S. 262, 270 (1976); *Gregg v. Georgia* , 428 U.S. 153, 195 (1976).

The new statutes did not, however, require states to provide standards to guide prosecutors' decisions as to whether to seek the death penalty in the first place.  See Tex. Code Crim. Proc . art. 37.071. As Justice Brennan has pointed out,

. . . discrimination and arbitrariness at an earlier point in the selection process nullify the value of later controls on the jury.  The selection process for the imposition of the death penalty does not begin at trial; it begins in the prosecutor's office.  His decision whether or not to seek capital punishment is no less important than the jury's.  Just like the jury, then, where death is the consequence, the prosecutor's "discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." . . . The prosecutor's choices are subject to no standards, no supervision, no controls whatever . . . if the price of prosecutorial independence is the freedom to impose death in an arbitrary, freakish, or discriminatory manner, it is a price the Eighth Amendment will not tolerate.

*De Garmo v. Texas* , 474 U.S. 973, 975 (1985) (Brennan, J., dissenting from denial of cert.).  If imposing the death penalty on a freakishly and randomly selected subset of those who commit murder violated the Eighth Amendment, *see Furman* , then surely allowing prosecutors to choose, without any standards whatsoever, what subset of those accused of capital murder will face the death penalty is equally unconstitutional.

In light of the Equal Protection analysis of *Bush v. Gore* , the Supreme Court's previous approval of Texas' system for selecting which defendants should face the death penalty must be revisited.  The Court has reasoned that such unbounded prosecutorial discretion does not violate the Eighth Amendment because a prosecutor's decision not to seek the death penalty when the law allowed him to do so involved the "decision to afford

an individual defendant mercy" rather than the unconstitutional decision to impose the death penalty on a "capriciously selected group of offenders."   *Gregg* , 428 U.S. at 199.

 The decision to show a particular defendant mercy is an invalid reason for allowing prosecutorial discretion because, as noted by Justice Blackmun in his dissent in *Furman* , "the power to be lenient is the power to discriminate." *McCleskey* , 481 U.S. at 312. While statutes channeling the discretion of the jury can reduce the dangers of arbitrary jury decisions in a particular case, they cannot change the arbitrariness inherent in a system in which the decision of who will be chosen to face that sentencing jury is guided by nothing more than one person's personal philosophy.  Put another way, if local prosecutors decide to "afford mercy," that is, decline to seek the death penalty, based on vastly different standards, or racially discriminatory standards, or no standards at all, the resulting system remains arbitrary and capricious, and thus, unconstitutional.  The insight of the *Bush v. Gore* Equal Protection reasoning is that arbitrariness can exist not just when an individual defendant (or ballot) is subjected to a judgment that is unguided by any standards, but also when an entire system lacks consistent standards so that defendants (or ballots) in each locality may be subjected to vastly differing penalties.

The evidence that individual prosecutors do, indeed, use vastly different standards to decide whether to seek the death penalty also requires a re-evaluation of the Supreme Court's approval of unbounded prosecutorial discretion.  In a concurrence in *Gregg* , Justice White expanded on the reasons why he thought unbounded prosecutorial discretion did not violate the Eighth Amendment, writing that "absent facts to the contrary" he would not assume that prosecutors will "exercise [their] power in a standardless fashion."  *Gregg* , 428 U.S. at 225 (White, J., concurring).  Justice White assumed that

the standards by which [prosecutors] decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and innocence.  Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong.

*Id.*  In fact, as discussed above, under the current system many prosecutors do not seek the death penalty in every death-eligible case if they think that a jury would not return a death sentence.  Some decide not to seek the death penalty upon request by the victim's family, (see Jury Process in Zamora Murder Trial to Start Jan. 20, Dallas Morning News, December 6, 1997, LEXIS), or because the defendant hires an experienced defense attorney, (Texas Civil Rights Project, The Death Penalty In Texas 22 (2000), http://www. texascivilrightsproject.org), or, as discussed above, possibly because the victim of the crime is not white.  Taking into consideration all of these facts, the assumption that it is unnecessary to channel a prosecutors' discretion is illogical and misguided.

Noting the constitutional problems inherent in a system where prosecutors enjoy unchecked freedom and widely varying standards when deciding whether to seek the death penalty, the New Jersey Supreme Court has called for standards to "instill uniformity in charging and prosecuting practices throughout the state." *State v. Marshall* , 613 A.2d at 1112.  That court acknowledged the fact that courts should not usurp the decision-making function of prosecutors, but argued that in light of the "need to promote uniformity in the administration of the death penalty," statewide standards were warranted.   *State v. Koedatich* , 548 A.2d at 955.  These recommendations were made on the basis of the Eighth Amendment requirements of reliability and non-arbitrariness in capital proceedings.  Combined with the Equal Protection Clauses' requirement that standards be in place to ensure equality with regards to fundamental rights, such standards are not simply

advisable, they are constitutionally required.

Other courts have recognized that the Fourteenth Amendment requires limiting discretion to ensure equality and non-arbitrariness in governmental decision-making . *Bush v. Gore* was not the first time a court has held that a system in which government officials have unbounded discretion is unconstitutional. The Supreme Court and federal appellate courts have found violations of the Fourteenth Amendment when governments and governmental agencies have unlimited discretion to select among qualified applicants for licenses and government benefits.   Those courts reasoned that allowing governmental decision makers to make choices without any uniform standards allows an intolerable amount of arbitrariness.   Although these cases have not been widely followed, they provide further persuasive support for the Equal Protection holding in *Bush* and for the necessity of some channeling of prosecutorial discretion in the Texas death penalty system.

The Supreme Court held that a lack of standards in a scheme of issuing permits, and the arbitrary and discriminatory refusal to grant permits to one group when they were routinely granted to other groups, violates the Equal Protection clause. *Niemotko v. Maryland* , 340 U.S. 268, 273 (1951) (alternative holding).   In that case, a City Council refused to grant a permit to a group of Jehovah's Witnesses who wished to hold a meeting in a public park.   While that case also involved the First Amendment and a prior restraint on the freedom of speech and religion issues, *id.* at 271, the Court found that the complete discretion vested in the City Council as to whether to grant permits violated the Equal Protection clause.   The Fifth Circuit applied similar reasoning to a case not involving the First Amendment in *Hornsby v. Allen* , 326 F.2d 605 (5th Cir. 1964). The City of Atlanta's

system for granting liquor licenses was found to violate the Equal Protection clause because it operated under no standards, allowing the city to arbitrarily deny applications of eligible applicants.   *Id.* at 610.   The court rejected the city's argument that the Equal Protection requirement of non-arbitrary standards did not apply because liquor licenses are not protected rights or entitlements but rather a "privilege."   *Id.*   While "government bodies have great latitude in enacting reasonable standards," they do not have the latitude to make decisions "on the basis of uncontrolled discretion and whim" or "without any established standards."   *Hornsby v. Allen* , 330 F.2d 55, 55 (5th Cir. 1964) (denying petition for reh'g).   For the same reason, the problems of arbitrariness inherent in a standardless system for choosing among "non-preference" applicants for public housing violated the Due Process Clause.   *Holmes v. New York City Housing Authority* , 398 F.2d 262 (2d Cir.N.Y.1968).

As in these cases, where governmental decision makers had complete discretion as to which eligible applicants they would grant permits or accept into public housing, in the Texas death penalty prosecution system 254 individual county prosecutors have complete discretion as to which death-eligible defendants will face a possible death sentence and which will not.   This standardless system allows for the arbitrary and inconsistent treatment of similarly situated defendants and is thus unconstitutional.   Even if a prosecutor's decision not to seek the death penalty is a "privilege" of mercy granted to some capital defendants but not others, the decision whether to grant that privilege cannot be left to the unfettered discretion of 254 individual county prosecutors.   Such a system allows for an unacceptable level of arbitrariness with life-or-death consequences.   Of course, mandating that prosecutors seek the death penalty in any death-eligible case would

not solve these problems.  Such a mandate would not only mean a tremendous misuse of time and money, but would run afoul of the Eighth Amendment requirement of individualized consideration of each offender and the related prohibition against an "unduly harsh and unworkably rigid" mandatory death penalty statute.  *Woodson v. North Carolina* , 428 U.S. at 293.  While the reasoning in *Holmes* and *Hornsby* and the alternative holding in *Niemotko* have not been widely followed, their support for the reasoning in *Bush v. Gore* reinforces its validity and underlines the fact that a system of unfettered discretion, like Texas' standardless system for deciding when to seek the death penalty in capital cases, violates the Equal Protection Clause.

Because the Texas death penalty scheme violates the defendant's right to equal protection of the law by failing to provide standards to guide the decision makers death penalty choices, the defendant prays that this Court reverse his death sentence and remand his case for a new punishment hearing wherein the death penalty is precluded as a sentencing option.

## ISSUE NO. 13

THE TEXAS DEATH PENALTY STATUTE VIOLATES THE EIGHTH AND FOURTEENTH

AMENDMENTS TO THE UNITED STATES CONSTITUTION BY IMPERMISSIBLY

RESTRICTING A JURY'S CONSIDERATION OF MITIGATING EVIDENCE

*FACTS*

Prior to trial Appellant filed his Motion Requesting the Court to Find Tex. Code Crim. Proc. Art. 37071, Section 2(f)(4) to be Unconstitutional .  CR: 828-850.  This

motion as well as all other Constitutional challenges raised by Appellant was overruled by the Trial court.  CR: 24.  RR2: 140.  The jury was instructed pursuant to this statute at the punishment phase of Appellant' trial.  CR:151-156.

## ARGUMENTS AND AUTHORITIES

It is the duty of courts to make certain that the death sentence is not "wantonly or freakishly" imposed and that the purposes of Art. 37.071 are accomplished.   *Ellason v. State* , 815 S.W.2d 656, 660 (Tex. Crim. App. 1991).

The Supreme Court of the United States has held that "[a]ccurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die."  *Gregg v. Georgia* , 428 U.S. 153, 190 (1976).

Art. 37.071 §2(e)(1) of the Texas Code of Criminal Procedure requires the court to instruct the jury to determine:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

 Tex. Code Crim. Proc. art. 37.071 §2(e)(1).

Art. 37.071 §2(f)(4) defines mitigating evidence to be "evidence that a juror might regard as reducing the defendant's moral blameworthiness."

This statutory definition violates the Eighth and Fourteenth Amendments to the United States Constitution.

It impermissibly instructs jurors to disregard mitigating evidence that is unrelated to a defendant's moral blameworthiness.  The instruction unconstitutionally narrows the jury's discretion in sentencing, to factors that concern only moral blameworthiness.

The Eighth and Fourteenth Amendments to the United States Constitution require that the sentencer "not be precluded from considering, *as a mitigating factor* , any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death ⸴ " *Eddings v. Oklahoma* , 455 U.S. 104, 110 (1982) (overruled in part on other grounds) (quoting *Lockett v. Ohio* , 438 U.S. 586, 604 (1978) (plurality opinion of BURGER, C.J.)).

The Supreme Court of the United States found the Texas death penalty statute to be constitutional on the basis of guarantees that sentencing juries would be able to consider "whatever mitigating circumstances" the defendant might be able to show.  *Lockett* , 438 U.S. at 607 (referring to *Jurek v. Texas* , 428 U.S. 262 (1976)).

The Court held that these mitigating circumstances were necessary to ensure that the death penalty was not imposed in an arbitrary or capricious manner.  This belief was based on the principle that "defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh* , 492 U.S. 302, 319 (1989) (overruled on other grounds).

It is therefore well established that a sentencer "may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Skipper v. South*

*Carolina* , 476 U.S. 1, 4 (1986) (quoting Eddings , 455 U.S. at 114).  The Supreme Court of the United States has held that relevant mitigating evidence is "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke* , 159 L. Ed. 2d 384, 395, 124 S. Ct. 2562, 2570 (2004).

The Supreme Court of the United States has further ruled that once the "low threshold for relevance is met, the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence."  *Tennard* , 159 L. Ed. 2d at 396, 124 S. Ct. at 2570 (quoting *Boyde v. California* , 494 U.S. 370, 377-378 (1990)).  It is therefore unconstitutional for a state to exclude or limit a defendant's ability to present relevant mitigating evidence.

However, Art. 37.071 §2(f)(4) of the Texas Code of Criminal Procedure instructs jurors to disregard any potentially relevant mitigating evidence that does not relate to the defendant's moral blameworthiness.

The instruction can only reasonably be interpreted as a limitation on the mitigating circumstances, referred to in Art. 37.071 §2(e)(1), that a jury can consider to warrant a sentence of life imprisonment rather than a death sentence.  If the clause is not read as a limitation on what mitigating evidence can be considered it is rendered completely superfluous when read in conjunction with Art 37.071 §2(e)(1).

"It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause and word of a statute so that no part thereof be rendered

superfluous or inoperative." *Spence v. Fenchler* , 107 Tex. 443, 457 (Tex. 1915).  The only way to give effect to Art. 37.071 §2(f)(4) without rendering it superfluous is to read it as a limitation on Art 37.071 §2(e)(1).

Limiting the jury's consideration of mitigating evidence to factors that reduce the defendant's moral blameworthiness creates an unacceptable risk that the death penalty would be imposed despite the existence of evidence that would infer the basis for a sentence less than death.  "When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."  *Lockett* , 438 U.S. at 605 (1978).

The Supreme Court of the United States has held that "the sentencing process must permit consideration of the 'character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death' . . . in order to ensure the reliability, under Eighth Amendment standards, of the determination that 'death is the appropriate punishment in a specific case.'" *Lockett* , 438 U.S. at 601, (quoting *Woodson v. North Carolina* , 428 U.S. 280, at 304–305 (1976)).

A restriction on the mitigating evidence that can be considered by jurors in the sentencing phase of this trial is therefore unconstitutional, and also renders whatever, if any, sentence to be delivered unreliable since it is not certain that all relevant factors have been considered.

In determining whether to impose a sentence of death the jury "can do little more –

and must do nothing less – than express the conscience of the community on the ultimate issue of life or death." *Witherspoon v. Illinois* , 391 U.S. 510, 519 (1968). The conscience of the community can only be reliably expressed by a jury that has access to all mitigating evidence to make an informed decision.

It is therefore, requested that Appellant's death sentence be reversed and his case remanded to the Trial court for a new sentencing hearing.

## ISSUE NO. 14

THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

## ISSUE NO. 15

THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE COURSE OF LAW UNDER ARTICLE I, SECTION 19 OF THE TEXAS CONSTITUTION.

### *ARGUMENTS AND AUTHORITIES*

Due process in both the federal and state constitutions requires that Appellant receive the fundamental fairness necessary to the due administration of justice.  *Lisenba v. California,* 314 U.S. 219, 236, 62 S. Ct.  280, 290, 86 L. Ed. 166, 180 (1941); *Reese v. State,* 877 S.W.2d 328, 333 (Tex. Crim. App. 1994).  As complained of herein, Appellant's trial procedure began with remarks made by the trial court in the jury panel's presence which favored the prosecution, at this same time Appellant was shackled and subjected to a prejudicial show of force in the presence of the jury panel and individual jurors; this occurred after the State placed Appellant at a further disadvantage by seeking a new

indictment against him just prior to trial.  Appellant cites other constitutional and statutory violations, in addition, in the issues contained in Appellant's brief.  If this Court deems that none of these reasons taken alone justify reversing the trial court's judgment, then Appellant prays the Court consider the cumulative effect of the errors in the trial court.  Constitutional breaches so permeated the voir dire and trial of Appellant's case so as to deprive him of the "fundamental fairness" implicit in the Fifth and Fourteenth Amendments, as well as Article I, Section 19.  Consequently, the trial court's judgment should be reversed, and the cause remanded for a new trial.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, there being reversible error appearing in the record of the trial of the case, Appellant prays that this Honorable Court will reverse the judgment of the trial court below and render judgment of acquittal or, alternatively, remand the cause to the trial court for further proceedings.

Respectfully Submitted

_____

C. Wayne Huff

P.O. Box 2334

Boerne, Texas 78006

Bar Card No. 10180600

(210) 488-4440

Facsimile (830) 230-5567

ATTORNEY         FOR
APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing brief has been served on John

Roach, Collin County District Attorney, 2100 Bloomdale Rd., Suite 20004, McKinney,

Texas 75071, by emailing a copy to John Rolater, his assistant, on May _____, 2009.

———————————————

C. WAYNE HUFF

**FOOTNOTES**

1:

Harris County's average population from 1988 to 1997 was 2,857,978; Dallas County's was 1,917,501.  Harris County had a murder rate of 17.3 per 100,000; Dallas County's was 19.3 per 100,0000.  Statistics are from research conducted by USA Today.  Willing and Fields, *Geography of the Death Penalty* , USA Today, December 20, 1999, at 6A.

2:

Bexar County's average population from 1988 to 1997 was 1,245,209 and it had 29 inmates on death row in 1999.   Thus, Dallas and Bexar Counties combined had a population of 3,162,710 and 66 inmates on death row (compared to Harris County's population of less than 3 million and 140 death row inmates).  Willing and Fields, *supra* , at 6A.

3:

Sorensen and Marquart's study compared death-eligible arrestees to defendants charged with capital murder, excluding acquittals, from 1980 to 1988, in order to measure prosecutorial discretion.  Acquittals were excluded because there were very few of them.  Thus, the defendants referred to as being charged with capital murder were also convicted.  Sorensen and Marquart, *supra* , at 758.

4:

The record reflects that the defendant in this case is an African American male and the alleged victim is a white female.

5:

25.8% of death-eligible offenders in white-victim cases were charged and convicted of capital murder, compared with just 5.6% of those in black-victim cases and 11.9% in Hispanic-victim cases.  Sorensen and Marquart, *supra* , at 764, Table 1.

6:

56.6% of defendants in rape-murder cases were charged with capital murder, vs. 15.5% of those in robbery-murders and 12.4% of those in burglary-murders.  45.9% of defendants in multiple-victim cases were charged with capital murder, vs. 16% in single-victim cases.  Sorensen and Marquart, *supra* , at 764, Table 1.

7:

A defendant in a white-victim crime is 4.6 times as likely to be charged with capital murder as a defendant in a black-victim crime; a defendant in a multiple-victim crime is 2.86 times as likely to be charged as one in a single-victim crime.  *See supra* notes 4 and 5.