**WRIT NO. _____**
**TRIAL COURT NO. 380-81972-07**

---

**IN THE 380th JUDICIAL DISTRICT COURT**
**COLLIN COUNTY, TEXAS**

**and returnable to**

**THE COURT OF CRIMINAL APPEALS**
**OF TEXAS**

---

**EX PARTE KOSOUL CHANTHAKOUMMANE**

---

**APPLICATION FOR WRIT OF HABEAS CORPUS**

**pursuant to Article 11.071 of the**
**Texas Code of Criminal Procedure**

---

**THIS IS A DEATH PENALTY CASE**

**Catherine Clare Bernhard**
**P.O. Box 2817**
**Red Oak, Texas 75154**
**972-617-5548**
**fax – 972-617-5547**
**cbern@worldlogon.com**
**State Bar No. 02216575**

**ATTORNEY FOR APPLICANT**

# TABLE OF CONTENTS

HISTORY OF THE CASE.............................................................................1

INTRODUCTION…...................................................................................2

STATEMENT OF FACTS FROM TRIAL....................................................4

FIRST GROUND FOR RELIF....................................................................22

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
SUFFICIENTLY DEVELOP AND PRESENT SIGNIFICANT
MITIGATING EVIDENCE IN VIOLATION OF KOSOUL
CHANTHAKOUMMANE'S SIXTH AMENDMENT RIGHT
TO COUNSEL.

SECOND GROUND FOR RELIEF..............................................................52

KOSOUL CHANTHAKOUMMANE'S SIXTH
AMENDMENT RIGHT TO AN IMPARTIAL JURY WAS
VIOLATED WHEN A JUROR COMMITTED
MISCONDUCT BY DISCUSSING THE CASE WITH HIS
SPOUSE.

THIRD GROUND FOR RELIEF....................................................................55

KOSOUL CHANTHAKOUMMANE'S FIFTH, SIXTH AND
FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED
WHEN A JUROR COMMITTED JURY MISCONDUCT BY
CONSIDERING APPLICANT'S FAILURE TO TESTIFY.

FOURTH GROUND FOR RELIEF..........................................................58

    APPELLATE COUNSEL WAS INEFFETIVE FOR FAILING
    TO CHALLENGE THE ADMISSION OF BRIAN
    CONNER'S EXPERT GANG TESTIMONY.


FIFTH GROUND FOR RELIEF...............................................................64

    APPELLATE COUNSEL WAS INEFFECTIVE FOR
    FAILING TO ARGUE THAT THE EVIDENCE WAS
    LEGALLY INSUFFICIENT TO PROVE BEYOND A
    REASONABLE DOUBT THAT MR.
    CHANTHAKOUMMANE WOULD BE A FUTURE
    DANGER.


SIXTH GROUND FOR RELIEF…………………………………………..67

    APPELLATE COUNSEL WAS INEFFECTIVE FOR
    FAILING TO CHALLENGE THE ADMISSIBILITY OF A.P.
    MERILLAT'S TESTIMONY.


SEVENTH GROUND FOR RELIEF…………………………………...73

    APPELLATE COUNSEL WAS INEFFECTIVE FOR
    FAILING TO CHALLENGE THE DENIAL OF
    APPLICANT'S MOTION TO SUPPRESS HIS STATEMENT.


EIGHTH GROUND FOR RELIEF……………………………………77

    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
    SPECIFICALLY OBJECT TO MR.
    CHANTHAKOUMMANE'S STATEMENT BECAUSE THE
    WAIVER OF HIS RIGHTS WAS NOT VALID.

NINTH GROUND FOR RELIEF…………………………………………….79

    APPELLATE COUNSEL WAS INEFFECTIVE FOR
    FAILING TO RAISE THE ISSUE THAT THE TEXAS
    DEATH PENALTY SCHEME IS UNCONSTITUTIONAL
    BECAUSE THE STATUTORY TERMS ARE VAGUE AND
    DO NOT PROPERLY CHANNEL THE JURY'S
    DISCRETION.

TENTH GROUND FOR RELIEF…………………………………………84

    APPELLATE COUNSEL WAS INEFFECTIVE FOR
    FAILING TO RAISE THE ISSUE THAT THE TEXAS
    DEATH PENALTY SCHEME IS UNCONSTITUTIONAL
    BECAUSE THE "10-12" PROVISION IS MISLEADING
    AND INACCURATE.

ELEVENTH GROUND FOR RELIEF……………………………….…96

    APPELLATE COUNSEL WAS INEFFECTIVE FOR
    FAILING TO RAISE THE ISSUE THAT THE TEXAS
    DEATH PENLATY SCHEME IS UNCONSTITUTIONAL
    BECAUSE THE MITIGATION SPECIAL ISSUE DOES NOT
    ALLOCATE A BURDEN OF PROOF.

TWELTH GROUND FOR RELIEF……………………………………100

    APPELLATE COUNSEL WAS INEFFECTIVE FOR
    FAILING TO RAISE THE ISSUE THAT THE USE OF THE
    TERM "PROBABILITY" IN THE FIRST SPECIAL ISSUE
    DILUTES THE REASONABLE DOUBT STANDARD.

PRAYER...................................................................................106

VERIFICATION..........................................................................................107


CERTIFICATE OF SERVICE...................................................................108


JUDGMENT………………………………………..……APPENDIX A


EXHIBITS 1- 6......................................................APPENDIX  VOL. I

EXHIBIT 7…………………………………….APPENDIX VOL. II

EXHIBITS 8 -22  …………………………..APPENDIX VOL. III

# EXHIBITS

**Appendix Volume I**

Exhibit 1...............................Affidavit of Komonh Chanthakoummane

Exhibit 2............................... School Records

Exhibit 3...............................Affidavit of Constance Lesese

Exhibit 4...............................Affidavit of Marty Sloan-Clontz

Exhibit 5...............................Affidavit of Sopha Chanthakoummane

Exhibit 6……………………..Affidavit of Pam Freeburn

**Appendix Volume II**

Exhibit 7……………………..Juvenile Records

**Appendix Volume III**

Exhibit 8……………………..DSS Records

Exhibit 9……………………...Affidavit of Perry Owen

Exhibit 10…………………… Affidavit of Dr. Raleigh Bailey

Exhibit 11…………………… Affidavit of Deborah Grey

Exhibit 12…………………….Notes from interview of Phongsamout
                          Chanthakoummane

Exhibit 13……………………..Affidavit of Kominh
                          Chanthakoummane

Exhibit 14……………………..Affidavit of Steven R. Miears

Exhibit 15……………………..Curriculum Vitae of Dr. Shelley Riggs

Exhibit 16……………………..Report of Dr. Shelley Riggs

Exhibit 17……………………..Immigration Papers

Exhibit 18……………………..Psycho-social history prepared by
                                           Deborah Grey, LCSW

Exhibit 19……………………Affidavit of Raechel Parolisi

Exhibit 20……………………..Notes from interview of Alternate Juror
                                           Michael McCalpin

Exhibit 21……………………Notes from interview of Alternate Juror
                                           Kimberly Smith

Exhibit 22……………………Collin County Jail Visitor Logs

# INDEX OF AUTHORITIES

**Cases**

Anderson v. State, 901 S.W.2d 946, 950 (Tex.Crim.App. 1995)................ 62

Anderson v. State, 932 S.W.2d 502, 508 (Tex. Crim. App. 1996).............. 98

Apprendi v. New Jersey, 530 U.S. 466 (2000).......................................... 101

Banda v. State, 890 S.W.2d 42 (Tex. Crim. App. 1994)........................ 60, 68

Beasley v. State, 902 S.W.2d 452, 457 (Tex.Crim.App. 1995) .................. 62

Beck v. Alabama, 447 U.S. 625, 643 (1980)................................................ 94

Berghuis v. Thompkins, No. 08-1470. (cert pet. filed May 26, 2009, cert

    granted September 30, 2009) ...................................................................... 75

Berry v. State, 233 S.W.3d 847 (Tex. Crim. App. 2007), ........................... 65

Blakely v. Washington, 124 S.Ct. 2531 (2004)......................................... 101

Blue v. State, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003) ................ 81

Boyd v. State, 811 S.W.2d 105, 113 (Tex. Crim. App. 1991) .................... 81

Boyde v. California, 494 U.S. 370 (1990)................................................. 102

Broders v. Heise , . 924 S.W.2d 148, 153 (Tex. 1996) ............................... 69

Brooks v. Dretke, 418 F.3d 430, 434 (5th Cir. 2005).................................. 53

Burns v. State, 761 S.W.2d 353, 356 (Tex. Crim. App. 1988).................... 64

Cage v. Louisiana, 498 U.S. 39, 41 (1990) .............................................. 104

Caldwell v. Mississippi, 472 U.S. 320 (1985)....................................... 87, 89

Caldwell v. State, 818 S.W.2d 790, 798 (Tex. Crim. App. 1991)............... 81

California v. Brown, 479 U.S. 538, 541 (1987) ......................................... 90

California v. Ramos, 463 U.S. 992, 1001 (1983) ....................................... 87

Cantu v. State, 939 S.W.2d 627, 641 (Tex. Crim. App. 1997).................... 98

Cantu v. State, 939 S.W.2d 627, 643 (Tex. Crim. App. 1997)................. 104

Cantu v. State, 939 S.W.2d 627, 644 (Tex. Crim. App. 1997).................... 94

Castillo v. State, 913 S.W.2d 529, 534 (Tex. Crim. App. 1995)................. 62

Crutsinger v. State, 206 S.W.3d 607, 613 (Tex. Crim. App. 2006) ............. 94

Cuevas v. State, 742 S.W.2d 331 (Tex. Crim. App. 1987) ......................... 81

Dawson v. Delaware, 503 U.S. 159 (1992) ................................................ 61

Druery v. State, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007).................. 81

Dunklin v. State, 194 S.W.3d 14, 19-20 (Tex. App. – Tyler 2006, no pet.); 56

Eldridge v. State, 940 S.W.2d 646, 654 (Tex. Crim. App. 1996) ............... 98

Ellason v. State, 815 S.W.2d 656, 659 (Tex. Crim. App. 1991) ................. 80

Estelle  v.  McGuire, 502 U.S. 62, 73 n.4 (1991) ...................................... 104

Evitts v. Lucey, 469 U.S. 387, 394 (1985 ........................................... passim

Ex parte Green, 159 S.W.3d 925, 926 (Tex. Crim. App. 2004)(................. 57

Fare v. Michael C., 422 U.S. 707, 725 (1979)............................................ 75

Felder v. State, S.W.2d 85, 97 (Tex. Crim. App. 1992). ............................ 81

Francis v. Franklin, 471 U.S. 316 (1985) ................................................... 90

Fuller v. State, 829 S.W.2d 191, 196 n.2 (Tex.Crim.App. 1992) cert. denied

    113 S.Ct. 2418 (1993 ................................................................. 62

Fullwood v. Lee, 290 F.3d 663 (4th Cir. 2002) ............................. 54

Furman v. Georgia, 408 U.S. 238 (1972) ...................................... 85

Golden Eagle Archery, Inc. v. Jackson, 24 S.W.3d 362, 374-75 (Tex. 2000)

    ................................................................................................. 56

Goodwin v. Johnson, 132 F.3d 162, 170 (5th Cir. 1998); ............................ 59

Gregg v. Georgia, 428 U.S. 153 (1976)......................................... 85

Hines v. State, 3 S.W.3d 618, 622 (Tex. App. – Texarkana 1999, pet. ref'd)

    ................................................................................................. 56

Horne v. State, 607 S.W.2d 556, 565 (Tex. Crim. App. 1980) .................. 103

Hughes v. State, 878 S.W.2d 142, 148 (Tex. Crim. App. 1993).................. 81

Irvin v. Dowd, 366 U.S. 717, 722, (1961) ...................................... 52

Jackson v. State, 17 S.W.3d 664 (Tex. Crim. App. 2000) .................... 60, 68

Jackson v. State, 992 S.W.2d 480-81 (Tex. Crim. App. 1999) .................... 98

Jackson v. Virginia, 433 U.S. 307 (1979) ...................................... 64

Johnson v. Texas, 509 U.S. 350, 370-71 (1993) .......................... 97

Jones v. State, 843 S.W.2d 487, 495 (Tex. Crim. App. 1992) ............. 80, 104

Jones v. United States, 527 U.S. 373, 394 (1999) ........................ 92

Kelly v. South Carolina, 534 U.S. 246, 248 (2002) ...................... 87

Kemp v. State, 846 S.W.2d 289, 309 (Tex. Crim. App. 1992) .................. 104

Ladd v. State, 3 S.W.3d 547, 573-74 (Tex. Crim. App. 1999)..................... 98

Lagrone v. State, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997)............... 104

Lawton v. State, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995)............ 94, 98

Lewis v. Dretke, 355 F.3d 364 (5th Cir. 2003)............................................... 23

Lombard v. Lynaugh, 868 F.2d 1475, 1479 (5th Cir. 1989) ......................... 59

Lowenfield v. Phelps, 484 U.S. 231, 252 (1988) ......................................... 93

Massey v. State 933 S.W.2d 141 (Tex. Crim. App. 1996).................... 60, 68

Matchett v. State, 941 S.W.2d 922, 936 (Tex. Crim. App. 1996)............... 98

Maynard v. Cartwright, 486 U.S. 356 (1988)................................................ 80

McDonald v. Pless, 238 U.S. 264 (1915) ..................................................... 57

McFarland v. State, 928 S.W.2d 482, 497 (Tex. Crim. App. 1996) ............ 98

Medina v. State, 7 S.W.3d 633, 644 (Tex. Crim. App. 1999)...................... 98

Miranda v. Arizona, 384 U.S. 436, 460-61 (1966)....................................... 73

Morales v. State, 32 S.W.3d 862 (Tex. Crim. App. 2000) .......................... 70

Moran v. Burbine, 475 U.S. 412, 421 (1986)................................................ 74

Morris v. State, 940 S.W.2d 610, 614 (Tex. Crim. App. 1996) .................. 98

Muniz v. State, 851 S.W.2d 238, 250 (Tex. Crim. App. 1993)................... 80

Newbury v. State, 135 S.W. 22, 45 (Tex. Crim. App. 2004) ...................... 81

North Carolina v. Butler, 441 U.S. 369 (1979) ........................................... 75

Padgett v. State, 717 S.W.2d 55, 58 (Tex. Crim. App. 1986) ..................... 88

Parker v. Gladden, 385 U.S. 363, 364, (1966) ............................................. 52

Parker v. Head, 244 F.3d 831, 839 n.6 (11th Cir. 1001) .............................. 53

Prystash v. State, 3 S.W.3d 522, 536-37 (Tex. Crim. App. 1999); .............. 94

Raby v. State, 970 S.W.2d 1, 8-9 (Tex. Crim. App. 1998) ......................... 98

Ramdass v. Angelone, 530 U.S. 156, 195 (2000) ........................................ 87

Rayford v. State, 125 S.W.3d 521, 532 (Tex. Crim. App. 2003) ................. 94

Remmer v. United States, 347 U.S. 227 (1954) .......................................... 53

Renteria v. State, 206 S.W.3d 689, 707 (Tex. Crim. App. 2006)................ 97

Richardson v. State, 83 S.W.3d 332, 362 (Tex. App. – Corpus Chirsti 2002,

   pet. ref'd)................................................................................................... 56

Rocha v. State, 16 S.W.3d 1, 12 (Tex. Crim. App. 2000)........................... 75

Rompilla v. Beard, 545 U.S. 374 (2005) ..................................................... 23

Russeau v. State, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005)................ 94

Sanders v. State, 1 S.W.3d 885, 888 (Tex. App. – Austin 1999, no pet.).... 56

Sanders v. State, 715 S.W.2d 771 (Tex. App. – Tyler 1986, no pet.) .......... 77

Sells v. State, 121 S.W.3d 748 (Tex. Crim. App. 2003) .............................. 70

Shafer v. South Carolina, 532 U.S. 36, 39 (2001)....................................... 87

Shannon v. State, 942 S.W.2d 591, 600 (Tex. Crim. App. 1996) ............... 98

Shelton v. State, 41 S.W.3d 208, 218 (Tex.App. – Austin 2001, pet. ref'd) 63

Shultz v State, 957 S.W.2d 52 (Tex. Crim. App. 1997) ............................... 70

Simmons v. South Carolina, 512 U.S. 154, 175 (1994) ............................... 87

Smith v. Phillips, 455 U.S. 209 (1982) ......................................................... 53

Sosa v. State, 769 S.W.2d 909, 917 (Tex. Crim. App. 1989) ..................... 104

Strickland v. Washington, 466 U.S. 668, 687 (1984 ............................. passim

Stringer v. Black, 503 U.S. 222, 235 (1992) ................................................ 80

Tanner v. United States, 483 U.S. 107, 126-27 (1987) ................................ 56

Turner v. State, 87 S.W.3d 111, 118 (Tex. Crim. App. 2002) ..................... 81

United States v. Brooks, 934 F.2d 196 (9th Cir. 1991) ................................. 54

United States v. Butler, 822 F.2d 1191, 1195 n.2 (D.C. Cir. 1987)( ............ 53

Valle v. State, 109 S.W.3d 500, 504 (Tex. Crim. App. 2003) ..................... 97

Vela v. State, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006)................. 60, 68

Walton v. Arizona, 497 U.S.  639, 650 (1990) ............................................. 96

White v. State, 181 S.W.3d 514, 524-26 (Tex. App. – Texarkana 2005) aff'd
    225 S.W.3d 571 (Tex. Crim. App. 2007) ................................................. 56

White v. State, 440 S.W.2d 660, 667 (Tex. Crim. App. 1969) 83, 95, 98, 105

Wiggins v. Smith, 539 U.S. 510 (2003) ....................................................... 23

Woodson v. North Carolina, 428 U.S. 280, 305 (1976) ............................... 85

**Statutes**

Tex. Code Crim. Proc. Art. 11.071…………………………………….…1

Tex. Code Crim. Proc. Art. 11.071 § 4(a). .................................................... 2

Tex. Code Crim. Proc. Art. 11.071 § 4(b). .................................................... 2

Tex. Code Crim. Proc. Art. 36.28 ................................................................ 71

Tex. Code Crim. Proc. Art. 37.071 § 2(b)(1) ...................................... passim

Tex. Code Crim. Proc. Ann. art. 37.071 § 2(c) .................................. 85, 101

Tex. Code Crim. Proc. art. 37.071(2)(a) ....................................................... 85

Tex. Code Crim. Proc. art. 37.071(2)(d)(2) .................................................. 84

Tex. Code Crim. Proc. art. 37.071(2)(f)(1) .................................................. 85

Tex. Code Crim. Proc. art. 37.071(2)(f)(2) .................................................. 84

Tex. Code Crim. Proc. art. 37.071(2)(g) ....................................................... 85

Tex. Penal Code § 12.31(a) .......................................................................... 65

## Other **Authorit**ies

Commentary to Guideline 1.1 of the American Bar Association's Guidelines

    for the Appointment and Performance of Counsel in Death Penalty Cases

    (2003), <u>reprinted in</u> 13 Hofstra L. Rev. 913, ........................................... 50

Paul Wiseman, <u>USA Today</u>, December 11, 2003, at

    http://www.usatoday.com/news/world/2003-12-11-loas-bombs_x.htm. .. 24

## **Rules**

Tex. R. Evid. 403 ................................................................... 58, 67, 70, 71

Tex. R. Evid. 606(b) ................................................................................ 56, 57

Tex. R. Evid. 702 ................................................................................... 60, 68

Tex. R. App. P. 44.2(a) ................................................................................ 63

## Constitutional Provisions

U.S. Const. amends V, …………………………………………………55,77

U.S. Const. amends. VI, ............................................ 23, 54, 55 77,79, 96, 97

U.S. Const. amends. VIII ........................................................... 23, 79, 96, 97

U.S. Const. amends. XIV .................................................................. passim

KOSOUL CHANTHAKOUMMANE, Applicant, is currently

confined on death row in the Texas Department of Criminal Justice –

Correctional Institutions Division, pursuant to a conviction for capital

murder and sentence of death. (See Appendix A - Judgment). Applicant now

seeks relief from that judgment and files this Application for Writ of Habeas

Corpus pursuant to Article 11.071 of the Texas Code of Criminal Procedure.

## HISTORY OF THE CASE

Kosoul Chanthakoummane was charged with capital murder in cause

no. 380-81972-07 in the 380th Judicial District Court of Collin County,

Texas. Mr. Chanthakoummane's indictment read, in pertinent part, that he

did "intentionally and knowingly cause the death of Sarah Walker, an

individual, hereinafter called deceased, by stabbing and cutting deceased

with a knife, a deadly weapon, and by stabbing and cutting deceased with an

object, a deadly weapon, whose exact nature and identity is unknown to the

grand jurors, and by striking deceased with a plant stand, a deadly weapon,

while the defendant was in the course of committing or attempting to

commit the offense of robbery of deceased." The offense was alleged to

occur on or about July 8, 2006. (I C.R. at 7[1]). Mr. Chanthakoummane

---

[1] Applicant requests that this court take judicial notice of the record in this case on direct appeal.

entered a plea of not guilty, but was convicted by a jury and subsequently sentenced to death on October 17, 2007. (I C.R. at 161).

Mr. Chanthakoummane's direct appeal is still pending in the Court of Criminal Appeals in cause no. AP-75,794. The State's brief was filed on November 20, 2009.

Applicant's initial deadline was January 4, 2010. However, the trial court granted a 90-day extension, as permitted by Art. 11.071 § 4(b). Therefore, this application should be considered timely if filed on or before April 5, 2010[2].

This is Mr. Chanthakoummane's first application for a writ of habeas corpus.

## INTRODUCTION

Kosoul Chanthakoummane was born in this country shortly after his family immigrated here from war torn Laos. The trauma that his parents and siblings had endured on their journey to America, had lasting implications for Kosoul's early childhood. But Kosoul's jury never heard anything about his childhood. In fact, not a single family member testified at his trial. Kosoul's trial attorneys wholly failed to investigate and present significant mitigating evidence in his case. Instead, his attorneys basically conceded

---

[2] The actual deadline is April 4, 2010, which falls on a Sunday.

Kosoul's guilt and opened their case by telling the jury all about Kosoul's prior criminal record. And that was really all that the jury ever learned about Kosoul Chanthakoummane – that he had been locked up for much of his life, beginning at about age fifteen. His attorneys tried to convince the jury that Kosoul had always been a good inmate, and would not be a danger in the future. But the escalating pattern of criminal conduct, presented without any mitigating context, convinced the jury that Kosoul should be killed. But given his trial attorneys' constitutionally deficient performance, this verdict cannot be allowed to stand.

Additional problems with this verdict come in the form of jury misconduct. There is credible evidence that at least one of the jurors engaged in misconduct by discussing the case with his wife while the trial was ongoing. This same juror also considered Kosoul's failure to testify as a circumstance against him. And to top it off, there were numerous issues that should have been raised by direct appeal counsel in this case, but were not. Considering the totality of the constitutional deficiencies in this case, to execute Kosoul Chanthakoummane would be an affront to the constitution and the laws of this land.

## STATEMENT OF FACTS FROM TRIAL

In their opening statement to the jury, Kosouls' trial attorneys began by telling the jury that Kosoul, at the age of 27, had already spent a good part of his life behind bars. (XXI R.R. at 23-24). They tell the jury that at the age of 16, Kosoul and one of his buddies, steal a car, break into a home, and then proceed to tie up two old ladies after robbing them at gunpoint. Kosoul's attorneys also tell the jury that Kosoul did well in prison, and ultimately was paroled. His attorneys explain that Kosoul couldn't handle freedom, and ended up committing the offense with which he was now charged. (XXI R.R. at 28-29).

The State began its case by presenting the testimony of Randy Tate, the ex-husband of Sarah Walker. (XXI R.R. at 31-32). During their marriage, Randy and Sarah had a son, Joshua. (XXI R.R. at 34). Randy and Sarah eventually divorced, but remained friendly. (XXI R.R. at 35). They shared custody of their son Joshua. (XXI R.R. at 36). On the morning of July 8, 2006, Randy went to Sarah's residence to pick up Joshua. (XXI R.R. at 36). Sarah showed Randy a brand new Rolex watch that she had just purchased the day before. (XXI R.R. at 39).

Later that afternoon, Randy was notified that something terrible had happened to Sarah. (XXI R.R. at 42). Randy immediately went to the model home where he knew Sarah was working. (XXI R.R. at 43). There, Randy learned that Sarah had been murdered. (XXI R.R. at 44).

Jessica Allen testified that she was Sarah's cousin. She and Sarah had been talking on the phone around 12:30 PM on the afternoon of July 8, 2006. Sarah ended their phone call when she told Jessica someone had just walked in to the model home where she was working. (XXI R.R. at 52). Jessica also described some of the rings that Sarah typically wore. (XXI R.R. at 55). Jessica also told the jury about finding an empty Rolex box and receipt in Sarah's house after the offense. (XXI R.R. at 56).

Andy Lilliston testified that he and his wife were out looking at model homes on the morning of July 8, 2006. (XXI R.R. at 57). At about 1:10 PM, he and his wife discovered the body of Sarah Walker in the kitchen of a model home. (XXI R.R. at 62). They immediately called 911. (XXI R.R. at 62).

Texas Ranger Richard Shing testified outside of the jury's presence, that he hypnotized State's witnesses Mamie Sharpless and Nelson Villavicencio. Both of these witnesses described a suspect they had seen in the area on the morning of July 8, 2006. Officer Shing was trained in

hypnotic procedures and believed that he followed all of the proper procedures and safeguards in this case. (XXI R.R. at 68-69).

Mamie Sharpless then told the jury that she and her husband, Nelson Villavicencio were near the scene where Sarah had been murdered on July 8, 2006. Mamie was a real estate agent. (XXI R.R. at 87). She had received a call from a man who identified himself as Chan Lee. He wanted to look at a home that was for sale. (XXI R.R. at 89). Although, the call got disconnected before they could arrange a time to meet, Ms. Sharpless and her husband proceeded to the home, in hopes of finding Chan Lee. (XXI R.R. at 95). While parked on the street, Ms. Sharpless and her husband observed an Asian male in a white Mustang. They asked him if he was Chan Lee. He responded "no". (XXI R.R. at 99-100). In the courtroom, Ms. Sharpless identified Kosoul as the person that she had seen that morning. (XXI R.R. at 102).

Nelson Villavicencio then testified that he was Mamie's husband and he accompanied her to meet with Chan Lee on the morning of July 8, 206. (XXI R.R. at 110). He also related the encounter with the Asian man who said he was not Chan Lee. (XXI R.R. at 113). The next day, after learning of Sarah's murder, Nelson and his wife contacted the police about what they

had seen. (XXI R.R. at 120). Nelson later met with a sketch artist who produced a sketch of the Asian man based on Nelson's description. (XXI R.R. at 120). Nelson explained that the sketch was made after Nelson was hypnotized by a DPS agent. (XXI R.R. at 121). Nelson also identified Kosoul as the Asian man they had seen that morning. (XXI R.R. at 123).

Texas Ranger A.P. Davidson testified that he was called in to assist the McKinney Police Department with their investigation into the murder of Sarah Walker. (XXI R.R. at 128). He responded to the scene on the afternoon of July 8, 2006. He described seeing evidence of a struggle and lots of blood. (XXI R.R. at 138-140). He was present as other officers dusted for prints and collected swabs from the blood stains. (XXI R.R. at 152). Although Sarah had clearly been stabbed numerous times, no weapon was found at the scene. (XXI R.R. at 153). Sarah was not wearing her new Rolex watch. (XXI R.R. at 156). Officer Davidson also participated in a search of Sarah's home later that evening. Although, the Rolex box was found, it was empty. (XXI R.R. at 159).

During the course of his investigation, Ranger Davidson discovered that Sarah Walker had been to a bank on the morning of July 8, 2006. (XXI R. R. at 170). He contacted the bank and got its surveillance video. Ranger

Davidson watched this video and determined that at 11:45 AM, Sarah Walker was wearing a watch and a ring. (XXI R.R. at 171-72).

Near the end of August, Ranger Davidson learned from the crime lab, that a potential match had been made on a national DNA database using some of the blood evidence obtained from the crime scene. (XXI R.R. at 182). The investigation then focused on Kosoul Chanthakoummane. (XXI R.R. at 182). The police put him under surveillance and learned that he drove a white Mustang. (XXI R.R. at 183). Once an arrest warrant was obtained, officers knocked on Kosoul's door and he was arrested without incident. (XXI R.R. at 192).

Officer Pete Copin testified that he also responded to the crime scene on the day of the murder. (XXI R.R. at 206). He helped collect and process various items of blood evidence. (XXI R.R. at 216-17).

Jeff Shaver testified that he was a secret service agent with special training in the forensic analysis of cell phones. (XXI R.R. at 241). He analyzed Kosoul's cell phone. (XXI R.R. at 244). Kosoul had a photograph on his phone that depicted Kosoul holding his mouth up to a small dog as if to bite the dog. (XXI R.R. at 246, State's Exh. 75).

Officer Joe Ellenburg testified that he was involved in the arrest of Kosoul. (XXII R.R. at 63). He transported Kosoul to the McKinney Police Department. Officer Ellenburg was instructed not to tell Kosoul anything about why he had been arrested. (XXII R.R. at 65). When they arrived at the McKinney Police Department, Officer Ellenburg read Kosoul his *Miranda* warnings. (XXII R.R. at 68). Kosoul said he understood his rights. (XXII R.R. at 68).

Officer Randall Norton testified that he and Sergeant Riley conducted an interview of Kosoul when he arrived at the McKinney Police Department. (XXII R.R. at 76). Officer Norton's interview strategy with Kosoul was to get "a series of …base hits rather than trying to go in and hit a home run." (XXII R.R. at 82). In other words, Officer Norton did not ask Kosoul directly if he killed Sarah Walker. (XXII R.R. at 83).

At first, Kosoul told Officer Norton that he had only been to McKinney when he was making deliveries for his job. (XXII R.R. at 85). Officer Norton told Kosoul that his personal vehicle, the Mustang, had been seen by witnesses in McKinney. (XXII R.R. at 86). Kosoul eventually admitted that his car broke down in front of the model home where Sarah's body had been found. He admitted entering the model home to try and use a

phone to call for assistance. (XXII R.R. at 88). He admitted going into the home as far as the kitchen where he tried to get a drink of water at the sink. However, he could not make the faucet work, and so he left. Kosoul did not see anyone else in the home, nor was anything in disarray. (XXII R.R. at 88-89). Kosoul also told Officer Norton that he had cut his hand on the job, and might have bled a little on the sink. (XXII R.R.R. at 89-90). Kosoul also stated that when he left the model home, he was asked by a couple if his name was Chan Lee. (XXII R.R. at 90).

Dr. William Rohr conducted the autopsy on Sarah Walker. (XXII R.R. at 203). Sarah had several blunt force injuries to her head and 33 stab wounds. (XXII R.R. at 215). At least ten of these stab wounds were "immediately fatal." (XXII R.R. at 222). She also had a bite mark on her neck. (XXII R.R. at 225).

Dr. Bret Hutson was a forensic dentist who examined the bite mark on Sarah's neck. (XXII R.R. at 239). He also conducted a forensic dental exam on Kosoul. (XXII R.R. at247). Dr. Hutson concluded "within reasonable dental certainty beyond a doubt" that Kosoul was the person that inflicted the bite mark on Sarah's neck. (XXII R.R. at 259).

Dr. Stacy McDonald testified that she conducted DNA analysis on numerous items of evidence collected in this case. (XXII R.R. at 264). She found DNA profiles consistent with Kosoul's on numerous items. (XXII R.R. at 273-279). The statistical strength of these "matches" ranged from one in 280,000 to one in 635 trillion. (XXII R.R. at 280-284).

There was no cross-examination of most of the State's witnesses. (XXI R.R. at 45, 56, 65, 109, 123, 201, 236 , XXII R.R. at 73, 234, 261, 285). The defense rested without calling any witnesses. (XXII R.R. at 285). The jury found Mr. Chanthakoummane guilty as charged in the indictment.

In the punishment phase, Det. Susan Sarvis testified that she was a detective in North Carolina. (XXIV R.R. at 22). On October 10, 1995, she was dispatched to Eastway Middle School to investigate an assault. (XXIV R.R. at 23). A boy by the name of Shawn Bank was assaulted in some woods near the school. He sustained a fractured arm and various other injuries. (XXIV R.R. at 26). Kosoul admitted to being part of the group that had assaulted Shawn. (XXIV R.R. at 30).

Robert Rollins was also a police officer from North Carolina. (XXIV R.R. at 46). On July 17, 1997, he was investigating an incident involving a stolen vehicle. (XXIV R.R. at 47). Two boys and a girl ran from a stolen

vehicle. The girl quickly stopped running and came back to talk to the police. (XXIV R.R. at 48). Several hours later, Det. Rollins responded to the scene of a burglary. Two elderly women reported that they returned home, only to find two boys in their home. The boys robbed the women at gunpoint, and left them tied up, as the two boys escaped in the women's vehicle. (XXIV R.R. at 51-53). One of the boys was later identified as Kosoul. (XXIV R.R. at 57).

Lawrence Smith testified that on March 15, 1995, he was about 15 or 16 years old. (XXIV R.R. at 79). Kosoul had a reputation as a "bad kid." (XXIV R.R. at 80). One day, while Lawrence was out riding his bicycle, Kosoul approached him, punched him in the face, and took his bike. (XXIV R.R. at 81-82). Mr. Smith ended up with six fractured ribs and a concussion. (XXIV R.R. at 83).

Paul Brian Conner testified that he had been Kosoul's juvenile probation officer or "court counselor". (XXIV R.R. at 115). As part of his job, he would make a recommendation to the court about the sentence a juvenile should receive. (XXIV R.R. at 116). When he supervised Kosoul, he ordered him to stay away from certain gangs. This was done because Kosoul had some association with gangs. (XXIV R.R. at 125). He also

remembered that Kosoul was not respectful of his parents. (XXIV R.R. at 130). At some point, Mr. Conner recommended that Kosoul's probation be revoked. (XXIV R.R. at 132). He recommended sending Kosoul to "training school", rather than the Buddhist temple, which was where Kosoul wanted to be placed. (XXIV R.R. at 133). After Kosoul was sent to the training school, he sent Mr. Conner a letter than contained gang symbols on it. (XXIV R.R. at 138).

Barbara Johnson was a realtor. (XXIV R.R. at 178). In May of 2006, she worked to help find Kosoul an apartment in Texas. (XXIV R.R. at 179). On July 7, 2006, Kosoul knocked on Ms. Johnson's door. He told her his car had broken down and he needed to use her phone. (XXIV R.R. at 183). She did not recognize him as a client at that time. (XXIV R.R. at 183).She let him use her phone and gave him a drink of water. (XXIV R.R. at 185). When he wouldn't leave, Ms. Johnson began to get frightened and called the police. (XXIV R.R. at 187). The police came out and helped Kosoul get his car started and get on his way. (XXIV R.R. at 188).

Tedrick Gardner testified that he was Kosoul's parole officer when he was paroled to Texas. (XXIV R.R. at 194). On the morning of July 8, 2006, he conducted a home visit at Kosoul's apartment. (XXIV R.R. at 196-97).

He noticed nothing unusual about Kosoul's appearance or demeanor. (XXIV R.R. at 199).

That concluded the State's punishment case-in-chief.

The defense began with Domingus Duarte. He was the director of Restoration House Ministries, a program providing transitional housing for men coming out of prison and jail. (XXV R.R. at 7). He was also involved in jail ministry. During the late 1990s, Mr. Duarte had counseled with Kosoul when he was in the Union County Jail in North Carolina. (XXV R.R. at 10). Kosoul was having problems with his family who would not come to visit him in jail. (XXV R.R. at 10). He also remembered Kosoul as having an extraordinary talent for drawing. He still had some of the artwork that Kosoul had done. (XXV R.R. at 20). The Kosoul that Mr. Duarte knew was not a violent person. (XXV R.R. at 20). He remembered him as being very meek and humble. (XXV R.R. at 21).

Lawrence Parsons testified that he was the assistant superintendant of one of the prisons in North Carolina. (XXVI R.R. at 7). He had worked at a minimum custody prison when Kosoul was there. (XXVI R.R. at 22). Kosoul had a job doing janitorial work in the prison's administrative office. Mr. Parsons remembered Kosoul as being sort of a loner. (XXVI R.R. at 24).

Kosoul never had any disciplinary issues. (XXVI R.R. at 25). On cross-examination, Mr. Parsons agreed that Kosoul was nearing the end of his sentence at this time, and any disciplinary problems might have delayed his parole. (XXVI R.R. at 29). He also agreed that inmates sometimes committed violent acts while in prison. (XXVI R.R. at 31).

Michael Pitman testified that he also worked in the prisons of North Carolina. (XXVI R.R. at 49). He remembered Kosoul as being "an excellent inmate." Kosoul was "always respectful to staff, obeyed their orders, never gave any problems". (XXVI R.R. at 52). He never considered Kosoul to be dangerous. (XXVI R.R. at 54).

Bruce Shabo was another prison guard from North Carolina. (XXVI R.R. at 56). He did not remember Kosoul as a dangerous inmate or someone who caused problems. (XXVI R.R. at 59).

Tony Shank was a convicted felon from North Carolina who had been in prison with Kosoul. (XXVI R.R. at 63). He remembered Kosoul as being a very "low key" inmate. (XXVI R.R. at 73). Mr. Shank never saw Kosoul cause any trouble as an inmate. Mr. Shank participated in a work release program with Kosoul. Good behavior was important because if an inmate had any infractions they would lose their job. (XXVI R.R. at 74).

Kevin Tuttle also worked in the prisons of North Carolina when Kosoul was there. Kosoul was never a problem as an inmate. (XXVI R.R. at 89). He never knew him to disobey orders, cause fights, or try to escape. (XXVI R.R. at 93).

Jessie McDonald was another prison guard from North Carolina. He had also dealt with Kosoul and never knew him to be a problem of any kind. (XXVI R.R. at 95).

Dr. Brad Fisher testified that he was a forensic clinical psychologist who specialized in inmate classifications and risk assessment. (XXVI R.R. at 116-124). He admitted that violence occurs in prisons, but that extreme violence is very rare. In his opinion, the best predictor of future behavior was past behavior. (XXVI R.R. at 127). In this case, Dr. Fisher reviewed Kosoul's incarceration records. (XXVI R.R. at 133). Kosoul had been incarcerated for most of his life, starting at age 15. He did have a few disciplinary infractions during this time, but it would have been unusual not to have any. In one case, Kosoul was found with a needle which was used for tattoos. In another incident, Kosoul had turned in a shank to a guard. (XXVI R.R. at 136). Dr. Fisher was also aware of an incident where Kosoul had been released on a furlough to his parents and did not return to the

prison. (XXVI R.R. at 150). There was also another incident where Kosoul had been allowed to attend a festival with other inmates, but did not return at the appointed time.  (XXVI R.R. at 152). Kosoul had been placed in disciplinary segregation four times, and in administrative segregation two times while he was incarcerated in North Carolina. (XXVI R.R. at 153-54). In Dr. Fisher's opinion, Kosoul did not have any infractions on his prison record that indicated violent behavior. (XXVI R.R. at 140). Dr. Fisher did not believe that there was a probability that Kosoul would commit criminal acts of violence that would constitute a continuing threat to society if he were to be confined to prison for the rest of his life. (XXVI R.R. at 142). However, if Kosoul were not in prison, he would constitute a threat. (XXVI R.R. at 147). On cross-examination, Dr. Fisher agreed that Kosoul also fit the criteria for a diagnosis of anti-social personality disorder. (XXVI R.R. at 170).

Dr. Fisher acknowledged that the classification system that he helped design had been in effect in Texas when the "Texas Seven" escaped. (XXVI R.R. at 154). The "Texas Seven" were almost all older than Kosoul was now when they escaped from prison.  The classification system was revised after the "Texas Seven".  The system now has five levels – G1 through G5. (XXVI R.R. at 156). G1 was the minimum custody level.  Dr. Fisher could

not say what Kosoul's level of classification would be if he were sentenced to life without parole. (XXVI R.R. at 157). Dr. Fisher was also aware of a recent escape by two Texas inmates who were serving lengthy sentences. This escape attempt resulted in the death of a prison guard. (XXVI R.R. at 159-60).

Phyllis Kornfeld was a prison art expert. (XXVI R.R. at 195-196). She taught art in numerous prisons and had published books on inmate art. (XXVI R.R. at 197). She believed that art in prison was a positive thing for everyone involved. Art was a way for inmates to relate to each other that was "non-threatening and peaceful". (XXVI R.R. at 205). She had seen some of Kosoul's art and thought that others would enjoy his art. It was a positive thing for him to do. (XXVI R.R. at 209-211).

Pamela Allen testified that she was Kosoul's case manager when he was in prison in North Carolina. (XXVII R.R. at 11). She remembered Kosoul as being "very quiet, very polite". (XXVII R.R. at 12). Kosoul first worked in the prison as a dishwasher. Then he was given the job of janitor for the superintendent. (XXVII R.R. at 13). Later, he got a work release job outside of the prison at CMH Flooring. Ms. Allen would meet with Kosoul once a week to check on how things were going for him. (XXVII R.R. at 15). Kosoul always got "raving reviews" from his supervisor on the job.

(XXVII R.R. at 16). She remembered Kosoul as "an exemplary inmate." (XXVII R.R. at 17).

The State then presented A.P. Merillat as a rebuttal witness. He is an investigator with the prison's special prosecution unit. (XXVII R.R. at 61). He explained that when an inmate first arrives in prison, he goes through a diagnostic process to determine his ultimate placement. (XXVII R.R. at 67). This decision is made by prison officials. No outside person or agency can tell the prison where an inmate is to be placed. (XXVII R.R. at 71). During this diagnostic process, the inmate gets classified. There are two separate classifications. The L or Line designation determines your good time accumulation. L-1 is the best, or earns the most time credits. (XXVII R.R. at 69). If someone was serving life without parole, the L designation would not apply to them since they would not earn good time. (XXVII R.R. at 70). The G designation determines your custody status. G-1 would be the least restrictive, up through G-5.  An inmate with a life without parole sentence would enter prison with a G-3 designation. (XXVII R.R. at 71). That is a middle of the road classification.  An inmate with a G-3 classification can live in general population, work, go to school, etc. (XXVII R.R. at 72). A G-3 inmate cannot go outside the prison. (XXVII R.R. at 94).  Inmates convicted of capital murder are not automatically placed in administrative

segregation. Administrative segregation is basically solitary confinement. (XXVII R.R. at 76). Although some people are placed in Administrative segregation on a permanent basis for membership in certain gangs, most people placed in administrative segregation get their status reviewed every six months or so. (XXVII R.R. at 77). Even an inmate in administrative segregation has opportunities to commit acts of violence. (XXVII R.R. at 78). There have been many violent offenses committed in prison, including some committed by inmates on death row. (XXVII R.R. at 79).

Jackie Mull testified that she was Sarah Walker's sister. (XXVII R.R. at 112). Sarah had been a good mother to her son, Josh, and a good sister to Jackie. (XXVII R.R. at 114-115). Sarah's death had been very hard on the whole family. (XXVII R.R. at 117).

Dawn Tate was Randy Tate's mother and took care of Josh. (XXVII R.R. at 118). She testified that Josh was having a hard time dealing with his mother's murder. (XXVII R.R. at 120).

The defense then presented the testimony of Dr. Walter Quijano. (XXVII R.R. at 133). Dr. Quijano was a clinical psychologist who worked for the prison system. (XXVII R.R. at 134). He testified that a person convicted of capital murder and sentenced to life without parole would be in

what was called "close custody". (XXVII R.R. at 137). Although there was still violence in prison, the current classification has reduced it significantly. (XXVII R.R. at 141). On cross-examination, Dr. Quijano explained the concept of "incremental aggravation in the seriousness of offenses." He agreed that Kosoul's criminal history demonstrated progressively more violent offenses. (XXVII R.R. at 146). Younger offenders were more violent than older ones. Men were more violent than women. Also if a person were envious of others, that increased the potential for violence. (XXVII R.R. at 148-49). He agreed that Kosoul met the criteria for anti-social personality disorder based on his criminal history. (XXVII R.R. at 149). A person who picks a victim at random is also more dangerous. (XXVII R.R. at 150). A person who shows no remorse and does not surrender immediately is also more dangerous. (XXVII R.R. at 153). Although Dr. Quijano was not asked to render an opinion as to Kosoul's future dangerousness, he had previously testified in a very similar case that Victor Saldano was a future danger. (XXVII R.R. at 160).

The jury answered the special issues in such a manner that Kosoul Chanthakoummane was sentenced to death.

**FIRST GROUND FOR RELIEF**

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
SUFFICIENTLY DEVELOP AND PRESENT SIGNIFICANT
MITIGATING EVIDENCE IN VIOLATION OF KOSOUL
CHANTHAKOUMMANE'S SIXTH AMENDMENT RIGHT TO
COUNSEL.

Although Kosoul's trial attorneys did hire a mitigation specialist, the mitigation investigation that was conducted consisted mostly of obtaining Kosoul's juvenile and prison records and speaking with people who knew him in prison. While some family members were interviewed, this contact was all too brief and unproductive. Not one family member testified at Kosoul's trial, although they would have been available and willing to do so, had they been asked. None of Kosoul's school records were obtained. Nor were any of his teachers interviewed. In short, the mitigation investigation that was conducted in Kosoul's case, focused on presenting Kosoul as a model prisoner. But none of what came before his descent into criminality was ever explored or presented to the jury. And what came before was significant and compelling. Kosoul was the product of a family that had been ravaged by war and associated trauma. The failure of his attorneys to explore and present this story violated Kosoul's Sixth Amendment right to effective

assistance of counsel. U.S. Const. amend. VI, VIII, XIV; <u>Strickland v. Washington</u>, 466 U.S. 668 (1984); <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003); <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005); <u>Lewis v. Dretke</u>, 355 F.3d 364 (5th Cir. 2003).

In closing arguments at punishment, the prosecutor told the jury that Kosoul had no problems in his family - that he came from an intact home. (XXVIII R.R. at 20, 53). But Kosoul's family was far from intact. Kosoul's family members were traumatized war refugees from Laos. But his jury never heard that story because his trial attorneys did not take the time or make the effort to discover it.

Kosoul's father, Komonh Chanthakoummane, was born and raised in Laos. He was the second of seven children born to a family of farmers. In 1966, he joined the Lao army. (Exhibit 1[3] – Affidavit of Komonh Chanthakoummane at 1). This was during the time of the Vietnam War when the United States recruited Lao troops to help disrupt the supply routes of the North Vietnamese. However, the Geneva Accords had dictated that Laos was to remain neutral, so the United States did not acknowledge its involvement in Laos until much later. As a result, the conflict came to be known as the "Secret War in Laos". Despite its "secrecy", over two million

_____
[3] Exhibits are bound separately but should be considered incorporated for all purposes.

tons of ordnance were dropped on Laos, making it "the most heavily bombed nation in the history of warfare". Paul Wiseman, <u>USA Today</u>, December 11, 2003, at http://www.usatoday.com/news/world/2003-12-11-loas-bombs_x.htm.

Kosoul's father, Komonh was part of a troop whose job was "to watch for Communists". During this time, Komonh was frequently exposed to "gunfire and bombing". (Exhibit 1 at 2). When the Communists finally took over Laos in 1975, Komonh, along with many other Lao military men, was sent to a "re-education" camp. Before Komonh was sent to the "camp", his first wife became pregnant. While at the "camp", Komonh was granted a two-week leave to go and visit his first wife. Komonh never returned to the camp. However, the Communists came searching for Komonh and eventually he had to flee to Thailand because "if the Communists found [him] they would kill [him]." Komonh never saw his first wife or his child again. (Exhibit 1 at 3-4).

Komonh met Kosoul's mother, Phongsamout Tongpu (Phong) in Thailand, where she also had sought refuge from the Communists in Laos. Phong was the second oldest of fifteen children. The Communists controlled the area where her family lived and everything had to be "shared" with the Communists. Her father was in the Lao army and the family moved a lot.

Phong only attended school until the third grade. She never learned to read or write. After leaving school, she helped the family make a living by cooking food and selling it in front of the house. Phong learned from an early age that "you were not allowed to talk about your own problems from inside the house on the outside."

Phong's family lived near a military base, Camp 42, and she witnessed many horrors as a young child. She described life near Camp 42 as follows:

> I saw people being shot. I saw truckloads of bodies. We all went and hid when the Communists came looking for my father. You would hear the bombs falling at night, mostly at night it was not safe. From 1961 to 1964, especially, we had to hide in our trenches. During the day, we would go to get supplies. We had to dig in the dirt and we dug trenches outside. You had to eat early because you were afraid that the Communists would come – if you wait, they will come and shoot you, so you have to go and hide in your trench. Around three or four o'clock we would have to start to go to the trenches. We would have to stay in the trenches at night and stay very quiet in the dark. You would only leave your trench to go to the bathroom. Later on, I remember being in the trenches with my baby. The soldiers would also come and they would shoot people. I had friends who were shot. On rainy days, the soldiers would not come and we would not be so scared. Also, the soldiers put these landmines in the ground all around where we lived. They put these there to try to kill our soldiers, but we had to be careful, they were all around our town.

(Exhibit 12 – Notes from interview of Phongsamout Chanthakoummane at 1-2).

Phong married her first husband and had her first child, Viengkhan, when she was sixteen. By the time she was twenty, the couple had "drifted apart". When she was twenty-one, Phong married a police officer from another village. Her second son, Chanh, was born in 1970. In 1972, she had a child that "was born with a birthmark that meant he would not drink milk and he died when he was only one and a half years old." Phong lived with her family "in a town where [you] could hear the bombs and hear the fighting, but [they] were not in the middle of it. It was safer there."

In 1974, when Phong was pregnant with another son, Phonsavanh, her husband, who was "about thirty" died of a heart attack while in bed. Phong called for help. She says that "[t]hey tried bringing peppers to put in his mouth, they tried biting his toes, but he was dead".

Phong, now alone with three young children, soon took up with another man who was a soldier. She became pregnant with her son Kominh. The soldier had managed to escape to Thailand and was coming back for Phong and the children, when he was shot and killed by the Communists while crossing the river. Believing that it was no longer safe for her in Laos, Phong, pregnant and with three young children, decided to try to escape to Thailand herself. Phong described her journey as follows:

> I was going to escape across the river, by boat. The boat was
> not large enough for me to take all of my children. I had to

choose which child to take with me. My mother did not want me to take my oldest child with me, she wanted to keep him. She said my youngest was too little to fend for himself, he could not even walk. So I decided that I would take Chanh and I had to leave my other two children behind. I had to pay money to cross the Mekong River and go to Thailand and I knew that it was very dangerous. You could only cross at night and once you made it safely across the river, then there were the Thai guards in the water waiting and looking. When I arrived in Thailand I had only a few little clothes and some jewelry I hoped to be able to sell for money. Chanh did not even have shoes. He got all scratched up by the bushes coming in and the red ants were biting his feet. There were no shoes, no shirt, we had nothing and he was only five or six years old.

(Exhibit 12 at 2-3).

Shortly after Phong arrived in Thailand, she gave birth to Kominh. Soon after that, she was arrested for being in Thailand illegally. The authorities put her and her children in jail. They stayed in jail for almost six weeks and then were taken to a refugee camp. There, she met Kosoul's father, Komonh. Phong and Komonh decided to get married. They all lived in a small hut that Phong described as follows:

The house had a dug out place to go to the bathroom but it was right there in the house. It was stinky. The reason for this was because it was not safe to go out of the house at night to go to the outhouse. People would get robbed or hurt if they went out at night. The Camp was not a safe place. Everyone lived very close together. You could smell what everyone was cooking. People would go to the bathroom in their house and just leave it there. It smelled. You could not go out at night.

(Exhibit 12 at 3).

In 1979, Sopha was born. A short time later, the family was approved to immigrate to America. (Exhibit 17 – Immigration papers).  They were sent to Gothenburg, Nebraska. (Exhibit 1 at 5; Exhibit 12 at 3). The family's living expenses were paid for several months by their sponsor. However, Phong soon started feeling very sick. The sponsor would not take her to see a doctor, just bought her some aspirin instead. The family started to hear "about other areas that had better schools, had better jobs and maybe more people from Laos." (Exhibit 1 at 5). So in search of a better life, the family moved to Rock Island, Illinois.

When they arrived in Illinois, Komonh found out where a Hmong person lived. Komonh went to the man's house and knocked on his door. Komonh described his arrival in Illinois as follows:

> I did not know this person and they did not know that I was coming. He opened the door and just looked at me. He asked how did I get here and I told him the story of how another Hmong person had connected us, that I wanted to stay with a Lao person. He asked if I had any cousins and when I said no, he said I could come in and stay with them. Then I told him that I had a wife and three children.

Remarkably, the man let the whole family stay with him. (Exhibit 1 at 6).

Phong was now pregnant with Kosoul and still feeling very sick. A doctor told her that she had a problem with her spleen. She was also feeling depressed and angry. When Kosoul was born in 1980, Phong described that

"[Kosoul] had his cord wrapped around his neck three times and he was very blue." She said that "[t]here is a Laos saying that when that happens, it can be either very good or very bad." She thought that it "was a foreshadowing". (Exhibit 12 at 4).

One month after giving birth to Kosoul, Phong had to have surgery. She describes this time as follows:

> They told me not to lift anything over five pounds and Kosoul weighed around seven pounds at birth. So I could not lift him from the time he was born until about seven months. My husband would go to work and the kids would be at school and I would be at home with Kosoul and [Sopha]. Because I could not lift him, all I could do was to prop him up and keep feeding him and change his diaper. He got so fat it was even harder to do anything. I could not hold him, could not do anything for him. I would get so tired sometimes that it was hard to breathe, I would feel like I would suffocate. I thought a lot about Laos, about my mom and dad, about my siblings. It was a very difficult year.

(Exhibit 12 at 4).

After about a year, the family moved again. They lived for awhile in Ohio, and then went to New York. By the time they were in New York, Phong felt well enough to start working. Komonh worked during the day and Phong worked at night. It wasn't long before the family moved again. They spent several months in Spartanburg, South Carolina, and finally ended up in Charlotte, North Carolina. The family moved about seven times before Kosoul started school in Charlotte. (Exhibit 12 at 5).

The jury never heard about the trauma that Kosoul's parents had endured in their journey to America. His trial attorneys never spent the time with his parents to learn the story. Komonh met with the attorneys for about an hour when they came to talk to him in Charlotte. They used Kosoul's sister Sopha[4] to help translate. Komonh came to Texas for Kosoul's trial, but the very night he arrived, he learned that his father had died. Komonh was torn between staying to help his son or returning to Charlotte to bury his father. Kosoul's attorneys did not discuss Komonh's testimony with him or why it might be important for him to stay and testify. No one suggested the possibility of continuing Kosoul's trial until after Komonh could bury his father. (Exhibit 1 at 11). Komonh was willing to testify and would have done so, had he been asked. He says that "Even if I was dead, I would come back to testify." (Exhibit 1 at 12).

Kosoul's sister Sopha also made the trip to Texas for his trial. She also left with her father and brother when they learned that her grandfather had died. She had this to say:

> The attorneys did not ask me if I would come back to testify. If they had asked me, of course I would have come back. They finished the case without me. I don't understand to this day why they did that. I tried calling the lawyers from North Carolina. I needed to talk to them about testifying. They never returned any

---
[4] Sopha is sometimes referred to as Monica.

of my phone calls. I think I called five times and no one called
me back.

(Exhibit 5 – Affidavit of Sopha Chanthakoummane)

Kosoul's mother, Phong reports a similar lack of contact with the trial
attorneys. She recalls a visit of about two hours. A close friend of Phong's
was used to interpret. No one ever asked her about testifying in her son's
trial. (Exhibit 12 at 6). Since Phong was Kosoul's primary caregiver during
his early formative years, her story was absolutely critical.

During jury selection in Kosoul's trial, his attorneys explained
mitigating evidence by saying that it could be anything – it could be
something as simple as learning that a defendant's mother smiled when she
saw him. This example was used with nine of the jurors who ultimately
served on Kosoul's case. (VI R.R. at 127; VIII R.R. at 156, 253; IX R.R. at
53; XII R.R. at 61; XV R.R. at 52, 134; XVI R.R. at 267; XVIII R.R. at
147). To repeatedly use this example to explain mitigating evidence, primed
the majority of Kosoul's jury to expect to hear something from Kosoul's
mother. To then fail to produce her, was inexcusable.

Although Kosoul's trial attorneys spoke with various members of
Kosoul's family, they did not call them as witnesses in his case because they
"did not think they would be helpful to Kosoul's case". (See Exhibit 14 –
Affidavit of Steven R. Miears). Either, Kosoul's attorneys were not getting

the complete story from his family, or the attorneys just failed to recognize the mitigating potential of Kosoul's story. Both possibilities amount to ineffective assistance in this case.

One of the reasons Kosoul's attorneys may not have gotten the complete story from his family, was their improper interview techniques. Quite often, family members were used to interpret for other family members. Compounding this problem was a cultural reluctance to share "family business" with outsiders. The use of an independent interpreter who was able to establish a rapport with family members was absolutely critical in this case.

Deborah Grey, a licensed clinical social worker, conducted the mitigation investigation for Applicant's habeas case. (See Exhibit 18 – Psyho-social history prepared by Deborah Grey, LCSW). In reviewing the mitigation investigation done for Kosoul's trial, she commented:

> Certain cases present special cultural issues that must be researched and considered at every step of the process, including: impact of refugee experiences on family and parents' ability to provide for and nurture the client; the method of communication with the client and family; assessment of the client's conduct in the offense, with law enforcement, and during incarceration and presentation of evidence in the penalty phase and at sentencing. As a general standard, interpreters must be located and used with those witnesses unable to fully understand the nature of questions and to facilitate more complex answers from those individuals unable to fully express themselves in English. Due to the sensitive nature of the

> questions being asked in a traditional mitigation investigation,
> under no circumstances is it acceptable to use a family member
> or family friend to interpret.

(See Exhibit 11 - Affidavit of Deborah Taylor Grey, LCSW at 5).

Another reason that Kosoul's trial attorneys may not have realized the mitigating potential of Kosoul's story was because they failed to consult with an expert in the Laotian refugee experience. Their failure to understand this experience and Lao culture may have prevented them from asking the right questions in the right way. Such an expert would also have helped Kosoul's jury understand his family and his story.

Dr. Raleigh Bailey is the director of an organization in North Carolina that assists immigrants and refugees. He has extensive experience with Lao refugees, in particular. Kosoul's habeas team consulted with Dr. Bailey about the Chanthakoummane's experience and Dr. Bailey had this to say:

> Based on my observation of multiple refugee camps and their
> residents, this was a traumatized group of people. These
> individuals were refugees largely because of their support of
> and service with US military forces during the Viet Nam War,
> including the secret war in Laos. After the communists took
> over Laos, the Communists targeted for retribution the Hmong
> tribesmen and ethnic Lao who had served in the Royal Lao
> Army and provided support for US military activities in Laos.
> Many had experienced trauma in their homelands, had
> experienced the loss of relatives in political strife, had spent
> time in "reeducation" camps (prisoner of war camps) where
> they experienced deprivation and torture at the hands of the
> communists. Many of the families experienced traumas such as
> rape, robbery, and loss of life while struggling to escape Laos

by crossing the Mekong River to the refugee camps in Thailand. The conditions at the Camps were harsh during this time. The residents lived in huts with straw or plastic roofs without running water or electricity, and living conditions were primitive. In the late seventies, there were no services to speak of in the refugee camps. They may have had emergency medical care available as well as food delivery of dried fish and rice once to twice a week. There were no educational or social services.

It is important to understand that the refugee experience is different from immigration: immigrants chose to leave their country while refugees did not. Refugees were driven from their homeland. They and their children have been exposed to war, violence and suffering. Refugees are displaced persons uprooted by war and violence. They arrive in a new country and, back in 1979, their arrival would have been without major support systems or much assistance in becoming assimilated. They cannot return home and in a sense they are without a country. These families have survived the horrors of war, dangerous escape attempts, crowded refugee camps and then resettlement into a Western culture/country with the pressures of adjustment. These families experienced multiple losses, including non-normative losses that come from children assimilating to western culture through language development at a more rapid rate than their parents.

The Chanthakoummane family entered the United States in 1979 at a time before the United States offered any formal settlement services. In 1980 the United States passed the Refugee Resettlement Act to provide uniform services to the refugee community. Prior to that time, individuals such as the Chanthakoummanes were brought into this country through other organizations such as Lutheran Immigrant and Refugee Services with minimal governmental support or coordination. Enthusiastic churches on local levels would make a commitment to sponsor a family. The ethnic Laotians were the smallest group of refugees amongst the Southeast Asian refugee populations who were resettled in the US. I have been told that the Chanthakoummanes were brought into Gothenburg

Nebraska. It is highly likely that they were the only Laotians in the town. They would have been completely culturally isolated with no one who spoke their language or was familiar with their culture. When they left that town, they left their sponsor behind and they left whatever services were being offered to them in that area. They would no longer have had that personal relationship with a sponsor or refugee support systems to help them navigate their way through the various cultural and legal requirements expected of them in this new land, nor would there have been any form of ongoing services with portability to the various locations.

In 1980 the federal government modified its refugee resettlement policies. We had learned from problems faced by families like the Chathakoummanes that this is the wrong way to work with refugees. We have learned that they must be settled in an area where they can have a built in community of their cultural or ethnic background. We learned that if that is not present, families will jump from place to place looking for community. We also learned that people will move from place to place in order to find work. Every move means starting all over for these families in strange place where they do not know their way around. I cannot overemphasize the problem of isolation that refugees can feel. That is certainly compounded by the varying levels of post-traumatic stress disorder (PTSD) that many of them carry.

There are times that well meaning people will think that to place someone who is Lao together with someone who is Hmong or who is Thai would be the answer to their cultural isolation. This would be the equivalent in post World War II to placing the French with the Hungarians- because they are all from Europe. There are vast cultural differences and disagreements between the various Asian ethnic groups, and they also represent different languages and religions.

These days, families are settled into areas where there are people of similar backgrounds. This ethnic clustering began around 1982, three years after the Chanthakoummanes arrived. By this time, congress had authorized funds for immediate

resettlement services lasting three months to hook the family up with appropriate services. This would be done with a caseworker who could speak their language. A secondary level of services would begin after three months and last for the next five years: the family would be eligible for ESL classes and job placement services. They can take advantage of these services in any location; the services are portable. At the time the Chanthakoummanes came into the country, they would have lost any benefits or services offered through their sponsor when they left Gothenburg. They would have been on their own.

As mentioned earlier, in the U.S., the normative developmental roles within the refugee family are reversed as the youth assimilate faster than the adults. Parents begin to feel their children are lost to them. The children feel they know more than their parents and begin to rebel. The ways of discipline in their country of origin (corporal punishment, discipline as maintained by tradition and reinforcement by teachers, monks and other elders) are not familiar or acceptable in the western culture and these parents are often without tools to discipline and set limits in a western culture. Their traditional supports for discipline are not available here.

Corporal punishment is common in their home country of Laos and many of these families end up being referred to child protective services because of harsh discipline. When things do not go well with the children, they discipline the way that they were disciplined when they were little. When that does not work, they may escalate the intensity of that discipline. In Laotian families, the rule would be not to talk about your family business outside of the home. A social worker would not be viewed as a friend, someone to confide in. I understand that the social worker visiting the Chanthakoummanes brought them written materials, likely in English, and talked to the parents without an interpreter. That would not be uncommon but also would not be that productive: most likely, the parents would be unable to read the materials or fully comprehend what was being said to them.

The children of Lao refugees are in a transitional situation. They are given American values at school and in the community but given Laotian values and language at home. They often have a sense that they do not fit in either environment. Any additional "difference" such as physical impairment or disfigurement would only further that sense of alienation, of not fitting in.  Sadly, many of these youth find that gangs offer a sense of belonging, community, acceptance and support.

Parents with limits in their language skills, a lack of awareness of what is available as far as community resources, who are also tied up working long hours on varying shifts would have a doubly difficult time dealing with the special needs of a child experiencing physical, emotional and developmental difficulties. Differences and problems can be viewed in this culture as bringing shame upon the family. This could be accompanied by not grasping or understanding the complexity of the problems, for example that a hearing impairment is a physical problem needing treatment; that this problem can affect language development and classroom participation which in turn can effect a child's behavior and self esteem. Parents may lack the language to fully understand what they are being told by the school; they may have trouble making meetings with the school due to working long hours in low paying jobs. Parents with limited language may have difficulty making and keeping specialty medical appointments. If the child needs special help at home, for example extra help with reading or keeping up with homework, the parents may not be there due to working shifts or unable to help because of the language and learning barrier. Furthermore, the family, which is already challenged by the Western culture being adopted by their children, may have especial difficulty helping their child to navigate the complex social environment of a special needs child.

The Lao community is small and the sense of privacy is intense. It is extremely difficult for family members to talk about private and shameful matters and they do not want anyone in their community to know their business. They are hesitant to

disclose and that need for privacy may take a priority over offering assistance (in the way of information) that might help a family member. I have seen many Laotian families disintegrate here, not just between parents and children, but divorces- which are uncommon in Laos- and conflicts between siblings and as each chooses a different path in their attempts to adjust to life here. I know this only because I have had the opportunity to know some families quite personally as well as professionally. These conflicts are not discussed with the broader community.

A typical Laotian family living in Laos would live in a small village of rice farmers, as it did for Mr. Chanthakoummane's father. Life would have pivoted around traditions that go back for hundreds of years. The local Buddhist temple would likely have also been the community center, the school, the health department, and the counseling service. Childrearing would be shared by everyone, and children who were out of line could be redirected by any adults in the community. Beginning in the 1980's the US government began providing six month cultural orientation services in refugee camps for refugees who were slated to come to the United States. The Chanthakoumane family did not have access to this cultural orientation in the late seventies.

(Exhibit 10 – Affidavit of Dr. Raleigh Bailey).

Kosoul's trial attorneys also failed to collect his school records or talk to any of his teachers. (Exhibit 14). Had they done so they might have learned that Kosoul failed his hearing test in kindergarten. Testing showed that he had a "moderate high frequency hearing loss bilaterally with normal hearing through 1500-2000 Hz. His ability to understand speech at a soft conversational level was poor in the right ear and fair in the left ear…." (Exhibit 2- School records at 35). The school recommended that Kosoul be

evaluated by an Ear, Nose and Throat physician. (Exhibit 2 at 33). However, Kosoul's hearing loss went untreated. By the second grade he was referred to "Exceptional Children Services". (Exhibit 2 at 44). Kosoul was below average in hearing, receptive language, expressive language and articulation. (Exhibit 2 at 50). One teacher noted that due to his pronunciation problems, "sometimes he [could not] be understood." (Exhibit 2 at 55).

When Kosoul was in the third grade, the family moved to Alabama because Komonh thought he could make better money catching crabs. However, Komonh had no "crabbing" experience and did not do very well. (Exhibit 1 at 9). Komonh thought that the "crabbing" might be better somewhere else, so the family moved to a trailer park in Louisiana. (Exhibit 1 at 9-10). When that didn't work out, the family moved back to Charlotte, North Carolina.

When Kosoul's family returned to Charlotte, Kosoul was in the fourth grade. One of his teachers was Constance Lesesne. She remembers Kosoul as being "calm and quiet". He "did not seem to interact much with the other children." She worried about him because he was "unusually quiet" and "children like that often have things going on that they don't talk about". (Exhibit 3 – Affidavit of Constance Lesesne).

Kosoul's hearing problems still had not been addressed. (Exhibit 2 at 75). Marty Sloan-Clontz was the audiologist for the Charlotte Mecklenburg School system. She remembers Kosoul and had this to say:

> The records show that Kosoul has a bilateral sensori-neural hearing loss that is moderate to severe in the higher frequencies. There are two types of hearing loss: conductive and sensorineural. The conductive type is in the middle ear and most frequently come from having numerous ear infections or fluid in the ears. Sensorineural hearing loss is in the inner ear, is often associated with aging and usually has nothing to do with ear infection. Once you have this type of hearing loss you will have it forever. This type of hearing loss can be genetic. It can come from exposure to extremely loud noises. It can occur in people who have had chemotherapy. Less likely, it could come from numerous ruptures of his eardrum. I see from my notes in his record that the otological exam showed reddened and scarred tympanic membranes. This would indicate a history of ruptures.
>
> The type of hearing loss that Kosoul had would have caused difficulties picking up on high frequency sounds like "s" and "th". The "s" gives you both plurality and possession, which has bearing on being able to hear and therefore understand these concepts. Of course, it also has a bearing on learning how to form and use these words when learning language. Kosoul was also learning a second language, which could potentially create further difficulties. The hearing loss could cause problems with learning the language as well as delaying speech. Language in turn affects how we understand the world and how we connect with the world. It certainly affects a child's self-esteem when it comes to feeling different from class mates. Among the ways children are effected is being ridiculed or teased for speech that is hard to understand or different; for not being able to understand things; and from not being able to hear and therefore not being able to learn at the same speed as classmates. For Kosoul, these difficulties would have been compounded by English being a second language on top of his hearing impairment.

In my years of working with children from different countries, I have also seen that there are differing cultural responses to deafness. There is sometimes a fear that leads parents to refuse services. Among Asian populations, parents often do not want to hear that there is a hearing loss from the belief it makes you less of a person.

I remember Kosoul well. One of the main reasons I remember him is that the school people could not pronounce his name and so they changed it to John. Neither he nor his parents were consulted about this and I felt horrible about it, it made me furious. That sort of thing would never happen these days. I made an effort to learn how to pronounce both of his names and to call him by name.

I remember Kosoul as a very shy and very unhappy boy. I think I remember him because he was such a pitiful little guy. The first intervention that we tried with Kosoul was an FM system. This involved Kosoul wearing an FM monitor around his neck with earphones and the teacher wearing a microphone. The device was big, obvious – it made him stand out. Kosoul seemed to hate it and I think he was very unhappy about having to wear that monitor. Now the monitors are tiny but back then they were great big old things. Kosoul would withdraw or pull back when he saw me coming. I think he associated me with having to wear the device.

While I did audiograms on Kosoul, I could not recommend hearing aids so I referred him to an ENT who did recommend the hearing aids. Back then, hearing aids were bigger and more obvious than they are now. It is not at all uncommon for children to not want to wear their hearing aid. Children don't want to do anything that will make them stand out as different. I remember Kosoul for another reason.  I examined his ears on one occasion and one of the ears appeared to be quite packed with blackened wax. The wax was so hardened that I couldn't get it out. I remember that I tried to get the parents to take him to the doctor and they wouldn't do it. I had to initiate a referral for the school to take him to the doctor, which would have taken weeks. I later learned after he had been taken to the doctor that he had had a dead cockroach in his ear. Most likely the roach was alive when it crawled into his ear and then couldn't back its way out. It likely would have scrabbled

around in his ear trying to get out. It would have been painful as well as scary for the child. The dead roach then stayed there and the wax grew all around it. I have been an audiologist for twenty years and I can remember something like this happened maybe once in all those years.

(Exhibit 4 – Affidavit of Marty Sloan-Clontz).

When Kosoul was in the fifth grade, the school finally intervened and arranged for Kosoul to get hearing aids. He had to leave the hearing aids at school and could not wear them home. (Exhibit 2 at 81, 106). It was also around that same time, that the school began to notice that there appeared to be some problems in Kosoul's home. (Exhibit 2 at 106). When Kosoul was in sixth grade, it was noted that "there [was] substantiated familial dysfunction that…frequently resulted in [Kosoul] experiencing emotional difficulties." (Exhibit 2 at 112).

Kosoul's trial attorneys also failed to get his records from the Department of Social Services (DSS). (Exhibit 14). They spoke with Pam Freeburn who remembers telling Kosoul's attorneys that, although there were no records in Kosoul's name, there were other records with the last name of Chanthakoummane. (See Exhibit 6 – Affidavit of Pam Freeburn). The attorneys did not inquire further and left without any records. However, the attorneys should have known that some DSS records existed because there was a notation in Kosoul's juvenile records, which the trial attorneys

did have, about a "substantiated complaint" for "excessive discipline". (Exhibit 7 – Juvenile Records at 179).

Had Kosoul's trial attorneys obtained the DSS records for Kosoul and his family, they would have learned that when Kosoul was in fifth grade, his thirteen year old sister, Sopha began running away from home. On June 15, 1992, Sopha was picked up by the police in Cherokee County, South Carolina. Sopha gave the police and DSS a fake name and told them that she didn't know where her parents were. They had supposedly gone to California, but Sopha did not know where, or if they would return. Sopha told the police that her parents would "pull her hair, kick her, slap her, and on one occasion tried to suffocate her with the covers." (Exhibit 8 – DSS records at 27). DSS investigated and found her complaints "unsubstantiated". (Exhibit 8 at 31). DSS workers spoke to Sopha's parents. Komonh denied abusing Sopha, stating the "[he knew] about American laws." (Exhibit 8 at 28). DSS concluded that Sopha was "rebellious and her parents [were] at a loss as to how to control her actions." DSS found that "the conflict between the parents and [Sopha were] due to cultural differences and expectations." (Exhibit 8 at 31).

On October 16, 1992, DSS opened an investigation regarding Kosoul. Kosoul had "complained that his parents would hit him with shoes, sticks,

electrical wire, coat hangers, belts, or with their hands." Kosoul had a visible lump on his arm that the DSS worker observed. (Exhibit 8 at 15). Kosoul told the DSS worker that the beatings would occur at night and on weekends so that the marks would be gone before Kosoul went to school. Kosoul stated that he was afraid of his parents. He reported that Sopha had been beaten after the previous DSS investigation involving her. (Exhibit 8 at 35). After the initial interview with Kosoul, he subsequently told the DSS worker that Sopha had asked him "why he told 'those people' that mom and dad were beating him." Kosoul told the worker that his sister "advised him to not reveal anything that went on in the house any more". (Exhibit 8 at 16). When the worker interviewed Kosoul's parents, they admitted to frequent beatings, by hitting Kosoul on the legs with electrical wire. His parents told the worker that in Laos, children were expected to be afraid of their parents and they found nothing wrong with that. (Exhibit 8 at 18). Kosoul's parents told the worker that they were very frustrated by Kosoul's behavior and saw no other alternative besides beating him, to get him to behave as they wanted. On a later visit, the DSS worker asked his parents to sign a "protection plan" agreeing not to beat Kosoul with objects. His parents refused to sign the agreement "as they believe[d] that they [might] at some point, need to hit [Kosoul] with objects again to control his behavior".

(Exhibit 8 at 19). The worker ultimately substantiated the complaint of inappropriate discipline and noted that Kosoul's parents held "unrealistic expectations" regarding Kosoul's behavior. The family was referred for counseling. (Exhibit 8 at 22).

The follow-up treatment consisted of the social worker conducting several more visits to the family. The family was provided with literature on discipline. There is no indication that an interpreter was used or that the literature was in the Lao language. The worker found the parents "cordial but obviously disinterested in disclosing information about their private lives." (Exhibit 8 at 3). When the worker met with Kosoul and Sopha, they too, seemed "secretive and reluctant to discuss family life." On a subsequent visit, the family told the worker that the children's behavior had improved and corporal punishment had ceased. They also told the worker that Sopha was getting married soon. (Exhibit 8 at 5). Sopha would have been fourteen at the time. The case was closed, as DSS found the "risks were significantly reduced". (Exhibit 8 at 11).

By this time Kosoul had started middle school. Perry Owen was the school social worker. He remembered both Kosoul and Sopha. Kosoul was "a real kind hearted and loving kid". Sopha was "quite bright and very beautiful". Mr. Owen also remembered Kosoul's father, Komonh. Komonh

was "concerned that his children were becoming too Americanized. He was frustrated with the route that they were going." Mr. Owen was never contacted by Kosoul's trial attorneys and was surprised to learn that he had gotten into trouble. The Kosoul that he knew was "very kind, very innocent, and very gentle". (Exhibit 9 - Affidavit of Perry Owen).

Sopha continued to have her own problems growing up. This was important for the jury to know about since Sopha was the family member that Kosoul went to live with in Texas after making parole. Kosoul's brother, Kominh had this to say about his siblings:

> Neither my brother nor sister ever seemed to have self-discipline. They both have real problems with setting or following any kind of goals. My sister has a really hard time holding down a job. I have tried lecturing her but it goes in one ear and out the other. My sister has had more new cars that I can count. My mom and dad would help her or cosign and then she wrecked or lost them all. She has a car now, but she has the ability to get things but does not have the ability to follow through with them. She is almost helpless. She cannot seem to support herself. She would get a boyfriend and then organize her life around that. My sister lacks independent living skills. She has always relied upon my parents and they have always backed her up. My dad gave her a big amount of money from the sale of our home and she went through all of it.
> My sister was not a stable person for my brother to go and live with. Developmentally, she is much more like a fifteen or sixteen year old. She is always changing friends, falling out with them. She is not stable at all. Her son, my nephew, stays with our father. She can talk my parents into anything. Her main reason for going to Texas was a new start. She even tried to talk me into moving there. My brother Kosoul said she talked

him into coming out to Texas saying that he did not need to be
around any of his old friends in Charlotte.

(Exhibit 13 – Affidavit of Kominh Chanthakoummane at 6-7).

Kosoul's parents divorced in 2000. There were allegations that
Komonh was physically abusive with Phong. (Exhibit 12 at 5; Exhibit 13 at
4).

Had Kosoul's trial attorneys understood his childhood experiences,
they might have conducted further inquiry into the psychological
consequences of this childhood. Habeas counsel has consulted with Dr.
Shelley Riggs, a psychologist who specializes in family attachment issues.
(See Exhibit 15 – Curriculum Vitae of Dr. Shelley Riggs). Dr. Riggs
reviewed the affidavits of Kosoul's family members and teachers, school
records, and DSS records. Based on this review she concluded that
"Kosoul's parents may have suffered a variety of post-traumatic sequelae,
which can include depression, angry outbursts, somatic and dissociative
reactions, as well as other anxiety-related symptoms." (Exhibit 16 – Report
of Dr. Shelley Riggs at 7). The trauma experienced by Komonh and Phong
affected their ability to parent. Dr. Riggs explains that:

> [The children of traumatized parents] often develop insecure-
> disorganized attachment, which manifests in incoherent coping
> strategies and paradoxical approach-avoidance behaviors.
> Research evidence suggests that infant disorganized attachment
> is related to insecure attachment and a variety of maladaptive

behaviors in later childhood and adolescence, including internalizing (e.g., depression, anxiety) and externalizing (e.g., anger, aggression, hyperactivity) problems, social difficulties, controlling behaviors, and dissociative symptomatology.

(Exhibit 16 at 8)(citations omitted). Regarding Kosoul, Dr. Riggs states:

Kosoul's early development occurred in the context of a chaotic family life, marked by multiple relocations, parental unemployment and financial strain, and little social support that appeared to lead to some degree of child neglect. Parent-child role reversal may also have been present due to the need to rely on older siblings to care for younger ones, as well as parental difficulties with the English language and the children's role in translating. After the family settled in North Carolina, documents suggest that the Chanthakoummane family environment remained disorganized and unstructured, with inadequate child supervision and inconsistent disciplinary practices characterized by either harsh physical punishment or little to no consequences for misbehavior. Family cohesion, which protects young boys from behavioral problems, appeared to be lacking. Instead as the children grew older, there seemed to be increasing parent-child conflict due to acculturative dissonance created by a mismatch between immigrant parents, who adhere to traditional cultural values and behaviors, and their more acculturated teenagers, who adopt individualistic American attitudes. Across diverse groups of immigrants, differences in acculturation between parents and children often result in an erosion of parental hierarchy and authority, which has significant mental health consequences for all family members. Intergenerational conflict and the inability of parents to control or monitor child behavior places Asian youth at risk for academic difficulties, depression, and behavior problems, which increase their vulnerability for association with delinquent peers/gangs and violence. Adverse psychosocial environments during childhood undermine the development of coherent internal representations of self and other and limit the capacity to understand the psychological states of others, an important criterion for empathy. Parental trauma and their poor mental and physical health, as well as immigration-related

stressors jeopardized Kosoul's early attachment bonding process. In combination with hearing loss and language deficiencies, this may have contributed to inadequate coping strategies, emotional distress, and poor social skills. Kosoul exhibited mild emotional difficulties in early elementary school, initially demonstrating some signs of depression and anxiety, with can be manifested in either sad/withdrawn affect or anger and irritability in children. By late elementary and early middle school, Kosoul's behavioral profile shifted to externalizing symptoms, such as anger, oppositionality (e.g., disrespect, breaking curfew), lying and stealing from family members.

(Exhibit 16 at 9-10)(citations omitted). In short, Dr. Riggs concluded that "multiple individual, family, peer and cultural factors placed Kosoul at substantial risk for maladaptive development." (Exhibit 16 at 11).

But Kosoul's jury never heard anything about these risk factors. In fact, Kosoul's jury never heard anything about his life before his first arrest. They knew nothing of the trauma his parents and older siblings had endured. They never knew that his mother was not able to pick him up and hold him for the first six months of his life. Trial counsel had a constitutionally required duty to investigate Kosoul's early life and present the mitigating evidence to the jury. This was especially important in a case where guilt was basically conceded. There was no reasonable strategic reason for not presenting this evidence to the jury. As the Commentary to Guideline 1.1 of the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003), reprinted in 13

Hofstra L. Rev. 913, 927, states: "This Eighth Amendment right to offer mitigating evidence 'does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present, and insist on the consideration of those compassionate or mitigating factors stemming from the diverse frailties of humankind.'" Kosoul's story should have been unearthed and presented.

Deborah Grey had this critique to make:

> It is my understanding that the pre-trial mitigation investigator spent minimal time with the defendant, Mr. Chanthakoummane. It is further my understanding that he did not interview members of the clients' family prior to trial, that any interviews were done by other members of the team. The mitigation investigator did not obtain the school records that outline the history of the client's hearing impairment and attendant academic difficulties. He made no effort to locate or talk to the client's teachers, health professionals or social workers, all of who were available and willing to talk. There is no indication that any research was done on the impacts of the exposure to war, violence, poverty, terror, malnutrition upon Mr. Chanthakoummane's parents in the time period immediately preceding his conception and early childhood. There is no indication that a careful and detailed history was taken around prenatal care, birth, infancy and attachment issues. There is no indication that investigation was performed on the impact of refugee status upon this family's life cycle throughout Mr. Chanthakoummane's infancy and early childhood. This information represents a critical piece of Mr. Chanthakoummane's developmental history. This information, too, is readily available and investigation of this would be a standard part of any mitigation investigation. Because of the lack of written documentation, it is difficult to know exactly what this mitigation investigator did.

Information was presented in the sentencing phase of this trial regarding Mr. Chanthakoummane's lengthy history of juvenile arrests and incarcerations. This information was presented to the jury without any information whatsoever about Mr. Chanthakoummane's background; the issues around mother child attachment and early child neglect and abuse; the refugee status of his family; the cultural differences encountered by children of refugees; the difficulties encountered by a child with special needs being raised by parents physically, culturally and linguistically ill equipped to recognize and address these needs. The record of his juvenile arrests was presented totally out of context; the jury had no knowledge whatsoever of Mr. Chanthakoummane's complex and multilayered history of abuse, neglect, physical and attendant cognitive deficits.

(Exhibit 11 at 8-9). In fact, the Collin County Jail Visitor's Log reflects that the mitigation investigator, Vince Gonzales only visited Kosoul one time. (See Exhibit 21 – Collin County Jail Visitor's Log at 7).

Had a sufficient mitigation investigation been done and the evidence presented to the jury in this case, there is a reasonable probability that at least one of the jurors would have made a different decision. In fact, both of the alternate jurors in this case were asked what effect this mitigating evidence might have had on the jury. They both thought it might have made a difference in answering the second special issue. (See Exhibit 20 – Notes from Interview of Alternate Juror Michael McCalpin at 3; Exhibit 21 – Notes from Interview of Alternate Juror Kimberly Smith at 3). The failure of Kosoul's attorneys to discover and present the whole picture, clearly

deprived Kosoul of his Sixth Amendment right to the effective assistance of counsel.

## SECOND GROUND FOR RELIEF

### KOSOUL CHANTHAKOUMMANE'S SIXTH AMENDMENT RIGHT TO AN IMPARTIAL JURY WAS VIOLATED WHEN A JUROR COMMITTED MISCONDUCT BY DISCUSSING THE CASE WITH HIS SPOUSE.

One of the twelve jurors admitted to talking about the case during the trial with his wife. The wife was also following the case in the media. This admission was made to a law student who was interviewing the jurors as part of a class project. (See Exhibit 19 – Affidavit of Raechel Parolisi at 1). This conduct amounted to improper third party contact or an external influence on the jurors in this case.

Under the Sixth Amendment, a criminal defendant is guaranteed the right to an impartial jury. "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." Irvin v. Dowd, 366 U.S. 717, 722, (1961)

(internal quotation marks omitted). The Supreme Court has made clear that private communications between an outside party and a juror raise Sixth Amendment concerns. <u>Parker v. Gladden</u>, 385 U.S. 363, 364, (1966). "[P]rivate talk, tending to reach the jury by outside influence" is constitutionally suspect because it is not subject to "full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." <u>Id</u>. (internal quotation marks omitted). Extrajudicial remarks directed at influencing a juror's resolution of an issue under deliberation, even if the remarks are isolated, may contravene the constitutional guarantee of a fair trial. <u>Id</u>. at 363-65. And, if even a single juror's impartiality is overcome by an improper extraneous influence, the accused has been deprived of the right to an impartial jury. <u>Id</u>. at 366 ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.").

In <u>Remmer v. United States</u>, 347 U.S. 227 (1954), the Court held that in criminal cases, any ex parte communication with a juror was per se prejudicial. However, in <u>Smith v. Phillips</u>, 455 U.S. 209 (1982), the Court indicated that an affirmative showing of prejudice was required to prevail on grounds of jury misconduct. Lower courts have since divided over whether <u>Remmer's</u> presumption of prejudice survived the Court's opinion in <u>Phillips</u>.

See Brooks v. Dretke, 418 F.3d 430, 434 (5th Cir. 2005); Parker v. Head, 244 F.3d 831, 839 n.6 (11th Cir. 1001)(collecting cases); United States v. Butler, 822 F.2d 1191, 1195 n.2 (D.C. Cir. 1987)(collecting cases).

Whether by presumption or actual showing, the possibility of prejudice is simply unacceptable in a death penalty case. Mr. Chanthakoummane should be entitled to a hearing to establish the prejudicial effect of the improper jury conduct in this case. See Fullwood v. Lee, 290 F.3d 663 (4th Cir. 2002); United States v. Brooks, 934 F.2d 196 (9th Cir. 1991). U.S. Const. amend. VI, XIV.

## THIRD GROUND FOR RELIEF

KOSOUL CHANTHAKOUMMANE'S FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN A JUROR COMMITTED JURY MISCONDUCT BY CONSIDERING APPLICANT'S FAILURE TO TESTIFY.

One of the twelve jurors also admitted that he took Applicant's failure to testify into consideration in reaching his verdict. This admission was also made to the law student who was interviewing him. When asked about this, the juror stated "to say that it didn't would be a lie, but in my heart, I felt that if he had something to say, he should say it, and he didn't so there probably wasn't anything that he could have said that could help him." He continued, "when you don't defend yourself, it's not a good thing". (See Exhibit 19 at page 8 of attachment A). This improper conduct violated Mr. Chanthakoummane's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. U.S.Const. amends. V, VI, XIV.


THE APPLICATION OF RULE 606(b) SHOULD NOT BAR CONSIDERATION OF THIS CLAIM.

Texas Rule of Evidence 606(b) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

Although this provision has previously been found to be constitutional and to bar claims such as the one presented in this case, see e.g., Tanner v. United States, 483 U.S. 107, 126-27 (1987); Golden Eagle Archery, Inc. v. Jackson, 24 S.W.3d 362, 374-75 (Tex. 2000); Dunklin v. State, 194 S.W.3d 14, 19-20 (Tex. App. – Tyler 2006, no pet.); White v. State, 181 S.W.3d 514, 524-26 (Tex. App. – Texarkana 2005) aff'd 225 S.W.3d 571 (Tex. Crim. App. 2007); Richardson v. State, 83 S.W.3d 332, 362 (Tex. App. – Corpus Chirsti 2002, pet. ref'd); Sanders v. State, 1 S.W.3d 885, 888 (Tex. App. – Austin 1999, no pet.); Hines v. State, 3 S.W.3d 618, 622 (Tex. App. – Texarkana 1999, pet. ref'd), applying Rule 606(b) in this manner results in a denial of due process that is especially intolerable in a death penalty case. As stated by one judge of the Court of Criminal Appeals:

While the impulse that produced that rule may be good, the prohibition sometimes results in improper conduct in the jury room that impermissibly affects the verdict. Here it was improper speculation about parole. In another case, it may be a juror using personal experience, unrelated to the case at bar, to influence the vote of other jurors, such as a juror who has been burglarized talking about the sense of violation that such victims feel and urging conviction or severe punishment based not on the burglary, but on the juror's own emotional distress in response to a different burglary. We should not invade the jury room for little purpose, but due process demands that there be a way to address blatant misconduct. Rule 606(b) bars any examination of the process. A trial cannot be fair if jury deliberations are tainted.

Ex parte Green, 159 S.W.3d 925, 926 (Tex. Crim. App. 2004)(Johnson, J., statement dissenting to the dismissal of the writ application). Rules of evidence should not be invoked to thwart fundamental constitutional protections. When discussing this issue in McDonald v. Pless, 238 U.S. 264 (1915), the United States Supreme Court said noted that "it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without 'violating the plainest principles of justice.' This might occur in the gravest and most important cases." Id. at 268-69. Certainly, a death penalty case must be considered a "grave and important case".

## FOURTH GROUND FOR RELIEF


APPELLATE COUNSEL WAS INEFFETIVE FOR FAILING TO
CHALLENGE THE ADMISSION OF BRIAN CONNER'S EXPERT
GANG TESTIMONY.

Brain Conner was Kosoul's juvenile court counselor in North
Carolina. (XXIV R.R. at 115). Mr. Conner testified that Kosoul was a
member of the Crip gang. (XXIV R.R. at 125). Mr. Conner based this
opinion on his conversations with Kosoul and his family. However, Mr.
Conner could not recall any specifics of why he thought Kosoul was a Crip.
He also acknowledged that he could not really speak with Kosoul's parents
since they did not speak English, and Mr. Conner did not speak Laotian.
(XXIV R.R. at 100). Mr. Conner also produced a letter that Kosoul had sent
him. Mr. Conner testified that the letter was filled with gang symbols.
(XXIV R.R. at 138-140). The defense objected to Mr. Conner's testimony
about Kosoul's gang membership because Mr. Conner was not properly
qualified as an expert and could not recall any of the underlying facts that
supported his opinion. The defense also objected that this testimony was not
relevant or admissible under Rule 403 of the Texas Rules of Evidence.

(XXIV R.R. at 110-11). These objections were overruled. (XXIV R.R. at 112).

Despite being properly preserved for review, appellate counsel did not raise any issues concerning the admission of Mr. Conner's gang testimony. This amounted to ineffective assistance of appellate counsel.

A criminal defendant is entitled to constitutionally effective assistance of counsel on direct appeal. Evitts v. Lucey, 469 U.S. 387, 394 (1985); Goodwin v. Johnson, 132 F.3d 162, 170 (5th Cir. 1998); Lombard v. Lynaugh, 868 F.2d 1475, 1479 (5th Cir. 1989). The failure to provide effective assistance of counsel on direct appeal violates a defendant's rights to due process under the Fourteenth Amendment. U.S. Const. amends. VI, XIV; Evitts v. Lucey at 396.

In order to prove ineffective assistance of counsel, a petitioner must first show that his attorney's performance was deficient and, second, demonstrate that such deficiency caused him prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984).

A. BRIAN CONNER WAS NOT A PROPERLY QUALIFIED "GANG EXPERT".

Mr. Conner himself admitted that he was not a "gang expert". (XXIV R.R. at 103). Nevertheless, the trial court allowed him to opine about

Kosoul's supposed gang affiliations. This testimony was allowed even though Mr. Conner could not recall any specific facts upon which this opinion was based. (XXIV R.R. at 101-102; 105-106).

Mr. Conner's testimony about gang affiliation was expert testimony that must be governed by Rule 702 of the Texas Rules of Evidence. Under Rule 702, the burden is on the proponent of the evidence to establish by clear and convincing evidence that the evidence should be admitted. <u>Jackson v. State</u>, 17 S.W.3d 664 (Tex. Crim. App. 2000); <u>Massey v. State</u> 933 S.W.2d 141 (Tex. Crim. App. 1996). The decision to admit or exclude expert testimony lies within the sound discretion of the trial court and upon appellate review is reviewed for abuse of discretion. <u>Banda v. State</u>, 890 S.W.2d 42 (Tex. Crim. App. 1994).

An expert witness must first be qualified to render a particular opinion. Qualification is a two-step inquiry. As the Court of Criminal Appeals stated in <u>Vela v. State</u>, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006), "[a] witness must first have a sufficient background in a particular field, but a trial judge must then determine whether that background 'goes to the very matter on which [the witness] is to give an opinion.'"

Although Mr. Conner testified that he had received 120 hours of "gang specific training", he repeatedly stated that he was not a "gang

expert". There was no evidence about when this training took place. As Mr. Conner acknowledged, "gangs change everyday", and someone who is a gang expert one day, may not be one the next day. (XXIV R.R. at 103-104).

Mr. Conner was not a properly qualified gang expert and should not have been permitted to testify about Kosoul's gang affiliations. Trial counsel properly objected to Mr. Conner's gang testimony and appellate counsel should have raised this issue on appeal. The failure to do so amounted to deficient performance.

## B. MR. CONNER'S TESTIMONY ABOUT KOSOUL'S GANG AFFILIATIONS WAS NOT SHOWN TO BE RELEVANT.

Trial counsel also objected to the gang affiliation testimony of Mr. Conner as not being relevant. (XXIV R.R. at 110). The trial court overruled this objection. (XXIV R.R. at 112). However, appellate counsel failed to raise this issue on appeal. This, too, amounted to ineffective assistance.

In order to prove the relevance of a defendant's membership in an organization or group, the State must show: (1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization. See Dawson v. Delaware, 503 U.S. 159 (1992); Fuller v. State, 829 S.W.2d 191, 196 n.2 (Tex. Crim. App. 1992) cert. denied 508

U.S. 941 (1993) <u>overruled on other grounds by</u> <u>Castillo v. State</u>, 913 S.W.2d 529, 534 (Tex. Crim. App. 1995).

In <u>Anderson v. State</u>, the Court of Criminal Appeals held that evidence of gang membership is admissible and relevant to show the character of a defendant at the punishment phase of trial.  <u>See</u> <u>Anderson v. State</u>, 901 S.W.2d 946, 950 (Tex. Crim. App. 1995).  However, in that case the State established that the defendant: (1)was a member of the "Canine Posse" gang; (2) the "Canine Posse" gang had a bad reputation; and (3) the gang was involved in the distribution of narcotics in the apartment complex where the crime took place.  <u>Id</u>.  Moreover, in Justice Clinton's concurring opinion he points out that gang affiliation is not an admissible method of proving character *per se*.  <u>Anderson v. State</u>, 901 S.W.2d at 951 (concurring opinion by Justice Clinton).  The Court further clarifies the issue in <u>Beasley v. State</u>, 902 S.W.2d 452, 457 (Tex. Crim. App. 1995). In that case, the Court of Criminal Appeals stated that evidence of gang affiliation is relevant and admissible to show the character of the accused, *if evidence of the gang's activities is also presented*.  <u>Id</u>.  (emphasis supplied).

In the instant case there was no evidence about the activities or bad acts of the Crips, or any other gang. The only evidence presented was that in Mr. Conner's opinion, Kosoul was a member of the Crips and associated

with other gangs. There was some testimony about the structure and relationships of these gangs, (XXVI R.R. at 126), but there was nothing to make this testimony relevant to any of the special issues before the jury or to rebut any mitigating evidence presented by the defense. Without any testimony about the activities or bad reputation of Kosoul's gang membership, testimony about such membership violates Kosoul's First Amendment rights of freedom of speech and association.

Trial counsel's relevancy objection to Mr. Conner's testimony should have been sustained. Appellate counsel should have raised this issue on appeal. The failure to do so was clearly deficient performance that resulted in prejudice.

Had this issue been raised on appeal, the court would have found error in the admission of Brian Conner's testimony about Kosoul's gang membership. Error in the improper admission of gang testimony amounts to constitutional error under Tex. R. App. P. 44.2(a). See Shelton v. State, 41 S.W.3d 208, 218 (Tex.App. – Austin 2001, pet. ref'd). This error was not harmless. The testimony from Brian Conner was the only testimony that the jury heard about any gang ties that Kosoul might have had. Had this issue been raised on appeal, there is a reasonable probability that the result of the proceeding would have been different.

## FIFTH GROUND FOR RELIEF

APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO ARGUE THAT THE EVIDENCE WAS LEGALLY INSUFFICIENT TO PROVE BEYOND A REASONABLE DOUBT THAT MR. CHANTHAKOUMMANE WOULD BE A FUTURE DANGER.

Appellate counsel did not raise the legal sufficiency of the evidence of future dangerousness. Failing to raise this issue amounted to ineffective assistance of appellate counsel. U.S. Const. amends. VI, XIV; Evitts v. Lucey at 396.

Legal sufficiency is traditionally determined by the Jackson v. Virginia, 433 U.S. 307 (1979), standard – whether any rationale trier of fact could have found beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. However, in the context of the first special issue, the court has defined the question as whether there is "more than a 'mere modicum' of evidence to support the jury's conclusion it is probable he would commit criminal acts of violence that would constitute a continuing threat to society. Burns v. State, 761 S.W.2d 353, 356 (Tex. Crim. App. 1988).

In <u>Berry v. State</u>, 233 S.W.3d 847 (Tex. Crim. App. 2007), the Court of Criminal Appeals found the evidence of future dangerousness to be insufficient in a case where the defendant had killed two of her own children. The court noted that it was a relevant factor that the defendant was going to be locked up for at least 40 years under the parole laws in effect at the time of her offense. Thus, she would be beyond child-bearing years if she was ever released and no longer a probable danger since the only threat seemed to be to her own children. Since the time of Berry's offense the capital murder statute has been amended to now provide for life without parole. Tex. Penal Code § 12.31(a). This was the statute in effect for Mr. Chanthakoummane's trial. The relevant inquiry for Mr. Chanthakoummane's case, therefore, becomes whether he will be a future danger in prison for the rest of his life.

The defense presented extensive evidence of Mr. Chanthakoummane's good behavior while confined. Numerous prison guards and even a fellow inmate testified that Kosoul had always had good behavior in prison and was not an inmate that would cause trouble. (XXV R.R. at 7-21; XXVI R.R. at 7-95; XXVII R.R. at 11-17). A forensic psychologist with expertise in prison behavior and classification, reviewed Mr. Chanthakoummane's records and concluded that he was not likely to be

a future danger. (XXVI R.R. at 142). Although the State did present evidence of extraneous offenses and prior bad acts, none of these acts occurred while Mr. Chanthakoummane was confined. The State likewise did not present any psychological testimony that Mr. Chanthakoummane would be a future danger. In short, the State failed to prove beyond a reasonable doubt that Mr. Chanthakoummane would be a future danger.

This issue should have been raised on appeal and the failure to do so was ineffective assistance. U.S. Const. amends. VI, XIV; <u>Evitts v. Lucey</u> at 396. Had the issue been raised on appeal, there is a reasonable probability that the result of the proceeding would have been different.

**SIXTH GROUND FOR RELIEF**

APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO
CHALLENGE THE ADMISSIBILITY OF A.P. MERILLAT'S
TESTIMONY.

In the punishment phase of Mr. Chanthakoummane's trial, the State
presented the testimony of A.P. Merillat, an investigator with the Special
Prosecutor's Office. Merillat testified about the classification system in the
Texas penitentiary and the occurrence of violence in prison. (XXVII R.R. at
30-31). The defense objected to Mr. Merillat testifying about classification
issues because Mr. Merillat was not properly qualified as an expert in this
area and his testimony was unfairly prejudicial under Rule 403. (XXVII
R.R. at 59-60). The court overruled the defense objections and Merillat was
allowed to testify.

Although the issue of the admissibility of Merillat's testimony was
properly preserved, appellate counsel did not raise this issue on appeal. The
failure to do so amounted to ineffective assistance. U.S. Const. amends. VI,
XIV; Evitts v. Lucey at 396.

A. MERILLAT WAS NOT A PROPERLY QUALIFIED EXPERT ON
THE PRISON CLASSIFICATION SYSTEM.

A.P. Merillat was presented as an expert in the TDCJ classification system. (XXVII R.R. at 58). As such his testimony was governed by Rule 702 of the Texas Rules of Evidence. Under Rule 702, the burden is on the proponent of the evidence to establish by clear and convincing evidence that the evidence should be admitted. <u>Jackson v. State</u>, 17 S.W.3d 664 (Tex. Crim. App. 2000); <u>Massey v. State</u> 933 S.W.2d 141 (Tex. Crim. App. 1996). The decision to admit or exclude expert testimony lies within the sound discretion of the trial court and upon appellate review is reviewed for abuse of discretion. <u>Banda v. State</u>, 890 S.W.2d 42 (Tex. Crim. App. 1994).

An expert witness must first be qualified to render a particular opinion. Qualification is a two-step inquiry. As the Court of Criminal Appeals stated in <u>Vela v. State</u>, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006), "[a] witness must first have a sufficient background in a particular field, but a trial judge must then determine whether that background 'goes to the very matter on which [the witness] is to give an opinion.'"

In this case, A.P. Merillat testified that he worked as an investigator in the Special Prosecutor's Office. This office assisted prosecutors throughout the state in the prosecution of crimes occurring in the Texas penitentiaries. What is not explained, is how Merillat's work as an investigator, gives him any particular expertise in the prisoner classification system of TDCJ.

Merillat had never worked for the prison system. (XXVII R.R. at 32-33).

Merillat did not have a degree in criminal justice or psychology. (XXVII

R.R. at 32-33). Merillat did not help develop the prison classification system

or work on any committee that was involved in prisoner classification.

(XXVII R.R. at 34). Although, he had authored a book that talked about

prisoner classification in TDCJ, this book was published by the Texas and

County District Attorney's Association. He had not authored any material

that was peer-reviewed. (XXVII R.R. at 42). Merillat never explained why

his work as an investigator in a prosecuting office gave him any particular

expertise in the prisoner classification system in TDCJ.

The trial court's decision to find that Merillat was qualified as an

expert on prisoner classification was an abuse of discretion. As the Texas

Supreme Court pointed out in <u>Broders v. Heise</u> , . 924 S.W.2d 148, 153

(Tex. 1996), the proponent of expert testimony must establish that the expert

has "knowledge, skill, experience, training, or education' regarding the

specific issue before the court which would qualify the expert to give an

opinion on that particular subject." There was no such showing in this case.

This issue should have been raised by reasonably competent appellate

counsel. The failure to do so amounted to deficient performance.

## B. MERILLAT'S TESTIMONY WAS UNFAIRLY PREJUDICAL

## UNDER RULE 403.

Trial counsel also objected to Mr. Merillat's testimony on the basis of Rule 403, that the probative value of his testimony was substantially outweighed by the danger of unfair prejudice. (XXVII R.R. at 60). However, appellate counsel failed to raise this issue on appeal. This was also deficient performance.

In making the decision to admit or exclude expert testimony, the trial court must perform a Rule 403 analysis. <u>Morales v. State</u>, 32 S.W.3d 862 (Tex. Crim. App. 2000). Expert testimony should be excluded if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. <u>Shultz v State</u>, 957 S.W.2d 52 (Tex. Crim. App. 1997). In this case, Merillat was not offering any opinion that was individualized to Mr. Chanthakoummane or his case. (XXVII R.R. at 52). Because his testimony was not individualized to Mr. Chanthakoummane's case, it had little real probative value. In <u>Sells v. State</u>, 121 S.W.3d 748 (Tex. Crim. App. 2003), the court found that a video tape depicting life in administrative segregation in one of the prison units, was inadmissible under Rule 403. The court stated that:

> The videotape was not offered as information about the individual defendant or about how the individual

> defendant might be handled. Rather, as the judge noted, it
> portrayed only one aspect of an entire system and offered
> only general information about some procedures used in
> that system. That others have been controlled in the prison
> system or that certain procedures are in place without
> specifically connecting those procedures to appellant was
> not evidence of consequence to the jury's factual
> determination of whether appellant would pose a
> continuing threat to society.

Sells at 766. Merillat's testimony suffered from the same short comings. He was not able to individualize his testimony to Mr. Chanthakoummane's case. As a result, Merillat's testimony should not have been admitted under Rule 403 and appellate counsel should have raised this issue. The failure to do so amounted to ineffective assistance.

Merillat's testimony about prisoner classification was clearly important to the jury, in that it was the subject of a note from the jury. (I C.R. at 157). The jury asked for Merillat's testimony. However, the jury was not provided with Merrilat's testimony since the jury did not state that its members had a disagreement about a portion of Merillat's testimony, as required by Article 36.28 of the Texas Code of Criminal Procedure. Nevertheless, it is clear from the jury's note, that this was an important point of discussion within the jury. It cannot be said that the erroneous admission of Merillat's testimony had no effect on Mr. Chanthakoummane's

substantial rights. Had the issue been raised on appeal, there is a reasonable

probability that the result of the proceedings would have been different.

## SEVENTH GROUND FOR RELIEF

## APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE DENIAL OF APPLICANT'S MOTION TO SUPPRESS HIS STATEMENT.

Applicant gave a video-taped statement in this case. Trial counsel filed a motion to suppress this statement challenging the voluntariness of Applicant's statement and the sufficiency of the Miranda warnings he received. (III C.R. at 475; II R.R. at 14). A hearing was held on this motion, after which it was denied by the trial court. (II R.R. at 69). Despite being properly preserved by trial counsel[5], appellate counsel did not raise this issue in his brief. The failure to do so amounted to ineffective assistance of counsel. U.S. Const. amends. VI, XIV; Evitts v. Lucey at 396.

Mr. Chanthakoummane was arrested pursuant to a warrant on September 5, 2006. He was immediately transported to the McKinney police station where his oral video-taped statement was taken. (II R.R. at 15-16). Therefore, there is no question that Mr. Chanthakoummane was in custody at the time of his statement, and the dictates of Miranda apply. Miranda v. Arizona, 384 U.S. 436, 460-61 (1966).

In Mr. Chanthakoummane's case there was not a valid waiver of his Miranda rights. Officer Joe Ellenburg read Kosoul his rights in this case. After reading the rights, Officer Ellenburg asked Kosoul to initial the form, showing that he understood his rights. Officer Ellenburg explicitly told Kosoul that by signing the form, he was **not** saying that he was waiving his rights, only that he understood them. Additionally, Officer Ellenburg told Kosoul that if he initialed the form – saying only that he understood his rights – Officer Ellenburg would remove Kosoul's handcuffs. (XXII R.R. at 96). Kosoul was never explicitly asked if he waived his rights or even if he wanted to talk to the officers. Clearly, this was not a valid waiver.

Any waiver of <u>Miranda</u> rights on behalf of an accused must be made knowingly, intelligently, and voluntarily. <u>Miranda</u>, 384 U.S. at 475. Whether an accused has effectively waived his rights has two distinct inquiries: first, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. <u>Id</u>. An express waiver is not necessary; waiver may be inferred

---

from the actions and words of the person interrogated. <u>North Carolina v.</u>
<u>Butler</u>, 441 U.S. 369, 373 (1979); <u>Rocha v. State</u>, 16 S.W.3d 1, 12 (Tex.
Crim. App. 2000). A court must consider the totality of the circumstances
when determining whether an accused has waived his <u>Miranda</u> rights. <u>Fare</u>
<u>v. Michael C.</u>, 422 U.S. 707, 725 (1979).

In <u>North Carolina v. Butler</u>, 441 U.S. 369 (1979), the Supreme Court
held that an express waiver was not required. However, in that case the
Defendant affirmatively stated to the officers that he wanted to answer their
questions. <u>Id.</u> at 371-72. The Court found that statement was significant in
the totality of the circumstances analysis. In Mr. Chanthakoummane's case
there was no similar indication that Mr. Chanthakoummane wanted to talk to
the officers or answer their questions.

During the time that Mr. Chanthakoummane's appeal was pending,
the U.S. Supreme Court granted a cert petition on this very issue in <u>Berghuis</u>
<u>v. Thompkins</u>, No. 08-1470. (cert pet. filed May 26, 2009, cert granted
September 30, 2009). To fail to raise this important issue in Mr.
Chanthakoummane's appeal clearly fell below an objective standard of
reasonableness.

---

next ground for relief.

Had appellate counsel raised this issue on appeal, there is a reasonable probability that the result of the proceeding would have been different. Mr. Chanthakoummane's "confession" was an important part of the State's case. Both prosecutors emphasized Mr. Chanthakoummane's statement in their closing arguments. (XXIII R.R. at 23-25, 38). In addition to the admissions in Mr. Chanthakoummane's statement itself, the State also used to the statement to argue that Mr. Chanthakoummane lacked remorse. (XXIII R.R. at 38). Thus, the erroneous admission of this statement, impacted the punishment phase as well as the guilt phase.

**EIGHTH GROUND FOR RELIEF**

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO SPECIFICALLY OBJECT TO MR. CHANTHAKOUMMANE'S STATEMENT BECAUSE THE WAIVER OF HIS RIGHTS WAS NOT VALID.

Although it was certainly clear from trial counsel's questions in the hearing on the motion to suppress that the defense was challenging the lack of a valid waiver of rights, (II R.R. at 37-41; 67-68), counsel did not specifically make this objection on the record. The failure to clearly make this objection amounted to ineffective assistance. See Sanders v. State, 715 S.W.2d 771 (Tex. App. – Tyler 1986, no pet.). U.S. Const. amends V, VI, XIV.

During defense counsel's cross-examination of Officer Ellenburg, counsel emphasized that Officer Ellenburg had told Kosoul that by signing the waiver card, he was just indicating that he understood his rights. Kosoul was never expressly asked if he was waiving his rights or if he wanted to talk to the officers. During the cross-examination of Officer Norton, it was brought out that Kosoul never said he wanted to waive his rights or that he wanted to talk. Nevertheless, no explicit argument was made on the record

that there was no valid waiver of Kosoul's Miranda rights. In fact, there was no argument made at all when the judge ruled on the defense motion to suppress Kosoul's statements. (II R.R. at 69).

The failure to make this specific objection on the record, amounted to ineffective assistance on the part of Mr. Chanthakoummane's trial attorneys. If this objection had been made, Mr. Chanthakoummane's oral statement should have been suppressed for the reasons set out in the previous Ground for Relief. Also pointed out in the previous ground is the prejudicial impact of the improper admission of Mr. Chanthakoummane's oral statement on both phases of the trial.

## NINTH GROUND FOR RELIEF

APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE THAT THE TEXAS DEATH PENALTY SCHEME IS UNCONSTITUTIONAL BECAUSE THE STATUTORY TERMS ARE VAGUE AND DO NOT PROPERLY CHANNEL THE JURY'S DISCRETION.

Mr. Chanthakoummane's trial counsel objected to the court's failure to define certain terms in the future dangerousness special issue. (V C.R. at 897, 967; XXVIII R.R. at 4-5). Specifically, counsel objected to the failure to define the terms "probability", "society", "continuing threat" and "criminal acts of violence". These objections were overruled. (I C.R. at 25; XXVIII R.R. at 6). Although trial counsel preserved the issue, appellate counsel failed to raise it on appeal. This amounted to ineffective assistance of counsel. U.S. Const. amend. XIV; Evitts v. Lucey at 396.

Article 37.071 § 2(b)(1) of the Texas Code of Criminal Procedure, the future dangerousness issue, is unconstitutional because the aggravating factors it uses are vague and do not properly channel the sentencer's discretion in violation of the Eighth and Fourteenth Amendments to the United States Constitution. U.S. Const. amends. VI, VIII, XIV. See,

Maynard v. Cartwright, 486 U.S. 356 (1988). Since the jury is not provided with definitions of such terms as "probability", "continuing threat to society" and "criminal acts of violence", the statute violates the constitutional requirement that each statutory aggravating circumstance genuinely narrows the class of persons eligible for the death penalty and reasonably justifies the imposition of the death penalty. Stringer v. Black, 503 U.S. 222, 235 (1992).

The words "probability" and "society" are certainly capable of definition in such a way as to provide meaning to the jury and relevance to the issues to be decided, i.e. "probability" can be defined to mean "more likely than not", "continuing" can be defined to mean "uninterrupted"; and "society" can be defined to mean "prison society". In fact, when the Court of Criminal Appeals reviews the legal sufficiency of the evidence of future dangerousness, it has applied such definitions. See, e.g. Ellason v. State, 815 S.W.2d 656, 659 (Tex. Crim. App. 1991)("probability" means "more than a bare chance"); Muniz v. State, 851 S.W.2d 238, 250 (Tex. Crim. App. 1993); Jones v. State, 843 S.W.2d 487, 495 (Tex. Crim. App. 1992)("'society' includes not only free citizens but also inmates in the penitentiary.").

It is also true that a juror with a "faulty understanding" of these terms is challengeable for cause. Hughes v. State, 878 S.W.2d 142, 148 (Tex.

Crim. App. 1993). And a prosecutor errs if he defines those terms improperly in argument. <u>Felder v. State</u>, S.W.2d 85, 97 (Tex. Crim. App. 1992).

Nevertheless, the Court of Criminal Appeals has repeatedly held that the terms "probability", "society", "criminal acts of violence", and "continuing threat" need not be defined for the jury, <u>see</u>, <u>e.g.</u>, <u>Druery v. State</u>, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); <u>Newbury v. State</u>, 135 S.W. 22, 45 (Tex. Crim. App. 2004); <u>Blue v. State</u>, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003); <u>Turner v. State</u>, 87 S.W.3d 111, 118 (Tex. Crim. App. 2002); <u>Caldwell v. State</u>, 818 S.W.2d 790, 798 (Tex. Crim. App. 1991), <u>Boyd v. State</u>, 811 S.W.2d 105, 113 (Tex. Crim. App. 1991). The rationale for such holdings has always been that because the legislature provided no statutory definition of these terms, the terms should be taken and understood in their usual meaning in common language. And jurors are "presumed to know and apply such meaning[s]". <u>See</u>, <u>e.g.</u>, <u>Cuevas v. State</u>, 742 S.W.2d 331 (Tex. Crim. App. 1987). But presuming that jurors know and understand these terms is an unconstitutional risk.

It would seem that if the court goes to the trouble of defining these terms for itself when it analyzes the sufficiency of the evidence, the jury should be given the same tools. If potential jurors and prosecutors, on

occasion, apply improper definitions of these terms, why should we presume that the seated jurors do not? Certainly, if a juror answered the first special issue "yes" because he thought there was a "bare chance" that the defendant would be a future danger, such a verdict could not stand. Allowing jurors to apply whatever they believe to be the common definition of a term, results in a statute that fails to sufficiently channel a sentencer's discretion in violation of the constitution.

In Mr. Chanthakoummane's case, trial counsel preserved this issue by requesting definitions of the terms in the future dangerousness special issue. This was done in a pretrial motion and again on the record when the jury was charged. But appellate counsel failed to raise this issue on direct appeal. Such failure amounted to deficient performance. Even though this claim has been repeatedly rejected on appeal, the fact that it continues to be raised supports a finding that raising the claim is part of the prevailing professional norm for reasonably competent capital appellate counsel.

This failure to raise this issue on appeal also resulted in prejudice to Applicant. See Strickland v. Washington, 466 U.S. 668, 687 (1984). The failure to define these vague terms, effectively renders the statute unconstitutional. An indictment based on an unconstitutional statute should be quashed. See White v. State, 440 S.W.2d 660, 667 (Tex. Crim. App.

1969). Appellate counsel's failure to raise this properly preserved issue deprived Mr. Chanthakoummane of his due process rights. U.S. Const. amend. XIV.

## TENTH GROUND FOR RELIEF

APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE
THE ISSUE THAT THE TEXAS DEATH PENALTY SCHEME IS
UNCONSTITUTIONAL BECAUSE THE "10-12" PROVISION IS
MISLEADING AND INACCURATE.

Trial counsel raised the issue in a pretrial motion that the Texas death penalty statute is unconstitutional because the "10-12" provision is misleading and inaccurate. The statutory prohibition on informing the jury of the consequences of a single "hold out" juror further confuses the issue. (IV C.R. at 773-74; V C.R. at 946). This motion was overruled by the trial court. (I C.R. at 25). Although this issue was properly preserved by trial counsel, appellate counsel failed to raise it in his brief. This amounted to ineffective assistance. U.S. Const. amends. VI, XIV; Evitts v. Lucey at 396.

Tex. Code Crim. Proc. art. 37.071(2)(d)(2) requires the Court to charge the jury that it may not answer any issue submitted under Subsection (b) of this article "yes" unless it agrees unanimously, and it may not answer any issue "no" unless ten or more jurors agree. The Court is required by Tex. Code Crim. Proc. art. 37.071(2)(f)(2) to charge the jury that it may not answer the issue submitted under Subsection (e) "no" unless it agrees unanimously and it may not answer "yes" unless ten or more jurors agree.

Under Tex. Code Crim. Proc. art. 37.071(2)(c) and 37.071(2)(f)(1) the jurors "shall" answer each interrogatory either "yes" or "no."

In the event that the jury is unable to answer any issue because either answer fails to marshal the requisite number of votes, Tex. Code Crim. Proc. art. 37.071(2)(g) requires the Court to sentence the defendant to life in prison. This is substantively identical to the sentence that results if the jury is able to answer "no" to at least one issue submitted under Subsection (b) or "yes" to the issue submitted under Subsection (e).

Tex. Code Crim. Proc. art. 37.071(2)(a) prohibits the Court, either attorney, and the defendant himself from informing the jury, or any prospective juror, that the failure to answer any of the issues presented will result in a mandatory life sentence. Jurors who ask questions regarding the consequences of such a deadlock are routinely reread the original instructions.

Death is different, not only in severity but also in kind, from all other punishments. The Eighth and Fourteenth Amendments to the United States Constitution demand additional procedural safeguards in capital trials. See Furman v. Georgia, 408 U.S. 238 (1972); Gregg v. Georgia, 428 U.S. 153 (1976); See also Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (holding that "death is qualitatively different"). The effect of this is that

legislatures and courts are obligated to strike a difficult, but constitutionally mandated, balance between the non-arbitrary imposition of the death penalty, and the right of each defendant to individualized sentencing. The Texas death penalty statute, by providing misleading information to jurors and then prohibiting the court, the attorneys, and the defendant from correcting that misinformation, both creates a constitutionally impermissible risk of arbitrariness, and denies defendants their right to individualized sentencing.

The Texas death penalty statute affirmatively creates confusion in the minds of the jurors. Jurors are first told that the jury as a whole "shall" answer "yes" or "no" to each issue presented. They are subsequently told that ten or more jurors must be in agreement to give one set of answers and that they must be unanimous in order to give another. This necessarily raises the question of what happens in the event that the jury, despite being instructed that it must answer each question, is unable to get the minimum number of votes required to give either answer. The statute clearly provides that in the event of a non-answer, the defendant is to receive a sentence that is substantively identical to that which he or she would have received had there been a verdict in favor of life. Thus, the law itself exhibits no confusion with regard to the situation presented. However, not only does the

statute fail to do all that is humanly possible to ensure that decisions regarding life and death are not made as a result of that manufactured confusion, but it actively prohibits any clarification of the confusion by preventing jurors from being informed at any point of the effect of a non-answer.

It is true that state legislatures are often given discretion to decide what information is relevant to a capital sentencing determination, and are thus able to exclude some information from jury instructions.  See California v. Ramos, 463 U.S. 992, 1001 (1983) (holding that the Court generally ". . . defer[s] to the State's choice of substantive factors relevant to the penalty determination.").  However, that discretion is bound by the requirements of due process.  See, e.g., Simmons v. South Carolina, 512 U.S. 154, 175 (1994) (O'Connor, J. concurring in judgment); Ramdass v. Angelone, 530 U.S. 156, 195 (2000) (Stevens, J. dissenting); Shafer v. South Carolina, 532 U.S. 36, 39 (2001); Kelly v. South Carolina, 534 U.S. 246, 248 (2002).

In Ramos, the Court permitted a jury instruction regarding the State governor's commutation powers on the ground that the instruction was both accurate and relevant to a legitimate state penological interest.  Ramos, 463 U.S. at 1001-06.  Despite being prompted to apply Ramos in the case of Caldwell v. Mississippi, 472 U.S. 320 (1985), the Court refused, holding

that when the State argues that automatic appellate review is meant to determine whether the death penalty is appropriate in a given case, this information not only inaccurately depicts the role of the appellate court, but more importantly, it serves an illegitimate State purpose by diminishing the ability of jurors to feel the gravity of their task.  Caldwell, 472 U.S. at 336.

The Texas procedural rules and corresponding jury instructions are equally inaccurate and illegitimate.  When jurors are instructed that they may not give a verdict of life unless ten or more agree upon a life answer in response to at least one of the issues, this provides an incorrect picture of the state of the law.  In fact, if only one juror is able to conclude that sufficient mitigation exists to warrant the imposition of a life sentence, despite that juror's inability to convince nine other jurors of his or her position, a life sentence will be imposed.  This situation is unique to capital sentencing juries.  Under the Texas sentencing scheme, while the legislature might prefer a life sentence that derives from the agreement of ten jurors to one that arrives by default, the position of the defendant is identical in both.  See Padgett v. State, 717 S.W.2d 55, 58 (Tex. Crim. App. 1986) (". . . a jury's inability to answer a punishment question in a capital murder case has the same sentencing effect as a negative answer.").  Thus, instructing the jury that ten or more of them must agree upon a "life" answer in order to

sentence the defendant to life, regardless of whether the court informs the jury of the effects of a non-answer, is an incorrect statement of the law. So long as the Texas statute equates the sentencing consequences of a life verdict with the consequences of a non-verdict, the jury must not be misled to believe that anything more than one vote for life is required to secure that sentence. The false distinction between a "life" answer of ten or more jurors and a non-answer of less than ten jurors must be removed.

Not only are the instructions inaccurate, but they were intended to be inaccurate and confusing in order to serve an illegitimate state interest. Just as jurors who are informed that their decision will be reviewed for appropriateness by an appellate court are impermissibly led to deflect their awesome responsibility onto the appellate courts, Caldwell v. Mississippi, 472 U.S. 320 (1985), Texas jurors are impermissibly led to relieve themselves of a sense of responsibility by placing it either upon the other jurors who are unwilling to join the vote in favor of life ("It is their fault that the defendant will be killed because by not joining me they prevent us from reaching the required minimum of ten votes"), or upon the statutory scheme that purports to require ten votes, rather than merely one, in order to give life ("It is the fault of the Texas statute because unless I can get at least ten votes for life, I myself may not vote for life"). The principle behind Caldwell is

that courts must ensure that jurors are not invited to place their individual responsibility onto anyone else. Just as it is impermissible to lead jurors to place that responsibility upon the appellate courts, it is impermissible to lead them to place it upon their fellow jurors, or upon a restrictive sentencing statute.

The result of misinforming jurors and forcing them to deliberate without knowledge of what happens in the event of a non-answer is that they are presented with a false dilemma. Jurors are given general instructions that they must answer either "yes" or "no" to the issues before them and specific instructions that define the minimum number of votes required to give each of these answers. Because they are told that a death sentence follows from one set of answers and a life sentence follows from another, a reasonable juror might conclude that the *only* way to get either of these punishments is to answer the questions posed to them. <u>See</u> <u>California v. Brown</u>, 479 U.S. 538, 541 (1987) (quoting <u>Francis v. Franklin</u>, 471 U.S. 316 (1985) (holding that the constitutional sufficiency of capital sentencing instructions is determined by "what a reasonable juror could have understood the charge as meaning"). This leaves jurors free to speculate as to what would occur should they be unable to provide an answer to the issues. While it is possible that jurors might correctly guess that the failure

to agree will result in a life sentence, it is perhaps more likely that they will conclude that a non-answer will lead to a lesser sentence, a costly retrial or resentencing proceeding, or absolute freedom for the defendant.  Given that each of the jurors has already found the defendant guilty of a capital offense, none of these options would look desirable to a juror who honestly believes that a life sentence is warranted.  Jurors are left to deliberate with the false belief that if they are unable to gain unanimity for a death sentence or ten or more votes for a life sentence, an altogether unacceptable third option will result.

While this confusion might pressure voters to change their position in order to avoid the unknown third option, it might lead to an even more basic misunderstanding.  Because jurors are told that each question must be answered, and voting ballots do not include an option for non-answer, a reasonable juror following the instructions might believe that a non-answer is not only undesirable, but is in fact impermissible.  Such a juror might believe that because he or she is unable to secure the ten votes required to give the answer that that juror wishes the jury to give, and because some answer either way must be given, that juror is in fact obliged to vote with the others and sentence the defendant to death.  Although the law is clear that a death sentence may never be mandatory, and individual jurors must always

be free to vote for life, such a belief would not reasonably follow from the instructions mandated by the Texas sentencing scheme.

The inaccurate and illegitimate instructions provided to Texas capital sentencing juries create an unacceptable risk that decisions are being made arbitrarily or by mistake. While it is true that uncertainty about the consequences of a non-answer might lead a lone holdout for a life sentence to join the other jurors voting for death, it is equally true that this confusion might lead at least one of the three holdouts for death to join the nine other jurors voting for life. See, e.g., Jones v. United States, 527 U.S. 373, 394 (1999) (stating that the petitioner could not demonstrate prejudice because "[i]t is just as likely that the jurors, loathe to recommend a lesser sentence, would have compromised on a sentence of life imprisonment as on a death sentence."). With regard to the Texas statute, while this point might be correct, it fails to prevent serious constitutional infirmities for two reasons.

First, because the statute provides defendants with the exact same sentence regardless of whether they receive one vote for life or ten, the State itself is not prejudiced when votes for death are changed into votes for life for the sake of obtaining the ten vote minimum. The defendant, however, suffers a tremendous wrong when holdouts for life switch their votes to death out of confusion or a feeling of obligation. Thus, only the defendant,

and not the State, could suffer harm from such confusion. Even if the State did have an interest in keeping life sentences that derive from a verdict distinct from life sentences that derive by default, that interest is vastly overshadowed by the defendant's interest. <u>See</u> <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 252 (1988) (Marshall, J., dissenting) (stating that when the substantive outcome of a deadlock is identical to that of a life verdict, ". . . the State's interest in a verdict . . . [is] relatively weak, whereas the defendant's interest in preserving the integrity of a dissenting vote [is] correspondingly strong."). Stated simply, while the defendant never needs to have a voter change his or her vote out of confusion, the State, because death may only be imposed through a unanimous verdict, does. Thus, while it might be true that it would be difficult to determine whether a particular defendant was prejudiced, it is beyond dispute that the system as a whole can only prejudice the defendant.

Second, it is eminently clear that when confusion regarding the outcome of a deadlock leads jurors to change their votes in either direction simply for the sake of a verdict, those decisions regarding life and death are being made arbitrarily. In cases in which the jury does not quickly, and without dispute, come to agreement on the appropriate punishment, the two most important factors remaining for a decision are the general confusion of

the jurors caused by misinformation, and the initial disposition of the jury

regarding whether to impose death.  If nine jurors find sufficient mitigation

to warrant a life sentence, at least one of the three jurors holding out for

death will be likely to switch over solely out of uncertainty regarding the

consequences of a non-answer or due to a mistaken belief that an answer

must be reached at all costs.  If eleven jurors vote for death and one finds

that the mitigating evidence warrants life, that juror might be swayed to vote

for death for identical reasons.  When jury instructions misinform jurors and

purposefully prevent clarification, and verdicts are rendered out of such

confusion, it is clear that those instructions ". . . introduce[ ] a level of

uncertainty and unreliability into the factfinding process that cannot be

tolerated in a capital case."  Beck v. Alabama, 447 U.S. 625, 643 (1980).

Although this issue has been repeatedly rejected by the appellate

courts, see, e.g. Crutsinger v. State, 206 S.W.3d 607, 613 (Tex. Crim. App.

2006); Russeau v. State, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005);

Rayford v. State, 125 S.W.3d 521, 532 (Tex. Crim. App. 2003); Prystash v.

State, 3 S.W.3d 522, 536-37 (Tex. Crim. App. 1999);  Cantu v. State, 939

S.W.2d 627, 644 (Tex. Crim. App. 1997); Lawton v. State, 913 S.W.2d 542,

559 (Tex. Crim. App. 1995), the fact that it continues to be raised, supports a

finding that raising this issue is within the prevailing norms of reasonable

competent capital appellate counsel. The failure to raise this issue was deficient performance.

This failure to raise this issue on appeal also resulted in prejudice to Applicant. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). The misleading and inaccurate jury instructions on the "10-12" provision, effectively renders the statute unconstitutional. An indictment based on an unconstitutional statute should be quashed. <u>See</u> <u>White v. State</u>, 440 S.W.2d 660, 667 (Tex. Crim. App. 1969). Appellate counsel's failure to raise this properly preserved issue deprived Mr. Chanthakoummane of his due process rights. U.S. Const. amend. XIV.

## ELEVENTH GROUND FOR RELIEF

## APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE THAT THE TEXAS DEATH PENLATY SCHEME IS UNCONSTITUTIONAL BECAUSE THE MITIGATION SPECIAL ISSUE DOES NOT ALLOCATE A BURDEN OF PROOF.

Trial counsel filed two pretrial motions arguing that the Texas death penalty statute is unconstitutional because it fails to allocate a burden of proof on the mitigation special issue. (VI C.R. at 1028, 1100). These motions were denied by the trial court. (I C.R. at 25). Despite the fact that the issue was properly preserved, appellate counsel failed to raise it. This amounted to ineffective assistance. U.S. Const. amends. VI, VIII, XIV; Evitts v. Lucey at 396.

The statutory "mitigation" special issue is unconstitutional because it fails to place the burden of proof on the state regarding aggravating evidence. The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. See, e.g., Walton v. Arizona, 497 U.S. 639, 650 (1990)(state's method of allocating burdens of proof during capital sentencing phase cannot lessen the State's burden to prove the existence of

aggravating circumstances). In order to understand why Walton applies to the statutory "mitigation" special issue, the Court must recognize that this special issue is a conduit for aggravating (as well as mitigating) factors. By asking jurors to determine whether there are "sufficient…mitigating circumstances", the statutory special issue in effect tells jurors to consider any possible aggravating factors that may outweigh the mitigating factors present in the case. Although the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute. Cf. Johnson v. Texas, 509 U.S. 350, 370-71 (1993)(describing jurors' determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances). Because the statute is silent about whether the state or the defense has the burden of proof on aggravating factors, and moreover, because the language of the special issue implies that the burden to disprove aggravating circumstances is on the defense, the statute is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution. U.S. Const. amends. VI, VIII, XIV.

This issue has also been repeatedly rejected by the appellate courts. See, e.g., Renteria v. State, 206 S.W.3d 689, 707 (Tex. Crim. App. 2006); Valle v. State, 109 S.W.3d 500, 504 (Tex. Crim. App. 2003); Ladd v. State,

3 S.W.3d 547, 573-74 (Tex. Crim. App. 1999); <u>Medina v. State</u>, 7 S.W.3d 633, 644 (Tex. Crim. App. 1999); <u>Jackson v. State</u>, 992 S.W.2d 480-81 (Tex. Crim. App. 1999); <u>Brooks v. State</u>, 990 S.W.2d 278, 288 (Tex. Crim. App. 1999); <u>Raby v. State</u>, 970 S.W.2d 1, 8-9 (Tex. Crim. App. 1998); <u>Cantu v. State</u>, 939 S.W.2d 627, 641 (Tex. Crim. App. 1997); <u>Shannon v. State</u>, 942 S.W.2d 591, 600 (Tex. Crim. App. 1996); <u>Matchett v. State</u>, 941 S.W.2d 922, 936 (Tex. Crim. App. 1996); <u>Morris v. State</u>, 940 S.W.2d 610, 614 (Tex. Crim. App. 1996); <u>Anderson v. State</u>, 932 S.W.2d 502, 508 (Tex. Crim. App. 1996); <u>McFarland v. State</u>, 928 S.W.2d 482, 497 (Tex. Crim. App. 1996); <u>Eldridge v. State</u>, 940 S.W.2d 646, 654 (Tex. Crim. App. 1996); <u>Lawton v. State</u>, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995). However, the fact that the issue continues to be raised, supports a finding that reasonably competent capital appellate counsel would have raised it in Mr. Chanthakoummane's case. The failure to do so was deficient.

This failure to raise this issue on appeal also resulted in prejudice to Applicant. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). The failure to allocate a burden of proof on the mitigation issue, effectively renders the statute unconstitutional. An indictment based on an unconstitutional statute should be quashed. <u>See</u> <u>White v. State</u>, 440 S.W.2d 660, 667 (Tex. Crim. App. 1969). Appellate counsel's failure to raise this

properly preserved issue deprived Mr. Chanthakoummane of his due process

rights. U.S. Const. amend. XIV.

**TWELTH GROUND FOR RELIEF**

**APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE
THE ISSUE THAT THE USE OF THE TERM "PROBABILITY" IN THE
FIRST SPECIAL ISSUE DILUTES THE REASONABLE DOUBT
STANDARD.**

Trial counsel filed a pretrial motion contending that the future

dangerousness special issue is unconstitutional, in part, because the use of

the term "probability" in the issue, dilutes the reasonable doubt standard and

confuses jurors. (V C.R. at 967). This motion was denied by the trial court.

(I C.R. at 25). Despite being properly preserved, this issue was not raised by

appellate counsel. The failure to raise it amounted to ineffective assistance.

U.S. Const. amends. VI, XIV; Evitts v. Lucey at 396.

In compliance with the Texas statutory scheme, the jury was

instructed to answer the following question in the punishment jury charge:

> Do you find from the evidence beyond a reasonable doubt that
> there is a probability that the defendant, Kosoul
> Chanthakoummane, would commit criminal acts of violence
> that would constitute a continuing threat to society?

(I C.R. at 155). Tex. Code Crim. Proc. Ann. art. 37.071 § 2(b)(1). The jury

was further instructed that:

> The State has the burden of proving beyond a reasonable doubt that Special Issue No. 1 should be answered "Yes".

(I C.R. at 151). Tex. Code Crim. Proc. Ann. art. 37.071 § 2(c). This use of the term "probability" in what is commonly referred to as the "future dangerousness" special issue, dilutes the reasonable doubt standard in violation of due process. U.S. Const. amend. XIV.

Because the future dangerousness special issue increases the punishment for capital murder beyond the prescribed statutory maximum, the issue acts as the functional equivalent of a traditional element of the crime that has to be proven to a jury beyond a reasonable doubt. See Apprendi v. New Jersey, 530 U.S. 466 (2000). In the absence of a finding of future dangerousness, the maximum sentence to which a Texas capital defendant is exposed is life imprisonment, not the death penalty. As was made clear in Blakely v. Washington, 542 U.S. 296 (2004), "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose **without** any additional findings." Blakely, 542 U.S. at 303-304 (emphasis in original). Blakely's straightforward and unambiguous definition of Apprendi's "prescribed statutory maximum" language leaves no doubt that Apprendi applies to the Texas capital sentencing scheme's future dangerousness special issue. Because the determination of future dangerousness is a fact

that, if found, exposes the defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone, the future dangerousness special issue must be found by a jury beyond a reasonable doubt.

The term "probability" in the future dangerousness special issue impermissibly dilutes the reasonable doubt standard. Its appearance in conjunction with the reasonable doubt standard relieves the State of its constitutional burden to prove every element of the offense beyond a reasonable doubt. The term eviscerates the reasonable doubt standard, rendering it a nullity or, at best, a preponderance of the evidence standard. In addition, the term undermines the vital role the reasonable doubt standard plays in reducing the risk of erroneous factual determinations.

Placing competing burdens of proof in such close proximity to each other can produce only confusion and frustration in jurors' minds as they grapple with the incomprehensible concept of proof of a probability beyond a reasonable doubt. The Supreme Court recognized in <u>Boyde v. California</u>, 494 U.S. 370 (1990), that:

> Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

Id. at 380-81. The concept of "probability beyond a reasonable doubt" was described as "execrable" and "absurd" by Judge Roberts in Horne v. State, 607 S.W.2d 556, 565 (Tex. Crim. App. 1980) (Robert, J., concurring). When average lay jurors are faced with such an illogical instruction, the commonsense understanding most likely to prevail in their minds would focus on the more familiar concept of "probability," to the detriment of a less familiar, legal term of art like "reasonable doubt." Jurors would quickly abandon any "technical hairsplitting" once they realized the futility of attempting to determine what quantum of evidence would constitute proof of a future event's probability beyond a reasonable doubt. Jurors will be no more successful at deciphering the "execrable" and "absurd" than was Judge Roberts in Horne.

Merely having the phrase "beyond a reasonable doubt" in the jury instructions to describe the burden of proof on the future dangerousness special issue neither adequately safeguards a defendant's Fourteenth Amendment due process rights nor advances the vital interests served by the reasonable doubt standard. The critical inquiry is not whether the phrase "beyond a reasonable doubt" appears in the instructions. Instead, it is whether the reasonable doubt standard has been tainted by other instructions that may allow the jury to find an element of the crime based on a burden of

proof that is below that required by the due process clause. See Cage v. Louisiana, 498 U.S. 39, 41 (1990) (instructions equating "reasonable doubt" with "grave uncertainty" and "actual substantial doubt" violate due process), overruled on other grounds by Estelle v. McGuire, 502 U.S. 62, 73 n.4 (1991) (clarifying that standard of review for erroneous jury instructions is whether they had a "reasonable likelihood" of misleading the jury). Use of the term "probability" in this special issue creates just such a problem and violates due process under the Fourteenth Amendment. U.S. Const. amend. XIV.

The failure to raise this properly preserved claim on appeal was clearly deficient. This issue has been raised repeatedly and is one that competent counsel should have known to raise. See, e.g., Rayford v. State, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003); Lagrone v. State, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997); Cantu v. State, 939 S.W.2d 627, 643 (Tex. Crim. App. 1997); Kemp v. State, 846 S.W.2d 289, 309 (Tex. Crim. App. 1992); Jones v. State, 843 S.W.2d 487, 496 (Tex. Crim. App. 1992); Sosa v. State, 769 S.W.2d 909, 917 (Tex. Crim. App. 1989).

This failure to raise this issue on appeal also resulted in prejudice to Applicant. See Strickland v. Washington, 466 U.S. 668, 687 (1984). The use of the term "probability" in Tex. Code Crim. Proc. Ann. art. 37.071 §

2(b)(1), effectively renders the statute unconstitutional. An indictment based on an unconstitutional statute should be quashed. <u>See</u> <u>White v. State</u>, 440 S.W.2d 660, 667 (Tex. Crim. App. 1969). Appellate counsel's failure to raise this properly preserved issue deprived Mr. Chanthakoummane of his due process rights. U.S. Const. amend. XIV.

# PRAYER

WHEREFORE, Applicant prays that the convicting court issue the writ of habeas corpus, conduct a hearing, order discovery relevant to these claims, make findings of fact and conclusions of law, and recommend that Applicant should be entitled to relief from his conviction for capital murder and sentence of death. Applicant further prays that after review by the Court of Criminal Appeals, that court enter a judgment ordering Applicant's release.

Respectfully submitted,

_____
Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax – 972-617-5547
cbern@worldlogon.com
State Bar No. 02216575

ATTORNEY FOR APPLICANT

**VERIFICATION**

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Application are in all respects true and correct.

_____

Catherine Clare Bernhard

STATE OF TEXAS
COUNTY OF DALLAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 1st day of April, 2010.

_____

Notary Public in and for the
State of Texas.

**CERTIFICATE OF SERVICE**

I hereby certify to the Court that a true and correct copy of the foregoing Application was served on the Office of the District Attorney for Collin County, 2100 Bloomdale Road, McKinney, Texas 75071, by personal delivery on the same date of filing herewith.


_____

Catherine Clare Bernhard

APPENDIX A

COPY OF JUDGMENT