**CAUSE NUMBER W380-81972-07-HC**

| | | |
|---|---|---|
| EX PARTE | § | IN THE 380TH JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | COLLIN COUNTY, TEXAS |
| | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Having considered the application for writ of habeas corpus, the State's answer, the affidavits and other official court documents and records in this cause and in Chanthakoummane's capital murder trial in Cause Number 380-81972-07, the record of the hearing, and the Court's own personal recollection and experience, the Court makes the following Findings of Fact and Conclusions of Law:

**Background and procedural history**

1. The applicant, Kosoul Chanthakoummane, was indicted and convicted of the capital murder of Sarah Walker in Cause Number 380-81972-07 in the 380th District Court of Collin County, Texas.

2. The case was tried before the Honorable Quay Parker, judge presiding by assignment at voir dire, and the Honorable Charles Sandoval, judge presiding at trial. The habeas proceedings were conducted by the Honorable Mark Rusch of the 401st District Court at the agreement of the parties because the successor judge of the 380th District Court, Suzanne Wooten, was under investigation, indicted, convicted of multiple felonies, and resigned during the pendency of the writ.

3. The applicant was represented during trial by two licensed attorneys, Steven R. Miears and Keith Gore.

4. On October 17, 2007, after the jury answered special issue one in the affirmative and special issue two in the negative, the trial court assessed punishment at death by lethal injection. CR1 161-64; 28 RR 73-74, 77.

5. The Court of Criminal Appeals affirmed the case on direct appeal on April 28, 2010. *Chanthakoummane v. State*, No. AP-75,794, 2010 WL 1696789 (Tex. Crim. App. Apr. 28, 2010) (not designated for publication), *cert. denied*, 131 S.Ct. 506 (2010).

6. The recitation of facts in the Court of Criminal Appeals' opinion on direct appeal provides an accurate summary of the trial testimony. *See*

1



*Chanthakoummane*, 2010 WL 1696789, at *1-4.

a. On July 8, 2006, real estate agent Sarah Walker dropped her son off at her ex-husband's house, showing him a new Rolex watch she had purchased. Later that morning, security footage from Walker's bank showed her wearing a watch and an ornate ring. Walker's cousin testified she often wore large, valuable rings.

b. Another real estate agent, Mamie Sharpless, received a phone call at 9:40 a.m. from a man who identified himself as "Chan Lee." Lee asked to look at a town house she had listed in the Craig Ranch subdivision of McKinney. Sharpless was suspicious of some of the details Lee provided, so she asked her husband to come with her on the showing. When they arrived, they saw an Asian man in a white Ford Mustang. He denied being Lee, and Lee never arrived to view the house. Sharpless and her husband both observed the white Mustang parked outside a D.R. Horton model home in the neighborhood when they left between 12:30 and 1:00 p.m.

c. At 12:30 p.m., Walker called her cousin on the telephone and talked to her for approximately fifteen minutes. She concluded the call when someone walked into the D.R. Horton model home where she worked.

d. Andy Lilliston and his wife discovered Walker's body inside the model home at approximately 1:10 p.m. The home appeared to have been "ransacked," and a large plant stand was knocked over. There was a large pool of blood in the dining room/sales office, and a trail of blood led to Walker's body in the kitchen.

e. When processing the crime scene, the police found a bloody fingerprint on the deadbolt lock and blood on the plant stand, a tile in the entryway, the wall next to the window by the front door, and the pull cord from the window blinds. Diluted blood that appeared to have been washed off was found in the kitchen sink.

f. Walker's ring and watch were not found on her body, and the police did not locate them when they searched her home.

g. Walker had several blunt force injuries consistent with being struck by the plant stand found in the home. She had bruises on her face and head, a broken nose, and fractured teeth. She had defensive wounds on her arms and hands. She was stabbed thirty-three times, including ten independently fatal wounds. She also had a bite mark on her shoulder.

2

h. DNA linked Applicant to the scene.  His DNA profile was consistent with DNA obtained from Walker's fingernails, the window blind pull cords, the deadbolt, and swabs taken from the living room, kitchen, and entryway of the home.  The blood in the sink was too diluted for a full match, but a partial profile was consistent with Applicant's.

i. Applicant was arrested after the police received the DNA match.  He owned a white Ford Mustang, and his apartment was only three miles from the payphone where "Chan Lee" called Sharpless.  Applicant had healed cuts or scratches on his hands and fingers.

j. In an interview with police, Applicant initially denied ever being in McKinney.  He then claimed his car broke down in front of a model home and he took just a few steps inside to ask for help.  Finally he claimed he had gone to the kitchen sink for a drink of water and "old cuts" from his hand may have bled into the sink.

k. Forensic dentist Brent Hutson compared Applicant's teeth to the bite mark on Walker's shoulder.  He found "within reasonable dental certainty beyond a doubt" that Applicant was responsible for the bite mark on Walker.

7. Punishment evidence showed that Applicant had a lengthy history of violence:

a. As a juvenile, Applicant assaulted and robbed a classmate, punching him repeatedly and breaking six ribs. 24 RR 82-83. Applicant was also charged with communicating threats and credit card fraud against his mother. 24 RR 120-21. He was placed on probation, but his probation was revoked after he stole several cars and assaulted another juvenile, breaking his arm. 24 RR 22-28, 118, 154-56; SX 114.

b. While at the juvenile detention center, Applicant was considered AWOL for not returning from an approved furlough. 24 RR 168-69. He wrote letters to his former probation officer that contained several symbols identifying him as a member of the Crips gang, including his signature "Gangsta Crip John." 24 RR 134-40; SX 115.

c. While on furlough from the detention center, Applicant and two cohorts stole a car. 24 RR 47-48, 174. While evading police, Applicant and one other person broke into a trailer occupied by two elderly women, tied them up with electrical cord, ransacked the trailer, and stole their car. 24 RR 50-55, 116-21.

d. Applicant was charged as an adult with robbery and kidnapping,

3

pleaded guilty, and was sentenced to fifty-one to seventy-one months' imprisonment. 24 RR 73-74; SX 122. Applicant was paroled from prison in February 2006. SX 122.

e. On July 7, 2006, Applicant came to the home of Barbara Johnson, a real estate agent who had helped him find an apartment. 24 RR 179-83. He claimed his car had broken down by her house, although she had not told him where she lived and would have had to make several turns from a main road and go down an alley to reach the spot where his car was parked. 24 RR 181-83, 188-90. Johnson gave him a glass of water and let him use her phone, but she was afraid when her dog started barking and Applicant tried to come through the fence and banged on the door. 24 RR 185-87. She called the police, and Applicant left. 24 RR 187-88.

## Juror affidavits

8. Applicant has attached evidence that consists of statements of a juror and two alternate jurors to his application. *See* Applicant's Writ Exhibits 19, 20, 21.

9. The juror affidavits are inadmissible because they concern the jurors' deliberation or the effect certain evidence had or might have had and do not concern the jurors' qualifications or an outside influence on the jury. *See* Tex. R. Evid. 606(b).

10. The Court hereby sustains the State's objection and strikes all juror affidavits and interviews from the record, except to the extent that they concern outside influences on the jury. The Court will not consider them for any other purpose.

## Credibility of counsel and mitigation expert

11. Attorneys Miears and Gore each filed an affidavit in response to the claims in the application regarding ineffective assistance of counsel pursuant to the order of the Court. (Hereinafter the "Miears Affidavit" and "Gore Affidavit").

12. Vince Gonzales, a mitigation specialist hired by Applicant's defense team, also filed an affidavit in response to the claims regarding ineffective assistance of counsel pursuant to the order of the Court. (Hereinafter the "Gonzales Affidavit").

13. Miears and Gore are personally known to the Court as competent attorneys experienced in criminal defense.

14. Miears is board certified in criminal law by the Texas Board of Legal

4

Specialization.

15. In its lengthy experience practicing in and then presiding over courts in Collin County, the Court has observed first-hand a broad spectrum of attorney conduct.

16. Counsel's accounts of trial are consistent with the record.

17. Counsels' affidavits are consistent with the partial billing records contained within the Court's file unsealed at the request of the State.

18. This Court finds Miears's and Gore's affidavits to be credible.

19. Gonzales's affidavit is consistent with the affidavits of Miears and Gore and supported by attached documentation.

20. This Court finds Gonzales's affidavit to be credible.

**Ground 1: Ineffective Assistance of Counsel (Mitigation Evidence)**

21. Applicant alleges that trial counsel were ineffective in failing to develop and present mitigating evidence in the punishment phase of trial. *See* Application at 22-51. Specifically, Applicant complains counsel did not present evidence of his parents' immigration experiences, his hearing problems as a child, and indications of child abuse in records from the Department of Social Services.

*Counsel's investigation and conduct of trial*

22. Counsel conducted a thorough and detailed investigation into the offense, Applicant's background, and potential mitigation evidence as part of their preparation for trial.

23. Counsel hired a mitigation expert, Vince Gonzales, and a fact investigator, Bill Brown, to assist them in the investigation and preparation of the case. Miears Affidavit at 11; Gore Affidavit at 3; Gonzales Affidavit at 1.

24. Counsel consulted with several experts regarding Applicant's mental state during the offense and any possible mental illnesses. Applicant was examined by a forensic psychologist and a forensic neuropsychologist. He was given an IQ test and a neurological test for brain dysfunction. Miears Affidavit at 4-5; March 25, 2008 Ex parte Order for Payment to J. Randall Price.

25. Counsel specifically instructed Gonzales and other experts not to prepare

written reports because they could become discoverable during the trial process and could provide the State access to information it would not otherwise be able to access. Miears Affidavit at 5; Gore Affidavit at 9. This was a reasonable decision to limit the State's access to potentially harmful information.

26. Counsel also investigated the charged offense by visiting the crime scene, reviewing evidence, interviewing witnesses, and investigating potential alibis, misidentification themes, alternate suspects, and affirmative defenses. Miears Affidavit at 4-5; Gore Affidavit at 10.

27. Counsel was unable to discover any potential defense to the offense in light of the State's strong evidence and the lack of any neurological or psychological dysfunctions. Counsel adopted a strategy of conceding guilt in a not-guilty plea to put the State to its proof while gaining credibility with the jury for the punishment phase of trial. Miears Affidavit at 6, 9.

28. Counsel filed numerous pretrial motions addressing the conduct of trial, attacking the validity of the Texas death penalty statute, and requesting a change of venue. Pre-trial hearings were held to address these issues. CR1 2, 12-17, 25; CR2 211, 258-62; CR3 463-604; CR4 605-796; CR5 797-1003; CR6 1006-1104.

29. Counsel conducted a thorough voir dire of prospective jurors, challenging numerous jurors for cause and exercising all available peremptory strikes. Counsel adopted a specific method of voir dire, the "Colorado Method," for examining prospective jurors regarding the future dangerousness special issue. Miears Affidavit at 10.

30. Counsel also vigorously opposed the State's introduction of evidence and experts at trial, attacking the DNA evidence, a witness's identification conducted under hypnosis, and forensic dental evidence. 20 RR 6-78; 21 RR 70-86, 122; 22 RR 10-58.

31. In preparation for the punishment phase, counsel requested Applicant's prison, juvenile, school, and social services records. Miears Affidavit at 7, 18-19. The defense team made several trips to North Carolina to interview Applicant's family and friends, as well as guards and other prison staff who had contact with Applicant during his previous incarcerations. Miears Affidavit at 13, 18-19; Gore Affidavit at 3-6; Gonzales Affidavit at 4-7.

32. As a result of interviews with Applicant's parents and siblings, counsel determined that Applicant's family would not be beneficial witnesses for the defense. Miears Affidavit at 13-17; Gore Affidavit at 11.

33. During the punishment phase, counsel focused on whether Applicant would be a future danger if sentenced to life in prison.

    a. Counsel highlighted evidence that Applicant was not violent as an inmate, calling ten different witnesses to testify about his non-violent nature in prison. 25 RR 5-29; 26 RR 6-47, 47-56, 56-61, 62-87, 88-94, 95-101, 116-71, 193-213; 27 RR 133-61. The witnesses were mostly prison guards, who counsel classified in closing argument and in his affidavit as Applicant's "real family." 28 RR 46-47; Miears Affidavit at 19.

    b. Counsel retained two prison-classification experts to offer opinions on Applicant's potential for violence in prison. Miears Affidavit at 14. Counsel also offered evidence regarding the punitive aspects of imprisonment and that prison was an environment where violent crimes are rare. 27 RR 140-41.

    c. Counsel offered evidence regarding Applicant's artistic abilities. His art was not pornographic or violent, and an expert testified that it would allow him to create a peaceful environment in prison and peaceful relationships with others. 26 RR 178-80, 211-12; DX 32.

34. With regard to the mitigation special issue, counsel used Applicant's criminal history to demonstrate that he was not prepared to live in the free world, that he had not had the opportunity to mature because he had spent his formative years in prison, and that he could make a peaceful contribution to prison society through his art.

35. Counsel's investigation and presentation of the case was thorough, competent, and conscientious. Counsel put forward a compelling picture to the jury that presented the best possible interpretation of Applicant's violence-riddled past.

*Immigration experiences*

36. Applicant's father, Komonh, and mother, Phong, immigrated from Laos before Applicant's birth.

    a. Komonh served in the Laotian Army, assisting the United States in the war in Southeast Asia in the late 1960s before being sent to a reeducation camp after the Communists took power in 1975. Applicant's Writ Exhibit 1 at 1-2.

    b. Komonh was forced to leave his family behind, but he met Phong and her two sons, Chanh and Kominh, and they went to a refugee camp together. After Sopha (also called Monica) was born in 1979, the

family immigrated to the United States. *Id.* at 4-5.

   c. The family had a sponsor in the United States that provided them a place to live, help finding a job, and money for food and clothing. The family moved in search of better work while Phong was pregnant with Applicant. They moved several times when Applicant was young, finally settling in Charlotte, North Carolina when Applicant was five years old. *Id.* at 5-8.

37. Counsel was aware of Applicant's parents' immigration experiences through interviews with Applicant and his family but determined that it was not relevant to Applicant's mitigation case.

   a. Counsel believed that the immigration experience of Applicant's parents, however terrible, would not be regarded as mitigating by a jury because it was not Applicant's own experience. If anything, it could be seen as an aggravating factor because the jury would see that Applicant's parents rescued him from that life and he did not take advantage of the opportunity. Miears Affidavit at 15-16.

   b. Applicant's three older siblings were generally law-abiding. His sister Sopha had minor disciplinary problems such as sneaking out with boyfriends. His brother Kominh spent one night in jail as a teenager but never got into any other legal trouble. His eldest brother Chanh served in the Army and worked for a bank. Applicant's Writ Exhibit 13 at 4-7.

   c. Counsel believed that the successes of his siblings would diminish the effectiveness of any arguments that Applicant's parents' immigration experiences were responsible for Applicant's behavior. Miears Affidavit at 15-16; Gore Affidavit at 11.

38. Counsel also believed that Applicant's family's testimony would have introduced several negative factors.

   a. Applicant's mother explained to the defense team that it would be "very sad" if her son was executed, but that if he had committed the charged offense then he deserved to die. Miears Affidavit at 13-14, 17. Other relatives echoed this sentiment. Miears Affidavit at 17; Gore Affidavit at 5, 11.

   b. A mother's testimony that her son deserved to die would be extremely powerful testimony before the jury and significantly prejudicial to the defense.

   c. Applicant's relatives were also familiar with Applicant's history with

8

Asian gangs and crimes committed as a juvenile. Had they testified for the defense, they would have been susceptible to cross-examination on these issues. Miears Affidavit at 14-17; Gore Affidavit at 5, 10-11.

  d. Counsel believed that a person's gang affiliation is seen by juries as a strong predictor of future dangerousness. Testimony from Applicant's family on this ground would undermine counsel's primary argument, that Applicant was not a future danger. Miears Affidavit at 17.

39. Counsel investigated Applicant's family's immigration history through family interviews and learned the same information that Applicant presented in his writ evidence. Miears Affidavit at 15. Counsel's investigation on this ground was adequate and in keeping with local standards.

40. Counsel did elicit testimony about Applicant's family being war refugees and possible "integration" issues in American society through Applicant's juvenile court counselor. 24 RR 165-66.

41. Counsel made a strategic decision that testimony about Applicant's family's immigration experiences would not be mitigating and could be aggravating, both in itself and through the other evidence that would have been introduced had Applicant's family testified. Miears Affidavit at 14-15, 17; Gore Affidavit at 11.

42. Counsel's strategic decision not to present immigration testimony was reasonable, based on their investigation and experience with Collin County juries. Counsel were not deficient on this ground.

43. Applicant was not prejudiced by counsel's choice not to present immigration testimony in his case, based on its minimal mitigating potential, its potential to be considered an aggravating factor, and the harmful testimony Applicant's family could have offered under cross-examination had they been called regarding this issue.

*Hearing problems*

44. Applicant had minor hearing problems as a child. He failed a hearing test in kindergarten, showing "moderate to severe" hearing loss in the higher frequencies. His hearing problems were not treated until he was in fifth grade, when he was fitted with hearing aids. Applicant's Writ Exhibit 4 at 1-4.

45. Applicant informed counsel of minor hearing loss as a child, but he did not indicate that he suffered any hearing loss at the time of trial. Applicant's relatives did not mention any hearing loss. None of his juvenile or prison records indicated any hearing problems. Neither counsel nor any of the experts

who examined Applicant noted any hearing problems.  Applicant did not have any difficulty hearing and consulting with counsel at the time of trial.  Miears Affidavit at 6-7; Gore Affidavit at 14.

46. Gonzales obtained information from family that Applicant had received treatment for an ear problem. Gonzales Affidavit at 5. Prison records attached to Gonzales's Affidavit show that Applicant wore hearing aids. E.g., Gonzales Affidavit, "N.C. Department of Correction Report of Medical Examination" dated 3/18/99.

47. The State provided material during discovery, specifically grand jury testimony of Applicant's sister, in which she mentioned Applicant's hearing issue. State's Writ Exhibit 1 at 4.

48. Counsel reasonably determined that no further investigation of Applicant's early hearing loss was required. "Counsel is not required to pursue every path until it bears fruit or until all hope withers." *Moore v. Johnson*, 194 F.3d 586, 616 (5th Cir. 1999) (*quoting Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980)).

49. The result of the proceeding would not have been different had counsel presented this evidence. Testimony that Applicant had minor hearing loss as a child that was resolved by adulthood would have minimal mitigating value to a jury.  It would be greatly outweighed by the facts of the offense and Applicant's extensive criminal history. Also, presenting the testimony through any of Applicant's relatives would have introduced significant prejudicial evidence.

*Social services records*

50. Counsel interviewed Applicant and his family "extensively, repeatedly, and often" regarding any history of child abuse or involvement with social services. Applicant and his relatives always denied any form of child abuse.  Miears Affidavit at 4, 19; Gore Affidavit at 4-5, 10; Gonzales Affidavit at 8.

51. Counsel also investigated the potential of child abuse by visiting the Department of Social Services in North Carolina and requesting any records for Applicant or his family.  Counsel was informed in person and in writing that no records existed. Miears Affidavit at 3, 20-21; Gore Affidavit at 6-8.

52. Social services records did exist under Applicant's sister Sopha's name. These records were discovered during the habeas investigation and attached to the writ application.  Applicant's Writ Exhibit 8.  The records indicated that:

   a.  Social services first became involved with the family when Sopha ran

10

away and made an allegation of abuse, but that allegation was ruled "unsubstantiated." *Id.* at 27, 31.

b. A subsequent complaint involved Applicant and inappropriate discipline, including spanking with an electrical wire. This claim was substantiated. *Id.* at 22.

c. Applicant's parents were cooperative with the investigation and engaged in "discussions about safer, more appropriate forms of discipline." After they became aware of cultural differences in forms of discipline between Laos and the United States, they stopped using physical discipline. *Id.* at 12, 22.

d. Applicant had numerous discipline problems even after involvement from social services, including stealing from his siblings, going out late at night without permissions, and kicking holes in the walls of the home. *Id.* at 18.

53. Applicant proffered the Affidavit of Pam Freeburn, an employee of the Mecklenburg County Department of Social Services. Freeburn states that counsel spoke with her when investigating Applicant's background and she told them there were no records under Applicant's name. Freeburn alleges that she told counsel that there were other records under the last name of Chanthakoummane and that Applicant might be listed under a parent's names, but counsel did not provide her other names to check or ask her about those names even though she could have checked those names for counsel. Applicant's Writ Exhibit 6 at 1-2.

54. Miears disputes Freeburn's statements in his affidavit. Freeburn told Miears that there were no records under Applicant's name, and Miears asked her to check other databases and use other resources to see if such records existed and to follow up with counsel as to the results of her search. Freeburn agreed to do so, but on August 1, 2007 she faxed a letter to Gore's office stating that she and her staff found no records related to Applicant. A similar letter was sent from Brenda McCray. Accordingly, counsel did not further investigate this aspect of Applicant's case. Miears Affidavit at 19-21.

55. Miears disputes Freeburn's statements that counsel were in a hurry to catch a plane. Miears asked Freeburn to search under alternative spellings of Applicant's name and "all names possible." Miears Affidavit at 22.

56. Gore likewise disputes Freeburn's statements in her affidavit. Gore Affidavit at 6-9.

57. Freeburn's version and Miears's and Gore's versions of the events are not reconcilable.

58. Miears's and Gore's version of the events is consistent with the other evidence before the Court of counsels' extensive investigations of the case.

59. Miears's and Gore's version of the events is consistent with the vigorous defense exemplified in the trial record.

60. Freeburn's allegations regarding counsels' investigation of Applicant's social services background are not credible to the extent they conflict with Miears's and Gore's affidavits.

61. Counsels' inability to obtain social services records was through no fault of their own.

62. Counsel reasonably determined that no further investigation into possible childhood abuse was necessary. *See Moore*, 194 F.3d at 616.

63. Counsels' investigation into potential childhood abuse was diligent and in keeping with local standards of appropriate investigation.  Counsel were not deficient.

64. Even had counsel been aware of the social services records, a decision not to call Applicant's relatives to testify would have been reasonable, and the result of the proceeding would not have been different had counsel discovered the records.

   a. Counsel assert in their affidavits that they would have presented evidence of childhood abuse through the testimony of Applicant's relatives had they been aware of the social services records.  Miears Affidavit at 4, 18, 23; Gore Affidavit at 2.

   b. Counsel also repeatedly assert elsewhere in their affidavits that they made a strategic decision not to call Applicant's relatives to testify because of the potentially harmful nature of their testimony, including introducing evidence of gang involvement and the family's opinions that Applicant deserved the death penalty.  Miears Affidavit at 13-14, 15, 17; Gore Affidavit at 11.

   c. The potential mitigation evidence was weak.  Although there was some evidence of childhood abuse, the records also reflected that the abuse was minor, the parents were motivated by cultural differences rather than animus, and the family underwent counseling and adopted more reasonable disciplinary methods as soon as they were made aware of the

12

cultural differences.

d. The potential harm from the family's testimony was severe.  Testimony regarding Applicant's criminal activities from a very young age, even before his involvement in the juvenile justice system, and his association with gangs would significantly undermine counsel's strategy of attacking the future dangerousness special issue.

e. The testimony of Applicant's own family—most especially Applicant's mother—that he deserved the death penalty would be highly prejudicial. It would be difficult for even severely mitigating evidence to overcome such prejudicial testimony.

f. Counsel's assertion that the relatives would have been called to testify about minor childhood abuse is not is not consistent with their identification of highly prejudicial testimony the relatives would have provided.

65. Even had the social services evidence been presented, the result of the proceeding would not have been different in light of the minimal mitigating value and strong possibility of additional prejudicial testimony.

*Conclusion*

66. In assessing claims of failure to discover and present mitigating evidence, the Court must assess both the aggravating and mitigating evidence to determine how a jury might reasonably answer the mitigation special issue. *Ex parte Gonzales*, 204 S.W.3d 391, 397-98 (Tex. Crim. App. 2006), *citing Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

67. The State's evidence showed that Applicant committed a brutal and apparently premeditated crime against a stranger.  The victim's injuries were not inflicted from a distance but up close, including by biting.  The motive for the crime was money, and Applicant acted alone.  Applicant had an extensive criminal history from a young age, including escalating crimes of violence.

68. Applicant's proposed mitigating evidence was minor.  While his parents' immigration experience was difficult, he showed no significant connection between it and his personal experiences.  Neither his childhood hearing problems nor the involvement with social services showed to have any lasting impact or influence on his later life and criminal activity.

69. Introduction of the proposed mitigation evidence would have shown additional aggravating factors.  Applicant was not mentally ill, of average intelligence, and obtained help in school when he experienced problems such as hearing

13

loss.   His family supported him.    Applicant's parents made significant
sacrifices for Applicant to be born and raised in the United States and to
provide a good home for him.  Although there were cultural differences, his
parents were willing to learn appropriate discipline after problems were
identified.  His siblings, who came from the same family environment, showed
no tendency to violence or criminal activity.  But Applicant showed behavioral
problems from a young age and was involved with gangs.  Applicant's family
believed he deserved the death penalty for his crime.

70. A decision by counsel not to introduce the proposed mitigating evidence would
have been reasonable in light of the aggravating factors it would also have
introduced.

71. Counsel were not deficient.

72. In light of the horrific nature of the murder, Applicant's lengthy and violent
criminal history, the minimal mitigation from the proposed evidence, and the
additional aggravating factors from that evidence, the jury would not have
answered the mitigation special issue differently had counsel introduced the
proposed evidence.   The result of the proceeding would not have been
different.

73. Applicant did not receive ineffective assistance of counsel as to Ground 1.

**Ground 2: Juror Misconduct (Outside Communication)**

74. Applicant alleges that a juror, Alan Schwartz, committed misconduct by
discussing the case with his wife. *See* Application at 52-54.

75. Applicant does not allege a constitutional violation because he does not claim
that the juror was biased against him or that a state actor wrongly
communicated with the juror. *Cf. Parker v. Gladden*, 385 U.S. 363, 364
(1966) (finding constitutional violation where trial court bailiff, a state actor,
told jurors the defendant was a "wicked fellow" and guilty, and a juror testified
she was prejudiced by the statements).

76. Applicant raises only a violation of Article 36.22 of the Code of Criminal
Procedure, the statutory rule prohibiting contact with jurors.

77. Applicant's claim is not cognizable on habeas review because it does not allege
a fundamental or constitutional violation. *Ex parte Sanchez*, 918 S.W.2d 526,
527 (Tex. Crim. App. 1996).

78. Alternatively, Applicant has not shown any misconduct.

79. On November 10, 2010, this Court conducted a hearing on Applicant's complaint. *See* Transcript of 11-10-10 Hearing ("Juror Transcript"). All twelve jurors, Juror Schwartz's wife Theresa, and the two former law students who conducted juror interviews testified:

    a. Juror Schwartz testified that he did not talk to his wife about the trial until after it was over. Juror Transcript at 19. He knew that he was not allowed to read or watch any news coverage of the trial, and his wife did not communicate any outside fact to him during the trial. *Id.* at 19-21, 28. His verdict was based solely on what he heard in the courtroom and not any other source. *Id.* at 29.

    b. The eleven other jurors testified that Juror Schwartz did not provide any information about the case that he had learned outside the courtroom or say anything that indicated he had spoken to his wife or anyone outside the courtroom about the case. Juror Transcript at 34-35 (Reed), 40-41 (Brown), 47-49 (Lambeth), 59-62 (Dick), 65-68 (Mullis), 71-74 (Nehama), 77-81 (Harris), 84-87 (Robitaile), 90-94 (Wilson), 99-102 (Drake), 105-108 (Gilchrist).

    c. Raechel Parolisi testified that she observed the trial while a law student and conducted juror interviews for a class project after the trial was over. Juror Transcript at 113. She participated on all interviews except for Juror Schwartz's. *Id.* at 116. Her partner, Denise Santa Ana, conducted Juror Schwartz's interview. *Id.* at 116-17. Parolisi testified that she believed Juror Schwartz's answers indicated juror misconduct, but Santa Ana said she did not want to get him in trouble. *Id.* at 121. Santa Ana showed Parolisi approximately a minute of the video footage of the interview but did not provide the entire tape to her. *Id.* at 121-22, 124-26.

    d. Juror Schwartz's wife, Theresa Schwartz, testified that Juror Schwartz did not tell her anything about what happened in the courtroom during the trial. Juror Transcript at 144. They did not talk about the case at all until after the trial was over. *Id.* at 146.

    e. Denise Santa Ana testified that she observed the trial while a law student and conducted juror interviews for a class project after the trial was over. Juror Transcript at 157-58. She interviewed Juror Schwartz at his home. *Id.* at 159. Because Parolisi could not attend that interview, Santa Ana's boyfriend attended the interview with her and videotaped it. *Id.* at 159-61. Santa Ana transcribed the interview but did not keep a copy of the video. *Id.* at 163. Santa Ana recalled that Juror Schwartz mentioned talking about the case with his wife, but she

believed that he was referring to only after the trial was over. *Id.* at 161-62, 164-65, 171, 177.

80. The testimony of the jurors, Mrs. Schwartz, and Santa Ana were consistent and based on personal knowledge. Their testimony was credible.

81. Parolisi was not present at Santa Ana's interview of Juror Schwartz, did not view the video of the interview, and based her testimony solely on Santa Ana's description of the interview. Her hearsay account is not credible to the extent it contradicts the first-hand accounts of the other witnesses.

82. No credible evidence suggests that Juror Schwartz improperly communicated with his wife or any other person during trial, or that any juror was privy to any outside information or shared it with the rest of the jury.

83. Applicant has failed to prove by a preponderance of the evidence that he is entitled to relief on Ground 2.

**Ground 3: Juror Misconduct (Consideration of Failure to Testify)**

84. Applicant alleges that Juror Schwartz improperly considered the fact that he did not testify in rendering his verdict. *See* Application at 55-56.

85. Applicant's sole evidence in support of his claim is an affidavit from Parolisi, a law student recounting another law student's description of an interview with Juror Schwartz, Applicant's Writ Exhibit 19. This evidence is inadmissible as a statement regarding the jury's deliberations and will not be considered for any purpose. Tex. R. Evid. 606(b); *see* Finding 10 *supra*.

86. Because Applicant has offered no admissible evidence in support of his claim, he has not shown that any misconduct occurred. Applicant is not entitled to relief on Ground 3.

**Grounds 4-12: Ineffective Assistance of Counsel on Appeal**

87. Applicant alleges that he received ineffective assistance of counsel because his appellate attorney did not raise various arguments on his direct appeal. *See* Application at 58-105.

88. Applicant received a meaningful appeal.

    a. Appellate counsel designated a record on appeal and filed a timely brief.

    b. Appellate counsel raised 15 issues on appeal in a 92-page brief. The Court of Criminal Appeals agreed that one piece of evidence was

improperly admitted, though it found the error harmless. *See Chanthakoummane*, 2010 WL 1696789, at *17-19.

c. Appellate counsel timely filed a petition for writ of certiorari with the Supreme Court of the United States, which was subsequently denied. *Chanthakoummane v. Texas*, 131 S.Ct. 506 (Nov. 1, 2010).

*Ground 4*

89. In Ground 4, Applicant claims that his appellate counsel was ineffective for failing to challenge the admissibility on appeal of Brian Conner's testimony regarding Applicant's signs of gang membership. *See* Application at 59-62. Specifically, he claimed appellate counsel should have argued Conner was not qualified as an expert witness and his testimony was not relevant.

90. Conner testified that he received over 120 hours of gang investigation training, had received a certificate for advanced gang investigations, and had experience investigating gangs. 24 RR 91. He explained why certain elements in a letter written by Applicant demonstrated gang affiliation.

91. The State established that Conner was qualified as an expert witness through his training, knowledge, and experience pursuant to Texas Rule of Evidence 702.

92. Even if Conner was not qualified as an expert witness, his testimony was admissible as lay opinion testimony regarding "observations which do not require significant expertise to interpret and which are not based on a scientific theory." *See Osbourn v. State*, 92 S.W.3d 531 (Tex. Crim. App. 2002).

93. Appellate counsel was not ineffective for declining to raise the issue of Connor's qualifications on appeal because he would not have prevailed. *See Burger v. Kemp*, 483 U.S 776, 784 (1987) (reasonable strategic decision to forego claim on appeal is not ineffective assistance of counsel).

94. Defense counsel did not object at trial that the testimony was not relevant. He objected to notice and that Conner was not qualified as an expert. 24 RR 110-11.

95. Appellate counsel was not ineffective for declining to raise the issue of relevance on appeal because it was not preserved and would have been dismissed.

96. Applicant is not entitled to relief on Ground 4.

*Ground 5*

97. In Ground 5, Applicant complains his appellate counsel was ineffective for failing to raise a complaint that the evidence was insufficient to prove he was a future danger. *See* Application at 65-66.

98. The *Keeton* factors overwhelmingly support a finding of future dangerousness. *See Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

   a. Applicant acted alone. Neither the DNA evidence nor any eyewitness ever suggested more than one person was involved in the murder. There was no indication that Applicant was influenced or coerced by anyone into committing the offense.

   b. The crime was calculated, premeditated, and deliberate. Applicant appeared at the home of a real estate agent the night before the murder and tried to get inside the house before the agent called the police. The morning of the murder, Applicant called another real estate agent to arrange to meet her, using an assumed name. After encountering her with her husband, Applicant went to a nearby model home to commit the brutal murder of Sarah Walker. The record showed that Applicant intentionally and repeatedly attempted to isolate a woman to commit the offense.

   c. Applicant stabbed Sarah Walker more than thirty times, hit her in the face with a plant stand, and bit her shoulder. Applicant's motive was apparently robbery, as he took a Rolex watch and a ring from the victim. The violent, close-range murder of a stranger for money further demonstrates premeditation, as well as explosive anger and danger.

   d. Applicant's criminal history was extensive and fraught with violence. He committed violent assaults and thefts as a juvenile, stole cars, and once tied up two elderly women with electrical cord before stealing their car while on the run from police.

   e. Applicant was twenty-five years old at the time of the murder. He was not so young that his brain was immature and still developing. Neither was he old enough that he was unlikely to be a danger in the future.

   f. Applicant did not show any remorse for his crime, changing his story multiple times and insisting despite his DNA being all over the crime scene that he had merely entered the home for a drink of water.

   g. There was no psychiatric testimony indicating any mental health issues or impairments.

99. Applicant's contrary evidence—that he was not violent when he was incarcerated and that he was an artist—was not so strong that the jury could not reasonably conclude Applicant would be a future danger.

100.    Because the evidence was legally sufficient to sustain the jury's finding on Special Issue 1, appellate counsel was not deficient for failing to raise it on appeal. *See Burger*, 483 U.S at 784.

101.    Applicant has not shown a reasonable probability that he would have prevailed on appeal. Accordingly, he has not shown he was prejudiced by counsel's decision not to raise the issue.

102.    Applicant did not receive ineffective assistance of counsel as to Ground 5.

*Ground 6*

103.    In Ground 6, Applicant complains his appellate counsel was ineffective for failing to raise a complaint that A.P. Merillat was not qualified as an expert on prison classification. *See* Application at 67-73.

104.    A.P. Merillat testified that he was a senior investigator with the Special Prosecution Unit, which assists with the prosecution of crimes committed in prisons around the state. 27 RR 61-64. He had testified as an expert, written articles, written books, and lectured, all on the topic of the inmate classification system used by the Texas Department of Criminal Justice.

105.    Merillat testified regarding the classification system currently used by TDCJ, including how prisoners are classified upon arrival and what will cause a change in classification. 27 RR 67-73. He also testified that there have been 148 murders and numerous other violent offenses in Texas prisons since 1984, including offenses against other inmates, guards, staff members, and visitors. 27 RR 78-81.

106.    Merillat's testimony regarding the inmate classification system described the application of a concrete rule and was admissible as fact testimony.

107.    Merillat's testimony regarding the possibility for violence in prison was admissible as fact testimony. *See Lucero v. State*, 246 S.W.3d 86, 97 (Tex. Crim. App. 2008) (approving admission of similar testimony regarding inmates' opportunities for violence).

108.    Merillat was qualified to testify as an expert based on his nineteen years of experience in the SPU, as well as his writings and teaching on the subject.

19

> *See Coble v. State*, 330 S.W.3d 253, 287 (Tex. Crim. App. 2010) (finding Merillat's testimony admissible as rebuttal "educator expert" testimony).

109.    Because Merillat's testimony was admissible, an appeal on this issue would not have been successful.  Applicant has not shown that his appellate counsel was deficient for failing to raise the issue, nor has he demonstrated prejudice.

110.    Merillat did not testify that Applicant's classification status could improve. *Cf. Estrada v. State*, 313 S.W.3d 274, 286-87 (Tex. Crim. App. 2010) (reversing for new punishment hearing where Merillat testified incorrectly that a life-without-parole inmate could improve from G3 to G2).

111.    Applicant did not receive ineffective assistance of counsel as to Ground 6.

## Grounds 7 & 8

112.    In Ground 7, Applicant complains his appellate counsel was ineffective for not arguing that his statement to police was inadmissible because he did not affirmatively waive his right to remain silent. *See* Application at 74-75.  In Ground 8, he complains that his trial counsel was ineffective for not objecting specifically enough to the admission of his confession. *See* Application at 77-78.

113.    Mere silence is not an invocation of a defendant's waiver of his right to remain silent, and such a waiver may be inferred after a defendant receives *Miranda* warnings, understands them, and responds to questioning from an officer. *Berghuis v. Thompkins*, 130 S.Ct. 2250 (2010); *Joseph v. State*, 309 S.W.3d 20 (Tex. Crim. App. 2010).

114.    Applicant received *Miranda* warnings, acknowledged that he understood them, and answered every question asked by the detectives. SX 76 (written warnings initialed by Applicant); SX 77 (videotape of interrogation). This was a valid waiver of rights under *Thompkins*.

115.    Because an objection regarding Applicant's statement would not have been successful at trial or on appeal, Applicant has not shown that his counsel were deficient for failing to raise the issue, nor has he demonstrated prejudice.

116.    Applicant did not receive ineffective assistance as to Grounds 7 or 8.

## Grounds 9-12

117.    In Ground 9-12, Applicant complains his appellate counsel was

ineffective in failing to raise various constitutional challenges to the death penalty, namely the future dangerousness issue, the "10-12 Rule," the absence of a burden of proof on the mitigation issue, and the use of "probability" in the future dangerousness issue. *See* Application at 79-105.

118.    Applicant's complaints have been repeatedly rejected by the Supreme Court of the United States and the Texas Court of Criminal Appeals. *See, e.g., Jurek v. Texas*, 428 U.S. 262, 275 (1976) (future dangerousness issue); *Crutsinger v. State*, 206 S.W.3d 607, 613 (Tex. Crim. App. 2006) (10-12 Rule); *Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007) (burden of proof on mitigation); *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003) (probability).

119.    Counsel was not deficient for declining to raise issues on appeal that have been repeatedly rejected by the courts. *See Burger*, 483 U.S. at 784 (noting the importance of strategy in choosing which claims to advance on appeal).

120.    Applicant cannot be prejudiced by appellate counsel's failure to raise these issues because, if the law later changes so that these issues have merit, he can raise them in a subsequent writ. *Ex parte Hood*, 211 S.W.3d 767, 775-76 (Tex. Crim. App. 2007), *overruled on other grounds*, 304 S.W.3d 397 (Tex. Crim. App. 2010).

121.    Applicant did not receive ineffective assistance as to Grounds 9-12.

**Conclusion**

122.    The Court finds Applicant's trial counsel, Steven R. Miears and Keith Gore, and their mitigation specialist, Vince Gonzales, to be credible witnesses. Their account of the trial is consistent with the record, each other, and the partial billing records contained in the Court's file.

123.    Counsel investigated and presented the case in accordance with their trial strategy.

124.    Applicant has not shown that no reasonable attorney would have pursued the same trial strategies. Accordingly, counsel was not deficient. *See Strickland*, 466 U.S. at 687-88.

125. Applicant has not shown that the result of the proceeding would have been different but for the alleged errors. Accordingly, Applicant was not prejudiced. *See Strickland*, 466 U.S. at 687-88.

126. Applicant did not receive ineffective assistance of counsel.

127. Ground 2 is not cognizable on habeas because it does not allege a constitutional violation.

128. No credible evidence supports Applicant's allegations of juror misconduct.

129. Applicant received a meaningful appeal in which appellate counsel raised all issues reasonably likely to obtain appellate relief.

130. Appellate counsel was not deficient in failing to raise issues that bore no reasonable likelihood of success.

131. Applicant has not shown that the result of the appeal would have been different but for the alleged errors. Accordingly, Applicant was not prejudiced. *See Strickland*, 466 U.S. at 687-88.

132. Applicant did not receive ineffective assistance of counsel on appeal.

133. Applicant is not entitled to relief, and his application for writ of habeas corpus should be denied.

## Recommendation

The Court recommends that relief be **DENIED.**

## Order

It is ordered that the Clerk of this Court is to send copies of this Order to counsel for Applicant, Catherine Clare Bernhard, P.O. Box 2817, Red Oak, Texas 75154, and the Appellate Division of the Collin County District Attorney's Office. It is further ordered that the District Clerk shall immediately transmit to the Court of Criminal Appeals a copy of: Applicant's Application; the State's Answer; this Court's Order Designating Issues; the record of the evidentiary hearing in this matter; copies of the billing records in the Court's file unsealed and judicially noticed by the Court; the parties' proposed findings of fact and conclusions of law; and this Order.

SIGNED and ENTERED this the 20th day of September, 2012.

Mark Rusch
Presiding Judge
401st District Court