*15794*

## In the Court of Criminal Appeals of Texas at Austin

| | | |
|---|---|---|
| Kosoul Chanthakoumanne, | § | |
| Appellant | § | |
| | § | |
| v. | § | |
| | § | |
| The State of Texas, | § | |
| Appellee | § | |

RECEIVED IN
COURT OF CRIMINAL APPEALS

No. AP-76,794 2009

Louise Pearson, Clerk  ORIGINAL

On Appeal from Cause Number 380-81972-07 in the 380th Judicial District Court of Collin County, Texas, the Honorable Quay Parker, Judge Presiding by Assignment, and the Honorable Charles Sandoval, Judge Presiding.

§ § §

### State's Brief

§ § §

FILED IN
COURT OF CRIMINAL APPEALS

NOV 2 0 2009

Louise Pearson, Clerk

**John R. Roach**
Criminal District Attorney
Collin County, Texas

**John R. Rolater, Jr.**
Assistant Criminal District Attorney
Chief of the Appellate Division
SBT#00791565
2100 Bloomdale Rd., Ste. 20004
McKinney, Texas 75069
(972) 548-4323
FAX (214) 491-4860

**Gregory Davis**
**Curtis Howard**
**Andrea Westerfeld**
Assistant Criminal District Attorneys

The State Requests Oral Argument

SCANNED

_____
DATE

# Table of Contents

Index of Authorities ................................................................. vi

Statement of the Case................................................................. 1

Statement of Facts .................................................................... 2

    *Sarah Walker's Final Hours* ...................................................... 2

    *The Investigation of the Scene, Sarah's Home, and the Autopsy* ................... 3

    *The Mysterious Chan Lee* ......................................................... 6

    *DNA Hit, Arrest, and Interview* .................................................. 8

    *No Doubt At Trial* ............................................................... 9

    *The State's Punishment Case—Appellant's Prior Crimes* .......................... 11

    *Appellant's Punishment Evidence* ............................................... 15

Summary of the State's Arguments .................................................... 16

State's Reply To Appellant's Issue 1—Introduction of Elected Prosecutor As "Judge Roach"........................................................................... 20

    Appellant's claim should be summarily overruled because he objected three days after the challenged comments. Nevertheless, a trial court does not err by introducing the elected district attorney whose office is prosecuting the case along with the other attorneys in the case. And Appellant suffered no harm because he effectively conceded his guilt, the evidence of guilt was overwhelming, and the punishment evidence showed a heinous offense, escalating criminal behavior, and no meaningful mitigation........................................................... 20

    The Trial Court Introduces The Lawyers ...................................... 20

    Appellant Did Not Timely Object And The Claim Is Not Preserved .............. 21

    The Trial Court's Introduction Of The Attorneys Was Proper ................. 22

    Appellant's Authorities Do Not Support His Claim ........................... 24

    The Record Shows Appellant Was Not Harmed.................................. 26

State's Reply To Appellant's Issue 2—Leg Restraints..................................... 30

The record does not show that the jurors in Appellant's case saw him in leg restraints. Even if a juror saw Appellant in restraints, he suffered no harm because the evidence of guilt was overwhelming, and the punishment evidence showed a heinous offense, escalating criminal behavior, and no meaningful mitigation. .......... 30

Precautions Were Taken To Prevent The Venire From Seeing The Leg Restraints ... 30

Some Members Of The Venire May Have Inadvertently Seen The Restraints .......... 31

The Record Does Not Show Appellant's Jurors Saw The Restraints ......................... 31

Any Error Was Harmless Beyond A Reasonable Doubt............................................. 33

State's Reply To Appellant's Issue 3—Continuance......................................... 36

The trial court properly denied Appellant's requested continuance because the reindictment did not materially change the nature of the case. It was well known to the defense that the victim died from sharp force and blunt force injury. Furthermore, Appellant did not demonstrate actual prejudice. ................................... 36

The State Provided Ample And Timely Discovery So That Appellant Knew The Facts Of The Case And The Mechanisms Of Death .................................................. 36

The Trial Court Properly Granted A Limited Continuance Because Counsel Had Ample Time and Means To Prepare.......................................................................... 38

State's Reply To Appellant's Issue 4—Legal Sufficiency ............................... 41

The jury's verdict is amply supported by evidence that Sarah was wearing an expensive watch and a ring immediately prior to her murder but was not wearing those items when her body was found. Moreover, Appellant had a motive to commit robbery because his bank account was overdrawn at the time of the murder, and there is no evidence of any other motive to commit the murder. ........... 41

Evidence Of Theft Plus Motive Amply Demonstrates The Underlying Robbery ...... 41

Appellant's Authority Is Distinguishable.................................................................. 43

State's Reply To Appellant's Issue 5—Lesser-Included Offense ..................... 46

The trial court properly denied the request for the lesser-included offense because there is no evidence in the record showing that Appellant could be guilty *only of* murder. Neither party in a criminal case may request a lesser-included offense instruction solely on the ground that the jury might disbelieve otherwise uncontradicted evidence. Other evidence in the case does not raise the lesser-included offense............................................................................................... 46

Applicable Law..................................................................................................... 46

That The Jury Can Disbelieve The State's Evidence Does Not Allow A Lesser-Included Offense Instruction ........................................................................... 47

Statements During Appellant's Interview Did Not Raise The Issue Of The Lesser-Included Offense..................................................................................... 48

State's Reply To Appellant's Issue 6—Definitions In Jury Charge ................................. 51

The jury charge contains no error because it properly required the jury to find that Appellant intentionally caused the death of Sarah Walker in the course of committing or attempting to commit the offense of robbery. ....................................... 51

The Trial Court's Charge Properly Required The Jury To Find That Appellant Intentionally Murdered Sarah Walker In The Course Of Committing Robbery......... 51

Appellant Was Not Harmed By Any Error In The Abstract Portion Of The Charge Because The Application Paragraph Was Correct And He Conceded Guilt In The Face of Overwhelming Evidence ................................................................. 53

State's Reply To Appellant's Issue 7—Admissibility Of Bitemark Evidence................. 55

The bitemark testimony was admissible because the trial court determined that Dr. Hutson properly applied the technique of bitemark comparison in this case. In any event, Appellant's substantial rights were not violated because other evidence conclusively established his identity as the murderer. ............................................... 55

Trial Courts Have Broad Discretion Regarding Admissibility Of Evidence .............. 55

Dr. Hutson's Qualifications And His Technique ....................................................... 56

The Defense Expert Disagreed With One Of Dr. Hutson's Conclusions, But Not The Basic Theory Or Technique ............................................................................... 58

The Trial Court's Choice Between Competing Experts Should Not Be Disturbed .... 59

Appellant Was Not Harmed By The Admission Of The Bitemark Testimony .......... 61

State's Reply To Appellant's Issue 8—Admissibility Of DNA Evidence ....................... 62

The trial court properly admitted Dr. McDonald's testimony because it determined that she properly applied the scientific technique at issue. ........................................ 62

Trial Courts Have Broad Discretion Regarding Admissibility Of Evidence .............. 62

Dr. McDonald Properly Applied The Technique In Question ................................... 62

The Trial Court Properly Admitted Reliable Scientific Testimony ........................... 67

*No SOP Violation*.............................................................................................. 68

*Fingernail Results Did Not Identify Another Source*................................................ 68

*Pull-Cord Results Were Reliable Because The Defense Expert Testified The
Error In The Report Was A Typographical Error* ..................................................... 69

State's Reply To Appellant's Issues 9 and 10—Challenges For Cause .......................... 71

The record supports the trial court's rulings because both veniremembers indicated
in their individual voir dire that they would place a higher burden of proof on the
State in a death penalty case. Moreover, any error was harmless because the record
does not demonstrate Appellant was deprived of a lawfully constituted jury. ........... 71

Trial Court's Rulings On Challenges For Cause Reviewed With Great Deference ... 71

Veniremember Mania Would Increase the State's Burden of Proof........................... 72

Mania Was Not Rehabilitated, Or At Most He Vacillated On The Burden of Proof.. 75

Veniremember Delacruz Would Increase the State's Burden of Proof....................... 76

Any Error Was Harmless Because The Record Does Not Show Appellant Was
Deprived Of A Fair And Impartial Jury ..................................................................... 80

State's Reply To Appellant's Issue 11—"Man Bites Dog" Photograph ........................... 82

No abuse of discretion is shown because Appellant's biting ability was an issue in
the case. In any event, Appellant was not harmed by the admission of the photo...... 82

The "Man Bites Dog" Photo..................................................................................... 82

Evidentiary Rulings Are Reviewed For Abuse of Discretion ..................................... 82

The Photograph Of Appellant At Play With His Dog Was Not Unfairly Prejudicial
Or Cumulative, But It Was Relevant.......................................................................... 83

Appellant's Substantial Rights Were Not Violated By The Photo In A Case Where
Other Evidence Later Established The Same Fact At Issue And The Evidence
Overwhelmingly Demonstrated His Guilt.................................................................. 85

State's Reply To Issue 12—Statewide Standards For Death Penalty Prosecution........... 88

This Court has repeatedly rejected this very claim, and Appellant offers no basis on appeal for this Court to revisit the issue. ................................................................ 88

State's Reply To Appellant's Issue 13— Definition Of Mitigating Evidence ................. 90

This Court has previously rejected similar challenges, and Appellant offers no argument why this Court should revisit the issue. ........................................................ 90

State's Reply To Issues 14 And 15—Cumulative Error ..................................................... 91

No constitutional error affected Appellant's trial, and none of his claimed errors interacts with another such that it could have a cumulative effect. ............................. 91

Prayer ........................................................................................................................................ 92

Certificate of Service. ............................................................................................................. 92

## Index of Authorities

## Cases

*Allridge v. State,*
   762 S.W.2d 146 (Tex. Crim. App. 1988) ........................................................ 24

*Almanza v. State,*
   686 S.W.2d 157 (Tex. Crim. App. 1984) ........................................................ 54

*Arevalo v. State,*
   943 S.W.2d 887 (Tex. Crim. App. 1997) ........................................................ 46

*Barnes v. State,*
   56 S.W.3d 221 (Tex. App.–Fort Worth 2001, no pet.) .......................... 52, 53

*Blue v. State,*
   41 S.W.3d 129 (Tex. Crim. App. 2000) .............................................. 24, 25, 26

*Brumit v. State,*
   206 S.W.3d 639 (Tex. Crim. App. 2006) .................................................. 25, 26

*Busby v. State,*
   235 S.W.3d 661 (Tex. Crim. App. 2008) ........................................................ 89

*Bush v. Gore,*
   531 U.S. 98 (2000) .................................................................................. 18, 88, 89

*Bustamante v. State,*
   106 S.W.3d 73 (Tex. Crim. App. 2003) .......................................................... 50

*Casey v. State,*
   215 S.W.3d 870 (Tex. Crim. App. 2007) ........................................................ 85

*Chamberlain v. State,*
   998 S.W.2d 230 (Tex. Crim. App. 1999) ........................................................ 91

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993) .......................................................................... 56, 58, 65

*Deck v. Missouri,*
   544 U.S. 622 (2005) .................................................................................. 31, 34

*Duhamel v. State,*
   717 S.W.2d 80 (Tex. Crim. App. 1986) .......................................................... 39

*Escamilla v. State,*
    143 S.W.3d 814 (Tex. Crim. App. 2004) ...................................................................... 91

*Fuller v. State,*
    253 S.W.3d 220 (Tex. Crim. App. 2008) ...................................................................... 22

*Gallo v. State,*
    239 S.W.3d 757 (Tex. Crim. App. 2007) .............................................................. 61, 83

*Gardner v. State,*
    No. AP-75,582, 2009 WL 3365652 (Tex. Crim. App. Oct. 21, 2009) ................... 71, 72

*Garrett v. State,*
    851 S.W.2d 853 (Tex. Crim. App. 1993) ...................................................................... 75

*Gigliobianco v. State,*
    210 S.W.3d 637 (Tex. Crim. App. 2006) .............................................................. 83, 84

*Godsey v. State,*
    719 S.W.2d 578 (Tex. Crim. App. 1986) .............................................................. 49, 50

*Guidry v. State,*
    9 S.W.3d 133 (Tex. Crim. App. 1999) .......................................................................... 24

*Guzman v. State,*
    955 S.W.2d 85 (Tex. Crim. App. 1997) ........................................................................ 60

*Hampton v. State,*
    109 S.W.3d 437 (Tex. Crim. App. 2003) .............................................................. 47, 48

*Heiselbetz v. State,*
    906 S.W.2d 500 (Tex. Crim. App. 1995) .............................................................. 38, 40

*Hernandez v. State,*
    643 S.W.2d 397 (Tex. Crim. App. 1983) ...................................................................... 40

*Hernandez v. State,*
    805 S.W.2d 409 (Tex. Crim. App. 1993) ...................................................................... 32

*Herrin v. State,*
    124 S.W.3d 436 (Tex. Crim. App. 2002) .......................................................... 43, 44, 45

*Hines v. State,*
    38 S.W.3d 805 (Tex. App.–Houston [14th Dist.] 2001, no pet.) .................................. 69

*Irving v. State*,
    176 S.W.3d 842 (Tex. Crim. App. 2005) ........................................ 49

*Jacobs v. State*,
    787 S.W.2d 397 (Tex. Crim. App. 1990) ......................... 32, 33, 35

*Jasper v. State*,
    61 S.W.3d 413 (Tex. Crim. App. 2001) ............................... 25, 26

*Jones v. State*,
    982 S.W.2d 386 (Tex. Crim. App. 1998) ......................... 76, 80, 81

*Jordan v. State*,
    928 S.W.2d 550 (Tex. Crim. App. 1996) ..................................... 56

*Jurek v. Texas*,
    428 U.S. 262 (1976) ................................................................. 88

*Kelly v. State*,
    824 S.W.2d 568 (Tex. Crim. App. 1992) ............... 55, 56, 60, 62, 69

*Lakin v. Stine*,
    431 F.3d 959 (6th Cir. 2005) ................................................... 35

*Long v. State*,
    823 S.W.2d 259 (Tex. Crim. App. 1991) ......................... 31, 32, 34

*Mathis v. State*,
    67 S.W.3d 918 (Tex. Crim. App. 2002) ..................................... 47

*Montgomery v. State*,
    810 S.W.2d 372 (Tex. Crim. App. 1991)(op. on reh'g) .......... 55, 62, 82

*Narvaiz v. State*,
    840 S.W.2d 415 (Tex. Crim. App. 1992) ..................... 74, 75, 76, 79

*Nonn v. State*,
    117 S.W.3d 874 (Tex. Crim. App. 2003) ............................... 85, 87

*Patrick v. State*,
    906 S.W.2d 481 (Tex. Crim. App. 1995) ............................... 53, 54

*Paulson v. State*,
    28 S.W.3d 570 (Tex. Crim. App. 2000) ..................................... 75

*Penry v. Johnson,*
    532 U.S. 782 (2001) ........................................................................... 90

*Perry v. State,*
    158 S.W.3d 438 (Tex. Crim. App. 2004) ......................................... 90

*Price v. State,*
    626 S.W.2d 833 (Tex. App.–Corpus Christi 1981, no pet.) ........................... 28

*Rachal v. State,*
    917 S.W.2d 799 (Tex. Crim. App. 1996) .............................. 74, 79

*Rousseau v. State,*
    855 S.W.2d 666 (Tex. Crim. App. 1993) ...................................... 46

*Saldano v. State,*
    70 S.W.3d 873 (Tex. Crim. App. 2002) ........................................ 22

*Sanders v. State,*
    942 S.W.2d 3 (Tex. Crim. App. 1997) ......................................... 22

*Segundo v. State,*
    270 S.W.3d 79 (Tex. Crim. App. 2008) ........................................ 24

*Sigala v. State,*
    No. AP-74,212, 2004 WL 231326 (Tex. Crim. App. Jan. 14, 2004) ........... 83, 85

*Skinner v. State,*
    956 S.W.2d 532 (Tex. Crim. App. 1997) .............................. 47, 48

*State v. Herndon,*
    215 S.W.3d 901 (Tex. Crim. App. 2007) ...................................... 22

*Threadgill v. State,*
    146 S.W.3d 654 (Tex. Crim. App. 2004) ...................................... 88

*Whitaker v. State,*
    286 S.W.3d 355 (Tex. Crim. App. 2009) ...................................... 90

*Wolfe v. State,*
    917 S.W.2d 270 (Tex. Crim. App. 1996) ...................................... 42

*Young v. State,*
    283 S.W.3d 854 (Tex. Crim. App. 2009) ...................................... 41

## Statutes

Tex. Code Crim. Proc. Ann. art. 35.16(b)(3)(Vernon 2006) ...................................... 74, 79

Tex. Code Crim. Proc. Ann. art. 37.071 (Vernon Supp. 2009) ................................. 88, 89

Tex. Code Crim. Proc. Ann. art. 37.09(1)(Vernon 2006) ................................................ 46

Tex. Code Crim. Proc. Ann. art. 38.03 (Vernon Supp. 2009) ......................................... 88

Tex. Code Crim. Proc. Ann. art. 4.04(b)(Vernon 2005) ................................................. 88

Tex. Gov't Code Ann. § 24.007 (Vernon 2004) ............................................................... 23

Tex. Gov't Code Ann. § 24.378 (Vernon 2004) ............................................................... 23

Tex. Penal Code Ann. § 19.02(b)(1)(Vernon 2003) ........................................................ 51

Tex. Penal Code Ann. § 19.03(a)(2)(Vernon Supp. 2009) ......................................... 51, 88

Tex. Penal Code Ann. § 6.03(a)(Vernon 2003) ............................................................... 52

Tex. Penal Code Ann. § 6.03(a), (b) (Vernon 2003) ....................................................... 52

## Rules

Tex. R. App. P. 33.1(a) ................................................................................................... 22

Tex. R. App. P. 44.2(a) ................................................................................................... 26

Tex. R. App. P. 44.2(b) ...................................................................................... 26, 61, 85, 87

Tex. R. Evid. 401 ....................................................................................................... 82, 83

Tex. R. Evid. 402 ............................................................................................................ 82

Tex. R. Evid. 403 ....................................................................................................... 83, 85

## Treatises

Cathy Cochran,
   Texas Rules of Evidence Handbook 716 (5th Ed. 2003) ............................................. 60

| Kosoul Chanthakoumanne, | § | |
| Appellant | § | |
| | § | |
| v. | § | No. AP-75,794 |
| | § | |
| The State Of Texas, | § | |
| Appellee | § | |

On Appeal from Cause Number 380-81972-07 in the 380th Judicial District Court of Collin County, Texas, the Honorable Quay Parker, Judge Presiding by Assignment, and the Honorable Charles Sandoval, Judge Presiding.

To the Honorable Court of Appeals:

## Statement of the Case

Appellant was convicted of capital murder after a jury trial. The trial court sentenced Appellant to death based upon the jury's answers to the special issues submitted. CR1: 161-64.

The Honorable Quay Parker, Assigned Judge, presided over jury selection. The Honorable Charles Sandoval presided over the trial on the merits.

**Statement of Facts**

*Sarah Walker's Final Hours*

On the morning of July 8, 2006, Randy Tate picked up his son Joshua at the home of Sarah Walker, his ex-wife. 21 RR 32, 33, 36-38. They talked for about thirty minutes until Josh woke. 21 RR 37-38. She showed him a new Rolex watch she had just purchased for herself the previous day, and he asked her if she was saving money because he was worried about her finances. 21 RR 39. He traded cars with her because her car had a car seat for Joshua. 21 RR 38. She would take his Porshe to her job as a sales agent at D.R. Horton Homes in Craig Ranch, a new development in McKinney. 21 RR 38, 43, 48-49. She told Josh "I love you" as Tate and Josh drove away. 21 RR 41.

At 11:47 a.m. that day, Sarah's image was captured on a surveillance camera at a Bank of America in Frisco. 21 RR 170-73. The surveillance footage showed a watch on her left wrist and a ring on her right ring finger. 21 RR 172-73; SX 42; SX 43.

At around 12:30, Sarah called her cousin, Jessica Allen, on the phone. 21 RR 52. Allen also worked as a sales agent at a development in Allen called Lost Creek Ranch. 21 RR 51. The call ended when someone entered the model home where Sarah was working. 21 RR 52-53. Allen testified that Sarah owned several Yurman rings that she wore all the time. 21 RR 54-55. Yurman rings are large and ornate with colorful stones. 21 RR 55.

Andy Lilliston was looking at homes in Craig Ranch when he tried to enter a model home with his wife. 21 RR 57-59. The first model home was locked, so they went to an adjacent unit that was unlocked. 21 RR 59-60. He entered the living room and no-

2

ticed something out of place on the floor. 21 RR 60. Several objects were on the floor in an adjacent area, and his first thought was that someone had ransacked the home. 21 RR 61. He stepped farther into that room and saw a large pool of blood by a table and a trail of blood leading into the kitchen. 21 RR 61-62. He followed the blood trail and found a woman's body in the kitchen. 21 RR 62. The woman's face and entire upper body were covered in blood. 21 RR 62. He told his wife to call 911; it was about 1:20 p.m. 21 RR 62. Lilliston went outside, flagged down a passing driver, then went back inside the home. 21 RR 63-64. He checked the woman for signs of life, then, detecting none, went back outside to wait for the police. 21 RR 63-64.

*The Investigation of the Scene, Sarah's Home, and the Autopsy*

The McKinney Police Department investigated the offense with the assistance of Texas Ranger A. P. Davidson. 21 RR 128. A search of the exterior of the home showed no damage, no signs of forced entry, and no blood trail leading away from the home. 21 RR 129-30. The exterior search also did not reveal any weapons around the house, in nearby trash cans, or in nearby storm drains. 21 RR 130. On their initial walk-through, the investigating officers noticed drops of blood on the wooden floors in the entry but no signs of struggle in the entry or living room. 21 RR 135. The dining room, which was set up as an office with a desk, did show signs of a struggle. 21 RR 136-47. The desk was crooked, a chair was pushed away, a wooden plant stand was knocked over, and there was planting material on the floor as well. 21 RR 136-37. A broken hair barrette was on the floor. 21 RR 137-38. Blood led from the dining room to the kitchen, where Sarah's body lay. 21 RR 138. Sarah was very bloody, and her clothing was in disarray, with her

3

skirt "hiked up," apparently because she was dragged by her feet into the kitchen. 21 RR 138-39. Her underwear was visible but "in place." 21 RR 139. Stab wounds were visible on her chest. 21 RR 139. There were no signs of struggle elsewhere in the house. 21 RR 140-41. The crime scene was videotaped and photographed. 21 RR 141; SX 10, 11-19, 20-26. McKinney PD collected samples of the bloodstains because a killer often cuts himself or is injured during a crime. 21 RR 151-52. Police looked for an edged weapon as a murder weapon but found no weapons in the house or neighborhood. 21 RR 152-53.

Other evidence collected in the crime scene included blood from the deadbolt of the door, the deadbolt itself, and pull-cords from the blinds near the door that appeared to have bloodstains. 21 RR 209-210; SX 68-69. Blood samples were collected from multiple other locations, including the entry, living room, kitchen, and some "washed out" stains from the kitchen sink. 21 RR 210-11, 216, 224-26. A fingerprint in the blood on the deadbolt was not of comparable quality. 21 RR 228.

After learning that Sarah lived in Frisco, the officers requested that Frisco PD secure her home while they obtained a search warrant. 21 RR 154. Tate, Sarah's ex-husband, came to the scene and was visibly upset but very cooperative. 21 RR 155-56. The police determined that he was playing golf at the time of the murder and eliminated him as a suspect. 21 RR 155. After speaking with him, however, they began searching for a Rolex watch. 21 RR 156. There was no watch on Sarah's body. 21 RR 156. Upon searching her home, however, officers recovered a box for a Rolex watch and a sales receipt for that watch dated the previous day. 21 RR 165-66; SX 35, 36, 37.

4

Ranger Davidson determined that Sarah had been to the bank, and he obtained the bank surveillance tapes. 22 RR 170-73. He also witnessed the autopsy by Collin County Medical Examiner William Rohr the following day. 21 RR 167. Sarah had many stab wounds on her back and neck, as well as broken bones in her face. 21 RR 168. The medical examiner found no rings on her body. 22 RR 205. Blunt force injuries included a broken nose, a large bruise on the right side of the face, loosened or "fractured" teeth, and bruises on the scalp. 22 RR 208-209. The blunt force injuries were caused by several blows because the injuries were on different sides of Sarah's head. 22 RR 212. The blunt force injuries could have been caused by the plant stand recovered in the crime scene. 22 RR 213.

Sarah also suffered thirty-three different stab wounds. 22 RR 215. She suffered stab wounds to the neck, chest, and side that cut her carotid artery and subclavian vein, and penetrated her breasts, lungs, and heart. 22 RR 220-22. Ten of the wounds could have been almost immediately fatal. 22 RR 222. Eighteen stab wounds were found in her back and neck. 22 RR 223. She had defensive wounds on her arms and had a broken thumbnail and blood under her fingernails. 22 RR 225-26, 226-27; SX 90. Her fingernails were collected via clipping. 22 RR 226-27. Dr. Rohr also noticed a bitemark on Sarah's neck. 22 RR 225. He called forensic dentists Dr. Brent Hutson and Dr. William Schell to consult regarding the bitemark. 22 RR 227-28. Drs. Hutson and Schell photographed the bitemark and made an impression of the mark using "alginate putty." 22 RR 241-45. Dr. Rohr stated in his report that Sarah died due to multiple sharp force trauma, strangulation,

and blunt force injuries. SX 79. He collected a rape kit, but he did not see any definitive evidence of sexual assault. 22 RR 232-33.

*The Mysterious Chan Lee*

The investigators received numerous leads about the case, some of which seemed genuine, and some "off the wall." 21 RR 169. These leads were put in a database and assigned to different investigators for follow up. 21 RR 19. One of the leads pursued by Ranger Davidson involved a witness named Mamie Sharpless and a possible suspect named "Chan Lee." 21 RR 173-74.

Sharpless lived in Plano and worked as a realtor for the Keller Williams company. 21 RR 87. Most of her business was developed from advertisements or phone calls. 21 RR 88. On July 8, 2006, the day of Sarah's murder, she received a telephone call from a man who identified himself as Chan Lee. 21 RR 88-90. He told her he had found her name from a "red book" at a 7-11 and was calling from a phone booth. 21 RR 89. He also told her he had recently graduated from the University of North Carolina-Charlotte and worked for Texas Instruments in Dallas. 21 RR 90. He wanted to look at a home she had listed on Trolley Trail in Craig Ranch. 21 RR 91. He told her he was staying at the In-Town Suites. 21 RR 90. She gave him directions to the home but was unable to set a meeting time because the call kept getting cut off. 21 RR 94. She tried calling the InTown Suites but was unable to reach anyone named Chan Lee there. 21 RR 94. Nevertheless, she decided to try and meet him at the property in question. 21 RR 94.

Sharpless thought it odd that the caller worked for Texas Instruments but did not have a cell phone. 21 RR 92-93. She also thought it odd that he had an Asian-sounding

name but on the phone sounded like an African-American from the South. 21 RR 93. Sharpless often took her husband, Nelson Villavicenzio, with her to show properties, and he accompanied her on this trip as well. 21 RR 87, 94-95.

Sharpless and her husband drove to Craig Ranch in her car, a green Toyota Camry. 21 RR 95. They parked at her listing and sat in her car. 21 RR 98. A man in a white Mustang drove by and parked across from a D. R. Horton model home. 21 RR 98-99. Sharpless and her husband decided to drive up to the Mustang and ask the driver if he was Chan Lee. 21 RR 100. When they reached the Mustang, the driver—who was not African-American—had gotten out of the car; they asked if he was Chan Lee, but he said no. 21 RR 99-100, 113. The man was about 5'4" or 5'5", Asian, and had a muscular build and a "buzz cut." 21 RR 100-101; 114. Sharpless drove to the end of the block, turned around, and came back. 21 RR 102. The car had left. 21 RR 102. Sharpless then drove to her listing, went inside, and called the owner to tell him the buyer was a no-show. 21 RR 103. Another potential buyer then came to look at the home. 21 RR 103-104, 116. Later, as Sharpless and her husband were leaving about 1:00 p.m., they saw a white Mustang parked in front of the model home where the murder occurred. 21 RR 105-06, 118.

Ranger Davidson looked for people in the area named Chan Lee, or variations of that name. 21 RR 174. He also cross-checked drivers licenses with that name and owners of Mustang cars. 21 RR 174. He located a Chan Houng Lee in Arlington who drove a silver Mustang, but he had a strong Asian accent and Sharpless had described the caller as having a voice like a black male. 21 RR 175-76. The Ranger also went to the InTown Suites in Carrollton, following up on Sharpless's information that Chan Lee stated he was

staying at an InTown Suites. 21 RR 176. The first location he visited did not have a room 245, but they directed him to another nearby location. 21 RR 177. The second location had a room 245, but a female student had occupied that room for some time around the time of the murder. 21 RR 177; SX 44. The Ranger also looked for the pay phone the caller stated he used. 21 RR 89-90, 178. There were a few in the area of Midway Road and Park Boulevard, but one of the stores had closed so there was no surveillance video and the other location, a gas station, had already reused its surveillance tape. 21 RR 178. That location was 12.9 miles from the crime scene, and it took approximately twenty minutes to drive that distance. 21 RR 179-80. Ranger Davidson enlisted the aid of law enforcement officers in North Carolina, who helped him learn that UNC-Charlotte had no record of Chan Lee. 21 RR 180; SX 45.

*DNA Hit, Arrest, and Interview*

On August 30, McKinney PD learned that DNA testing at the Southwestern Institute of Forensic Sciences (SWIFS) had identified a suspect. 21 RR 181-82. The following day, they learned that their suspect was named Kosoul Chanthakoumanne, the Appellant, and that he drove a white Ford Mustang. 21 RR 182-83. Appellant lived in an apartment about three miles from the pay phones at Midway and Park. 21 RR 184. By September 5, the police set up surveillance on Appellant and were seeking an arrest warrant. 21 RR 183-85. The officers were notified that a warrant was issued, and they arrested Appellant without incident after 10:40 p.m. 21 RR 191-94. There was a child present at Appellant's apartment, and the police waited for Appellant's sister to come to the scene and get her child. 21 RR 194.

Ranger Davidson learned from Appellant's sister that Appellant had attended school in North Carolina and had moved to the Dallas-Fort Worth area in February 2006. 21 RR 196-97. Other investigation showed that Appellant had previously tried leasing an apartment near an InTown Suites. 21 RR 197-99. Appellant's sister had stayed at an In-Town Suites in September of 2006. 21 RR 200; SX 44.

After his arrest, Appellant was transported to the McKinney Police Department and placed in an interview room. 22 RR 65-68. The police gave him a coat because he was cold. 22 RR 67. After being advised of his *Miranda* rights, he waived them and agreed to talk to the officers. 22 RR 69-72; SX 76, 77, 78. Appellant was not handcuffed, and the interviewers did not believe he was intoxicated or on drugs. 22 RR 79-80. Based on discussions with an FBI profiler, the interviewers sought to obtain "base hits" rather than "home runs" during the videotaped interview. 22 RR 82-83. Although Appellant initially denied being in McKinney in his car, he later told the interviewers that he had had car trouble, he went inside the model home to get some water, but he left when the tap only gave hot water. 22 RR 85-89. Appellant admitted seeing a couple in a green car outside the house who talked to him. 22 RR 90. He showed no emotion or remorse during the interview. 22 RR 91-92.

*No Doubt At Trial*

At trial, Mamie Sharpless identified Appellant as the man she saw near the model home on the day of the murder. 21 RR 102-103. Appellant's bank account was overdrawn at the time of the offense. 21 RR 201; SX 52. A forensic dentist compared the bitemark evidence collected at the autopsy to bitemark exemplars created from an im-

pression collected from Appellant after his arrest. 22 RR 246, 252-59; SX 101-106. Appellant could not be excluded as the source of the bitemark. 22 RR 258-59. Finally, Appellant's DNA—collected after his arrest—was compared to DNA evidence from the crime scene. 22 RR 269-72. DNA matching Appellant's was found at numerous places within the crime scene and on Sarah Walker's body:

- Mixed with Sarah's DNA on the bloodstained pull-cords from the window blinds in the home (22 RR 272-73, 274);

- Mixed with Sarah's DNA on her fingernail clippings (22 RR 274-75);

- In the living room (22 RR 275-76);

- In the kitchen, both alone and mixed with Sarah's DNA (22 RR 276-77);

- From the kitchen sink (22 RR 277-78); and

- From the deadbolt lock (alone) and lock faceplate (with Sarah's DNA) (22 RR 278-79).

The State's DNA scientist, Dr. Stacy McDonald of SWIFS, calculated a "likelihood ratio" for some evidence. 22 RR 280-82. She calculated that it was 216 million times more likely that Appellant and Sarah were the source of the DNA on the pull-cords than a combination of Sarah and some other person. 22 RR 280. It was 16.5 billion times more likely that Appellant and Sarah were the source of the fingernail DNA rather than Sarah and some other person. 22 RR 280-81. Dr. McDonald also calculated a "random match probability" for some evidence. 22 RR 281-83. Only 1 in 645 trillion persons would match Appellant's profile from the mixed sample in the kitchen. 22 RR 281-82. Only 1 in 38.1 billion persons would match Appellant's profile from the deadbolt lock. 22 RR 283. Only 1 in 278,000 persons would match Appellant's profile from the lock

faceplate. 22 RR 283-84. The world population is less than 7 billion. 22 RR 282; SX 108, 110 (DNA reports.

*The State's Punishment Case—Appellant's Prior Crimes*

In the punishment phase, the State adduced evidence of Appellant's escalating criminal behavior as a juvenile and young adult. On March 15, 1995, Appellant and some friends assaulted Larry Smith and stole his bicycle. 24 RR 79-83. After Appellant began the assault by punching Smith without warning, he and his friends kicked Smith in the back, ribs, and face. 24 RR 82. Appellant was laughing during the assault. 24 RR 83. Smith suffered six fractured ribs and a concussion. 24 RR 83. The case was filed against Appellant as a "strong-arm robbery," but Appellant pleaded guilty to a lesser misdemeanor assault. 24 RR 119-20, 144. Other charges against Appellant at the time included communicating threats and credit card fraud against his mother. 24 RR 120-21; SX 114 (juvenile records). Appellant was placed on probation. 24 RR 118.

Appellant's next major charge was an assault with serious injury committed on October 10, 1995. 24 RR 22. During that incident, Appellant was skipping school with other students when he assaulted Shawn Bank. 24 RR 24-26. Bank suffered a fractured arm and bruises to his head. 24 RR 26-28. In a non-custodial interview with police Appellant admitted committing the assault. 24 RR 30, 33. Appellant was unconcerned for Bank and showed no remorse during the interview. 24 RR 30-31.

New juvenile petitions were filed against Appellant for this crime, as well as for several car thefts. 24 RR 154-56. Appellant's probation was revoked, and he was sent to training school at Swannoa, a campus-like facility where juveniles lived in cottages and

attended school. 24 RR 157, 134, 160. After a certain amount of time with good behavior, juveniles at Swannoa were allowed furloughs. 24 RR 168-69. At one point, Appellant was considered "AWOL" because he refused to return. 24 RR 169.

At Swannoa, Appellant wrote to his former probation officer and expressed some remorse for his assault crime. 24 RR 135-38; SX 115. The letter also contained symbols and words indicating that Appellant was a member of the Crips gang. 24 RR 135-38. One symbol, C4L, meant "Crips for Life." 24 RR 138. Other gang symbols included spelling out the word "six" instead of using the numeral, the way he defaced the letter "B" to show disrespect for Bloods, a pitchfork, and his signature, "Gangsta Crip John." 24 RR 138-40; SX 115. Appellant's conditions of probation had required him to avoid the Kaos Klan Kings, a gang associated with the Crips. 24 RR 125-26.

Appellant was on furlough from Swannoa when he committed his next crimes. 24 RR 174. On June 17, 1997, sheriff's deputies in Union County, North Carolina learned of a stolen vehicle after three suspects fled a traffic stop. 24 RR 47-48, 62. One of the suspects turned herself in immediately, but the other two later broke into a trailer occupied by two elderly women, tied them up with an electrical cord, ransacked the trailer, and stole a car. 24 RR 50-55; SX 116-21. Appellant was charged with two counts of kidnapping, two counts of robbery with a dangerous weapon, breaking and entering and larceny to the residence, and larceny to the car. 24 RR 57-58. Because he was 16 years old, Appellant was charged as an adult and detained in the adult jail. 24 RR 62, 64. Appellant was sentenced to fifty-one to seventy-one months' imprisonment after pleading guilty to

robbery and kidnapping. 24 RR 73-74; SX 122. Appellant's sentences ran consecutively, and he was paroled from North Carolina prison on February 19, 2006. SX 122 at 6.

The State's punishment evidence also showed that Appellant appeared to be stalking another woman the day before the murder. 24 RR 181-90. Barbara Johnson, a real estate agent who specialized in rentals and relocations, had helped Appellant locate an apartment in May 2006. 24 RR 179. They met one time during that process, and she did not tell him where she lived. 24 RR 181. On the evening of July 7, 2006, she was home alone with her dog when someone rang her doorbell. 24 RR 182-83. She did not recognize Appellant at the time, but he was at her door mumbling something about his car being "broken down" or "in her driveway." 24 RR 183. She asked if he needed her phone, and he said yes. 24 RR 183.

Johnson closed her door, retrieved her phone, and went back to the front door. 24 RR 183. Appellant was not at the door or in her yard. 24 RR 183. Johnson thought Appellant may have misunderstood her, and she closed the door and went through her house to the backyard, which was fenced off from her rear entry driveway. 24 RR 183-84. She "hollered out at him" to see if he needed the phone. 24 RR 183-84. Her dog was very upset and barking. 24 RR 184. Appellant needed the phone, and she handed it over the fence. 24 RR 185. Appellant asked for water, and because she felt bad for him she went to her house to get him some. 24 RR 185. But, she also became afraid. 24 RR 185. She gave him a glass of water over the fence and asked him where he lived. 24 RR 185. He said Plano, but he did not answer when she asked him why he was in her neighborhood. 24 RR 185. Johnson was becoming very scared, and she started back toward her house as

Appellant began trying to open her back gate. 24 RR 186. She thought he might be trying to return the water glass, but she told him the gate was broken. 24 RR 186. He asked her to let her dog out to keep him company while he waited, but she told him the dog would bite and went back into her house. 24 RR 186.

Appellant went back to her front door, but she did not answer it. 24 RR 187. He then went to the back door and started beating on it. 24 RR 187. Johnson called the police. 24 RR 187. The police came and talked to Appellant, and she saw a white car while they were talking to him. 24 RR 187-88. The police lectured her and told her never to open her door to a stranger. 24 RR 187-88. They also said that it appeared that he did have car trouble but had gone. 24 RR 188. Johnson lived in a cul de sac, and Appellant would have had to make several turns from a main road and go down an alley to reach the spot where his car was parked. 24 RR 188-90.

Appellant's parole officer met with him the morning of the murder. 24 RR 192-94. He dropped by Appellant's apartment unannounced at 7:30 in the morning. 24 RR 196-97. Appellant's nephew answered the door and went to get Appellant, who had been sleeping. 24 RR 198. Appellant and the parole officer talked for about ten minutes about Appellant's job and the difficulties he had had reporting. 24 RR 198. The parole officer noted nothing unusual about Appellant; he did not appear agitated or express any concerns. 24 RR 198. The parole officer had no idea Appellant was about to commit a violent crime. 24 RR 199. Appellant also reported to another parole officer on July 10, 2006, two days after Sarah Walker's murder. 24 RR 199. Nothing unusual was recorded about that visit. 24 RR 199.

*Appellant's Punishment Evidence*

Appellant's main trial strategy focused on the issue of future danger. 21 RR 31; 24 RR 15-20. Specifically, Appellant argued that his history showed that he was not a violent inmate, and that he would not be dangerous if imprisoned for life. 24 RR 16, 18-20. Appellant called ten different witnesses in punishment—mainly prison guards familiar with him—in an attempt to show he was not dangerous when incarcerated and had artistic abilities. 25 RR 5-29 (Duarte); 26 RR 6-47 (Parsons), 47-56 (Pitman), 56-61 (Shabo), 62-87 (Shank), 88-94 (Tuttle), 95-101 (McDonald); 26 RR 116-71 (Fisher), 193-213 (Kornfeld); 27 RR 133-61 (Quijano). Appellant also offered evidence about how prison is punitive through testimony of a former inmate. 26 RR 62-87. Finally, he offered evidence that prison is generally an environment where violent crimes are rare. 27 RR 140-41.

**Summary of the State's Arguments**

In Issue 1, Appellant claims the trial court erred by introducing the elected district attorney as "Judge Roach" to the venire and prejudicing the venire against him. Appellant's claim should be summarily overruled because he objected three days after the challenged comments. Nevertheless, a trial court does not err by introducing the elected district attorney whose office is prosecuting the case along with the other attorneys in the case. And Appellant suffered no harm because he effectively conceded his guilt, the evidence of guilt was overwhelming, and the punishment evidence showed a heinous offense, escalating criminal behavior, and no meaningful mitigation.

In Issue 2, Appellant claims that the trial court erred in denying his motion to quash the venire after it was noted that some of the venire might have been able to see his leg restraints. The record does not show that the jurors in Appellant's case saw him in leg restraints. Even if a juror saw Appellant in restraints, he suffered no harm because the evidence of guilt was overwhelming, and the punishment evidence showed a heinous offense, escalating criminal behavior, and no meaningful mitigation.

In Issue 3, Appellant complains that the trial court denied his motion for continuance and motion to quash when the State reindicted him. The trial court properly denied Appellant's requested continuance because the reindictment did not materially change the nature of the case. It was well known to the defense that the victim died from sharp force and blunt force injury. Furthermore, Appellant did not demonstrate actual prejudice.

Appellant claims in Issue 4 that the evidence is legally insufficient to prove he committed murder while in the course of committing or attempting to commit robbery. The jury's verdict is amply supported by evidence that Sarah was wearing an expensive watch and a ring immediately prior to her murder but was not wearing those items when her body was found. Moreover, Appellant had a motive to commit robbery because his bank account was overdrawn at the time of the murder, and there is no evidence of any other motive to commit the murder.

Appellant claims in Issue 5 that he should have received a jury charge on the lesser-included offense of murder. The trial court properly denied the request for the lesser-included offense because there is no evidence in the record showing that Appellant could be guilty only of murder. Neither party in a criminal case may request a lesser-included offense instruction solely on the ground that the jury might disbelieve otherwise uncontradicted evidence. Other evidence in the case does not raise the lesser-included offense.

In Issue 6, Appellant complains that the trial court erred in its definition of the culpable mental state applicable to the offense of robbery. The jury charge contains no error because it properly required the jury to find that Appellant intentionally caused the death of Sarah Walker in the course of committing or attempting to commit the offense of robbery.

In Issue 7, Appellant claims that the trial court erred by admitting the testimony of the State's forensic dentist. The bitemark testimony was admissible because the trial court determined that Dr. Hutson properly applied the technique of bitemark com-

parison in this case. In any event, Appellant's substantial rights were not violated because other evidence conclusively established his identity as the murderer.

In Issue 8, Appellant claims that the trial court erred by admitting the testimony of the State's DNA expert. The trial court properly admitted Dr. McDonald's testimony because it determined that she properly applied the scientific technique at issue.

Appellant claims in Issues 9 and 10 that the trial court abused its discretion in granting two challenges for cause. The record supports the trial court's rulings because both veniremembers indicated in their individual voir dire that they would place a higher burden of proof on the State in a death penalty case. Moreover, any error was harmless because the record does not demonstrate Appellant was deprived of a lawfully constituted jury.

Appellant claims in Issue 11 the trial court erred by admitting a photograph depicting him as if he were about to bite his dog. No abuse of discretion is shown because Appellant's biting ability was an issue in the case. In any event, Appellant was not harmed by the admission of the photo.

In Issue 12, Appellant claims that the Texas Death Penalty Statute violates his right to equal protection under the federal constitution because there are no "uniform, statewide standards to guide prosecutors in deciding when they should seek the death penalty," citing *Bush v. Gore*, 531 U.S. 98 (2000). This Court has repeatedly rejected this very claim, and Appellant offers no basis on appeal for this Court to revisit the issue.

In Issue 13, Appellant claims that the mitigation special issue in Article 37.071 violates the Eighth and Fourteenth Amendments of the federal constitution be-

cause it impermissibly restricts the jury's consideration of mitigating evidence. This Court has previously rejected similar challenges, and Appellant offers no argument why this Court should revisit the issue.

In Issue 14, Appellant claims that cumulative errors in his trial violated the federal constitution. In Issue 15, Appellant claims that cumulative errors in his trial violated the Texas Constitution. No constitutional error affected Appellant's trial, and none of his claimed errors interacts with another such that it could have a cumulative effect.

**State's Reply To Appellant's Issue 1—Introduction Of Elected Prosecutor As "Judge Roach"**

In Issue 1, Appellant claims the trial court erred by introducing the elected district attorney as "Judge Roach" to the venire and prejudicing the venire against him. Appellant's claim should be summarily overruled because he objected three days after the challenged comments. Nevertheless, a trial court does not err by introducing the elected district attorney whose office is prosecuting the case along with the other attorneys in the case. And Appellant suffered no harm because he effectively conceded his guilt, the evidence of guilt was overwhelming, and the punishment evidence showed a heinous offense, escalating criminal behavior, and no meaningful mitigation.

**The Trial Court Introduces The Lawyers**

An assigned trial judge, the Honorable Quay Parker, conducted jury selection in Appellant's trial. 5 RR 21-22. On September 7, 2007, Judge Parker addressed the venire as a whole. 5 RR 1, 21-22. Judge Parker introduced himself and briefly recounted his experiences as an elected judge and prosecutor in West Texas. 5 RR 22-23. He explained that he had retired to Collin County where he owned a small farm, and he explained that some members of the venire had met the elected trial judge, the Honorable Charles Sandoval, the previous week. 5 RR 23-24. Judge Parker then stated that he would introduce the "distinguished lawyers" that were seated at counsel table. 5 RR 24.

Judge Parker first introduced John Roach, the Collin County Criminal District Attorney. 5 RR 24. Judge Parker introduced him as "Judge John Roach," and he briefly outlined Judge Roach's prior service as District Judge of the 199th District Court and Justice

of the Fifth Court of Appeals. 5 RR 24-25. Judge Parker noted that Judge Roach's son is judge of the 296th District Court, that his daughter is an attorney, and that his daughter-in-law is likewise an attorney. 5 RR 25. Next, the judge introduced the lead prosecutor, Gregory Davis, and noted that they had tried "a lot" of cases together, that they had tried a murder case together three weeks earlier, and that he was a "very professional and very good prosecutor." 5 RR 25. Judge Parker then introduced lead defense counsel, Steven Miears, and told the venire that they too had tried cases together. Finally, Judge Parker introduced second-chair defense counsel, Keith Gore, and he informed the jury that Gore tried the recent murder case with Davis. 5 RR 26. Judge Parker described Gore as a "very fine young criminal defense lawyer" who "did a very fine job" in that case. 5 RR 26.

**Appellant Did Not Timely Object And The Claim Is Not Preserved**

Appellant challenges the references to "Judge Roach" as the elected criminal district attorney during initial voir dire in this case. Appellant's Brief at 17-22. Appellant concedes, however, that he did not object at the time Judge Parker made the remarks. Appellant's Brief at 21. As noted by Appellant, Judge Parker introduced the elected Criminal District Attorney, John Roach, to the venire as "Judge John Roach" and briefly outlined his prior service as District Judge of the 199th District Court and Justice of the Fifth Court of Appeals. 5 RR 24-25. Appellant did not object during the trial judge's introductory remarks. 5 RR 24-26. Three days later, Appellant objected to the remarks in writing and on the record and sought to quash the panel. CR 41-44; 6 RR 5-7. The trial judge noted the remarks were part of an introduction and overruled the objection. 6 RR 6-7.

To preserve error for appellate review, the record must show that: (1) a complaint was made by a timely request, objection, or motion; (2) sufficiently specific to make the trial court aware of the complaint; (3) and the trial court ruled on the complaint, either expressly or implicitly. Tex. R. App. P. 33.1(a). This is true even if a complaint affects a constitutional right of the defendant. *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008).

In this case, Appellant did not object when the trial court made the initial introduction. The primary purpose in requiring timely objections is to permit the trial judge to immediately rectify any potential problems and ensure that the original trial moves forward unhampered by any error in its proceedings. *See State v. Herndon*, 215 S.W.3d 901, 911 n.39 (Tex. Crim. App. 2007); *Saldano v. State*, 70 S.W.3d 873, 887 (Tex. Crim. App. 2002). Here, a timely objection would have permitted the trial judge to examine the issue immediately after "Judge Roach" was introduced and modify (if necessary) the other introductions of the lawyers. But Appellant waited until after he had the advantage of viewing the entire panel and after a shuffle and disqualifications. Accordingly, the claim is not preserved for review and should be summarily overruled. *See Sanders v. State*, 942 S.W.2d 3, 5 (Tex. Crim. App. 1997) (objection to shuffle after conclusion of voir dire was untimely).

**The Trial Court's Introduction Of The Attorneys Was Proper**

Appellant argues that Judge Parker's introductory comments made him an "active advocate for the execution of Appellant." Appellant's Brief at 19. But nowhere does Appellant identify anything in Judge Parker's comments indicating that Appellant was guilty

or that his crime was worthy of capital punishment. Rather, the comments were merely an introduction—these are the lawyers involved. And introducing the lawyers and elected officials is important because it allows veniremembers to indicate whether they have a bias in favor or against a lawyer. Indeed, the juror questionnaires in the case asked the veniremembers whether they knew any of the 106 potential witnesses. DX 10 at 11-12. The questionnaires also asked about positive or negative experiences with police, whether the veniremember had ever supported groups associated with law enforcement, and whether the veniremember had other associations with law enforcement. DX 10 at 5-6. Finally, the questionnaire asked whether the veniremember knew the prosecutors or defense attorneys. DX 10 at 10. Thus, viewed in context, Judge Parker's introductory comments dovetail neatly with the questionnaire and the individual voir dire process for the purpose of winnowing out persons who might decide the case on a basis other than the facts.

Roach's prior judicial service could be an important source of bias against (or in favor of) the State. After all, as a trial judge, he assessed punishment in criminal cases, awarded custody of children, and assessed civil damages.[1] Some veniremembers may have been aggrieved by these rulings, and other veniremembers may have been favorably disposed by the same rulings. Similarly, the judicial service of his son, and the legal representation of his daughter and daughter-in-law might lead to the same attitudes on the part of members of the venire.

---

[1] The 199th District Court is a court of general jurisdiction. Tex. Gov't Code Ann. § 24.007 (Vernon 2004); Tex. Gov't Code Ann. § 24.378 (Vernon 2004).

Moreover, Judge Parker's comments did not favor one party over the other. Rather, he stated that he knew all of the attorneys, referred to all as "distinguished," and praised defense counsel Gore no less than he did lead prosecutor Davis for their recent handling of a murder trial. 5 RR 24-26.

Trial courts enjoy broad discretion in the conduct of voir dire. *E.g., Segundo v. State*, 270 S.W.3d 79, 92 (Tex. Crim. App. 2008); *Allridge v. State*, 762 S.W.2d 146, 167 (Tex. Crim. App. 1988). Informing the venire of the identity of the lawyers and questioning the venire about those lawyers is common practice in Texas courts. As Judge Parker's introductions informed the venire about relevant information and did not favor either party, he did not abuse his discretion. *See Guidry v. State*, 9 S.W.3d 133, 139-40 (Tex. Crim. App. 1999) (holding trial court's remarks to venire that some of them might find the defendant's gender mitigating, and some not, and informing venire of gender makeup of death row did not improperly induce jurors to discriminate against Guidry based upon his gender).

**Appellant's Authorities Do Not Support His Claim**

Appellant bases his argument on *Blue v. State*, 41 S.W.3d 129 (Tex. Crim. App. 2000). Appellant's Brief at 19-22. In *Blue*, the trial court informed the venire that they had been waiting because the State and Blue were trying to plea the case, that Blue had been unable to make up his mind, and that the trial court believed Blue should plead guilty. The trial court also attempted to explain to the jury why innocent defendants might choose not to testify, but in so doing it implied that defense lawyers might encourage defendants they know are guilty to testify falsely simply because they might make

good witnesses. *Blue*, 41 S.W.3d at 130. These comments by the trial judge were not objected to at trial, and a divided court of appeals affirmed Blue's conviction because the comments were not preserved for appeal. A plurality of this Court found that the trial court's comments amounted to fundamental error because they tainted the presumption of innocence. *Blue*, 41 S.W.3d at 132.

But Judge Parker's introduction in this case is wholly unlike the comments condemned by this Court in *Blue*. Judge Parker did not talk about negotiations between Appellant and the State or his opinion of what Appellant should do. In fact, Appellant was not mentioned at all. Judge Parker also did not mention any evidence in the case. Rather, he introduced the attorneys to the venire, noting that all of them were "distinguished" and recounting his personal history with them. 5 RR 24-27. The remarks took less than three pages at the very beginning of the voir dire process, and they were made one month before the beginning of the trial on the merits. 5 RR 24-27, 1; 21 RR 1. And, Appellant's arguments notwithstanding, both adversarial parties were praised by the judge, as compared to the one-sided remarks of the trial court in *Blue*.

Moreover, this Court has not expanded on the holding of *Blue*. In *Brumit v. State*, 206 S.W.3d 639, 645-46 (Tex. Crim. App. 2006), the Court declined to extend *Blue* to comments made by a trial judge indicating his dissatisfaction with the sentence Brumit received in another county for a related case. In *Jasper v. State*, 61 S.W.3d 413, 420-21 (Tex. Crim. App. 2001), the Court declined to extend *Blue* to comments indicating impatience by the trial court with defense counsel during cross-examination of State witnesses. Both *Brumit* and *Jasper* involve situations more comparable to *Blue* than the in-

stant case, but this Court declined to extend *Blue*. The judge in *Brumit* addressed his comments solely to the defendant and assessed the maximum sentence allowed. *Brumit*, 206 S.W.3d at 641. The judge in *Jasper* made comments directed only at the conduct of defense counsel and indicated irritation. *Jasper*, 61 S.W.3d at 421. Judge Parker, by contrast, said only positive things about the attorneys representing both parties, and his introduction did not tilt the case in favor of the State.

**The Record Shows Appellant Was Not Harmed**

Finally, the record shows no harm in this case. This Court reviews general claims of error under two standards. If an error is non-constitutional, an error must be disregarded unless it affects substantial rights. Tex. R. App. P. 44.2(b). If an error is of constitutional magnitude, then an appellate court must reverse a conviction unless it determines beyond a reasonable doubt that the error did not contribute to a conviction or punishment. Tex. R. App. P. 44.2(a). Here, Appellant's claim must fail under either standard.

First, Appellant effectively conceded his guilt in this case. During opening statements, his counsel admitted that Appellant intended to rob the victim, that the robbery went wrong, and that he killed the victim. 21 RR 29-30. During closing arguments on guilt, his counsel again conceded Appellant killed Sarah Walker. 23 RR 29-30, 33. And, indeed, the evidence showing Appellant killed Sarah Walker in the course of robbing her was conclusive:

- his DNA was recovered from multiple bloodstains at the scene and beneath Sarah Walker's fingernails (22 RR 272-83);

- a bite mark on the victim was linked to his teeth (22 RR 240-59);

- he admitted being present at the crime scene (22 RR 86-91; SX 77);

- witnesses placed Appellant and his car at the crime scene immediately before the murder (21 RR 98, 103, 112, 182-83);

- surveillance video taken immediately before the murder shows Walker wearing a watch and a ring (21 RR 170-73; SX 42; SX 43);

- Walker did not have her watch or ring when her body was found (22 RR 205); and

- Walker died due to blunt force trauma, strangulation, and thirty-three stab wounds (22 RR 204-34; SX 79);

Judge Parker's comments were not mentioned by the lawyers for either party during the guilt-phase arguments. 23 RR 19-39. Furthermore, Judge Parker's introduction did not address the charge against Appellant, the evidence in the case, or the law applicable to the case. Thus, his comments did not lower the burden of proof, make it easier for the State to convict Appellant, or make it more difficult for Appellant to make his concessionary defense.

Judge Parker's introduction likewise did not affect the punishment phase of the trial. He did not address the special issues, the evidence of Appellant's criminal history, or punishment generally other than to note that a jury trial was required when the State sought the death penalty. 5 RR 26. And the State's case on punishment was also strong:

- Appellant was twenty-six years old at the time of the offense (24 RR 35-36);

- Appellant had been incarcerated for offenses of steadily increasing violence since he was fifteen, ranging from credit card larceny to misdemeanor assault to kidnapping and robbery ( 24 RR 79-118, 22-31, 47-74; SX 114, 22);

- Evidence showed that Appellant approached another woman, Barbara Johnson, under suspicious circumstances in the hours immediately prior to the murder of Sarah Walker (24 RR 181-90);

- Evidence showed that Appellant posed as Chan Lee and attempted to arrange a showing of a home in the same neighborhood as the murder on the morning of the murder with another female real estate agent, Mamie Sharpless (21 RR 87-106);

- Appellant conceded responsibility for the violent and brutal murder of Sarah Walker;

- Appellant showed no remorse when he spoke to police after his arrest for the murder of Sarah Walker (22 RR 91-92);

- Appellant's selection of strangers as victims showed that he had a broad victim pool and was more dangerous than an offender who victimized someone he knew (28 RR 150); and

- Appellant's defense in the punishment phase merely showed that he had relatively minor infractions while in prison and was a talented artist.

Judge Parker's introduction was not mentioned in the closing arguments on punishment. 28 RR 12-70.

The record demonstrates that Judge Parker merely introduced the attorneys who were to try the case and noted his past experiences with those attorneys. All of the attorneys were described as distinguished, and the judge equally praised both the prosecutor and the defense counsel who had recently tried a case before him. In light of Appellant's concession of guilt, the overwhelming evidence of guilt, the premeditated and violent nature of the crime, Appellant's criminal history, and the absence of meaningful mitigating evidence, any error in Judge Parker's introduction did not harm Appellant. *See Price v. State*, 626 S.W.2d 833, 836 (Tex. App.–Corpus Christi 1981, no pet.) (holding harmless offensive comments by a trial judge regarding religion during voir dire where they did not benefit the State or prejudice the defense).

In sum, Appellant did not object to Judge Parker's introduction of the attorneys representing the parties until three days later, hence his claims are not preserved for ap-

peal. In any event, the introduction was not error because it did not favor either party and dealt with matters regularly addressed in voir dire. Finally, Appellant suffered no harm as the evidence of guilt was overwhelming and the punishment evidence showed escalating criminal behavior and no mitigation. Appellant's Issue 1 should be overruled.

**State's Reply To Appellant's Issue 2—Leg Restraints**

In Issue 2, Appellant claims that the trial court erred in denying his motion to quash the venire after it was noted that some of the venire might have been able to see his leg restraints. The record does not show that the jurors in Appellant's case saw him in leg restraints. Even if a juror saw Appellant in restraints, he suffered no harm because the evidence of guilt was overwhelming, and the punishment evidence showed a heinous offense, escalating criminal behavior, and no meaningful mitigation.

**Precautions Were Taken To Prevent The Venire From Seeing The Leg Restraints**

Immediately prior to general voir dire of the first panel, Appellant's counsel objected to the presence of leg restraints on Appellant during voir dire and the trial on the merits. 5 RR 13-16. During this objection, Appellant's counsel noted that Appellant would be seated in such a way that the restraints would not be visible due to the use of a floor-length tablecloth. 5 RR 13. Nevertheless, Appellant's counsel believed that Appellant's movements would be restricted. 5 RR 13. Appellant's counsel also believed that spectators might see Appellant's restraints once proceedings moved from the Central Jury Room to the courtroom. 5 RR 14. The prosecutor noted for the record that this was a death penalty case and that Appellant had a criminal history out of North Carolina for violent crimes including robbery and kidnapping. 5 RR 17. The prosecutor also stated that, in the courtroom, Appellant's legs would be hidden at all times from jurors and prospective jurors. 5 RR 17. Finally, the State noted that Appellant would be seated closest to the exit in the courtroom. 5 RR 17-18. The trial court noted that Appellant was not handcuffed, and it denied the motion to remove Appellant's leg restraints. 5 RR 19.

**Some Members Of The Venire May Have Inadvertently Seen The Restraints**

After the trial court made general remarks to the panel and accepted excuses and disqualifications, the panel was released to lunch. 5 RR 142. Before the panel returned, Appellant's counsel renewed his prior objection. 5 RR 143. Counsel stated that certain seats in the Central Jury Room would allow a view of Appellant's leg restraints—a cloth strap—when counsel were at the bench, which occurred on a number of occasions. 5 RR 143-46. Some members of the venire had occupied these seats. 5 RR 145. The trial judge stated that veniremembers would not be seated in that area when the venire was seated in numerical order after a defense shuffle. 5 RR 144, 147-48. The trial court denied Appellant's request to quash the panel and his request for a continuance. 5 RR 147. Appellant did not ask the Court to question the venire regarding whether anyone saw the restraints or his legs. RR 142-47.

**The Record Does Not Show Appellant's Jurors Saw The Restraints**

Appellant did not raise his objection again after the jury was seated, nor did he renew his objection to the use of restraints during his trial. Moreover, Appellant did not call the jurors or any of the venire to see if any of them actually saw the leg restraints.

The Fifth and Fourteenth Amendments prohibit the use of physical restraints *visible to the jury* absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. *Deck v. Missouri*, 544 U.S. 622, 629 (2005). This Court reviews a trial court's decision to shackle a defendant for abuse of discretion. *Long v. State*, 823 S.W.2d 259, 282 (Tex. Crim. App. 1991). Error in shackling a defendant is harmless, however, if the jury does not see the defendant's re-

straints. *Id.* Moreover, where jurors inadvertently see the defendant in shackles, the error is harmless when the record does not reflect they considered that fact against him. *Hernandez v. State*, 805 S.W.2d 409, 414-15 (Tex. Crim. App. 1993).

Appellant does not challenge on appeal the trial court's decision to order him shackled. Instead, he claims the court erred in refusing to quash the first venire panel based on the possibility that some members of the venire may have seen his leg restraints. Appellant's Brief at 25. This claim must fail because the record does not reveal that any member of the jury actually saw the restraints.

This Court rejected the same claim based on similar facts in *Jacobs v. State*, 787 S.W.2d 397, 407 (Tex. Crim. App. 1990). There, the record showed that members of the venire "could have seen" leg restraints when Jacobs crossed his leg and via a small aperture in the spectator rail. But the record did not show any members of the venire indicated they had seen the restraints and that the trial court had taken steps to insure the restraints were unseen. This Court found no error and no harm based on the record.

The record in the instant case reveals essentially the same facts as those held insufficient in *Jacobs*. Appellant's counsel stated that, from certain seats, it was possible to see the restraints when counsel were at the bench. But no member of the venire or serving juror mentioned seeing Appellant's restraints. None of the jurors were questioned on the matter during individual voir dire. 6 RR 82-139; 8 RR 122-60, 202-60; 9 RR 11-59; 12 RR 23-72; 13 RR 134-81; 14 RR 115-71; 15 RR 7-58, 99-140; 16 RR 230-73; 18 RR 53-94, 107-51. And Appellant does not claim, and he presented no evidence, that his leg restraints were visible to the veniremembers during individual voir dire or to the jury dur-

ing trial, when all the parties were in the courtroom. Accordingly, in the absence of evidence that members of the jury actually saw his restraints, the trial judge did not abuse its discretion in denying his motion to quash the panel. *See Jacobs*, 787 S.W.2d at 407.

**Any Error Was Harmless Beyond A Reasonable Doubt**

Even if the record supports an inference that jurors saw the leg restraints, any error was harmless beyond a reasonable doubt because the exposure was limited and inadvertent, and the trial court took corrective measures to ensure it did not happen again. 5 RR 144-46. Moreover, as Appellant chose not to make an additional record on the matter, the only evidence before this Court is that some members of the venire *may* have sat where they *possibly* could see a restraint *only* during times when Appellant's counsel were at the bench. Nothing in the record shows that any veniremember or serving juror *actually* saw the cloth restraint, or that the matter was discussed by the jury.

Review of the individual voir dire shows that each juror agreed to give Appellant the presumption of innocence and to hold the State to its burden of proof at guilt and on the future dangerousness special issue. For example, Juror Sharon Reed, who appeared for individual voir dire the day after the panel voir dire, testified that she would presume him to be innocent and that she would not automatically answer the special issues for death just because she might find him guilty of capital murder. 6 RR 86; 109. Likewise, Juror Marion Brown testified that he would give the defendant the benefit of the presumption of innocence and the right not to testify and would not automatically impose a death sentence even if that was "the easy answer." 8 RR 136. All the other serving jurors stated that they would respect the presumption of innocence, hold the State to its burden

of proof on guilt and special issue one, and appropriately deliberate the special issues in punishment.[2]

Furthermore, the facts of the offense were egregious—an apparently premeditated robbery and murder of a stranger—and the evidence of Appellant's identity as the murderer was conclusive, including his DNA under the victim's fingernails and at the crime scene, his admission he was present at the crime scene, and the witness statements placing him at the crime scene. Moreover, nothing in the record shows that the possibility of inadvertent exposure of the restraints to some members of the venire affected the assessment of punishment more than one month later. Rather, Appellant's punishment rests firmly on the facts of his prior violent criminal behavior, the absence of meaningful mitigating evidence, and the savagery of the crime he committed. Thus, the devastating evidence, the jurors' uncontradicted statements that they would answer the special issues based on the evidence, and the strong punishment evidence renders any shackling error harmless because the chief harm of shackling is its impairment of the presumption of innocence and the preference of life over death in punishment. *See Deck*, 544 U.S. at 630.

Because the record does not show anyone actually saw the restraints during the limited opportunities to do so, the evidence overwhelmingly established his guilt, and the punishment evidence was strong, any possibility of error was harmless beyond a reasonable doubt. *Long*, 823 S.W.2d at 282 (error regarding shackling harmless where no evi-

---

[2] Lambeth (8 RR 205, 217, 229, 235, 238, 241-43, 245); Dick (9 RR 20, 24, 36, 37, 41, 47, 52); Mullins (12 RR 27-28, 40, 48, 52, 53-54); Nehama (13 RR 137, 140, 149, 166, 168, 174); Harris (14 RR 120, 139, 148, 150, 153, 168); Robitalle (15 RR 13, 17, 33, 35, 44, 46, 49, 50); Schwartz (15 RR 104, 105, 106, 108, 120, 124-25, 131, 139); Wilson (16 RR 237-38, 242, 254, 255, 265, 268); Drake (18 RR 54, 65, 75, 87, 91); Gilchrist (18 RR 109, 111, 118, 122, 126, 138, 140).

dence jurors saw shackles); *Jacobs*, 787 S.W.2d at 407 (no harm shown where record revealed only the possibility the venire could have seen restraint); *Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005) (error in forcing defendant to appear before jury in leg chains harmless in light of overwhelming evidence of guilt). Issue 2 should be overruled.

**State's Reply To Appellant's Issue 3—Continuance**

In Issue 3, Appellant complains that the trial court denied his motion for continuance and motion to quash when the State reindicted him. The trial court properly denied Appellant's requested continuance because the reindictment did not materially change the nature of the case. It was well known to the defense that the victim died from sharp force and blunt force injury. Furthermore, Appellant did not demonstrate actual prejudice.

**The State Provided Ample And Timely Discovery So That Appellant Knew The Facts Of The Case And The Mechanisms Of Death**

The Collin County Grand Jury indicted Appellant on September 21, 2006 for the capital murder of Sarah Walker. CR2: 212. The indictment alleged that Appellant caused the death of Walker by stabbing and cutting her with a knife. CR2: 212. The State gave notice of its intent to seek the death penalty on October 27, 2006. CR2: 237. The State immediately began providing discovery to Appellant's counsel:

- Crime scene and autopsy photos on October 27, 2006 (CR2: 239);

- Additional crime scene photos and videos on November 7, 2006 (CR2: 242-44);

- DNA reports, Collin County Medical Examiner's report, cell phone records, video surveillance tapes, witness statements, investigator notes, supplemental police reports, and numerous other items (40 total) on March 26, 2007 (CR2: 252-54);

- Police evidence reports, Texas Ranger reports, hypnosis video, video of search of Appellant's apartment on April 10, 2007 (CR2: 255);

- Designation of witnesses on April 13, 2007 (CR2: 265-70);

- Designation of expert witnesses on April 13, 2007 (CR2: 271-74);

- Notice of extraneous offenses on April 13, 2007 (CR2: 275-76);

- Recordings of witness interviews on April 13, 2007 (CR2: 278);

- Certified copies of business and government records, including Appellant's records from North Carolina on April 13, 2007 (CR2: 323-82);

- Additional recordings of witness interviews on April 26, 2007 (CR2: 386);

- Certified copies of business records on May 7, 2007 (CR3: 400-443);

- Certified copies of business records on May 8, 2007 (CR3: 444-49);

- Supplemental notice of extraneous offenses on June 18, 2007 (CR3: 454-61); and

- Supplemental designation of witnesses on June 27, 2007 (CR6: 1105).

The State provided discovery prior to the trial court's January 5, 2007 "Pretrial Scheduling and Discovery Order" and provided the items required in that order prior to the April 15, 2007 deadline. CR2: 245-49.

On August 21, 2007, the Collin County Grand Jury returned another indictment (the "reindictment") against Appellant. CR1: 7. The reindictment alleged that Appellant caused the death of Sarah Walker by stabbing and cutting her with a knife, *by stabbing and cutting her with an unknown object, and by striking her with a plant stand*. CR1: 7. Otherwise, the reindictment alleged the same victim and date of offense as the original indictment. *Compare* CR1: 7 *with* CR2: 212.

Appellant sought to quash the reindictment or obtain a continuance. CR1: 12-17; 3 RR 16. Appellant's counsel focused on the additional allegations regarding an unknown object and a plant stand and claimed Appellant was being forced to "try a death penalty case with 10 days' notice." 3 RR 5. Counsel claimed to be "truly surprised" by the additional allegations and noted that all of his pretrial motions and mitigation investigation had been done in light of the allegations contained in the original indictment. 3 RR 6-7.

Counsel complained that Appellant had not been provided any reports that the cause of death was by an unknown means. 3 RR 7.

The prosecutor responded to Appellant's claims and pointed out that the manner and means alleged had not changed, but rather two additional manner and means had been added. 3 RR 11. Furthermore, the prosecutor noted that the defense had had the autopsy report for months, that the report stated that the victim had suffered blunt force trauma injuries, and that defense counsel had known for months that no murder weapon had been recovered in the case. 3 RR 11. The prosecutor stated that the reindictment was not based on any new evidence and that no additional reports or discovery would be forthcoming. 3 RR 11. After hearing arguments, the trial court granted a partial continuance from August 31 until September 7, 2007 to begin jury selection. 3 RR 15. As noted by the trial court, this would give Appellant over a month to continue to work on the case prior to the commencement of the trial on the merits. 3 RR 15-16. The trial court did not rule on Appellant's motion to quash or on his objections to the limited continuance of the case. 3 RR 16-17. Appellant subsequently re-urged his written motion before Judge Parker at the beginning of voir dire but did not present anything in support of the motion, which Judge Parker denied. 5 RR 12.

**The Trial Court Properly Granted A Limited Continuance Because Counsel Had Ample Time and Means To Prepare**

The grant or denial of a continuance is within the sound discretion of the trial court. *Heiselbetz v. State*, 906 S.W.2d 500, 511 (Tex. Crim. App. 1995). To find an abuse of discretion in refusing to grant a motion for continuance, there must be a showing that

the defendant was prejudiced by his counsel's inadequate preparation time. *Duhamel v. State*, 717 S.W.2d 80, 83 (Tex. Crim. App. 1986).

Here, the trial court did not abuse its discretion because Appellant made no showing that he was unaware of the medical examiner's findings that Sarah Walker died from sharp force injuries and blunt force injuries. Moreover, Appellant made no showing that the police recovered a weapon that he relied on as the murder weapon to frame his defense. 3 RR 11. Finally, Appellant had ample time to prepare his defense because the trial on the merits did not begin until October 7, 2007, slightly less than a year after he started receiving discovery from the State and slightly less than six months after discovery was essentially complete on April 13, 2007. CR2: 239, 265-82. And Appellant makes no claim that the reindictment affected his jury selection strategy. 3 RR 4-11.

Appellant's claim that the reindictment affected his mitigation strategy is refuted by the record of the trial. Appellant designated several expert witnesses on July 23 and August 16 2007, prior to the reindictment on August 21, 2007. CR6: 1134, 1136. Four of Appellant's five designated experts later testified at trial, three in the punishment phase. 22 RR 32-57 (Senn); 26 RR 116-71 (Fisher); 26 RR 193-213 (Kornfeld); 27 RR 133-61 (Quijano). Appellant called ten different witnesses in punishment in an attempt to show he was not dangerous when incarcerated and had artistic abilities. 25 RR 5-29 (Duarte); 26 RR 6-47 (Parsons), 47-56 (Pitman), 56-61 (Shabo), 62-87 (Shank), 88-94 (Tuttle), 95-101 (McDonald); 26 RR 116-71 (Fisher), 193-213 (Kornfeld); 27 RR 133-61 (Quijano). Appellant offers no argument that the reindictment affected his punishment strategy other than bare allegations that he not had time to investigate whether Walker died from being

struck and was stabbed after the fact. 3 RR 7-8. But the record reveals that he could have investigated those matters because he had the same Medical Examiner's report that the State possessed for almost five months prior to the reindictment. CR2: 252-54; 3 RR 11.

Further, Appellant was arrested late on September 5, 2006 for capital murder. 21 RR 192-93. An interim attorney was appointed the following day. CR2: 213. Appellant's trial counsel were appointed on September 15, 2006. CR2: 224-25. Appellant's jury selection began on September 7 and his trial on the merits began on October 8, 2007. 5 RR 1; 21 RR 1. Thus, his trial counsel had almost one year prior to jury selection and over one year prior to the trial on the merits in which to prepare for his case. Their claim of surprise is refuted by the State's timely and thorough discovery in the case. *See, e.g.,* CR2: 252-54 (early production of offense reports, forensic reports, and other evidence). Appellant cites no fact-specific authority supporting his argument that the abundant time he received to prepare both before and after the reindictment was inadequate. Accordingly, the trial court did not abuse its discretion by denying the motion to quash and motion for continuance. *Heiselbetz*, 906 S.W.2d at 511-12 (no abuse of discretion in denying continuance where counsel appointed only 43 days before jury selection in death penalty case in the absence of a showing of specific prejudice); *Hernandez v. State*, 643 S.W.2d 397, 399-400 (Tex. Crim. App. 1983) (no abuse of discretion shown where counsel appointed only 24 days prior to trial). Issue 3 should be overruled.

**State's Reply To Appellant's Issue 4—Legal Sufficiency**

Appellant claims in Issue 4 that the evidence is legally insufficient to prove he committed murder while in the course of committing or attempting to commit robbery.[3] The jury's verdict is amply supported by evidence that Sarah was wearing an expensive watch and a ring immediately prior to her murder but was not wearing those items when her body was found. Moreover, Appellant had a motive to commit robbery because his bank account was overdrawn at the time of the murder, and there is no evidence of any other motive to commit the murder.

In reviewing a claim that evidence is legally insufficient to support a judgment, "the relevant question [on appeal] is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard accounts for the jury's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Therefore, in analyzing the legal sufficiency of the evidence, this Court determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence, both direct and circumstantial, when viewed in the light most favorable to the verdict. *Young v. State*, 283 S.W.3d 854, 862 (Tex. Crim. App. 2009).

**Evidence Of Theft Plus Motive Amply Demonstrates The Underlying Robbery**

In this case, ample evidence demonstrates Appellant murdered Sarah in the course of robbing her. First, Appellant was broke at the time of the offense. 21 RR 201; SX 52.

---

[3] Appellant does not challenge the sufficiency of the evidence to establish the other elements of the offense.

Thus, he had a motive to commit robbery—the need for money. Next, clearly visible, expensive jewelry Sarah was wearing at the bank prior to her murder was gone immediately after. 21 RR 39, 54-55, 170-73; SX 42, 43. Sarah's blouse had three-quarter-length sleeves allowing a clear view of her jewelry. SX 42, 43, 21. Sarah did not know Appellant, so he had no personal motive to murder her. 21 RR 44. Appellant, posing as Chan Lee, had earlier tried to lure Mamie Sharpless, another real estate agent, into a situation where she would be alone at a nearby house. 21 RR 88-100, 102-103. There was no evidence of attempted sexual assault: Sarah's underwear was "in place," and the medical examiner noted no signs of sexual assault. 21 RR 39; 22 RR 232-33. There is no evidence indicating that anyone else was in the model home between the time Appellant murdered Sarah (after 12:30 p.m.), the time his car was still visible at the scene (1:00 p.m.), and the time her body was found (before 1:20 p.m.). 21 RR 52, 105-106, 118, 62. Finally, Appellant conceded during opening statements on guilt that Appellant was trying to rob Sarah when the offense was committed. 21 RR 29. Accordingly, as Appellant needed money, valuable items were stolen during the murder, there is no evidence of other motive, and there is no evidence that anyone else took Sarah's property, the evidence is legally sufficient to prove that Appellant murdered Sarah in the course of committing robbery. *See Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996) (holding evidence sufficient to prove murder committed in the course of committing robbery where victim's purse contents were scattered in the crime scene near her body, even though there was conflicting evidence whether any money was actually taken).

**Appellant's Authority Is Distinguishable**

Appellant relies on *Herrin v. State*, 124 S.W.3d 436 (Tex. Crim. App. 2002), in arguing that the evidence is insufficient to prove the underlying offense of robbery. Appellant's Brief at 34. But *Herrin* involved far different facts. Herrin was charged with murder in the course of kidnapping and robbery. The victim in *Herrin* went with a cousin to Herrin's family property to check on some equipment. The victim was carrying at least $100 in cash, and he "was known to carry a good amount of money." The victim passed Herrin on the way to the property, but Herrin pulled in behind him in the driveway, walked up to his truck, said "I've got you now, you son of a bitch," and shot him with a rifle. Herrin pulled the victim from his truck, and the victim's cousin ran and hid in the woods. Herrin's father and another man ran to Herrin, who was standing over the victim. When asked why he shot the victim, Herrin said "Well, I guess I messed up now." Appellant put his gun away at his father's request and dragged the victim as if to load the victim into the victim's truck. The other man tried to stop him, but Herrin formed his hand into the shape of a pistol and told the man "I've got something for you, too." Herrin's father sent the other man to a store to call 911 and drove another truck to his own home to call 911. The victim still seemed alive. Herrin's father then left the property to meet the Sheriff. After his father left, Herrin apparently tied the victim to a four-wheeler and dragged his body about a mile and a half and dumped it in some heavy brush.

The victim's wallet was missing, and his pockets were intact, making it unlikely his wallet dropped out while his body was dragged away. Herrin wrote from jail that the "greatest high there is [sic] murdering someone [who] has it coming... [the victim's fam-

ily] will pay me." Other evidence showed Appellant told one of his experts that the victim owed him money. But Herrin had $13,000 in the bank, and there was no evidence he knew the victim had money or carried large sums of money. Herrin's parents testified that he was mentally unstable, and he had become increasingly bizarre prior to the offense and had been committed to Rusk State Hospital about six months before the murder. He refused to take his medication and threatened to kill his mother every day. *Herrin*, 124 S.W.3d at 448-39, 441-42.

This Court first found the evidence insufficient to prove Herrin committed murder in the course of kidnapping. The Court then considered whether the evidence was sufficient to prove robbery. The Court noted that Herrin did not need money and there was no evidence that he knew the victim had money when he committed the murder. This Court held that an intent to rob the victim could not be inferred from this evidence, and while debts might supply a motive for murder, they did not show Herrin actually took the victim's wallet. The Court reformed Herrin's conviction to the lesser-included offense of murder. *Id.* at 441-43.

Many differences distinguish this case from *Herrin*:

- Appellant needed money, as evidenced by his empty bank account, while Herrin had $13,000 in the bank;

- Appellant could see Sarah's expensive jewelry on her exposed wrist and ring finger, while nothing showed Herrin knew his victim had money;

- There is no evidence of another motive for Appellant to kill Sarah, while Herrin appeared to be motivated simply to kill and said his victim "had it coming;"

- Appellant did not know his victim, while Herrin did, thus allowing for a broader range of motives; and

- There is no evidence of undirected aggressive behavior by Appellant, while Herrin had severe mental issues, was off his medication, and threatened to kill his mother daily.

Most importantly, however, Herrin committed his murder in front of multiple witnesses who saw him shoot his victim without any demands for money or other incidents of robbery. Thus, even though the other facts in that case might support an inference of robbery where the killing was not witnessed, the same inference would not lie where the killing was witnessed but appeared to be "mere" murder. This Court should limit the application of *Herrin* to its unique facts.

Appellant needed money, Sarah's expensive jewelry was visible to her murderer, that jewelry was not present on her body, and nothing in the record shows a motive other than robbery for the murder. Indeed, Appellant's counsel conceded during opening statements that the crime stemmed from a botched robbery. Accordingly, the evidence is legally sufficient to prove the murder was committed in the course of committing robbery, and Issue 4 should be overruled.

**State's Reply To Appellant's Issue 5—Lesser-Included Offense**

Appellant claims in Issue 5 that he should have received a jury charge on the lesser-included offense of murder. The trial court properly denied the request for the lesser-included offense because there is no evidence in the record showing that Appellant could be guilty *only of* murder. Neither party in a criminal case may request a lesser-included offense instruction solely on the ground that the jury might disbelieve otherwise uncontradicted evidence. Other evidence in the case does not raise the lesser-included offense.

**Applicable Law**

A two-prong test must be met before a jury charge instruction on a lesser-included offense must be given:

- the requested offense must be a lesser-included offense;[4] and

- some evidence must exist in the record that if the defendant is guilty, he is guilty only of the lesser offense.

*See Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993). Both prongs of the test must be met, regardless of whether such an instruction is requested by the defendant or by the State. *Arevalo v. State*, 943 S.W.2d 887 (Tex. Crim. App. 1997).

Murder is a lesser-included offense of capital murder. *See* Tex. Code Crim. Proc. Ann. art. 37.09(1)(Vernon 2006). Accordingly, the issue before this Court is whether there was some evidence that would have permitted a rational jury to find that Appellant

---

[4] The first prong of the test is often stated: "the lesser-included offense must be included within the proof necessary to establish the offense charged." *Rousseau*, 855 S.W.2d at 672. But that is just the most common of the four definitions of a lesser-included offense contained in Article 37.09. *See* Tex. Code Crim. Proc. Ann. art. 37.09(1) (Vernon 2006).

was guilty only of the lesser offense, i.e., there must be some evidence from which a jury could have rationally acquitted Appellant of the greater offense while convicting him of the lesser. *Mathis v. State*, 67 S.W.3d 918, 925 (Tex. Crim. App. 2002). It is not enough that the jury could have chosen to disbelieve crucial evidence of the greater offense. *Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003); *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997).

## That The Jury Can Disbelieve The State's Evidence Does Not Allow A Lesser-Included Offense Instruction

Appellant's counsel identified no evidence at trial from which a jury could have rationally acquitted Appellant of capital murder while convicting him of murder. 23 RR 8. In fact, Appellant's counsel cited no evidence at all when he requested the lesser-included offense charge. 23 RR 8. On appeal, Appellant likewise cites no evidence in the record showing that murder was a "valid, rational alternative" to capital murder. Appellant's Brief at 37-38. Rather, Appellant's argument is that there is no evidence he acquired Sarah's watch or ring. Appellant's Brief at 37.

Appellant's argument is indistinguishable from an argument rejected by this Court in *Hampton*. Hampton was charged with aggravated sexual assault, and the indictment alleged he used or exhibited a knife during the offense. The victim in the case testified, without contradiction by the State or defense, that Hampton threatened her with a knife during the assault. At trial the State requested and received a lesser-included offense charge on sexual assault over Hampton's objection, and he was convicted of the lesser offense. The State's theory on appeal was that the lesser-included offense was raised by

evidence that the police did not find the knife when they arrested Hampton *at the scene of the crime. Hampton*, 109 S.W.3d at 440. This Court rejected the State's argument. The fact that a weapon was not recovered was not "affirmative evidence that no weapon was used," nor did it contradict the victim's testimony that Hampton used a knife during the assault. *Id.* at 441. Accordingly, the lesser-included offense was not raised by the evidence. *Id.*

In the instant case, as in *Hampton*, Appellant points to no affirmative evidence that a robbery was not committed. The only evidence before the trial court was that Sarah was wearing an expensive watch and ring immediately before her murder but those items were gone when her body was discovered immediately after the murder. The evidence regarding Appellant's motive to rob Sarah—his lack of money—was uncontradicted. And there was no evidence that anyone other than Appellant stole the items. Accordingly, the trial court properly denied the request for a charge on the lesser-included offense of murder. *See id.*; *Skinner*, 956 S.W.2d at 543-44 (trial court properly refused request for lesser-included offense of murder where no evidence showed the multiple murders were not intentionally or knowingly committed).

### Statements During Appellant's Interview Did Not Raise The Issue Of The Lesser-Included Offense

The only evidence from Appellant regarding his actions at the house were brief statements in his interview with the McKinney Police Department. When Appellant finally acknowledged that he went into the model home, he told the police "I don't want y'all to get me on no B & E bullshit." 22 RR 175. Appellant denied taking anything from

the model home. 22 RR 176. He saw nothing disturbed in the model home. 22 RR 178-79. Later Appellant stated, "If something got stolen out of there, I don't want to go down for B and E because I didn't steal nothing." 22 RR 182. According to Appellant, no one was in the model home. 22 RR 182-83. Appellant denied talking to a woman at the model home and maintained that he did not "want to go back over no B and E" and that he "didn't take nothing." 22 RR 188-89. At this point, the discussion moved to why Appellant's blood was in the model home, and the portion of the interview presented to the jury ended soon after. 22 RR 190-93.

Appellant's statements were that he did not commit a burglary or commit a theft by taking anything from the home. But Appellant was not charged with burglary or with theft from the model home. Appellant was charged with the murder of Sarah Walker in the course of committing or attempting to commit robbery. CR1: 2. Indeed, Appellant said no one was at the model home. 22 RR 182-83. Thus, Appellant's statements merely indicating that he did not commit *any* offenses at all would not provide a "valid, rational alternative" for the jury to find him guilty only of murder. *See Godsey v. State*, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986) (lesser-included offense not raised where defendant denies committing any offense). Nor did Appellant say he never intended to commit a robbery when he entered the home. A completed theft is not necessary to prove the offense of capital murder in the course of committing robbery, so a general denial of theft unconnected to the murder should not raise the issue of the lesser-included offense of murder. *See Irving v. State*, 176 S.W.3d 842, 845-46 (Tex. Crim. App. 2005) (noting that facts raising lesser-included offense must be related to facts of offense charged, not a

different offense); *Bustamante v. State*, 106 S.W.3d 738, 740 (Tex. Crim. App. 2003) (completed theft not required to prove capital murder in course of committing robbery). This Court does not "pluck" words out of context when examining whether the evidence raises a lesser-included offense. *See Godsey*, 719 S.W.2d at 584. Appellant's attempts to distance himself entirely from the murder are not affirmative evidence he committed the murder for a reason other than robbery. The trial court properly denied the request for an instruction on murder, and Issue 5 should be overruled.

**State's Reply To Appellant's Issue 6—Definitions In Jury Charge**

In Issue 6, Appellant complains that the trial court erred in its definition of the culpable mental state applicable to the offense of robbery. The jury charge contains no error because it properly required the jury to find that Appellant intentionally caused the death of Sarah Walker in the course of committing or attempting to commit the offense of robbery.

**The Trial Court's Charge Properly Required The Jury To Find That Appellant Intentionally Murdered Sarah Walker In The Course Of Committing Robbery**

Appellant's indictment charged him with capital murder by intentionally murdering Sarah Walker in the course of committing or attempting to commit the offense of robbery. CR1: 7. The application paragraph of the jury charge provided in pertinent part:

> [I]f you believe from the evidence beyond a reasonable doubt that on or about July 8, 2006, the [Appellant], did *intentionally* cause the death of Sarah Walker, an individual, hereinafter called deceased ... and the [Appellant] *intentionally* did cause the death of deceased while the [Appellant] was in the course of committing or attempting to commit the offense of robbery, you will find the [Appellant] guilty of capital murder as charged in the indictment.

CR1: 146-47 (emphasis added). The jury charge instructed the jurors in the abstract regarding the definitions of murder and capital murder, including specifically that a person "commits capital murder when he *intentionally* causes the death of an individual in the course of committing or attempting to commit the offense of robbery." CR1: 143 (emphasis added); Tex. Penal Code Ann. § 19.02(b)(1)(Vernon 2003); Tex. Penal Code Ann. § 19.03(a)(2)(Vernon Supp. 2009). The charge instructed the jurors that a person com-

mits robbery if he "intentionally or knowingly causes bodily injury to another" in the course of committing theft and with intent to obtain or maintain control of the property. CR1: 143. The charge later defined the culpable mental state of "intent" as limited to the offense of capital murder: "A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result." CR1: 145; Tex. Penal Code Ann. § 6.03(a)(Vernon 2003). The charge gave the full definitions of the culpable mental states of "intentionally" and "knowingly" with regard to the offense of robbery. CR1: 145; Tex. Penal Code Ann. § 6.03(a), (b) (Vernon 2003).

Appellant objected to the definitions of the culpable mental states applied to robbery in the abstract portion of the charge. 23 RR 5-6. Appellant claimed that robbery was a "specific intent" crime, and he objected to the definitions of "intentionally" and "knowingly." 23 RR 5-6. On appeal, Appellant argues that the trial court erred by not limiting the mental states applied to robbery to the "result of conduct" definitions because robbery is a "result of conduct" offense. Appellant's brief at 40-41. Appellant also argues that the jury might have applied the "nature of conduct" definition given for robbery in the abstract portion of the charge to the result of conduct offense of capital murder. Appellant's Brief at 41.

The trial court's charge is correct for this case. Robbery is an offense that encompasses all three types of conduct elements recognized in the Penal Code: results of conduct (bodily injury), circumstances of conduct (in the course of committing theft), and nature of conduct (unlawful appropriation). *Barnes v. State*, 56 S.W.3d 221, 234 (Tex. App.–Fort Worth 2001, no pet.). Thus, the trial court's definition—in the abstract portion

of the charge—was not erroneous. *Id.* Moreover, the trial court's charge allowed conviction only if the jury determined that Appellant *intentionally* caused the death of Sarah Walker, and that he *intentionally* caused the death in the course of committing or attempting to commit a robbery. CR1: 146-47; *see also* CR1: 143 (definition of capital murder offense), 145 (definition of intent applicable to capital murder). Appellant's objection at trial, and his argument on appeal, does not acknowledge the most important part of the charge: the portion where the law is applied to the facts. 23 RR 5-6. Appellant's Brief at 40-41. Because the application paragraph required the jury to find that Appellant *intentionally* caused the death in the course of committing or attempting to commit robbery, and the abstract definitions given for the mental states applicable to robbery and to capital murder were correct, there is no error in the charge. *See Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995) (trial court properly gave full definition in the abstract of the culpable mental state applicable to underlying offense where the offense contained all three types of conduct elements).

### Appellant Was Not Harmed By Any Error In The Abstract Portion Of The Charge Because The Application Paragraph Was Correct And He Conceded Guilt In The Face of Overwhelming Evidence

Furthermore, even if the trial court should have limited the culpable mental state definition applicable to robbery, the record does not reveal that Appellant was harmed. When reviewing alleged charging error, this Court must conduct a harm analysis. "[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including contested issues and the weight of the probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a

whole." When the error was the subject of a timely objection in the trial court, reversal is required only if the defendant suffered "some harm." Otherwise, charge error is reversible only where the defendant suffers "egregious harm." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

In this case, Appellant was not harmed because the application paragraph required the jury to find that he intentionally caused Sarah's death and that he intentionally caused that death in the course of committing or attempting to commit the offense of robbery. CR1: 146-47. Thus, the charge properly focused the jury on the applicable mental state for the offense on trial. *Patrick*, 906 S.W.2d at 493 (error in failing to further restrict definitions of culpable mental states harmless where application paragraph of charge required jury to find the murder was intentionally committed in the course of committing another felony). Moreover, Appellant's culpable mental state was never really in issue. Nothing about the facts of the case indicate anything other than an intentional murder. The facts showed that Appellant smashed Sarah in the head with a plant stand and stabbed her thirty-three times. Accordingly, Appellant suffered no harm. Issue 6 should be overruled.

**State's Reply To Appellant's Issue 7—Admissibility Of Bitemark Evidence**

In Issue 7, Appellant claims that the trial court erred by admitting the testimony of the State's forensic dentist. The bitemark testimony was admissible because the trial court determined that Dr. Hutson properly applied the technique of bitemark comparison in this case. In any event, Appellant's substantial rights were not violated because other evidence conclusively established his identity as the murderer.

**Trial Courts Have Broad Discretion Regarding Admissibility Of Evidence**

Determination of the admissibility of evidence rests within the sound discretion of the trial court. The trial court's admission of evidence will not be disturbed absent a clear abuse of discretion. To show a clear abuse of discretion requires more than a showing that this Court disagrees with the trial court's determination of the issue. Rather, a clear abuse of discretion is shown only where the trial court's determination falls outside "the zone of reasonable disagreement" with regard to the determination. *Montgomery v. State*, 810 S.W.2d 372, 386, 391 (Tex. Crim. App. 1991)(op. on reh'g).

This Court applies a three-part reliability test to determine the admissibility of scientific testimony under Rule 702: (1) the scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique in question must have been properly applied on the occasion in question. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Factors related to this determination include but are not limited to: (1) acceptance by the relevant scientific community; (2) qualifications of the expert; (3) literature concerning the technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which

the underlying theory or technique can be explained to the court; and (7) the experience and skill of the person applying the technique. *Id.* This Court has since held that this inquiry is essentially the same as that described in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Jordan v. State*, 928 S.W.2d 550, 554 (Tex. Crim. App. 1996).

**Dr. Hutson's Qualifications And His Technique**

At a *Daubert* hearing requested by the defense, Dr. Brent Hutson testified that he was a licensed dentist and the Director of Clinical Fixed Prosthodontics at Baylor College of Dentistry. 22 RR 9-10. He graduated from Baylor College of Dentistry in 1993, and he has taught there since 1995. 22 RR 11. In 1996, he became an adjunct to the Collin County Medical Examiner. 22 RR 11. He is a published author. 22 RR 11.

He was called by the Collin County Medical Examiner to consult on this case along with Dr. William Schell, another forensic dental consultant. 22 RR 12. Drs. Hutson and Schell attended Sarah Walker's autopsy. 22 RR 12-13; 21 RR 167. There, they observed a patterned injury on the left posterior of Sarah's neck. 22 RR 12-13.

Dr. Hutson testified that the American Board of Forensic Odontology has established guidelines for the examination, evaluation, and analysis of bitemark evidence. 22 RR 13. These guidelines include how to collect evidence, photograph, and measure bitemarks. 22 RR 13. Following these guidelines, Dr. Hutson photographed the injury, measured it, and took an impression using a custom-fabricated acrylic tray and alginate putty. 22 RR 13. The impression was used back at his lab to create a "stone model" that can be used to capture subtle evidence that might not be apparent from visual inspection of the

injury. 22 RR 14. The stone model was also used to create a master mold so that additional casts could be made for other experts on the case, including the defense experts. 22 RR 14. This process allowed comparison of the recovered bitemark to a known subject. 22 RR 15.

More than two months later, Drs. Hutson and Schell went to the Collin County Jail to conduct an examination of Appellant. 22 RR 15-16. Following American Board of Forensic Odontology guidelines, Dr. Hutson performed a complete internal and external examination of Appellant's mouth in order to note any conditions that would affect his ability to bite. 22 RR 16. Dr. Hutson saw no impairments. 22 RR 17. He then photographed the inside and outside of Appellant's mouth and collected two alginate impressions of his teeth. 22 RR 17. These impressions were used to create stone models of Appellant's teeth. 22 RR 17. Dr. Hutson compared the cast from the autopsy with the cast of Appellant's teeth, and he compared "computer overlay" images of Sarah's injury and Appellant's cast. 22 RR 17-18, 19-20. The overlay images were created using Adobe Photoshop and a flatbed scanner. 22 RR 22, 252-53. Using Photoshop, Dr. Hutson prepared slides showing how Appellant's teeth aligned with the marks on Sarah's body. 22 RR 22-23. In Dr. Hutson's opinion, Appellant's teeth caused the bitemark injury. 22 RR 18-19; SX 10. Dr. Hutson shared his findings with Dr. Schell, who also signed the report, and with Dr. Paula Brummett and Dr. Robert Williams, who worked as forensic dental consultants for the Dallas County Medical Examiner. 22 RR 24. None of these doctors had issues with his technique or conclusions. 22 RR 24-25. Dr. Hutson sent his evidence to the defense expert, Dr. Senn. 22 RR 25.

On cross, Dr. Hutson testified that the American Board of Forensic Odontology certifies dentists in the field of Forensic Odontology but he was not certified. 22 RR 26. He did not compare the recovered bitemark pattern to persons other than Appellant, but he did not believe that comparison to others would have been helpful. 22 RR 27. His report stated that Appellant could not be excluded as the source of the bitemark, but he was not stating that Appellant was the only person in the world who could have left that bitemark. 22 RR 28. Rather, his opinion was that, within a reasonable dental certainty, Appellant was the source of the bitemark. 22 RR 28. Comparison of other persons to the bitemark would also have been difficult because Appellant had very specific characteristics in his dentition that would make it difficult to find other comparison subjects. 22 RR 29. Dr. Hutson did not assist the medical examiner, Dr. Rohr, in recovering the actual tissue from Sarah that contained the bitemark. 22 RR 29-31.

### The Defense Expert Disagreed With One Of Dr. Hutson's Conclusions, But Not The Basic Theory Or Technique

Dr. David Senn testified for the defense at the *Daubert* hearing. 22 RR 32-33. Dr. Senn practiced forensic odontology or forensic dentistry at the University of Texas Health Science Center in San Antonio, was a consultant to the Bexar County Medical Examiner's Office, and was board certified in forensic dentistry by the American Board of Forensic Odontology. 22 RR 33-34. He had testified in courts before as an expert, published articles in the field of forensic dentistry, and was familiar with the process of analyzing bitemarks on skin. 22 RR 34.

Dr. Senn agreed with Dr. Hutson's conclusion that the injury on Sarah's neck was a human bitemark. 22 RR 36. He took issue with the use of two separate rulers during the photography of Sarah's injury. 22 RR 38. The photographer should have used an L-shaped ruler placed in the same plane as the camera. 22 RR 38. He believed that it was not a very clear bitemark. 22 RR 36-38. Dr. Hutson also disagreed with the manner in which Dr. Rohr removed the tissue from Sarah's body—the tissue should have been fixed in place with an acrylic ring so that it did not shrink. 22 RR 39. Without being fixed, the tissue would not be useful for future comparisons. 22 RR 39-40.

Dr. Senn watched Dr. Hutson's testimony about using Adobe Photoshop and testified that he used a very similar technique to superimpose images. 22 RR 42-43. Using samples from his case files, Dr. Senn compared the bitemark in this case to four other individuals. 22 RR 46-51. He was unable to exclude three of the four as a source of the bitemark. 22 RR 47-50. On cross-examination, Dr. Senn testified that he could not exclude Appellant as a source of the bitemark in question and was not offering an opinion that someone other than Appellant produced the bitemark. 22 RR 56. At the conclusion of the hearing, the trial court ruled that Dr. Hutson's testimony was "in the nature of circumstantial evidence" and admissible. 22 RR 58.

## The Trial Court's Choice Between Competing Experts Should Not Be Disturbed

In this case, the trial court heard evidence from competing experts. It was undisputed, however, that a bitemark can be compared to an individual to determine if he is the source of the bitemark. It was likewise undisputed that the use of overlay images to compare a bitemark to a source is a valid technique in the field of bitemark comparison. *See*

*Kelly*, 824 S.W.2d at 573. The issue for the trial court to resolve was therefore whether Dr. Hutson properly applied that technique in this case. *Id.* And, that is an issue that the trial court was in the best position to determine. After all, he saw both dentists on the witness stand, observed the presentations supporting their opinions first hand, observed their demeanor, and had the most familiarity with the other testimony and evidence in the case. *See Guzman v. State*, 955 S.W.2d 85, 87-89 (Tex. Crim. App. 1997) (noting that, while purely legal rulings are reviewed de novo, issues of law involving a determination of credibility and demeanor and issues of fact are reviewed with "almost total deference); *see also* Cathy Cochran, Texas Rules of Evidence Handbook 716 (5th Ed. 2003) (noting that the Rules of Evidence reflect a liberal policy in favor of admissibility and that courts should resolve doubts regarding expert testimony in favor of admitting evidence and allowing vigorous cross-examination).

That a competing expert offers a competing opinion does not establish that an expert did not properly apply an otherwise valid technique. Indeed, if that were the rule then any party could always prevent the presentation of scientific testimony simply by digging up a contradicting expert. And, certain of Dr. Senn's criticisms did not impact Dr. Hutson's testimony. The removal of the bitemark tissue did not affect Dr. Hutson's opinion because his opinion was based on the impression taken from Sarah's body and the photograph. Likewise, the photography of the injury was not key because there was no showing that the photograph in question was actually inaccurate. Accordingly, the trial court did not abuse its discretion by crediting Dr. Hutson's testimony that Appellant was the source of the bitemark over Dr. Senn's testimony that he could not say Appellant was the

source. *Cf. Gallo v. State*, 239 S.W.3d 757, 774 (Tex. Crim. App. 2007) (giving deference to jury's decision to credit one expert over another regarding a claim of mental retardation).

**Appellant Was Not Harmed By The Admission Of The Bitemark Testimony**

In any event, Appellant was not harmed by the admission of testimony that he was the source of the bitemark on Sarah's neck. The harmless error rule requires that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b). Here, Appellant was not harmed because other scientific evidence established his identity beyond any doubt: DNA evidence. 22 RR 269-84; SX 108, 110. Appellant was also seen at the scene of the crime by an eyewitness, and he admitted his presence at the crime scene to the McKinney Police. 21 RR 102-103; 22 RR 85-89. Finally, his counsel conceded both in opening and closing that he was the murderer. 21 RR 29; 23 RR 33. Thus any error by the trial court in admitting Dr. Hutson's testimony did not affect Appellant's substantial rights and was harmless. Issue 7 should be overruled.

## State's Reply To Appellant's Issue 8—Admissibility Of DNA Evidence

In Issue 8, Appellant claims that the trial court erred by admitting the testimony of the State's DNA expert. The trial court properly admitted Dr. McDonald's testimony because it determined that she properly applied the scientific technique at issue.

## Trial Courts Have Broad Discretion Regarding Admissibility Of Evidence

Determination of the admissibility of evidence rests within the sound discretion of the trial court. The trial court's admission of evidence will not be disturbed absent a clear abuse of discretion. To show a clear abuse of discretion requires more than a showing that this Court disagrees with the trial court's determination of the issue. Rather, a clear abuse of discretion is shown only where the trial court's determination falls outside "the zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 386, 391 (Tex. Crim. App. 1991)(op. on reh'g).

This Court applies a three-part reliability test to determine the admissibility of scientific testimony under Rule 702: (1) the scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique in question must have been properly applied on the occasion in question. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

## Dr. McDonald Properly Applied The Technique In Question

At a pre-trial *Daubert* hearing, Dr. Stacy McDonald testified that she was the Deputy Chief of the Physical Evidence Section at SWIFS and Acting Supervisor of the Forensic Biology Unit. 20 RR 6. She earned a Ph.D. in cytogenetics and earned a post-doctoral fellowship at the Mayo Clinic. 20 RR 6-7. Prior to joining SWIFS, she also

worked as a visiting scientist at the counter-terrorism and forensic science research unit of the Federal Bureau of Investigation. 20 RR 6. She had published several articles in the field of DNA and testified on many occasions. 20 RR 8.

Dr. McDonald testified that DNA is the genetic material that "makes us human." 20 RR 9. The genetic material in most humans is 99.9% the same. 20 RR 9. The field of forensic DNA analysis deals with the 0.1% of genetic material that differs among individuals. 20 RR 9. The portions of DNA used in forensic DNA analysis are highly variable between individuals, and that variation has been documented. 20 RR 10. Evidentiary samples provide a DNA profile that can be compared to DNA profiles from known sources. 20 RR 10. The comparison allows an individual to be included or excluded as a source of DNA if the evidence has a single-source profile or as a contributor to a multi-source profile. 20 RR 10. An analyst can apply a statistical weight to the match. 20 RR 10.

DNA is extracted from both evidentiary samples and known samples in the same way. 20 RR 11. DNA from evidentiary samples is extracted first in order to lessen the chances of contamination. 20 RR 11. Biological material is treated with a chemical to cause cells to burst. 20 RR 11. The results of this process are then "cleaned up" so that all that is present is DNA in some sort of liquid. 20 RR 11. The DNA is quantitated so that it is known how much there is, then it is amplified, and then placed on a capillary electrophoresis machine that is connected to a computer. 20 RR 11. The computer generates the profile. 20 RR 11-12. The profile from the evidentiary sample is compared to the profile of the known standard. 20 RR 12. If the profiles match at every single site, then the

known person is included; if they do not match at one or more sites, the person is excluded. 20 RR 12.

The process used by Dr. McDonald in this case is a technique accepted in the scientific community and based on a large body of published literature. 20 RR 12. No literature refutes the theory or process used. 20 RR 12-13. Error is controlled at each step by the use of built-in safeguards: blanks or negative controls that should not show a DNA profile when testing is complete, and positive controls that should show a known profile when testing is complete. 20 RR 13. Moreover, the policy at SWIFS is to retain half of the evidence sample for possible future testing by an outside agency. 20 RR 14.

In this case, SWIFS performed DNA testing on twenty-six evidence samples and seventeen known standards. 20 RR 14-15. One of the standards was from Sarah Walker, and one was from Appellant. 20 RR 15. Other known persons were submitted as elimination standards. 20 RR 15. Using the process she described to the trial court, Dr. McDonald tested each of the evidentiary samples before testing the known standards. 20 RR 16. She then compared the profiles generated to the known standards and either included or excluded each. 20 RR 16. The testing instrument used is an Applied Biosystems 310 Genetic Analyzer that was validated prior to use and was calibrated yearly. 20 RR 16. There were no indications of problems during the testing and no problems with the positive and negative controls. 20 RR 16-17. Dr. McDonald believed that she correctly applied her technique to each of the samples in question. 20 RR 17. Her entire case packet was reviewed by another analyst at SWIFS. 20 RR 17.

Dr. McDonald submitted multiple reports to the McKinney Police Department. 20 RR 18. Her final report was submitted September 6, 2007, and contained additional statistical analyses using Chinese and Vietnamese population databases. 20 RR 18. Her prior reports used only the Caucasian, African-American, and Hispanic databases typically used for forensic DNA reporting in Texas. 20 RR 19. She used the Chinese and Vietnamese databases because she was unable to find a Laotian[5] database and her internet research indicated that these two population groups would be the best to use to compare to someone of Laotian descent. 20 RR 19. The FBI produced the program—PopStats—that she used to perform her statistical analyses. 20 RR 19. The Chinese and Vietnamese population databases used were also from the FBI. 20 RR 19.

On cross-examination, Dr. McDonald testified that the sample sizes for the databases used for statistical purposes ranged from 500 for the Caucasian database to a little over 100 for the Chinese database. 20 RR 34-35. A 1992 study showed that a database is valid if it has between 100 and 150 samples. 20 RR 38. "Many papers" supported the use of the FBI database for generating statistics in this fashion. 20 RR 38. The standard operating procedure (SOP) at SWIFS did not include looking at Asian populations for generating the statistical report, but the SOP did not prohibit the use of additional databases in this fashion. 20 RR 40, 41, 47, 49. The accreditation process for SWIFS is based in part on the existence and use of SOPs. 20 RR 41-42.

Casey Dupont testified for the defense at the *Daubert* hearing. 20 RR 50. Dupont worked at OrchidCellmark, an accredited DNA laboratory in Dallas, as a DNA analyst.

---

[5] Appellant was of Laotian descent. 24 RR 129.

20 RR 50-51. Dupont reviewed Dr. McDonald's DNA analyses. 20 RR 53. She reviewed all the documentation, reports, and statistical analysis. 20 RR 53. She noted some anomalies in her report. 20 RR 54. One thing she noted was the use of Caucasian, African-American, and Hispanic population databases in the initial reports. 20 RR 54. Dupont reviewed the most recent report but not the statistical data underlying the report. 20 RR 54-55. Dupont did not believe that Dr. McDonald's use of the Chinese and Vietnamese databases was reliable; SOP at OrchidCellmark involved the use of a "general" Asian database. 20 RR 55. The generation of general Asian statistics is part of the OrchidCellmark SOP. 20 RR 56.

Dupont also noted an error in Dr. McDonald's report regarding item 13-N-T1 in that she omitted a marker from her report. 20 RR 57. Dupont also believed that as to the pull-cord, Dr. McDonald's "likelihood ratio" should have included the possibility that two unrelated persons contributed to the stain, although she acknowledged that some labs would report results the same way as Dr. McDonald. 20 RR 58. Dupont also identified what she characterized as a typographical error regarding the number of alleles present on a sample. 20 RR 59-60. Finally, Dupont believed that Dr. McDonald consumed some evidence in testing despite the policy at SWIFS not to do so. 20 RR 61-62. SOP at OrchidCellmark was that evidence could not be consumed absent permission. 20 RR 62. Dupont could not testify as to exactly what evidence was consumed. 20 RR 62.

On cross, Dupont agreed that SWIFS was an accredited lab. 20 RR 63. She did not have any issues with SWIFS's SOPs. 20 RR 63. Dupont agreed that Dr. McDonald conducted the DNA testing correctly and that her results were valid. 20 RR 63-64. Orchid-

Cellmark uses population subsets to conduct its testing and uses the FBI database to generate statistical results. 20 RR 64. The Chinese and Vietnamese databases from the FBI are acceptable databases. 20 RR 64. Dupont did not conduct her own statistical analysis for item 13-N-T1. 20 RR 65. She did not know whether SWIFS retained samples of evidence for additional testing, but she agreed that additional testing could be conducted if SWIFS retained sufficient evidence. 20 RR 66.

Dr. McDonald was recalled by the defense. 20 RR 66. She agreed that she made an error in omitting an allele in one calculation. 20 RR 66. SWIFS retained portions of all evidence tested in the case for possible additional testing, although the DNA extract from some items was consumed. 20 RR 67. Additional DNA testing on the retained samples should generate reliable scientific results. 20 RR 68-69. Appellant objected to Dr. McDonald's testimony on multiple grounds. 20 RR 72-76. The trial court overruled the objections. 20 RR 78.

### The Trial Court Properly Admitted Reliable Scientific Testimony

Appellant claims that the trial court erred in finding Dr. McDonald's testimony admissible because SWIFS violated SOP by using the Chinese and Vietnamese population databases, because of an "anomaly" in the fingernail DNA indicating it came from multiple contributors, and because of an error in the State's DNA report regarding the number of markers found on one of the pull-cords. The trial court did not err, however, because both scientists agreed that the DNA testing was conducted correctly, the results were valid, and the databases used to generate the statistical results were valid.

*No SOP Violation*

Appellant claimed in the hearing and on appeal that SWIFS violated its SOP by using the Chinese and Vietnamese databases for calculating statistics. 20 RR 40-42, 47-49; Appellant's Brief at 49. But Dr. McDonald testified that the SOP allowed the use of other databases. 20 RR 41-42, 47-49. The defense expert, Dupont, did not testify that SWIFS violated its SOP. 20 RR 55-56. Rather, she testified that SOP at OrchidCellmark differs from SOP at SWIFS in that OrchidCellmark always reports statistical results for a general Asian population. 20 RR 56. OrchidCellmark uses FBI databases just like the Chinese and Vietnamese databases used by Dr. McDonald. 20 RR 65-65. Dupont agreed that these were acceptable databases. 20 RR 65. Thus, the only evidence before the trial court was that Dr. McDonald did not violate SOP and that the databases she used to generate statistics were appropriate and from the same source as used by the defense expert. Accordingly, the evidence regarding SOPs refutes Appellant's claim.

*Fingernail Results Did Not Identify Another Source*

Appellant claims in his brief that DNA results from the fingernails should have been excluded because of an "anomaly" indicating that the DNA came from multiple sources. Appellant's Brief at 49. The record does not support this claim. Rather, the record shows that Dr. McDonald left out a marker when reporting results for item 13-N-T1, a sample from Sarah's fingernails. 20 RR 57, 65. Dr. McDonald agreed this was an error. 20 RR 66. Dupont stated that this error would affect the statistical calculation, but she did not state *how*, nor did she conduct her own calculation. 20 RR 57, 65. Neither of the DNA scientists testified that this reporting error indicated that the fingernail DNA came

from a source other than Sarah or Appellant. Absent evidence that the statistical error favored Appellant, the trial court was free to infer from this testimony that any error was minimal.

*Pull-Cord Results Were Reliable Because The Defense Expert Testified The Error In The Report Was A Typographical Error*

Appellant's final argument is that results from the pull-cords should have been excluded because of an error in the State's DNA report regarding the number of markers. Appellant's Brief at 49. Dupont testified that at one spot, the State's DNA report stated that there were "twenty (29)" genetic markers detected. 20 RR 59; DX 15 at Bates Stamp 07910. But Dupont testified that this appeared to be a typographical error. 20 RR 60. The most that she would see is that it might indicate inattention to detail in the laboratory. 20 RR 60. Otherwise, Dupont had no issue with SWIFS's SOPs, and she testified that Dr. McDonald's DNA analysis was correct and that her results were valid. 20 RR 63-64.

The evidence before the trial court showed that forensic DNA comparison is a valid scientific theory, that the techniques employed by Dr. McDonald were valid, and that she properly applied those techniques. 20 RR 12-17. The defense expert agreed. 20 RR 63-64. Accordingly, the trial court did not abuse its discretion by choosing to credit the State's expert rather than accepting defense counsel's unsubstantiated arguments and reliance on typographical errors. *See Kelly*, 824 S.W.2d at 574 (finding testimony based on earlier DNA techniques reliable); *Hines v. State*, 38 S.W.3d 805, 808-09 (Tex. App.– Houston [14th Dist.] 2001, no pet.) (holding trial court did not abuse its discretion by admitting DNA testimony because appellant only raised the possibility that the expert

committed an error and could not point to any specific instances of error). Issue 8 should be overruled.

**State's Reply To Appellant's Issues 9 and 10—Challenges For Cause**

Appellant claims in Issues 9 and 10 that the trial court abused its discretion in granting two challenges for cause. The record supports the trial court's rulings because both veniremembers indicated in their individual voir dire that they would place a higher burden of proof on the State in a death penalty case. Moreover, any error was harmless because the record does not demonstrate Appellant was deprived of a lawfully constituted jury.

**Trial Court's Rulings On Challenges For Cause Reviewed With Great Deference**

A veniremember is challengeable for cause if he has a bias or prejudice against the defendant or against the law upon which either the State or the defense is entitled to rely. The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. Before a prospective juror may be excused for cause on this basis, the law must be explained to him and he must be asked whether he can follow that law, regardless of his personal views. Finally, the proponent of a challenge for cause has the burden of establishing that the challenge is proper. The proponent does not meet this burden until he has shown that the veniremember understood the requirements of the law and could not overcome his prejudice well enough to follow the law. When the record reflects that a veniremember vacillated or equivocated on his ability to follow the law, the reviewing court must defer to the trial judge. *Gardner v. State*, No. AP-75,582, 2009 WL 3365652 at*10 (Tex. Crim. App. Oct. 21, 2009)(not yet reported).

This Court reviews a trial court's ruling on a challenge for cause with considerable deference because the trial court is in the best position to evaluate a veniremember's demeanor and responses. A trial court's ruling on a challenge for cause may be reversed only for a clear abuse of discretion. When a veniremember's answers are ambiguous, vacillating, unclear, or contradictory, the appellate court must give particular deference to the trial court's decision. *Id.*

**Veniremember Mania Would Increase the State's Burden of Proof**

Veniremember William Mania stated in his questionnaire that he did not believe the death penalty was fairly applied in Texas and that his views regarding the death penalty had changed because of DNA exonerations in Dallas County. DX 9 (Mania Questionnaire) at 2.[6] Mania also stated early in his individual voir dire that he believed the death penalty in Texas had been unfairly applied in the past to poor people and people of color while white people and wealthy people had been protected. 7 RR 98. Mania stated, however, that Appellant's Asian ethnicity would not affect his consideration of the case. 7 RR 99. The prosecutor then explained that the State's burden of proof on guilt was "beyond a reasonable doubt," just as it was in all criminal cases, but that some people felt that the State should have to prove guilt beyond "all doubt" in death penalty cases. 7 RR 99-100. Mania stated that he would require a standard greater than beyond a reasonable doubt:

> I would have to say honestly that it probably would fall
> somewhere between those two. It would probably be a little

---

[6] All of the questionnaires from voir dire were scanned and are in the record as Defense Exhibit 9 from the hearing on the motion to change venue.

> bit higher than reasonable doubt and a little bit lower than
> certainty.

7 RR 100. Mania explained that his belief was due to "the gravity of the situation itself"

reinforced by "what has happened in Dallas County." 7 RR 100-101. Mania would not

require "the law to get it right one hundred percent of the time" because that was "unreal-

istic." 7 RR 101. Mania also stated that he felt Texas used the death penalty "too often"

because it was a conservative state. 7 RR 102; DX 9 (Mania Questionnaire) at 2. Mania, a

medical doctor, also testified that, from the State's perspective, he might not be a good

juror because his overriding concerns regarding his medical practice would keep him

from giving the case his full attention. 7 RR 89, 92-95, 111; DX 9 (Mania Questionnaire)

at 13. On a scale of one hundred, Mania's concern about his practice was "75 to 80" be-

cause his patients counted on him. 7 RR 112.

Upon further questioning from defense counsel, Mania maintained his concern

that his practice would "worry" him if he served as a juror, but he also stated that he

would "do his best." 7 RR 117. Despite multiple follow-up questions from defense coun-

sel, Mania never stated with certainty that the case would receive his full attention. 7 RR

117-18.

Defense counsel also questioned Mania about the State's burden of proof. 7 RR

118-19. Mania agreed with counsel that, although the beyond a reasonable doubt standard

applied to both capital murder cases and traffic tickets, those offenses "were factually dif-

ferent things." 7 RR 119. Defense counsel informed Mania that he could set his own

standard for "beyond a reasonable doubt" as long as it was not "beyond all doubt." 7 RR

120. Mania then agreed with defense counsel that he did not have a problem with the "beyond a reasonable doubt" standard in a capital murder case. 7 RR 120.

On re-examination, Mania agreed with the prosecutor that he had previously stated that he would require the State to prove guilt past the "beyond a reasonable doubt" legal standard. 7 RR 123. Mania still felt that way. 7 RR 123. The prosecutor's examination ended as follows:

> [Prosecutor]: I mean, you know yourself and you know what's in your heart and you know how you truly feel about these cases and about the gravity and that's how you honestly feel; isn't it?
>
> [Mania]: That's correct.
>
> [Prosecutor]: Without putting any words into your mouth, your true feelings?
>
> [Mania]: Yes, sir.

7 RR 123. Mania then agreed with defense counsel that "beyond a reasonable doubt" in a capital murder case "would mean almost a certainty." 7 RR 124-25. It was then that Mania agreed he could follow the judge's instructions regarding the State's burden of proof. 7 RR 125-26. The trial court sustained the State's challenge for cause on the ground that Mania would hold the State to a higher burden of proof than "beyond a reasonable doubt." 7 RR 127-30.

The record demonstrates that Mania was disqualified because he would hold the State to a higher burden of proof than beyond a reasonable doubt. *See* Tex. Code Crim. Proc. Ann. art. 35.16(b)(3)(Vernon 2006); *Rachal v. State*, 917 S.W.2d 799, 810 (Tex. Crim. App. 1996); *Narvaiz v. State*, 840 S.W.2d 415, 427 (Tex. Crim. App. 1992). Spe-

cifically, when told that the burden was beyond a reasonable doubt, but some people thought it should be beyond all doubt, Mania stated that he believed the standard should be somewhere between those two concepts, necessarily making his standard greater than the legal standard. 7 RR 100. Despite efforts to rehabilitate him with leading questions, Mania maintained that the State must prove Appellant's guilt to some degree higher than beyond a reasonable doubt. 7 RR 123, 124-25. Thus, the trial court's ruling was correct. *See Narvaiz*, 840 S.W.2d at 427 (jurors properly disqualified when they gave both positive and negative answers regarding their ability to hold the State to the proper burden of proof rather than a higher standard).

**Mania Was Not Rehabilitated, Or At Most He Vacillated On The Burden of Proof**

Although Appellant's counsel tried to rehabilitate Mania, he did so employing an improper method. Appellant's counsel tried to obtain Mania's agreement that he could comply with the judge's instructions regarding burden of proof because Mania could determine what the burden of proof was: almost a certainty. 7 RR 120, 124-25. But that is not the law. Rather, the law is that the State must prove guilt beyond a reasonable doubt. *See, e.g., Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000). No case has ever held that jurors may set their own definition for beyond reasonable doubt—be it "88% sure," "almost a certainty," "beyond nearly all doubt," or "enough so that I sleep at night." Rather, jurors must use the term "beyond a reasonable doubt," but they may decide what level of evidence is necessary to convince them of that standard. *See Garrett v. State*, 851 S.W.2d 853, 859 (Tex. Crim. App. 1993) (noting that a juror was not challengeable for cause by the State if he could not find the State proved the first special issue

beyond a reasonable doubt based solely on the facts of the offense), *overruled on other grounds*, *Jones v. State*, 982 S.W.2d 386 (Tex. Crim. App. 1998). But here, Appellant's counsel explained to Mania, not that he alone could determine what evidence would meet the beyond a reasonable doubt standard, but rather that he could make up his own *standard*. Thus, Mania's agreement that he could follow the judge's instructions by applying his own standard did not rehabilitate him. Moreover, even if defense counsel's instructions to Mania about the burden of proof were correct, the record reflects vacillating answers to the lawyers' questioning on the matter—Mania stated twice to the prosecutor that he would apply a higher burden of proof and twice to defense counsel that he could follow the law. On such facts, the trial court does not abuse its discretion in granting the challenge for cause to a veniremember who vacillated on such an important issue. *Narvaiz*, 840 S.W.2d at 427 (jurors properly excused where they vacillated on State's burden of proof).

**Veniremember Delacruz Would Increase the State's Burden of Proof**

Veniremember Delacruz stated in his questionnaire that he did not believe the death penalty should ever be imposed but that he could follow the law and assess it under proper circumstances. DX 9 (Delacruz Questionnaire at 1). During voir dire, Delacruz reaffirmed his opposition to the death penalty generally but modified his position to include the death penalty for premeditated murders or for defendants who "lived their life just committing crimes left and right." 12 RR 162. When asked whether he could impose a death sentence, Delacruz stated: "Oh, I believe in the death penalty. I mean, I believe there's bad people out there that need to be — I mean." 12 RR 163. The prosecutor asked

again whether Delacruz could participate in the process that ended Appellant's life, and Delacruz said he could. 12 RR 163. Delacruz then reiterated that he did not believe the death penalty was appropriate if the defendant did not have a criminal history. 12 RR 164; DX 9 (Delacruz Questionnaire at 1).

The prosecutor questioned Delacruz about the State's burden of proof and explained to him the "preponderance of the evidence," "clear and convincing evidence," and "beyond a reasonable doubt" standards of proof commonly used in the criminal justice system. 12 RR 166-67. After talking about the seriousness of death penalty cases, the prosecutor and Delacruz discussed the burden of proof:

> [Prosecutor]: Some people will say, you know what, if it's a death case, if the state is seeking the death penalty, then I would require just a little bit more than beyond a reasonable doubt than I would in a burglary case or a driving while intoxicated or a speeding case.
> Some people will say, you know, because of the finality of the decision in this case, you just need that little extra.
> Is that something that you subscribe to?
>
> [Delacruz]: Yeah, I would think so. I mean, something as big as death, *I mean I think you have to prove your case a little bit more than, you know, us having like some doubts about it.*
>
> [Prosecutor]: Or even beyond — I mean the standard is beyond a reasonable doubt but because it's a death case you've got to have that little extra.
>
> [Delacruz]: *Yeah, I feel like y'all should be proving it just a little bit more.*
>
> [Prosecutor]: Some people will say beyond a shadow of a doubt. Have you ever heard that?
>
> [Delacruz]: No, I've never heard that.

[Prosecutor]: Have you ever heard — have you ever watched those TV lawyer shows?

[Delacruz]: I mean, I might have heard of beyond a shadow of a doubt.

[Prosecutor]: Okay, or some people will say beyond all doubt.

[Delacruz]: I've never heard that.

[Prosecutor]: You've never heard of that?

[Delacruz]: I've only heard reasonable doubt.

[Prosecutor]: You've heard beyond a reasonable doubt?

[Delacruz]: I've heard that. I don't fully understand it. You know, I mean I know it's like something that maybe like y'all don't have all the reasons of why he did it but maybe some of the reasons but like a shadow of a doubt and all that I've never heard of it.

[Prosecutor]: Okay. *But because of the seriousness of this you feel we've got to prove it —*

[Delacruz]: *Yeah, yeah.*

[Prosecutor]: *— a little bit more than beyond a reasonable doubt?*

 [Delacruz]: *Yeah, because it's involving somebody else's life.*

12 RR 168-70 (emphasis added). Delacruz reaffirmed his feelings in response to later questioning, stating that he would hold the State to a higher burden of proof because it was a death penalty case. 12 RR 180.

Appellant's counsel questioned Delacruz and told him the State was only required to prove guilt beyond a reasonable doubt and that it was up to him to decide what proof beyond a reasonable doubt is. 12 RR 181-82. Delacruz stated that he would hold the State to that burden of proof. 12 RR 182. Delacruz told defense counsel he would not require the State to prove guilt beyond all doubt because there was "no way they could do that." 12 RR 182. But Delacruz then told defense counsel that the standard was "the max of reasonable doubt... the maximum reasonable doubt." 12 RR 182.

The prosecutor challenged Delacruz because he stated to both the prosecutor and defense counsel that he would hold the State to a higher burden of proof than the "beyond a reasonable doubt" standard. 12 RR 184-85. The trial court sustained the challenge. 12 RR 185.

The record demonstrates that Delacruz was disqualified because he would hold the State to a higher burden of proof than beyond a reasonable doubt. *See* Tex. Code Crim. Proc. Ann. art. 35.16(b)(3)(Vernon 2006); *Rachal*, 917 S.W.2d at 810; *Narvaiz*, 840 S.W.2d at 427. Specifically, after being told the State's burden of proof was "beyond a reasonable doubt," Delacruz stated that he would need the State to "prove it a little bit more." 12 RR 168-69. He later reaffirmed this and agreed he would need proof by "a certainty." 12 RR 180. Although he later agreed with defense counsel that he would hold the State to proof "beyond a reasonable doubt," he also volunteered that the standard was "the max of reasonable doubt... the maximum reasonable doubt." 12 RR 182. Thus, defense counsel's attempts to rehabilitate him were unavailing, or at most showed a vacillating juror. *Narvaiz*, 840 S.W.2d at 427 (jurors properly disqualified when they gave

both positive and negative answers regarding their ability to hold the State to the proper burden of proof rather than a higher standard).

## Any Error Was Harmless Because The Record Does Not Show Appellant Was Deprived Of A Fair And Impartial Jury

While the record demonstrates that the trial judge properly granted the State's challenges for cause, the record also demonstrates that Appellant was not harmed by the trial court's ruling. Error in granting a State's challenge for cause is generally non-constitutional. *Jones v. State*, 982 S.W.2d 386, 391 (Tex. Crim. App. 1998). In order to show harm from an improper State's challenge for cause, the record must show that the defendant was deprived of a fair and impartial jury. *Id.* at 394.

In this case, the trial court found that veniremembers Mania and Delacruz would hold the State to a burden of proof greater than "beyond a reasonable doubt." 7 RR 127-30; 12 RR 185. Therefore, any error by the trial court is non-constitutional because it does not involve erroneous exclusion of a juror for his doubts regarding the death penalty. *Id.* at 391. And the record shows that Appellant ultimately received a fair and impartial jury. All the serving jurors stated that they would respect the presumption of innocence, hold the State to its burden of proof on guilt and special issue one, and appropriately deliberate the special issues in punishment.[7] Appellant does not identify anything in the record showing that his jury was not fair and impartial. Appellant's Brief at 55-59.

---

[7] Reed (6 RR 86, 109); Brown (8 RR 136); Lambeth (8 RR 205, 217, 229, 235, 238, 241-43, 245); Dick (9 RR 20, 24, 36, 37, 41, 47, 520; Mullins (12 RR 27-28, 40, 48, 52, 53-54); Nehama (13 RR 137, 140, 149, 166, 168, 174); Harris (14 RR 120, 139, 148, 150, 153, 168); Robitalle (15 RR 13, 17, 33, 35, 44, 46, 49, 50); Schwartz (15 RR 104, 105, 106, 108, 120, 124-25, 131, 139); Wilson (16 RR 237-38, 242, 254, 255, 265, 268); Drake (18 RR 54, 65, 75, 87, 91); Gilchrist (18 RR 109, 111, 118, 122, 126, 138, 140).

Accordingly, Appellant was not harmed by the rulings he challenges. *Jones*, 982 S.W.2d at 394. Issues 9 and 10 should be overruled.

**State's Reply To Appellant's Issue 11—"Man Bites Dog" Photograph**

Appellant claims in Issue 11 the trial court erred by admitting a photograph depicting him as if he were about to bite his dog. No abuse of discretion is shown because Appellant's biting ability was an issue in the case. In any event, Appellant was not harmed by the admission of the photo.

**The "Man Bites Dog" Photo**

The State offered a photograph of Appellant apparently acting as if he were going to bite his dog. 21 RR 237; SX 75. The photo was recovered from Appellant's cell phone. 21 RR 237. The State offered the photo because it showed Appellant's appearance and because it showed his ability to inflict a bite like that found on Sarah's body. 21 RR 237. Appellant objected on the basis that similar testimony was expected from forensic dentists and because the photo was more prejudicial than probative. 21 RR 238-39. The trial court overruled the objection. 21 RR 239.

**Evidentiary Rulings Are Reviewed For Abuse of Discretion**

Determination of the admissibility of evidence rests within the sound discretion of the trial court. The trial court's admission of evidence will not be disturbed absent a clear abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 386, 391 (Tex. Crim. App. 1991)(op. on reh'g).

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. Relevant evidence is generally admissible. Tex. R. Evid. 402. But relevant evidence may be excluded if the

probative value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. Photographs are generally admissible if testimony regarding the matter depicted is admissible. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007).

## The Photograph Of Appellant At Play With His Dog Was Not Unfairly Prejudicial Or Cumulative, But It Was Relevant

Appellant's "man bites dog" photo was not so prejudicial as to outweigh its probative value. In this case, the State alleged that Appellant murdered Sarah Walker, and it had the burden to prove that murder beyond a reasonable doubt. Sarah's murderer inflicted a large bitemark during the murder. 22 RR 225. Thus, if Appellant could administer such a bite, it would make it more probable that he inflicted the bite, and thus more probable that he was the murderer. Thus, the photo was relevant. *See* Tex. R. Evid. 401; *Sigala v. State*, No. AP-74,212, 2004 WL 231326 at *6-7 (Tex. Crim. App. Jan. 14, 2004)(not designated for publication)(crime scene photo depicting a nude female homicide victim relevant in capital murder prosecution where defendant indicted for killing a different victim in the same transaction).

Furthermore, the trial court's ruling did not violate Rule 403. At the time the photo was offered, the State's forensic dentist and DNA analyst had not testified. Thus, the photo was not cumulative of other testimony showing Appellant was the murderer. *See* Tex. R. Evid. 403; *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006) (noting that the cumulative evidence portion of Rule 403 is analyzed as to evidence already admitted). Furthermore, Appellant had already sought exclusion of the State's DNA and forensic dentistry evidence. *See* State's Replies to Points of Error 7 and 8 *su-*

*pra*. Thus, the State and the trial court could anticipate both that Appellant would again seek to exclude the other evidence establishing Appellant's identity as the murderer and that Appellant would offer evidence contradicting the State's evidence on these issues.

There was also no danger of unfair prejudice. "Unfair prejudice" refers to a tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one. *Id.* The "man bites dog" picture was not unfairly prejudicial because, while it shows Appellant's bite ability, it reveals nothing else about him. It is an apparently playful moment captured on his cell-phone camera, not an extraneous offense[8] or other indicator of Appellant's more sinister character. Appellant articulates nothing unfairly prejudicial about the photo. 21 RR 238-39; Appellant's Brief at 60-61.

When conducting a Rule 403 balancing test, a trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or repeat evidence already admitted. *Gigliobianco*, 210 S.W.3d at 641. In this case, Appellant offers no argument that the photo lacks probative force. Appellant's Brief at 60-61. And nothing in Appellant's brief or the record shows that the photo would suggest a decision

---

[8] Appellant did not claim below that the photo depicts an extraneous offense or bad act, nor does he do so on appeal. 21 RR 238-39; Appellant's brief at 60-61. No one ever suggested he actually bit his dog.

on an improper basis, confuse or distract the jury, or be given undue weight. It took only five pages in the record to admit the photo into evidence. 21 RR 241-46. Accordingly, the trial court did not abuse its discretion in rejecting Appellant's Rule 403 claim and admitting the single "man bites dog" photo. *See Casey v. State*, 215 S.W.3d 870, 883-84 (Tex. Crim. App. 2007) (rejecting Rule 403 challenge to admittedly graphic photos of female genitalia, an unconscious woman being sexually abused, and a man having sex with an unconscious woman that otherwise corroborated claim of victim that she was assaulted and rebutted claim by defense that the conduct was consensual); *Sigala*, 2004 WL 231326, at *6-7 (crime-scene photograph admissible over Rule 403 objection).

### Appellant's Substantial Rights Were Not Violated By The Photo In A Case Where Other Evidence Later Established The Same Fact At Issue And The Evidence Overwhelmingly Demonstrated His Guilt

Even if the trial court erred in admitting the photo, any error was harmless because it did not affect Appellant's substantial rights. If an error is non-constitutional, an error must be disregarded unless it affects substantial rights. Tex. R. App. P. 44.2(b). In this case, Appellant was not harmed because similar evidence regarding his ability to bite was admitted during the testimony of the State's forensic dentist, Dr. Hutson. 22 RR 248-50. Other photos showing Appellant's biting ability were also admitted into evidence. 22 RR 249-50; SX 96. Appellant did not object to the admission of Dr. Hutson's photo of the "maximum opening" of Appellant's mouth. 22 RR 29-50. Accordingly, as the same evidence was admitted elsewhere in the guilt phase without objection, Appellant was not harmed. *See Nonn v. State*, 117 S.W.3d 874, 883 (Tex. Crim. App. 2003) (holding defen-

dant not harmed by erroneous admission of an improperly warned confession where the same evidence was properly admitted through other evidence).

Moreover, Appellant effectively conceded his guilt in this case. During opening statements, his counsel admitted that Appellant intended to rob the victim, that the robbery went wrong, and that he killed the victim. 21 RR 29-30. During closing arguments on guilt, his counsel again conceded Appellant killed Sarah Walker. 23 RR 29-30, 33. And, indeed, the evidence showing Appellant killed Sarah Walker in the course of robbing her was conclusive:

- his DNA was recovered from multiple bloodstains at the scene and beneath Sarah Walker's fingernails (22 RR 272-83);

- other evidence showed the bite mark on the victim was linked to his teeth (22 RR 240-59);

- he admitted being present at the crime scene (22 RR 86-91; SX 77);

- witnesses placed him and his car at the crime scene immediately before the murder (21 RR 98, 103, 112, 182-83);

- surveillance video taken immediately before the murder showed Walker wearing a watch and ring (21 RR 170-73; SX 42, 43);

- Walker did not have her ring or watch when her body was found (22 RR 205); and

- Walker died due to blunt force trauma, strangulation, and 33 stab wounds (22 RR 204-34; SX 79).

Thus, Appellant's concessions merely acknowledged the strong evidence against him. Because the evidence establishing his guilt was conclusive and other properly admitted evidence showed Appellant's ability to bite, any error in the admission of the "man bites

dog" photo did not affect his substantial rights and was harmless. *See* Tex. R. App. P. 44.2(b); *Nonn*, 117 S.W.3d at 883. Issue 11 should be overruled.

**State's Reply To Issue 12—Statewide Standards For Death Penalty Prosecution**

In Issue 12, Appellant claims that the Texas Death Penalty Statute violates his right to equal protection under the federal constitution because there are no "uniform, statewide standards to guide prosecutors in deciding when they should seek the death penalty," citing *Bush v. Gore*, 531 U.S. 98 (2000). Appellant's Brief at 63-85. This Court has repeatedly rejected this very claim, and Appellant offers no basis on appeal for this Court to revisit the issue. *See, e.g., Threadgill v. State*, 146 S.W.3d 654, 672 (Tex. Crim. App. 2004).

In any event, uniform statewide standards regarding the death penalty do exist. The Texas Penal Code defines which offenses are eligible for the death penalty. Tex. Penal Code Ann. § 19.03 (Vernon Supp. 2009). The Code of Criminal Procedure lays out the procedure for determining whether a defendant convicted of a capital offense receives the death penalty or life in prison without parole. Tex. Code Crim. Proc. Ann. art. 37.071 (Vernon Supp. 2009). All prosecutions for capital murder are subject to the same, stringent burden of proof—beyond a reasonable doubt. *See, e.g.,* Tex. Code Crim. Proc. Ann. art. 38.03 (Vernon Supp. 2009). Finally, this Court has direct appellate responsibility for all death penalty convictions in the state, thus ensuring that there are not conflicts between lesser Texas courts regarding the meaning of these guiding laws. *See* Tex. Code Crim. Proc. Ann. art. 37.071 § 2(h); Tex. Code Crim. Proc. Ann. art. 4.04(b)(Vernon 2005); *Jurek v. Texas*, 428 U.S. 262, 276 (1976)(noting this Court's role in ensuring "the evenhanded, rational, and consistent imposition of death sentences under law" in Texas). Thus, prosecutorial discretion in death penalty cases is amply controlled by statewide law

that applies to all Texas prosecutors. Appellant's Issue 12 lacks any basis in fact or law and should be overruled. *See Busby v. State*, 235 S.W.3d 661, 667 (Tex. Crim. App. 2008) (rejecting equal protection attack on Article 37.071 based on *Bush v. Gore*).

**State's Reply To Appellant's Issue 13—Definition Of Mitigating Evidence**

In Issue 13, Appellant claims that the mitigation special issue in Article 37.071 violates the Eighth and Fourteenth Amendments of the federal constitution because it impermissibly restricts the jury's consideration of mitigating evidence. Appellant's Brief at 85-89. This Court has previously rejected similar challenges, and Appellant offers no argument why this Court should revisit the issue. *See, e.g., Whitaker v. State*, 286 S.W.3d 355, 369 n.14 (Tex. Crim. App. 2009); *Perry v. State*, 158 S.W.3d 438, 449 (Tex. Crim. App. 2004). Moreover, the Supreme Court has previously indicated that the mitigation special issue in the current statute is adequate to the task. *See Penry v. Johnson*, 532 U.S. 782, 803 (2001) (contrasting the nullification instruction used in Penry's second trial with "brevity and clarity" of the current special issue). Appellant offers no examples of evidence that might be mitigating but that would not relate to a defendant's "moral blameworthiness." Appellant's brief at 85-89. Accordingly, Appellant's Issue 13 should be overruled.

**State's Reply To Issues 14 And 15—Cumulative Error**

In Issue 14, Appellant claims that cumulative errors in his trial violated the federal constitution. In Issue 15, Appellant claims that cumulative errors in his trial violated the Texas Constitution.

This Court has repeatedly recognized that, while a number of errors may cause harm in their cumulative effect, non-error cannot cumulatively cause error. *Escamilla v. State*, 143 S.W.3d 814, 829 (Tex. Crim. App. 2004); *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). No constitutional error affected Appellant's trial, and none of his claimed errors interacts with another such that it could have a cumulative effect. Accordingly, Issues 14 and 15 should be overruled.

**Prayer**

The State prays that Appellant's conviction and sentence be affirmed.

Respectfully submitted,

**JOHN R. ROACH**
Criminal District Attorney
Collin County, Texas

**JOHN R. ROLATER, JR.**
Assistant Criminal District Attorney
Chief of the Appellate Division
SBT#00791565
2100 Bloomdale Rd., Ste. 20004
McKinney, TX 75071
(972) 548-4323
(214) 491-4860 fax

## Certificate of Service

A true copy of the State's brief has been sent by first-class mail to counsel for Appellant, C. Wayne Huff, P.O. Box 2334, Boerne, Texas 78006, on this, the 18th day of November, 2009.

John R. Rolater, Jr.