Hr-12 174

CLERK'S RECORD

VOLUME 5 OF 6

TRIAL COURT CAUSE NO: 380-81972-07
A REINDICTMENT OF NO: 380-82629-06

IN THE 380TH DISTRICT COURT
OF COLLIN COUNTY, TEXAS,
HONORABLE CHARLES SANDOVAL JUDGE PRESIDING

---

KOSOUL CHANTHAKOUMMANE      APPELLANT

**FILED IN
COURT OF CRIMINAL APPEALS**

VS.

FEB 26 2008

THE STATE OF TEXAS      APPELLEE

Louise Pearson, Clerk

---

APPEALED TO THE
COURT OF CRIMINAL APPEALS IN AUSTIN, TEXAS

---

ATTORNEY FOR APPELLANT:
NAME: C WAYNE HUFF
ADDRESS: P O BOX 2334
     BOERNE   TX   78006-2334
TELEPHONE: (214)803-4127
FAX NO: (830)230-5567
SBOT NO: 10180600

ATTORNEY FOR APPELLEE:
NAME:   JOHN R ROACH
ADDRESS: 2100 BLOOMDALE RD
     MCKINNEY TX 75069
TELEPHONE: (972) 548-4323
FAX NO:   (972) 548-4388
SBOT NO:   90001601

---

DELIVERED TO THE COURT OF CRIMINAL APPEALS IN AUSTIN, TEXAS
ON THE 13TH DAY OF FEBRUARY, 2008

SIGNATURE OF CLERK: _____
NAME OF CLERK:   CAROLYN MCCARLEY
TITLE:   DEPUTY CLERK

---

APPELLATE COURT CAUSE NO. AP-75,794

FILED IN THE COURT OF CRIMINAL APPEALS IN AUSTIN, TEXAS

ON THE_____DAY OF_____20__.

_____, CLERK

BY_____, DEPUTY

CAUSE NUMBER 380-82629-06

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | §. | COLLIN COUNTY, TEXAS |
| | § | |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MEMORANDUM IN SUPPORT OF MOTION TO PRECLUDE THE DEATH PENALTY AS A SENTENCING OPTION

Equal Protection and Prosecutorial Discretion in the Texas Death Penalty System
by
Jennifer Hunter,
Yale Law School
January 2002
John Niland,
Texas Defender Service
Professor Stephen Bright

## TABLE OF CONTENTS

Table of Contents...................................................................................i

Table of Authorities................................................................................ii

Argument.............................................................................................
1

I. Texas must institute uniform statewide standards to guide prosecutors in deciding when they should seek the death penalty in order to comply with the Equal Protection Clause...........................................................................................1

    A. Because the right to life is a fundamental right which must be subject to at least the same constitutional protections as the right to vote, the state must establish safeguards to ensure that it does not treat its citizens in a disparate and arbitrary manner.......................................................................................2

    B. The lack of standards to guide local prosecutors in their decisions as to whether to seek the death penalty inevitably leads to the arbitrary and disparate treatment of similarly situated defendants..........................................................7

797

C. <u>The integrity of the rule of law and of the court system demands that courts treat the Equal Protection principle announced in Bush v. Gore seriously and afford it precedential weight</u>...............................................................................14

II. THE NEED FOR NON-ARBITRARY STANDARDS IN THE APPLICATION OF THE DEATH PENALTY OUTWEIGHS ANY BENEFITS OF UNBOUNDED PROSECUTORIAL DISCRETION........16

III. STATEWIDE STANDARDS TO GUIDE PROSECUTORIAL DISCRETION WOULD ADVANCE THE EIGHTH AMENDMENT GOAL OF NON-ARBITRARINESS IN CAPITAL PROCEEDINGS….........21

IV. OTHER COURTS HAVE RECOGNIZED THAT THE FOURTEENTH AMENDMENT REQUIRES LIMITING DISCRETION TO ENSURE EQUALITY AND NON-ARBITRARINESS IN GOVERNMENTAL DECISION MAKING…........................................................................................25

## TABLE OF AUTHORITIES

### Cases

| | |
|---|---|
| <u>Bordenkircher v. Hayes</u>, 434 U.S. 357 (1978) | 18 |
| <u>Bush v. Gore</u>, 531 U.S. 98 (2000) | passim |
| <u>De Garmo v. Texas</u>, 474 U.S. 973 (1985) | 22 |
| <u>Furman v. Georgia</u>, 408 U.S. 238 (1972) | 3, 21, 22 |
| <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976) | 21, 22, 23 |
| <u>Holmes v. New York City Housing Authority</u>, 398 F.2d 262 (2d Cir. 1968) | 26, 27 |
| <u>Hornsby v. Allen</u>, 326 F.2d 605 (5th Cir. 1964) | 26, 27 |
| <u>Jurek v. Texas</u>, 428 U.S. 262 (1976) | 21 |
| <u>McCleskey v. Kemp</u>, 481 U.S. 279 (1987) | 4, 23 |
| <u>Nader v. Saxbe</u>, 497 F.2d 676 (1974) | 19 |
| <u>Newman v. United States</u>, 382 F.2d 479 (1967) | 18 |
| <u>Niemotko v. Maryland</u>, 340 U.S. 268, 273 (1951) | 25, 27 |
| <u>Oyler v. Boles</u>, 368 U.S. 448 (1962) | 18 |
| <u>Skinner v. Oklahoma</u>, 316 U.S. 535 (1942) | 17, 19 |
| <u>State v. Koedatich</u>, 548 A.2d 939 (N.J. 1988) | 13, 22 |
| <u>State v. Marshall</u>, 613 A.2d 1059 (N.J. 1992) | 13, 14, 24 |
| <u>United States v. Armstrong</u>, 517 U.S. 456 (1996) | 17,18 |
| <u>United States v. Batchelder</u>, 442 U.S. 114 (1979) | 17 |
| <u>United States v. Chemical Foundation, Inc.</u>, 272 U.S. 1 (1926) | 18 |
| <u>United States v. Cox</u>, 342 F.2d 167 (5th Cir. Miss. 1965) | 18 |
| <u>United States v. Shaw</u>, 226 A.2d 366 (D.C. 1967) | 18 |
| <u>Wayte v. United States</u>, 470 U.S. 598 (1985) | 17, 19 |
| <u>Woodson v. North Carolina</u>, 428 U.S. 280 (1976). | 27 |

798

<u>Yick Wo v. Hopkins</u>, 118 U.S. 356 (1886)     18

### Statutes

Tex. Code Crim. Proc. art. 37.071 (2000)     8, 22
Tex. Penal Code §19.03 (2000)     8

### Law Review Articles

Cass R. Sunstein, <u>Symposium: Bush v. Gore: Order without Law</u>,
    68 U. Chi. L. Rev. 737 (2001)     4, 15
David A. Strauss, <u>Symposium: Bush v. Gore: What Were They Thinking?</u>,
    68 U. Chi. L. Rev. 737 (2001)     15, 16
James Vorenberg, <u>Decent Restraint of Prosecutorial Power</u>,
    94 Harv. L. Rev. 1521 (1981)     18, 20
Jonathan R. Sorensen and James W. Marquart, <u>Prosecutorial And Jury Decision-Making
    in Post-Furman Texas Capital Cases</u>, 18 N.Y.U. Rev. L. & Soc. Change 743
    (1990/91)....................................................................................12,13
Laurence Benner et. al., <u>Criminal Justice in the Supreme Court: An Analysis of United
    States Supreme Court Criminal and Habeas Corpus Decisions (October 2, 2000 -
    September 30, 2001)</u>, 38 Cal. W. L. Rev. 87(2001).........................................................3
Michael P. Seng, <u>Commentary: Reflections on when "We, the People" Kill</u>,
    34 J. Marshall L. Rev. 713 (2001)..................................................................................4
Robert H. Bork, <u>Neutral Principles and Some First Amendment Problems</u>,
    47 Ind. L.J. 1 (1971)     14, 15

### Constitutional Provisions

U.S. Const. amend. I     23, 24
U.S. Const. amend. V     3
U.S. Const. amend. VIII     20, 21, 22, 25
U.S. Const. amend. XIV     3, 23
U.S. Const. amend. XIV, §1     passim

### Other Authorities

Black's Law Dictionary, Seventh Edition (1999)      14

Texas Civil Rights Project, The Death Penalty In Texas (2000)      24

U.S. Department of Justice, The Federal Death Penalty System: Supplementary Data,
Analysis and Revised Protocols for Capital Case Review (2001)....................................6

United States Attorneys' Manual §9-10.010 et. seq. (1995)      6

United States General Accounting Office, Death Penalty Sentencing: Research Indicates
Pattern of Racial Disparities, GDD-90-57
(1990)..........................................................13

## Newspaper Articles

Armando Villafranca, A Man of Conviction: For Securing Death Penalty, Offering Blunt
Views, Few Top District Attorney, Houston Chronicle, November 29, 1998.................9

Holly Becka, Vance Retiring With Legacy Of Helping Crime Victims; Attorneys Note
Ethical Standards Set by DA, Assistant, Dallas Morning News, December 31, 1998.....9

Julie Mason, Candidates for DA Draw Differences; Pair Disagree on State's Death-
Sentence System, Houston Chronicle, October 26, 2000...............................................10

Jury Process in Zamora Murder Trial to Start Jan. 20,
Dallas Morning News, December 6, 1997      24

Mike Tolson and Steve Brewer, Harris County is a Pipeline to Death Row,
Houston Chronicle, February 2, 2001      10, 12

Richard Willing, Prosecutor Often Determines Which Way A Case Will Go,
USA Today, Monday, December 20, 1999      9

Richard Willing and Gary Fields, Geography of the Death Penalty,
USA Today, December 20, 1999, at 1A      9, 11, 12

800

I.  TEXAS MUST INSTITUTE UNIFORM STATEWIDE STANDARDS TO GUIDE PROSECUTORS IN DECIDING WHEN THEY SHOULD SEEK THE DEATH PENALTY IN ORDER TO COMPLY WITH THE EQUAL PROTECTION CLAUSE

Under the Equal Protection principle announced by the Supreme Court in Bush v. Gore, 531 U.S. 98 (2000), current Texas law is unconstitutional because it fails to set forth uniform standards as to when a prosecutor should seek the death penalty in a potentially capital case. The intense reactions which greeted the Bush opinion in the fall of 2000 notwithstanding, the Supreme Court's holding in that case is quite simple: When fundamental rights are involved, the Equal Protection Clause of the Fourteenth Amendment requires that there be "uniform" and "specific" standards to prevent the arbitrary and disparate treatment of similarly situated people. Bush, 531 U.S. at 106. Because the Florida Supreme Court did not set forth such standards in its opinion ordering a recount but instead announced only that ballots should be counted according to a vague "intent of the voter" standard, the recount would not respect the "equal dignity owed to each voter." Id. at 102.

The Texas death penalty system concerns a right even more fundamental than the right to vote, that is, the right to life. As was true in the Florida recount, in Texas, the lack of statewide standards to guide prosecutors in determining which cases warrant seeking the death penalty inevitably leads to the disparate treatment of similarly situated people accused of potentially capital offenses. While the Supreme Court stated that its

holding in <u>Bush v. Gore</u> was limited to the facts of that case, the principles it announced are sound and must be subject to respect as precedent. Those principles require that the method used by prosecutors in deciding which defendants will face the death penalty should be subject to at least as much scrutiny as the process of counting votes. The need for equality and non-arbitrariness when the state seeks to deprive a citizen of his life outweighs any benefits of unbridled prosecutorial discretion.

> A. <u>Because the right to life is a fundamental right which must be subject to at least the same constitutional protections as the right to vote, the state must establish safeguards to ensure that it does not treat its citizens in a disparate and arbitrary manner</u>

If anything, courts must require additional safeguards to ensure the equal treatment of all persons in the context of death penalty prosecutions than in that of an election recount. Whereas the right to vote is "fundamental" because of historical trends and legislative decisions, the right to life that is at stake in Texas' system of capital punishment is the most fundamental of all rights, and accordingly is found in the very text of the United States Constitution.

In <u>Bush v. Gore</u> the Supreme Court recognized that "[t]he individual citizen has no federal constitutional right to vote for electors for the President of the United States." <u>Bush</u>, 531 U.S. at 104. However, "[h]istory has now favored the voter," and since every state now chooses its electors through a statewide election, "the right to vote as the legislature has prescribed is fundamental." <u>Id.</u>

In contrast to the implied Constitutional right to vote, the right to life is contained in the text of the Constitution. The Fifth and Fourteenth Amendments provide that neither the federal government nor the states shall deprive any person of "life, liberty, or property" without due process of law. U.S. Const. amend. V; amend. XIV, §1. The Supreme Court has long recognized the fundamental nature of the right to life, particularly in the context of the death penalty. See Furman v. Georgia, 408 U.S. 238, 359 (1972) ("because capital punishment deprives an individual of a fundamental right (i.e., the right to life), . . . the State needs a compelling interest to justify it").

Because the right to life is fundamental, when a state implements a death penalty system it must establish mechanisms to ensure that the system values the lives of all of its citizens equally. As the Supreme Court noted with respect to voting, "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Bush, 531 U.S. at 104-05. By the same reasoning, since the Constitution has ensured both the right to life and to the equal protection of the laws, a state may not, by arbitrary and disparate treatment, value one person's life over that of another. In the brief period since Bush was handed down, several commentators have taken notice of this result; see Laurence Benner et. al., Criminal Justice in the Supreme Court: An Analysis of United States Supreme Court Criminal and Habeas Corpus Decisions (October 2, 2000 - September 30, 2001), 38 Cal. W. L. Rev. 87, 91 (2001) ("Certainly the Bush v. Gore equal protection principle ought to be no less applicable when a state permits "disparate treatment" of death eligible defendants because county prosecutors use differing standards for electing which

803

defendants they will seek to execute"); Michael P. Seng, Commentary: Reflections on when "We, the People" Kill, 34 J. Marshall L. Rev. 713, 717 (2001) ("Certainly, if a state or its courts cannot arbitrarily dilute or deny a person's right to vote because of the Equal Protection clause, then human life must also be given equal protection"); Cass R. Sunstein, Symposium: Bush v. Gore: Order Without Law, 68 U. Chi. L. Rev. 737, 758 (2001) (noting that the Bush holding might require that "methods be in place to ensure against the differential treatment of those subject to capital punishment").

Texas' lack of standards to ensure non-arbitrary treatment with regard to the fundamental right to life is enough in itself to establish an Equal Protection violation; a showing of intentional discrimination against a protected class is not required. See Bush, 531 U.S. at 106. While in traditional claims of discrimination against individuals courts require evidence of discriminatory intent by a state actor in that particular case, see, e.g., McCleskey v. Kemp, 481 U.S. 279 (1987), in Bush the Court did not require any such showing. Unlike these traditional Equal Protection claims of intentional discrimination against a protected class, claims like this one and the one in Bush are not based on an individual act of discrimination, but rather challenge a system in which unchecked official discretion makes arbitrary and unequal treatment inevitable.

The Texas death penalty prosecution system must be subject to the same Equal Protection constraints. If the Equal Protection clause requires rules to ensure that localities do not treat "identical types of ballots used in identical brands of machines and exhibiting identical physical characteristics" differently, Bush, 531 U.S. at 134 (Souter, J., dissenting) (agreeing with per curium that the lack of standards for the statewide

recount violated the Equal Protection Clause but disagreeing as to the proper remedy), then it must require rules to ensure that localities do not treat similarly situated offenders committing the same types of crimes differently with respect to their lives. While the Bush v. Gore opinion declares that its "consideration is limited to the present circumstances," *Id.* at 109, suggesting that the principle announced might not apply to any other situations, the fundamental nature of the right to life requires that the principle also apply, as logically appropriate, to the death penalty system.

The per curium opinion in Bush explains the narrow scope of its holding by distinguishing the somewhat unusual situation of a court-ordered statewide recount from an ordinary election. In ordinary elections, the Court says, the Equal Protection Clause does not prohibit counties from developing "different systems for implementing elections." Bush, 531 U.S. at 109. One reason for this distinction is that once ballots have been cast, the "factfinder confronts a thing, not a person," and thus "[t]he search for intent can be confined by specific rules designed to ensure uniform treatment." *Id.* at 106. Also, individual counties may have "expertise" that justifies letting them choose their own methods of conducting elections. *Id.* at 109. Another explanation is that "local variety [in voting machines and procedures] can be justified by concerns about cost, the potential value of innovation, and so on" whereas a "different order of disparity" occurs when, after ballots have been cast, physically identical ballots are hand-counted according to different rules. *Id.* at 134 (Souter, J., dissenting). Finally, of course, voting is different than capital punishment, and arguably the differences between the two might justify different constitutional analyses.

805

These explanations do not diminish the relevance of the <u>Bush</u> Equal Protection rule to Texas' death penalty system, however. Just as Florida counties can use different voting machines in their elections, Texas counties can certainly have separate prosecutors and can structure those prosecutors' offices differently; this allows the flexibility demanded by limited budgets and justified by local expertise, and takes into account the potential for innovation inherent in a system of local control. With regard to the Court's distinction between a "thing" and "person," although it is true that prosecutors charged with deciding when to seek the death penalty confront people and not things, this does not diminish the Equal Protection Clause's requirement of non-arbitrariness. While it might be easier to design standards about whether to count "hanging chads" as legal votes, it is certainly not impossible to write standards to guide prosecutors in the decision making process with regards to when the death penalty should be sought. <u>See, e.g.</u>, <u>United States Attorneys' Manual</u> §9-10.010 et. seq. (1995) (laying out "federal protocol" for capital cases); U.S. Department of Justice, <u>The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review</u> (2001) 6, http://www.usdoj.gov/dag/pubdoc/deathpenaltystudy.htm. It is true that elections and capital punishment are different, but the fact remains that both involve a fundamental right and therefore should be subject to the same "minimum requirement for non-arbitrary treatment," <u>Bush</u>, 531 U.S. at 105. The Fourteenth Amendment protections required in an election recount do not derive from the candidates' right to have all the votes for them counted correctly, but from the "equal dignity owed to each voter," <u>Id.</u> at 104. Surely the equal dignity owed to each person's life requires no less.

6

B. The lack of standards to guide local prosecutors in their decisions as to whether to seek the death penalty inevitably leads to the arbitrary and disparate treatment of similarly situated defendants

It is not necessary to imagine what disparities might result from a system wherein 254 local prosecutors each use different standards for determining whether to seek the death penalty; that is the system that exists in Texas today. Texas law provides no standards to guide prosecutors in their decisions as to when to seek the death penalty; instead, prosecutors in each county make such decisions on their own, according to unwritten and widely varying standards. The result is that whether a person charged with a capital crime will face the death penalty depends largely on arbitrary factors such as the county in which the crime occurred and, even more disturbingly, the race of the victim. While under the Bush standard it is not necessary to show that a standardless system has, or will have, a disparate or discriminatory impact, the evidence of such an impact in Texas underlines the arbitrariness inherent in such a system. Statewide standards would remedy this blatant violation of the Equal Protection Clause.

Current Texas law does not comply with the Equal Protection Clause's "minimum requirement for non-arbitrary treatment," Bush, 531 U.S. at 105, because it contains no standards as to when local prosecutors should seek the death penalty in a potentially capital case. While the law contains provisions to limit the class of offenders eligible for the death penalty and allows for individualized sentencing determinations by juries, see Tex. Penal Code §19.03 (2000); Tex. Code Crim. Proc. art. 37.071 (2000), there are no

standards to guide a prosecutor's decision whether or not to seek the death penalty. Tex. Code Crim. Proc. art. 37.071 (2000). The Texas statute's definition of capital murder narrows the class of those who are subject to the death penalty, but the statute does not indicate how local prosecutors are to distinguish among those defendants charged with murder to determine who should face a possible death sentence and who should not.

Worse, Texas law does not even provide an "abstract proposition" or a "starting principle," Bush, 531 U.S. at 106, as to how local prosecutors ought to make these life-and-death decisions. In Bush v. Gore, the Florida Supreme Court had at least set forth a general principle regarding how the recount was to proceed. By contrast, Texas law does not provide any general  principles to guide prosecutors in their decision as to when the death penalty should be sought.

The Bush Court surveyed examples of the kinds of disparities in vote-counting procedures that the lack of uniform standards created. The examples were merely illustrative of the kinds of problems that would result from an Equal Protection Clause violation; a showing of inequality in the treatment of individual voters or protected classes of voters was not required to prove such a violation.

Texas' system, or lack of system, for determining who will face the death penalty creates levels of disparity and arbitrariness that dwarf the problems addressed by the Supreme Court in the Florida election recount. As in the Florida recount, standards vary from county to county, and even within a county the standards may change dramatically when a new district attorney takes office. Whether a life-and-death decision is made according to legally relevant criteria, financial considerations, moral judgements, or by

8

whim is often impossible to determine, since there are generally no written standards for prosecutors to consult as a guide to making such a decision. As longtime Harris County District Attorney John Holmes admitted, "The decision [whether to seek the death penalty] is mine unilaterally." Armando Villafranca, A Man of Conviction: For Securing Death Penalty, Offering Blunt Views, Few Top District Attorney, Houston Chronicle, November 29, 1998, LEXIS. In other Texas counties, differing systems are used. In Travis County, committees of assistant prosecutors assist the district attorney when making decisions in potentially capital cases. Richard Willing, Prosecutor Often Determines Which Way A Case Will Go, USA Today, Monday, December 20, 1999, at 1A. Meanwhile, in Dallas County, for many years the District Attorney's first assistant, Norman Kinne, made the decisions himself. Holly Becka, Vance Retiring With Legacy Of Helping Crime Victims; Attorneys Note Ethical Standards Set by DA, Assistant, Dallas Morning News, December 31, 1998, LEXIS.

When a District Attorney decides who will face the death penalty, the importance of that person's personal philosophy should not be underestimated. "Indeed, the willingness of the local prosecutor to seek the death penalty seems to play by far the most significant role in determining who will eventually be sentenced to death." Richard Willing and Gary Fields, Geography of the Death Penalty, USA Today, December 20, 1999, at 1A. When John Holmes retired as District Attorney for Harris County, a debate between the two candidates competing to succeed him revealed the utter lack of consensus as to how life-and-death decisions should be made. Chuck Rosenthal, Holmes' hand-picked successor and the current District Attorney for Harris County,

9

stated that the county's system of seeking and obtaining death sentences (unilateral decision by the D.A.) "works great." Rosenthal's opponent Jim Dougherty, however, was more circumspect. Dougherty questioned both the eagerness with which the Harris County District Attorney's office seeks the death penalty and the arbitrariness underlying that decision, saying, "[w]e need to be conscious of the fact that there is great disproportionality in the system" and that "[i]f you push hard enough you can get the death penalty in most of these cases, but is that the right thing to do every time?" Julie Mason, <u>Candidates for D.A. Draw Differences; Pair Disagree on State's Death-Sentence System</u>, Houston Chronicle, October 26, 2000, LEXIS.

Indeed Harris County, with its lack of standards for determining which individual defendants will face death, provides the most glaring example of the resultant disparities in Texas' system. The approach of District Attorneys Holmes and Rosenthal has been not to consider criteria such as the relative moral culpability of the defendant or the heinousness of the crime, but rather, as Rosenthal says, to seek the death penalty whenever prosecutors judge there is a "better than average chance" of a jury returning a death sentence. Mike Tolson and Steve Brewer, <u>Harris County is a Pipeline to Death Row</u>, Houston Chronicle, February 2, 2001, LEXIS. This approach has been roundly criticized, not only by defense attorneys and death penalty advocates but also by other prosecutors and judges. As state District Judge Doug Shaver, himself a former prosecutor, said in regard to Harris County, "It seems to me that there are cases going through that are not necessarily death cases. It is no longer reserved for the special cases it ought to be reserved for." <u>Id.</u> Former District Attorney Holmes acknowledged but

810

dismissed the fact that different counties employ different standards in deciding whether or not to seek the death penalty, commenting, "I'd rather be tried for horse theft in Houston than in West Texas, where I'm going to get a harsher sentence, but what does that prove?" Willing and Fields, supra. What it proves is that when it comes to capital punishment, which, unlike horse theft, involves the fundamental right to life, the lack of statewide standards as to when prosecutors should seek the death penalty has led to a system lacking the "minimum requirement for non-arbitrary treatment," Bush, 531 U.S. at 105, that the Equal Protection Clause commands.

As was the case in the Florida recount, the lack of standards in Texas' death penalty prosecution system leads to glaring disparities in the number of people sent to death row in different counties. Just as the more lenient standards for counting ballots in Broward County as compared to Palm Beach County led to a "markedly disproportionate" number of new votes being discovered in Broward County, Bush, 531 U.S. at 107, the different standards employed by prosecutors in Texas' 254 counties leads to people being sentenced to death at rates markedly disproportionate to their counties' populations and murder rates. For instance, in 1999 Harris County had 140 people on death row, while Dallas County, whose population is about two-thirds that of Harris County's, had only 37. This is despite the fact that Dallas County's murder rate is higher than Harris County's.[1] Willing and Fields, supra, at 6A. Indeed, if Dallas County and Bexar County were combined into one, they would have a population greater than Harris

---

1 Harris County's average population from 1988 to 1997 was 2,857,978; Dallas County's was 1,917,501. Harris County had a murder rate of 17.3 per 100,000; Dallas County's was 19.3 per 100,0000. Statistics are from research conducted by USA Today. Willing and Fields, Geography of the Death Penalty, USA Today, December 20, 1999, at 6A.

County's, but would have less than half the number of people on death row.[2]  While Harris County had 26% of the state's murders from 1988-1997, it was responsible for 31% of the people on death row in the state.  Dallas County, with 19% of the state's murders, was responsible for contributing only 9% to the population on death row.  _Id._ Meanwhile, 138 (more than half) of Texas' 254 counties have never sentenced anyone to death.  Tolson and Brewer, supra.

Even more disturbing than the differences among county prosecutors' approaches to deciding whether to seek the death penalty are the racial disparities evident in those decisions.  Researchers have concluded[3] that all other things being equal, a Texan who murders a white person is twice as likely to be charged with capital murder than one who murders a Hispanic person, and almost *five* times more likely to be charged with capital murder than one who murders an African-American.[4]  Jonathan R. Sorensen and James W. Marquart, Prosecutorial And Jury Decision-Making in Post-Furman Texas Capital Cases, 18 N.Y.U. Rev. L. & Soc. Change 743, 765 (1990/91).  Some legally relevant criteria also increase the chance that an offender will be charged with capital murder; for instance, those who commit murder-rapes and those who kill multiple people are more

---

2 Bexar County's average population from 1988 to 1997 was 1,245,209 and it had 29 inmates on death row in 1999.  Thus, Dallas and Bexar Counties combined had a population of 3,162,710 and 66 inmates on death row (compared to Harris County's population of less than 3 million and 140 death row inmates).  Willing and Fields, supra, at 6A.

3 Sorensen and Marquart's study compared death-eligible arrestees to defendants charged with capital murder, excluding acquittals, from 1980 to 1988, in order to measure prosecutorial discretion.  Acquittals were excluded because there were very few of them.  Thus, the defendants referred to as being charged with capital murder were also convicted.  Sorensen and Marquart, supra, at 758.

4 25.8% of death-eligible offenders in white-victim cases were charged and convicted of capital murder, compared with just 5.6% of those in black-victim cases and 11.9% in Hispanic-victim cases.  Sorensen and Marquart, supra, at 764, Table 1.

likely to be charged with capital murder than are other death-eligible offenders.[5] _Id._ at 764-65. The fact that a murder victim is white increases an offender's chance of being charged with capital murder *more* than if he is charged with multiple killings.[6] _Id._

Racial disparity is a problem not just in Texas, but across the nation. A study by the General Accounting Office found that 82% of studies conducted nationwide reported that the race of the victim increased the likelihood that a defendant would be charged with capital murder or receive the death penalty. That is, "those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks." United States General Accounting Office, Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities, GDD-90-57, 5 (1990), www.gao.gov/docdblite/summary. The "evidence for the race of the victim influence was stronger for the earlier stages of the judicial process (e.g., prosecutorial decision to charge defendant with a capital offense, decision to proceed to trial rather than plea bargain) than in the later stages." _Id._ It is evidence like this that has led the New Jersey Supreme Court to "strongly recommend" that the state adopt "guidelines for use throughout the state by prosecutors in determining the selection of capital cases." State v. Koedatich, 548 A.2d 939, 955 (1988); State v. Marshall, 613 A.2d 1059, 1112 (1992)(overruled in part on other grounds). Guidelines would not only help to ensure uniformity, but would "be able to screen out any possible effects of race or socioeconomic status in the charging and selection process." Marshall, 613 A.2d at 1112. The Bush Equal Protection principle makes such a system not just beneficial, but constitutionally required.

---

5 56.6% of defendants in rape-murder cases were charged with capital murder, vs. 15.5% of those in robbery-murders and 12.4% of those in burglary-murders. 45.9% of defendants in multiple-victim cases were charged with capital murder, vs. 16% in single-victim cases. Sorensen and Marquart, supra, at 764, Table 1.

6 A defendant in a white-victim crime is 4.6 times as likely to be charged with capital murder as a defendant in a black-victim crime; a defendant in a multiple-victim crime is 2.86 times as likely to be charged as one in a single-victim crime. See supra notes 4 and 5.

C. THE INTEGRITY OF THE RULE OF LAW AND OF THE JUDICIAL SYSTEM DEMANDS THAT COURTS TREAT THE EQUAL PROTECTION PRINCIPLE ANNOUNCED IN BUSH V. GORE SERIOUSLY AND AFFORD IT PRECEDENTIAL WEIGHT

The circumstances surrounding the 2000 Presidential election and the <u>Bush</u> ruling were certainly unusual, but that cannot diminish the validity of the Court's reasoning or its applicability to future cases. The authority of our judicial system depends upon the presumption that court rulings are based on principles rather than on the personal political viewpoints of judges. This is ensured by the principle of *stare decisis*, which literally means, "to stand by things decided." Black's Law Dictionary, Seventh Edition, p. 1414 (1999). *Stare decisis* ensures that there will be stability and predictability in the legal system, and that decisions will be made according to law, not men. As Robert Bork has written:

> The requirement that the Court be principled arises from the resolution of the seeming anomaly of judicial supremacy in a democratic society. If the judiciary really is supreme, able to rule when and as it sees fit, the society is not democratic . . . [I]t follows that the Court's power is legitimate only if it has and can demonstrate in reasoned opinions that it has a valid theory, derived from the Constitution . . . If it does not have such a theory, but merely imposes its own value choices . . . the Court violates the postulates of the Madisonian model that alone justifies its power.

Robert H. Bork, <u>Neutral Principles and Some First Amendment Problems</u>, 47 Indiana L.J. 1, 2-3 (1971). To write off the <u>Bush</u> decision as a politically motivated anomaly or to consider its rule to be valid one day and not the next would undermine the very foundation upon which the judicial system depends.

14

Although some portions of the Bush v. Gore decision are vulnerable to criticism, its core Equal Protection holding is neither implausible nor unsupportable. While many judges and commentators have questioned parts of the ruling, that criticism has focused solely on the Court's remedy. Bush, 531 U.S. at 127 (Stevens, J., dissenting), 135 (Souter, J., dissenting), 143 (Ginsburg, J., dissenting), 147 (Breyer, J., dissenting); David A. Strauss, Symposium: Bush v. Gore: What Were They Thinking?, 68 U. Chi. L. Rev. 737 (2001); Cass R. Sunstein, Order Without Law, 68 U. Chi. L. Rev. 757 (2001). As the per curium opinion noted, seven Justices were in agreement on the basic premise that the Florida Supreme Court's recount order violated the Equal Protection Clause because it lacked standards to ensure the non-arbitrary treatment of voters. Bush, 531 U.S. at 111 (referring to Justices Souter and Breyer and the five Justices who signed the per curium opinion). Similarly, even critics who lambasted the decision allowed that the Equal Protection reasoning in the opinion, while not dictated by the Court's prior precedents, was reasonable and even praiseworthy. Thus, erstwhile critics commented that the Court's interpretation of the Equal Protection clause "has considerable appeal," Sunstein, supra, at 773, and "can be seen both as an extension of the Warren Court's vision of democracy and as a logical implication of the view, seriously proposed a generation ago, that the Constitution limits the degree to which discretion can be vested in executive officials of both the state and federal governments." Strauss, supra, at 740. The closeness of the election and the political implications of the Court's decision do not mean that the principle upon which its ruling was based can be ignored.

8 1 5

To the extent that the Equal Protection principle in <u>Bush v. Gore</u> conflicts with the Court's declaration that the holding only applies to the particular circumstances of the 2000 Presidential election, the principle must take precedence. It is not only appropriate but wise for courts to limit their holdings to the facts of the particular case with which they are confronted. However, in a legal system based on precedent, a legal principle cannot be valid on one day and not the next. The reasoning of <u>Bush v. Gore,</u> like that of any of the Court's rulings, must apply to all other situations to which it logically extends. The Equal Protection Clause mandates that when a fundamental right is threatened, states must establish standards to ensure that localities do not treat its citizens in an arbitrarily disparate manner. Thus, Texas' death penalty prosecution scheme, which provides no standards to ensure the non-arbitrary treatment of capital offenders by prosecutors, is unconstitutional.

II.   <u>THE NEED FOR NON-ARBITRARY STANDARDS IN THE APPLICATION OF THE DEATH PENALTY OUTWEIGHS ANY BENEFITS OF UNBOUNDED PROSECUTORIAL DISCRETION</u>

No argument for prosecutorial discretion can justify a system that contains no safeguards to ensure that the lives of similarly situated offenders are treated with equal dignity. Because the right to life is fundamental, if Texas is to maintain such a system, its justifications for that system would have to pass strict scrutiny. <u>Skinner v. Oklahoma,</u> 316 U.S. 535, 541 (1942) (reversing an order to sterilize a felon because the law allowing for sterilization did not pass strict scrutiny, as it treated larceny and embezzlement differently despite their being essentially the same crime). In order to pass strict scrutiny, the state would have to show that allowing prosecutors the unbridled discretion to decide

when to seek the death penalty is necessary to achieve a compelling governmental interest. Our constitutional structure does not bar courts from evaluating the Constitutionality of the system by which prosecutors decide whether or not to seek the death penalty. Neither do the arguments in favor of prosecutorial discretion that have been made over the years justify the arbitrary seeking of death.

The separation of powers doctrine does not bar courts from requiring some restraint on prosecutorial discretion. Courts can and do evaluate particular prosecutorial decisions for Equal Protection violations; see, e.g., United States v. Armstrong, 517 U.S. 456 (1996) (declining to allow discovery on defendant's selective prosecution claim but acknowledging that such discovery would be allowed if petitioner had shown that the Government declined to prosecute similarly situated persons of other races); Wayte v. United States, 470 U.S. 598 (1985) (reviewing the prosecution of a man for refusing to register with the Selective Service System under a "selective prosecution" Equal Protection analysis); United States v. Batchelder, 442 U.S. 114, 125 (1979) (noting that while it is broad, prosecutorial discretion is nonetheless "subject to constitutional constraints"); Bordenkircher v. Hayes, 434 U.S. 357, 365 (1977) (same); Oyler v. Boles, 368 U.S. 448 (1962) (same); Yick Wo v. Hopkins, 118 U.S. 356 (1886) (ordering the release of Chinese petitioners who were prosecuted and jailed for operating laundries without a permit while similarly situated Caucasian laundry operators were not prosecuted). In selective-prosecution and vindictive prosecution cases, courts are deferential to prosecutorial decisions and require "clear evidence" to rebut the presumption that prosecutors have acted legally. Armstrong, 517 U.S. at 464 (quoting

817

United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 (1926)). Because of separation of powers concerns, courts refuse to force district attorneys and U.S. Attorneys to prosecute particular offenders, as doing so would "encroach[ ] on the prerogatives of another department of the Government." United States v. Shaw, 226 A.2d 366, 368 (1967); see also Newman v. United States, 382 F.2d 479 (1967); United States v. Cox, 342 F.2d 167 (1965). However, "there is an enormous difference between, on the one hand, forcing a prosecutor to charge or stripping him of authority to charge and, on the other, regulating that authority . . ." James Vorenberg, Decent Restraint of Prosecutorial Power, 94 Harv. L. Rev. 1521, 1546 (1981). This analysis is neither attacking a particular decision of an individual prosecutor as vindictive or selective, nor is it asking the courts to force prosecutors to file charges in particular cases. Rather, it is alleging that the laws of Texas violate the Equal Protection Clause by failing to establish standards by which prosecutors are to decide whether to seek the death penalty in a potentially capital case. "The law has long recognized the distinction between judicial usurpation of discretionary authority and judicial review of the statutory and constitutional limits to that authority." Nader v. Saxbe, 497 F.2d 676, 679 n. 19 (1974). After conducting such a review, courts can only conclude that Texas' lack of a system to guide prosecutors in the decision whether certain offenders will face the death penalty violates the Constitutional guarantee of equal protection.

As the Court noted in Bush v. Gore, despite the "limits on judicial authority" imposed by the Constitution, when Constitutional violations are brought to the attention of the courts, "it becomes our unsought responsibility to resolve the federal and

constitutional issues the judicial system has been forced to confront." Bush, 531 U.S. at 111. When faced with a Constitutional violation, courts cannot wait for the Legislature to take action.

The frequently cited reasons for allowing prosecutors broad discretion as to what charges to bring cannot justify a system which allows some defendants' lives to be arbitrarily valued less than others'. Because of the fundamental nature of the right to life, such rationale would have to pass strict scrutiny. Skinner v. Oklahoma, 316 U.S. 535, 541. The primary justification for judicial noninterference with prosecutorial decision making is that judicial review of individual prosecutorial decisions would be difficult or inefficient. Wayte v. United States, 470 U.S. 598, 607. One reason that courts may have difficulty reviewing prosecutors' decisions as to whether to seek the death penalty is that there are no clearly articulated, uniform standards by which those decisions are made. If such standards were in place, judicial review would be much more feasible. Further, the existence of statewide standards would not mean that courts would have to begin micro-managing prosecutors' offices; they could remain fairly deferential to prosecutors' decisions so long as prosecutors are able to justify their decisions according to the standards. See Vorenberg, supra, at 1546-47. Concerns about the increased burden on courts and prosecutors that could result from statewide standards cannot justify ignoring a constitutional mandate. Standards to guide a prosecutor's discretion as to when to seek the death penalty would not constitute a mandatory death penalty, nor would they completely eliminate a prosecutors' discretion or ability to consider the individual circumstances of each case. Statewide standards would simply provide "some assurance

19

819

that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." Bush, 531 U.S. at 109.

Other rationale for broad prosecutorial discretion are similarly unable to excuse the disparities and arbitrariness of Texas' current system. Such considerations as the need for flexible use of prosecutorial resources based on changing enforcement priorities, or the loss of deterrence which might result from revealing prosecutorial motives, are not "compelling governmental interests" sufficient to overcome the need for non-arbitrariness when the state decides whether to seek to take a defendant's life. While such considerations may justify broad discretion in the criminal justice system in general, they are incapable of justification when life is at stake. Allowing the decision whether to seek the death penalty to be made based on an individual prosecutor's feeling that one particular type of crime needs to be deterred more than another allows an unconstitutional degree of arbitrariness, inconsistency and unpredictability. Further, even if the reasons for allowing broad prosecutorial discretion were "compelling" by themselves, they cannot justify the risk that life-or-death decisions might be made on the basis of mere caprice or, worse, racial prejudice.

III. STATEWIDE STANDARDS TO GUIDE PROSECUTORIAL DISCRETION WOULD ADVANCE THE EIGHTH AMENDMENT GOAL OF NON-ARBITRARINESS IN CAPITAL PROCEEDINGS

Requiring standards to ensure that prosecutors do not, through the exercise of unfettered discretion, arbitrarily value some peoples' lives more than others' would not only ensure that the Texas death penalty system complies with the Equal Protection

820

Clause but would further the Eighth Amendment's mandate of reliability and consistency in the imposition of the death penalty. In 1972 the Supreme Court invalidated the death penalty in part on the grounds that the standardless death penalty statutes then in effect allowed the ultimate punishment to be applied "wantonly and so freakishly," Furman v. Georgia, 408 U.S. 238, 310 (1972) (Stewart, J., concurring), and that in practice there was no meaningful basis for distinguishing between the cases in which it was applied and those in which it was not, id. at 313 (White, J., concurring). Four years later, when the court approved revised death penalty statutes, it held that state legislatures confronted these problems by drafting statutes that provided the sentencer with guidance in determining the appropriate sentence and narrowed the sentencer's discretion to impose the death penalty. Jurek v. Texas, 428 U.S. 262, 270 (1976); Gregg v. Georgia, 428 U.S. 153, 195 (1976). The new statutes did not, however, require states to provide standards to guide prosecutors' decisions as to whether to seek the death penalty in the first place. See Tex. Code Crim. Proc. art. 37.071 (2000). As Justice Brennan has pointed out,

> . . . discrimination and arbitrariness at an earlier point in the selection process nullify the value of later controls on the jury. The selection process for the imposition of the death penalty does not begin at trial; it begins in the prosecutor's office. His decision whether or not to seek capital punishment is no less important than the jury's. Just like the jury, then, where death is the consequence, the prosecutor's "discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." . . . The prosecutor's choices are subject to no standards, no supervision, no controls whatever . . . if the price of prosecutorial independence is the freedom to impose death in an arbitrary, freakish, or discriminatory manner, it is a price the Eighth Amendment will not tolerate.

De Garmo v. Texas, 474 U.S. 973, 975 (1985) (Brennan, J., dissenting from denial of cert.). If imposing the death penalty on a freakishly and randomly selected subset of those who commit murder violated the Eighth Amendment, see Furman, then surely allowing prosecutors to choose, without any standards whatsoever, what subset of those accused of capital murder will face the death penalty is equally unconstitutional.

In light of the new Equal Protection analysis of Bush v. Gore, the Supreme Court's previous approval of Texas' system for selecting which defendants should face the death penalty must be revisited. The Court has reasoned that such unbounded prosecutorial discretion does not violate the Eighth Amendment because a prosecutor's decision not to seek the death penalty when the law allowed him to do so involved the "decision to afford an individual defendant mercy" rather than the unconstitutional decision to impose the death penalty on a "capriciously selected group of offenders." Gregg, 428 U.S. at 199. The decision to show a particular defendant mercy is an invalid reason for allowing prosecutorial discretion because, as noted by Justice Blackmun in his dissent in Furman, "the power to be lenient [also] is the power to discriminate." McCleskey v. Kemp, 481 U.S. 297, 312 (1987). While statutes channeling the discretion of the jury can reduce the dangers of arbitrary jury decisions in a particular case, they cannot change the arbitrariness inherent in a system in which the decision of who will be chosen to face that sentencing jury is guided by nothing more than one person's personal philosophy. Put another way, if local prosecutors decide to "afford mercy," that is, decline to seek the death penalty, based on vastly different standards, or racially discriminatory standards, or no standards at all, the resulting system remains arbitrary and capricious, and thus,

22

822

unconstitutional. The insight of the <u>Bush v. Gore</u> Equal Protection reasoning is that arbitrariness can exist not just when an individual defendant (or ballot) is subjected to a judgment that is unguided by any standards, but also when an entire system lacks consistent standards so that defendants (or ballots) in each locality may be subjected to vastly differing penalties.

The evidence that individual prosecutors do, indeed, use vastly different standards to decide whether to seek the death penalty also requires a re-evaluation of the Supreme Court's approval of unbounded prosecutorial discretion. In a concurrence in <u>Gregg</u>, Justice White expanded on the reasons why he thought unbounded prosecutorial discretion did not violate the Eighth Amendment, writing that "[a]bsent facts to the contrary" he would not assume that prosecutors will "exercise [their] power in a standardless fashion." <u>Gregg</u>, 428 U.S. at 225 (White, J., concurring). Justice White assumed that "the standards by which [prosecutors] decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence. Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong." <u>Id.</u> In fact, as discussed above, under the current system many prosecutors do not seek the death penalty in every death-eligible case if they think that a jury would not return a death sentence. Some decide not to seek the death penalty upon request by the victim's family, (see <u>Jury Process in Zamora Murder Trial to Start Jan. 20</u>, Dallas Morning News, December 6, 1997, LEXIS), or because the defendant hires an experienced defense attorney, (Texas Civil Rights Project, <u>The Death Penalty In Texas</u> 22

823

(2000), http://www.texascivilrightsproject.org), or, as discussed above, possibly because the victim of the crime is not white. Taking into consideration all of these facts, the assumption that it is unnecessary to channel a prosecutors' discretion is illogical and misguided.

Noting the constitutional problems inherent in a system where prosecutors enjoy unchecked freedom and widely varying standards when deciding whether to seek the death penalty, the New Jersey Supreme Court has called for standards to "instill uniformity in charging and prosecuting practices throughout the state." State v. Marshall, 613 A.2d 1059, 1112 (N.J. 1992). That court acknowledged the fact that courts should not usurp the decision making function of prosecutors, but argued that in light of the "need to promote uniformity in the administration of the death penalty," statewide standards were warranted. State v. Koedatich, 548 A.2d 939, 955 (N.J. 1988). These recommendations were made on the basis of the Eighth Amendment requirements of reliability and non-arbitrariness in capital proceedings. Combined with the Equal Protection Clauses' requirement that standards be in place to ensure equality with regards to fundamental rights, such standards are not simply advisable, they are constitutionally required.

IV.  OTHER COURTS HAVE RECOGNIZED THAT THE FOURTEENTH AMENDMENT REQUIRES LIMITING DISCRETION TO ENSURE EQUALITY AND NON-ARBITRARINESS INI GOVERNMENTAL DECISIONMAKING

Bush v. Gore was not the first time a court has held that a system in which government officials have unbounded discretion is unconstitutional. The Supreme Court and federal appellate courts have found violations of the Fourteenth Amendment when governments and governmental agencies have unlimited discretion to select among qualified applicants for licenses and government benefits. Those courts reasoned that allowing governmental decision makers to make choices without any uniform standards allows an intolerable amount of arbitrariness. Although these cases have not been widely followed, they provide further persuasive support for the Equal Protection holding in Bush and for the necessity of some channeling of prosecutorial discretion in the Texas death penalty system.

The Supreme Court held that a lack of standards in a scheme of issuing permits, and the arbitrary and discriminatory refusal to grant permits to one group when they were routinely granted to other groups, violates the Equal Protection Clause. Niemotko v. Maryland, 340 U.S. 268, 273 (1951) (alternative holding). In that case, a City Council refused to grant a permit to a group of Jehovah's Witnesses who wished to hold a meeting in a public park. While that case also involved the First Amendment and a prior restraint on the freedom of speech and religion issues, id. at 271, the Court found that the complete discretion vested in the City Council as to whether to grant permits violated the Equal Protection Clause. The Fifth Circuit applied similar reasoning to a case not involving the First Amendment in Hornsby v. Allen, 326 F.2d 605 (5th Cir. 1964). The city of Atlanta's system for granting liquor licenses was found to violate the Equal Protection Clause because it operated under no standards, allowing the city to arbitrarily

25

deny applications of eligible applicants. *Id.* at 610. The court rejected the city's argument that the Equal Protection requirement of non-arbitrary standards did not apply because liquor licenses are not protected rights or entitlements but rather a "privilege." *Id.* While "governmental bodies have great latitude in enacting reasonable standards," they do not have the latitude to make decisions "on the basis of uncontrolled discretion and whim" or "without any established standards." Hornsby v. Allen, 330 F.2d 55, 55 (5th Cir. 1964) (denying petition for reh'g). For the same reason, the problems of arbitrariness inherent in a standardless system for choosing among "non-preference" applicants for public housing violated the Due Process Clause. Holmes v. New York City Housing Authority, 398 F.2d 262 (2d Cir. 1968).

As in these cases, where governmental decision makers had complete discretion as to which eligible applicants they would grant permits or accept into public housing, in the Texas death penalty prosecution system 254 individual county prosecutors have complete discretion as to which death-eligible defendants will face a possible death sentence and which will not. This standardless system allows for the arbitrary and inconsistent treatment of similarly situated defendants and is thus unconstitutional. Even if a prosecutor's decision not to seek the death penalty is a "privilege" of mercy granted to some capital defendants but not others, the decision whether to grant that privilege cannot be left to the unfettered discretion of 254 individual county prosecutors. Such a system allows for an unacceptable level of arbitrariness with life-or-death consequences. Of course, mandating that prosecutors seek the death penalty in any death-eligible case would not solve these problems. Such a mandate would not only mean a tremendous

misuse of time and money, but would run afoul of the Eighth Amendment requirement of individualized consideration of each offender and the related prohibition against an "unduly harsh and unworkably rigid" mandatory death penalty statute. <u>Woodson v. North Carolina</u>, 428 U.S. 280, 293 (1976). While the reasoning in <u>Holmes</u> and <u>Hornsby</u> and the alternative holding in <u>Niemotko</u> have not been widely followed, their support for the reasoning in <u>Bush v. Gore</u> reinforces its validity and underlines the fact that a system of unfettered discretion, like Texas' standardless system for deciding when to seek the death penalty in capital cases, violates the Equal Protection Clause.

827

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

**MOTION TO PRECLUDE DEATH PENALTY AS A SENTENCING OPTION
DUE TO EQUAL PROTECTION VIOLATIONS**
**Constitutional Motion No. 7**

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant in the above-entitled and numbered criminal action, files this motion to preclude death penalty as a sentencing option due to equal protection violations. In support, the defendant will show the following.

## Background

The defendant has been indicted for the offense of capital murder by the Collin County grand jury. The State is seeking the death penalty. The Eight Amendment requires a greater degree of accuracy and fact finding than would be true in a noncapital case. *Gilmore v. Taylor*, 508 U.S. 333 (1993); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The courts of this state are bound by the law to make certain that a death sentence is not wantonly or freakishly imposed and that the purposes of Art. 37.071 are accomplished in a constitutional manner. *Ellason v. State*, 815 S.W.2d 656 (Tex. Crim. App. 1991).

## Analysis

A.    Facailly Unconstitutional: No Uniform and Specific Standards in Place

There are no uniform, statewide standards to guide prosecutors in deciding when they should seek the death penalty, as required by the Equal Protection Clause and, therefore, Article 37.071 of the Texas Code of Criminal Procedure is unconstitutional on its face. In *Bush v. Gore*,

1

531 U.S. 98 (2000), the United States Supreme Court held that when fundamental rights are involved, the Equal Protection Clause of the Fourteenth Amendment requires that there be "uniform" and "specific" standards to prevent the arbitrary and disparate treatment of similarly situated people. *Bush*, 531 U.S. at 102. The Court, applying this principle, concluded that the Florida Supreme Court's opinion ordering a recount in the 2000 presidential election was unconstitutional because the standard – "intent of the voter" – was too vague and thus would not respect the "equal dignity owed to each voter." *Id.* at 104.

As a prerequisite to implementing death penalty systems, States must establish mechanisms to ensure that the lives of all of its citizens are treated equally. As the Supreme Court noted with respect to voting, "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05. By the same reasoning, since the Constitution has ensured both the right to life and to the equal protection of the laws, a state may not, by arbitrary and disparate treatment, value one person's life over that of another. In the brief period since *Bush* was handed down, several commentators have taken notice of this result. *See* LAURENCE BENNER ET. AL., CRIMINAL JUSTICE IN THE SUPREME COURT: AN ANALYSIS OF UNITED STATES SUPREME COURT CRIMINAL AND HABEAS CORPUS DECISIONS (October 2, 2000 - September 30, 2001), 38 Cal. W. L. Rev. 87, 91 (2001) ("Certainly the *Bush v. Gore* equal protection principle ought to be no less applicable when a state permits 'disparate treatment' of death eligible defendants because county prosecutors use differing standards for electing which defendants they will seek to execute."); MICHAEL P. SENG, COMMENTARY: REFLECTIONS ON WHEN "WE, THE PEOPLE" KILL, 34 J. Marshall L. Rev. 713, 717 (2001) ("Certainly, if a state or its courts cannot

arbitrarily dilute or deny a person's right to vote because of the Equal Protection clause, then human life must also be given equal protection."); CASS R. SUNSTEIN, SYMPOSIUM: *BUSH V GORE*: ORDER WITHOUT LAW, 68 U. Chi. L. Rev. 737, 758 (2001) (noting that the *Bush* holding might require that "methods be in place to ensure against the differential treatment of those subject to capital punishment").

Texas' lack of standards to ensure non-arbitrary treatment with regard to the fundamental right to life is enough in itself to establish an Equal Protection violation; a showing of intentional discrimination against a protected class is not required. *Bush*, 531 U.S. at 106. Unlike traditional Equal Protection claims of intentional discrimination against a protected class, claims like this one and the one in *Bush* are not based on an individual act of discrimination, but rather challenge a system in which unchecked official discretion makes arbitrary and unequal treatment inevitable. *Cf. McCleskey v. Kemp*, 481 U.S. 279 (1987) (holding superseded by statute in part).

If the Equal Protection clause requires guidelines to ensure that localities do not treat "identical types of ballots used in identical brands of machines and exhibiting identical physical characteristics" differently, *Bush*, 531 U.S. at 134 (Souter, J., dissenting) (agreeing with per curium that the lack of standards for the statewide recount violated the Equal Protection Clause but disagreeing as to the proper remedy), then it must require guidelines to ensure that localities do not treat similarly situated offenders committing the same types of crimes differently with respect to their lives. While the *Bush v. Gore* opinion declares that its "consideration is limited to the present circumstances," *id.* at 109, suggesting that the principle announced might not apply to any other situations, the fundamental nature of the right to life requires that the principle also apply, as logically appropriate, to the death penalty system. The per curium opinion in *Bush*

3

explains the narrow scope of its holding by distinguishing the somewhat unusual situation of a court-ordered statewide recount from an ordinary election. In ordinary elections, the Court says, the Equal Protection Clause does not prohibit counties from developing "different systems for implementing elections." *Bush*, 531 U.S. at 109. One reason for this distinction is that once ballots have been cast, the "fact finder confronts a thing, not a person," and thus "[t]he search for intent can be confined by specific rules designed to ensure uniform treatment." *Id.* at 106. Also, individual counties may have "expertise" that justifies letting them choose their own methods of conducting elections. *Id.* at 109. Another explanation is that "local variety (in voting machines and procedures) can be justified by concerns about cost, the potential value of innovation, and so on" whereas a "different order of disparity" occurs when, after ballots have been cast, physically identical ballots are hand-counted according to different rules. *Id.* at 134 (Souter, J., dissenting). Finally, of course, voting is different than capital punishment, and arguably the differences between the two might justify different constitutional analyses.

These distinctions, however, do not diminish the relevance of the *Bush* Equal Protection rule to Texas' death penalty system. Just as Florida counties can use different voting machines in their elections, Texas counties can certainly have separate prosecutors and can structure those prosecutors' offices differently; this allows the flexibility demanded by limited budgets and justified by local expertise, and takes into account the potential for innovation inherent in a system of local control. With regard to the Court's distinction between a "thing" and a "person," although it is true that prosecutors charged with deciding when to seek the death penalty confront people and not things, this does not diminish the Equal Protection Clause's requirement of non-arbitrariness. In fact, written standards are already in use in other jurisdictions to guide

4

prosecutors in the decision making process with regards to when the death penalty should be sought. *See, e.g.*, United States Attorneys' Manual §9-10.010 et. seq. (1995) (laying out "federal protocol" for capital cases); U.S. Department of Justice, The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review (2001), http://www.usdoj.gov/dag/pubdoc/deathpenaltystudy.htm.

B.    Right to Life is a Fundamental Right

The United States Constitution requires safeguards to ensure the equal treatment of all persons in the context of death penalty prosecutions. Whereas the right to vote is "fundamental" because of historical trends and legislative decisions, the right to life at stake in Texas' system of capital punishment is the most fundamental of all rights. In contrast to the implied constitutional right to vote, the right to life is contained in the text of the Constitution. The Fifth and Fourteenth Amendments provide that neither the federal government nor the states shall deprive any person of "life, liberty, or property" without due process of law. U.S. Const. amend. V; amend. XIV, §1; *cf.* Bush v. Gore, 531 U.S. at 104 ("the individual citizen has no federal constitutional right to vote for electors for the President of the United States." Instead, "[h]istory has favored the voter," and since every state now chooses its electors through a statewide election, "the right to vote as the legislature has prescribed is fundamental."). The Supreme Court has long recognized the fundamental nature of the right to life, particularly in the context of the death penalty. *See Furman v. Georgia*, 408 U.S. 238, 359 (1972) ("because capital punishment deprives an individual of a fundamental right [*i.e.*, the right to life], . . . the State needs a compelling interest to justify it").

C.    Arbitrary and Disparate Treatment of Similarly Situated Texas Defendants

832

The lack of standards to guide local prosecutors in their decisions as to whether to seek the death penalty inevitably leads to the arbitrary and disparate treatment of similarly situated defendants. Prosecutors in each of Texas' 254 counties make such decisions on their own, according to unwritten and widely varying standards. TEX. CODE CRIM. PROC. *passim*; TEX. PENAL CODE *passim*. The result is that whether a person charged with a capital crime will face the death penalty depends largely on arbitrary factors such as the county in which the crime occurred and, even more disturbingly, the race of accused and the victim. While under the *Bush* standard it is not necessary to show that a standardless system has, or will have, a disparate or discriminatory impact, the evidence of such an impact in Texas underlines the arbitrariness inherent in such a system. Even within Rusk County, similarly situated defendants are not treated the same. Since 1984, Rusk County Grand Juries have indicted 11 individual for capital murder, but only the defendant has faced the death penalty. Statewide standards would remedy this blatant violation of the Equal Protection Clause.

Texas' system, or lack of system, for determining who will face the death penalty creates levels of disparity and arbitrariness that dwarf the problems addressed by the Supreme Court in the Florida election recount. As in the Florida recount, standards vary from county to county, and even within a county the standards may change dramatically when a new district attorney takes office. Whether a life-and-death decision is made according to legally relevant criteria, financial considerations, moral judgments, insistence of the deceased's family or by whim is often impossible to determine, since there are generally no written standards for prosecutors to consult as a guide to making such a decision. Longtime Harris County District Attorney John Holmes, stated Harris County's policy when he said that, "the decision [whether to seek the death penalty]

is mine unilaterally." Armando Villafranca, A Man of Conviction: For Securing Death Penalty, Offering Blunt Views, Few Top District Attorney, Houston Chronicle, November 29, 1998, LEXIS. In other Texas counties, differing systems are used. In Travis County, committees of assistant prosecutors assist the district attorney when making decisions in potentially capital cases. Richard Willing, Prosecutor Often Determines Which Way A Case Will Go, USA Today, Monday, December 20, 1999, at 1A. Meanwhile, in Dallas County, for many years the District Attorney's first assistant, Norman Kinne, made the decisions himself. Holly Becka, Vance Retiring With Legacy Of Helping Crime Victims; Attorneys Note Ethical Standards Set by DA, Assistant, Dallas Morning News, December 31, 1998, LEXIS.

When a District Attorney decides who will face the death penalty, the importance of that person's personal philosophy should not be underestimated. "Indeed, the willingness of the local prosecutor to seek the death penalty seems to play by far the most significant role in determining who will eventually be sentenced to death." Richard Willing and Gary Fields, Geography of the Death Penalty, USA Today, December 20, 1999, at 1A. When John Holmes retired as District Attorney for Harris County, a debate between the two candidates competing to succeed him revealed the utter lack of consensus as to how life-and-death decisions should be made. Chuck Rosenthal, Holmes' hand-picked successor and the current District Attorney for Harris County, stated that the county's system of seeking and obtaining death sentences (unilateral decision by the D.A.) "works great." Rosenthal's opponent Jim Dougherty, however, was more circumspect. Dougherty questioned both the eagerness with which the Harris County District Attorney's office seeks the death penalty and the arbitrariness underlying that decision, saying, "[w]e need to be conscious of the fact that there is great disproportionality in the system" and that "[i]f you push

7

hard enough you can get the death penalty in most of these cases, but is that the right thing to do every time?" Julie Mason, Candidates for D.A. Draw Differences; Pair Disagree on State's Death-Sentence System, Houston Chronicle, October 26, 2000, LEXIS.

Indeed Harris County, with its lack of standards for determining which individual defendants will face death, provides the most glaring example of the resultant disparities in Texas' system. The approach of District Attorneys Holmes and Rosenthal has been not to consider criteria such as the relative moral culpability of the defendant or the heinousness of the crime, but rather, as Rosenthal says, to seek the death penalty whenever prosecutors judge there is a "better than average chance" of a jury returning a death sentence. Mike Tolson and Steve Brewer, Harris County is a Pipeline to Death Row, Houston Chronicle, February 2, 2001, LEXIS. This approach has been roundly criticized, not only by defense attorneys and death penalty opponents but also by other prosecutors and judges. As state District Judge Doug Shaver, himself a former prosecutor, said in regard to Harris County, "It seems to me that there are cases going through that are not necessarily death cases. It is no longer reserved for the special cases it ought to be reserved for." *Id.* Former District Attorney Holmes acknowledged but dismissed the fact that different counties employ different standards in deciding whether or not to seek the death penalty, commenting, "I'd rather be tried for horse theft in Houston than in West Texas, where I'm going to get a harsher sentence, but what does that prove?" Willing and Fields, *supra.* What it proves is that when it comes to capital punishment, which, unlike horse theft, involves the fundamental right to life, the lack of statewide standards as to when prosecutors should seek the death penalty has led to a system lacking the "minimum requirement for non-arbitrary treatment," *Bush,* 531 U.S. at 105, that the Equal Protection Clause commands.

8

835

The lack of standards in Texas' death penalty prosecution system leads to glaring disparities in the number of people sent to death row in different counties. Just as the more lenient standards for counting ballots in Broward County as compared to Palm Beach County led to a "markedly disproportionate" number of new votes being discovered in Broward County, *Bush*, 531 U.S. at 107, the different standards employed by prosecutors in Texas' 254 counties leads to people being sentenced to death at rates markedly disproportionate to their counties' populations and murder rates. For instance, in 1999 Harris County had 140 people on death row, while Dallas County, whose population is about two-thirds that of Harris County's, had only 37. This is despite the fact that Dallas County's murder rate is higher than Harris County's.[1] Willing and Fields, *supra*, at 6A. Indeed, if Dallas County and Bexar County were combined into one, they would have a population greater than Harris County's, but would have less than half the number of people on death row.[2] While Harris County had 26% of the state's murders from 1988-1997, it was responsible for 31% of the people on death row in the state. Dallas County, with 19% of the state's murders, was responsible for contributing only 9% to the population on death row. *Id.* Meanwhile, 138 (more than half) of Texas' 254 counties have never sentenced anyone to death. Tolson and Brewer, *supra*.

Even more disturbing than the differences among county prosecutors' approaches to deciding whether to seek the death penalty are the racial disparities evident in those decisions.

---

1 Harris County's average population from 1988 to 1997 was 2,857,978; Dallas County's was 1,917,501. Harris County had a murder rate of 17.3 per 100,000; Dallas County's was 19.3 per 100,0000. Statistics are from research conducted by USA Today. Willing and Fields, *Geography of the Death Penalty*, USA Today, December 20, 1999, at 6A.

2 Bexar County's average population from 1988 to 1997 was 1,245,209 and it had 29 inmates on death row in 1999. Thus, Dallas and Bexar Counties combined had a population of 3,162,710 and 66 inmates on death row (compared to Harris County's population of less than 3 million and 140 death row inmates). Willing and Fields, *supra*, at 6A.

Researchers have concluded[3] that all other things being equal, a Texan who murders a white person[4] is twice as likely to be charged with capital murder than one who murders a Hispanic person, and almost five times more likely to be charged with capital murder than one who murders an African-American.[5] Jonathan R. Sorensen and James W. Marquart, Prosecutorial And Jury Decision-Making in Post-Furman Texas Capital Cases, 18 N.Y.U. Rev. L. & Soc. Change 743, 765 (1990/91). Some legally relevant criteria also increase the chance that an offender will be charged with capital murder; for instance, those who commit murder-rapes and those who kill multiple people are more likely to be charged with capital murder than are other death-eligible offenders.[6] Id. at 764-65. The fact that a murder victim is white increases an offender's chance of being charged with capital murder *more* than if he is charged with multiple killings.[7] *Id.*

Racial disparity is a problem not just in Texas, but across the nation. A study by the General Accounting Office found that 82% of studies conducted nationwide reported that the race of the victim increased the likelihood that a defendant would be charged with capital murder or

---

3 Sorensen and Marquart's study compared death-eligible arrestees to defendants charged with capital murder, excluding acquittals, from 1980 to 1988, in order to measure prosecutorial discretion. Acquittals were excluded because there were very few of them. Thus, the defendants referred to as being charged with capital murder were also convicted. Sorensen and Marquart, *supra*, at 758.

4 The record reflects that the defendant in this case is an African American male and the alleged victim is a white female.

5 25.8% of death-eligible offenders in white-victim cases were charged and convicted of capital murder, compared with just 5.6% of those in black-victim cases and 11.9% in Hispanic-victim cases. Sorensen and Marquart, *supra*, at 764, Table 1.

6 56.6% of defendants in rape-murder cases were charged with capital murder, vs. 15.5% of those in robbery-murders and 12.4% of those in burglary-murders. 45.9% of defendants in multiple-victim cases were charged with capital murder, vs. 16% in single-victim cases. Sorensen and Marquart, *supra*, at 764, Table 1.

7 A defendant in a white-victim crime is 4.6 times as likely to be charged with capital murder as a defendant in a black-victim crime; a defendant in a multiple-victim crime is 2.86 times as likely to be charged as one in a single-victim crime. *See supra* notes 4 and 5.

10

receive the death penalty. That is, "those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks." United States General Accounting Office, Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities, GDD-90-57, 5 (1990), www.gao.gov/docdblite/summary. The "evidence for the race of the victim influence was stronger for the earlier stages of the judicial process (*e.g.*, prosecutorial decision to charge defendant with a capital offense, decision to proceed to trial rather than plea bargain) than in the later stages." *Id.* It is evidence like this that has led the New Jersey Supreme Court to "strongly recommend" that the state adopt "guidelines for use throughout the state by prosecutors in determining the selection of capital cases." *State v. Koedatich*, 548 A.2d 939, 955 (1988); *State v. Marshall*, 613 A.2d 1059, 1112 (1992) (aff'd in part, rev'd in part by *Marshall v. Hendricks*, 307 F.2d 36). Guidelines would not only help to ensure uniformity, but would "be able to screen out any possible effects of race or socioeconomic status in the charging and selection process." *Marshall*, 613 A.2d at 1112. The *Bush* Equal Protection principle makes such a system not just beneficial, but constitutionally required.

Although some portions of the *Bush v. Gore* decision are vulnerable to criticism, its core Equal Protection holding is neither implausible nor unsupportable. While many judges and commentators have questioned parts of the ruling, that criticism has focused solely on the Court's remedy. *Bush*, 531 U.S. at 127 (Stevens, J., dissenting), 135 (Souter, J., dissenting), 143 (Ginsburg, J., dissenting), 147 (Breyer, J., dissenting); David A. Strauss, Symposium: *Bush v. Gore*: What Were They Thinking?, 68 U. Chi. L. Rev. 737 (2001); Cass R. Sunstein, Order Without Law, 68 U. Chi. L. Rev. 737 (2001). As the per curium opinion noted, seven Justices were in agreement on the basic premise that the Florida Supreme Court's recount order violated

838

the Equal Protection Clause because it lacked standards to ensure the non-arbitrary treatment of voters. *Bush*, 531 U.S. at 111 (referring to Justices Souter and Breyer and the five Justices who signed the per curium opinion). Similarly, even critics who lambasted the decision allowed that the Equal Protection reasoning in the opinion, while not dictated by the Court's prior precedents, was reasonable and even praiseworthy. Thus, erstwhile critics commented that the Court's interpretation of the Equal Protection clause "has considerable appeal," Sunstein, *supra*, at 773, and "can be seen both as an extension of the Warren Court's vision of democracy and as a logical implication of the view, seriously proposed a generation ago, that the Constitution limits the degree to which discretion can be vested in executive officials of both the state and federal governments." *Strauss*, *supra*, at 740. The closeness of the election and the political implications of the Court's decision do not mean that the principle upon which its ruling was based can be ignored.

To the extent that the Equal Protection principle in *Bush v. Gore* conflicts with the Court's declaration that the holding only applies to the particular circumstances of the 2000 Presidential election, the principle must take precedence. It is not only appropriate, but wise for courts to limit their holdings to the facts of the particular case with which they are confronted. However, in a legal system based on precedent, a legal principle cannot be valid on one day and not the next. The reasoning of *Bush v. Gore*, like that of any of the Court's rulings, must apply to all other situations to which it logically extends. The Equal Protection Clause mandates that when a fundamental right is threatened, states must establish standards to ensure that localities do not treat its citizens in an arbitrarily disparate manner. Thus, Texas' death penalty prosecution scheme, which provides no standards to ensure the non-arbitrary treatment of capital offenders by

839

prosecutors, is unconstitutional.

D.     Invoking prosecutorial discretion does not excuse unconstitutional statute

The need for non-arbitrary standards in the application of the death penalty outweighs any benefits of unbounded prosecutorial discretion. No argument for prosecutorial discretion can justify a system that contains no safeguards to ensure that the lives of similarly situated offenders are treated with equal dignity. Because the right to life is fundamental, if Texas is to maintain such a system, its justifications for that system would have to pass strict scrutiny. *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (reversing an order to sterilize a felon because the law allowing for sterilization did not pass strict scrutiny, as it treated larceny and embezzlement differently despite their being essentially the same crime). In order to pass strict scrutiny, the state would have to show that allowing prosecutors the unbridled discretion to decide when to seek the death penalty is necessary to achieve a compelling governmental interest and narrowly tailored. Our constitutional structure does not bar courts from evaluating the Constitutionality of the system by which prosecutors decide whether or not to seek the death penalty. Neither do the arguments in favor of prosecutorial discretion that have been made over the years justify the arbitrary seeking of death.

The separation of powers doctrine does not bar courts from requiring some restraint on prosecutorial discretion. Courts can and do evaluate particular prosecutorial decisions for Equal Protection violations. *See, e.g., United States v. Armstrong*, 517 U.S. 456 (1996) (declining to allow discovery on defendant's selective prosecution claim but acknowledging that such discovery would be allowed if petitioner had shown that the Government declined to prosecute similarly situated persons of other races); *Wayte v. United States*, 470 U.S. 598 (1985) (reviewing the prosecution of a man for refusing to register with the Selective Service System under a "selective

13

840

prosecution" Equal Protection analysis); *United States v. Batchelder*, 442 U.S. 114, 125 (1979) (noting that while it is broad, prosecutorial discretion is nonetheless "subject to constitutional constraints"); *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978) (same); *Oyler v. Boles*, 368 U.S. 448 (1962) (same); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (ordering the release of Chinese petitioners who were prosecuted and jailed for operating laundries without a permit while similarly situated Caucasian laundry operators were not prosecuted). In selective-prosecution and vindictive prosecution cases, courts are deferential to prosecutorial decisions and require "clear evidence" to rebut the presumption that prosecutors have acted legally. *Armstrong*, 517 U.S. at 464 (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)). Because of separation of powers concerns, courts refuse to force district attorneys and U.S. Attorneys to prosecute particular offenders, as doing so would "encroach on the prerogatives of another department of the Government." *United States v. Shaw*, 226 A.2d 366, 368 (D.C. 1967); *see also Newman v. United States*, 382 F.2d 479 (1967); *United States v. Cox*, 342 F.2d 167 (5th Cir.Miss. 1965). However, "there is an enormous difference between, on the one hand, forcing a prosecutor to charge or stripping him of authority to charge and, on the other, regulating that authority . . ." James Vorenberg, Decent Restraint of Prosecutorial Power, 94 Harv. L. Rev. 1521, 1546 (1981). This analysis is neither attacking a particular decision of an individual prosecutor as vindictive or selective, nor is it asking the courts to force prosecutors to file charges in particular cases. Rather, it is alleging that the laws of Texas violate the Equal Protection Clause by failing to establish standards by which prosecutors are to decide whether to seek the death penalty in a potentially capital case. "The law has long recognized the distinction between judicial usurpation of discretionary authority and judicial review of the statutory and constitutional limits to that

14

841

authority." *Nader v. Saxbe*, 497 F.2d 676, 679 n. 19 (1974). After conducting such a review, courts can only conclude that Texas' lack of a system to guide prosecutors in the decision whether certain offenders will face the death penalty violates the Constitutional guarantee of equal protection. As the Court noted in *Bush v. Gore*, despite the "limits on judicial authority" imposed by the Constitution, when Constitutional violations are brought to the attention of the courts, "it becomes our unsought responsibility to resolve the federal and constitutional issues the judicial system has been forced to confront." *Bush*, 531 U.S. at 111. When faced with a Constitutional violation, courts cannot wait for the Legislature to take action.

The frequently cited reasons for allowing prosecutors broad discretion as to what charges to bring cannot justify a system which allows some defendants' lives to be arbitrarily valued less than others'. Because of the fundamental nature of the right to life, such rationale would have to pass strict scrutiny. *Skinner v. Oklahoma*, 316 U.S. at 541. The primary justification for judicial noninterference with prosecutorial decision-making is that judicial review of individual prosecutorial decisions would be difficult or inefficient. *Wayte v. United States*, 470 U.S. at 607. One reason that courts may have difficulty reviewing prosecutors' decisions as to whether to seek the death penalty is that there are no clearly articulated, uniform standards by which those decisions are made. If such standards were in place, judicial review would be much more feasible. Further, the existence of statewide standards would not mean that courts would have to begin micro-managing prosecutors' offices; they could remain fairly deferential to prosecutors' decisions so long as prosecutors are able to justify their decisions according to the standards. *See Vorenberg*, *supra*, at 1546-47. Concerns about the increased burden on courts and prosecutors that could result from statewide standards cannot justify ignoring a constitutional mandate. Standards

842

to guide a prosecutor's discretion as to when to seek the death penalty would not constitute a mandatory death penalty, nor would they completely eliminate a prosecutors' discretion or ability to consider the individual circumstances of each case. Statewide standards would simply provide "some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." *Bush*, 531 U.S. at 109.

Other rationales for broad prosecutorial discretion are similarly unable to excuse the disparities and arbitrariness of Texas' current system. Such considerations as the need for flexible use of prosecutorial resources based on changing enforcement priorities, or the loss of deterrence which might result from revealing prosecutorial motives, are not "compelling governmental interests" sufficient to overcome the need for non-arbitrariness when the state decides whether to seek to take a defendant's life. While such considerations may justify broad discretion in the criminal justice system in general, they are incapable of providing justification when life is at stake. Allowing the decision whether to seek the death penalty to be made based on the unfettered discretion of an individual prosecutor allows an unconstitutional degree of arbitrariness, inconsistency and unpredictability. Further, even if the reasons for allowing broad prosecutorial discretion were "compelling" by themselves, they cannot justify the risk that life-or-death decisions might be made on the basis of mere caprice or, worse, racial prejudice.

E.    Statewide Standards Required by the Eighth Amendment

Requiring standards to ensure that prosecutors do not, through the exercise of unfettered discretion, arbitrarily value some peoples' lives more than others' would not only ensure that the Texas death penalty system complies with the Equal Protection clause, but would further the Eighth Amendment's mandate of reliability and consistency in the imposition of the death penalty.

16

In 1972, the Supreme Court invalidated the death penalty in part on the grounds that the standardless death penalty statutes then in effect allowed the ultimate punishment to be applied "wantonly and ... freakishly," *Furman v. Georgia*, 408 U.S. 238, 310 (1972) (Stewart, J., concurring), and that in practice there was no meaningful basis for distinguishing between the cases in which it was applied and those in which it was not: *Id.* at 313 (White, J., concurring). Four years later, when the court approved revised death penalty statutes, it held that state legislatures confronted these problems by drafting statutes that provided the sentencer with guidance in determining the appropriate sentence and narrowed the sentencer's discretion to impose the death penalty. *Jurek v. Texas*, 428 U.S. 262, 270 (1976); *Gregg v. Georgia*, 428 U.S. 153, 195 (1976). The new statutes did not, however, require states to provide standards to guide prosecutors' decisions as to whether to seek the death penalty in the first place. See TEX. CODE CRIM. PROC. art. 37.071 (2000). As Justice Brennan has pointed out,

> . . . discrimination and arbitrariness at an earlier point in the selection process
> nullify the value of later controls on the jury. The selection process for the
> imposition of the death penalty does not begin at trial; it begins in the prosecutor's
> office. His decision whether or not to seek capital punishment is no less important
> than the jury's. Just like the jury, then, where death is the consequence, the
> prosecutor's "discretion must be suitably directed and limited so as to minimize the
> risk of wholly arbitrary and capricious action." . . . The prosecutor's choices are
> subject to no standards, no supervision, no controls whatever . . . if the price of
> prosecutorial independence is the freedom to impose death in an arbitrary, freakish,
> or discriminatory manner, it is a price the Eighth Amendment will not tolerate.

17

*De Garmo v. Texas*, 474 U.S. 973, 975 (1985) (Brennan, J., dissenting from denial of cert.). If imposing the death penalty on a freakishly and randomly selected subset of those who commit murder violated the Eighth Amendment, *see Furman*, then surely allowing prosecutors to choose, without any standards whatsoever, what subset of those accused of capital murder will face the death penalty is equally unconstitutional.

In light of the Equal Protection analysis of *Bush v. Gore*, the Supreme Court's previous approval of Texas' system for selecting which defendants should face the death penalty must be revisited. The Court has reasoned that such unbounded prosecutorial discretion does not violate the Eighth Amendment because a prosecutor's decision not to seek the death penalty when the law allowed him to do so involved the "decision to afford an individual defendant mercy" rather than the unconstitutional decision to impose the death penalty on a "capriciously selected group of offenders." *Gregg*, 428 U.S. at 199. The decision to show a particular defendant mercy is an invalid reason for allowing prosecutorial discretion because, as noted by Justice Blackmun in his dissent in *Furman*, "the power to be lenient is the power to discriminate." *McCleskey*, 481 U.S. at 312. While statutes channeling the discretion of the jury can reduce the dangers of arbitrary jury decisions in a particular case, they cannot change the arbitrariness inherent in a system in which the decision of who will be chosen to face that sentencing jury is guided by nothing more than one person's personal philosophy. Put another way, if local prosecutors decide to "afford mercy," that is, decline to seek the death penalty, based on vastly different standards, or racially discriminatory standards, or no standards at all, the resulting system remains arbitrary and capricious, and thus, unconstitutional. The insight of the *Bush v. Gore* Equal Protection reasoning is that arbitrariness can exist not just when an individual defendant (or ballot) is subjected to a judgment that is

18

unguided by any standards, but also when an entire system lacks consistent standards so that defendants (or ballots) in each locality may be subjected to vastly differing penalties.

The evidence that individual prosecutors do, indeed, use vastly different standards to decide whether to seek the death penalty also requires a re-evaluation of the Supreme Court's approval of unbounded prosecutorial discretion. In a concurrence in *Gregg*, Justice White expanded on the reasons why he thought unbounded prosecutorial discretion did not violate the Eighth Amendment, writing that "absent facts to the contrary" he would not assume that prosecutors will "exercise [their] power in a standardless fashion." *Gregg*, 428 U.S. at 225 (White, J., concurring). Justice White assumed that "the standards by which [prosecutors] decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and innocence. Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong." *Id.* In fact, as discussed above, under the current system many prosecutors do not seek the death penalty in every death-eligible case if they think that a jury would not return a death sentence. Some decide not to seek the death penalty upon request by the victim's family, (see Jury Process in Zamora Murder Trial to Start Jan. 20, Dallas Morning News, December 6, 1997, LEXIS), or because the defendant hires an experienced defense attorney, (Texas Civil Rights Project, The Death Penalty In Texas 22 (2000), http://www. texascivilrightsproject.org), or, as discussed above, possibly because the victim of the crime is not white. Taking into consideration all of these facts, the assumption that it is unnecessary to channel a prosecutors' discretion is illogical and misguided.

Noting the constitutional problems inherent in a system where prosecutors enjoy unchecked

845

freedom and widely varying standards when deciding whether to seek the death penalty, the New Jersey Supreme Court has called for standards to "instill uniformity in charging and prosecuting practices throughout the state." *State v. Marshall*, 613 A.2d at 1112. That court acknowledged the fact that courts should not usurp the decision-making function of prosecutors, but argued that in light of the "need to promote uniformity in the administration of the death penalty," statewide standards were warranted. *State v. Koedatich*, 548 A.2d at 955. These recommendations were made on the basis of the Eighth Amendment requirements of reliability and non-arbitrariness in capital proceedings. Combined with the Equal Protection Clauses' requirement that standards be in place to ensure equality with regards to fundamental rights, such standards are not simply advisable, they are constitutionally required.

Other courts have recognized that the Fourteenth Amendment requires limiting discretion to ensure equality and non-arbitrariness in governmental decision making. *Bush v. Gore* was not the first time a court has held that a system in which government officials have unbounded discretion is unconstitutional. The Supreme Court and federal appellate courts have found violations of the Fourteenth Amendment when governments and governmental agencies have unlimited discretion to select among qualified applicants for licenses and government benefits. Those courts reasoned that allowing governmental decision makers to make choices without any uniform standards allows an intolerable amount of arbitrariness. Although these cases have not been widely followed, they provide further persuasive support for the Equal Protection holding in *Bush* and for the necessity of some channeling of prosecutorial discretion in the Texas death penalty system.

The Supreme Court held that a lack of standards in a scheme of issuing permits, and the

arbitrary and discriminatory refusal to grant permits to one group when they were routinely granted to other groups, violates the Equal Protection clause. *Niemotko v. Maryland*, 340 U.S. 268, 273 (1951) (alternative holding). In that case, a City Council refused to grant a permit to a group of Jehovah's Witnesses who wished to hold a meeting in a public park. While that case also involved the First Amendment and a prior restraint on the freedom of speech and religion issues, *id.* at 271, the Court found that the complete discretion vested in the City Council as to whether to grant permits violated the Equal Protection clause. The Fifth Circuit applied similar reasoning to a case not involving the First Amendment in *Hornsby v. Allen*, 326 F.2d 605 (5th Cir. 1964). The City of Atlanta's system for granting liquor licenses was found to violate the Equal Protection clause because it operated under no standards, allowing the city to arbitrarily deny applications of eligible applicants. *Id.* at 610. The court rejected the city's argument that the Equal Protection requirement of non-arbitrary standards did not apply because liquor licenses are not protected rights or entitlements but rather a "privilege." *Id.* While "government bodies have great latitude in enacting reasonable standards," they do not have the latitude to make decisions "on the basis of uncontrolled discretion and whim" or "without any established standards." *Hornsby v. Allen*, 330 F.2d 55, 55 (5th Cir. 1964) (denying petition for reh'g). For the same reason, the problems of arbitrariness inherent in a standardless system for choosing among "non-preference" applicants for public housing violated the Due Process Clause. *Holmes v. New York City Housing Authority*, 398 F.2d 262 (2d Cir.N.Y.1968).

As in these cases, where governmental decision makers had complete discretion as to which eligible applicants they would grant permits or accept into public housing, in the Texas death penalty prosecution system 254 individual county prosecutors have complete discretion as to

848

which death-eligible defendants will face a possible death sentence and which will not. This standardless system allows for the arbitrary and inconsistent treatment of similarly situated defendants and is thus unconstitutional. Even if a prosecutor's decision not to seek the death penalty is a "privilege" of mercy granted to some capital defendants but not others, the decision whether to grant that privilege cannot be left to the unfettered discretion of 254 individual county prosecutors. Such a system allows for an unacceptable level of arbitrariness with life-or-death consequences. Of course, mandating that prosecutors seek the death penalty in any death-eligible case would not solve these problems. Such a mandate would not only mean a tremendous misuse of time and money, but would run afoul of the Eighth Amendment requirement of individualized consideration of each offender and the related prohibition against an "unduly harsh and unworkably rigid" mandatory death penalty statute. *Woodson v. North Carolina*, 428 U.S. at 293. While the reasoning in *Holmes* and *Hornsby* and the alternative holding in *Niemotko* have not been widely followed, their support for the reasoning in *Bush v. Gore* reinforces its validity and underlines the fact that a system of unfettered discretion, like Texas' standardless system for deciding when to seek the death penalty in capital cases, violates the Equal Protection Clause.

<u>Conclusion</u>

Because the Texas death penalty scheme violates the defendant's right to equal protection of the law by failing to provide standards to guide the decisionmakers' death penalty choices, the defendant prays that the court preclude the death penalty as a sentencing option in this case.

849

Respectfully submitted,

Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been

furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of

_____ June, 2007.

Steven R. Miears

23

CAUSE NUMBER 380-82629-06

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## ORDER ON THE DEFENDANT'S MOTION TO PRECLUDE DEATH PENALTY AS A SENTENCING OPTION DUE TO EQUAL PROTECTION VIOLATIONS
### Constitutional Motion Number 7

BE IT REMEMBERED, that on this day came to be considered the foregoing motion to preclude the death penalty as a sentencing option. After consideration, the court has determined that the motion shall be, and is hereby:

_____ GRANTED

_____ DENIED, to which the Defendant excepts.

SO ORDERED.

SIGNED the _____ day of _____, 2007.

_____
JUDGE PRESIDING

24

851

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION TO PRECLUDE THE DEATH PENALTY DUE TO THE GRAND JURY'S FAILURE TO ALLEGE IN THE INDICTMENT ALL ELEMENTS NECESSARY TO MAKE THE DEFENDANT DEATH-ELIGIBLE
### Constitutional Motion Number 8

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant in the above-entitled and numbered criminal action, files this motion to preclude the death penalty due to the grand jury's failure to allege in the indictment all elements necessary to make the defendant death-eligible. In support, the defendant will show the court the following.

### Background

The defendant has been indicted for the offense of capital murder by the Collin County grand jury. The State is seeking the death penalty. The Eight Amendment requires a greater degree of accuracy and fact finding than would be true in a noncapital case. *Gilmore v. Taylor*, 508 U.S. 333 (1993); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The courts of this state are bound by the law to make certain that a death sentence is not wantonly or freakishly imposed and that the purposes of Art. 37.071 are accomplished in a constitutional manner. *Ellason v. State*, 815 S.W.2d 656 (Tex. Crim. App. 1991).



### Analysis

The penalty for the offense of capital murder is life in prison. TEX. PENAL CODE § 12.31; TEX. CODE CRIM. PROC. art. 37.071 § 2(e)(2)(B). It is only when the state seeks the death

1

852

penalty that the prescribed statutory maximum can be exceeded and then only if the finder of fact concludes, beyond a reasonable doubt, that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1); TEX. PENAL CODE § 12.31.

Under Texas law there are three facts which must be found by a jury in order to increase the penalty for the crime beyond the prescribed statutory maximum of life without parole for a minimum of 40 years to that of death. These facts are: (1) future dangerousness, TEX. CODE CRIM. PROC. art. 37.071, §2(b)(1); (2) whether the defendant, as a party, intended or anticipated the death of the individual TEX. CODE CRIM. PROC. art. 37.071, §2(b)(2); and (3) the lack of a mitigating circumstance justifying the imposition of a life sentence rather than death. TEX. CODE CRIM. PROC. art. 37.071, §2 (e)(1). An affirmative response to the first two and a negative response to the third are matters which enhance the punishment to death and, therefore, must be alleged in the indictment and proved to the jury beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The Texas legislature has created two offenses, one is a Capital Felony where the State seeks death and the other is a Capital Felony where the state does not seek death. TEX. PENAL CODE § 12.31(a).

Evidence of the defendant's future dangerousness, mens rea and lack of mitigation must be presented to the grand jury and alleged in the indictment, if such elements are found by the grand jurors. Although the grand jury provision of the Fifth Amendment of the United States Constitution has not been extended to the states through the Fourteenth Amendment, *Hurtado v. California*, 110 U.S. 516, 538 (1884), the Texas Constitution provides, in relevant part, that "no person shall be held to answer for a criminal offense, unless on an indictment of a grand jury. .

2

.." TEX. CONST. art. 1 § 10. Further the Texas Constitution states, "[t]he practice and procedures relating to the use of indictments and informations, including their contents, amendment, sufficiency and requisites, are as provided by law." TEX. CONST. art 5 § 12.

Deriving its authority from that provision, the Legislature enacted TEX. CODE CRIM. PROC. art. 21.03, which requires that "[e]verything should be stated in an indictment which is necessary to be proved." "[A]ll elements constituting an offense must be sufficiently charged so as to inform, without intendment, the presumptively innocent [accused] of the charges against him." *McCravy v. State*, 642 S.W.2d 450, 455 (Tex. Crim. App. 1980). And "[w]here a particular intent is a material fact in the description of the offense, it *must* be stated in the indictment." TEX. CODE CRIM. PROC. art. 21.05 (emphasis added). Moreover, the indictment may not be amended without the grand jury's permission if the change is directed toward the grand jury's responsibility to make findings on all the essential allegations of the offense. *Batiste v. State*, 785 S.W.2d 432, 435 (Tex. App.—Corpus Christi 1990, pet. ref'd). If the indictment does not make the proper allegations, then the Court's jurisdiction is restricted to imposition of the punishment for the charge actually made in the indictment -- in this case, a non-death capital felony.

The United States Constitution forbids the State of Texas from depriving the defendant of "life, liberty or property without due process of law." U.S. CONST. amend. 14. While the federal right to grand jury indictment has not been extended to the states, the Supreme Court has expressly held that a State must comply with its own laws in charging criminal offenses in order to avoid running afoul of the Due Process guarantee. *Hurtado*, 110 U.S. 516, 538 ("No man can be restrained of his liberty, be prevented from removing himself from place to place as he

2

chooses, be compelled to go to a place contrary to his inclination, or be in any way imprisoned or confined unless by virtue of the express laws of the land.")

Conclusion

The death penalty must be precluded as a sentencing option in this case because the indictment returned against the defendant fails to make the necessary allegations to elevate the offense of capital-life to capital-death. To allow the State to seek the death penalty against the defendant on the basis of an insufficient indictment would violate the Texas Constitution and the United States Constitution.

Respectfully submitted,

Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of _____ June _____, 2007.

Steven R. Miears

3

855

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## ORDER OF THE COURT ON THE DEFENDANT'S MOTION TO PRECLUDE THE DEATH PENALTY DUE TO THE GRAND JURY'S FAILURE TO ALLEGE IN THE INDICTMENT ALL ELEMENTS NECESSARY TO MAKE THE DEFENDANT DEATH-ELIGIBLE
### Constitutional Motion Number 8

BE IT REMEMBERED, that on this day came to be considered the foregoing motion to preclude the death penalty due to the grand jury's failure to allege in the indictment all elements necessary to make the defendant death-eligible. After consideration, the court has determined that the motion shall be, and is hereby:

_____ GRANTED. IT IS THEREFORE ORDERED that the death is precluded as a sentencing option in this case.

_____ DENIED, to which the Defendant excepts.

SIGNED the _____ day of _____, 2007.

_____
JUDGE PRESIDING

4

850

CAUSE NUMBER 380-82629-06

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION PRECLUDE THE DEATH PENALTY AS A SENTENCING OPTION AND TO DECLARE TEX. CODE CRIM. PROC. ART. 37.071 UNCONSTITUTIONAL (*RING V. ARIZONA*)
### Constitutional Motion Number 9

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant herein, and pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 3, 10, 13 and 19 of the Texas Constitution, moves this Court to preclude the death penalty as a sentencing option in this case based upon the constitutionally defective indictment against him. In support of his motion, the Defense respectfully shows as follows:

1. The Defendant has been indicted for the offense of capital murder by the Collin County grand jury. The State of Texas is seeking the death penalty.

2. The Eighth Amendment requires a greater degree of accuracy and factfinding than would be true in a noncapital case. *Gilmore v. Taylor*, 508 U.S. 333 (1993); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The courts of this state are bound by the law to make certain that a death sentence is not wantonly or freakishly imposed and that the purposes of Art. 37.071 are accomplished in a constitutional manner. *Ellason v. State*, 815 S.W.2d 656 (Tex. Crim. App. 1991).

857

3. The maximum penalty for the offense of capital murder is life in prison. Tex. Penal Code § 12.31 (Lexis through 2002). It is only when the state seeks the death penalty that the prescribed statutory maximum can be exceeded and then only if the jury concludes, beyond a reasonable doubt, that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1) (West 2002). The Texas legislature has created two offenses: (1) a Capital Felony where the state seeks the death penalty, and (2) a Capital Felony where the state does not seek the death penalty. Tex. Penal Code § 12.31(a) (Lexis through 2002).

4. The Defendant has the constitutional right to be accused of Capital Murder only on an indictment of a grand jury. Tex. Const. art I, § 10 ("no person shall be held to answer for a criminal offense, unless on an indictment of a grand jury, except in cases in which the punishment is by fine or imprisonment, otherwise than in the penitentiary"); *Cook v. State*, 902 S.W.2d 471, 475 (Tex. Crim. App. 1995) (holding that Texas Constitution guarantees right to indictment by grand jury for all felony offenses). Further, the Defendant has the right, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, sections 10, 13, and 19 of the Texas Constitution, to be informed of the specific nature of the accusations against him. *See In re Oliver*, 333 U.S. 257, 273 (1948) ("A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense ... are basic in our system of jurisprudence...").

5. Indictment by grand jury protects citizens against arbitrary accusations by the government. *King v. State*, 473 S.W.2d 43, 45 (Tex. Crim. App. 1971). An indictment is essential to vest the trial court with jurisdiction. Tex. Const. art. V, § 12(b); *Cook*, 902 S.W.2d at 475. The purpose of an indictment is to provide notice of the charged offense so that the

presumptively innocent accused may prepare, before trial, an informed and effective defense. *Riney v. State*, 28 S.W.3d 561, 565 (Tex. Crim. App. 2000). "The accused is not required to anticipate any and all variant facts the State might hypothetically seek to establish." *Brasfield v. State*, 600 S.W.2d 288, 295 (Tex. Crim. App. 1980) (overruled on other grounds by *Janecka v. State*, 739 S.W.2d 813, 819 (Tex. Crim. App. 1987)).

6. Therefore, an indictment must aver all the elements of the crime with which it charges. *Campbell v. State*, 5 S.W.3d 693, 701 (Tex. Crim. App. 1999); *Garcia v. State*, 981 S.W.2d 683, 685 (Tex. Crim. App. 1998) ("[A]n indictment must allege, in plain and intelligible language, all the facts and circumstances necessary to establish all the material elements of the offense charged."); *Ward v. State*, 829 S.W.2d 787, 794 (Tex. Crim. App. 1992) (overruled on other grounds by *Riney*, 28 S.W.3d at 566); *Labelle v. State*, 720 S.W.2d 101, 110 (Tex. Crim. App. 1986); *Ex parte County*, 577 S.W.2d 260, 261 (Tex. Crim. App. 1979); *Benoit v. State*, 561 S.W.2d 810, 813 (Tex. Crim. App. 1977); *State v. Draper*, 940 S.W.2d 824, 826 (Tex. App.—Austin 1997); *cf. Hamling v. United States*, 418 U.S. 87, 117 (1974). Indeed, the Texas Legislature has mandated that an indictment must contain all material elements of the offense charged: "Everything should be stated in an indictment which is necessary to be proved." Tex. Code Crim. Proc. Ann. art. 21.03 (West 2002); *see also* Tex. Code Crim. Proc. Ann. art. 21.11 (West 2002).

7. In the past, Texas courts have rejected the contention that, where the State seeks the death penalty, the failure of the capital murder indictment to allege the punishment criteria—the special issues for the jury, mandated by Article 37.071, section 2(b), of the Texas Code of Criminal Procedure—renders a subsequent death sentence constitutionally invalid. *See, e.g., Moore v. State*, 969 S.W.2d 4, 13 (Tex. Crim. App. 1998).

8. Those courts justified their holdings with two arguments. First, the courts reasoned that since the purpose of an indictment is to provide notice, the punishment special issues need not be alleged in the indictment because "the very fact of a capital murder indictment places the defendant on notice that conviction will result in either life imprisonment or the death penalty" *Aranda v. State*, 640 S.W.2d 766, 770 (Tex. App.—San Antonio 1982); *see also Moore*, 969 S.W.2d at 13; *Callins v. State*, 780 S.W.2d 176, 187 (Tex. Crim. App. 1986) ("a defendant who is charged under capital murder indictment is effectively put on notice that the special questions under Article 37.071, . . . will be issues in the case and that such procedural provisions need not be alleged in the indictment") (citations omitted); *Castillo v. State*, 739 S.W.2d 280, 298-99 (Tex. Crim. App. 1987); *Vigneault v. State*, 600 S.W.2d 318, 330 (Tex. Crim. App. 1980) (observing that "the fact that the issues to be submitted to the jury are in every capital case identical and wholly independent of the varying fact situations which may come to trial places the capital defendant in a substantially different posture as regards notice thereof, from that of a civil litigant," and therefore holding that the failure to allege the special issues in the indictment did not deprive the appellant of notice) (footnote omitted).

9. The argument that capital defendants are already provided all the notice constitutionally required of the punishment special issues by a capital murder indictment that does not allege the facts to support the issues cannot seriously be maintained. With respect to the Defendant's rights under the Texas Constitution, that notice must "come from the face of the indictment. Indeed the accused is not required to look elsewhere." *Ward*, 829 S.W.2d at 794; *Labelle*, 720 S.W.2d at 110 (observing that Article I, section 10, of the Texas Constitution requires that notice must come from the face of the indictment); *Benoit*, 561 S.W.2d at 813 (holding that defendant's knowledge of the offense with which he was charged does not obviate

inquiry into whether the charge, in writing, furnished that information in plain and intelligible language). An indictment that does not allege, for example, that a probability exists that the Defendant would commit criminal acts of violence that constitutes a "continuing threat to society" fails to provide notice of that accusation from its face. Likewise, an indictment that fails to allege that no circumstance exists that would justify a life sentence fails to provide notice of that allegation. The Defendant is not clairvoyant; he cannot use the indictment sworn out against him as a crystal ball to read the prosecutor's mind and foresee the State's intention to prove at trial that he is a "continuing threat to society." and that there is nothing that will justify a life sentence.

10. Nor does the fact that the future dangerousness issue and lack of mitigating evidence are raised in every capital murder case provide the Defendant with the constitutionally required notice that these will be issues in his case. For instance, that the victim was killed is a fact at issue in every capital murder case, but a capital murder indictment that fails to allege the victim's death is patently defective. *Cf. Welch v. State*, 543 S.W.2d 378, (Tex. Crim. App. 1976) (requiring indictment for theft to allege, *inter alia*, that stolen personal property was owned, and to name the owner if known); *Ex parte Winton*, 549 S.W.2d 751, 752 (Tex. Crim. App. 1977) (holding that failure to allege required culpable mental state renders indictment defective). Underscoring the fallaciousness of assuming that what is at issue in one capital murder case provides adequate notice in another case, the "continuing threat to society" and "mitigation" special issues embrace a confluence of factors that varies from case to case. *See, e.g., Tong v. State*, 25 S.W.3d 707 (Tex. Crim. App. 2000) (unadjudicated extraneous offenses); *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998) (evidence of pedophilia and unlikelihood of rehabilitation) (overruled in part on other grounds); *Walbey v. State*, 926 S.W.2d 307 (Tex. Crim.

App. 1996) (facts of crime); *Ford v. State*, 919 S.W.2d 107 (Tex. Crim. App. 1996) (lack of remorse); *Mason v. State*, 905 S.W.2d 570 (Tex. Crim. App. 1995) (membership in white-supremacist organization that engaged in criminal activities); *McBride v. State*, 862 S.W.2d 600 (Tex. Crim. App. 1993) (psychiatric testimony). The Defendant has not been provided with notice as to which, if any, of these theories will be pursued by the State at punishment. As such, the indictment is defective as a matter of state and federal constitutional law. *See* Tex. Const. art. I, §§ 10, 13, & 19; *see also Ables v. Scott*, 73 F.3d 591, 593-94 & n.4 (5th Cir. 1996) (resting refusal to grant relief for indictment's failure to allege "deadly weapon" sentence enhancement under Fifth, Sixth, and Fourteenth Amendments on the fact that petitioner had actual notice of State's punishment theory, and because, at the time the case was decided, pre-*Apprendi*, aggravating factors increasing punishment were not considered elements of the offense but are now).

11. The second reason why the Texas courts have not required the punishment special issues to be alleged in the indictment is that the courts deemed them not to be elements of the offense of capital murder. *See Moore*, 969 S.W.2d at 13; *Rosales v. State*, 748 S.W.2d 451, 458 (Tex. Crim. App. 1987); *Castillo*, 739 S.W.2d at 298-99; *Sharp v. State*, 707 S.W.2d 611, 624 (Tex. Crim. App. 1986) ("Appellant is correct in his assertion that everything necessary to be proven to sustain a conviction *in the guilt/innocence phase* must be alleged in an indictment. However, the special issues of Art. 37.071 (b), supra, are not an element of the offense of capital murder; Art. 37.071 relates only to punishment").

12. The notion that the punishment special issues are not elements of the offense of capital murder contradicts over a century of Texas case law addressing accusations on what constitutes a "crime." This authority establishes that a "crime" includes every fact that is by law

a basis for imposing or increasing—as opposed to mitigating—punishment. Only facts that were not the basis for punishment were not elements, and thus did not need to be alleged in the indictment. *See* 1 J. Bishop, Law of Criminal Procedure § 81, at 51 (2d ed. 1872) ("The indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted."), *adopted*, *Hobbs v. State*, 44 Tex. 353, 354 (Tex. 1875). Statutory aggravating facts were treated the same way—as elements of a new, aggravated grade of the common law crime rather than some sort of "non-element" that enhances the sentence of a common law crime. Indictments not alleging these statutory aggravators were deficient as a matter of law, even if the jury found the presence of the aggravating circumstance beyond a reasonable doubt. *See, e.g.*, *Gooden v. State*, 145 S.W.2d 177, 178 (Tex. Crim. App. 1940); *Williams v. State*, 108 S.W. 371, 372 (Tex. Crim. App. 1908); *Garcia v. State*, 19 Tex. Ct. App. 389, 393 (Tex. Crim. App. 1885); *Searcy v. State*, 1 Tex. Ct. App. 440, 444 (1876); *Hobbs*, 44 Tex at 355; *see generally*, *Apprendi v. New Jersey*, 530 U.S. 466, 500-18 (2000) (Thomas, J., concurring) (gathering case law).

13. This principle—that a fact that increases the penalty for a crime beyond the prescribed statutory maximum must be alleged in the indictment and proved to the jury beyond a reasonable doubt—is a matter of constitutional law. *See Apprendi v. New Jersey*, 530 U.S. 466, 476-77 (2000); *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999) ("any fact (other than prior conviction) that increases the maximum penalty for a crime *must be charged in an indictment*, submitted to a jury, and proven beyond a reasonable doubt.") (emphasis added). The question of whether a fact denominated a sentencing factor by the legislature defining the offense is an element "is not one of form, but of effect." *Apprendi*, 530 U.S. at 494. If a State makes a defendant's authorized punishment contingent on the finding of a fact, that fact—"no matter how

the State labels it"—constitutes an element of the offense. *Ring v. Arizona*, 536 U.S. 584, 602 (2002).

14. Furthermore, the Texas Court of Criminal Appeals has implicitly acknowledged that the punishment special issues are elements of the offense of capital murder where the State seeks the death penalty, as distinguished from the offense of capital murder where the State does not seek the death penalty. In *Powell v. State*, the Texas Court of Criminal Appeals, construing the version of Article 37.071 of the Texas Code of Criminal Procedure then in effect, stated that the "legislature defined a *capital murder punishable by death* as including the element of [the punishment special issue] deliberateness." 897 S.W.2d 307, 316 (Tex. Crim. App. 1994) (emphasis added) (*overruled by Prystash v. State*, 3 S.W.3d 522, 532 (Tex. Crim. App. 1999)). Revisiting the issue following *Apprendi*, the Texas Court of Criminal Appeals denied that the punishment special issues are elements of capital murder; however, in the same breath, the court confirmed that their centrality to the imposition of a death sentence, stating that "the 'deliberateness' special issue is an element of the death penalty, not capital murder." *Smith v. State*, 74 S.W.3d 868, 873-74 (Tex. Crim. App. 2002). Tellingly, the *Smith* court conceded that a punishment special issue might be an element of capital murder when a death sentence is sought, though the court concluded that the capital murder statute nevertheless complies with the *Apprendi* rule in the context of the claim in that case. *Id.* at 874.

15. Since *Smith*, the U.S. Supreme Court has verified that a statutory aggravating circumstance that, when found by the fact finder, increases the punishment for capital murder from life imprisonment to the death penalty is an element of the offense of capital murder. *Ring*, 153 L. Ed. 2d at 564 (overruling *Walton v. Arizona*, 497 U.S. 639 (1990)).

16. While the Defendant has been indicted for capital murder under section 12.31(a) of the Texas Penal Code and the State is seeking the death penalty, the indictment against him fails to allege the requisite statutory aggravating circumstances for a death sentence. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2 (West 2002). Specifically, the indictment fails to allege, much less assert the factual predicates for such an accusation, that the Defendant constitutes a "continuing threat to society." *Id.* at § 2(b). Evidence of the Defendant's future dangerousness must be presented to the grand jury and alleged in the indictment, if such dangerousness is found to be true by the grand jurors. If the indictment does not make the proper allegation, then this Court lacks the jurisdiction to try the Defendant for anything other than a non-death capital felony, and death should therefore be precluded as a sentencing option. To proceed otherwise would violate the Defendant's rights under the Texas and United States Constitutions.

17. Likewise, the absence of a circumstance that would justify a life sentence must be plead in the indictment and established by the state, beyond a reasonable doubt. The failure of Article 37.071 to place the burden of establishing, beyond a reasonable doubt, that no circumstance exists that would justify a sentence of life violates the rights and protections afforded to the accused by the provisions of the 5th, 6th, 8th and 14th Amendments to the United States Constitution. *Ring, supra.*

WHEREFORE, PREMISES CONSIDERED, the Defendant prays that this Court preclude the death penalty as a sentencing option in this case.

Respectfully submitted,

_____

Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has

been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of

_____, 2007.

_____

Steven R. Miears

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## ORDER ON THE DEFENDANT'S MOTION PRECLUDE THE DEATH PENALTY AS A SENTENCING OPTION AND TO DECLARE TEX. CODE CRIM. PROC. ART. 37.071 UNCONSTITUTIONAL (*RING V. ARIZONA*)
### Constitutional Motion Number 9

BE IT REMEMBERED, that on the _____ day of _____, 2007,

came to be considered the foregoing motion to preclude the death penalty as a sentencing option.

After consideration, the court has determined that the motion shall be, and is hereby:

_____ GRANTED

_____ DENIED, to which the Defendant excepts.

SO ORDERED.

SIGNED the _____ day of _____, 2007.


_____
JUDGE PRESIDING

867

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

<u>MOTION PRECLUDE THE DEATH PENALTY AS A SENTENCING OPTION</u>
Constitutional Motion Number 10

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant herein, and pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 3, 10, 13 and 19 of the Texas Constitution, moves this Court to preclude the death penalty as a sentencing option in this case. In support of his motion, the Defense would respectfully show unto this Honorable Court as follows:

1. The Defendant was indicted for the offense of capital murder by the Collin County grand jury. The State is seeking the death penalty.

2. The Eight Amendment requires a greater degree of accuracy and fact finding than would be true in a noncapital case. *Gilmore v. Taylor*, 508 U.S. 333 (1993); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The courts of this state are bound by the law to make certain that a death sentence is not wantonly or freakishly imposed and that the purposes of Art. 37.071 are accomplished in a constitutional manner. *Ellason v. State*, 815 S.W.2d 656 (Tex. Crim. App. 1991).

3. The maximum penalty for the offense of capital murder is life in prison. Tex. Penal Code § 12.31. It is only when the state seeks the death penalty that the prescribed statutory maximum can be exceeded and then only if the jury concludes, beyond a reasonable doubt, that

1

HANNAH KUNKLE
DISTRICT CLERK
COLLIN COUNTY, TEXAS
2022 JUN 22 PM 1: 06
BY

"there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071, § 2(b)(1). The Texas legislature has created two offenses: (1) a Capital Felony where the state seeks the death penalty, and (2) a Capital Felony where the state does not seek the death penalty. Tex. Penal Code § 12.31(a).

4. The Defendant has the constitutional right to be accused of Capital Murder only on an indictment of a grand jury. Tex. Const. art I, § 10 ("no person shall be held to answer for a criminal offense, unless on an indictment of a grand jury, except in cases in which the punishment is by fine or imprisonment, otherwise than in the penitentiary"); *Cook v. State*, 902 S.W.2d 471, 475 (Tex. Crim. App. 1995) (holding that Texas Constitution guarantees right to indictment by grand jury for all felony offenses). Further, the Defendant has the right, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, sections 10, 13, and 19 of the Texas Constitution, to be informed of the specific nature of the accusations against him. *See In re Oliver*, 333 U.S. 257, 273 (1948) ("A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense … are basic in our system of jurisprudence…").

5. Indictment by grand jury protects citizens against arbitrary accusations by the government. *King v. State*, 473 S.W.2d 43, 45 (Tex. Crim. App. 1971). The most "celebrated purpose" of the grand jury "is to stand between the government and the citizen" and protect individuals from the abuse of arbitrary prosecution. *United States v. Mara*, 410 U.S. 19, 45 (1973).

6. An indictment is essential to vest the trial court with jurisdiction. Tex. Const. art. V, §

2

12(b); *Cook*, 902 S.W.3d at 475. The purpose of an indictment is to provide notice of the charged offense so that the presumptively innocent accused may prepare, before trial, an informed and effective defense. *Riney v. State*, 28 S.W.3d 561, 565 (Tex. Crim. App. 2000). "The accused is not required to anticipate any and all variant facts the State might hypothetically seek to establish." *Brasfield v. State*, 600 S.W.2d 288, 295 (Tex. Crim. App. 1980) (overruled on other grounds by *Janecka v. State*, 739 S.W.2d 813, 819 (Tex. Crim. App. 1987)).

7. In *Jones v. United States*, 526 U.S. 227 (1999), the United States Supreme Court held that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than a prior conviction) that increase[d] the maximum penalty for a crime must be charged in an indictment, submitted to a jury and proven beyond a reasonable doubt," *Jones*, 526 U.S. at 243, n.6. In *Apprendi v. New Jersey*, 530 U.S. 466, 475 (2000), the United States Supreme Court extended the Jones holding to the States through the Fourteenth Amendment. In *Ring v. Arizona*, 122 S. Ct. 2428 (2002) the United States Supreme Court held that the rule of *Jones* and *Apprendi* applies with equal force to capital cases. Aggravating factors operate as the functional equivalent of an element or a greater offense. *Ring*, 122 S. Ct. at 2443. "The relevant inquiry is one not of form but of effect." *Apprendi*, 530 U.S. at 494. Thus, aggravating factors must be pled in the indictment, submitted to a jury and proved by the prosecution beyond a reasonable doubt. Likewise, the absence of a circumstance that would justify a life sentence must be plead in the indictment and established by the state, beyond a reasonable doubt.

8. The logical conclusion that can be drawn from this is that the discretion to choose to seek death in a "capital eligible" case lies with the grand jury, not the State of Texas through its

3

prosecutors. The only discretion that is left to the prosecutors following the application of *Jones,*
*Apprendi* and *Ring* are to (1) decide if evidence of statutory and non-statutory aggravators are to
be presented to the grand jury and (2) should the grand jury find the aggravators to be "true,"
whether or not the State will offer evidence in support of those aggravators. This
constitutionally mandated procedure was not followed in this case in that no evidence of
aggravating circumstances was presented to this grand jury, no findings were made as to the
existence of aggravating circumstances, accordingly death should be precluded as a sentencing
option.

WHEREFORE, PREMISES CONSIDERED, the Defendant prays that this Court
preclude the death penalty as a sentencing option in this case.

Respectfully submitted,

_____
Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has
been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of
_____, 2007.

_____
Steven R. Miears

4

871

CAUSE NUMBER 380-82629-06

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## ORDER ON THE DEFENDANT'S MOTION TO PRECLUDE DEATH PENALTY AS A SENTENCING OPTION
Constitutional Motion Number 10

BE IT REMEMBERED, that on this day came to be considered the foregoing motion to preclude the death penalty as a sentencing option. After consideration, the court has determined that the motion shall be, and is hereby:

_____ GRANTED

_____ DENIED, to which the Defendant excepts.

SO ORDERED.

SIGNED the _____ day of _____, 2007.

_____
JUDGE PRESIDING

5

872

CAUSE NUMBER 380-82629-06

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION TO PRECLUDE THE DEATH PENALTY AS A SENTENCING OPTION AND DECLARE ARTICLE 37.071 UNCONSTITUTIONAL (*JONES V. UNITED STATES*; *APPRENDI V. NEW JERSEY*; AND *RING V. ARIZONA*)
### Constitutional Motion Number 11

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, Defendant herein, by and through counsel and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Article 1, Sections 3, 10, 13 and 19 of the Texas Constitution.

1. The Defendant has been indicted for the offense of capital murder.

2. The State is seeking the death penalty. The Eight Amendment requires a greater degree of accuracy and fact finding than would be true in a noncapital case. *Gilmore v. Taylor*, 508 U.S. 333, 113 S. Ct. 2112, 124 L. Ed. 2d 306 (1993) and *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

3. The maximum penalty for the offense of capital murder is life in prison. Texas Penal Code 12.31. It is only when the state seeks the death penalty that the prescribed statutory maximum can be exceeded and then only if the finder of fact concludes, beyond a reasonable doubt, that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071(2)(b)(1).

4. A fact ("future dangerousness") that increases the penalty for a crime beyond the prescribed statutory maximum ( a sentence of LWOP - increased to death) must be alleged in the indictment and proved to the jury beyond a reasonable doubt. *Jones v. United States*, 526 U.S.

2007 JUN 2 PH 1:16

HANNAH KUEHLE
DISTRICT CLERK
COLLIN COUNTY, TEXAS
BY_____ DEPUTY

227 (1999); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The Texas legislature has created two offenses, one is a Capital Felony where the state seeks death and a Capital Felony where the state does not seek death, Texas Penal Code Section 12.31 (a). Evidence of the Defendant's future dangerousness must be presented to the grand jury, and alleged in the indictment, if such dangerousness is found to be true by the grand jurors. If the indictment does not make the proper allegation, then the Court does not have jurisdiction to prosecute the Defendant for anything other than a non-death capital felony and death should be precluded as a sentencing option.

5. In *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002), the Supreme Court held that the rule of *Apprendi v. New Jersey*, applies to capital cases: Where a sentence of death is authorized only upon the finding of certain facts, those facts "operate as 'the functional equivalent of an element of a greater offense . . . .'" *Ring*, 122 S. Ct. at 2443 (quoting *Apprendi*, 530 U.S. at 494 n. 19). In *Ring*, the Sixth Amendment's jury trial guarantee thus required that the Arizona death penalty statute's aggravating factors be treated as elements: "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury.'" *Ring*, 122 S. Ct. at 2443 (quoting *Apprendi*, 530 U.S. at 494 n. 19). Ring did not "contend that his indictment was constitutionally defective" because the Fourteenth Amendment "has not been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury.'" *Ring*, 122 S. Ct. at 2437 n.4 *(quoting Apprendi*, 530 U.S. at 477 n.3).

Article 1, Section 10 of the Texas Constitution provides, in part:

> ". . . no person shall be held to answer for a criminal offense, unless on an indictment of a grand jury except in cases in which the punishment is by fine or imprisonment, otherwise than in the penitentiary. . . ."

6. The State of Texas is trying to kill the accused. The issues relating to future "criminal acts of violence" and mitigation are submitted to the jury. In violation of the rule of *Ring*, Tex. Code Crim. Proc. Art. 37.071 treats the special issue questions not as elements, but as sentencing factors, and provides for proof of these facts without indictment by a grand jury. Because the procedures that are set out (or omitted from) Art. 37.071, the statute violates the rule of *Jones*, *Apprendi*, and *Ring,* and it is facially unconstitutional. *Cf. Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) ("In the hands of the grand jury lies the power to charge a greater offense or a lesser offense . . . a capital offense or a noncapital offense — all on the basis of the same facts."); *Campbell v. Louisiana*, 523 U.S. 392, 399 (1998) (grand jury controls "whether to charge a greater or lesser offense, including the important decision to charge a capital crime"). Because Art. 37.071 is fatally defective and the indictment fails to make the allegations that are necessary before the jury can even consider to impose death, death must be excluded as a sentencing option for the jury that will hear this case.

7. Tex. Code Crim. Proc. art 37.071(2)(3)(e)(1) requires the Court to instruct the jury as follows:

> Whether, taking into consideration of all of the evidence including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

If the jury finds that a probability exists that the defendant will commit future acts of criminal violence and an affirmative finding on the "anti-parties" instruction, the jury must consider the "mitigation" issue. However, Art. 37.071 does not state who has the burden on this

issue. This omission has been approved by the Texas Court of Appeals which added that it will not review the sufficiency of the evidence offered in support of the issues. *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995).

The burden on this instruction is clearly not on the prosecution. *Barnes v. State*, 876 S.W.2d 316, 329-330. In fact of practice, however, the defendant has the burden of proof for two reasons. First, the Defendant must convince the jury that it is more likely than not that at least one circumstance exists that would justify a life sentence. Secondly, the jury is instructed to consider the "moral culpability of the defendant" against mitigating evidence presented. This death qualified jury has just found the defendant guilty of intentional murder (legal culpability). It is not possible for a jury then to eliminate "legal culpability" from its deliberation and distinguish "legal culpability" from "moral culpability". The jury is even instructed to consider the circumstances of the offense which makes it impossible for them to find a circumstance that would justify a life sentence without also finding that such circumstances exceed the legal/moral culpability of the defendant.

A*pprendi* and *Ring* both require that "If a state makes an increase in defendant's authorized punishment contingent on the finding of a fact, that fact–no matter how the State labels it–must be found by a jury beyond a reasonable doubt. *Apprendi*, 530 U.S. at 482-483. *Art.*37.071 fails to require that the state prove the absence of a circumstance that would justify a life sentence and is therefor in violation of the 8[th] Amendment to the United States Constitution and should be found to be unconstitutional.

WHEREFORE, PREMISES CONSIDERED, the Defendant prays that this Court preclude the death penalty as a sentencing option in this case and further the Article 37.071(2)(e)(1) is unconstitutional.

Respectfully submitted,

Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has

been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of

_____ June, 2007.

Steven R. Miears

877

CAUSE NUMBER 380-82629-06

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## ORDER ON THE DEFENDANT'S MOTION PRECLUDE THE DEATH PENALTY AS A SENTENCING OPTION AND DECLARE ARTICLE 37.071 UNCONSTITUTIONAL (*JONES V. UNITED STATES; APPRENDI V. NEW JERSEY; AND RING V. ARIZONA*)
Constitutional Motion Number 11

BE IT REMEMBERED, that on this day the Court considered the foregoing motion to preclude the death penalty as a sentencing option. After consideration, the court has determined that the motion shall be, and is hereby:

_____ GRANTED

_____ DENIED, to which the Defendant excepts.

SO ORDERED.

SIGNED the _____ day of _____, 2007.

_____
JUDGE PRESIDING

873

CAUSE NUMBER 380-82629-06

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION TO PRECLUDE THE DEATH PENALTY AS A SENTENCING OPTION
### (SELECTION OF DEATH PENALTY CASES)
Constitutional Motion Number 12

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant herein, by counsel, and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution, Article 1, Sections 3, 10, 13, 19 and 29 and Tex. Code Crim. Proc. Articles 1.05, 1.06 and 1.09 and moves the Court to preclude the death penalty as a sentencing option and in support thereof would show the court the following:

1. The Defendant has been indicted by the county grand jury for capital murder.

2. The State is seeking the death penalty. The Eighth Amendment to the United States Constitution requires a greater degree of accuracy and fact finding than would be true in a noncapital case. *Gilmore v. Taylor*, 508 U.S. 333, 113 S. Ct. 2112, 124 L. Ed. 2d 306 (1993) and *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

3. Tex. Code Crim. Proc. 37.071 fails to provide a method by which the state determines the death-worthiness of the Defendant. This failure eliminates rationality and consistency in the decision to seek death and violates the Defendant's right to equal protection and due process as set out in the 5th and 14th Amendment to the United States Constitution, Article 1, Sections 13 and 19 of the Texas Constitution and Tex. Code Crim. Proc. Art.1.04.

4. The decision as to which defendant is to be subjected to the death penalty varies from county to county. There are likely 254 different methods in determining which cases shall be prosecuted as capital cases and in which of those the penalty of death will be sought. Often the

decision can turn on the county's willingness to fund the defense, the race of the defendant, the age, sex, race or status of the victim in the community. When a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied. *Bush v. Gore*, 531 U.S. 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000).

    5. Justice Potter Stewart said in his concurring opinion in *Gregg v. Georgia*, 96 S. Ct. 2909, 2949 (1976) "Petitioners argument that prosecutors behave in a standardless fashion in deciding which cases to try as capital felonies is unsupported by any facts. Petitioner simply asserts that since prosecutors have the power not to charge capital felonies they will exercise that power in a standardless fashion. This is untenable. Absent facts to the contrary it cannot be assumed that prosecutors will be motivated in their charging decisions by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts."

    The Supreme Court of the United States is saying that those facts are relevant to a challenge to the decision making process. Accordingly, it is necessary for this Court to consider those facts and determine what standards are used by district attorneys in Texas in deciding what cases are to be prosecuted as death cases and those that will be prosecuted as non-death capital cases. It is only when the standards are determined, through pre-trial testimony of those charged with making the decision, can this Court properly rule on this Defendant's challenge.

    6. The cited decision of the United States Supreme Court involved varying standards used to count votes in a presidential election. The Court noted that voters should be accorded Equal Protection even though the right to vote is not guaranteed by the Constitution. But as history has "favored the voter" the right to vote as the legislature has prescribed is fundamental".

*Bush*, 531 U.S. at 104. " Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.*

7. Although the Supreme Court tried to limit the holding in Gore to the circumstances of the particular case. Can it be said that the Supreme Court should have a more lenient standard for its favorite political candidate, but require those facing the death penalty to adhere to the stricter cause and prejudice standard announced in *McCleskey*? *McCleskey v. Zant*, 499 U.S. 467 (1991).

8. As the right to life is guaranteed by the Constitution certainly the life of a citizen demands as much consideration and protection as does a voter. The right to life is a fundamental one. *Furman v. Georgia*, 408 U.S. 238, 359 (1972). The failure of the State to set forth uniform and specific standards to determine against whom a death sentence will be sought, violates the principles set forth by the Supreme Court in *Bush v. Gore*, *supra*, as well as the Constitutional and statutory provisions cited herein.

9. The Texas Death Penalty scheme magnifies the arbitrary and freakish manner in which the death penalty is imposed in the state, all in violation of the Due Process clause of the 5th Amendment to the United State Constitution and the prohibition against the imposition of Cruel and Unusual Punishment of the 8th Amendment. Specifically, the potentially arbitrary and capricious discretion of the county prosecutors is made worse by the fact that (a) Tex. Code Crim. Proc. Art. 37.071 does not require a proportionality review to be performed on sentences of death; (b )Texas juries are not told that their failure to agree on any of the sentencing phase special issues will result in a life sentence. Jurors are in fact told that ten (10) of them must agree in order to return a verdict in favor of the Defendant; (c) the Governor of Texas does not have independent authority to grant Clemency and can only do so upon recommendation of the

Texas Board of Pardons and Parole; (d) the Texas Board of Pardons and Parole does not meet when considering Clemency petitions and "faxes" or "calls in" their votes; (e) counsel for Clemency petitioners are denied compensation for their assistance provided to a condemned inmate, essentially denying him counsel in the final hour of life.

WHEREFORE, PREMISES CONSIDERED, Movant prays that upon hearing herein, the Indictment returned against the Defendant be quashed or in the alternative that the jury who will hear this case be precluded from considering death as a sentencing option and such other relief that the Defendant may show himself to be justly entitled.

Respectfully submitted,

Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of _____ June _____, 2007.

Steven R. Miears

882

CAUSE NUMBER 380-82629-06

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## ORDER OF THE COURT ON THE DEFENDANT'S
## MOTION TO PRECLUDE THE DEATH PENALTY AS A SENTENCING OPTION
## (SELECTION OF DEATH PENALTY CASES)

Constitutional Motion Number 12

BE IT REMEMBERED, that on the _____ day of _____, 2007, came

to be considered the above motion. After consideration of the motion, it is the opinion of the

court that Defendant's motion be:

GRANTED _____

DENIED _____ , to which action the Defendant excepts.


_____

Judge Presiding

883

CAUSE NUMBER 380-82629-06

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION TO PRECLUDE PROSECUTION FROM SEEKING THE DEATH PENALTY
Constitutional Motion Number 13

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant herein, by and through his attorney of record, and files this Motion to Preclude Prosecution from Seeking the Death Penalty, and as grounds therefore would show this Honorable Court as follows:

A. Background.

In view of the many different capital sentencing schemes that have been in operation in Texas in the post-*Furman* era[1], the Texas death penalty has been arbitrarily imposed and thus is unconstitutional under the Eighth and Fourteenth Amendments. In order to understand the basis of this claim, this Court must recognize the large number of discrete capital sentencing schemes that have been in operation in Texas capital cases since the early 1970's, when the modern death penalty statutes were enacted in the wake of the Supreme Court's decision in *Furman*.[2] **At a capital murder trial in 1994, a capital defendant's sentencing jury will be instructed**

---

[1]    *See Furman v. Georgia*, 408 U.S. 238 (1972).

[2]    *See* Michael Kuhn, Note, *House Bill 200: The Legislative Attempt to Reinstate Capital Punishment in Texas*, 11 HOUS. L. REV. 351 (1974); *see also* David Crump, *Capital Murder: The Issues in Texas*, 14 HOUS. L. REV. 531, 532-33 & nn.7-8 (1977); Stephen W. MacNoll, Note, *A Constitutional Analysis of the Texas Death Statute*, 15 AMER. J. CRIM. L. 69, 79-81 (1988).

pursuant to TEX. CODE CRIM. PROC. art. 37.071 (Vernon's 1993). As discussed below, this is one of many different capital sentencing schemes in operation in Texas since 1973.

Of the many hundreds of persons sentenced to death in Texas since the "modern" capital sentencing statute was enacted[3], the vast majority were sentenced under jury instructions that simply tracked the unadorned "special issues" contained in the original version TEX. CODE CRIM. PROC. art. 37.071(b) (Vernon's 1989). *See generally* P.M. McClung, JURY CHARGES FOR TEXAS CRIMINAL PRACTICE 75-78 (rev. ed. 1981). After the landmark decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989) (overruled in part on other grounds), however, the consistency in Texas capital sentencing instructions quickly disappeared, both as a result of legislative action and unsupervised judicial improvising by trial courts. *See generally* Peggy M. Tobolowsky, *What Hath Penry Wrought?: Mitigating Circumstances and the Texas Death Penalty*, 19 AMER. J. CRIM. L. 345 (1992). In 1991, the Texas Legislature enacted an amended, post-*Penry* version of Article 37.071, which modified the "special issue" format. That statute applies to all crimes committed on or after September 1, 1991; under the 1991 version of the statute, the old version of Article 37.071 applied to all crimes committed before September 1, 1991. *See* TEX. CODE CRIM. PROC. art. 37.071 (Vernon 1992). Again in 1993, the Texas Legislature enacted yet another

---

3    Defendant is aware of no source that collects all of the capital trials that have occurred in Texas since the post-*Furman* statute was enacted. An informed estimate of that number is approximately 750. *See* James M. Marquart et al., *Gazing Into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?*, 23 LAW & SOC. REV. 449 (1989) (as of end of 1988, approximately 600 capital murder trials in Texas at which the State sought the death penalty); Sean Fitzgerald, Note, *Walking a Constitutional Tightrope: Discretion, Guidance, and the Texas Capital Sentencing Scheme*, 28 HOUS. L. REV. 663 (1991); *see also* NAACP Legal Defense Fund, *Death Row U.S.A. Reporter, 1976-93* (Texas' death row has grown by approximately 20-50 inmates per year since 1973).

amended version of Article 37.071. That statute, which became effective September 1,

1993, amended the "special issue" format applicable to all crimes committed before

September 1, 1991. *See* TEX. CODE CRIM. PROC. art. 37.0711 (Vernon 1993).

Roughly speaking, the various types of Texas capital sentencing instructions in the post-*Furman* era can be broken down into seven different categories, although at least two categories contain sub-sets:

(i)     The unadorned "special issues" in the pre-1991 version of Article 37.071. That statute was in effect for all capital murder trials from January 1, 1974 until the date on which *Penry* was decided on June 26, 1989. For capital murders committed before September 1, 1991, it also was in effect for many cases tried from June 26, 1989 until August 30, 1993, when Art. 37.071 was amended (discussed *supra*).[4]

(ii)     The 1991 amended version of the statute. This version of the sentencing instructions has been applied in all capital murder trials for murders committed on or after September 1, 1991. This version of the statute is

---

4    That statute, in pertinent part, reads as follows:

    (b)    On conclusion of the presentation of the evidence, [at the sentencing phase of a capital murder trial] the court shall submit the following three issues to the jury:

        (1)    whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

        (2)    whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

        (3)    if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

    . . . .

    (e)    If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. . . . .

    There have been countless trials at which such instructions w 121-124 (Tex. Crim. App. 1984) ere submitted, both before and after *Penry*. *See, e.g., Stewart v. State*, 686 S.W.2d 118,; *see also State v. McPherson*, 851 S.W.2d 846, 849 & n. 8 (Tex. Crim. App. 1992) (collecting cases).

applicable to Defendant's case.[5]

(iii) The pre-1991 statute with an extra-statutory *"Quinones"*-type instruction.[6] This version of the sentencing instructions was applied at a number of Texas capital murder trials both before and after *Penry* was decided.[7] There have been several versions of this extra-statutory charge, each containing material differences.[8]

---

[5]  Simply put, that amended statute eliminated the "deliberateness" and "provocation" special issues and added two new special issues, one of which was directly in response to *Penry.*

The first new special issue asked:

> [I]n cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

*See* Art. 37.071(b)(2) (Vernon 1992).

The new *"Penry"* issue asks:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating or circumstances to warrant that a sentence of life imprisonment rather than a death sentence should be imposed.

*See* Art. 37.071(e) (Vernon 1992).

[6]  In *Quinones v. State*, 592 S.W.2d 933, 947 (Tex. Crim. App. 1980), this Court held that it was not error for the trial court to have refused to submit the following extra-statutory instruction to the capital defendant's sentencing jury:

> "Evidence presented in mitigation of the penalty may be considered should the jury desire, in determining the answer to any of the special issues."

[7]  *See* Tr. at 117-18. The trial court instructed the jury that "[i]n determining each of the[] [special] [i]ssues, you may take into consideration all the evidence submitted to you in the trial of this case, whether aggravating or mitigating in nature ... ."

[8]  *Compare* the instruction in the instant case, *supra* note, *with Boggess v. State*, 855 S.W.2d 645, 647 (Tex. Crim. App. 1991); *Fuller (Tyrone) v. State*, 827 S.W.2d 919, 937 (Tex. Crim. App. 1992), *Rios v. State*, 846 S.W.2d 310, 315-16 (Tex. Crim. App. 1992); *Satterwhite v. State*, 858 S.W.2d 412, 425 (Tex. Crim. App. 1993).

887

(iv) The pre-1991 statute with an extra-statutory "*Penry*"-type "fourth special issue."[9] This version of the sentencing instructions has been applied certain trials after *Penry* for a capital murder committed before September 1, 1991.

(v) The pre-1991 statute with a "nullification" instruction.[10] This version of the sentencing instructions has been applied at a large number of trials after *Penry* for capital murders committed before September 1, 1991. There have been several different versions of this extra-statutory instruction, each containing material differences.[11]

(vi) The pre-1991 statute in which "deliberately" is broadly defined.[12] This

---

9    *See, e.g., State v. McPherson*, 851 S.W.2d 846  (Tex. Crim. App. 1992).

10   *See, e.g., San Miguel v. State*, 864 S.W.2d 493  (Tex. Crim. App. 1993); *Fuller (Aaron) v. State*, 829 S.W.2d 191, 209 & n. 5  (Tex. Crim. App. 1992).  The proto-typical "nullification" instruction was in *Fuller*, which read as follows:

> When you deliberate about the questions posed in the Special Issues, you are to consider any mitigating circumstances supported by the evidence presented at both phases of the trial.  A mitigating circumstance may be any aspect of the defendant's character and record or circumstances of the crime which you believe makes a sentence of death inappropriate in this case.  If you find there are any mitigating circumstances, you must decide how much weight they deserve and give them effect when you answer the Special Issues.  If you determine, in consideration of this evidence, that a life sentence, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, you are instructed to answer at least one of the Special Issues under consideration "No."

*Fuller*, 829 S.W.2d at 209 n.5 .

11   *Compare* the instruction in *supra* note, *with Blue v. State*, No. 72,912, unpublished slip op. at 9 (Tex. Crim. App. September 23, 1992).  The instruction in *Blue* read as follows:

> In answering the Special Issues you shall consider: (1) all evidence offered by either party at the guilt/innocence phase of the trial regarding the defendant's individual participation in the commission of the Capital Murder; and (2) all evidence offered by wither party at the punishment phase of the trial, whether it be aggravating or mitigating evidence.  If the mitigating evidence persuades you that the defendant should not be sentenced to death, then you shall answer one or more of the Special Issues "No."

*See Blue v. State, supra,* at 9.

12   *See, e.g., Martinez v. State*, 867 S.W.2d 30  (Tex. Crim. App. 1993).

838

version of the sentencing instructions has been applied in certain trials since *Penry* was decided for capital murders committed before September 1, 1991.

(vii)    The 1993 version of the statute as applied to all crimes committed on or before August 30, 1991.[13] This version of the statute will apply to any trial or re-trial that commences after August 29, 1993, for capital murders committed on or before August 30, 1991.

Note that the above categories of cases reveal three significant contradictions in the Court of Criminal Court's capital sentencing jurisprudence during the last two decades: First, there is the contradiction between *Quinones v. State, supra* , and its progeny and the many recent cases in which the Court has given its imprimatur to the very instruction rejected in *Quinones. See, e.g., Fuller (Tyrone) v. State, supra* . Second, there is the contradiction between *Stewart v. State*, 686 S.W.2d 118, 121-24 (Tex. Crim. App. 1980), and at least one case in which the Court has given its imprimatur an extra-statutory charge specifically permitting jurors to consider specific mitigating evidence. *See McPherson v. State, supra.* Also relevant in this regard are the many recent cases in which the Court of Criminal Appeals has given its stamp of approval to "nullification" instructions. *See, e.g., Fuller (Aaron) v. State, supra.* Finally, there is the contradiction between the Court's consistent refusal to require trial courts to define "deliberately" as used in the first special issue, *see, e.g., Russell v. State*, 665 S.W.2d 771, 779-80 (Tex. Crim. App. 1983), and the Court's imprimatur of a trial judge's extra-statutory definition of the term in

---

13    *See* Art. 37.0711 (Vernon 1993). This version of the statute contains all three of the "old" special issues. *See id.* (b)(1)-(b)(3). It further provides that, if the jury returns affirmative answers to all three special issues, then the trial court should further submit to jurors the new, *Penry*-type special issue enacted in the 1991 amendment. This version of the statute instructs jurors that "[i]f a defendant is convicted of an offense under Section 19.03(a)(6), Penal Code, the court shall submit the [special] issues ... only with regard to the conduct of the defendant in murdering the deceased individual first named in the indictment."

*Martinez v. State, supra.*

B. Argument.

In numerous cases, the United States Supreme Court has stated, in keeping with our Nation's federalism, that "we are unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." *Spaziano v. Florida*, 468 U.S. 447, 464 (1984) (citing cases). The Court has stated, however, that *within* a single state, there must be consistency in the treatment of capital defendants who are subject to the death penalty. *Id.* at 460 ("If a State has determined that death should be an available for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not.") (citing cases). Thus, "'each distinct [state] system must be examined on an individual basis.'" *See Pulley v. Harris*, 465 U.S. 37, 45 (1984) (quoting *Gregg v. Georgia*, 428 U.S. 153, 195 (1976) (joint opinion of Stewart, Powell & Stevens, JJ.)).

In *Furman v. Georgia*, 408 U.S. 238 (1972), the chief constitutional infirmity that the controlling Members of the Court pointed to in their respective concurring opinions was *arbitrariness*. *See id.* at 274 (Brennan, J., concurring) ("In determining whether a punishment comports with human dignity, we are aided . . . by . . . [a] second principle inherent in [the Eighth Amendment Cruel and Unusual Punishments] Clause – that the State must not arbitrarily inflict punishment."); *id.* at 309 (Stewart, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.") ; *see also Spaziano*, 468 U.S. at 460.

The above discussion of the various sentencing schemes concurrently[14] in operation in Texas, "a distinct system," *Gregg*, 428 U.S. at 195 , amply demonstrate that the present Texas death penalty system is being implemented in an "arbitrary" manner. At least seven categories of similarly situated capital defendants have been treated disparately. Put another way, it is certainly conceivable that, *ceteris paribus*, a single hypothetical Texas capital defendant would be given a different sentence[15] depending on which of the seven different sentencing schemes was in operation at his trial. This is quintessential arbitrariness -- the very type condemned in *Furman*.

Defendant recognizes that the Texas Legislature was certainly justified in amending Art. 37.071(b) as it did in 1991; indeed, *Penry* certainly appeared to require such. *See* Shelley Clarke, *NOTE, A Reasoned Moral Response: Rethinking Texas's Capital Sentencing Statute After Penry v. Lynaugh.*, 69 TEX. L. REV. 407 (1990). If that were the only other scheme concurrently in operation with the pre-1991 version of Art. 37.071, in all likelihood Defendant would never have made this claim. But that is not what happened in the wake of *Penry*.

Rather, numerous trial courts throughout this state and the Texas Legislature have haphazardly created, in addition to the prevailing pre-1991 capital sentencing scheme, a total of at least six new, distinct capital sentencing schemes that have governed similarly or identically

---

14    Although after August 29, 1993, all trials will be tried under either Art. 37.071 and Art. 37.0711, the pre-1991 version of Art. 37.071 was still in operation in many cases up until August 30, 1993. Moreover, *on appeal*, the pre-1991 version of Art. 37.071 will still be in operation in the foreseeable future in this Court's sufficiency-of-the-evidence analyses regarding juries' affirmative answers to the special issues.

15    Of course, in a Texas capital case, where a defendant has been found guilty of capital murder, the only sentencing options are a life sentence and a death sentence.

situated Texas capital defendants. Particularly noteworthy is the Court of Criminal Appeal's failure to impose uniformity among the practices adopted by the trial courts. Nor is the Legislature free from its share of the blame. By waiting until August 30, 1993, to amend Art. 37.071 as it applies to trials or retrials of capital defendants who committed their crimes before September 1, 1991, the Legislature has sowed the seeds of arbitrariness and inconsistency. Under both identical and analogous circumstances, other States have not dealt with seemingly sweeping invalidations of their post-*Furman* death penalty statutes in such a chaotic manner. *See* OREGON REVISED STATUTES, § 163.150 (as amended July 24, 1989); *State v. Wagner*, 786 P.2d 93, 99-100 (Ore. 1990); *cf.* OHIO REVISED CODE §§ 2929.02-06 (as amended 1981); *State v. Melchior*, 381 N.E.2d 195, 200 (Ohio 1978); David J. Benson, *Constitutionality of Ohio's New Death Penalty Statute*, 14 TOLEDO L. REV. 77 (1982).

 *Fetterly v. Paskett*, 997 F.2d 1295 (9th Cir. 1993), presents an analogous situation to the instant case. In that case, the Ninth Circuit condemned an instance of "*Furman* arbitrariness" within a single state's capital sentencing system. In particular, the court in dicta stated that a federal constitutional violation occurred when the Idaho Supreme Court's refusal to apply the clear mandate of state capital sentencing law, which governed the weighing of aggravating factors against mitigating factors, to all similarly situated capital defendants. The court's reasoning is cogent and should be applied to Texas' experience:

> In *Godfrey v. Georgia*, 446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d
> 398 (1980), the Supreme Court held that states can impose the
> death penalty for certain crimes without running afoul of our
> Constitutional prohibition against cruel and unusual punishment,

but only if the manner in which the penalty is selected "provide[s] a meaningful basis for distinguishing the few cases in which [the penalty] imposed from the many cases in which it is not." *Id.* at 427 .... As pointed out by Justice Stevens, "this Court's decisions have made clear that States may impose this ultimate sentence *only if they follow procedures* that are designed to assure reliability in sentencing determinations. *Barclay v. Florida*, 463 U.S. 939, 958-5 9, 103 S. Ct. 3418, 3429, 77 L. Ed. 1134 (1983) (Stevens, J., concurring) (emphasis added). Part of the requirement of reliability is "that the [aggravating and mitigating] reasons present in one case will reach a similar result to that reached under similar circumstances in another case.'" *Id.* at 954 ..(quoting *Proffitt v. Florida*, 428 U.S. 242, 251, 96 S. Ct. 2960, 2966, 49 L. Ed. 2d 913 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)) (internal quotations omitted). Because Fetterly may not have been sentenced to death as prescribed by Idaho Code § 19-2515 (c), this goal of similar sentences in similar cases may not have been met.

...

*Fetterly*, 997 F.2d at 1299.

Although Texas' experience is different in that it involves a global violation of all Texas capital defendants' rights to be free from arbitrary, inconsistent capital sentencing procedures, while Idaho apparently only violated one or a few defendant's rights, *Fetterly*'s reasoning applies

equally to Texas. The bottom line is that Texas courts and the state Legislature, without any discernible rational basis, have haphazardly turned Texas' capital sentencing scheme into a patch-work quilt. Because similarly situated Texas capital defendants -- including Defendant -- have been unjustifiably sentenced to death under radically different sentencing schemes, this Court must vacate Defendant's death sentence.[16]

---

16    Defendant adopts all of the arguments made *supra* with respect to a state constitutional claim. Although Defendant has primarily cited federal Eighth Amendment authority herein, he intends that this Court should separately consider his claim under the Texas and U.S. Constitutions. As the Court of Criminal Appeals has noted, it can and should interpret the Texas Constitution in a more expansive manner than the federal Constitution. *Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991) (overruled on other grounds); *Ex parte Hererra*, 860 S.W.2d 106 (Tex. Crim. App. 1993) (Maloney, J., dissenting, joined by Baird, Clinton & Overstreet, JJ.); *see also* Judge Rusty Duncan, *Terminating the Guardianship: A New Role for State Court*, 19 ST. MARY'S L. J. 809 (1988).

   Particularly noteworthy is the fact the Texas Constitution proscribes "cruel *or* unusual punishments," while the U.S. Constitution proscribes "cruel *and* unusual punishments." Texas Const. Art. I, § 13. Obviously, despite apparent implicit claims to the contrary by courts and commentators, the Texas Constitution, based on its plain language, was intended offer broader protections than the U.S. Constitution. *Cf. People v. Anderson*, 493 P.2d 880, 883-87 (Cal. 1972) (attributing textual significance to state constitutional proscription against "cruel *or* unusual punishments"). Because Defendant's primary argument here is that the many sentencing schemes operating concurrently inject arbitrariness into the Texas capital sentencing scheme, at the very least Defendant's death sentence is "unusual."

## CONCLUSION

In conclusion, this Court should hold that the State of Texas cannot constitutionally seek the death penalty against Defendant.

Respectfully submitted,

_____
Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of

_____ June _____, 2007.

_____
Steven R. Miears

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## ORDER OF THE COURT ON THE DEFNDANT'S MOTION TO PRECLUDE PROSECUTION FROM SEEKING THE DEATH PENALTY

### Constitutional Motion Number 13

On this day, came on to be heard the foregoing Motion, and after due consideration, the Court is of the opinion, and it is hereby ORDERED, that the Defendant's requests are GRANTED or DENIED individually as reflected in the Motion.

SIGNED this the _____ day of _____, 2007.

_____
JUDGE PRESIDING

899

CAUSE NUMBER 380-82629-06

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION TO HOLD THAT TEX. CODE CRIM. PROC.
## ART. 37.01 IS UNCONSTITUTIONAL
### Constitutional Motion Number 14

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant herein, by and through his attorney of record and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Article 1, sections 3, 10, 13, 15 & 19 of the Texas Constitution and Tex. Code. Crim. Proc. art. 2.03 and 38.03 and makes this his motion to hold that Tex. Code Crim. Proc. art. 37.071 is unconstitutional and as grounds therefore would show the Court as follows:

1. The Defendant has been indicted by the county grand jury for capital murder.

2. The State is seeking the death penalty. The Eighth Amendment to the United States Constitution requires a greater degree of accuracy and fact-finding than would be true in a noncapital case. *Gilmore v. Taylor*, 508 U.S. 333, 113 S. Ct. 2112, 124 L. Ed. 2d 306 (1993) and *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

3. Tex. Code Crim. Proc. art. 37.071 is unconstitutionally vague and arbitrarily applied to the Accused in violation of the 5th, 6th 8th and 14th Amendments to the United States Constitution.

4. Specifically, the following words and phrases are not defined for the jury:

   (a) "..the personal moral culpability of the defendant..."

   (b) "..probability.."

   (c) "...criminal acts of violence phrase ..."

837

(d) "..continuing threat..."

(e) "..society..."

5. Such terms, without proper definition, are vague, ambiguous and do not offer sufficient guidance to the jury. *See Maynard v. Cartwright*, 486 U.S. 356 (1988). The words "probability" and "society" are capable of definition in such a way as to provide meaning to the jury and relevance to the issues to be decided, i.e. "probability" can be defined to mean "more likely than not," "continuing" can be defined to mean "uninterrupted;" and society can be defined to mean "prison society."

6. The failure of the Texas legislature to define these terms allows the jury to decide the issue without the guided discretion that the 8th Amendment requires. *Furman v. Georgia*, 408 U.S. 238 (1972).

7. The failure to define these terms deprives the Accused of his right to a unanimous jury as each juror can decide on their own how to define the terms with the result that the Accused may be sentenced to death, not by a unanimous jury but by a jury that has decided the case based upon twelve (12) different sets of guidelines.

WHEREFORE, PREMISES CONSIDERED, Defendant prays this court will hold this statute unconstitutional, and for such other relief as Defendant may be entitled.

Respectfully submitted,

Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

893

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has

been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of

_____ June _____, 2007.

_____

Steven R. Miears

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

<u>ORDER OF THE COURT ON THE DEFENDANT'S MOTION</u>
<u>TO HOLD THAT TEX. CODE CRIM. PROC.</u>
<u>ART. 37.01 IS UNCONSTITUTIONAL</u>
Constitutional Motion Number  14

BE IT REMEMBERED, that on the _____day of _____, 2007, came

to be considered the above motion.  After consideration of the motion, it is the opinion of the

court that Defendant's motion be:

GRANTED   _____

DENIED   _____, to which action the Defendant excepts.


_____
Judge Presiding

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION TO PRECLUDE THE DEATH PENALTY AS A SENTENCING OPTION
### Constitutional Motion Number 15

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant herein, by and through his attorneys of record, and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution, Article 1, Sections 3, 10, 13, 19 and 29 of the Texas Constitution, Articles 1.05, 1.06 and 1.09 of the Texas Code of Criminal Procedure and moves the Court to preclude the death penalty as a sentencing option and in support thereof would show the Court the following:

### DEATH IS DIFFERENT

1. The Defendant has been indicted by the county grand jury for the offense of capital murder.

2. The State is seeking the death penalty. *Furman v. Georgia*, 408 U.S. 238 (1972), mandates that where discretion is afforded in sentencing on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). It is certainly not a novel proposition that discretion in the area of sentencing be exercised in an informed manner. *Id.*.

## ARBITRARY APPLICATION OF DEATH SHOULD BE PRECLUDED

3. Section 19.03 of the Texas Penal Code defines the categories of crimes that are death eligible. It is supplemented by Art. 37.071 of the Texas Code of Criminal Procedure, which governs the procedure in which death penalty is sought. These provisions are intended to narrow the class of death eligible defendants to "insure[ ] that the death penalty will only be imposed for the most serious crimes (and) . . . that (it) will only be imposed for the same type of offenses which occur under the same types of circumstances." *Jurek v. Texas,* 428 U.S. 262, 270 (1976) (internal quotes omitted); *See also Furman,* 408 U.S. 238; *Zant v. Stephens,* 462 U.S. 862 (1983).

4. The Court has found that narrowing definitions alone are not of controlling constitutional significance. *Roberts v. Louisiana,* 428 U.S. 325, 332 (1976). Instead, what is essential is that the death penalty is not applied in such a way as to be arbitrary and capricious. To insure that death penalty statutes are applied in a consistent and meaningful way, the sentencer must be provided with adequate guidance. *Arave v. Creech,* 507 U.S. 463 (1993). The same is true of the manner in which the state decided whether or not to seek death in a death eligible case.

5. Art. 37.071 of the Texas Code of Criminal Procedure fails to provide a method by which the State determines against whom the death penalty will be sought. This failure eliminates any possible rationality and consistency in the decision to seek death. Thus, it violates the Defendant's right to Due Process as set out in the 5th Amendment to the United States Constitution and Due Process and Equal Protection mandated by the 14th

Amendment to the United States Constitution, Article 1, Sections 13 and 19 of the Texas Constitution and Art. 1.04 of the Texas Code of Criminal Procedure. *See State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992) (holding a provision of a definitional statute, as opposed to procedural as in case at bar, that failed to sufficiently narrow the class of death eligibility must be struck down.)

6. The Eighth Amendment prohibition against the infliction of cruel and unusual punishment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society. Thus, a penalty or procedure that was permissible at one time in our Nation's history is not necessarily permissible today, such as the killing of one for the rape of an adult woman, mandatory death sentences or the killing of a person with mental retardation. *See Roberts v. Louisiana*, 428 U.S. 325 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Atkins v. Virginia*, 536 U.S. 304 ( 2002); and *Furman*, 408 U.S. at 329. So, whereas the unfettered discretion of state prosecutors as a means of affording individual defendants mercy, was upheld in *Gregg*, 428 U.S. at 199 (White, J., concurring), states throughout the nation are now recognizing that a uniform means of statewide guidelines to review such selection processes are necessary. *See* 18 U.S.C. § 3598 (a)(1)(2); Section 9-10.020, U.S. Attorney Manual: http://www.doj.gov; New Jersey Guidelines for County Prosecutors, www.idoc.state.il.us/ccp/ccp/reports/commission_report *nj*guidelines_prosecutors.pdf; *see also* Illinois Report, Chapter 5: ww.idoc.state.il.us/ccp/ccp/reports/commission_report/chapter_05.pdf; Tennessee's Death Penalty: Costs and Consequences, John G. Morgan, Comptroller of the Treasury

Office of Research July, 2004, pp 13-15, 48: Virginia JLARC Final Report, January 15,

2002, Summary of findings, p. iv-vi: http://jlarc.state.va.us/pubs_rec.htm; Nebraska

Commission on Law Enforcement and Criminal Justice:

http://www.nol.org/home/crimecom/; New York period of reflection provision, NY CLS

CPL § 250.40 (2004); Report of the Massachusetts Governor's Council on Capital

Punishment, p12 (2003): www.mass.gov/Agov2/docs/5-3-

04%20MassDPReportFinal.pdf; The Constitution Project, *Mandatory Justice: Eighteen*

*Reforms to the Death Penalty*, 2001, n. VIII:

http://pweforum.org/deathpenalty/resources/reader/23.php3.


7. The decision as to which defendant is to be subjected to the death penalty prosecution

varies from county to county in Texas. There are two hundred and fifty-four (254)

counties in Texas and likely two hundred and fifty-four (254) different methods used to

determine which cases shall be prosecuted as capital cases, a different system for each of

the counties. *See* Lena Roberts, *All Over the Map ... How an Accident of Geography*

*turns Texas' Death Penalty Scheme into a Lethal Lottery*, p27, copyright 2003.

Geography plays a stronger role than anything else in determining whether a person is

charged with a capital crime and whether the death penalty will be sought. *Id.* at p44.

Because of this lack of uniformity, the county in which the defendant is prosecuted

results in actual arbitrary application of the death sentence.


8. The death sentence is a charge on behalf of the citizens of the state. *See Furman,* 408

U.S. at 379. Where a fundamental right, such as the constitutionally enumerated right to

life, U.S. Const. amend. XIV, § 1, is at stake, official discretion must be controlled to prevent unequal treatment in the enjoyment of that right. *Bush v. Gore*, 531 U.S. 98, 109 (2000).

9. The decision of the United States Supreme Court in *Bush v. Gore* addressed the varying standards used to count votes in a presidential election. The Court noted that voters should be accorded Equal Protection even though the right to vote is not guaranteed by the Constitution, finding "the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Id.* at 104. It then held, "the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* 104, 105. Stated broadly, *Bush v. Gore* thus teaches that the failure to create standards to control official discretion alone can violate the Equal Protection Clause of the Fourteenth Amendment when abridgment of a fundamental right is involved. Laurence Benner et. al., *THIRD ANNUAL REVIEW OF UNITED STATES SUPREME COURT CRIMINAL LAW AND PROCEDURE CASES: Criminal Justice in the Supreme Court: An Analysis of United States Supreme Court Criminal and Habeas Corpus Decisions (October 2, 2000 - September 30, 2001),* 38 Cal. W. L. Rev. 87 (2001).

10. Thus, to establish an equal protection violation, in this fundamental context, it is not necessary to prove the existence of purposeful discrimination, as was necessary under *McClesky* when a state's death penalty scheme was challenged due to discriminatory effect based on the suspect class of race. *McCleskey v. Kemp,* 481 U.S. 279 (1987).

11. *Stare decisis* is the preferred course to analyze the constitutional standard because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. *See Crawford v. Washington,* 124 S. Ct. 1354, 1378 (2004) (Rehnquist, C.J., concurring) (quoting *Payne v. Tennessee,* 501 U.S. 808, 827 (1991)). Furthermore, "[n]o panel is empowered to hold that a prior decision applies only to the limited facts set forth in that opinion." *Medellin v. Dretke,* 371 F.3d 270, 21 (5th Cir. 2004), *cert. granted* 160 L. Ed. 2d 518, 125 S. Ct. 686 (quoting *United States v. Smith,* 354 F.3d 390, 399 (5th Cir. 2003)).

12. The fundamental right to life is guaranteed by the Constitution. U.S. Const. amend. XIV, § 1. Thus, the life of a citizen at minimum demands as much due process as does the right to vote. The failure of the State to set forth uniform and specific standards to determine against whom a death sentence will be sought renders the sentence of death one that is wantonly and freakishly applied that is prohibited by the 8th and 14th Amendments to the United States Constitution. *See Furman v. Georgia,* 408 U.S. 238, 310 (1972).

13. The decision to seek death is one that should rightfully be made by the grand jury and not by the prosecuting attorney. Under the Due Process Clause of the 5th Amendment and the notice and jury trial guarantees of the 6th Amendment, any fact (other than a prior conviction) that increased the maximum penalty for a crime must be

charged in an indictment, submitted to a jury and proven beyond a reasonable doubt. *Jones v. United States* 526 U.S. 227 (1999); *Apprendi v. New Jersey*, 530 U.S. 466 (2000). This rule applies to death penalty cases. *Ring v. Arizona*, 122 S. Ct. 2428 (2002). The Texas Court of Criminal Appeals has tried to rationalize that Apprendi and Ring do not apply to Texas because there is no finding of fact that raises the level of punishment above the maximum punishment of death. (cite Texas case here). However, any question as to whether or not *Jones, Apprendi*, and *Ring* apply to Texas was resolved in favor of applicability by the United States Supreme Court in Blakely v. Washington where Justice Scalia, writing for the majority said: (insert "maximum sentence" language).

Accordingly, the decision should be made by the grand jury who is the protector of the public's right to be free from arbitrary decisions of a local prosecutor (need cite here). The discretion of the prosecutor is in whether or not evidence of future dangerousness and lack of a mitigating circumstance that would justify a sentence of life is to be offered to the grand jury. It is this body who will make the probably cause finding as to the probability that the Accused will commit criminal acts of violence that will constitute a continuing threat to society. It is also these grand jurors who should determine, under the cited cases, if there is probable cause that there is no circumstance that will justify a sentence of life. While the burden of this latter issue has historically been placed on the Defendant, by authority of *Blakely v. Washington*, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), the State should properly be required to negate beyond a reasonable doubt the existence of a circumstance that would justify a sentence of life. As this is a burden of

the State at trial, so too should the grand jury be required to negate the existence of a mitigating circumstance and so allege this in the indictment.

Following indictment, the prosecuting attorney would have the discretion to determine if he/she would be offering evidence in support of the allegations of the indictment. The prosecuting attorney would still have discretion, but it would not be the discretion to seek death in the first place. This decision should rightfully be resolved by the grand jury.

13. In the alternative and without waiving the foregoing, the Defendant would show that the method (or lack of method) that is utilized by the prosecuting attorney to determine against whom he/she will seek death is arbitrary and violates the rights and protections of the Defendant under the 5th, 6th, 8th and 14th Amendments to the United States Constitution and the Constitution of the State of Texas.

This Court should find that the process that was used by the prosecuting attorney to select the Defendant as one whom the State of Texas would seek to kill violates the cited provisions of the State and Federal Constitutions and that death should be precluded as a sentencing option.

WHEREFORE PREMISES CONSIDERED, the Defendant prays that upon hearing the Court:

(1) preclude death as a sentencing option in this case;

(2) grant the Defendant such other and further relief as he may show himself to be justly entitled.

Respectfully submitted,

Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of _____ June _____, 2007.

Steven R. Miears

CAUSE NUMBER 380-82629-06

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## ORDER OF THE COURT ON THE DEFENDANT'S
## MOTION TO PRECLUDE THE DEATH PENALTY AS A SENTENCING OPTION
### Constitutional Motion Number 15

BE IT REMEMBERED, that on the _____ day of _____, 2007, came

to be considered the above motion. After consideration of the motion, it is the opinion of the

court that Defendant's motion be:

GRANTED _____

DENIED _____, to which action the Defendant excepts.


_____

Judge Presiding

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION TO HOLD STATUTORY DEFINITION OF MITIGATING EVIDENCE UNCONSTITUTIONAL AS APPLIED TO IMPOSE A "NEXUS" LIMITATION, AND TO GRANT DEFENDANT'S REQUESTED CLARIFYING VOIR DIRE, INSTRUCTION, ARGUMENT AND MOTION IN LIMINE. *Tennard v. Dretke*
### Constitutional Motion Number 16

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant herein, by counsel, and pursuant to the 6th, 8th and 14th Amendments to the United States Constitution and Article I, Sections 3, 10, 13, 19 and 29 of the Texas Constitution and files this, his Motion to Hold Statutory Definition of Mitigating Evidence Unconstitutional as Applied to Impose a "Nexus" Limitation, and to Grant Defendant's Requested Clarifying Voir Dire, Instruction, Argument and Motion in Limine. Defendant invokes each of the above provisions in support of his following claim, and would respectfully show the Court as follows:



HANNAH KUEHLE
DISTRICT CLERK
COLLIN COUNTY, TEXAS
2007 JUN 22
BY. _____ DEPUTY

I.

The Statutory Definition of Mitigating Evidence is Being Interpreted and Applied to Impose an Unconstitutionally Restrictive "Nexus" Test, Which Prevents the Jury From Considering and Giving Independent Mitigating Effect to Defendant's Constitutionally Relevant Mitigating Evidence.

In *Tennard v. Dretke*, ___ U.S. ___ , 124 S. Ct. 2562 (2004) the Supreme Court rejected the "nexus" test the Fifth Circuit and the Texas Court of Criminal Appeals had been using as a restriction upon independent mitigating evidence in Texas state courts. In the context of deciding that the Texas capital Defendant was entitled to a certificate of appealability (COA) the

Court found that the relevance standard applicable to mitigating evidence in capital cases is simply whether the evidence is of such character that it might serve as a basis for a sentence less than death, regardless of whether the defendant is able to establish a nexus between the evidence and his commission of the crime.

In an opinion issued only shortly before *Tennard v. Dretke*, the Texas Court of Criminal Appeals, after a long and confusing series of opinions, took the position in 2004 that it is "proper" that the jury instructions impose a "nexus" restriction upon the defendant's evidence offered as mitigation under the mitigation special issue. The Court of Criminal Appeals believed that the statutory definition of mitigating evidence, and the "reduces moral blameworthiness" or "nexus" restrictions were consistent with the Supreme Court's 1989 decision in *Penry I*, and even that such limitation is required by *Penry I. Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (overruled on other grounds). The Court of Criminal Appeals effectively adopted the very test (including the "nexus" requirement) that the Fifth Circuit employed and the Supreme Court rejected in *Tennard*. *See, Ex parte Smith*, 132 S.W.3d 407 (Tex. Crim. App. 2004) The Supreme Court makes clear in *Tennard* that the nexus limitation is not "proper" and is not required by its *Penry I* decision.

It is of no consequence to Defendant that the Court of Criminal Appeals has found in some cases that the Texas statute on its face allows for a broader scope of mitigating evidence, consistent with Supreme Court jurisprudence, when in reality the operation of the statute conflicts with it. Defendant urges this Court to find that the Texas definition of mitigating evidence in Subsection 2(e) is unconstitutionally restrictive as it is being interpreted and applied by the Court of Criminal Appeals, and to allow Defendant to take the steps that will correct the unconstitutionally narrow operation of the statute, by granting his requests for clarifying voir

2

dire, by admitting his proffered mitigating evidence in accordance with the recognition that there is no "nexus" limitation, by including a clarifying instruction in the jury charge and by granting a motion in limine to prevent any prosecutorial argument that tells the jury to apply "nexus" or reduces moral blameworthiness" as a test for what they may consider to be mitigating evidence.

The Texas statute directs this Court to instruct capital jurors that <u>in answering the mitigation special issue</u> submitted under Subsection 2(e) of the death penalty statute, they "<u>shall</u> consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness". When those instructions use "nexus" in the form of "moral culpability or moral blameworthiness" <u>as a restriction</u> upon independent mitigating evidence, a capital defendant like Defendant is unfairly precluded from gaining the jury's effective consideration of his constitutionally relevant mitigating evidence that may not fit the "nexus" test because it cannot be said to have caused or contributed to his commission of the crime; it does not explain or excuse his commission of the crime. The jury may believe that mitigating evidence, <u>defined</u> as reducing a defendant's moral culpability for committing the crime itself, cannot encompass such evidence as his childhood spent in poverty or racial prejudice, his mental slowness or learning disability, his acts of heroism or kindness, his good behavior in jail or prison after committing the crime, as independent mitigating evidence. The prosecutors may (and frequently do) tell the jurors that such evidence is out of bounds and cannot be considered as mitigating in answering the mitigation special issue because of the "reduces moral blameworthiness" or "nexus" language in the 2(e) definition. Jurors may follow the instruction and argument, and put aside the Defendant's proffered mitigation, while <u>at the same time</u> they do not think the death penalty is <u>appropriate, because of that very same evidence</u>.

The Court of Criminal Appeals has in the past seven years interpreted the statutory definition of mitigating evidence as allowing "an open-ended, subjective determination engaged in by each juror," so that Art.37.071, Sec.2(f)(4) does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness." *Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. App. 1997), *cert. denied*, 522 U.S. 994 (1997). The Court held similarly in *Shannon v. State*, 942 S.W.2d 591, 597 (Tex. Crim. App. 1996), and in *King v. State*, 953 S.W.2d 266, 274 (Tex. Crim. App.1997), when defense counsel argued that the statutory definition was unconstitutional on its face because it "limits the jury's consideration to factors that render him less morally blameworthy and thereby narrows the jury's discretion in violation of the Eighth and Fourteenth Amendment to the United States Constitution". As it had in *Cantu, supra*, the Texas court found the statutory definition to be broader in scope than it appeared on its face.

In *Tennard v. Dretke, supra*, delivered in June, 2004, the Supreme Court rejected the "nexus" test the Fifth Circuit and the Texas Court of Criminal Appeals have been using as a restriction upon independent mitigating evidence, and found that the relevance standard applicable to mitigating evidence in capital cases is simply whether the evidence is of such character that it might serve as a basis for a sentence less than death, regardless of whether the defendant is able to establish a nexus between the evidence and his commission of the crime.

> "As we have explained, the Fifth Circuit's screening test has no basis in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context." *Id.* at 2572.

## II.

The Restrictive Definition of Mitigating Evidence Also Prevents Defendant From Exercising His Due Process Right to Present a Complete and Vigorous Defensive Case on Mitigation, in Violation of His Rights Under the Fourteenth Amendment.

The Supreme Court's holdings have long made it clear that the Fourteenth Amendment guarantees the criminal defendant a meaningful opportunity to present a complete and vigorous defense. He can be precluded from introducing some kinds of defensive evidence only if the exclusion is rationally justified for some countervailing reason of state law, and any such state law will be carefully examined in light of the competing interests. *See, Washington v. Texas,* 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *Crane v. Kentucky,* 476 U.S.683, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986); *California v. Trombetta,* 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984); *Chambers v. Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).

Defendant asks this Court to recognize the special status of a capital defendant's constitutional right to present his defensive case for life, and to grant his requests to conduct voir dire, submit jury instructions, and conduct argument upon the *Tennard* definition of mitigating evidence, without the "nexus" or "reduces moral blameworthiness" definition as a restriction upon the jury's consideration of his evidence. Of course, Defendant will ask the Court at trial to admit his proffered mitigating evidence as well, without assessing whether Defendant can prove there is any "nexus" to the commission of the crime or whether it tends to "reduce his moral blameworthiness" for the crime. He will certainly ask for admission of all evidence that "is of such a character that it might serve as a basis for a sentence less than death." *See, Tennard v. Dretke, supra.*

The only "competing state rule or law" that would call for keeping such evidence out is the statutory definition of mitigating evidence as interpreted to impose the "nexus" or "reduces moral blameworthiness" language as a limitation upon what is admissible as "*Penry* evidence" and what may be considered as "*Penry* evidence". As argued above, it is quite clear that the

Supreme Court has disavowed such restrictive interpretation of its *Penry I* decision, in *Tennard v. Dretke, supra.* The "countervailing state law" is the very one the Supreme Court has invalidated as a reason for exclusion in *Tennard.* The Court of Criminal Appeals' previous findings on the admissibility of such evidence are no longer good authority for excluding Defendant's evidence that he offers as a basis for a sentence less than death, but that he cannot prove relates to his commission of the crime.

Only if this Court applies the correct constitutional standard throughout the trial will Defendant be accorded the due process right to a meaningful opportunity to present a complete and vigorous defensive case of mitigation.

III.

**1.) <u>Request to Voir Dire</u>**
**2.) <u>Request for Instruction</u>**
**3.) <u>Motion in Limine to Prevent Improper Prosecutorial Argument.</u>**

<u>Request to Voir Dire Using *Tennard* Definition of Mitigation, Not Limited by "Nexus" or "Reduces Moral blameworthiness" Restriction.</u>

1.) Defendant requests that the Court permit him to conduct voir dire based upon the proposition that the jury is to consider mitigating evidence according to the definition in *Tennard v. Dretke*, as "any evidence that may serve as a basis for a sentence less than death, regardless of whether the defendant is able to establish a nexus between the evidence and his commission of the crime." U.S. Const. Amends. 8 and 14; Tex. Const. Secs. 10, 13 and 19.

After due consideration, it is hereby ORDERED, that said Request is:

_____        GRANTED

_____        DENIED

<u>Request For Instruction on *Tennard* Definition of Mitigating Evidence</u>

2.)     Defendant requests that the Court instruct the jury at the close of punishment that the statutory definition of mitigating evidence does not impose any "nexus' or "reduces moral blameworthiness" limitation, either as to whether they may consider the evidence or whether they must accord it particular weight.

6

Defendant requests a separate instruction in the language of *Tennard*, that the jury may consider and give effect to as mitigating "any evidence that may serve as a basis for a sentence less than death, regardless of whether the defendant is able to establish a nexus between the evidence and his commission of the crime." U.S. Const. Amends. 8 and 14, Tex..Const. Secs. 10, 13 and 19.

After due consideration, it is hereby ORDERED, that said Request is:

_____        GRANTED

_____        DENIED


### Motion in Limine to Prevent Prosecutorial Argument Contrary to *Tennard* Scope of Mitigating Evidence

3.)    Defendant makes this Motion in Limine, asking that the Court instruct the prosecutors not to make any argument or suggestion to the jurors that would tend to impose the concepts of "nexus" or "reduces moral blameworthiness" as the test for mitigation or the limit upon the scope of what they may consider and give effect to as mitigation, and not to suggest that the language in the statute demonstrates a preferential weight be given to evidence that does have a nexus to the crime, so that the absence of "nexus" evidence calls for special weight, under the statute. U.S. Const. Amends. 8 and 14; Tex. Const. Secs. 10, 13 and 19.

After due consideration, it is hereby ORDERED, that said Request is:

_____        GRANTED, and the prosecutors are instructed not to make
                      any argument or suggestion like that set out in Defendant's Motion
                      in Limine, and to approach the bench and secure the Court's ruling
                      before making any argument that might violate the Court's
                      instruction.

_____        DENIED


## **CONCLUSION AND PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Defendant prays that upon hearing, this Court sustain his Motion and allow him to conduct voir dire as requested, grant him the instruction requested and grant his motions in limine as requested to prevent improper argument, and record its rulings on the forms provided in the body of this Motion.

Respectfully submitted,

_____
Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument

has been furnished to counsel for the State by hand-delivery of a copy of same this the

22 day of _____June_____, 2007.

_____
Steven R. Miears

8

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## ORDER
### Constitutional Motion Number 16

On this day, came on to be heard the Defendant's MOTION TO HOLD STATUTORY DEFINITION OF MITIGATING EVIDENCE UNCONSTITUTIONAL AS APPLIED TO IMPOSE A "NEXUS" LIMITATION, AND TO GRANT DEFENDANT'S REQUESTED CLARIFYING VOIR DIRE, INSTRUCTION, ARGUMENT AND MOTION IN LIMINE, and after due consideration, the Court is of the opinion, and it is hereby ORDERED, that the Defendant's requests are GRANTED or DENIED individually as reflected in the Motion.

SIGNED this the _____ day of _____, 2007.


_____
JUDGE PRESIDING

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION TO HOLD THAT TEX. CODE CRIM. PROC.
## ART. 37.01 IS UNCONSTITUTIONAL
### Constitutional Motion Number 17

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant herein, by and through his attorney of record and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Article 1, sections 3, 10, 13, 15 & 19 of the Texas Constitution and TEX. CODE. CRIM. PROC. art. 2.03 and 38.03 (Vernon) and makes this his motion to hold that TEX. CODE CRIM. PROC. art. 37.071 is unconstitutional and as grounds therefore would show the Court as follows:

1. The Defendant has been indicted by the Collin County grand jury for capital murder.

2. The State is seeking the death penalty. The Eighth Amendment to the United States Constitution requires a greater degree of accuracy and fact-finding than would be true in a noncapital case. *Gilmore v. Taylor*, 508 U.S. 333, 113 S. Ct. 2112, 124 L. Ed. 2d 306 (1993) and *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

3. The Eighth Amendment's prohibition of "cruel and unusual punishment" must be interpreted in light of "evolving standards of decency." *Atkins v. Virginia*, 122 S. Ct. 2242 (2002). It is settled law that the 5th Amendment's broad guarantee of "due process" must be interpreted in light of evolving standards of fairness and ordered liberty. *See, e.g. Planned Parenthood v. Casey*, 505 U.S. 833, 846-851 (1992); *Rochin v. California*, 342 U.S. 165, 171-

172 (1952) (overruled on other grounds).

4.      More than 100 inmates from the country's death rows have been exonerated. That a citizen of this country can be exonerated by the "system" is not comforting when one realizes that it is the same "system" that decided that this person was not only guilty of the charged offense, but deserved to die. The unfairness of this alarming scenario is magnified by the lack of protections that are afforded to defendants in capital trials in Texas and the extent to which the state will go to "win." Tactics that are customarily used include the offering to the court and jury "predictions" by witnesses whose own "scientific community virtually unanimously agree that psychiatric testimony on future dangerousness is, to put it bluntly, unreliable and unscientific." *Flores v. Johnson*, 210 F.3d 456, 463 (5th Cir.Tex. 2000).

If protection of innocent people from state-sponsored execution is a protected liberty, and if such protected liberty includes the right of an innocent person not to be deprived, by execution, of the opportunity to demonstrate his innocence, then Congress may not override such liberty absent a far more clear and compelling need than any presented here. *United States v. Quinones*, 205 F. Supp. 2d 256 (S.D.N.Y. 2002). This Court can no longer have a high degree of confidence in any verdict because of the fallible nature of the manner in which evidence has been collected by the state, the length of time between the date of the offense and the time of arrest, the intentional misrepresentation to the jury of the effect of its inability to reach a verdict in the punishment phase of a capital trial and the many other inequities that plague the system, which include:

a.      Failure of the state to codify a Juror Bill of rights that would insure that a juror that wanted to vote for life would be free from harassment from pro-death jurors;

b.      The "death qualification" process of the venire in a capital case results in a jury that is more conservative, is more inclined to view death as the appropriate "default" option, more inclined to shift the burden to the defendant that life is the appropriate

sentence and is less receptive of to merits phase issues that are raised by the defense.

c.      A rule that says that 10 jurors must agree to return a verdict of life when the law requires only one (1) juror for a life vote.. The law says that an inability to agree on any of the issues then the result is a life sentence, not a hung jury. Jurors are not told this, in fact they are intentionally misled;

d.      The state continues to sponsor testimony (and state judges continue to allow such testimony) from supposed professionals who provide clinical opinions as to the probability that the defendant will commit criminal acts of violence that will constitute a continuing threat to society. There is no science that supports a psychiatrist's ability to make long term clinical predictions of violent conduct in a prison setting.

e.      In this regard, judges have completely abandoned their role as gate keepers in keeping out evidence that is scientifically unreliable;

f.      Failure of the state to ban the execution of juveniles while at the same time prohibiting someone of the same age from consuming alcohol or smoking cigarettes on the basis that they are not wise enough to make the proper decision about their **lives**;

g.      Failure of the state to ban the execution of juveniles when the pre-frontal cortex of the brain of a juvenile may be no better developed than one who suffers from mental retardation;

h.      Failure to require that prior to execution, there be some finding that defendant has, in fact, been a continuing threat to prison society and that unless executed he will continue to be a continuing threat to society and that no mitigating circumstances have arisen. Even if an individual is guilty of a heinous crime, that person may have been redeemed and no longer be the "same person" when he is killed by the state;

i.      Fails to adequately provide definitions for terms: probability, society, future, continuing threat;

j.      Allows the state to introduce evidence of extraneous, unadjudicated offenses during the penalty phase of a capital trial–even offenses for which the accused has been found not guilty;

k.      Fails to require that the state prove beyond a reasonable doubt all of the elements of the alleged unadjudicated offenses;

l.      Fails to allege unadjudicated offenses in the indictment returned against the accused;

m.      Fails to allege in the indictment returned against the accused that there is a probability that he will commit criminal acts of violence that will constitute a continuing threat to society.

n.      Fails to allege in the indictment returned against the accused that there is an absence of a circumstance that would justify a sentence of life.

o.      Failure to require prior notice of all prior unadjudicated offenses that the state will offer during the penalty phase of the trial;

p.      Allowing introduction of victim impact evidence during the penalty phase of a capital trial.  This evidence severely prejudices the defendant and  encourages the jurors to seek revenge in their sentencing.

q.      Failure to allow an accused in a capital case to have the same right of discovery that is allowed a litigant in a civil case;

r.      Failure to require in a capital case that the any extraneous defense be proven beyond a reasonable doubt and by special issue as to each alleged offense.;

s.      Failure to require proportionality review in death sentences;

t.      makes one who attempts to aid another in the commission of a capital crime eligible for the death penalty and does not require the state to allege the actual role of the accused in the offense.

u.      requiring that a jury consider the defendant's moral culpability along with mitigating circumstances after the jury has already found the defendant legally culpable of capital murder;

v.      Failure to place burden on state that they must negate existence of any mitigating circumstance beyond a reasonable doubt;

w.      Failure to provide that a Defendant in a capital case is entitled to every benefit that a defendant in a non- capital case would;

x.      Failure to insure that the jury and grand jury that hears evidence properly reflects the cross section of the community in which the defendant is tried;

y.      Failure of this county to adequately compensate jurors so that a fair cross section of jurors can afford to sit and hear evidence for the length of time that is required to decided if this accused lives or dies;

5.      The Accused is presumed innocent. TEX. CODE CRIM. PROC. art. 2.03

and art. 38.03. The execution of a legally and factually innocent person would be a

constitutionally intolerable event. *Herrera v. Collins*, 506 U.S. 390 (1993). Because of

the number of exonerations due to DNA and non-DNA evidence and numerous

unconstitutional and unfair of the Death Penalty Scheme in Texas, this Court can no

longer have confidence in the verdicts in the culpability stage of this trial which is much

less than a decision by a jury to kill the Defendant. *See* Joseph S. Liebman, et al., <u>A</u>

<u>Broken system, Part II: Why There Is So Much Error in Capital Cases, And What Can Be</u>

<u>Done About it.</u> (2002), at 25.

      6.      The system that determines who should die in Texas is truly "broken."

The execution of a legally and factually innocent person would be a constitutionally

intolerable event. *Herrera v. Collins, supra.* The Court should find that TEX. CODE

CRIM. PROC. art. 37.071 violates the protections afforded to the Accused by the 8th and

14th Amendments to the United States Constitution and that the option to sentence the

Accused to die for a crime that he did not commit should be precluded as a sentencing

option.

WHEREFORE, PREMISES CONSIDERED, Defendant prays this court will hold this

statute unconstitutional, and for such other relief as Defendant may be entitled.

Respectfully submitted,

_____

Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of _____ June ____, 2007.

Steven R. Miears

CAUSE NUMBER 380-82629-06

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

<u>ORDER OF THE COURT ON THE DEFENDANT'S MOTION</u>
<u>TO HOLD THAT TEX. CODE CRIM. PROC.</u>
<u>ART. 37.01 IS UNCONSTITUTIONAL</u>
Constitutional Motion Number 17

BE IT REMEMBERED, that on the _____ day of _____, 2007, came

to be considered the above motion. After consideration of the motion, it is the opinion of the

court that Defendant's motion be:

GRANTED _____

DENIED _____, to which action the Defendant excepts.


_____
Judge Presiding

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION REQUESTING THE COURT TO FIND TEX. CODE CRIM. PROC. ART. 37.071. SECTION 2(f)(4) TO BE UNCONSTITUTIONAL
### Constitutional Motion Number 18

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant herein, by and through counsel, and pursuant to the 8th and 14th Amendments to the United States Constitution and Article 1, Sections 13 and 19 of the Texas Constitution and applicable Rules of Criminal Procedure, makes this Motion in Limine. In support thereof, Defendant would show:

1. The Defendant has been indicted for capital murder.

2. The State is seeking the death penalty. The Eighth Amendment to the United States Constitution requires a "greater degree of accuracy and factfinding than would be true in a non-capital case." Gilmore v. Taylor, 508 U.S. 333, 342 (1993); see also Woodson v. North Carolina, 428 U.S. 280, 305 (1976).

3. It is the duty of this Court and the Texas Court of Criminal Appeals to make certain that the death sentence is not "wantonly or freakishly" imposed and that the purposes of Art. 37.071 are accomplished. Ellason v. State, 815 S.W.2d 656, 660 (Tex. Crim. App. 1991).

4. The Supreme Court of the United States has held that "[a]ccurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die." Gregg v. Georgia, 428 U.S. 153, 190 (1976).

5. Art. 37.071 §2(e)(1) of the Texas Code of Criminal Procedure requires the court to instruct the jury to determine:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Tex. Code Crim. Proc. art. 37.071 §2(e)(1).

6. Art. 37.071 §2(f)(4) defines mitigating evidence to be "evidence that a juror might regard as reducing the defendant's moral blameworthiness."

7. This statutory definition violates the Eighth and Fourteenth Amendments to the United States Constitution.

8. It impermissibly instructs jurors to disregard mitigating evidence that is unrelated to a defendant's moral blameworthiness. The instruction unconstitutionally narrows the jury's discretion in sentencing, to factors that concern only moral blameworthiness.

9. The Eighth and Fourteenth Amendments to the United States Constitution require that the sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Eddings v. Oklahoma, 455 U.S. 104, 110 (1982) (overruled in part on other grounds) (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion of BURGER, C.J.)).

10. The Supreme Court of the United States found the Texas death penalty statute to be constitutional on the basis of guarantees that sentencing juries would be able to consider "whatever mitigating circumstances" the defendant might be able to show. Lockett, 438 U.S. at 607 (referring to Jurek v. Texas, 428 U.S. 262 (1976)).

11. The Court held that these mitigating circumstances were necessary to ensure that the death penalty was not imposed in an arbitrary or capricious manner. This belief was based on the principle that "defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (overruled on other grounds).

12. It is therefore well established that a sentencer "may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" Skipper v. South Carolina, 476 U.S. 1, 4 (1986) (quoting Eddings, 455 U.S. at 114).

13. The Supreme Court of the United States has held that relevant mitigating evidence is "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Tennard v. Dretke, 159 L. Ed. 2d 384, 395, 124 S. Ct. 2562, 2570 (2004).

14. The Supreme Court of the United States has further ruled that once the "low threshold for relevance is met, the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence." Tennard, 159 L. Ed. 2d at 396, 124 S. Ct. at 2570 (quoting Boyde v. California, 494 U.S. 370, 377-378 (1990)). It is therefore unconstitutional for a state to exclude or limit a defendant's ability to present relevant mitigating evidence.

15. However, Art. 37.071 §2(f)(4) of the Texas Code of Criminal Procedure instructs jurors to disregard any potentially relevant mitigating evidence that does not relate to the defendant's moral blameworthiness.

16. The instruction can only reasonably be interpreted as a limitation on the mitigating circumstances, referred to in Art. 37.071 §2(e)(1), that a jury can consider to

929

3

warrant a sentence of life imprisonment rather than a death sentence. If the clause is not read as a limitation on what mitigating evidence can be considered it is rendered completely superfluous when read in conjunction with Art 37.071 §2(e)(1).

17. "It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause and word of a **statute** so that no part thereof be rendered **superfluous** or inoperative." Spence v. Fenchler, 107 Tex. 443, 457 (Tex. 1915). The only way to give effect to Art. 37.071 §2(f)(4) without rendering it superfluous is to read it as a limitation on Art 37.071 §2(e)(1).

18. Limiting the jury's consideration of mitigating evidence to factors that reduce the defendant's moral blameworthiness creates an unacceptable risk that the death penalty would be imposed despite the existence of evidence that would infer the basis for a sentence less than death. "When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." Lockett, 438 U.S. at 605 (1978).

19. The Supreme Court of the United States has held that "the sentencing process must permit consideration of the 'character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death' . . . in order to ensure the reliability, under Eighth Amendment standards, of the determination that 'death is the appropriate punishment in a specific case.'" Lockett, 438 U.S. at 601, (quoting Woodson v. North Carolina, 428 U.S. 280, at 304–305 (1976)).

20. A restriction on the mitigating evidence that can be considered by jurors in the sentencing phase of this trial is therefore unconstitutional, and also renders whatever, if

any, sentence to be delivered unreliable since it is not certain that all relevant factors have been considered.

21. In determining whether to impose a sentence of death the jury "can do little more – and must do nothing less – than express the conscience of the community on the ultimate issue of life or death." <u>Witherspoon v. Illinois</u>, 391 U.S. 510, 519 (1968). The conscience of the community can only be reliably expressed by a jury that has access to all mitigating evidence to make an informed decision.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that upon hearing hereof, this court find that Art. 37.071 §2(f)(4) of the Texas Code of Criminal Procedure that defines mitigating evidence to be "evidence that a juror might regard as reducing the defendant's moral blameworthiness" violates the 8th and 14th Amendments to the United States Constitution. Defendant prays that relief be granted by appropriate Order precluding any instruction to the jury that mitigating evidence is that which reduces the defendant's moral blameworthiness.

Respectfully submitted,

_____
Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

931

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of _____ June _____, 2007.

_____
Steven R. Miears

CAUSE NUMBER 380-82629-06

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## ORDER OF THE COURT ON THE DEFENDANT'S MOTION REQUESTING THE COURT TO FIND TEX. CODE CRIM. PROC. ART. 37.071. SECTION 2(f)(4) TO BE UNCONSTITUTIONAL
### Constitutional Motion Number 18

BE IT REMEMBERED, that on the _____day of _____, 200__,

came to be considered the above motion. After consideration of the motion, it is the

opinion of the court that Defendant's motion be:

GRANTED    _____

DENIED        _____, to which action the Defendant excepts.


_____
Judge Presiding

933

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION TO DECLARE TEXAS DEATH
## PENALTY STATUTE TO BE UNCONSTITUTIONAL
### Constitutional Motion Number 19
### (Juror's inability to Predict Future Dangerousness)

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant in the above-cause,

by and through counsel and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States

Constitution and Article 1, Sections 3, 10, 13 and 19 of the Texas Constitution and files this

Motion to Declare the Texas Death Penalty Statute to be Unconstitutional and for good and

sufficient cause would show the Court the following:

1. The Defendant has been indicted for the offense of capital murder.

2. The State is seeking the death penalty. The Eight Amendment requires a greater

degree of accuracy and fact finding than would be true in a non-capital case. *Gilmore v. Taylor*,

508 U.S. 333, 113 S. Ct. 2112, 124 L. Ed. 2d 306 (1993); *Woodson v. North Carolina*, 428 U.S.

280, 305 (1976).

3. Tex. Code Crim. Proc. art. 37.071(2)(b)(1) requires a jury during the penalty phase of

a capital trial to answer the following question: "Whether there is a probability that the

defendant would commit criminal acts of violence that would constitute a continuing threat to

society"

4. The ability to accurately predict whether or not a person would commit criminal acts

of violence is not within the ability of the lay people on the jury. The probability that a person

934

will commit future violence is not a prediction that even the psychiatric community can make, particularly in the long run. The unreliability of psychiatric predictions of long-term future dangerousness is by now an established fact within the profession. *American Psychiatric Association Task Force on Clinical Aspects of the Violent Individual*, "Clinical Aspects of the Violent Individual" (1974) and *Amicus Brief of the American Psychiatric Association (APA) in Barefoot v. Estelle*, (1983). The APA, in its brief, said that the primary finding of the task force was that judgments concerning the long-run potential for future violence and the dangerousness of a given individual are "fundamentally of very low reliability," adding that the state of the art regarding predictions of violence is very unsatisfactory.

5. The unreliability of long term predictions of future dangerousness is acknowledged even today by those who take the position that there is some ability to predict dangerousness. "Using modern assessment tools, however, there is a growing body of data to suggest that psychiatrists can, in fact, predict violence more accurately than many believe–**at least in the short term**. Ken Hausman, "Predicting Violence Risk Possible but Complex" *Psychiatric News*, Vol 36, Number 13 (2001). These predictions of violence, even if more accurate than in the past, come in a civil setting where a determination is made about possible civil commitment, not in the context of a capital murder case where the issue is whether someone is going to live or die, not will their civil liberties be limited for short period of time. "Despite the pervasiveness of violence risk assessment in mental health law, research continues to indicate that the unaided abilities of mental health professionals to perform this task are modest at best". *MacArthur Research Network on Mental Health and the Law*, "Executive Summary," at 1. ( April, 2001).

6. The consideration for the jury must necessarily be a long-term consideration as a defendant who is given a life sentence will not be eligible for parole for 40 calendar years. The

ability to make such long-term predictions is rendered more unreliable by the propensity of a person to commit violence to "age out" as he grows older.

7. The State will often make the argument that the Defendant is a "future danger" to prison society because he has an anti-social personality. The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) states at page 648:

> Anti-social Personality Disorder has a chronic course but may become less evident or remit as the individual grows older, particularly by the fourth decade of life. Although this remission tends to be particularly evident with respect to engaging in criminal behavior, three is likely to be a decrease in the full spectrum of antisocial behaviors and substance abuse.

8. The jurors are not instructed to consider either the unreliability of long-term predictions nor the "aging-out" effect noted by the DSM-IV. This makes the application of the Texas Death Penalty statute both arbitrary and capricious. It further denies this Defendant a fair trial and due process of law.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that:

1. Art. 37.071 be found to be unconstitutional and the death penalty be precluded as a sentencing option for the jury that is sworn to decide this case;

2. In the alternative, that the jury that is empaneled to decide this case be instructed as to the unreliability of long term predictions of future dangerousness; and

3. that the jury be instructed that as a person ages, their propensity to commit violent acts remits, particularly in the 4th decade of life; and

4. That the Defendant have such other and further relief to which he may show himself to be justly entitled.

Respectfully submitted,

_____
Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of _____ June , 2007.

_____
Steven R. Miears

937

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## ORDER OF THE COURT ON THE DEFENDANT'S MOTION TO DECLARE TEXAS DEATH PENALTY STATUTE TO BE UNCONSTITUTIONAL
### Constitutional Motion Number 19

BE IT REMEMBERED, that on the _____ day of _____, 2007, came

to be considered the above motion. After consideration of the motion, it is the opinion of the

court that Defendant's motion be:

GRANTED    _____

DENIED    _____, to which action the Defendant excepts.


_____

Judge Presiding

930

CAUSE NUMBER 380-82629-06

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION TO DECLARE THE CAPITAL SENTENCING STATUTE UNCONSTITUTIONAL BECAUSE IT ALLOWS JURIES TO DECIDE FUTURE DANGEROUSNESS BASED SOLELY ON THE FACTORS OF THE CASE
### Constitutional Motion Number 20

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, KOSOUL CHANTHAKOUMMANE, the Defendant herein, by and through his attorney of record, and pursuant to the 5th, 6th, 8th, and 14th Amendments to the United States Constitution, Articles 1.05, 1.06 and 1.09 of the Texas Code of Criminal Procedure and moves the Court to declare the capital sentencing statute unconstitutional and in support thereof would show the Court the following:

1. The Defendant has been indicted by the county grand jury for the offense of capital murder.

2. The State is seeking the death penalty.

## ALLOWING THE FACTS OF THE CASE ALONE TO DETERMINE FUTURE DANGEROUSNESS CREATES MANDATORY DEATH SENTENCES FOR CERTAIN CRIMES

3. Statutes that made the death penalty mandatory for certain crimes were declared unconstitutional in Woodson v. North Carolina, 428 U.S. 280 (1976).

4. In Jurek v. Texas, 428 U.S. 262, 275-76 (1976), the Supreme Court rule that it is essential for the jury to have all possible relevant information about the defendant who it must sentence.

FILED 2007 JUN 22 AM 1:07 HANNAH KUBLE DISTRICT CLERK COLLIN COUNTY, TEXAS BY_____ DEPUTY

5. Although Texas statutory law on its face assured the Supreme Court that all evidence would be considered, the application of the requirement in the Texas Court of Criminal Appeals has done the opposite. That Court has repeatedly held that the facts of the crime itself "can be among the most revealing evidence of future dangerousness and alone may be sufficient to support an affirmative answer to that special issue." Wilson v. State, 7 S.W.3d 136, 142 (Tex. Crim. App. 1999) (quoting Bell v. State, 938 S.W.2d 35, 41 (Tex. Crim. App. 1996)).

**THE UNDEFINED TERMINOLOGY UTILIZED BY TEXAS COURTS IN EXPLAINING THE FACTS OF THE CASE INTRODUCES ARBITRARINESS INTO THE CAPITAL PROCEEDING AND ALLOWS FOR WANTON RESULTS**

6. In Jurek, the Supreme Court upheld Texas's death penalty statute because the Court felt that "Texas has provided a means to promote the evenhanded, rational and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution" Jurek, 428 U.S. at 276 (quoting Furman v. Georgia, 408 U.S. 238, 310 (Stewart, J., concurring))

7. The jury is supposed to determine if, there is a "probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071, §2(b)(1).

8. A court is not required to define any of these terms for the jury. Ladd v. State, 3 S.W.3d 547, 572 (Tex. Crim. App. 1999). "The trial court need not define such terms, because the jury is presumed to understand them without instruction." Id. at 572-73.

9. The entire purpose of the new death penalty statutes adopted after <u>Furman</u> was to remake the machinery of death in order to allow it to function without unbridled discretion. By allowing jurors to make determination about a defendant's future dangerousness without explaining to the jurors exactly what they are attempting to determine is giving jurors unlimited discretion.

10. The Supreme Court has said that proper jury instructions are very important in these cases. Juries should be given guidance regarding the factors about the crime and the defendant and the state deems particularly relevant to the sentencing decision. See <u>Gregg v. Georgia</u>, 428 U.S. 153, 192-93. It is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations." <u>Id.</u>

**FINDINGS OF FUTURE DANGEROUSNESS ARE INHERENTLY SPECULATIVE AND CANNOT BE TRUSTED WHEN ONLY THE FACTS OF THE CASE ARE UTILIZED TO ESTABLISH THAT A DEFENDANT WILL BE A CONTINTUING THREAT TO SOCIETY**

11. In upholding the Bail Reform Act (which requires courts to determine if a defendant poses a future danger to society), the Supreme Court stressed that the decision cannot be made arbitrarily. "The judicial officer is not given unbridled discretion in making the detention determination. Congress has specified the considerations relevant to that decision." <u>United States v. Salerno</u>, 481 U.S. 739, 742 (1987). A number of different factors must be taken into consideration by the fact-finder before the decision can be made.

12. It seems that a similar factor based analysis would be used in a death penalty future dangerous determination. The Supreme Court even implied this in <u>Jurek</u> by saying, "[w]hat is essential is that the jury have [sic] before it all

possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced." Jurek, 428 U.S. at 276.

13. Instead, the Texas Court of Criminal Appeals has interpreted the law in such a way that allows the jury to ignore most of the evidence that could help it make its decision. The Court of Criminal Appeals has enumerated a non-exclusive list of factors that the jury *may* consider to determine the defendant's future dangerousness. Smith v. State, 74 S.W.3d 868, 870 (Tex. Crim. App. 2002).

14. Unlike a judge determining bail, a jury need not consider all of the factors. In fact, the Texas courts continue to encourage juries to ignore most of the factors. In Smith, the Court of Criminal Appeals said "the circumstances of the offense alone may be enough warrant an affirmative answer to the future dangerousness special issue." Id. "It has been said that the circumstances of the offense and the facts surrounding it may furnish greater probative evidence than any other evidence regarding the probability of future acts of violence." Alexander v. State, 740 S.W.2d 749, 761 (Tex. Crim. App. 1987).

15. These cases clearly contradict the Supreme Court's wish in Jurek that all evidence would be considered before condemning a defendant to death. After all, "an individualized decision is essential in capital cases." Lockett v. Ohio, 438 U.S. 586, 605 (1978).

## ALLOWING A DETERMINATION OF FUTURE DANGEROUSNESS SOLELY FROM THE FACTS OF THE CASE IS ILLOGICAL

16. The Texas Court of Criminal Appeals has repeatedly held that the circumstances of the offence can be the best evidence of future dangerousness.

See, e.g., O'Bryan v. State, 591 S.W.2d 464, 480 (Tex. Crim. App. 1979); Alexander, 740 S.W.2d at 761; Joiner v. State, 825 S.W.2d 701, 705 (Tex. Crim. App. 1992).

17. Although the facts of a particular crime provide some useful information to a jury attempting to decide if a defendant will commit future acts of criminal violence, it cannot be the only evidence a jury could need.

18. By allowing the facts of the case alone to determine future dangerousness, the jury is given free reign to make its findings. Whenever a jury is particularly disgusted with a defendant's actions, it can condemn them to death and use the "facts of the case" as a spurious explanation.

19. By not specifically setting out particular factors that must be considered the jury can make a judgment based on an emotional response and sentence the defendant to death without considering all the relevant information.

20. Defendant requests that the Court order the State to respond to this motion in writing, at least five days prior to hearing. Defendant further requests that the Court make findings of fact and conclusions of law regarding this motion.

WHEREFORE PREMISES CONSIDERED, Defendant prays that relief be granted as prayed for herein.

Respectfully submitted,

Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418

Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument

has been furnished to counsel for the State by hand-delivery of a copy of same this the

22 day of _June_____, 2007.

_____
Steven R. Miears

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

**ORDER OF THE COURT ON THE DEFENDANT'S MOTION
TO DECLARE THE CAPITAL SENTENCING STATUTE
UNCONSTITUTIONAL BECAUSE IT ALLOWS JURIES TO DECIDE FUTURE
DANGEROUSNESS BASED SOLELY ON THE FACTORS OF THE CASE
Constitutional Motion Number 20**

BE IT REMEMBERED, that on the _____ day of _____, 2007,

came to be considered the above motion. After consideration of the motion, it is the

opinion of the court that Defendant's motion be:

GRANTED        _____

DENIED        _____, to which action the Defendant excepts.


_____
Judge Presiding

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION TO DECLARE THE "10-12 RULE" UNCONSTITUTIONAL
### Constitutional Motion Number 21

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant herein, by counsel and pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Article One, Sections Three, Ten, Thirteen, and Nineteen of the Texas Constitution; and other applicable law, moves this Court: (1) to declare Tex. Code Crim. Proc. article 37.071(2)(d)(2) and 37.071(2)(f)(2) unconstitutional on the ground that they create an impermissible risk of arbitrary imposition of the death penalty by placing a false dilemma before the jury; (2) to declare Article 37.071(2)(a) unconstitutional with respect to its prohibition on informing the jury that a life sentence necessarily results from an inability to answer any of the special issues; and in the alternative, (3) to provide clarifying instructions to the jury with regard to the failure of jurors to agree upon answers to special issues; and (4) to allow the attorneys to voir dire prospective jurors in order to discover their beliefs regarding the substantive outcome of deadlock at the sentencing phase. In support of his motion, the Defendant shows as follows:

### The "10-12 Rule"

1. Tex. Code Crim. Proc. art. 37.071(2)(d)(2) requires the Court to charge the jury that it may not answer any issue submitted under Subsection (b) of this article "yes" unless it agrees unanimously, and it may not answer any issue "no" unless ten or more jurors agree.

3. Under Tex. Code Crim. Proc. art. 37.071(2)(c) and 37.071(2)(f)(1) the jurors "shall" answer each interrogatory either "yes" or "no."

4. In the event that the jury is unable to answer any issue, either because it was unable to secure unanimity for a "yes" answer or ten votes for a "no" answer pursuant to the issues submitted under Subsection (b), or because it was unable to secure unanimity for a "no" answer or ten votes for a "yes" answer pursuant to the issue submitted under Subsection (e), Tex. Code Crim. Proc. art. 37.071(2)(g) requires the Court to sentence the defendant to life in prison. This is substantively identical to the sentence that results if the jury is able to answer "no" to at least one issue submitted under Subsection (b) or "yes" to the issue submitted under Subsection (e).

5. Tex. Code Crim. Proc. art. 37.071(2)(a) prohibits the Court, either attorney, and the defendant himself from informing the jury, or any prospective juror, that the failure to answer any of the issues presented will result in a mandatory life sentence. Jurors who ask questions regarding the consequences of such a deadlock are routinely reread the original instructions.

6. Death is different not only in severity but also in kind from all other punishments. The Eighth and Fourteenth Amendments to the United States Constitution demand additional procedural safeguards in capital trials. *See generally*, Furman v. Georgia, 408 U.S. 238 (1972); Gregg v. Georgia, 428 U.S. 153 (1976); *See* Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (holding that "death is qualitatively different"). The effect of this is that legislatures and courts are obligated to strike a difficult, but constitutionally mandated, balance between the non-arbitrary imposition of the death penalty, and the right of each defendant to individualized sentencing.[1] The Texas death penalty statute, by providing misleading information to jurors and then prohibiting the court, the attorneys, and the defendant from correcting that misinformation, both creates a constitutionally impermissible risk of arbitrariness, and denies defendants their right to individualized sentencing.

---

[1] It is precisely this difficulty that caused Justice Blackmun to conclude that the entire enterprise of seeking to make the death penalty constitutionally acceptable was flawed. In his dissent from the Court's denial of a petition to grant a writ of certiorari, Blackmun declared: "From this day forward, I no longer shall tinker with the machinery of death. . . . It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies." Callins v. Collins, 510 U.S. 1141, 1145 (1994)(Blackmun, J. dissenting).

## The "10-12 Rule" Creates an Impermissible Risk of Arbitrariness

7. The requirement that a death sentence not be imposed arbitrarily is derived from the "Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" Caldwell v. Mississippi, 472 U.S. 320, 323 (1985)(quoting Woodson v. North Carolina, 428 U.S. at 305 (1976)). It was chiefly the concern that decisions of life and death were being arbitrarily that led the Supreme Court in 1972 to declare the death penalty in violation of the Eighth and Fourteenth Amendments to the Constitution. See generally, Furman v. Georgia, 408 U.S. 238 (1972). In capital cases, therefore, the Court is committed to ensuring that there is sufficient process to "guarantee, as much as is humanly possible, that the sentence was not imposed out of whim . . . or mistake." Eddings v. Oklahoma, 455 U.S. 104, 118 (1982)(O'Connor, J., concurring) (overruled on other grounds).

8. The Texas death penalty statute affirmatively creates confusion in the minds of the jurors. Jurors are first told that the jury as a whole "shall" answer "yes" or "no" to each issue presented; they are subsequently told that ten or more jurors must be in agreement to give one set of answers and that they must be unanimous in order to give another. This necessarily raises the question of what happens in the event that the jury, despite being instructed that it must answer each question, is unable to get the minimum number of votes required to give either answer. The statute clearly provides that in the event of a non-answer, the defendant is to receive a sentence that is substantively identical to that which he or she would have received had there been a verdict in favor of life, and thus the law itself exhibits no confusion with regard to the situation presented. However, not only does the statute fail to do all that is humanly possible to ensure that decisions regarding life and death are not made as a result of that manufactured confusion, but it actively prohibits any clarification of the confusion by preventing jurors from being informed at any point of the effect of a non-answer.

9. It is true that state legislatures are often given discretion to decide what information is relevant to a capital sentencing determination, and are thus able to exclude some information from jury instructions. See California v. Ramos, 463 U.S. 992, 1001 (1983)(holding that the Court generally "defer[s] to the State's choice of substantive factors relevant to the penalty determination"). However, that discretion is bound by the requirements of due process. See, e.g., Simmons v. South Carolina, 512 U.S. 154, 175

3

(1994)(O'Connor, J. concurring in judgment); Ramdass v. Angelone, 530 U.S. 156, 195 (2000)(Stevens, J. dissenting); Shafer v. South Carolina, 532 U.S. 36, 39 (2001); Kelly v. South Carolina, 534 U.S. 246, 248 (2002).

10. In Ramos, the Court permitted a jury instruction regarding the State Governor's commutation powers on the ground that the instruction was both accurate and relevant to a legitimate state penological interest. California v. Ramos, 463 U.S. 992, 1001-06. Despite being prompted to apply Ramos in the case of Caldwell v. Mississippi, the Court refused, holding that when the State argues that automatic appellate review is meant to determine whether the death penalty is appropriate in a given case, this information not only inaccurately depicts the role of the appellate court, but more importantly it serves an illegitimate state purpose by diminishing the ability of jurors to feel the gravity of their task. Caldwell v. Mississippi, 472 U.S. 320, 336-41 (1985).

11. The Texas procedural rules and corresponding jury instructions are equally inaccurate and illegitimate. When jurors are instructed that they may not give a verdict of life unless ten or more agree upon a life answer in response to at least one of the three issues, this provides an incorrect picture of the state of the law. In fact, if only one juror is able to conclude that sufficient mitigation exists to warrant the imposition of a life sentence, despite that juror's inability to convince nine other jurors of his or her position, a life sentence will be imposed. This situation is unique to capital sentencing juries. During the guilt/innocence phase of a criminal trial, it is strictly correct to inform the jury that unanimity is required for either a verdict of guilt or acquittal. Although anything short of unanimity will lead to a mistrial, and thus might lead the defendant to be released as though he were acquitted, he may still be retried and is thus unable to claim numerous basic constitutional protections such as that of double jeopardy. Under the Texas sentencing scheme, while the legislature might prefer a life sentence that derives from the agreement of ten jurors to one that arrives by default, the position of the defendant is identical in both. See Padgett v. State, 717 S.W.2d 55, 58 (Tex. Crim. App. 1986) (holding that "a jury's inability to answer a punishment question in a capital murder case has the same sentencing effect as a negative answer"). Thus, instructing the jury that ten or more of them must agree upon a "life" answer in order to sentence the defendant to life, regardless of whether the court informs the jury of the effects of a non-answer, is an incorrect statement of the law. So long as the Texas statute equates the sentencing

consequences of a life verdict with the consequences of a non-verdict, the jury must not be misled to believe that anything more than one vote for life is required to secure that sentence. The false distinction between a "life" answer of ten or more jurors and a non-answer of less than ten jurors must be removed.

12. This was not the case prior to 1981. Under Texas's former capital sentencing statute, if a jury failed to respond to any of the three special issues the result was a complete mistrial, requiring a new trial not just on sentencing but on guilt as well. *See* Eads v. State, 598 S.W.2d 304, 308 (Tex. Crim. App. 1980). Under such a scheme, setting aside the other arguments proffered here, an instruction that ten or more jurors are required for a life sentence would be just as unobjectionable as an instruction that unanimity is required for death, a finding of guilty, or an acquittal. Presumably in response to Eads and the additional costs and difficulties that such a situation would pose, the Texas legislature in 1981 amended the death penalty statute, inserting the default sentence of life in the event of a non-answer. It was at this time that the legislature also added the infirm language that is now in Article 37.071(2)(a), prohibiting jurors from being informed of this default result. It is clear that the legislature wished to change the sentencing reality of defendants without informing jurors of this change. In doing so, however, the legislative change made the old instructions inaccurate depictions of the law.

13. Not only are the instructions inaccurate, but they were intended to be inaccurate and confusing in order to serve an illegitimate state interest. Just as jurors who are informed that their decision will be reviewed for appropriateness by an appellate court are impermissibly led to deflect their awesome responsibility onto the appellate courts, Texas jurors are impermissibly led to relieve themselves of a sense of responsibility by placing it either upon the other jurors who are unwilling to join the vote in favor of life ("It is their fault that the defendant will be killed because by not joining me they prevent us from reaching the required minimum of ten votes"), or upon the statutory scheme that purports to require ten votes, rather than merely one, in order to give life ("It is the fault of the Texas statute because unless I can get at least ten votes for life, I myself may not vote for life"). The principle behind Caldwell is that courts must ensure that jurors are not invited to place their individual responsibility onto anyone else. Just as it is impermissible to lead jurors to place that responsibility upon the appellate courts, it is

5

impermissible to lead them to place it upon their fellow jurors, or upon a restrictive sentencing statute.

14. Assuming *arguendo* that the Texas statute does not provide the jury with the type of inaccurate and illegitimate information prohibited by a traditional reading of Caldwell, new empirical data suggests that such a reading of Caldwell is entirely inadequate to ensure that capital jurors feel the "truly awesome responsibility" placed upon them. McGautha v. California, 402 U.S. 183, 208 (1971). One recent study by the Capital Jury Project concluded that "many death penalty jurors seek, and manage to find, ways to deny their personal moral responsibility for the sentencing decision." Joseph L. Hoffman, "Where's the Buck? – Juror Misperception of Sentencing Responsibility in Death Penalty Cases," 70 Ind. L.J. 1137, 1157 (Fall 1995). Given that jurors hardly need to have inaccurate information provided to them in order for them to deflect responsibility, the Caldwell rule itself should be read in light of the empirically supported premise that "death penalty jurors will take advantage of any available opportunity to *mislead themselves* about the extent of their responsibility for the sentencing decision." *Id.* If we are to give any meaning to Justice Harlan's concern that death penalty jurors be required to individually feel this terrific weight upon their shoulders, courts must inform jurors that just as each of them is required to vote for death in order for that punishment to take place, each has the power to give the defendant life unilaterally.

15. The result of misinforming jurors and forcing them to deliberate without knowledge of what happens in the event of a non-answer is that they are presented with a false dilemma. Jurors are given general instructions that they must answer either "yes" or "no" to the issues before them and specific instructions that define the minimum number of votes required to give each of these answers. Because they are told that a death sentence follows from one set of answers and a life sentence follows from another, a reasonable juror might conclude that the *only* way to get either of these punishments is to answer the questions posed to them. *See* California v. Brown, 479 U.S. 538, 541 (1987) (quoting Francis v. Franklin, 471 U.S. 316 (1985)(holding that the constitutional sufficiency of capital sentencing instructions is determined by "what a reasonable juror could have understood the charge as meaning"). This leaves jurors free to speculate as to what would occur should they be unable to provide an answer to the issues. While it is possible that jurors might correctly guess that the failure to agree will result in a life

6

sentence, it is perhaps more likely that they will conclude that a non-answer will lead to a lesser sentence, a costly retrial or resentencing proceeding, or absolute freedom for the defendant. Given that each of the jurors has already found the defendant guilty of a capital offense, none of these options would look desirable to a juror who honestly believes that a life sentence in warranted. Jurors are left to deliberate with the false belief that if they are unable to gain unanimity for a death sentence or ten or more votes for a life sentence, an altogether unacceptable third option will result.

16. In Simmons the Court prohibited just this sort of unfairness, holding that "The State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." Simmons v. South Carolina, 512 U.S. 154, 171 (1994). The Texas statute instructs jurors that at least ten of them must agree in order for a life sentence to be imposed, yet it prohibits jurors from learning that only one vote is actually required for a life sentence. It is precisely because jurors are left to speculate when capital juries are not informed of the consequences of a deadlock that several states have declared the practice to be in violation of Eight Amendment protections as found in Gregg v. Georgia, 428 U.S. 153 (1976). See, e.g., Louisiana v. Williams, 392 So.2d 619, 634-35 (1980)(holding that "by allowing the jurors to remain ignorant of the true consequence of their failure to decide unanimously upon a recommendation, the trial court failed to suitably direct and limit the jury's discretion so as to minimize the risk of arbitrary and capricious action"; New Jersey v. Ramseur, 106 N.J. 123, 314 (1987)(stating that "the jury must be told, in effect, that the law recognizes deadlock as a permissible result, an outcome allowed by the statute, a legal trial verdict that by law results in imprisonment rather than death").

17. While this confusion might pressure voters to change their position in order to avoid the unknown third option, it might lead to an even more basic misunderstanding. Because jurors are told that each question must be answered, and voting ballots do not include an option for non-answer, a reasonable juror following the instructions might believe that a non-answer is not only undesirable, but is in fact impermissible. Such a juror might believe that because he or she is unable to secure the ten votes required to give the answer that that juror wishes the jury to give, and because some answer either way must be given, that juror is in fact obliged to vote with the others and sentence the

7

defendant to death. Although the law is clear that a death sentence may never be mandatory, and individual jurors must always be free to vote for life, such a belief would reasonably follow from the instructions mandated by the Texas sentencing scheme. In fact, jurors often mistakenly believe that they are required by law to impose death.[2] One study found that when jurors asked for clarification and were simply referred back to the original instructions, rather than being disavowed of their false belief they became *more likely* to mistakenly believe that the evidence required them to vote for death.[3] This is precisely what the Texas statute would have judges do when jurors ask questions regarding the implications of a non-answer. The Texas statutory scheme creates a set of instructions that lead jurors to have false beliefs regarding their sentencing options, prohibits them from learning their true options, and then operates in a fashion that solidifies their pro-death leanings.

18. It is not mere conjecture that jurors might be confused by the Texas statute in particular. A quick survey of Texas capital cases reveals numerous instances in which jurors have exhibited their confusion by asking the judge for clarification.[0] Even in the absence of such evidence of confusion, however, the Court has stated unambiguously that the "trial judge's duty is to give instructions sufficient to explain the law, an obligation that exists independently of any question from the jurors or any other indication of perplexity on their part." Kelly v. South Carolina, 534 U.S. 246, 256. The Court in Kelly held that though the jury in that case did not exhibit its confusion by inquiring about parole as the juries in Simmons and Shafer had, common sense was all that was required to know that the jurors might have been confused. *Id.* at 20. Similarly, even if empirical evidence were not available to demonstrate that the "10-12 Rule" fosters confusion among jurors, common sense is sufficient to conclude that the statute itself, and in particular its prohibition on permitting trial judges from fulfilling their duty to give sufficient instructions to explain the law, is unconstitutional.

---

2 *See generally,* Garvey, Stephen P., Sheri Lynn Johnson, and Paul Marcus, "Correcting Deadly Confusion: Responding to Jury Inquiries in Capital Cases," 85 Cornell L. Rev. 627 (2000). In addition to this mistaken belief, one study also found that "[a]bout half the jurors incorrectly believe that a mitigating factor must be proved beyond a reasonable doubt. Less than a third of jurors understand that mitigating factors need only be proved to the juror's personal satisfaction. The great majority of jurors – in excess of sixty percent in both life and death cases – erroneously believe that jurors must agree unanimously for a mitigating circumstance to support a vote against death." Eisenberg, Theodore, and Martin T. Wells, "Deadly Confusion: Juror Instructions in Capital Cases," 79 Cornell L. Rev. 1 (1993).

3 85 Cornell L. Rev. 627, 639 (2000).

0

19. Commenting on the prohibition on informing juries of the effect of deadlock, Judge Clinton was likely correct when he stated in his dissent in Sattiewhite v. State that "[i]t seems apparent to me that the purpose . . . is to act as a kind of inverted 'dynamite' charge. The Legislature did not want jurors to know that failure to reach a punishment verdict—a hung jury—would *not* result in the State incurring the additional expense of a retrial." Sattiewhite v. State, 786 S.W.2d 271, 292 (Tex. Crim. App. 1989)(Clinton, J. dissenting). The converse of this is that the Texas legislature did want to foster the false belief of jurors that a non-answer would require the additional expense of a retrial. Even when it is true that a hung jury will result in a costly retrial, the Constitution does not permit judges to refer to the additional expenses when they urge deadlocked juries to try to come to a verdict. *See* United States v. Taylor, 530 F.2d 49, 52 (5th Cir. 1976). In the event that such costs do not in fact exist, as is the case under the Texas statute, it is all the more clear that the Constitution cannot permit the legislature to benefit from that misperception by prohibiting judges and lawyers from correcting the mistaken beliefs of jurors.

20. The inaccurate and illegitimate instructions provided to Texas capital sentencing juries creates an unacceptable risk that decisions are being made arbitrarily or by mistake. While it is true that uncertainty about the consequences of a non-answer might lead a lone holdout for a life sentence to join the other jurors voting for death, it is equally true that this confusion might lead at least one of the three holdouts for death to join the nine other jurors voting for life. *See, e.g.,* Jones v. United States, 527 U.S. 373, 394 (1999)(stating that the petitioner could not demonstrate prejudice because "[i]t is just as likely that the jurors, loathe to recommend a lesser sentence, would have compromised on a sentence of life imprisonment as on a death sentence"). With regard to the Texas statute, while this point might be correct, it fails to prevent serious constitutional infirmities for two reasons. First, because the statute provides defendants with the exact same sentence regardless of whether they receive one vote for life or ten, the State itself is not prejudiced when votes for death are changed into votes for life for the sake of obtaining the ten vote minimum. The defendant, however, suffers a tremendous wrong when holdouts for life switch their votes to death out of confusion or a feeling of obligation. Thus, only the defendant, and not the State, could suffer harm from such confusion. Even if the State did have an interest in keeping life sentences that derive

from a verdict distinct from life sentences that derive by default, that interest is vastly overshadowed by the defendant's interest. *See* <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 252 (Marshall, J. dissenting)(stating that when the substantive outcome of a deadlock is identical to that of a life verdict, "the State's interest in a verdict . . . [is] relatively weak, whereas the defendant's interest in preserving the integrity of a dissenting vote [is] correspondingly strong"). Stated simply, while the defendant never needs to have a voter change his or her vote out of confusion, the State, because death may only be imposed through a unanimous verdict, does. Thus, while it might be true that it would be difficult to determine whether a particular defendant was prejudiced, it is beyond dispute that the system as a whole can only prejudice the defendant.

21. Second, it is eminently clear that when confusion regarding the outcome of a deadlock leads jurors to change their votes in either direction simply for the sake of a verdict, those decisions regarding life and death are being made arbitrarily. In cases in which the jury does not quickly, and without dispute, come to agreement on the appropriate punishment, the two most important factors remaining for a decision are the general confusion of the jurors caused by misinformation, and the initial disposition of the jury regarding whether or not to impose death. If nine jurors find sufficient mitigation to warrant a life sentence, at least one of the three jurors holding out for death will be likely to switch over solely out of uncertainty regarding the consequences of a non-answer or due to a mistaken belief that an answer must be reached at all costs. If eleven jurors vote for death and one finds that the mitigating evidence warrants life, that juror might be swayed to vote for death for identical reasons. When jury instructions misinform jurors and purposefully prevent clarification, and verdicts are rendered out of such confusion, it is clear that those instructions "introduce[ ] a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." <u>Beck v. Alabama</u>, 447 U.S. 625, 643 (1980) (overruled on other grounds).

<u>The "10-12 Rule" Denies the Defendant's Right to Individualized Sentencing</u>

22. The Constitution requires that states balance the obligation to minimize the risk of arbitrariness with the need for individualized sentencing. "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of

955

inflicting death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976) ( In furtherance of this demand, the Court held in Lockett that "[T]he sentencer . . . [can] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."(citation omitted). Lockett v. Ohio, 438 U.S. 586, 604 (1978). Later cases have clarified that such mitigating evidence need only be proven by a preponderance of the evidence. See Walton v. Arizona, 497 U.S. 639, 649-50 (1990) (overruled on other grounds). More importantly, the Court has unequivocally held, and the Texas statute clearly states under Article 37.071(2)(f)(3) that a single juror must be permitted to consider and weigh mitigating evidence unilaterally, regardless of whether any other jurors accept the evidence as mitigation. See McKoy v. North Carolina, 494 U.S. 433, 435 (1990); Mills v. Maryland, 486 U.S. 367, 374-75 (1988).

23. Although the capital sentencing jury resembles juries that sit in the guilt/innocence phase of capital and non-capital trials, its role is distinct. All juries have historically been expected "to secure unanimity by comparison of views, and by arguments among the jurors themselves." Jones, 527 U.S. at 382 (quoting Allen v. United States, 164 U.S. 492, 501 (1896)). The capital sentencing jury, however, is charged more precisely with the duty to "express the conscience of the community on the ultimate question of life or death." Lowenfield, 484 U.S. at 238 (citation omitted). Because extraordinary protections are constitutionally required to ensure against unwarranted impositions of death, the Texas sentencing scheme, like the Louisiana statute, creates "a situation unique to the capital trial that a single juror, by persisting in a sentencing recommendation at variance with all of his fellow jurors, may alone cause imposition of a life sentence." State v. Loyd, 459 So. 2d 498, 503 (La. 1984). The requirement of individualized sentencing in capital trials means not simply that defendants must be judged based upon their own character but that they must be judged as such by individual jurors charged with considering the evidence and asked to make determinations of life and death. This clearly follows from the Court's demands that each individual juror be capable of considering mitigating evidence that that juror alone finds to exist simply by a preponderance of the evidence.

24. Members of a capital sentencing jury sit through the court's instructions, take an oath, and pass through the extraordinary process of death qualification. More than any

950

other jury that sits in a courtroom, we can be confident in our presumption that such jurors are unbiased, impartial, and capable of deliberation. It cannot be correct, therefore, to say that informing jurors of the effects of a deadlock would act as an "open invitation for the jury to avoid its responsibility and to disagree." Davis v. State, 782 S.W.2d 211, 221 (Tex. Crim. App. 1992)(overruled on other grounds)(quoting Justus v. Commonwealth, 266 S.E.2d 87, 92 (Va. 1980)). Rather, when a juror decides that sufficient mitigation exists to warrant a life sentence, and wishes to stick to that position despite the fact that it will prevent the jury from reaching a verdict, he does not violate some abstract duty to "secure unanimity" or to not "disagree." It is true that under the Texas sentencing statute, a juror would be abdicating his or her responsibility were he or she to not answer one of the questions. "The issues are framed in a manner which permits them to be answered either affirmatively or negatively, and it is the purpose of the deliberative process to resolve juror vacillation." Nobles v. State, 843 S.W.2d 503, 510 (Tex. Crim. App. 1992). Once deliberation has taken place, vacillation has been resolved, and each juror has settled upon his or her answer to the three special issues, however, surely the failure of those votes to meet the numerical requirements of the "10-12 Rule" cannot be considered a violation of the jury's duty. On the contrary, as the Supreme Court of New Jersey held in Ramseur, and as is equally true under Texas's statutory scheme, "A capital jury does not 'avoid its responsibility' by disagreeing – genuine disagreement is a statutorily permissible conclusion of its deliberations." Ramseur, 106 N.J. at 311.

25. Indeed, McKoy and Mills together stand for the principle that setting up barriers to prevent the jury from disagreeing can itself be constitutionally prohibited. This is precisely the case with the "10-12 Rule," the substantive effect of which is that it prohibits individual jurors from having a "meaningful opportunity" to judge the defendant on the basis of mitigation by creating the appearance that while each juror may introduce and weigh mitigating evidence unilaterally, a minimum of ten jurors are required to pass judgment on such factors.[5] This was exactly what the Court was

---

5 In Roberts v. Louisiana, the Supreme Court invalidated Louisiana's mandatory death penalty scheme on the grounds that it "afford[ed] no meaningful opportunity for consideration of mitigating factors presented by the circumstances of the particular crime or by the attributes of the individual offender." Roberts v. Louisiana, 428 U.S. 325, 333-34 (1976). That the sentencer must have a "meaningful opportunity" to consider mitigating factors suggests that not only may legislatures not actively prohibit such consideration, but they also must also take positive steps to foster it when necessary.

957

concerned about in McKoy when it held that "Mills requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." McKoy, 494 U.S. at 442-43. It is not enough for Texas to inform the jury that they "need not agree on what particular evidence supports an affirmative finding on the issue [of mitigation]," Article 37.071(2)(f)(3), if the effect of the entire instruction is that ten or more jurors must agree upon an affirmative finding in order to give effect to the finding of any one juror. Each juror must be capable of giving effect to mitigating evidence when determining the appropriate punishment, and thus only one juror, not ten, must be sufficient under Article 37.071(2)(f)(2) to answer "yes" to the mitigation issue present by 37.071(2)(e)(1). By instructing the jury that ten jurors are required in order to give a "yes" answer, the Texas statute violates the principles underlying Mills and McKoy by preventing individual jurors from having a meaningful opportunity to consider mitigating factors.

The "10-12 Rule" Denies the Defendant's Right to a Fair and Impartial Jury

26. As discussed above, the "10-12 Rule" operates by necessarily creating confusion in the minds of the jurors, and then prohibiting them from having their confusion clarified. This was earlier discussed within the context of the additional Eighth Amendment safeguards required to reduce the risk of arbitrary and unreliable sentences. An additional problem created by such confusion is that it permits jurors with misconceptions about the law formed prior to the trial and outside of the courtroom to introduce such ideas into deliberations.

27. It is beyond dispute that capital juries are often dominated by misconceptions regarding the state of the law, their role as jurors, and the definition of key concepts such as mitigation. As discussed above, a reasonable juror who conscientiously attempts to understand the Texas sentencing statute might be led to believe that just as a sentence of death may not be imposed unless the jury is unanimous with regard to all three special issues, a sentence of life may not be imposed unless at least ten jurors agree with respect to at least one of the three special issues. Not only does this mistaken belief raise an Eighth Amendment problem with regard to arbitrariness and reliability, but the possibility that jurors might draw upon their preconceived notions to resolve such a situation raises Sixth Amendment concerns.

28. The right to an impartial jury has long been recognized as fundamental. *See, e.g.*, Lockhart v. McCree, 476 U.S. 162 (1986). This is particularly crucial in capital cases, where the Constitution demands that "the decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death." Witherspoon v. Illinois, 391 U.S. 510, 523 n. 20 (1968) (overruled on other grounds). To protect this right, courts are obliged to take reasonable steps to ensure the impartiality of a jury. It is for this reason that voir dire is made available to both parties, the judge is equipped with the power to strike jurors for cause, each party is granted a certain number of peremptory challenges, and jury instructions are fashioned to clarify the jury's role and impress upon them the importance of their task and the oath to which they have sworn.

29. By manufacturing confusion in the minds of the jury and preventing the court or the attorneys from correcting it, the "10-12 Rule" creates fertile ground for jurors to draw upon their own biases and preconceived notions in coming to a verdict. This is particularly dangerous when jurors are confused about their sentencing options and the results of their sentencing decisions. The concept of a hung jury is widely understood to be a disfavored result. In most trials, a hung jury leads to a mistrial, and most people understand that a mistrial will either lead to a costly retrial or to the dropping of charges. While neither of these undesirable outcomes will result in the case of capital sentencing under the Texas statute, jurors are required to be kept in the dark with regard to that materially relevant fact. The "10-12 Rule" effectively forces the jury to wonder what would happen were they are unable to answer the special issues, possibly leads them to believe that an unacceptable third alternative other than life and death would follow, and then leaves them to draw upon their own preconceived notions in coming to a verdict. While the concept of a mistrial might be distasteful to a holdout, and is certainly disfavored by the court, during the guilt/innocence phase of a criminal trial, it is surely all the more unacceptable to a juror in a capital sentencing proceeding who has already found the defendant guilty of a capital offense. The risk that jurors will enter the courtroom with that misconception is too great to allow them to continue deliberating in the dark.

30. To ensure that capital juries do not rely upon their biases regarding hung juries during deliberations, jurors must either have their misperceptions corrected, or they must be examined for bias during voir dire. Because of the additional Eighth Amendment

problems with forcing jurors to deliberate using false information, this Court should declare Article 37.071(2)(a) unconstitutional with respect to its prohibition on informing the jury of the effects of a deadlock. The Court should protect the right to a fair and impartial jury by informing the jury that if they are unable to reach the minimum number of votes required to give an answer to any one of the special issues, they are permitted to return the ballot without any answer. In the event that the jury is unable to answer any of the three special issues, the court will sentence the defendant to life imprisonment as if he had been sentenced by the jury itself.

31. Should this Court not wish to protect the defendant's right to a fair and impartial jury by invalidating Article 37.071(2)(a), the Court must permit the attorneys to voir dire potential jurors to discover what they believe would happen in the event of a non-answer. *See* Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981)(holding that voir dire "plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored"). Not only is such questioning permitted by the Texas statute on the grounds that it would not involve informing prospective jurors of the actual consequences of a non-answer, but it is clearly in line with the central holding in Turner v. Murray that the risk of juror bias must be considered "in light of the ease with which that risk could have been minimized." Turner v. Murray, 476 U.S. 28, 36 (1986) (overruled in part on other grounds, affirmed in part). In Turner, the Court held that because of the complete finality of the death penalty, and the risk that racial prejudice would infect jury deliberations, the trial judge failed to protect the defendant's right to an impartial jury by not permitting the lawyers to question prospective jurors on their racial prejudice. *Id.* Similarly, because of the finality of the death penalty, and the risk that preconceived notions regarding the effects of a hung jury will improperly infiltrate jury deliberations, the right to an impartial jury must be protected at the very least by granting attorneys the right to question jurors about their beliefs. While defendants may not have an absolute right to voir dire potential jurors regarding their beliefs about deadlocked juries, when the legislature has barred all other means of bringing such biases to light and correcting them it becomes imperative that defendants be equipped with the tools to confront those who sit in judgment upon them.

32. In King v. Lynaugh, the Fifth Circuit sitting en banc reversed an earlier decision by a three judge panel which concluded that for Texas to deny a defendant the

15

opportunity to present information about parole eligibility is, therefore, to limit his decision to bring to the sentencer's consideration relevant information and circumstances that might cause the jury to decline capital punishment. King v. Lynaugh, 828 F.2d 257, 264 (5th Cir. 1987). In his dissent from the en banc ruling, Judge Rubin wrote: "It is precisely because Texas courts refuse to give accurate, corrective instructions that voir dire about potential jurors' understandings of parole law becomes necessary." King v. Lynaugh, 850 F.2d 1055, 1067 (5th Cir. 1988)(Rubin, Williams, Johnson, JJ. dissenting). An essential feature of the Court's holding in that case was that trial judges can use their discretion in determining how to restrict voir dire and fashion jury instructions, relying upon "immediate perceptions," Rosales-Lopez, 451 U.S. at 188-89, and the "demeanor" of the jury, Ristaino v. Ross, 424 U.S. 589, 595 (1976) (citation omitted). The present case is distinguishable from King, however, in that it is the legislature, and not the trial judge, that has decided not to issue accurate, corrective instructions to the jury regarding deadlock. Whereas the trial judge maintains the freedom to instruct the jury on parole or to allow the attorneys to voir dire the jury with regard to their beliefs on parole, the "10-12 Rule" expressly restricts the judge's discretionary powers with regard to instructing the jury on the law of deadlock. Thus, even if King is correct in instances in which it is the courts which make the decision to not give clarifying instructions, when the legislature makes such a decision as is the case here, it is the duty of the courts to protect the right to an impartial jury by providing additional safeguards through the process of voir dire. That duty derives from the unique advantages that the trial judge has over the legislature to ensure a fair and impartial jury on a case by case basis.

### The "10-12 Rule" Prevents the Defendant from Receiving Effective Assistance of Counsel

33. It is a fundamental principle in death penalty jurisprudence that "If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision." Gregg v. Georgia, 428 U.S. 153, 190 (Stewart, Powell, and Stevens, JJ.). This is so clear that the Fifth Circuit in Burley v. Cabana declared that it

16

was ineffective assistance of counsel in violation of the Sixth Amendment for the trial lawyer to not "inform the trial court of sentencing alternatives . . . ." Burley v. Cabana, 818 F.2d 414, 418 (5th Cir. 1987).

34. If it was ineffective assistance of counsel to not inform the judge of his sentencing alternatives, it would surely be ineffective assistance of counsel to not inform a sentencing jury of its sentencing alternatives. Yet this is precisely what the "10-12 Rule" forces trial counsel to do by preventing attorneys from informing the jury of the true state of the law. A reasonable defense attorney would surely inform each juror that not only is it that juror's right, but it is in fact that juror's duty, to individually weigh the evidence presented and make a determination for life or death on the basis of that individual's conscience. Such a statement would accurately describe the role of the capital juror, and would provide the jury with information materially relevant to their sentencing responsibilities. To prevent an attorney from informing the jury of the true state of the law when such information is essential to the capital juror's role is to prevent the attorney from providing the defendant with his right to adequate counsel. This is equally true in the event that counsel is prevented from conducting voir dire in order to intelligently utilize counsel's peremptory strikes to remove prospective jurors harboring devastating misunderstandings of the consequences of deadlock under the Texas death penalty.

### The "10-12 Rule" Has a Coercive Effect upon the Jury

35. "[T]he principle that jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration." Jenkins v. United States, 380 U.S. 445, 446 (1965)(quoting the Solicitor General's brief to the Court). In Jenkins, the Court declared that "in its context and under all the circumstances" the judge's statement to the jury that "'You have got to reach a decision in this case'" was coercive. Id. In United States v. United States Gypsum Co., the Court applied Jenkins in holding that reversal would have been appropriate "solely because of the risk that the foreman believed the court was insisting on a dispositive verdict." United States v. United States Gypsum Co., 438 U.S. 422, 462 (1978). In his concurrence with the Third Circuit's judgment in the case prior to the Supreme Court's ruling, Judge Adams concluded that when the jury foreman suggested to the trial judge that he knew the court wanted a verdict "one way or the other," the trial judge at that time "possessed the affirmative

obligation to make it clear to the foreman that the jury had the option of reaching no verdict, should juror unanimity prove impossible." <u>United States v. United States Gypsum Co.</u>, 550 F.2d. 115, 133 (3d Cir. 1977)(Adams, J. concurring).

36. Within the context of capital sentencing, and taking into consideration the circumstances required by the Texas statute, instructing the jury that they "shall" answer "yes" or "no" to the special issues presented to them acts as undue coercion. It has already been shown above that the Texas statute necessarily creates confusion in the minds of jurors, and might affirmatively mislead jurors to believe that a third alternative to life and death exists. Within the context of the demand that each issue must be answered, setting minimum votes for each answer has the effect of coercing holdouts for life or death to feel that the need to come to a verdict takes precedent over their conscientiously held belief. While this is unacceptable in all criminal trials, it is particularly unacceptable in capital sentencing proceedings.

37. In <u>Lowenfield</u>, the Court in a capital case upheld the use of a supplemental charge similar to an "Allen charge" that was intended to encourage the jury to come to a verdict. <u>Lowenfield</u>, 484 U.S. at 240-41. The Court acknowledged that although the traditional justification for such a charge—"the avoidance of the societal costs of a retrial"—did not exist, the State still had a strong interest in having the jury "'express the conscience of the community on the ultimate question of life or death.'" <u>Id.</u>, at 238 (citation omitted).

38. Under the Texas sentencing statute the societal cost justification for pressuring juries to return a verdict is similarly absent. Thus the only possible State interest that could balance against the strong State and private interests that jurors not be coerced, that defendants be tried by a fair and impartial jury, and that determinations of punishment be reliable and non-arbitrary is that capital juries are meant to speak the conscience of the community.

39. While it is true that capital juries are meant to represent the community, two reasons exist for why this value cannot outweigh the risk of coercion, bias, and arbitrariness that are created by not informing the jury that they have the option of not answering a question, and that the effect of a non-answer is a life sentence. First, in order for the jury to enter a verdict of death under the Texas scheme, all twelve members of the jury must agree on all three special issues. Thus, while the purpose of the jury is to express the collective conscience of the community, just as each community is made up

of individuals each jury is made up of individuals. What we are really looking for is not a jury that as a unit is asked to speak the singular voice of the community, but rather we are asking twelve representative individuals to each speak his or her own voice, and through that we hope to discern the collective conscience of the community.[6] It is a mistake, therefore, to consider that the State's interest in having the jury speak the conscience of the community conflicts with the State's interests in not coercing the jury, providing a fair and impartial jury, and limiting the risk for arbitrary and unreliable decisions. Those interests are one and the same, for if any member of the jury feels undue pressure to change his vote in order for the jury to come to a verdict, the State's interest in having the jury speak the conscience of the community is frustrated. It is only when each member of the jury is left entirely free to weigh the evidence presented, is permitted to unilaterally introduce and consider mitigation, and is fully informed of the individual, awesome responsibility that he or she bears in making this decision between life and death that the conscience of the community will be expressed. The Court must allow for the very real possibility that a non-verdict is itself an expression of the community's truly divided conscience with respect to the issue of whether an individual should live or die.

40. Secondly, even if the State's interest in a verdict does stand in opposition to the other interests that the State and the individual defendant might hold, the entire body of capital punishment jurisprudence speaks to the overriding nature of our need to protect against unwarranted impositions of death. The State always has an interest in reaching a verdict and having the jury speak the voice of the community. That interest has not been allowed to supercede the defendant's right to a fair and impartial jury, to not be subjected to cruel and unusual punishment, or to not receive the equal protection of the law.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully requests that: (1) the Court declare Tex. Code Crim. Proc. art.s 37.071(2)(d)(2), 37.071(2)(f)(2), and 37.071(2)(a)

---

[6] This statement of representativeness should not be taken to be an admission that capital juries are representative of the community. The process of death qualification leads to the removal for cause of conscientious objectors to the death penalty despite the fact that they are no less members of the community than anyone else, as well as individuals with qualms about the death penalty who are stricken through the use of peremptory challenges. Numerous studies have shown that those individuals who remain are more prone to support the death penalty than the average member of society, and are also more likely to convict the defendant either because of their personal beliefs, or because the extremely time-intensive process of death qualification focuses jurors not upon the guilt or innocence of the defendant, but rather upon what penalty he deserves once his guilt has been reached.

unconstitutional; (2) the Court instruct the jury that in the event that they are unable to answer any issue presented to them they are to return the ballot without said answer, and that a life sentence will be imposed upon the defendant pursuant to state law; and in the alternative (3) the Court permit the attorneys to voir dire prospective jurors to discover whether they harbor any preconceived notions regarding the consequences of a deadlock that will prevent them from accurately and reliably weighing the evidence presented at sentencing.

Respectfully submitted,

Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of _____ June _____, 2007.

Steven R. Miears

CAUSE NUMBER 380-82629-06

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

<u>ORDER OF THE COURT ON THE DEFENDANT'S</u>
<u>MOTION TO DECLARE THE "10-12 RULE" UNCONSTITUTIONAL</u>
Constitutional Motion Number 21

BE IT REMEMBERED, that on the _____day of _____, 2007, came

to be considered the above motion. After consideration of the motion, it is the opinion of the

court that Defendant's motion be:

GRANTED _____

DENIED _____, to which action the Defendant excepts.


_____
Judge Presiding

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

<u>MOTION TO FIND THAT TEX. CODE CRIM. PROC.</u>
<u>ART. 37.071 Sec. 2 (2)(b)(1) IS UNCONSTITUTIONAL</u>
("Future Danger" Issue)
Constitutional Motion Number 22

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant in the above cause,

by and through counsel and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States

Constitution and Article 1, Sections 3, 10, 13 and 19 of the Texas Constitution and moves the

Court to find that Tex. Code Crim. Proc. art. 37.071 , Sec. 2 (2)(b)(1) is unconstitutional. In

support thereof, Movant would show the Court the following:

1. The Defendant has been indicted for the offense of capital murder.

2. The State is seeking the death penalty. The Eight Amendment requires a greater

degree of accuracy and fact finding than would be true in a non-capital case. *Gilmore v. Taylor*,

508 U.S. 333, 113 S. Ct. 2112, 124 L. Ed. 2d 306 (1993); *Woodson v. North Carolina*, 428 U.S.

280, 305 (1976).

3. Tex. Code Crim. Proc. art. 37.071 Sec. 2 (b)(2)(1) provides that the jury determining

the punishment for one found guilty of capital murder shall set punishment by answering two, or

perhaps three, special issues. The issue that is commonly referred to as the "future danger"

special issue asks the jury to determine, beyond a reasonable doubt the following: "whether

there is a probability that the defendant would commit criminal acts of violence that would

constitute a continuing threat to society"

4. Because the future dangerousness special issue increases the punishment for capital murder beyond the prescribed statutory maximum, the issue acts as the functional equivalent of a traditional element of the crime that has to be proven to a jury beyond a reasonable doubt. Texas Penal Code § 19.03 provides that the offense of capital murder is a "capital felony." Texas Penal Code § 12.31(a) provides that: "[a]n individual adjudged guilty of a capital felony in a case in which the state seeks the death penalty shall be punished by [life] imprisonment . . . or by death."

5. A Texas judge can impose the death penalty only if the jury first makes statutorily required findings on one or two special issues and then returns a negative answer to the mitigation special issue. Tex. Code Crim. Proc. requires that the jurors are charged as follows:

(c) The state must prove each issue submitted under Subsection (b) of this article beyond a reasonable doubt, and the jury shall return a special verdict of "yes" or "no" on each issue submitted under Subsection (b) of this Article.

(d) The court shall charge the jury that:

. . . (2) it may not answer any issue submitted under Subsection (b) of this article "yes" unless it agrees unanimously and it may not answer any issue "no" unless 10 or more jurors agree.

(e)(1) The court shall instruct the jury that if the jury returns an affirmative answer to each issue submitted under Subsection (b) of this article, it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

. . .

(f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:

(1) shall answer the issue "yes" or "no";

(2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree;

(g) If the jury returns an affirmative finding on each issue submitted under Subsection (b) of this article and a negative finding on an issue submitted under Subsection (e) of this article, the court shall sentence the defendant to death. If the jury returns a negative finding on any issue submitted under Subsection (b) of this article or an affirmative finding on an issue submitted under Subsection (e) of this article or is unable to answer any issue submitted under Subsection (b) or (e) of this article, the court shall sentence the defendant to confinement in the institutional division of the Texas Department of Criminal Justice for life.

Tex. Code Crim. Proc. art. 37.071 § 2(b) - (g).

6. Like the defendant convicted of first-degree murder in *Ring v. Arizona,* 122 S. Ct. 2428 (2002), a defendant convicted of a capital felony in Texas cannot receive a sentence of death unless a sentencing jury first makes an affirmative finding on the aggravating future dangerousness special issue (and then answers "no" to the mitigation special issue). In the absence of a finding of future dangerousness, the maximum sentence to which a Texas capital defendant is exposed is life imprisonment, not the death penalty. As was made clear in *Blakely v. Washington,* 124 S. Ct. 2531 (2004) made clear, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Blakely*, 124 S. Ct at 2537 (emphasis in original).

7. The Texas Court of Criminal appeals has incorrectly said that *Apprendi v. New Jersey,* 530 U.S. 466 (2000) and *Blakely* do not apply in Texas and their rationale is unreasonably wrong. Its alternative holding in *Rayford v. State*, 125 S.W.3d 521, 533-34 (Tex. Crim. App. 2003) blithely dispenses with the constitutional challenge by relying on cases that predate *Apprendi*'s groundbreaking decision by many years. *See Rayford*, 125 S.W.3d at 534 (relying on *Robison v. State*, 888 S.W.2d 473, 481 (Tex. Crim. App. 1994)); App. 1 at 1 (relying on *Sosa v. State*, 769 S.W.2d 909, 917 (Tex. Crim. App. 1989)).

It is apparent that the Court of Criminal Appeals is unwilling to grapple with the serious

constitutional implications of *Apprendi*, *Ring*, and *Blakely* on the Texas capital sentencing scheme.

8. The Texas capital sentencing scheme's future dangerousness special issue violates the reasonable doubtstandard of *Apprendi* because both *Apprendi* and *Blakely* do in fact apply in Texas. As *Blakely* made clear, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose ***without*** any additional findings." *Blakely*, 124 S. Ct at 2537 (emphasis in original). *Blakely's* straightforward and unambiguous definition of *Apprendi's* "prescribed statutory maximum" language leaves no doubt that *Apprendi* applies to the Texas capital sentencing scheme's future dangerousness special issue. Because the determination of future dangerousness is a fact that, if found, exposes the defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone, the future dangerousness special issue must be found by a jury beyond a reasonable doubt. The only question for this Court, then, is whether the term "probability" found in the future dangerousness inquiry unconstitutionally lowers the reasonable doubt standard in violation of *Apprendi*.

"When a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as a tail which wags the dog of the substantive offense." *Apprendi*, 530 U.S. at 495 (internal quotation marks and citation omitted). *Apprendi's* fear of such a wag-the-dog scenario is realized here. Because the term "probability" in the future dangerousness special issue swallows the reasonable doubt standard, this aggravating factor acts as a tail that wags the dog of the substantive offense of capital murder.

*Apprendi*, *Ring*, and *Blakely* create, in effect, a new offense of aggravated capital murder

in Texas. As Justice Thomas noted in his *Apprendi* concurrence, "if the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact . . . the core crime and the aggravating fact together constitute an aggravated crime . . . . The aggravating fact is an element of the aggravated crime." 530 U.S. at 501 (Thomas, J., concurring). The aggravating factor of future dangerousness found in the Texas capital sentencing scheme now attains the status of an element of the crime of <u>aggravated capital murder</u>. Together with the traditional elements of the offense of capital murder found in Texas Penal Code § 19.03, the future dangerousness aggravating factor must be found by a jury beyond a reasonable doubt before the statutory maximum punishment, death, may be imposed.

9. The term "probability" in the future dangerousness special issue impermissibly dilutes the reasonable doubt standard. At a sentencing stage, a capital jury will have to answer the "future dangerousness" inquiry: Do you find from the evidence beyond a reasonable doubt <u>that there is a probability</u> the defendant <u>would</u> (not "will" which further dilutes the reasonable doubt standard) commit criminal acts of violence that would constitute a continuing threat to society? *See* Tex. Crim. Proc. Code art. 37.071 § 2(b)(1). The term "probability" wreaks havoc on the reasonable doubt standard. Its appearance in conjunction with the reasonable doubt standard relieves the State of its constitutional burden to prove every element of the offense beyond a reasonable doubt. The term eviscerates the reasonable doubt standard, rendering it a nullity or, at best, a preponderance of the evidence standard. In addition, the term undermines the vital role the reasonable doubt standard plays in reducing the risk of erroneous factual determinations.

Placing competing burdens of proof in such close proximity to each other can produce only confusion and frustration in jurors' minds as they grapple with the incomprehensible concept of proof of a probability beyond a reasonable doubt. This Court recognized in *Boyde v.*

*California*, 494 U.S. 370 (1990), that:

> Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id.* at 380-81. The concept of "probability beyond a reasonable doubt" was described as

"execrable and absurd" by Judge Roberts in *Horne v. State*, 607 S.W.2d 556, 565 (Tex. Crim.

App. 1980). When average lay jurors are faced with an illogical instruction like the one

mandated by Tex. Code Crim. Proc. art. 37.071 the commonsense understanding most likely to

prevail in their minds would focus on the more familiar concept of "probability," to the detriment

of a less familiar, legal term of art like "reasonable doubt." Jurors would quickly abandon any

"technical hairsplitting" once they realized the futility of attempting to determine what quantum

of evidence would constitute proof of a future event's probability beyond a reasonable doubt.

Jurors will be no more successful at deciphering the "execrable and absurd" than was Judge

Roberts in *Horne*.

Merely having the phrase "beyond a reasonable doubt" in the jury instructions to describe

the burden of proof on the future dangerousness special issue neither adequately safeguards a

defendant's Fourteenth Amendment due process rights nor advances the vital interests served by

the reasonable doubt standard. If such an incantation were sufficient to protect the reasonable

doubt standard from infection by the term "probability," then *Cage* error would not exist. In

*Cage v. Louisiana*, the Court held that jury instructions improperly defining the phrase "beyond a

reasonable doubt" unconstitutionally diluted the reasonable doubt standard. 498 U.S. 39, 41

(1990) (*per curiam*) (overruled on other grounds). The critical inquiry is not whether the phrase

"beyond a reasonable doubt" appears in the instructions. Instead, it is whether the reasonable

doubt standard has been tainted by other instructions that may allow the jury to find an element of the crime based on a burden of proof that is below that required by the Due Process Clause. *Id.* It would not satisfy the Due Process Clause if the instructions on one of the elements of robbery required the jury to find "from the evidence beyond a reasonable doubt that the defendant ***probably*** inflicted serious bodily injury or threatened another with immediate serious bodily injury." Such an instruction unconstitutionally diminishes the reasonable doubt standard. This Court should conclude no differently about an instruction that allows a jury to find the future dangerousness aggravating element of the "new" enhanced crime of death-eligible capital murder based on the same diminished burden of proof.

*Black's Law Dictionary*, 1081 (5th ed. 1979) defines the term "probability" as "likelihood; [a] condition or state created when there is more evidence in favor of the existence of a general proposition than there is against it." A lay dictionary defines the term "probability" as "the quality or state or being probable," with "probable" being defined as "supported by evidence strong enough to establish a presumption but not proof." There is, however, also another definition of the word with a much different – but commonly understood – meaning: "the chance that a given event will occur." Merriam- Webster's Collegiate Dictionary 928 (10th ed. 1993); *see Hughes v. State*, 878 S.W.2d 142, 148 (Tex. Crim. App. 1992) (setting out similar legal and lay definitions of the word "probability").

On first impression, a juror seeing the term "probability" in the future dangerousness special issue might equate its meaning with the legal definition or the first lay definition: a "more likely than not" burden that closely resembles the preponderance of the evidence standard. However, upon closer inspection, a juror would discard this definition in favor of the "chance" definition. The reason a juror would settle on this commonsense definition is straightforward:

Read in context, the Texas special issue asks the juror to predict whether a future event will occur. The juror is being asked if there is "any" chance that the defendant will commit criminal acts of violence that would constitute a continuing threat to society, whether that chance is 1 in 100, 51 in 100, or 80 in 100. The special issue does not ask the juror to answer "yes" to the special issue only if it is "more likely than not" that the defendant will pose a future danger.

Because the future dangerousness special issue is not concerned with whether the odds of future danger are great or negligible, a juror would answer the issue affirmatively as long as some measurable percentage existed. Just as bookies calculate the odds of winning for each horse entered in a race, from the long-shots to the favorites, or weather forecasters predict the chance of rain, jurors use their commonsense understanding of probability to conclude that nearly every criminal defendant – especially one recently found guilty of every traditional element of the offense of capital murder – possesses "some" chance of committing future acts of violence that would threaten society.

*Hughes v. State*, 878 S.W.2d 142, 146-48 (Tex. Crim. App. 1992), and *Robison v. State*, 888 S.W.2d 473, 481-82 (Tex. Crim. App. 1994), rejected understandings of the term "probability" based on "any percent possibility" rather than "likelihood" or "good chance." In *Hughes*, the Court of Criminal Appeals noted that "the second special issue calls for proof of more than a bare chance of future violence. Requiring more than a mere possibility that the defendant would commit criminal acts of violence and would constitute a continuing threat to society prevents the freakish and wanton assessment of the death penalty." 878 S.W.2d at 148. In *Robison*, the Court of Criminal Appeals found the "horse race" analogy inapt:

> Appellant argues that the term "probability" could mean one in a hundred. As an analogy, he alludes to a horse race, where a horse with such odds will be wagered on, there being a "probability" the horse could win. However, appellant's analogy fails to recognize the reason the bettor wages is based much on the potential payout of a win

when compared with the "chance" the horse will win. It is "probable" the horse will not win, however, because of the odds it is worth the gamble.

888 S.W.2d at 481.

The lower court's reasoning in these cases predating *Apprendi* cannot possibly serve as the foundation for dispensing with *Apprendi* challenges. Moreover, the lower court's rejection of the "odds or chances" definition of the term "probability" fails to consider two additional factors. First, it ignores the commonsense definition of the term that jurors will adopt when they are asked to predict whether a future event *will* occur, rather than determine whether an alleged historical event *did* occur. In the latter case, jurors will equate "probability" with the "more likely than not" understanding of the term. Compounding the problem, no statutory definition of the term exists, and the Court of Criminal Appeals has repeatedly held that the trial court does not err in refusing to instruct the jury as to the definition of the term. *See, e.g., Hughes,* 878 S.W.2d at 178; *Earhart v. State,* 823 S.W.2d 607, 632 (Tex. Crim. App. 1991); *Caldwell v. State,* 818 S.W.2d 790, 797 (Tex. Crim. App. 1991). The Court of Criminal Appeals (and prosecutors and defense attorneys in Texas) may understand that the term "probability" means more than a mere possibility, but most jurors do not.

The second factor that the lower court's definition of the term "probability" cannot account for is the incredibly high error rate by Texas capital juries in predicting future dangerousness. Even with the assistance of psychiatrists and other mental health experts, juries affirmatively answering the future dangerousness special issue get it wrong 95% of the time. *See* Texas Defender Service, *Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness* (2004), at www.texasdefender.org/publication.htm. Jurors' use of an "odds or chance" definition of the term "probability" may provide one explanation for this astonishing error rate. Because nearly everyone, from Charles Manson to the Pope, has

some chance, however slight, of committing future violence, juries are answering "yes" to the special issue based on a quantum of proof well below a "more likely than not" standard.

Regardless of which definition of the term "probability" that jurors in Texas are using to answer the future dangerousness special issue, there can be no question that they are employing a less onerous burden of proof than the reasonable doubt standard. Such a diluted reasonable doubt standard can no longer serve as "the prime instrument for reducing the risk of convictions resting on factual error." *In re Winship*, 397 U.S. 358, 363 (1970). When a jury's finding of future dangerousness based on a mere preponderance standard – or less – authorizes an increase in the maximum punishment for capital murder, it is appropriately characterized as "a tail which wags the dog of the substantive offense." *Apprendi*, 530 U.S. at 495 (internal quotation marks and citation omitted).

10. The jurors are further encouraged to speculate (thus reducing the state's burden) by the use of the phrase "would commit criminal acts of violence" in the instruction rather than the phrase "will commit criminal acts of violence". The jurors are then encouraged to speculate that "anyone who would commit the capital murder for which we have found this defendant guilty, probably would commit criminal acts of violence".

11. The Texas Court of Criminal Appeals has approved this form of speculative decision making in holding that a verdict on the future dangerousness issue can be supported by the facts of the crime alone. *Kunkle v. State*, 771 S.W.2d 435, 449 (Tex. Crim. App. 1986) and *Willingham v. State*, 897 S.W.2d 351, 356 (Tex. Crim. App. 1995). The state has <u>no burden</u> to prove that the defendant is a future danger. The Texas legislature has created the crime of aggravated capital murder for which death is a possible punishment. Through its devious use of the English language and the failure of the Court of Criminal Appeals to provide any effective

appellate review of the jury's verdict, an essential element of the offense of aggravated capital murder is won by the state by default, not beyond a reasonable doubt as is required by the 8th Amendment to the United States Constitution.

WHEREFORE PREMISES CONSIDERED, Defendant prays that he be granted a hearing on this motion and that upon hearing this court find that:

(1)  Tex. Code Crim. Proc. art. 37.071 Sec. 2 (2)(b)(1), the language that embodies the "future danger issue",  fails to require that this element of the capital crime with which the Accused is charged, to be proven by the State  beyond a reasonable doubt;

(2) that this, and any other portion of Tex. Code Crim. Proc. that is found to offend the provisions of the United States Constitution be found to be unconstitutional; and

(3) that as a result thereof, death must be precluded as a sentencing option in this case.

Respectfully submitted,

Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone:  903-640-4963
Telefax:  903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has

been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of

_____, 2007.

Steven R. Miears

CAUSE NUMBER 380-82629-06

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

<u>ORDER OF THE COURT ON THE DEFENDANT'S</u>
<u>MOTION TO FIND THAT TEX. CODE CRIM. PROC.</u>
<u>ART. 37.071 Sec. 2 (2)(b)(1) IS UNCONSTITUTIONAL</u>
("Future Danger" Issue)
Constitutional Motion Number 22

BE IT REMEMBERED, that on the _____ day of _____, 2007, came

to be considered the above motion. After consideration of the motion, it is the opinion of the

court that Defendant's motion be:

GRANTED _____

DENIED _____, to which action the Defendant excepts.

_____
Judge Presiding

979

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

## MOTION TO HOLD UNCONSTITUTIONAL TEX. CODE CRIM. PROC. ART. 37.071 SEC. 2(e) AND (f) - FAILURE TO REQUIRE MITIGATION BE CONSIDERED
### Constitutional Motion Number 23

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant herein, by counsel, and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution, Article 1, Sections 3, 10, 13, 19 and 29 and TEX. CODE CRIM. PROC. ANN. art. 1.05, 1.06 and 1.09 and by and through his attorneys of record makes this his Motion to Hold Unconstitutional TEX. CODE CRIM. PROC. art. 37.071 Sec. 2(e) and (f) - Failure to Require Mitigation be Considered, and as grounds therefore would show the Court as follows:

1. Article 37.071 Sec. 2(e) and (f), submitted to a jury upon conviction of capital murder reads as follows:

> (e) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

> (f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:

>> (1) shall answer the issue "yes" or "no";

>> (2) may not answer the issue "no" unless it agrees

FILED
2007 JUN 22 PM 07
HANNAH KUNKLE
DISTRICT CLERK
COLLIN COUNTY, TEXAS
BY _____ DEPUTY

unanimously and may not answer the issue "yes" unless 10
or more jurors agree.

2. This statute is unconstitutional because it fails to <u>require</u> that mitigation be considered. A juror is required to consider and give effect to all mitigation. After the juror has <u>considered</u> the mitigation, it is then up to the juror to determine what effect to give the mitigation. Failure to mandate consideration of mitigating evidence makes this statute unconstitutional in violation of the Eighth Amendment. *Penry v. Johnson*, 532 U.S. 782 (2001).

3. Capital murder statutes that have survived constitutional scrutiny all require that the jury be told that it must consider all mitigating evidence. *E.g., Johnson v. Texas*, 113 S. Ct. 2658 (1993); *Boyde v. California*, 494 U.S. 370 (1990); *Blystone v. Pennsylvania*, 494 U.S. 299 (1990).

WHEREFORE, PREMISES CONSIDERED, Defendant prays this Court will find Article 37.071 Sec. 2(e) and (f) unconstitutional, and for such other relief as Defendant may be entitled.

Respectfully submitted,

Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has

been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of

_____ June _____, 2007.

_____
Steven R. Miears

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

### ORDER OF THE COURT ON THE DEFENDANT'S MOTION TO HOLD UNCONSTITUTIONAL TEX. CODE CRIM. PROC. ART. 37.071 SEC. 2(e) AND (f) - FAILURE TO REQUIRE MITIGATION BE CONSIDERED
Constitutional Motion Number 23

BE IT REMEMBERED, that on the _____ day of _____, 2007, came

to be considered the above motion. After consideration of the motion, it is the opinion of the

court that Defendant's motion be:

GRANTED _____

DENIED _____, to which action the Defendant excepts.


_____
Judge Presiding

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

### MOTION TO DECLARE ARTICLE 37.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE UNCONSTITUTIONAL DUE TO UNRELIABILITY
### Constitutional Motion Number 24

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant in the above-entitled and numbered criminal action, files this motion to declare Article 37.071 of the Texas Code of Criminal Procedure unconstitutional due to unreliability. In support, the defendant will show the court the following.

### Background

The Defendant has been indicted by the Collin County Grand Jury for the offense of capital murder. The State is seeking the death penalty. The Eight Amendment requires a greater degree of accuracy and fact finding than would be true in a noncapital case. *Gilmore v. Taylor,* 508 U.S. 333, 113 S.Ct. 2112, 124 L. Ed.2d 306 (1993) and *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976). Article 37.071 of the Texas Code of Criminal Procedure sets out the framework for the trial of this criminal action.

### Analysis

The Eighth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, precludes the imposition of excessive or cruel and unusual punishment. Furthermore, the Eighth Amendment requires a greater degree of accuracy and fact-finding than would be true in a noncapital case. Gilmore v. Taylor, 508 U.S. 333 (1993);

Woodson v. North Carolina, 428 U.S. 280, 305 (1976). The Eighth Amendment's prohibitions must be interpreted in light of "evolving standards of decency." Atkins v. Virginia, 536 U.S. 304 (2002). Furthermore, it is settled law that the broad guarantee of "due process" must be interpreted in light of evolving standards of fairness and ordered liberty. See, e.g., Planned Parenthood v. Casey, 505 U.S. 833, 846-851 (1992); Rochin v. California, 342 U.S. 165, 171-172 (1952) (overruled on other grounds). A death sentence is unconstitutional if wantonly or freakishly imposed. Ellason v. State, 815 S.W.2d 656 (Tex. Crim. App. 1991).

Article 37.071 of the Texas Code of Criminal Procedure, for the reasons discussed herein, sets out a sentencing scheme that (1) is incomprehensible to the jury in violation of the guarantees of due process contained in the Fifth Amendment to the United States Constitution and made applicable to the states by the Fourteenth Amendment of the United States Constitution; (2) fails to narrow adequately the class of persons eligible for the death penalty in violation of the Eighth Amendment to the United States Constitution that bans the imposition of cruel and unusual punishment; (3) arbitrarily allows for the introduction of non-statutory aggravating offenses (extraneous, unadjudicated offenses) utilizing relaxed standards and procedures all in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution; (4) fails to require that the indictment allege all of the elements of a capital offense when the state is seeking the death penalty in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution; and (5) allows the jury to consider those non-statutory aggravating offenses that permit the arbitrary and capricious imposition of a sentence of death.

The Texas Death Penalty Statute, TEX. CODE CRIM. PROC. art. 37.071, arguably serves

2

deterrent and retributive functions, or so the Texas Legislature could reasonably have concluded when it passed the legislation reinstating the death penalty in Texas. But despite the important goals, and undoubted popularity, of the death penalty, courts have always been queasy about the possibility that an innocent person, mistakenly convicted and sentenced to death under such a statute, might be executed before he could vindicate his innocence -- an event difficult to square with basic constitutional guarantees, let alone simple justice. As Justice O'Connor, concurring along with Justice Kennedy in Herrera v. Collins, 506 U.S. 390 (1993), stated: "I cannot disagree with the fundamental legal principle that executing the innocent is inconsistent with the Constitution. Regardless of the verbal formula employed – 'contrary to contemporary standards of decency,' 'shocking to the conscience,' or offensive to a 'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental' – the execution of a legally and factually innocent person would be a constitutionally intolerable event." 506 U.S. at 419 (citations omitted).[1] 506 U.S. at 417. It is clear that a majority of the Court in Herrera believed that executing the innocent is forbidden by the Constitution. See 506 U.S. 390, 420 (1993) (O'Connor, J., joined by Kennedy, J., concurring); 506 U.S. at 430 (Blackmun, J., joined by Stevens, J., Souter, J., dissenting).

---

[1] The holding of Herrera was as follows:

We assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high. The showing made by the petitioner in this case falls short of any such threshold.

935

To the majority in Herrera, however, as to most judges and legislators at the time (1993), the possibility that an innocent person might be executed pursuant to a death penalty statute seemed remote. Thus, Chief Justice Rehnquist, writing for the Court in Herrera, discounted as potentially unreliable a study that had concluded that 23 innocent persons were executed in the United States between 1900 and 1987. See Herrera, 506 U.S. at n.15. While recognizing that no system of justice is infallible, the majority in Herrera implicitly assumed that the high standard of proof and numerous procedural protections required in criminal cases, coupled with judicial review, post-conviction remedies, and, when all else failed, the possibility of executive clemency, rendered it highly unlikely that an executed person would subsequently be discovered to be innocent.

That assumption no longer seems tenable. In just the few years since Herrera, evidence has emerged that clearly indicates that, despite all the aforementioned safeguards, innocent people -- mostly of color -- are convicted of capital crimes they never committed, their convictions affirmed, and their collateral remedies denied, with a frequency far greater than previously supposed.

Most striking are the results obtained through the use of post-conviction testing with deoxyribonucleic acid ("DNA"). Although DNA testing is of remarkably high reliability,[2] its value as a forensic tool in criminal investigations was not demonstrated until 1985[3] and its use in re-evaluating prior convictions was only beginning at the time Herrera was decided in 1993.[4]

---

[2]See, e.g., National Institute of Justice, Office of Justice Programs, U.S. Department of Justice, The Future of Forensic DNA Testing (2000) at 6.

[3]See id. at 1, 13.

[4]

See Development in the Law - Confronting the New Challenges of Scientific Evidence, 108

Yet in just the few years since then, DNA testing has established the factual innocence of no fewer than 12 inmates on death row, some of whom came within days of being executed and all of whom have now been released.[5] This fact alone strongly suggests that more than a few people have been executed in recent decades whose innocence, otherwise unapparent to either the executive or judicial branches, would have been conclusively established by DNA testing if it had been available in their cases.

The problem, however, goes well beyond the issue of the availability of DNA testing. Indeed, the success of DNA testing in uncovering the innocence of death row defendants has itself helped spark reinvestigation of numerous other capital cases as to which DNA testing is unavailable or irrelevant but as to which other techniques can be applied. Partly as a result, in just the past decade, at least 20 additional defendants who had been duly convicted of capital crimes and were facing execution have been exonerated and released. In fact, the Governor of the State of Illinois, George Ryan, recognized the flawed death penalty system in his state and the fact that innocent persons were sentenced to die and commuted the death sentences of all persons on Illinois' death row. Again, the inference is unmistakable that numerous innocent people have been executed whose innocence might otherwise have been similarly established, whether by newly-developed scientific techniques, newly-discovered evidence, or simply renewed attention to their cases.

Moreover, even the frequency of these recent exonerations resulting from DNA testing and from fresh attention to neglected cases hardly captures either the magnitude of the problem or how little it was recognized until recently. It was not until the year 2000, for example, that

---

Harv. L. Rev. 1557, 1573-78 (1995)

[5]See http://www.deathpenaltyinfo.org/innoccases.

933

Professor James S. Liebman and his colleagues at Columbia Law School released the results of the first comprehensive study ever undertaken of modern American capital appeals (4,578 appeals between 1973 and 1995). That study, though based only on those errors judicially identified on appeal, concluded that "the overall rate of prejudicial error in the American capital punishment system" is a remarkable 68%. James S. Liebman, et al., A Broken System: Error Rates in Capital Cases (2000) at ii. No system so "persistently and systematically fraught with error," id., can warrant the kind of reliance that would justify removing the possibility of future exoneration by imposing death.

Just as there is typically no statute of limitations for first-degree murder -- for the obvious reason that it would be intolerable to let a cold-blooded murderer escape justice through the mere passage of time -- so too one may ask whether it is tolerable to put a time limit on when someone wrongly convicted of murder must prove his innocence or face extinction. In constitutional terms, the issue is whether -- now that we know the fallibility of our system in capital cases -- capital punishment is unconstitutional because it creates an undue risk that a meaningful number of innocent persons, by being put to death before the emergence of the techniques or evidence that will establish their innocence, are thereby effectively deprived of the opportunity to prove their innocence -- and thus deprived of the process that is reasonably due them in these circumstances under the Fourteenth Amendment's due process clause.[6]

The issue -- not addressed by Supreme Court[7] or the Court of Criminal Appeals -- boils

---

[6]In Herrera, the concurring and dissenting justices (a majority of the court) in describing the execution of the innocent as a constitutionally intolerable event, used terms like "shock the conscience," suggesting that they view it as a denial of substantive due process.

[7]The Supreme Court did not reach the issue raised herein in Herrera. 506 U.S. at 408, n.6 (declining to reach any issue of substantive due process).

939

down to this. We now know, in a way almost unthinkable even a decade ago, that our system of criminal justice, for all its protections, is sufficiently fallible that innocent people are convicted of capital crimes with some frequency. Fortunately, as DNA testing illustrates, scientific developments and other innovative measures (including some not yet even known) may enable us not only to prevent future mistakes but also to rectify past ones by releasing wrongfully-convicted persons -- but only if such persons are still alive to be released. If, instead, we sanction execution, with full recognition that the probable result will be the state-sponsored death of a meaningful number of innocent people, have we not thereby deprived these people of the process that is their due? Unless we accept -- as seemingly a majority of the Supreme Court in Herrera was unwilling to accept -- that considerations of deterrence and retribution can constitutionally justify the knowing execution of innocent persons, the answer must be that the Texas death penalty statute is unconstitutional.

Because protection of innocent people from state-sponsored execution is a protected liberty, and because such protected liberty includes the right of an innocent person not to be deprived, by execution, of the opportunity to demonstrate his innocence, the State of Texas may not override such liberty absent a far more clear and compelling need than any presented here. United States v. Quinones, 196 F. Supp. 2d 416 (S.D.N.Y. 2002) (rev'd by 313 F.3d 49 (2d Cir. 2002)). This court can not have the necessary high degree of confidence in any verdict returned under this system because of the fallible nature of the Texas death penalty scheme.

Specifically, the system fails to codify a Juror Bill of rights that would insure that a juror who wanted to vote for life would be free from harassment from pro-death jurors; allows the "death qualification" process of the venire in a capital case to result in a jury that is more

7

conservative, is more inclined to view death as the appropriate "default" option, more inclined to shift the burden to the defendant that life is the appropriate sentence and is less receptive to issues that are raised by the defense; includes rule that says that 10 jurors must agree to return a verdict of life when the law requires only one (1) juror for a life vote. The law says that an inability to agree on any of the issues results in a life sentence, not a hung jury. Jurors are not told this, in fact they are intentionally misled. Further, the Texas death penalty system allows the state to sponsor testimony from supposed professionals who provide clinical opinions as to the probability that the defendant will commit criminal acts of violence that will constitute a continuing threat to society. There is no science that supports a psychiatrist's ability to make long term clinical predictions of violent conduct in a prison setting. The Texas system also allows the judiciary to completely abandon its role as gate keeper in keeping out evidence that is scientifically unreliable; fails to ban the execution of juveniles while at the same time prohibiting someone of the same age from consuming alcohol or smoking cigarettes on the basis that they are not mature enough to make the proper decision; fails to ban the execution of juveniles when the pre-frontal cortex of the brain of a juvenile may be no better developed than one who suffers from mental retardation; fails to require that, prior to execution, there be some finding that defendant has, in fact, been a continuing threat to prison society and that unless executed he will be a continuing threat to society and that no mitigating circumstances have arisen that would justify death (even if an individual is guilty of a heinous crime, that person may have been redeemed and no longer be the "same person" when he is killed by the state); fails to adequately provide definitions for terms: probability, society, future, and continuing threat, resulting in a jury whose discretion is unguided; allows the state to introduce evidence of extraneous,

8

unadjudicated offenses (non-statutory mitigators) during the penalty phase of a capital trial; fails

to require that the state prove beyond a reasonable doubt all of the elements of the alleged

unadjudicated offenses and fails to require that judge instruct the jurors that, as to each offense,

they must find the offense was committed beyond a reasonable doubt; fails to allege

unadjudicated offenses in the indictment returned against the accused; fails to allege in the

indictment returned against the accused that there is a probability that he will commit criminal

acts of violence that will constitute a continuing threat to society; fails to allege in the indictment

returned against the accused that there is an absence of a circumstance that would justify a

sentence of life; fails to require that the state has the burden, beyond a reasonable doubt, to

negate the existence of a mitigating circumstance that would justify a life sentence; fails to

require that the accused be given reasonable notice of all prior unadjudicated offenses that the

state will offer during the penalty phase of the trial; allows introduction of victim impact

evidence during the penalty phase of a capital trial, which severely prejudices the defendant and

encourages the jurors to seek revenge in their sentencing; fails to allow an accused in a capital

case to have the same right of discovery that is allowed a litigant in a civil case; fails to require in

a capital case that the any extraneous defense be proven beyond a reasonable doubt and by

special issue as to each alleged offense; fails to require proportionality review of death sentences;

makes one who attempts to aid another in the commission of a capital crime eligible for the death

penalty and does not require the state to allege the actual role of the accused as a party to the

offense; fails to place the burden on the state that they must negate the existence of any

mitigating circumstance beyond a reasonable doubt; fails to provide that a defendant in a capital

case is entitled to every benefit to which a defendant in a non-capital case is entitled; fails to

insure that the jury and grand jury that hears evidence properly reflects a cross section of the

community in which the defendant is tried; and fails to adequately compensate jurors so that a

fair cross section of jurors can afford to sit and hear evidence for the length of time that is

required to decide if this accused person lives or dies.

## Conclusion

The system that determines who should die in Texas is truly "broken." The Court should

find that Article 37.071 of the Texas Code of Criminal Procedure violates the protections

afforded to the defendant by the Eighth and Fourteenth Amendments to the United States

Constitution as well as the Texas Constitution, that the option to sentence the defendant to die

should be precluded as a sentencing option, and grant any other relief to which the defendant is

justly entitled.

Respectfully submitted,

Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the 22 day of _____ June _____, 2007.

_____
Steven R. Miears

994

CAUSE NUMBER 380-82629-06

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

ORDER OF THE COURT ON THE DEFENDANT'S MOTION TO DECLARE ARTICLE
37.071 OF THE TEXAS CODE OF CRIMINAL
PROCEDURE UNCONSTITUTIONAL DUE TO UNRELIABILITY
Constitutional Motion Number 24

BE IT REMEMBERED, that on this day the Court considered the foregoing motion to

declare Article 37.071 of the Texas Code of Criminal Procedure unconstitutional due to

unreliability. After consideration, the court has determined that the motion shall be, and is

hereby:

_____ GRANTED. IT IS THEREFORE ORDERED that Article 37.071 of

the Texas Code of Criminal Procedure is declared unconstitutional and the State is precluded

from seeking the death penalty against the defendant.


_____ DENIED, to which the Defendant excepts.


SIGNED the _____ day of _____, 2007.



_____
JUDGE PRESIDING

12

995

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

MOTION FOR COURT TO FIND ART. 37.071 OF THE
TEXAS CODE OF CRIMINAL PROCEDURE UNCONSTITUTIONAL
AS APPLIED TO THIS DEFENDANT
Constitutional Motion Number 26

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW KOSOUL CHANTHAKOUMMANE, the Defendant in the
above-cause, by and through counsel and pursuant to the 5th, 6th, 8th and 14th
Amendments to the United States Constitution and Article 1, Sections 10, 13, and 19 of
the Texas Constitution and applicable Rules of Criminal Procedure. In support thereof the
Accused would show:

1.    The Accused has been indicted for the offense of capital murder.


2.    The State is seeking the death penalty.  The Eighth Amendment of the United
States Constitution requires a greater degree of accuracy and fact-finding than would be
true in a non capital case. *Gilmore v. Taylor,* 508 U.S. 333, 113 S. Ct. 2112, 124 L. Ed.
2d 306 (1993); *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976).



3.    The courts of this state are bound by the law to make certain that the death sentence
is not wantonly or freakishly imposed and that the lawful purposes of Art. 37.071 are
accomplished. *Ellason v. State*, 815 S.W.2d 656 (Tex. Crim. App. 1991).


4.    The courts of this state are required by law to limit capital punishment to a "small
group of narrowly defined and particularly brutal offenses" and "for the same type of
offenses which occur under the same types of circumstances." *Jurek v. Texas*, 428 U.S.
262, 270 (1976).


5.    Statutory rules on capital punishment must guide the states so that the death
penalty is reserved for the most heinous and serious crimes. *Zant v. Stephens,* 462 U.S.
862 (1983).

6.  "When a severe punishment is not inflicted elsewhere, or when more serious crimes are punished less severely, there is a strong inference that the State is exercising arbitrary, 'unrestrained power.'" *Furman v. Georgia*, 408 U.S. 238, 276 (1972).

**Expansion of Capital Eligible Crimes**

1) Texas has expanded its list of capital eligible crimes from five aggravating circumstances in 1974 to eleven at the present time. In 1974, capital eligible crimes included: (1) murder of a peace officer or fireman who was on duty; (2) murder committed intentionally during the course of kidnapping, burglary, robbery, forcible rape, or arson; (3) murder for remuneration; (4) murder committed during an escape from a penal institution; and (5) murder of a prison employee by a prison inmate. Tex. Penal Code Art.1257 (Vernon 1974). (That article has been superseded by § 19.03 of the Texas Penal Code, which is substantially similar to Art. 1257. )

2) The crimes eligible for capital punishment have been expanded to now include: (1) prison inmates serving death or life sentences who kill a fellow inmate; or (2) prison inmates serving death or life sentences who murder with the intent to participate in the profits of a combination; (3) murder of more than one person during the same criminal transaction; or (4) murder of more than one person during different criminal transactions related to the same scheme; and (5) murder of an individual under six years of age. TEX. PENAL CODE ANN. § 19.03 (Vernon 2003).

3) The Massachusetts Council Report recommended limiting capital murder to eight aggravating circumstances. While the proposed Massachusetts capital murder statute would make political terrorism and intentional torture a crime, it did not include felony murder and the murder of individuals under six years old as aggravating circumstances as does Texas. Massachusetts Council Report on the Death Penalty, p. 12, at www.mass.gov/Agov2/docs/5-3-04%20MassDPReportFinal.pdf.

4) The Illinois Commission on the Death Penalty recommended narrowing the death penalty from its current list of twenty eligibility factors to five; (1) murder of a peace officer or firefighter killed in the line of duty; (2) murder of any person

(inmate, staff, visitor, etc.) at a correctional facility; (3) murder of two or more persons; (4) intentional murder of a person involving torture; and (5) murder by a person charged or convicted of a crime of anyone involved with the investigation, prosecution or defense of that crime. Illinois Commission on the Death Penalty, p. 23-24, at http://www.state.il.us/defender/summary_ recommendations.pdf.

5) The Constitution Project recommended that the states must meaningfully narrow the class of death-eligible offenders to prevent capital punishment in cases involving questionable categories of defendants and homicides. Constitution Project, p. 11, at http://www.constitutionproject.org/dpi

6) The Supreme Court found the death penalty can not be applied to every murder case and that mandatory application was unconstitutional. *Roberts v. Louisiana,* 428 U.S. 325 (1976).

7) The state of Texas has now broadened its definition of an "individual" to a "human being who is alive, including an unborn child at every stage of gestation from fertilization until birth." TEXAS PENAL CODE ANN. § 1.07 (a) (26). The previous definition of "individual" was "a human being who has been born and is alive." The change in definition means a person who murders a pregnant woman now can be held accountable for the death of two people, which is an aggravating circumstance for the death penalty. Therefore, the broader definition is yet another expansion of capital eligible crimes.

This recent redefinition of who is an "individual" conceivably expands the State's application of the death penalty to anyone who intentionally or knowingly causes the "death" of a fertilized egg. Texas Penal Code §19.03(a)(8) defines capital murder to include someone who "..murders an individual under six years of age". Any fertilized egg is now and "individual" and anyone who intentionally or knowingly causes the destruction of that egg could conceivably be charged with capital murder. The actions of the Texas legislature in expanding the definition of who an individual is, does irreparable harm to the constitutionality of the Texas Death Penalty Statute.

8) The Illinois Commission on the Death Penalty found that the expansion of the list of aggravating circumstances creates problems in the consistency of the application of the death penalty. "Prosecutors and courts struggle to fairly apply the ever evolving list of factors making a defendant eligible for the death penalty. The resulting capital prosecutions have over-taxed the resources of the criminal justice system, and more important, reflect a degree of arbitrariness, when decisions across the state are compared." Illinois Commission on the Death Penalty, p. 68, at http://www.state.il.us/defender/report/chaper_04.pdf.

9) Aggravating circumstances must genuinely narrow the class of capital eligible crimes and must reasonably justify the imposition of a death sentence compared to others found guilty of murder. That prevents an arbitrary and capricious sentencing pattern found in *Furman. Zant v. Stephens,* 462 U.S. 862, 877 (1983).

10) A state that authorizes capital punishment has a "constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'" *Gregg v. Georgia,* 428 U.S. 153, 196. (1976).

**No Longer is Specific Intent or a Knowing State of Mind Required**

11) A person commits murder in the state of Texas if he: (1) intentionally or knowingly causes the death of an individual; TEX. PENAL CODE §19.02 (b).

12) The Supreme Court found the new Texas Penal Code narrowed the scope of its laws by limiting capital homicides to committing "intentional and knowing murders." *Jurek v. Texas,* 428 U.S. 262, 268 (1976). But the expansion of the death penalty statute means some of the crimes do not require intent.

13) A form of strict liability in some instances has replaced specific intent for some crimes. For example, a person who accidentally kills an individual under six years old can receive the death penalty. *Ramos v. State,* 961 S.W.2d 637 (Tex. App.— San Antonio 1998). Now that an "individual" is now a fertilized egg, will the

accidental destruction of a fertilized egg also result in a possible death sentence?

14) The courts of Texas do not ensure the death penalty would be limited "for the same type of offenses which occur under the same types of circumstances." In the example cited above, a person who does not intend to kill an infant but does so during a drive by shooting, *Ramos v. State,* 961 S.W.2d 637 (Tex. App.—San Antonio 1998), can receive the same sentence as a person who intends to kill and torture an infant. *Wyatt v. State,* 23 S.W.3d 18, 25 (Tex. Crim. App. 2000).

15) The Eighth Amendment requires that the death penalty be reserved for murders that show a high degree of culpability, and that the "culpability of the average murderer is insufficient to justify the most extreme sanction available to the State." *Atkins v. Virginia,* 563 U.S. 304, 319 (2002).

16) The courts of the United States are bound by law to vacate the death sentence if the severity of the appropriate punishment does not reflect the culpability of the offender. *Godfrey v. Georgia,* 446 U.S. 420, 433 (1980).

**Law of Parties Unconstitutionally Expands to Class to Which the Death Penalty is a Possible Punishment**

17) The state of Texas allows the death penalty for a defendant who took part in a felony where a person was killed during the process. "All conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy." TEX. PENAL CODE § 7.02 (b).

18) Once a defendant is convicted under the law of parties rule, he can be sentenced to death if a jury finds he "anticipated that a human life would be taken" during the felony. TEX. CODE CRIM. PROC. art. 37.071 (b) (2). In these situations, anticipation replaces intent.

19) The Supreme Court found the death penalty is excessive punishment when

imposed on a defendant who participated in a felony but did not actually kill or intend to kill the victim. *Tison v. Arizona*, 481 U.S. 137, 150-151 (1987).

20) The Supreme Court ruled criminal culpability must be limited to participation in the crime, and the punishment must reflect "personal responsibility and moral guilt." A death sentence for someone who does not kill or does not intend to kill does not satisfy the retribution aspect of capital punishment. *Enmund v. Florida*, 458 U.S. 782, 801 (1982).

21) The Constitution Project recommended reserving the death penalty for the worst killers by limiting the cases eligible for capital punishment and excluding those people convicted of felony murder who "did not kill, intend to kill, or intend that a killing occur." Constitution Project, p. 11, atttp://www.constitutionproject.org/dpi/.

22) The Massachusetts Commission also recommended limiting capital murder to "defendants who commit first-degree murder either through their own conduct, or through the conduct of another person whom they directed or controlled, or with whom they entered into agreement to commit the murder." Massachusetts Council Report on the Death Penalty, p. 12, at http://www.mass.gov/Agov2/docs/5-3-04%20MassDPReportFinal.pdf.

23) The Supreme Court ruled that capital punishment is an excessive penalty for someone who does not take another life. *Coker v. Georgia*, 433 U.S. 584, 598 (1977). Defining an individual as a "human being who is alive, including an unborn child at every stage of gestation from fertilization until birth" unconstitutionally expands the class of those to which the death penalty can be fairly applied.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that upon hearing hereof, this court find that:

(1) Texas Penal Code art. 37.071 is unconstitutional as applied to the Accused;

(2) The District Attorney for Collin County, Texas should be precluded from seeking

the death penalty against the Accused;

(3) Such other and further relief to which the Accused, and or his counsel, may show themselves to be justly entitled.

Respectfully submitted,

_____
Steven R. Miears
State Bar No. 14025600
Post Office Box 736
211 North Main
Bonham, Texas 75418
Telephone: 903-640-4963
Telefax: 903-640-4964
Attorney for Kosoul Chanthakoummane

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument

has been furnished to counsel for the State by hand-delivery of a copy of same this the

22 day of _____June_____, 2007.

_____
Steven R. Miears

1002

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| | § | |
| KOSOUL CHANTHAKOUMMANE | § | 380TH JUDICIAL DISTRICT |

### ORDER OF THE COURT ON THE DEFENDANT'S
### MOTION FOR COURT TO FIND ART. 37.071 OF THE
### TEXAS CODE OF CRIMINAL PROCEDURE UNCONSTITUTIONAL AS APPLIED
### TO THIS DEFENDANT
### Constitutional Motion Number 26

BE IT REMEMBERED, that on the _____ day of _____, 2007, came to be considered the above motion. After consideration of the motion, it is the opinion of the court that Defendant's motion be:

_____ GRANTED. IT IS THEREFORE ORDERED that Article 37.071 of the Texas Code of Criminal Procedure is declared unconstitutional and the State is precluded from seeking the death penalty against the defendant.

_____ DENIED, to which the Defendant excepts.

So ORDERED on this the __ day of _____, 2007.

_____
Judge Presiding

1003