IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| KOSOUL | § | |
| CHANTHAKOUMMANE, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:13cv67 |
| | § | |
| WILLIAM STEPHENS, | § | |
| Director, Texas Department of | § | |
| Corrections, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT'S ANSWER WITH BRIEF IN SUPPORT

Petitioner Kosoul Chanthakoummane was properly convicted and sentenced to die for the particularly brutal murder of real estate agent Sarah Walker during the course of robbing, or attempting to rob, her. He now challenges that presumptively valid conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. For the reasons discussed below, Chanthakoummane fails to demonstrate that he is entitled to federal habeas relief.

## CHANTHAKOUMMANE'S ALLEGATIONS

The Director understands Chanthakoummane to assert the following claims in support of federal habeas relief:

1.  Trial counsel was constitutionally ineffective for failing to investigate and present mitigating evidence.

2.      Trial counsel was constitutionally ineffective for conceding guilt as the issue of whether a robbery occurred in this case.

3.      Chanthakoummane's rights to due process and an impartial jury were violated when a juror discussed the case with his spouse.

4.      Chanthakoummane's Fifth, Sixth, and Fourteenth Amendment rights were violated because a juror improperly considered his failure to testify.

5.      Appellate counsel was constitutionally ineffective for failing to challenge the admissibility of the State's gang affiliation witness.

6.      Appellate counsel was constitutionally ineffective for failing to challenge the sufficiency of the evidence regarding Chanthakoummane's future dangerousness.

7.      Appellate counsel was constitutionally ineffective for failing to challenge the admissibility of A. P. Merillat's testimony.

8.      Appellate counsel was constitutionally ineffective for failing to challenge the denial of the motion to suppress Chanthakoummane's statement.

9.      Trial counsel was constitutionally ineffective for failing to lodge a specific objection to the voluntariness of Chanthakoummane's *Miranda*[1] waiver during the suppression hearing.

---

[1]      *Miranda v. Arizona*, 384 U.S. 436 (1966).

10. The refusal of the Texas courts to define certain terms in the future dangerousness issue is contrary to, or an unreasonable application of, clearly established Federal law because Chanthakoummane was (1) "deemed eligible for the imposition of the death penalty … by the use of an unconstitutionally vague aggravator," and (2) "was selected for the death penalty without giving full consideration and effect to record evidence of his mitigating circumstances."

11. Appellate counsel was constitutionally ineffective for failing to challenge the constitutionality of Texas's death-penalty scheme because it (1) contains vague terms, and (2) does not properly channel the jury's discretion.

12. The trial court violated the constitution by failing to instruct the jury on the "12-10 Rule."

13. Appellate counsel was constitutionally ineffective for failing to brief the "12-10 Rule."

14. Texas's death-penalty scheme violates the Constitution because it does not allocate a burden of proof to the mitigation special issue.

15. Appellate counsel was constitutionally ineffective for failing to challenge the constitutionality of Texas's death-penalty scheme based on its failure to allocate a burden of proof to the mitigation special issue.

16. The trial court's comments during voir dire praising the prosecution violated Chanthakoummane's rights to a fair trial, the presumption of innocence, and effective assistance of counsel and subjected him to cruel and unusual punishment.

But as demonstrated below—where the claims are properly exhausted—

Chanthakoummane has not established that the state courts were

objectionably unreasonable in their rejection of his claims. In any event, all of Chanthakoummane's claims are without merit. The Director denies all allegations of fact made by Chanthakoummane except those supported by the record and those specifically admitted herein.[2]

## STATEMENT OF THE CASE

Having been indicted on charges of capital murder, Chanthakoummane was convicted and sentenced to death for the particularly brutal murder of Sarah Walker during the course of committing or attempting to commit robbery. 2 Clerk's Record (CR) 212; 1 CR 143-50, 151-56, 161-64. The Court of Criminal Appeals upheld his conviction and death sentence. *Chanthakoummane v. State*, No. 75,794 (Tex. Crim. App. April 28, 2010) (unpublished), *cert. denied*, 131 S. Ct. 506 (2010).

While his direct appeal was pending, Chanthakoummane sought state habeas relief. 1 SHCR-01[3] 7-138. The state habeas court entered findings of fact and conclusions of law recommending the denial of relief, 5 SHCR 1510-532, which the Court of Criminal Appeals adopted. *Ex parte*

---

[2]     Copies of Chanthakoummane's state court records have been previously filed with the Court.

[3]     "SHCR" refers to the state habeas clerk's record, the transcript of documents and pleadings filed during Chanthakoummane's state habeas proceedings, preceded by volume number (where applicable) and followed by page number(s). "SHRR" refers to the state habeas reporter's record, preceded by volume number and followed by page number(s).

*Chanthakoummane*, No. 78,107-01 (Tex. Crim. App. Jan. 30, 2013) (unpublished order).

## STATEMENT OF FACTS

I.    Facts Relating to Guilt/Innocence

The Court of Criminal Appeals summarized the facts of Sarah's murder on direct appeal as follows:

> On Saturday, July 8, 2006, real estate agent Sarah Walker was murdered in the D.R. Horton model home where she worked in the "Craig Ranch" subdivision in McKinney, Texas. [Chanthakoummane] was charged with intentionally and knowingly causing [Sarah's] death while in the course of committing or attempting to commit robbery.

> On the morning of July 8[th], [Sarah's] ex-husband, Randy Tate, went to [Sarah's] residence in Frisco, Texas.   [Sarah] planned to work at the model home that day, so Tate picked up their son early that morning.   While Tate was at [Sarah's] residence, [Sarah] showed him a new Rolex watch that she said she had purchased the previous day.  Later that morning, [Sarah] went to a Bank of America in Frisco.  Still photographs taken from the bank surveillance video showed [Sarah] wearing a watch and a ring around 11:45 a.m.   [Sarah's] cousin, Jessica Allen, testified that [Sarah] often wore ornate rings and a Tag Heuer watch that she had owned for several years.

> Another real estate agent, Mamie Sharpless, received a phone call at 9:40 a.m. that morning from a man who identified himself as "Chan Lee."  The man told Sharpless that he found her phone number in a Keller Williams advertisement and that he wanted to look at a town house she had listed in the Craig Ranch subdivision.  He said that he had just moved from North Carolina to the Dallas area, that he had graduated from the University of North Carolina at Charlotte, and that he worked for Texas

Instruments. He said that he was calling from a phone booth at the 7-Eleven at Midway and Park and that he was staying in Room 245 at the "InTown Suites." When Sharpless asked him for a contact number, he said that he did not have a cell phone. The phone "cut off" before their conversation ended, so Sharpless tried to reach him by calling his hotel. Sharpless testified that she "called two InTown Suites, and one didn't have a [Room] 245, the other one did, but it just had a recording on it."

Sharpless arrived to show the town house between 11:30 a.m. and noon, and she brought her husband, Nelson Villavicencio, with her. As they sat in their car and waited, they saw a man drive by in white Ford Mustang and park across from the D.R. Horton model home down the street. They observed the man getting out of the Mustang and starting to cross the street. They drove over and asked him if he was "Chan Lee," and he replied, "No." Sharpless described him as a muscular man of Asian descent, about 5'4" or 5'5" tall, with a "buzz cut." She made an in-court identification of [Chanthakoummane] as the man she saw that day, but explained that he was thinner with longer hair at the time of trial.

As Sharpless and Villavicencio drove away, they noticed that the Mustang had Texas license plates. When Villavicencio drove to the end of the block, turned around, and drove back, the Mustang was no longer there. He then drove back to the town house so Sharpless could show it to another potential buyer. As Villavicencio looked out the bedroom window while Sharpless showed the town house, he observed [Sarah] arrive in her Porsche Boxter. [Sarah] parked across the street from the D.R. Horton model home and went inside. At that point, Villavicencio also saw a white Mustang parked on the street in front of the model home. Sharpless then finished showing the town house and they left between 12:30 and 1:00 p.m. As they left the subdivision, Sharpless also noticed a white Mustang parked in front of the model home.

At about 12:30 p.m., [Sarah] called her cousin, Jessica Allen. Allen testified that [Sarah] was "in a really good mood"

during their brief telephone conversation. They talked for about 15 minutes, then [Sarah] "said someone had walked in and she'd call [Allen] back."

At approximately 1:10 p.m., Andy Lilliston and his wife came to look at the D.R. Horton model home. When they entered the model home, Lilliston thought it appeared to have been "ransacked." He observed a large pool of blood in the dining room, where the sales desk was located. He followed a trail of blood into the kitchen, where he saw [Sarah] lying face-up on the floor, with the upper half of her body covered in blood. Lilliston directed his wife to call 9-1-1, and they exited the model home. Lilliston ran into the street and flagged down a vehicle for help. He briefly went back inside the model home to check on [Sarah], but she did not display any signs of life. Lilliston then went back outside and waited for emergency personnel to arrive.

When Texas Ranger A.P. Davidson arrived at the model home, he noticed signs of a struggle in the dining room. The desk was crooked, the desk chair was out of place, a plant stand was knocked over, and a potted plant was on the floor. A pair of women's shoes, a broken hair clip, and a broke earring were also on the floor. There was a trail of blood leading from the dining room into the kitchen. [Sarah's] body was on the kitchen floor, and it appeared that he had multiple stab wounds. Davidson opined that [Sarah] had been dragged by her feet from the dining room to the kitchen because the long skirt she was wearing was rolled up to her waistline.

McKinney police officer Pete Copin discovered a bloody fingerprint on the deadbolt lock on the front door of the model home; however, he testified that were "not enough individual characteristics for a positive identification." Copin further observed what appeared to blood on the plant stand, on the ceramic tile in the entryway, on the wall next to the edge of the window beside the front door, and on the pull cord for the window blinds. It also appeared that there had been blood in the kitchen sink that had been washed or diluted with water. Copin collected

blood swabs and other evidence from the scene for further testing.

When [Sarah's] body was discovered, she was no longer wearing the watch and ring that she had been shown wearing earlier on the bank surveillance video. When the police searched [Sarah's] residence after her death, they found the Tag Heuer watch. The police never located her Rolex watch, but they did find the box and the receipt for the watch in her residence.

William Rohr, the Collin County Medical Examiner who performed [Sarah's] autopsy, testified that [Sarah] sustained several blunt force injuries to her head. He opined that the blunt force injuries were the result of "several blows," and that they were consistent with [Sarah] being struck in the face and head with the plant stand in the model home. [Sarah] had multiple bruises on her face and head, a broken nose, and fractured teeth. She had some defensive wounds, including an excised wound on her left arm and a broken fingernail on her right hand. She suffered a total of 33 stab wounds, 10 of which had penetrated vital organs and blood vessels. Rohr testified that any of those 10 wounds could have been "pretty much immediately fatal." [Sarah] also had a bite mark on the back of her neck that Rohr opined was inflicted "at or near her death." Rohr also testified that he preserved this evidence by using a scalpel to excise the bite mark and surrounding area.

DNA analysis linked [Chanthakoummane] to the evidence from the crime scene. [Chanthatkoummane's] DNA profile was consistent with the DNA obtained from [Sarah's] fingernails, the window blind pull cords, the deadbolt lock and faceplate, and some of the swabs taken from the living room, kitchen, and entryway of the model home. The DNA analyst testified that only a "partial profile" was obtained from the swab taken from the kitchen sink because the DNA extracted from the swab "was of low quality and degraded quality." However, the set of genetic markers that she was able to detect in the partial profile "correspond with the genetic markers observed in the DNA profile of [[Chanthakoumanne]]."

After receiving the results of the DNA analysis, police arrested [Chanthakoummane] at his apartment on September 5, 2006. Texas Ranger Davidson testified that [Chanthkoummane] owned a white Ford Mustang and this apartment was located three miles away from the pay phones at Midway and Park. Davidson spoke to [Chanthakoummane's] sister, who informed him that [Chanthakoummane] had attended school in North Carolina and that he had moved from Charlotte to Dallas in February 2006. Davidson determined that [Chanthakoummane] had filled out a lease at an apartment complex near the InTown Suites on Trinity Mills. Davidson also discovered that [Chanthakoummane's] bank account was overdrawn by $87.27 on the day before the [Sarah's] murder. Davidson testified that [Chanthakoummane] was muscular and had a shaved head at the time of his arrest. Officer Copin, who later photographed [Chanthakoummane] to document his appearance, testified that he observed what appeared to be some healed cuts or scratches on [Chanthakoummane's] hands and fingers.

[Chanthakoummane] was transported to the McKinney Police Department, where he was interviewed by Officer Randall Norton. [Chanthakoummane] at first denied ever being in McKinney in his white Mustang. Upon further questioning, he stated that his car had broken down at "a model house," that he knocked on the door but no one answered, that he took "like three or four steps" inside and asked if anyone was home but no one was there, and that he spoke to a man and a woman in a green or blue "Corolla or Camry" as he left. Next, he admitted that he went to the kitchen for a drink of water, but said that he "didn't know how to use the faucet because the hot water came out," so he left. He acknowledged that he had "old cuts" on his hands "from work," so it was possible that he could have been bleeding when he was inside the model home. He also acknowledged that he had sold some of his own property for cash at a pawn shop on Greenville Avenue, including a tape deck, a drill, and an inexpensive Kenneth Cole watch.

Forensic dentistry consultant Brent Hutson examined [Chanthakoummane] and made impressions of his teeth. Hutson compared [Chanthakoummane's] teeth to the bite mark on [Sarah's] back and found enough similarities that he was "unable to exclude [[Chanthakoummane]] from the population of individuals that could have inflicted this injury." Hutson concluded "within reasonable dental certainty beyond a doubt" that [Chanthakoummane] was responsible for the bite mark on [Sarah's] neck.

*Chanthakoummane v. State*, slip op. at 2-8.

## II.    Facts Relating to Punishment

### A.    The State's case for future dangerousness

Having heard the brutal facts of Sarah Walker's murder, the jurors learned that Chanthakoummane had begun his life of crime early and been given many chances to change the path he was on. Indeed, he was on parole and had met with his parole officer on the morning of July 8th, the day he ended Sarah's life.[4] Chanthakoummane did not appear agitated or concerned about anything; nothing unusual was noted. 24 Reporter's Record (RR) 192-94, 196-98.

At the age of fourteen, Chanthakoummane and at least two other people "jumped" Lawrence Smith—who described them as having been friends before this incident—and he "fell down to the ground because [they]

---

[4]    He met with another parole officer two days later, on July 10th. Nothing unusual was recorded about that visit either. 24 RR 199.

come behind and start jumping on [him], kicking [him] in the face," an assault that resulted in six fractured ribs, a concussion and shoe prints that stayed on Lawrence's face "a good week." 24 RR 80, 82-83. He was charged with "strong arm robbery," but after pleading guilty to misdemeanor assault, Chanthakoummane was placed on probation.[5] *Id.* at 118, 119-20, 144; *see also* SX 114, 118.

Just four days after being placed on probation, Chanthakoummane "hit, assaulted, kicked" Shawn Bank without hesitation because "he was a big, stupid, white mother fucker." 24 RR 30-31, 36, 45. Shawn's injuries included a fractured arm and bruises. *Id.* at 26-28; *see also* SX 112, 113. During a noncustodial interview with police, Chanthakoummane admitted committing the assault but demonstrated neither concern for Shawn nor remorse. 24 RR 30, 33. Chanthakoummane was charged with assaulting/inflicting serious injury, a felony. *Id.* at 31, 154. Concomitantly, he was charged with several car thefts. *Id.* at 154-56. As a result, his probation was revoked, and he was sent to training school at Swannoa, a

---

[5]     In addition to the assault on Lawrence, Chanthakoummane was charged with communicating threats ("The next time I see you, I'm going to kick your butt.") to Norman Smith and two counts of credit card fraud and withholding—he had stolen two credit cards from his mother. 24 RR 119-21; *see also* State's Exhibit (SX) 114, 118.

campus-like facility where juveniles lived and attended school.[6] *Id.* at 134, 157, 160. Having exhibited good behavior for enough time, Chanthakoummane was granted a furlough, but he was considered AWOL after refusing to return. *Id.* at 169.

In 1997, Chanthakoummane—on furlough from Swannoa—and two friends broke into the home—"smashed out a window on the back door, reached in and unlocked the door"—of Gertrude Reed (in her 70s or 80s at the time); Gertrude's friend Betty Cash was visiting at the time. The boys used the electrical cord off of a vacuum cleaner to restrain the women while they "rifled through drawers, [] looking for things" and then left by stealing a car belonging to one of the women. 24 RR 50-53. Chanathakoummane was charged with "two counts of kidnapping, two counts of robbery with a dangerous weapon[7] and breaking and entering and larceny to the residence and larceny of a motor vehicle." *Id.* at 57-58 (footnote added). Because he was sixteen, Chanthakoummane was charged as an adult and detained in the

---

[6] During his time here, Chanthakoummane wrote a letter to his former probation officer and expressed remorse for having assaulted Shawn. 24 RR 135-38; *see also* SX 115. The letter was littered with gang symbols indicating Chanthakoummane's membership in the Crips. 24 RR 135-38, 138-40. Notably, one condition of his probation had been to avoid contact with the Kaos Klan Kings, a gang associated with the Crips. *Id.* at 135-26.

[7] The handgun used during this crime was eventually recovered based on information provided by one of Chanthakoummane's co-defendants. 24 RR 59.

adult jail. He eventually pled guilty to kidnapping and robbery and was sentenced to fifty-one to seventy-one months. *Id.* at 73-74; *see also* SX 122. He was paroled on February 19, 2006. SX 122 at 6.

In addition to his criminal history, the jurors learned that Chanthakoummane was a member of a local gang that was in turn associated with the Crips. 24 RR 125, 126. He continued this association even after being placed on probation, even though on condition was that he not associate or have any contact with anyone in a gang. *Id.* They were also told that he did not show "proper respect" for his parents: "He would cut his eyes at them, they would say something, he would snap at them, of course he would do it in [Laotian], I didn't understand what he was saying, but you could tell when he would do it, they would sink down like they were being disrespected." *Id.* at 129-30; *see also id.* at 133 (Chanthakoummane wanted to go to the Buddhist temple to "learn the ways of his people," but his juvenile court counsel did not recommend this because "he wasn't showing his parents the respect and he was not going to be successful in the temple because he would have to show the monks the same respect, more respect than his parents, and if he couldn't show respect to his parents, I didn't see that he would be successful in the temple.").

The jury also learned that Chanthakoummane was not a model inmate. He was caught with a "shank or some type of weapon" and transferred to prison. 24 RR 172-74; *see also id.* at 176. He was disciplined after an altercation with another inmate during a card game and two separate escape attempts; he was found in possession of a map of the area surrounding Swannoa, and a piece of metal (one and a half inches by five inches) was found hidden in a book. Chanthakoumamne was placed in disciplinary segregation four times and administrative segregation twice. 26 RR 150-53.

Ultimately, the jurors learned even though he was given any number of chances to change the path was life was on, Chanthakoummane—described as "very articulate and intelligent"—did not take "advantage of any of [the various services available];" he did not do anything.[8] 24 RR 128, 167; *see also* 25 RR 23, 28, 84. When he moved to Texas, his parole was transferred here, and he was on parole when he brutally attacked and killed Sarah Walker. 24 RR 194. But just the day before he murdered Sarah, Chanthakoummane appeared to be stalking another woman, Barbara Johnson. Barbara, a real estate agent specializing in rentals and relocations, told the jury she had helped Chanthakoummane find an apartment in May, 2006. *Id.* at 179. The

---

[8] Indeed, there was no evidence that he suffered from any mental illness or substance abuse problem. 25 RR 23, 28. But the jury did learn that Chanthakoummane had an anti-social personality disorder. 26 RR 170.

two met one time during that process, and Barbara never told him where she lived. *Id.* at 181. Barbara testified that she did not have any suspicions about him and was not worried for her safety at the time. *Id.* at 190.

On the evening of July 7th, Barbara was home alone when someone rang the doorbell, and her dog began to bark. She did not recognize Chanthakoummane at the time, but he was at her door mumbling something about his car being "broke[n] down" or "in her driveway." When she asked him if he needed to use the phone, he said that he did. *Id.* at 182-83. Barbara closed the door, retrieved her phone and went back to the front door, but Chanthakoummane was no longer there. Thinking he may have misunderstood her, Barbara closed the door and went through the house to the backyard, which was fenced off from her rear entry driveway. She "hollered out at him" to ask whether he still needed the phone, which he did, so she handed it to him over the fence. Barbara told the jury that during this time, her dog was very upset and barking. Chanthakoummane asked her for some water, and feeling bad for him. Barbara went back into the house to get him some. She also became afraid, "thinking [she] shouldn't be doing this because [she] didn't have a porch light in the backyard." *Id.* at 183-85.

When Barbara handed him the glass of water over the fence, she asked Chanthakoummane where he lived. He said Plano, but when she asked why

he was in her neighborhood, he did not answer. *Id.* at 185. Now, Barbara was becoming very afraid, and as she started back toward her house, Chanthakoummane was trying to open the back gate. She told him the gate was broken. He then asked her to let the dog out to keep him company while he waited, but Barbara told him the dog would bite him and went back into her house. *Id.* at 186. Once she got back in the house, she "even shut the pet door because at the point [she] was pretty frightened." *Id.*

Chanthakoummane went back to the front door, but Barbara did not answer it. He then went to the back door—"a full glass atrium door"—and started beating on it. At this point, Barbara called 911 because she was "really scared and the dog went crazy;" the police then arrived and talked to him. Barbara noticed a white car while this was happening. *Id.* at 187. The police lectured her and told her never to open her door to a stranger. They also said that it appeared Chanthakoummane did have car trouble but had gone. *Id.* at 187-88.[9]

## B.     The defense's case in mitigation

The mitigating case focused primarily on rebutting the State's case for future dangerousness by establishing that Chanthakoummane was well-

---

[9]     In its case for rebuttal, the State offered the testimony of A.P. Merillat, who explained the prison classification system and discussed opportunities for inmate violence. 27 RR 67-80.

behaved while incarcerated and that he had redeeming value as a very talented artist. *See*, *e.g.*, 26 RR 209-12; 27 RR 12, 16, 17.

Domingus Duarte met with Chanthakoummane when he was in prison for the kidnapping and robbery charges. Duarte told the jury that Chanthakoummane participated in the Life Skills program, a seven-week, voluntary training course. 25 RR 6, 9, 11, 18; *see also id*. at 17. The two "discussed issues he had with his family where his family hadn't been visiting him since he was incarcerated in the jail. And we looked at a biblical perspective about honoring our parents and respecting our parents," after which Chanthakoummane's parents came to visit. *Id.* at 10, 12. Duarte remembered Chanthakoummane as a talented artist, *id*. at 19-20; *see* Defendant's Exhibit (DX) 27, and told the jury, "I never saw any violence in him. I never saw any anger in him. … I just remember a real, humble, meek person[.]" 25 RR 20-21.

The jury also heard from prison staff who were familiar with Chanthakoummane. He did not have any disciplinary issues and had a talent for drawing. 26 RR 25, 27; *see also id*. at 95, 100. His work-release program supervisor testified that he did know Chanthakoummane as violent, as someone who "couldn't be controlled:" "I thought he was an excellent inmate. I say excellent because was always respectful to staff, obeyed their

orders, never gave any problems that I knew of." *Id.* at 52; *see also id.* at 53-54. Another corrections officer told the jury that he did not have problems with Chanthakoummane; he was not known to be "someone who was a dangerous inmate, always causing trouble with weapons, running with gangs[.]" *Id.* at 59-60; *see also id.* at 93-94.

Tony Shank, a convicted felon who served time with Chanthakoummane, also testified. He did not know him to be a troublemaker or in a gang, and he did not know other inmates to be afraid of him. Shank described Chanthakoummane as

> [v]ery low key, come in, read, draw a lot, watch T.V., just, he didn't really deal with a lot of other people outside of a certain circle of friends we had. I've never once seen him in an altercation or anything of that nature. …. If anything, he was always telling jokes or drawing something comical, and hanging it on [other inmates'] bed[s] or something of that nature, never anything to be malicious to anyone or harmful in any dangerous type of way.

*Id.* at 73; *see also id.* at 74, 76, 79, 82-83. Shank believed that Chanthakoummane had a conscience. *Id.* at 87.

Finally, the jury heard from Dr. Brad Fisher, a clinical psychologist, on the issue of future dangerousness. Dr. Fisher explained that the "best predictor of behavior is patterns of behavior … especially that patterns of that behavior in similar settings." 26 RR 127-28. He described most of

Chanthakoummane's disciplinaries as "low level," and went on to say that "[s]tarting in about 2002, they disappear altogether, ... although I again had information that there was one time in his last year here where he had a piece of artwork at the Collin County Jail that was not allowed, but again it was not violent, I don't even know if was written up as a disciplinary." *Id.* at 140; *see also* DX 30.    In Dr. Fisher's opinion, Chanthakoummane would "likely continue to behave as he's been behaving and that his behavior has not been violent in a jail setting, which is a more problematic setting than prison[.]" *Id.* at 143.

## STANDARD OF REVIEW

Confined pursuant to a presumptively valid state court judgment, Chanthakoummane is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Thus, any claims he raises that are based solely on alleged violations of state law should be denied as a matter of law.

Habeas relief is also inappropriate for claims that are either unexhausted and procedurally defaulted, or claims that are exhausted yet were dismissed in a successive state habeas application and, thus, are also procedurally defaulted.  Indeed, under the AEDPA, a federal habeas petition shall not be granted unless:

(A)     the applicant has exhausted the remedies available in the courts of the State; or

(B)     (i)      there is an absence of available State corrective process; or

        (ii)     circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). Moreover, a writ may be denied on the merits, notwithstanding any failure to exhaust available state court remedies. 28 U.S.C. § 2254(b)(2).

Regarding exhausted claims that were adjudicated on the merits, federal habeas relief cannot be granted unless that adjudication:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has explained that a state court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from

relevant Supreme Court precedent but reaches an opposite result.[10] (*Terry*) *Williams*, 529 U.S. at 405-06.

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. To this end, a state court unreasonably applies Supreme Court precedent *only if* it correctly identifies the governing precedent but unreasonably applies it to the facts of the particular case. *Id.* at 407-09. And as the Court recently described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or … *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree* that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.*

---

[10] "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citing (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court reaches its decision." *Id.* at 71-72 (citing (*Terry*) *Williams*, 529 U.S. at 405, 413, and *Bell v. Cone*, 535 U.S. 685, 698 (2002)).

Thus, "a state court's only decision that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2002)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway the courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 644. This is particularly true when reviewing a state court's application of *Strickland v. Washington*, 466 U.S. 668 (1984), that when analyzed in conjunction with § 2254(d) creates a difficult and "doubly" deferential assumption in favor of the state court denial. *Richter*, 131 S. Ct. at 786.

Under this standard, even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Id.*

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops just short of imposing a complete bar on federal litigation of claims already rejected in state court. It preserves the authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther. [28 U.S.C. §]

2254(d) reflects the view that habeas corpus is a "guard against *extreme malfunctions* in the state court criminal justice systems, *not a substitute for ordinary error correction through appeal*."

*Id.* (emphasis added, internal citations omitted).

Further, it is a state court's "ultimate decision" that is to be tested for unreasonableness," "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion the state court reached and not on whether the state court considered and discussed every angle of the evidence"); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review on the state court's decision, not its reasoning or written opinion[.]"). And a state court's decision need not expressly cite any federal law or *even be aware of* applicable Supreme Court precedent in order to be entitled to deference. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *Early v. Packer*, 537 U.S. 3, 8 (2002) (state court decision must be upheld so long as the result does not contradict Supreme Court precedent). A state court's decision also need not specifically address the federal constitutional claim. *See Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) ("When a state court rejects a federal claim without expressly addressing the claim, a federal court must presume that the federal claim was adjudicated

on the merits—but that presumption can in some limited circumstances be rebutted.").

If the Supreme Court has not "broken sufficient legal ground to establish [a] … constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the "contrary to" or "unreasonable application" standards. (*Terry*) *Williams*, 529 U.S. at 381; *see also Marshall v. Rodgers*, 133 S. Ct. 2446, 1450-451 (2013) ("Although an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established Supreme Court precedent, …, it may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct." (citations omitted)). Stated differently,

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there *was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Richter*, 131 S. Ct. 786-87 (emphasis added). And a federal court must be wary of circumstances where it must "extend a [legal] rationale" of the

Supreme Court "before it can apply it to the facts at hand" because such a process suggests the proposed rule is not "clearly established." *Alvarado*, 541 U.S. 666; *see also White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (explaining that § 2254(d) "provides a remedy for instances in which a state court unreasonably *applies* [the] Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error." (emphasis in original, citation omitted)).

Regarding questions of fact, federal courts must presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1). "This presumption not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence on which a petitioner would challenge a state court finding must have been presented to the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (explaining that § 2254(d)(1) "refers in the past tense, to a state court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, [clearly] established law. This

backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at the time, i.e., the record before the state court.").  Further, because a federal habeas court is also prohibited from granting relief unless a decision was based on an "unreasonable determination of the facts in light of the evidence *presented in the state court proceeding*," it follows that demonstrating the incorrectness of a state court finding of fact based on evidence not presented to the state court would be of no use to a habeas petitioner.  28 U.S.C. § 2254(d)(2) (emphasis added).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; *and* (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found him guilty.  28 U.S.C. § 2254(e)(2).  A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence.  (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Beazley v. Johnson*, 242 F.3d 248, 272-73 (5th Cir. 2001).  For

example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2). (*Michael*) *Williams*, 529 U.S. at 433; *Beazley*, 242 F.3d at 273. But even if a petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits. *See Schriro v. Landrigan*, 550 U.S. 465, 474-75 (2007) ("It follows that if the record refutes applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *see also Clark v. Johnson*, 227 F.3d 273, 284-85 (2000).

I.    **The State Habeas Court Reasonably Determined that Chanthakoummane Had Not Established that Counsel Was Constitutionally Ineffective Assistance During the Punishment Trial.**

In his first claim, Chanthakoummane alleges that counsel was constitutionally ineffective for failing to investigate and/or present mitigating evidence as follows: (1) North Carolina Department of Social Services (DSS) records documenting his dysfunctional family life and history of abuse, (2) the cultural impact his Laotian immigration story had on his upbringing, and (3) school records establishing his hearing impairment and the impact it had on his childhood development. He further alleges that counsel was generally ineffective for failing to call any of his family members to testify. Petition at

17-51.   In sum, as a result of the deficient investigation, Chanthakoummane contends that trial counsel focused on the wrong thing—rebutting the State's case for future dangerousness—rather than on the cultural and social circumstances of his upbringing, and that had this been the focus of the punishment case, the outcome would have been different.  *Id.* at 50-51.

The Sixth Amendment, together with the Due Process Clause, guarantee a defendant both the right to a fair trial and the right to effective assistance of counsel at that trial.   *Strickland*, 466 U.S. at 684-86.   A defendant's claim that he was denied constitutionally effective assistance requires him to affirmatively prove both that (1) counsel rendered deficient performance, and (2) his actions results in actual prejudice.   *Id.* at 687-88, 690.   Importantly, failure to prove either deficient performance or resultant prejudice will defeat an ineffective-assistance-of-counsel claim, making it unnecessary to examine the other prong.   *Id.* at 687.

In order to demonstrate deficient performance, Chanthakoummane must show that, in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms."   *Id.* at 689-90; *see also Richter*, 131 S. Ct. at 788.   The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every

effort made to avoid "the distorting effect of hindsight."[11] *Strickland*, 466 U.S. 689-90; *see also Richter*, 131 S. Ct. at 788 ("It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'"); *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.") (citations omitted). Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. If there is *any* "reasonable argument that counsel satisfied *Strickland*'s deferential standard," the state court's denial will be upheld. *Richter*, 131 S. Ct. at 788.

Even if deficient performance can be established, Chanthakoummane must still affirmatively proved prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This requires him to show a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id.* And as recently explained by the Supreme

---

[11] "Representation of a capital defendant calls for a variety of skills. Some involve technical proficiency connected with the science of law. Other demands relate to the art of advocacy. The proper exercise of judgment with respect to the tactical and strategic choices that must be made in the conduct of a defense cannot be neatly plotted in advance by appellate courts." *Stanley v. Zant*, 697 F.2d 955, 970 & n.12 (11th Cir. 1983).

Court:  The question in conducting *Strickland*'s prejudice analysis "is *not* whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently."  *Id.* at 791-92 (emphasis added and citations omitted).  Rather, "[t]he likelihood of a different result must be substantial, not just conceivable."  *Richter*, 131 S. Ct. at 792 (citation omitted).

With respect to errors at the sentencing phase of a death penalty trial, the relevant prejudice inquiry is "whether there is a reasonable probability, that absent the errors, the sentencer [] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S. at 695; *see also Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) ("If the petitioner brings a claim of ineffective assistance with regard to the sentencing phase, he has the difficult burden of showing a reasonable probability that the jury would not have imposed the death sentence absent errors by counsel.") (internal quotation marks omitted).  "In assessing prejudice, [the reviewing court] reweigh[s] the evidence in aggravation against the totality of available mitigating evidence."  *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

Finally, because this claim has already been adjudicated by the state court and § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131 S. Ct. at 788; *see also id*. at 785 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."); (*Terry*) *Williams*, 529 U.S. at 391; *Busby v. Dretke*, 359 F.3d 708, 717 (5th Cir. 2004).

Contrary to what Chanthakoummane alleges, trial counsel did in fact conduct a mitigation investigation.[12]  His brother remembered a "team of

---

[12]     In support of his claim that counsel's investigation fell short of *Strickland*'s standards, Chanthakoummane cites to the ABA Guidelines. Petition at 21, 40. But the Supreme Court has soundly rejected the notion that these are an "inexorable command with which all capital defense counsel must fully comply" to be constitutionally effective. *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (per curiam) (internal quotation marks and citation omitted).  *Strickland*, the Court noted, "stressed … that 'American Bar Association standards and the like' are 'only guides' to what reasonableness means, not its definition." *Id*. at 8; *see also Wiggins*, 539 U.S. at 524.  The Court emphasized that the same was true of all state and private organization rules, noting that they are "free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented," but "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Bobby*, 558 U.S. at 9 (internal quotation marks omitted).  The Court additionally chided the court of appeals for having used the guidelines promulgated years after the trial in question to evaluate counsel's performance. *Id*. at 7-8 ("Judging counsel's conduct in the 1980s on the basis of these 2003 Guidelines—without even pausing to consider whether they reflected the prevailing professional practice at the time of trial—was error."); *see also id*. at 8 n.1 (guidelines "must reflect prevailing norms of practice, …, and standard practice, … and must not be so detailed that they would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions") (internal quotation marks and citations omitted).

lawyers" who travelled to North Carolina to talk to the family. 4 SHCR 915.

Both of Chanthakoummane's parents remembered being interviewed by

members of the defense team, and his father was flown to Texas for the trial.

4 SHCR 904 (mother); 2 SHCR 156-57 (father). A social services worker

recalled telling members of the defense team there were no records under

Chanthakoummane's name. 2 SHCR 333-35. Based on this evidence and the

affidavits of trial counsel, the state habeas court made the following findings

regarding the investigation generally:

> 22. Counsel conducted a thorough and detailed investigation into the offense, [Chanthakoummane's] background, and potential mitigation evidence as part of their preparation for trial.

> 23. Counsel hired a mitigation expert, Vince Gonzales, and a fact investigator, Bill Brown, to assist them in the investigation and preparation of the case. [5 SHCR 1144 (affidavit of Vince Gonzales); 1396 (affidavit of Keith Gore), 1423 (affidavit of Steven Miears)].

> 24. Counsel consulted with several experts regarding [Chanthakoummane's] mental state during the offense and any possible mental illnesses. [Chanthakoummane] was examined by a forensic psychologist and a forensic neuropsychologist. He was given an IQ test and a neurological test for brain dysfunction. [5 SHCR 1416-417 (Miears affidavit)].

> 25. Counsel specifically instructed Gonzales and other experts not to prepare written reports because they could become discoverable during the trial process and could provide the State with access to information it would otherwise not be

able to access. [5 SHCR 1402 (Gore affidavit), 1417 (Miears affidavit)]. This was a reasonable decision to limit the State's access to potentially harmful information. …

31. In preparation for the punishment phase, counsel requested [Chanthakoummane's] prison, juvenile, school, and social services records. [5 SHCR 1419, 1430-431 (Miears affidavit)]. The defense team made several trips to North Carolina to interview [Chanthakoummane's] family and friends, as well as guards and other prison staff who had contact with [Chanthakoummane] during his previous incarcerations. [5 SHCR 1147-150 (Gonzales affidavit), 1396-399 (Gore affidavit), 1425, 1430-431 (Miears affidavit)].

32. As a result of interviews with [Chanthakoummane's] parents and siblings, counsel determined that [Chanthakoummane's] family would not be beneficial witnesses for the defense. [5 SHCR 1404 (Gore affidavit), 1425-429 (Miears affidavit)].

5 SHCR 1514-515.

## A.   The DSS records

Chanthakoummane first contends that counsel was ineffective for failing to discover and present the DSS records because they contained "a wealth of mitigation evidence." Petition at 24; *see also id.* at 22-32.

Regarding this mitigating evidence, the state habeas court made the following findings:

50. Counsel interviewed [Chanthakoummane] and his family "extensively, repeatedly, and often" regarding any history of child abuse or involvement with social services. [Chanthakoummane] and his relatives always denied any

form of child abuse. [5 SHCR 1151 (Gonzales affidavit), 1397-398 (Gore affidavit), 1416, 1431 (Miears affidavit)].

51. Counsel also investigated the potential of child abuse by visiting the Department of Social Services in North Carolina and requesting records for [Chanthakoummane] or his family. Counsel was informed in person and in writing that no records existed. [5 SHCR 1399-1401 (Gore affidavit), 1415, 1432-433 (Miears affidavit)].

52. Social services records did exist under Chanthakoummane's sister Sopha's name. These records were discovered during the habeas investigation and attached to the writ application. [4 SHCR 742-873]. The records indicated that:

  a. Social services first became involved with the family when Sopha ran away and made an allegation of abuse, but that allegation was ruled "unsubstantiated." [*Id.* at 769, 773].

  b. A subsequent complaint involved [Chanthakoummane] and inappropriate discipline, including spanking with an electrical wire. This claim was substantiated. [*Id.* at 764].

  c. [Chanthakoummane's] parents were cooperative with the investigation and engaged in "discussions about safer, more appropriate forms of discipline." After they became aware of the cultural differences in forms of discipline between Laos and the United States, they stopped using physical discipline. [*Id.* at 754, 764].

  d. [Chanthakoummane] had numerous discipline problems even after involvement from social

> services, including stealing from siblings, going out late at night without permission, and kicking holes in the walls of the home. [*Id.* at 760].

5 SHCR 1519-520. The state habeas court also considered the competing affidavits of Pam Freeburn, 2 SHCR 333-35, and trial counsel and their investigator and concluded that the latter three affidavits were credible and not only "consistent with the other evidence before [it] of counsels' extensive investigations of this case," but also "consistent with the vigorous defense exemplified in the trial record." *Id.* at 1520-521 (¶¶53-60). Ultimately, the state court habeas court found that counsel's "inability to obtain social services records was through no fault of their own." *Id.* at 1521 (¶61). The court also found that counsel's determination not to further investigate the allegations of child abuse was reasonable. *Id.* at ¶62.

The court went on to find that no prejudice resulted from counsel's decision not to call Chanthakoummane's relatives, even had they been aware of the social services records:

> a.    Counsel assert in their affidavits that they would have presented evidence of childhood abuse through the testimony of [Chanthakoummane's] relatives had they been aware of the social services records. [5 SHCR 1395 (Gore affidavit), 1416, 1430, 1435 (Miears affidavit)].
>
> b.    Counsel also repeatedly assert elsewhere in their affidavits that they made a strategic decision not to call

[Chanthakoummane's] relatives to testify because of the potentially harmful nature of their testimony, including introducing evidence of gang involvement and the family's opinions that [Chanthakoummane] deserved the death penalty. [5 SHCR 1404 (Gore affidavit), 1425-426, 1427, 1429 (Miears affidavit)].

c.      The potential mitigation evidence was weak. Although there was some evidence of childhood abuse, the records also reflected that the abuse was minor, the parents were motivated by cultural differences rather than animus, and the family underwent counseling and adopted more reasonable disciplinary methods as soon as they were made aware of the cultural differences.

d.      The potential harm from the family's testimony was severe. Testimony regarding [Chanthakoummane's] criminal activities from a very young age, even before his involvement in the juvenile justice system, and his association with gangs would significantly undermine counsel's strategy of attacking the future dangerousness special issue.

e.      The testimony of [Chanthakoummane's] own family—most especially [his] mother—that he deserved the death penalty would be highly prejudicial. It would be difficult for even severely mitigating evidence to overcome such prejudicial testimony.

f.      Counsel's assertion that relatives would have been called to testify about minor childhood abuse is not consistent with their identification of highly prejudicial testimony the relatives would have provided.

5 SHCR 1521-522 (¶64);[13] *see also id.* at 1522 (¶65) ("Even had the social services records evidence been presented, the result of the proceeding would not have been different in light of the minimal mitigating value and strong possibility of additional prejudicial testimony."), 1530 (¶¶122-26).

Chanthakoummane contends that in making these findings, the court "failed to evaluate the totality of, and accord appropriate weight to, the available mitigating evidence." Petition at 20. This argument minimizes both the aggravating the evidence that was already before the jurors and that which would have surely been before them had these records been introduced, especially if his family had been called to testify about them. The Supreme Court has emphasized that "the reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice." *Wong v. Belmontes*, 558 U.S. 15, 26 (2009) (citing *Strickland*, 466 U.S. at 695-96); *see also id.* at 20 ("In evaluating [*Strickland*'s prejudice prong], it is necessary to consider *all* the relevant evidence that the jury would have had before it if

---

[13] As with any testimony or witness statement, the factfinder is free to accept or reject it all or accept it in part and reject it in part. But whatever credibility determinations the state habeas court makes, Chanthakoummane must rebut them by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Marshall v. Lonberger*, 459 U.S. 422, 433-35 (1983); *cf. United States v. Moore*, 708 F.3d 639, 646 (5th Cir. 2013) ("The jury [is] free to choose among reasonable constructions of the evidence. … The fact that both the medical evidence and eyewitness testimony are conflicting does not preclude a finding of guilt by a jury who has the task of deciding which evidence to credit." (citations omitted)).

[trial counsel] had pursued a different path—not just the mitigation evidence [trial counsel could have presented, but also [the aggravating evidence] that almost certainly would have come in with it.") (citing *Strickland*, 466 U.S. at 695-96).

For these reasons, even if counsel was somehow deficient for failing to discover the records, Chanthakoummane cannot establish that "[t]he likelihood of a different result [is] substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (citation omitted); *see Jordan v. Dretke*, 416 F.3d 363, 371 (5th Cir. 2005) (reiterating that burden of affirmatively proving prejudice rests with petitioner; it is not state's burden to disprove prejudice).[14] Thus, federal habeas relief must be denied.

## B. Cultural history and upbringing

Chanthakoummane next chides counsel for failing to tell the story of his parents' immigration from Laos to the United States because this

---

[14] Chanthakoummane points to the statements of the two alternate jurors as evidence that the outcome of the trial would have been different had the jurors had this information. Petition at 21, 32 (citing 4 SHCR 1002-009, 1010-015). Putting aside the fact that these jurors never participated in the deliberations (and that if they had, their statements would be barred by Federal Rule of Evidence 606(b)), these statements are not presented in the form of sworn affidavits; rather, they are attested to by the state habeas investigator. As such, they are nothing more than hearsay and should not be considered for any purpose. *See In re Nealy*, 223 Fed.App'x 358, 366 (5th Cir. 2007) (petitioner cannot meet burden where only evidence is a hearsay affidavit); *cf. Goodwin v. Johnson*, 132 F.3d 162, 186 (5th Cir. 1997) (hearsay affidavits in support of petition fail to provide factual basis for evidentiary hearing).

evidence "would have shown the jury the harsh cultural experience his parents endured and how they contributed to his dysfunctional and highly abusive upbringing." Petition at 38; *see also id.* at 32-39.

Regarding this evidence, the state habeas court made the following findings:

36. [Chanthakoummane's] father, Komonh, and mother, Phong, immigrated from Laos before [Chanthakoummane's] birth.

    a.    Komonh served in the Laotian Army, assisting the United States in the war in Southeast Asia in the late 1960s before being sent to a reeducation camp after the Communists took power in 1975. [2 SHCR 146-47].

    b.    Komonh was forced to leave his family behind, but he met Phong and her two sons, Chanh and Kominh, and they went to a refugee camp together. After Sopha (called Monica) was born in 1979, the family immigrated to the United States. [*Id.* at 149-50].

    c.    The family had a sponsor in the United States that provided them a place to live, help finding a job, and money for food and clothing. The family moved in search of better work while Phong was pregnant with [Chanthakoummane]. They moved several times when [Chanthakoummane] was young, finally settling in Charlotte, North Carolina[,] when [Chanthakoummane] was five years old. [*Id.* at 150-53].

37. Counsel were aware of [Chanthakoummane's] parents' immigration experiences through interviews with [Chanthakoummane] and his family but determined that it was not relevant to [Chanthakoummane's] mitigation case.

    a. Counsel believed that the immigration experience of [Chanthakoummane's] parents, however terrible, would not be regarded as mitigating by a jury because it was not [Chanthakoummane's] own experience. If anything, it could be seen as an aggravating factor because the jury would see that [Chanthakoummane's] parents rescued him from that life and he did not take advantage of the opportunity. [5 SHCR 1427-428 (Miears affidavit)].

    b. [Chanthakoummane's] three older siblings were generally law-abiding. His sister Sopha had minor disciplinary problems such as sneaking out with boyfriends. His brother Kominh spent one night in jail as a teenager but never got into any other legal trouble. His eldest brother Chanh served in the Army and worked for a bank. [4 SHCR 912-15].

    c. Counsel believed that the success of his siblings would diminish the effectiveness of any arguments that [Chanthakoummane's] parents' immigration experiences were responsible for [Chanthakoummane's] behavior. [5 SHCR 1404 (Gore affidavit), 1427-428 (Miears affidavit)].

5 SHCR 1516-517. Further, counsel was concerned—as he was regarding the other mitigating evidence Chanthakoummane contends should have been introduced—that putting relatives on the stand would only open the door to

damaging testimony that would only support the State's case for future dangerousness. *Id.* at 1517-518 (¶38). In addition to Chanthakoummane's mother's belief that her son should die for his crime, the family was familiar with his gang affiliation and criminal history. *Id.*

There is no question that counsel investigated this part of Chanthakoummane's history, *id.* at 1518 (¶39). There is also no question that counsel's decision not to present this testimony was eminently reasonable. *Id.* at ¶41 (citing 5 SHCR 1404 (Gore affidavit), 1426-427, 1429 (Miears affidavit)). In any event, as the state habeas court explained, the jury did hear something of this as "[c]ounsel elicited testimony about [Chanthakoummane's] family being war refugees and possible 'integration' issues in American society through [Chanthakoummane's] juvenile court counselor. *Id.* at ¶40 (citing 24 RR 165-66). Thus, the evidence Chanthakoummane argues counsel failed to uncover was actually presented in some form to the jury, and any additional testimony on the subject would have been cumulative. *See Motley v. Collins*, 18 F.3d 1223, 1228 (5th Cir. 1994); *Lincecum v. Collins*, 958 F.3d 1271, 1280 (5th Cir. 1992).

Ultimately, the state habeas court concluded that Chanthakoummane had established neither deficient performance or prejudice with respect to this evidence. 5 SHCR 1518 (¶¶42-43); *see also id.* at 1530 (¶¶122-26). In

light of the record that was before it and well-established Supreme Court and Fifth Circuit precedent, the rejection of this claim was not objectively unreasonable, and federal habeas relief is not warranted. 28 U.S.C. § 2254(d); *Pinholster*, 131 S. Ct. at 1398.

## C. School records

In his final complaint regarding trial counsel's investigation, Chanthakoummane argues that his school records detailing a childhood hearing impairment should have been presented. Petition at 39-43.

The state habeas court made the following findings regarding this evidence:

> 44. [Chanthakoummane] had minor hearing problems as a child. He failed a hearing test in kindergarten, showing "moderate to severe" hearing loss in the higher frequencies. His hearing problems were not treated until he was in fifth grade, when he was fitted with hearing aids. [2 SHCR 326-29].

> 45. [Chanthakoummane] informed counsel of minor hearing loss as a child, but he did not indicate that he suffered any hearing loss at the time of trial. [Chanthakoummane's] relatives did not mention any hearing loss. None of his juvenile or prison records indicated any hearing problems. Neither counsel nor any of the experts who examined [Chanthakoummane] noted any problems. [Chanthakoummane] did not have any difficulty hearing and consulting with counsel at the time of trial. [5 SHCR 1407 (Gore affidavit), 1418-419 (Miears affidavit)].

46. Gonzales obtained information from the family that [Chanthakoummane] had received treatment for an ear problem. [5 SHCR 1148 (Gonzales affidavit)]. Prison records attached to Gonzales's affidavit show that [Chanthakoummane] wore hearing aids. [5 SHCR 1319].

47. The State provided material during discovery, specifically grand jury testimony of [Chanthakoummane's] sister, in which she mentioned [his] hearing issue. [*Id*. at 1117].

5 SHCR 1518-519. The state habeas court then found that counsel's decision not to further investigate Chanthakoummane's early childhood hearing loss was not unreasonable. The court further found that "[t]estimony that [Chanthakoummane] had minor hearing loss as a child that was resolved by adulthood would have minimal mitigating value to the jury. It would be greatly outweighed by the facts of the offense and [Chanthakoummane's] extensive criminal history. Also, presenting the testimony through any of [Chanthakoummane's] relatives would have introduced significant prejudicial evidence." *Id*. at 1519 (¶¶48-49). This alone is fatal to Chanthakommane's claim. *See Wong*, 558 U.S. at 26; *Strickland*, 466 U.S. at 695-96.

Chanthakoummane contends that had this evidence been presented to the jury, along with the social services records and the evidence of his upbringing, the outcome would have been different. Petition at 44. But even if counsel was somehow deficient for failing to investigate this issue (or any of

these issues) further, Chanthakoummane cannot establish that "[t]he likelihood of a different result [is] substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (citation omitted); *see also Jordan*, 416 F.3d at 371. Thus, federal habeas relief must be denied.

## II. Chanthakoummane's Claim that Trial Counsel Was Constitutionally Ineffective for Conceding the Underlying Felony (Robbery or Attempted Robbery) Is Unexhausted and Procedurally Defaulted. In Any Event, It Is Completely Without Merit.

Chanthakoummane next alleges that trial counsel was constitutionally ineffective for conceding the underlying felony (robbery or attempted robbery) during opening statement. Petition at 51-63; *see* 21 RR 29 ("But he did go into a model home, and that's where Sarah Walker was. And he wanted to rob her, and it didn't go the right way, and he killed her."). Chanthakoummane acknowledges that this claim is procedurally defaulted because it was not raised in his state habeas application; however, he argues that the default should be excused because he can establish ineffective assistance of state habeas counsel as established in *Martinez v. Ryan*[15] and *Trevino v. Thaler*.[16] Petition at 52-52, 60-63.

---

[15]    132 S. Ct. 1309 (2012).

[16]    133 S. Ct. 1911 (2013).

In order to establish cause and prejudice under *Martinez*, Chanthakoummane must show (1) that his claim of ineffective assistance at trial is "substantial" (i.e., "has some merit"), and (2) that his state habeas counsel was ineffective (under *Strickland*) for failing to present that claim in the initial state habeas application.[17] *Id.*; *see also Trevino*, 133 S. Ct. at 1918. But as discussed below, the underlying claim is wholly without merit or not "substantial." 132 S. Ct. at 1318. Thus, the procedural default must be applied. *See Wilkins v. Stephens*, 2014 WL 1202524 at *5 (5th Cir. March 25, 2014) ("Concluding that [the petitioner] has failed to state any substantial [ineffective-assistance-of-counsel] claims, we deny a [certificate of appealability]." (citation omitted)); *Preyor v. Stephens*, 537 F. App'x 412, 422 (5th Cir. 2013) (concluding that the ineffectiveness of petitioner's state habeas counsel "ma[de] no difference to the outcome" because reasonably jurists would not debate the district court's conclusion that petitioner's claims were "not substantial").

---

[17] Chanthakoummane suggests that this claim might also be evaluated under the standard announced *United States v. Cronic*, 466 U.S. 648 (1984). Petition at 57-58. However, by its four corners, *Martinez* applies only to *Strickland* claims. 132 S. Ct. at 1317 ("A prisoner's inability to present a claim of trial error is of particular concern when the one is ineffective assistance of counsel. The right to the effective assistance of counsel at trial is a bedrock principle in our justice system."), 1320 ("The rule of *Coleman* [*v. Thompson*, 501 U.S. 722 (1991),] applies in all but the limited circumstances recognized here.").

In addition to counsel's concession during opening statement, Chanthakoummane points to the failure to cross-examine the State's witnesses, Petition at 53-55, as well as counsel's closing argument. *Id.* at 59; *see* 23 RR 30 ("[Y]ou've got to satisfy yourselves that they proved a robbery in the course of this murder. If they didn't, you're free to turn that verdict form over and write down that they should prosecute him for just murder."). But nowhere in the course of his argument, does Chanthakoummane acknowledge the state court's rejection of his claim that the evidence was legally insufficient to support his conviction for capital murder because Sarah's "watch and ring were never recovered[,] and there was no other property taken from the scene." *Chanthakoummane v. State*, slip op. at 8-9.

After explaining the *Jackson*[18] standard and that "direct evidence linking [Chanthakoummane] to the missing watch and ring was not required to establish guilt, *id.* at 9 (citation omitted), the Court of Criminal Appeals rejected the claim:

> The evidence showed that [Sarah] purchased a new Rolex watch the day before she was murdered. A bank surveillance video showed Sarah wearing a watch and a ring at around 11:45 a.m. on the day she was murdered. She was no longer wearing the watch and ring when her body was discovered less than two hours later. Police later discovered a box and receipt for [Sarah's] Rolex watch at her residence, but the watch itself was never

---

[18] *Jackson v. Virginia*, 443 U.S. 307 (1979).

found. Bank records showed that [Chanthakoummane's] bank account was overdrawn by $82.27 on the day before [Sarah's] murder. In his statement to police, [Chanthakoummane] said that he had recently pawned some personal property for cash and that his cell phone had been "cut off" because he "fell behind on bills and stuff." A pawn shop receipt dated July 26, 2006, confirmed [Chanthakoummane's] statement that he had pawned his Kenneth Cole watch.

… [T]he evidence in the instant case was such that the jury could reasonably infer that [Chanthakoummane] murdered [Sarah] in the course of committing or attempting to commit robbery. The evidence, viewed in the light most favorable to the jury's verdict, was legally sufficient to support [Chanthakoummane's] conviction.

*Id.* at 9-10 (footnote omitted).

While Chanthakoummane points to counsel's failure to cross-examine the State's witnesses regarding the missing watch and ring, beyond suggesting that Ranger Davidson should have been cross-examined generally about the bank surveillance video, he does not indicate what specific questions should have been posed to any of the State's witnesses. Nor does he present any new evidence suggesting that a robbery did not in fact occur. While he points to the fact that the State never found any evidence that either the Rolex or the ring had ever been pawned, this fact was actually before the jury, which Chanthakoummane acknowledges.[19] Petition at 55;

---

[19] This is the only fact that could arguably have established a reasonable doubt as to whether a robbery occurred. And it was before the jury. Thus,

~ 47 ~

*see* 22 RR 198. Thus, he points to nothing that counsel should have done that would have changed the outcome of the trial.

Even if counsel had not conceded the issue of the robbery in his opening statement, Chanthakoummane has not shown that "[t]he likelihood of a different result [is] substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (citation omitted); *see also Jordan*, 416 F.3d at 371. Thus, federal habeas relief must be denied because even he could somehow overcome the procedural bar, this claim is not just insubstantial; it is wholly without merit.

### III. The State Habeas Court Reasonably Concluded that Chanthakoummane Was Not Denied His Right to an Impartial Jury Simply Because a Juror Was Alleged to have Discussed the Case with His Spouse.

By his third claim, Chanthakoummane alleges that he was denied his Sixth Amendment right to an impartial jury because one of the jurors allegedly discussed the case with his spouse during the trial. This amounted to an "improper extraneous influence" on the deliberations. Petition at 64; *see also id.* at 63-72. As discussed below, this claim is wholly without merit.

The Constitution provides that a criminal defendant is entitled to a trial by an impartial jury. U.S. Const. Amend. VI. This right is violated when the jury is exposed to outside influences during its deliberations.

Chanthakoummane's argument that counsel failed to raise a reasonable doubt is without merit. *See* Petition at 53; *see also id.* at 53-55, 59-60.

*Parker v. Gladden*, 385 U.S. 363, 364-65 (1966) (citing *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965)); *see Willie v. Maggio*, 737 F.2d 1372, 1379 n.6 (5th Cir. 1984). As the Supreme Court has explained, this is because "[i]n the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke a juror must be indifferent as he stands unsworn. … His verdict must be based upon the evidence developed at trial." *Turner*, 379 U.S. at 472 (internal quotation marks and citations omitted). There can be no question that if a juror discusses the trial with someone other than his fellow jurors, such as is alleged here, this is an "external influence" which can be used to impeach the verdict. *See Oliver v. Quarterman*, 541 U.S. 329, 335-36 (5th Cir. 2008) ("A juror is exposed to an external influence when the juror reads information not admitted into evidence, such as newspaper article about the case, or hears prejudicial statements from others[.]"). But as set out below, the state habeas court reasonably found that the jury's deliberations were not tainted by any such influence.

As part of the state habeas proceedings, a hearing was held on this claim, during which all twelve jurors, Schwartz's wife, and two former law students who interviewed the jurors for a class project after the trial was over testified. 1 Supp. SHRR *et seq.* The court then entered the following findings:

a.  Juror Schwartz testified that he did not talk to his wife about the trial until it was over. [1 (Supp.) SHRR 19]. He knew that he was not allowed to read or watch any news coverage of the trial, and his wife did not communicate any outside fact to him during the trial. [*Id.* at 19-21, 28]. His verdict was based solely on what he heard in the courtroom and not any other source. [*Id.* at 29].

b.  The eleven other jurors testified that Schwartz did not provide any information about the case that he had learned outside the courtroom or say anything that indicated he had spoken to his wife or anyone outside the courtroom about the case. [*Id.* at 34-35 (Reed), 40-41 (Brown), 47-49 (Lambeth), 59-62 (Dick), 65-68 (Mullis), 71-74 (Nehama), 77-81 (Harris), 84-87 (Robitaile), 90-94 (Wilson), 99-102 (Drake), 105-08 (Gilchrist)].

c.  Raechel Parolisi testified that she observed the trial while a law student and conducted juror interviews for a class project after the trial was over. [*Id.* at 113]. She participated on all the interviews except for Juror Schwartz's. [*Id.* at 116]. Her partner, Denise Santa Ana, conducted Juror Schwartz's interview. [*Id.* at 116-17]. Parolisi testified that she believed Juror Schwartz's answers indicated juror misconduct but Santa Ana said she did not want to get him in trouble. [*Id.* at 121]. Santa Ana showed Parolisi approximately a minute of the video footage of the interview but did not provide the entire tape to her. [*Id.* at 121-22, 124-26].

d.  Juror Schwartz's wife, Theresa Schwartz, testified that Juror Schwartz did not tell her anything about what happened in the courtroom during the trial. [*Id.* at 144]. They did not talk about the case at all until after the trial was over. [*Id.* at 146].

e.  Denise Santa Ana testified that she observed the trial while a law student and conducted juror interviews for a class project after the trial was over. [*Id.* at 157-58]. She

interviewed Juror Schwartz at his home. [*Id.* at 159]. Because Parolisi could not attend that interview, Santa Ana's boyfriend attended the interview with her and videotaped it. [*Id.* at 159-61]. Santa Ana transcribed the interview but did not keep a copy of the video. [*Id.* at 163]. Santa Ana recalled that Juror Schwartz mentioned talking about the case with his wife, but she believed that he was referring to only after the trial was over. [*Id.* at 161-62, 164-64, 171-77].

5 SHCR 1524-525 (¶79). Having found the testimony of the jurors, Mrs. Schwartz and Santa Ana credible—as it was "consistent and based on personal knowledge"—and the testimony of Parolisi incredible "to the extent it contradict[ed] the first-hand accounts of the other witnesses," *id.* at 1525 (¶¶80-81),[20] the court reasonably rejected Chanthakoummane's claim of juror misconduct. *Id.* at ¶¶82-83. There was simply no credible evidence that Schwartz talked to his wife during the pendency of the trial as Chanthakoummane contends, much less any evidence about what, if anything, she may have said to him that was prejudicial. Petition at 64-66.

---

[20] *See Valdez*, 274 F.3d at 948 n.11; *cf. Wainwright v. Witt*, 469 U.S. 412, 429 n.9 (1985) ("[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen [by the trial court] below, but cannot always be spread upon the record."); *Ruiz v. Quarterman*, 460 F.3d 638, 646 (5th Cir. 2006) ("A stranger to the trial reading the bare transcript is left with incomplete sentences and elliptic answers with no reconciling theme. Yet one present at trial may well have quite a different picture. Inflection of voice and body movements of each case member, absent from the transcript, are present at trial.").

Without more and in light of the jury instructions,[21] this claim is nothing but rank speculation, and cannot form the basis for federal habeas relief. *Murphy v. Dretke*, 416 F.3d 427, 437 (5th Cir. 2005) (citing *Kock v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990), and *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

For these reasons, federal habeas relief must be denied. 28 U.S.C. § 2254(d).

## IV. The State Habeas Court Reasonably Rejected Chanthakoummane's Claim that His Constitutional Rights Were Violated Because a Juror Was Alleged to have Improperly Considered His Failure to Testify.

Chanthakoummane next alleges that he was again denied his right to an impartial jury, this time when a juror improperly considered his failure to testify. Petition at 72-78. His only evidence of this comes from the statement of one of the former law students who stated that the juror "seemed to hold the fact that [Chanthakoummane] did not testify or apologize against him." 4 SHCR 986. The state habeas court reasonably determined this did not constitute admissible evidence. 5 SHCR 1525 (¶85); *see also id.* at 1513 (¶¶8-

---

[21] The jury was instructed as follows: "You are charged that it is only from the witness stand that the jury is permitted to receive evidence regarding the case, and no juror is permitted to communicate to any other juror anything he might have heard regarding the case from any source other than the witness stand. ... In deliberating on this case you are not to refer to any matter or issue not in evidence before you; nor talk about this case to anyone not of your jury." 1 CR 148. Jurors are presumed to follow their instructions. *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993).

10). The court then rejected this claim on that same basis. *Id.* at 1525 (¶¶85-86).

It has long been held that post-verdict inquiry of jury members, as live witnesses or by affidavit, is inappropriate. *See Mattox v. United States*, 146 U.S. 140, 149 (1892) ("[T]he evidence of jurors, as to the motives and influences which affected their deliberations, is inadmissible either to impeach or support the verdict."); *see also Tanner v. United States*, 483 U.S. 107, 117-21 (1987) (discussing policy behind federal common law rule against admission of jury testimony to impeach verdict); *McDonald v. Pless*, 238 U.S. 267-68 (1915). Unless an allegation is made that an external influence bore on the deliberations, juror testimony will thus be prohibited. *Compare Tanner*, 483 U.S. at 117 (citing *McDonald*, 238 U.S. at 265-67 (no testimony from jurors regarding possible quotient verdict), and *Hyde v. United States*, 225 U.S. 347, 384 (1912) (no testimony from jurors that verdict was result of bargain)), and *id.* at 118-19 (questions of juror competence or sanity or whether a juror sufficiently understood English are internal influences (citations omitted)), *with Parker*, 385 U.S. at 365 (testimony regarding bailiff's comments about defendant allowed), and *Remmer v. United States*, 347 U.S. 227, 228-230 (1954) (testimony allowed regarding bribe offered to juror). The state court's rejection of this claim based solely on the lack of

admissible evidence was not out of line with this precedent. *See Greer v. Thaler*, 380 Fed.App'x 373, 382 (5th Cir. 2010) (affirming the district court's rejection of a similar claim because it "involved complaints about the jury's deliberative process"); *see also id.* ("In this case, reasonable jurists would not find debatable or wrong the district court's assessment of Greer's claim related to [the juror's] 'failure to testify' comments because the remarks were said during jury deliberations." (citing *Tanner*, 483 U.S. at 117-21)).[22]

For these reasons, federal habeas relief must be denied. 28 U.S.C. § 2254(d).

## V. The State Habeas Court Reasonably Concluded that Appellate Counsel Was Not Constitutionally Ineffective for Failing to Challenge the Admissibility of the State's Gang Affiliation Witness.

In his fifth allegation, Chanthakoummane contends that he was denied the right to constitutionally effective assistance on appeal because appellate counsel failed to challenge the admissibility of the State's gang affiliation witness, Brian Connor, on two grounds: his qualifications and the relevancy

---

[22] The jury was specifically instructed as follows: "Our law provides that a defendant may testify in his own behalf if he elects to do so. This, however, is a right afforded to the defendant, and in the event he elects not to testify, that fact cannot be taken as a circumstance against him. In this case, the defendant has elected not to testify, and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against the defendant." 1 CR 147; *see Zafiro*, 506 U.S. 540-41.

of his testimony. Petition at 78-85. But as explained below, this claim must be denied.

The Supreme Court has long held that "[i]t is not required that an attorney argue every conceivable issue on appeal. Indeed, it is his professional responsibility to choose among potential issues, according to his judgment as to their merit and his tactical approach." *Jones v. Barnes*, 463 U.S. 745, 750 (1983) (internal quotation marks and citation omitted); *see also Burger v. Kemp*, 483 U.S.776, 784 (1987) (decision not to raise "lesser culpability" argument on appeal was strategically sound where client was party who had actually killed victim and where argument had been rejected by state supreme court). As the Fifth Circuit has explained, "Counsel need not raise every nonfrivolous ground on appeal, but should instead present '[s]olid, meritorious arguments based on directly controlling precedent.'" *Schaetzle v. Cockrell*, 343 F.3d 440, 445 (5th Cir. 2003) (quoting *United States v. Williams*, 183 F.3d 458, 463 (5th Cir. 1999)). Thus, such a claim is judged under the *Strickland* standard. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*, 477 U.S. 527, 535-46 (1986)); *see also Schaetzle*, 343 F.3d at 444. Under *Strickland*, Chanthakoummane must establish both deficient performance and resultant prejudice. 466 U.S. at 687-88, 690. Importantly, failure to prove either deficient performance or

resultant prejudice will defeat an ineffective-assistance-of-counsel claim, making it unnecessary to examine the other prong. *Id.* at 687. In the instant case, Chanthakoummane cannot establish either deficient performance or resultant prejudice; thus, as discussed below, the state habeas court reasonably rejected this claim. 5 SHCR 1526 (¶93); *see also id.* at 1531 (¶¶129-32).

Regarding the question of whether Connor qualified as an expert, the state habeas court found that he "testified that he received over 120 hours of gang investigation training, had received a certificate for advanced gang investigations, and had experience in investigating gangs." 5 SHCR 1526 (¶90) (citing 24 RR 91). Connor then explained to the jury how "certain elements in a letter written by [Chanthakoummane] demonstrated gang affiliation." *Id.*; *see* 24 RR 138-40. The court then concluded that Conner was qualified to testify as an expert pursuant to Texas Rule of Evidence 702, 5 SHCR 1526 (¶¶90-91), and even if he was not, "his testimony was admissible as lay opinion testimony regarding 'observations which do not require scientific expertise to interpret and which are not based on a scientific theory.'" *Id.* at ¶92 (citing *Osborne v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002)). The court's ultimate conclusion that appellate

counsel was not constitutionally ineffective, *id.* at ¶93, is not objectively unreasonable.

Regarding the question of whether the testimony about Chanthakoummane's gang membership was relevant, the state habeas court found that trial counsel's objection on that ground was not properly made under Texas Rule of Appellate Procedure 33.1.[23]  5 SHCR 1526 (¶¶94-95). Now, citing to Texas Rule of Appellate Procedure 44.2(a),[24] Chanthakoummane contends that the Court of Criminal Appeals would have found that the admission of this testimony rose to the level of constitutional error and argues that it was not harmless.  Petition at 84-85.  He is mistaken. The State's case for future dangerousness was based on Chanthakoummane's extensive criminal history and the brutality and premeditation of Sarah's murder. *See* 5 SHCR 1527 (¶98); *see also* Statement of Facts, Section II(B). Thus, any error in the admission of gang membership evidence was certainly harmless beyond a reasonable doubt.  *See* Tex. R. App. P. 44.2(a); *Chapman*

---

[23]    Under Texas Rule of Appellate Procedure 33.1, in order to preserve a complaint for appellate review, an objection must have been timely made that "stated the grounds for the ruling … sought … with sufficient specificity to make the trial court aware of the complaint[.]"

[24]    "If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment."

*v. California*, 386 U.S. 18, 24 (1967) (holding that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt").

For these reasons, the state habeas court's ultimate conclusion that appellate counsel was constitutionally effective was not objectively unreasonable, 5 SHCR 1531 (¶¶131-32), and federal habeas relief must be denied. 28 U.S.C. § 2254(d); *see Richter*, 131 S. Ct. at 792; *Jordan*, 416 F.3d at 371.

## VI. The State Habeas Court Reasonably Concluded that Appellate Counsel Was Not Constitutionally Ineffective for Failing to Challenge the Sufficiency of the State's Evidence of Future Dangerousness.

The future dangerousness issue asks the jury to determine—beyond a reasonable doubt—whether there is a probability the defendant will commit future acts of violence that would constitute a threat to society. 1 CR 155; *see* Tex. Code Crim. Proc. art. 37.071, §(2)(b)(1). The Court of Criminal Appeals has explained that in determining a defendant's future dangerousness, the jurors may consider the following factors:

(1) the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;

(2) the calculated nature of the defendant's acts;

(3)     the forethought and deliberateness exhibited by the crime's
        execution;

(4)     the existence of a prior criminal record, and the severity of
        the prior crimes;

(5)     the defendant's age and personal circumstances at the time
        of the offense;

(6)     whether the defendant was acting under duress or the
        domination of another at the time of the commission of the
        offense;

(7)     psychiatric evidence; and

(8)     character evidence.

*Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987) (citations omitted).

Further, on appeal, the sufficiency of the evidence of future dangerousness is

reviewed under *Jackson v. Virginia*. *E.g.*, *Ross v. State*, 133 S.W.3d 618, 621

(Tex. Crim. App. 2004). Here, Chanthakoummane alleges he was denied

constitutionally effective assistance because appellate counsel failed to

challenge the sufficiency of the future dangerousness evidence. Petition at

85-94. This allegation is without merit.

The state habeas court found that the *Keeton* factors "overwhelmingly

support a finding of future dangerousness[:]"

a.      [Chanthakoummane] acted alone. Neither the DNA
        evidence nor any eyewitness ever suggested more than one
        person was involved in the murder. There was no

indication that [Chanthakoummane] was influenced or coerced by anyone into committing the offense.

b.    The crime was calculated, premeditated, and deliberate. [Chanthakoummane] appeared at the home of a real estate agent the night before the murder and tried to get inside the house before the agent called the police.  On the morning of the murder, [Chanthakoummane] called another real estate agent to arrange to meet her, using an assumed name.  After encountering her with her husband, [Chanthakoummane] went to a nearby model home to commit the brutal murder of Sarah Walker.  The record showed that [Chanthakoummane] intentionally and repeatedly attempted to isolate a woman to commit the offense.

c.    [Chanthakoummane] stabbed Sarah Walker more than thirty times, hit her in the face with a plant stand, and bit her shoulder.   [Chanthakoummane's] motive was apparently robbery, as he took a Rolex watch and ring from the victim.  The violent, close-range murder of a stranger for money further demonstrates premeditation, as well as explosive anger and danger.

d.    [Chanthakoummane's] criminal history was extensive and fraught with violence.  He committed violent assaults and thefts  as a juvenile, stole cars, and once tied up two elderly women with electrical cord before stealing their car while on the run from police.

e.    [Chanthakoummane] was twenty-five years old at the time of the murder.  He was not so young that his brain was immature and still developing.  Neither was he old enough that he was unlikely to be a danger in the future.

f.    [Chanthakoummane] did not show any remorse for his crime, changing his story multiple times and insisting despite his DNA being all over the crime scene that he had merely entered the home for a drink of water.

g.  There was no psychiatric testimony indicating any mental health issues or impairments.

5 SHCR 1527 (¶98).  Each of these findings is supported by the record.  Thus, the state habeas court's conclusion that appellate counsel was not constitutionally ineffective for failing to raise this issue on appeal is objectively reasonable.  *Id.* at 1528 (¶¶100-01).

For these reasons, federal habeas relief must be denied.  28 U.S.C. § 2254(d); *see Richter*, 131 S. Ct. at 792; *Jordan*, 416 F.3d at 371.

## VII.  The State Habeas Court Reasonably Concluded that Appellate Counsel Was Not Constitutionally Ineffective for Failing to Challenge the Admissibility of A.P. Merillat's Testimony.

Chanthakoummane again argues that he was denied constitutionally effective assistance on appeal, this time because counsel did not challenge the admissibility of the A.P. Merillat's testimony on the basis that Merillat is not an expert regarding either the classification system or the occurrence of prison violence.  Petition at 94-99.  In support of this argument, Chanthakoummane points to two cases in which the Court of Criminal Appeals has overturned death sentences on the basis of testimony given by Merillat.  *Id.* at 98 (citing *Velez v. State*, 2012 WL 2130890 (Tex. Crim. App. 2012), and *Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2010)).

Finally, he argues that the jury's request for a "read-back" of Merillat's testimony establishes *Strickland* prejudice. *Id.* at 99 (citing 1 CR 157).

The state habeas court made the following findings regarding Merillat's testimony:

> 104. A.P. Merillat testified that he was a senior investigator with the Special Prosecution Unit, which assists with the prosecution of crimes committed in prisons around the state. 27 RR 61-64. He had testified as an expert, written articles, written books, and lectured, all on the topic of the inmate classification system used by the Texas Department of Criminal Justice.
>
> 105. Merillat testified regarding the classification system currently used by TDCJ, including how prisoners are classified upon arrival and what will cause a change in classification. 27 RR 67-73. He also testified that there have been 184 murders and numerous other violent offenses in Texas prisons since 1984, including offenses against other inmates, guards, staff members, and visitors. [*Id.* at] 78-81.

5 SHCR 1528. The court then found that Merillat's testimony on both subjects was admissible as fact testimony. *Id.* at ¶¶106 (classification), 107 (inmate violence) (citing *Lucero v. State*, 246 S.W.3d 86, 97 (Tex. Crim. App. 2008) (approving admission of similar testimony regarding inmates' opportunities for violence)). The court also found that Merillat was qualified as an expert. *Id.* at 1528-529 (¶109) (citing *Coble v. State*, 330 S.W.3d 253, 287 (Tex. Crim. App. 2010) (finding Merillat's testimony admissible as

rebuttal "educator expert" testimony)); *see Vela v State*, 209 S.W.3d 128, 134 (Tex. Crim. App. 2006) (witness can qualify as an expert on experience alone). Finally, the court properly distinguished *Estrada* because Merillat did not testify that Chanthakoummane, a life-without parole inmate, could improve his classification status. 5 SHCR 1529 (¶110); *see* 27 RR 46-47, 71-72 (correctly testifying that a life-without-parole inmate would enter as G3, which could become worse but not better).[25]

For these reasons, the state habeas court's ultimate conclusion that appellate counsel was constitutionally effective was not objectively unreasonable, 5 SHCR 1531 (¶¶131-32), and federal habeas relief must be denied. 28 U.S.C. § 2254(d); *see Richter*, 131 S. Ct. at 792; *Jordan*, 416 F.3d at 371.

## VIII. The State Habeas Court Reasonably Concluded that Neither Trial Counsel Nor Appellate Counsel Were Constitutionally Ineffective for Failing to Challenge the Admissibility of Chanthakoummane's Confession.

In a pre-trial motion to suppress, Chanthakoummane challenged the "voluntariness of the statement and the sufficiency of the warnings he was

[25]     *Velez* involved a similar problem and is, thus, also distinguishable. 2012 WL 2130890 at **32-33. Further, the court noted in *Velez* that the State's case for future dangerousness was circumstantial, that "the state presented no psychiatric evidence that appellant was a future danger, nor did it attempt to rebut the defense's psychiatric evidence that appellant would not be [a] danger in the future." *Id.* at *33. In this case, the evidence of future dangerousness was substantial and direct.

given." 2 RR 14; *see also* 3 CR 479-80. A hearing was held during which the two police officers (Officers Ellenburg and Norton) who *Mirandized* Chanthakoummane testified. 2 RR 14-69. Each testified that (1) he understood his rights, *id.* at 20, 55,[26] (2) he did not appear to be under the influence of either drugs or alcohol, *id.* at 20, 54-55, and (3) he responded appropriately to what they were telling him. *Id.* at 20, 55. Officer Ellenburg described Chanthakoummane as cooperative and "willing to talk." *Id.* at 42. Ultimately, Chanthakoummane agreed to waive his rights and talk to the officers without consulting an attorney or having an attorney present. *Id.* at 22-23, 31; *see also id.* at 56-57 (testimony that Chanthakoummane never asked for an attorney or attempted to stop the interview). The trial court then denied the motion to suppress. *Id.* at 69.

In claims 8 and 9, Chanthakoummane alleges that both trial and appellate counsel were constitutionally ineffective for failing to challenge the admissibility of his confession. Petition at 99-105 (appellate counsel), 105-07

---

[26]    Officer Ellenburg testified on redirect that Chanthakoummane "read English" and that there were no problems "communicating with [him] in English." 2 RR 46. Officer Norton testified similarly, further explaining that if it appeared Chanthakoummane could not speak English or was having trouble understanding it, a translator would have been requested. *Id.* at 57.

(trial counsel).[27]    The confession, Chanthakoummane argues, was inadmissible because he did not voluntarily waive his *Miranda* rights, specifically his right to remain silent. *Id.* at 103-05.    The state habeas court found that neither trial counsel nor appellate counsel were constitutionally ineffective.    5 SHCR 1529 (¶¶113-16); *see also id.* at 1530 (¶126), 1531 (¶¶130-32).    As discussed below, this conclusion was not objectively unreasonable.

*Miranda* holds that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444.    "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Id.*    In the absence of these warnings or their "fully effective

---

[27]    Chanthakoummane alleges that trial counsel failed to "make a specific objection at the suppression hearing to the validity of the *Miranda* waiver." Petition at 106 (citing 2 RR 37-41, 67-68).    Although the state habeas court found that any objection on this ground would have been unsuccessful, 5 SHCR 1529 (¶115), a fair reading of the transcript from the hearing, 2 RR 14-69, and the motion, 3 CR 479-80, suggests that trial counsel did in fact object.    Indeed, the motion states that the statements should be suppressed "because the dictates of Article 38.22 of the Texas Code of Criminal Procedure and [*Miranda*] were not observed, because the statements were involuntary, *Jackson v. Denno*, 378 U.S. 368 (1964), and because the defendant's right to counsel was violated[.]"  3 CR 479-80.

equivalent," the State may not offer the defendant's statement as evidence of his guilt." *Id.* at 476.

The Court has explained that the invocation of the right to counsel must be unambiguous; "[i]f an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, ..., or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (quoting *Davis v. United States*, 512 U.S. 452, 459, 461-62 (1994)). The *Berghuis* Court stated that "there is no principled reason to adopt different standards for determining when an accused has invoked the [] right to remain silent and the [] right to counsel at issue in *Davis*." *Id.* "Both protect the privilege against compulsory self-incrimination, ..., by requiring an interrogation to cease when either is invoked." *Id.* (citations omitted).

Finally, two factors determine whether an accused has voluntarily and knowingly waived his Fifth Amendment privilege: first, the waiver of the right must be voluntary in that it was not the product of intimidation, coercion, or deception, and second, the relinquishment must be made with a full awareness of the nature of the right being waived. *See Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003) (citing *Moran v. Burbine*, 475 U.S.

412, 421 (1986)); *see also United States v. Mullin*, 178 F.3d 334, 341 (5th Cir. 1999) ("A confession is voluntary if it is the product of the defendant's free and rational choice; it is voluntary in the absence of official overreaching, either by direct coercion or subtle psychological persuasion."); *United States v. Posada-Rios*, 158 F.3d 832, 866 (5th Cir. 1998) ("A confession is voluntary if under all the circumstances it is the product of the defendant's free and rational choice.") (citation omitted). A confession is involuntary or coerced if "the totality of the circumstances" demonstrate that the confessor did not decide to confess of his own free will. *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991). But it is not enough for the State to establish that *Miranda* warnings were given and that "the accused made an uncoerced statement;" "[t]he prosecution must make the additional showing that the accused understood these rights." *Berghuis*, 560 U.S. at 384 (citations omitted).

The state habeas court made the following findings:

113. Mere silence is not an invocation of a defendant's waiver of his right to remain silent, and such a waiver may be inferred after a defendant receives *Miranda* warnings, understands them, and responds to questioning from an officer. *Berghuis v. Thompkins*, [560 U.S. 370, 384-88] (2010); *Joseph v. State*, 309 S.W.3d 20[, 26-27] (Tex. Crim. App. 2010).

114. [Chanthakoummane] received *Miranda* warnings, acknowledged that understood them, and answered every question asked by the detectives. SX 76 (writing warnings

> initialed by [Chanthakoummane]); SX 77 (videotape of
> interrogation). This is a valid waiver of rights under
> *Thompkins*.

5 SHCR 1529. Based on these findings, which are fully supported by the record, the court reasonably concluded that neither trial counsel nor appellate counsel had been constitutionally ineffective. *Id.* at ¶¶115-16.

For these reasons, federal habeas relief must be denied. 28 U.S.C. § 2254(d); *see Richter*, 131 S. Ct. at 792; *Jordan*, 416 F.3d at 371.

## IX. The State Habeas Court Reasonably Concluded Chanthakoummane's Challenges to Texas's Death-Penalty Scheme Were Without Merit.

Chanthakoummane makes three general challenges to Texas's death-penalty scheme as follows: (1) the future dangerousness issue contains several vague terms and does not properly channel the jury's discretion, Petition at 107-117 (claims 10-11); (2) the trial court erred in failing to instruct the jury on the "12-10" Rule, Petition at 117-23 (claims 12-13); and (3) Texas's death-penalty scheme violates the Constitution because it does not allocate a burden of proof as to the mitigation special issue, Petition at 123-30 (claims 14-15). Whether these claims are stand-alone challenges or couched in terms of ineffective assistance of trial or appellate counsel or trial court error, none of them can serve as a basis for federal habeas relief. As the state habeas court reasonably concluded, Chanthakoummane's

"complaints have been repeatedly rejected by the Supreme Court of the United States and the Texas Court of Criminal Appeals." 5 SHCR 1530 (¶118) (citations omitted).

## A. The future dangerousness special issue

The future dangerousness special issue is part of the Texas capital punishment scheme that has been repeatedly upheld by the Supreme Court against similar challenges. *See Johnson v. Texas*, 509 U.S. 350, 373 (1993); *Jurek v. Texas*, 428 U.S. 262 (1976); *see also Pulley v. Harris*, 465 U.S. 37, 50 n. 10 (1984) (stating that Texas's punishment issues are not impermissibly vague because they have a "common sense core of meaning"). The Fifth Circuit has also repeatedly rejected similar arguments that the words used in the punishment issues have such imprecise meanings in the context of a capital murder trial that the jury cannot discern what is being asked without having those terms defined in the jury instructions. *See Sprouse v. Stephens*, 748 F.3d 609, 622-23 (5th Cir. 2014) (citing *Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir. 2007); *Hughes v. Johnson*, 191 F.3d 607, 615-16 (5th Cir. 1999); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993)). As such, the state habeas court reasonably rejected this claim, 5 SHCR 1530 (¶¶118-20), and Chanthakoummane's claims must fail. 28 U.S.C. § 2254(d).

## B.     The "12-10" rule

Chanthakoummane's claim centers on the fact that the jury was not instructed regarding Texas's "one holdout juror rule"—that if it failed to answer either issue (because the ten or twelve votes could not be mustered), the judge would sentence Chanthakoummane to life in prison.  Tex. Code Crim. Proc. art. 37.071, § 2(g).  He contends that the trial court's failure to explain the consequences of the jury's inability to reach a verdict on the special issues generates confusion among jurors and creates a danger that confused jurors will acquiesce to the "majority rules mentality" rather than hold out, thus violating the principles of the Eighth Amendment that protect him from cruel and unusual punishment.   But this claim, too, is foreclosed by well-established precedent.  *See Druery v. Thaler*, 647 F.3d 535, 542 (5th Cir. 2011) ("To the extent Petitioner's challenge to Texas's "12-10" rule rests on *Mills v. Maryland*, 486 U.S. 367, [] (1988)[,] and the Eighth Amendment, … it is foreclosed by Fifth Circuit precedent."); *see also Jones v. United States*, 527 U.S. 373, 381-82 (1999).   Thus, the state habeas court's rejection of this claim was not objectively unreasonable, 5 SHCR 1530 (¶¶118-20), and Chanthakoummane's claims must fail.  28 U.S.C. § 2254(d).

C.    The mitigation special issue

The Fifth Circuit explained in *Sprouse*:

Although Sprouse maintains that the [state]-court opinion runs counter to *Apprendi v. New Jersey*, 530 U.S. 466, [] (2000), and *Ring v. Arizona*, 536 U.S. 584, [] (2002), we have expressly rejected that argument. *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007) ("We have specifically held that the Texas death penalty scheme did not violate either *Apprendi* or *Ring* by failing to require the state to prove beyond a reasonable doubt the absence of mitigating circumstances. In [*Granados v. Quarterman*, 455 F.3d 529, 536 (5th Cir. 2006)], we stated that 'the state was required to prove beyond a reasonable doubt every finding prerequisite to exposing [the defendant] to the maximum penalty of death,' and we concluded that 'a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death.'").

748 F.3d at 623-24.   Because this is all that the Constitution requires, Chanthakoummane's allegations must fail.   As such, the state court's adjudication of these claims was reasonable, 5 SHCR 1530 (¶¶118-20), and relief must be denied. 28 U.S.C. § 2254(d).

X.    **Chanthakoummane's Claim that the Trial Judge's Comments During Voir Dire Violated the Fifth, Sixth, and Fourteenth Amendments Was Reasonably Rejected by the Court of Criminal Appeals as Procedurally Defaulted   and Meritless.**

In his final complaint, Chanthakoummane alleges that the trial judge's comments during voir dire violated his rights to a fair trial, the presumption of innocence, and effective assistance of counsel, and subjected him to cruel

and unusual punishment.  Petition at 130-35.  As discussed below, this claim must be denied.

> Judge:      It's my privilege to introduce you to your elected district attorney, Judge John Roach. … Judge Roach is a very distinguished jurist in his own right.  Some of you probably know that not only is he serving now as your district attorney, but prior to that he was the presiding judge of the 199th District Court here in Collin County for quite a number of years.  And also I think, Judge Roach, weren't you a justice on court of appeals in Dallas for some time.

> DA:         Yes, sir.

> Judge:      So he's had a very distinguished career.  Not only that but Judge Roach raises his kids right.  They're all lawyers.  In fact, he has a daughter and a son that are both attorneys and his son was just recently elected to the 196th District Court here in Collin County as its judge, and he took office January 1 of this year and just has really had a good time and really doing good job in the 296th.  So we're glad to have Judge Roach up there.  But my favorite Roach that's a lawyer, Judge, is your daughter-in-law.

> DA:         Yes, sir, I'm sure.

> Judge:      John Jr.'s wife Laura.  She is a delight.  I always look forward to having in court.

> Okay, sitting next to Judge Roach there is his very able first assistant, Greg Davis.

> DA:         Good morning.

> Judge:      Greg is very accomplished—excuse me, Greg.  I'll call you Mr. Davis.  I'll be a little more formal.  I'm familiar with him because we've tried a lot of cases together.  In fact, we tried a murder case just about three weeks ago; wasn't it?

DA:        Yes, sir.

Judge:     You'll find that he's a very, very professional and very good prosecutor.  I always enjoy trying cases with him.

Seated [at] the counsel table to my left over here and now your right, is Mr. Steve Miears.

Miears:    Morning, ladies and gentlemen.

Panel:     Good morning.

Judge:     Mr. Miears and I have also tried cases together, and he will be lead counsel in this case, and then seated at the end of the table and assisting Mr. Miears is Mr. Keith Gore.

Gore:      Good morning.

Panel:     Good morning.

Judge:     A very fine young criminal defense lawyer.  In fact, Mr. Gore and Mr. Davis and I all tried that murder case together. You did a very fine job, Keith.

5 RR 24-26.

## A.    This claim is procedurally barred.

As an initial matter, the Court of Criminal Appeals rejected this claim because although counsel objected to the comments, 6 RR 5-7, the objection came three days later.  Thus, it was not contemporaneous as required by Texas Rule of Appellate Procedure 33.1.  *Chanthakoummane v. State*, slip op. at 21-22.

The contemporaneous objection rule has long been recognized by the Fifth Circuit as an independent and adequate bar to federal review. *See, e.g.*, *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007); *Rowell v. Dretke*, 398 F.3d 370, 375 (5th Cir. 2007); *Stryon v. Johnson*, 262 F.3d 438, 453-54 (5th Cir. 2001) (holding Texas's contemporaneous objection rule operates as procedural bar to federal habeas review). Thus, Chanthakoummane must demonstrate either cause and prejudice or a fundamental miscarriage of justice in order to overcome application of the bar. *Coleman v. Thompson*, 501 U.S. at 750. This he has not done, nor can he.

**B.    In any event, this claim is without merit.**

In holding that an objection was required, the Court of Criminal Appeals explained that the judge's comments did not rise to the level claimed by Chanthakoummane: "It is common for veniremembers to be introduced to prosecutors and defense counsel during voir dire examination (although not necessarily to this degree), just as it is common to ask veniremembers if they know any of the attorneys involved in the case. Here, Judge Parker complimented both the prosecutors and defense counsel when he introduced them to the jury. And his reference to the district attorney as "Judge John Roach" did not go so far as to taint the presumption of innocence." *Chanthakoummane v. State*, slip op. at 23; *see Jasper v. State*, 61 S.W.3d

~ 74 ~

413, 420-21 (Tex. Crim. App. 2001) (holding that trial court's interjection to correct defense counsel's misstatement and his irritation with defense counsel did not rise to such level as to bear on presumption of innocence or vitiate impartiality of jury); *cf. Brumitt v. State*, 206 S.W.3d 639, 644-45 (Tex. Crim. App. 2006) (holding that trial court's comments expressing dissatisfaction with a sentence the defendant had received in a prior case did not reflect partiality of the trial court or that a predetermined sentence was imposed).

Even so, Chanthakoummane cannot demonstrate that these comments were harmful. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993) (holding that the proper harmless-error analysis on federal habeas review is whether the error had a "substantial and injurious effect or influence" on the verdict) (citation omitted); *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007). As set out elsewhere, the State's case on guilt and future dangerousness was simply overwhelming. *See* 5 SHCR 1527 (¶98); *see also* Statement of Facts, Section II(B).

For these reasons, federal habeas relief must be denied. 28 U.S.C. § 2254(d).

# CONCLUSION

For the foregoing reasons—and considering the totality of the record—the State respectfully requests that this Court deny Chanthakoummane's petition for federal habeas relief.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

s/ Fredericka Sargent
*FREDERICKA SARGENT
Assistant Attorney General
Criminal Appeals Division
Texas Bar No. 24027829
*Counsel of Record          P.O. Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-1600
Fax: (512) 320-8132
e-mail:
fredericka.sargent@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I hereby certify that on Monday, July 28, 2014, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who has consented in writing to accept this Notice as service of this document by electronic means:

Carlo D'Angelo
100 East Ferguson, Suite 1210
Tyler, TX 75703
carlo@dangelolegal.com


      s/   Fredericka Sargent
FREDERICKA SARGENT
Assistant Attorney General