# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF TEXAS

# SHERMAN DIVISION

| | | |
|---|---|---|
| **KOSOUL CHANTHAKOUMMANE,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:13cv67** |
| | § | |
| **DIRECTOR, TDCJ-CID,** | § | |
| | § | |
| **Respondent.** | § | |

## MEMORANDUM OPINION AND
## ORDER OF DISMISSAL

Petitioner Kosoul Chanthakoummane, an inmate confined in the Texas prison system, filed the above-styled and numbered petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is challenging his capital murder conviction and death sentence imposed by the 380th Judicial District Court of Collin County, Texas in Cause Number 380-81972-07, in a case styled *The State of Texas v. Kosoul Chanthakoummane*. For reasons set forth below, the Court finds that the petition is not well-taken and that it will be denied.

## Procedural History of the Case

On October 17, 2007, Petitioner was convicted of the offense of capital murder for stabbing and killing Sarah Walker in the course of committing the offense of robbery, in violation of Tex. Penal Code § 19.03(a). The Texas Court of Criminal Appeals ("TCCA") affirmed the conviction and death sentence. *Chanthakoummane v. State*, No. AP-75,794, 2010 WL 1696789 (Tex. Crim. App. April 28,

2010) (unpublished). The Supreme Court denied his petition for a writ of certiorari. *Chanthakoummane v. Texas*, 131 S. Ct. 506 (2010).

Petitioner filed an application for a writ of habeas corpus in state court on April 5, 2010. An evidentiary hearing was conducted on November 10, 2010. The state trial court issued thorough findings of fact and conclusions of law on September 20, 2012. The TCCA subsequently denied relief based on the trial court's findings and conclusions and on its own review. *Ex parte Chanthakoummane*, No. WR-78,107-01, 2013 WL 363124 (Tex. Crim. App. Jan. 30, 2013) (unpublished).

Petitioner began the present proceedings on February 5, 2013. He filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on January 26, 2014 (docket entry #15). The Director filed an answer on July 28, 2014 (docket entry #31). No reply was filed.

## Factual Background of the Case

The TCCA thoroughly discussed the factual background of the case as follows:

On Saturday, July 8, 2006, real estate agent Sarah Walker was murdered in the D.R. Horton model home where she worked in the "Craig Ranch" subdivision in McKinney, Texas. [Petitioner] was charged with intentionally and knowingly causing Walker's death while in the course of committing or attempting to commit robbery.

On the morning of July 8, Walker's ex-husband, Randy Tate, went to Walker's residence in Frisco, Texas. Walker planned to work at the model home that day, so Tate picked up their son early that morning. While Tate was at Walker's residence, Walker showed him a new Rolex watch that she said she had purchased the previous day. Later that morning, Walker went to a Bank of America in Frisco. Still photographs taken from the bank surveillance video showed Walker wearing a watch and a ring at around 11:45 a.m. Walker's cousin, Jessica Allen, testified that Walker often wore ornate rings and a Tag Heuer watch that she had owned for several years.

Another real estate agent, Mamie Sharpless, received a phone call at 9:40 a.m. that morning from a man who identified himself as "Chan Lee." The man told Sharpless that he found her phone number in a Keller Williams advertisement and that he wanted to look at a town house she had listed in the Craig Ranch subdivision. He said that he had just moved from North Carolina to the Dallas area, that he had graduated from the University of North Carolina

at Charlotte, and that he worked for Texas Instruments. He said that he was calling from a phone booth at the 7–Eleven at Midway and Park and that he was staying in Room 245 at the "InTown Suites." When Sharpless asked him for a contact number, he said that he did not have a cell phone. The phone "cut off" before their conversation ended, so Sharpless tried to reach him by calling his hotel. Sharpless testified that she "called two InTown Suites, and one didn't have a [Room] 245, the other one did, but it just had a recording on it."

Sharpless arrived to show the town house between 11:30 a.m. and noon, and she brought her husband, Nelson Villavicencio, with her. As they sat in their car and waited, they saw a man drive by in a white Ford Mustang and park across from a D.R. Horton model home down the street. They observed the man getting out of the Mustang and starting to cross the street. They drove over to the man and asked him if he was "Chan Lee," and he replied, "No." Sharpless described him as a muscular man of Asian descent, about 5' 4" or 5' 5" tall, with a "buzz cut." She made an in-court identification of [Petitioner] as the man she saw that day, but explained that he was thinner with longer hair at the time of trial.

As Sharpless and Villavicencio drove away, they noticed that the Mustang had Texas license plates. When Villavicencio drove to the end of the block, turned around, and drove back, the Mustang was no longer there. He then drove back to the town house so Sharpless could show it to another potential buyer. As Villavicencio looked out the bedroom window while Sharpless showed the town house, he observed Walker arrive in her Porsche Boxster. Walker parked her car across the street from the D.R. Horton model home and went inside. At that point, Villavicencio also saw a white Mustang parked on the street in front of the model home. Sharpless then finished showing the town house and they left between 12:30 and 1:00 p.m. As they left the subdivision, Sharpless also noticed a white Mustang parked in front of the model home.

At about 12:30 p.m., Walker called her cousin, Jessica Allen. Allen testified that Walker was "in a really good mood" during their brief telephone conversation. They talked for about 15 minutes, then Walker "said someone had walked in and she'd call [Allen] back."

At approximately 1:10 p.m., Andy Lilliston and his wife came to look at the D.R. Horton model home. When they entered the model home, Lilliston thought that it appeared to have been "ransacked." He observed a large pool of blood in the dining room, where the sales desk was located. He followed a trail of blood into the kitchen, where he saw Walker lying face-up on the floor, with the upper half of her body covered in blood. Lilliston directed his wife to call 9–1–1, and they exited the model home. Lilliston ran into the street and flagged down a vehicle for help. He briefly went back inside the model home to check on Walker, but she did not display any signs of life. Lilliston then went back outside and waited for emergency personnel to arrive.

When Texas Ranger A.P. Davidson arrived at the model home, he noticed signs of a struggle in the dining room. The desk was crooked, the desk chair was out of place, a plant stand was knocked over, and a potted plant was on the floor. A pair of women's shoes, a broken hair clip, and a broken earring were also on the floor. There was a trail of blood leading

from the dining room into the kitchen. Walker's body was on the kitchen floor, and it appeared that she had multiple stab wounds. Davidson opined that Walker had been dragged by her feet from the dining room to the kitchen because the long skirt she was wearing was rolled up to her waistline.

McKinney police officer Pete Copin discovered a bloody fingerprint on the deadbolt lock on the front door of the model home; however, he testified that there were "not enough individual characteristics for a positive identification." Copin further observed what appeared to be blood on the plant stand, on the ceramic tile in the entryway, on the wall next to the edge of the window beside the front door, and on the pull cord for the window blinds. It also appeared that there had been blood in the kitchen sink that had been washed or diluted with water. Copin collected blood swabs and other evidence from the scene for further testing.

When Walker's body was discovered, she was no longer wearing the watch and ring that she had been shown wearing earlier on the bank surveillance video. When the police searched Walker's residence after her death, they found her Tag Heuer watch. The police never located her Rolex watch, but they did find the box and the receipt for the Rolex watch in her residence.

William Rohr, the Collin County Medical Examiner who performed Walker's autopsy, testified that Walker sustained several blunt force injuries to her head. He opined that the blunt force injuries were the result of "several blows," and that they were consistent with Walker being struck in the face and head with the plant stand in the model home. Walker had multiple bruises on her face and head, a broken nose, and fractured teeth. She had some defensive wounds, including an excised wound on her left arm and a broken fingernail on her right hand. She suffered a total of 33 stab wounds, 10 of which penetrated vital organs and blood vessels. Rohr testified that any one of those 10 wounds could have been "pretty much immediately fatal." Walker also had a bite mark on the back of her neck that Rohr opined was inflicted "at or near her death." Rohr testified that he preserved this evidence by using a scalpel to excise the bite mark and surrounding area.

DNA analysis linked [Petitioner] to evidence from the crime scene. [Petitioner's] DNA profile was consistent with the DNA obtained from Walker's fingernails, the window blind pull cords, the deadbolt lock and faceplate, and some of the swabs taken from the living room, kitchen, and entryway of the model home. The DNA analyst testified that only a "partial profile" was obtained from a swab taken from the kitchen sink because the DNA extracted from that swab "was of low quality and degraded quality." However, the set of genetic markers that she was able to detect in the partial profile "corresponded with the genetic markers observed in the DNA profile of [Petitioner]."

After receiving the results of the DNA analysis, police arrested [Petitioner] at his apartment on September 5, 2006. Texas Ranger Davidson testified that [Petitioner] owned a white Ford Mustang and that his apartment was located three miles away from the pay phones at Midway and Park. Davidson spoke to [Petitioner's] sister, who informed him that [Petitioner] had attended school in North Carolina and that he had moved from Charlotte to

Dallas in February 2006. Davidson determined that [Petitioner] had filled out a lease application at an apartment complex near the InTown Suites on Trinity Mills. Davidson also discovered that [Petitioner's] bank account was overdrawn by $82.27 on the day before Walker's murder. Davidson testified that [Petitioner] was muscular and had a shaved head at the time of his arrest. Officer Copin, who later photographed [Petitioner] to document his appearance, testified that he observed what appeared to be some healed cuts or scratches on [Petitioner's] hands and fingers.

[Petitioner] was transported to the McKinney Police Department, where he was interviewed by Officer Randall Norton. [Petitioner] at first denied ever being in McKinney in his white Mustang. Upon further questioning, he stated that his car had broken down at "a model house," that he knocked on the door but no one answered, that he took "like three or four steps" inside and asked if anyone was home but no one was there, and that he spoke to a man and a woman in a green or blue "Corolla or Camry" as he left. Next, he admitted that he went to the kitchen sink for a drink of water, but said that he "didn't know how to use the faucet because the hot water came out," so he left. He acknowledged that he had "old cuts" on his hands "from work," so it was possible that he could have been bleeding when he was inside the model home. He also acknowledged that he had sold some of his own property for cash at a pawn shop on Greenville Avenue, including a tape deck, a drill, and an inexpensive Kenneth Cole watch.

Forensic dentistry consultant Brent Hutson examined [Petitioner] and made impressions of his teeth. Hutson compared [Petitioner's] teeth to the bite mark on Walker's neck and found enough similarities that he was "unable to exclude [Petitioner] from that population of individuals that could have inflicted this injury." Hutson concluded "within reasonable dental certainty beyond a doubt" that [Petitioner] was responsible for the bite mark on Walker's neck.

*Chanthakoummane*, 2010 WL 1696789, at *1-4.

## **Grounds for Relief**

Petitioner brings the following grounds for relief:

1.   Trial counsel was ineffective for failing to sufficiently investigate, develop and present significant mitigating evidence in violation of Petitioner's Sixth Amendment right to counsel and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

2.   By conceding guilt as to the issue of whether a robbery occurred in this case, trial counsel rendered ineffective assistance of counsel in violation of Petitioner's Sixth Amendment right to counsel and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

3.  Petitioner's due process rights under the Fourteenth Amendment and his Sixth Amendment right to an impartial jury were violated when a juror committed misconduct by discussing the case with his spouse.

4.  A juror's improper consideration of Petitioner's failure to testify at trial violated his Fifth, Sixth and Fourteenth Amendment rights.

5.  Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to challenge the admissibility of the State's gang affiliation witness.

6.  Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to challenge the sufficiency of the evidence regarding Petitioner's future dangerousness.

7.  Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to challenge the admissibility of A. P. Merillat's testimony.

8.  Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to challenge the denial of Petitioner's motion to suppress his statement.

9.  Petitioner's trial counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to lodge a specific objection to the voluntariness of his *Miranda* waiver during the suppression hearing.

10. The refusal of the Texas courts to properly define the terms and phrases in the future dangerousness special issue was a decision contrary to, and an unreasonable application of clearly established constitutional law in that Petitioner was: (1) deemed eligible for the imposition of death as a penalty by the use of an unconstitutionally vague aggravator; and (2) Petitioner was selected for the death penalty without giving full consideration and effect to record evidence of his mitigating circumstances.

11. Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to brief the unconstitutionality of the Texas death penalty scheme because it is based upon vague statutory terms and does not properly channel the jury's discretion.

12. The trial court violated the Eighth and Fourteenth Amendments to the United States Constitution by failing to instruct the jury that a "No" vote by a single jury member would result in a Life sentence instead of a death sentence despite the statutory requirement of ten votes for a "No" answer to Article 37.071 § 2(b)(1) or for a "Yes" vote to Article 37.071 § 2(e).

13.     Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to brief the "10-12" Texas death penalty scheme.

14.     The Texas capital punishment scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because the mitigation special issue does not allocate a burden of proof.

15.     Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to brief that the Texas death penalty scheme does not allocate a burden of proof for mitigation special issues.

16.     The trial court's grossly impartial comments to the assembled jury venire praising the prosecution subjected Petitioner to cruel and unusual punishment and a deprivation of his rights to a fair trial, the presumption of innocence, and the effective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

### Standard of Review

The petition was filed in 2014, thus review is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997). Under AEDPA, a petitioner who is in custody "pursuant to the judgment of a State court" is not entitled to federal habeas corpus relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). "By its terms § 2254 bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, ___, 131 S. Ct. 770, 784 (2011). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the

doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citation and internal quotation marks omitted).

With respect to the first provision, a "state court decision is 'contrary to' clearly established federal

law if (1) the state court 'applies a rule that contradicts the governing law' announced in Supreme

Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of

materially indistinguishable facts." *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (en

banc) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)), *cert. denied*, 551 U.S. 1141 (2007).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated

the claim on the merits." *Cullen v. Pinholster*, 563 U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011). As

such, "evidence later introduced in federal court is irrelevant." *Id.* at 1400. "The same rule necessarily

applies to a federal court's review of purely factual determinations under § 2254(d)(2), as all nine

Justices acknowledged." *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011), *cert. denied*, 133 S. Ct.

105 (2012). With respect to § 2254(d)(2), a Texas court's factual findings are presumed to be sound

unless a petitioner rebuts the "presumption of correctness by clear and convincing evidence." *Miller-*

*El v. Dretke*, 545 U.S. 231, 240 (2005). The "standard is demanding but not insatiable; . . . [d]eference

does not by definition preclude relief." *Id.* (citation and internal quotation marks omitted). More

recently, the Supreme Court held that a "state court's determination that a claim lacks merit precludes

federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state

court's decision." *Richter*, 131 S. Ct. at 786. The Supreme Court has explained that the provisions

of AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order

to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the

extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Federal habeas corpus relief is

not available just because a state court decision may have been incorrect; instead, a petitioner must

show that a state court decision was unreasonable. *Id.* at 694. Furthermore, when a state court

provides alternative reasons for denying relief, a federal court may not grant relief "unless *each* ground supporting the state court decision is examined and found to be unreasonable under AEDPA." *Wetzel v. Lambert*, 565 U.S. ___, ___, 132 S. Ct. 1195, 1199 (2012) (emphasis in original).

<u>**Discussion and Analysis**</u>

**Claim Number 1:      Trial counsel was ineffective for failing to sufficiently investigate, develop and present significant mitigating evidence in violation of Petitioner's Sixth Amendment right to counsel and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.**

Petitioner initially presents a lengthy claim, including four sub-claims, regarding the efforts of his counsel to present mitigating evidence on his behalf during the punishment phase of the trial. Petitioner argues that he is entitled to federal habeas corpus relief because his attorney was ineffective for failing to sufficiently investigate, develop and present significant mitigating evidence. He acknowledged that counsel hired a mitigation specialist, but he asserted that the specialist did nothing more than compile a collection of juvenile delinquency and adult prison records. He acknowledged that the mitigation specialist contacted some of his family members, but he characterized the interviews as too brief and cursory to produce any meaningful mitigation evidence.

Petitioner listed the following four sub-claims in support of his claim that counsel failed to sufficiently investigate, develop and present significant mitigating evidence:

1.      North Carolina Department of Social Services records documenting his dysfunctional family life and history of abuse;

2.      School records establishing his hearing impairment and the impact it had upon his childhood development;

3.      The cultural impact his Laotian immigration story had upon his upbringing; and

4.      The failure of counsel to call any of his family members during his punishment trial.

The Director argues that Petitioner's claim lacks merit and that the state court's rejection of the claim was reasonable.

Petitioner's ineffective assistance of claims are governed by the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* provides a two-pronged standard, and a petitioner bears the burden of proving both prongs. 466 U.S. at 687. Under the first prong, the petitioner must show that counsel's performance was deficient. *Id.* To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, . . ." *Id.* at 689 (citations omitted). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). Under the second prong, the petitioner must show that his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails

if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697.

The Supreme Court recently discussed the difficulties associated with proving ineffective assistance of counsel claims as follows:

> "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky,* 559 U.S. ——, ——, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland,* 466 U.S., at 689–690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.,* at 689, 104 S. Ct. 2052; see also *Bell v. Cone,* 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S. Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S., at 690, 104 S.Ct. 2052.

*Richter*, 131 S. Ct. at 788. In a separate opinion issued on the same day, the Court reiterated that the "question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from the best practices or most common custom." *Premo v. Moore*, 562 U.S. 115, ___, 131 S. Ct. 733, 740 (2011) (citing *Strickland*, 466 U.S. at 690).

In the context of § 2254(d), the deferential standard that must be accorded to counsel's representation must also be considered in tandem with the deference that must be accorded to state court decisions, which has been referred to as "doubly" deferential. *Richter*, 131 S. Ct. at 788. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* "If the standard is difficult to meet, that is because it was meant to be." *Id.* at 786. *Also see Morales v. Thaler*, 714 F.3d 295, 302 (5th Cir.), *cert. denied*, 134 S. Ct. 393 (2013).

Petitioner specifically argues that his attorney was ineffective for failing to sufficiently investigate, develop and present significant mitigating evidence. "[D]efense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2002) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983)), *cert. denied*, 537 U.S. 1104 (2003). *See also Woods v. Thaler*, 399 F. App'x 884, 891 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 2444 (2011). In assessing whether counsel's performance was deficient, courts look to such factors as what counsel did to prepare for sentencing, what mitigation evidence he had accumulated, what additional "leads" he had, and what results he might reasonably have expected from those leads. *Neal*, 286 F.3d at 237. The reasonableness of counsel's investigation involves "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). *See also Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008), *cert. denied*, 556 U.S. 1240 (2009). "[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins*, 539 U.S. at 524 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.8.6, at 133 (1989)). The Supreme Court stressed in *Wiggins* that the "investigation into mitigating evidence should comprise efforts to discover *all reasonably available* mitigating evidence." *Id.* (emphasis in original).

The Court added, however, that the investigation into mitigating evidence has limits:

[We] emphasize that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the "constitutionally protected independence of counsel" at the heart of *Strickland*, 466 U.S., at 689, 104 S.Ct. 2052. We base

our conclusion on the much more limited principle that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." *Id.* at 690-91, 104 S.Ct. 2052. A decision not to investigate thus "must be directly assessed for reasonableness in all the circumstances." *Id.*, at 691, 104 S.Ct. 2052.

*Id.* at 533. In *Wiggins*, the Supreme Court held that counsel's representation "fell short of . . . professional standards" for not expanding their investigation beyond the investigation report and one set of records they obtained, particularly "in light of what counsel actually discovered" in the records. *Id.* at 524-25. More recently, the Court found counsel's representation deficient when he failed "to conduct *some* sort of mitigation investigation" even though his client was fatalistic and uncooperative. *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (emphasis in original). *See also Rompilla v. Beard*, 545 U.S. 374, 381-82 (2005) (counsel's investigation was unreasonable because counsel failed to review a prior conviction file used by the prosecution, a file that would have alerted counsel that further investigation was necessary). On the other hand, the Supreme Court has found that counsel's performance was not deficient where he gathered a substantial amount of information and then made a reasonable decision not to pursue additional sources. *Bobby v. Van Hook*, 558 U.S. 4, 11-12 (2009). Similarly, in *Strickland*, the Court found that counsel's decision not to seek more character or psychological evidence than was already in hand was reasonable. *Strickland*, 466 U.S. at 699. In order to establish that counsel was ineffective due to a failure to investigate the case, a petitioner must do more than merely allege a failure to investigate; instead, he must state with specificity what the investigation would have revealed, what specific evidence would have been disclosed, and how the evidence would have altered the outcome of the trial. *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994); *Rose v. Johnson*, 141 F.Supp.2d 661, 691 (S.D. Tex. 2001).

In his first sub-claim, Petitioner alleges that counsel was ineffective for failing to discover North Carolina Department of Social Services (DSS) records documenting his dysfunctional life and

13

history of abuse. He asserted that if trial counsel had bothered to pull DSS records under his last name, as opposed to simply searching records under his first name, counsel would have discovered a wealth of mitigation information. He complained that instead of acknowledging the lapse, counsel placed the blame on DSS for failing to suggest that they should dig deeper under his last name. He countered counsel's excuse by stressing that Pam Freeburn, a DSS employee, informed his "attorneys that there was no record in Kosoul's name. I also told them that there were several records with the last name of Chanthakoummane and that Mr. Chanthakoummane's record could be listed under a parent name." 2 SHCR 334.[1] The attorneys did not, however, ask her about other records under the name of Chanthakoummane. *Id.*

The issue was fully developed during the state habeas corpus proceedings. Ms. Freeburn's affidavit was before the court. Affidavits were also submitted by lead counsel Steven R. Miears (5 SHCR 1413-36), co-counsel Keith Gore (5 SHCR 1394-1408) and mitigation specialist Vince Gonzalez (5 SHCR 1144-1152). Miears affidavit included the following statement about DSS records:

> To this end, Mr. Gore and I travelled to the central location of Social Services, and their records, for the State of North Carolina. We had obtained and presented appropriate releases authorizing and directing that records concerning Kosoul be delivered to us. We identified the person we needed to interview concerning the existence, or non existence, of any such records as Ms. Pam Freeburn, M.S.W. She identified herself as the Social Works Supervisor for the Department of Social Services for Mecklenburg County located in Charlotte, North Carolina. We advised her that our mission was to obtain social service records concerning Kosoul, if existed, in preparation for his upcoming trial on capital murder charges.

> Ms. Freeburn was interrogated by me as to whether that agency would have any relevant records. I was assured by her that if they existed, she would be the right person to search for them. She left our interview and we waited in an office. After a while she returned, and advised us that she had conducted the search requested, and that there were absolutely no records under Kosoul's name. I specifically asked her to keep searching after we left, and to

---

[1]"SHCR" refers to the state habeas clerk's record preceded by the volume number and followed by the page number.

check in any other data bases, and use whatever other resources existed to ascertain if any such records existed. She assured me she would. I asked her to correspond with me, and to put in writing the results of her search. She advised she would.

While we were still in North Carolina Mr. Gore received by fax to his office in McKinney the correspondence attached hereto as exhibit 1. Ms. Freeburn stated in a letter addressed to me dated August 1, 2007 that:

"At your request, I checked our Youth and Family Services data system and found that our agency has no records listed under the name of Kosoul Chanthakoummane. Just to confirm, I contacted our record room staff and they also found this to be the case."

A separate fax was also received which is attached hereto as exhibit 2 from Ms. Brenda McCray. Ms. McCray was identified as an employee for the Youth and Family Services Division. She stated to me in her letter that as to Kosoul Chanthakoummane:

"There are no records within the youth and Family Services Division on file for the above mentioned claimant."

These writings from both Ms. Freeburn and Ms. McCray convinced and assured me that there was no further need to explore this particular area for mitigation evidence. To say I was shocked to see that these records did indeed exist would be an understatement.

5 SHCR 1432-33. Counsel attached copies of the faxes that were received from Ms. Freeburn and Ms. McCray. Co-Counsel Gore provided a similar statement in his affidavit. 5 SHCR 1399-1402.

Based on the application for a writ of habeas corpus, the State's answer, the affidavits and other official court records, the state habeas court issued the following findings regarding counsel's efforts to discover social services records:

50. Counsel interviewed [Petitioner] and his family "extensively, repeatedly, and often" regarding any history of child abuse or involvement with social services. [Petitioner] and his relatives always denied any form of child abuse. [5 SHCR 1151 (Gonzalez affidavit), 1397-98 (Gore affidavit), 1416, 1431 (Miears affidavit)].

51. Counsel also investigated the potential of child abuse by visiting the Department of Social Services in North Carolina and requesting any records for [Petitioner] or his family. Counsel was informed in person and in writing that no records existed. [5 SHCR 1399-1401 (Gore affidavit), 1415, 1432-33 (Miears affidavit)].

15

52.     Social services records did exist under [Petitioner's] sister Sopha's name.  These records were discovered during the habeas investigation and attached to the writ application.  [4 SHCR 742-873].  The records indicated that:

    a.     Social services first became involved with the family when Sopha ran away and made an allegation of abuse, but the allegation was ruled "unsubstantiated."  [*Id.* at 769, 773].

    b.     A subsequent complaint involved [Petitioner] and inappropriate discipline, including spanking with an electrical wire.  This claim was substantiated.  [*Id.* at 764].

    c.     [Petitioner's] parents were cooperative with the investigation and engaged in "discussions about safer, more appropriate forms of discipline."  After they became aware of cultural differences in forms of discipline between Laos and the United States, they stopped using physical discipline.  [*Id.* at 754, 764].

    d.     [Petitioner] had numerous discipline problems even after involvement from social services, including stealing from his siblings, going out late at night without permission, and kicking holes in the walls of the home.  [*Id.* at 760].

5 SHCR 1519-20.

The state habeas court noted the competing affidavits presented by Pam Freeburn and trial counsel and their investigator.  5 SHCR 1520.  The court then made the following findings in light of the competing affidavits:

57.     Freeburn's version and Miears's and Gore's versions of the events are not reconcilable.

58.     Miears's and Gore's version of the events is consistent with the other evidence before the Court of counsels' extensive investigations of the case.

59.     Miears's and Gore's version of the events is consistent with the vigorous defense exemplified in the trial record.

60.     Freeburn's allegations regarding counsels' investigation of [Petitioner's] social services background are not credible to the extent that they conflict with Miears's and Gore's affidavits.

61.     Counsels' inability to obtain social services records was through no fault of their own.

62.     Counsel reasonably determined that no further investigation into possible childhood abuse was necessary. *See Moore*,[2] 194 F.3d at 616.

5 SHCR 1521.

After making the findings of fact, the state habeas court issued the conclusion of law that counsels' investigation was diligent and in keeping with local standards of appropriate investigation. *Id.* The court concluded that counsels' representation on this issue was not deficient. The TCCA subsequently adopted the findings and conclusions in denying the application for a writ of habeas corpus. *Ex parte Chanthakoummane*, 2013 WL 363124, at *1.

In his petition, Petitioner attempts to counter the state court findings of fact by focusing on Freeburn's affidavit in arguing that counsel did not engage in efforts to discover all reasonably available mitigating evidence as it relates to the DSS records. The state court, however, considered all of the evidence, including the competing affidavits, and reasonably found that counsel engaged in an extensive investigation and that counsels' inability to obtain social service records was through no fault of their own. Petitioner has not satisfied his burden under § 2254(e)(1) of rebutting the presumption of correctness that must be accorded to the state court factual findings with clear and convincing evidence. *See Miller-El*, 545 U.S. at 240; *Roberts v. Thaler*, 681 F.3d 597, 604 (5th Cir.), *cert. denied*, 133 S. Ct. 529 (2012).

The state habeas court went on to discuss the second prong in the ineffective assistance of counsel analysis and concluded that Petitioner had not shown prejudice. The state habeas court's analysis overlaps with Petitioner's fourth sub-claim that counsel failed to call any family members during his punishment trial. The court issued the following findings:

---

[2]*Moore v. Johnson*, 194 F.3d 586, 616 (5th Cir. 1999)

64. Even had counsel been aware of the social services records, a decision not to call Petitioner's relatives would have been reasonable, and the result of the proceeding would not have been different had counsel discovered the records:

   a. Counsel assert in their affidavits that they would have presented evidence of childhood abuse through the testimony of [Petitioner's] relatives had they been aware of the social services records. [5 SHCR 1395 (Gore affidavit), 1416, 1430, 1435 (Miears affidavit)].

   b. Counsel also repeatedly assert elsewhere in their affidavits that they made a strategic decision not to call [Petitioner's] relatives to testify because of the potentially harmful nature of their testimony, including introducing evidence of gang involvement and the family's opinions that [Petitioner] deserved the death penalty. [5 SHCR 1404 (Gore affidavit), 1425-26, 1427, 1429 (Miears affidavit)].

   c. The potential mitigation evidence was weak. Although there was some evidence of childhood abuse, the records also reflected that the abuse was minor, the parents were motivated by cultural differences rather than animus, and the family underwent counseling and adopted more reasonable disciplinary methods as soon as they were made aware of the cultural differences.

   d. The potential harm from the family's testimony was severe. Testimony regarding [Petitioner's] criminal activities from a very young age, even before his involvement in the juvenile justice system, and his association with gangs would significantly undermine counsel's strategy of attacking the future dangerousness special issue.

   e. The testimony of [Petitioner's] own family - most especially [Petitioner's] mother - that he deserved the death penalty would be highly prejudicial. It would be difficult for even severely mitigating evidence to overcome such prejudicial testimony.

   f. Counsel's assertion that the relatives would have been called to testify about minor childhood abuse is not [ ] consistent with their identification of highly prejudicial testimony the relatives would have provided.

65. Even had the social services evidence been presented, the result of the proceeding would not have been different in light of the minimal mitigating value and strong possibility of additional prejudicial testimony.

5 SHCR 1521-22. Once again, the TCCA adopted these findings in denying Petitioner's application

for a writ of habeas corpus.

Petitioner provided only a limited challenge to the findings of the state habeas court. *See* Petition at 31-32. He reiterated counsels' assertion in their affidavits that they would have presented evidence of childhood abuse if they had been aware of the social services records. He reiterated that counsel concedes that "the information would have been vital to the adequate preparation of a mitigation case." 5 SHCR 1435. He went on to make the conclusory claim that it "is clear that counsel's deficient performance in following through and finding the DSS information would have changed the outcome of the punishment trial as required under the second prong of *Strickland*. The State's failure to see how this deficient performance by counsel affected the outcome of this case is therefore the result of an unreasonable application of *Strickland* to the facts of the case." Petition at 32. However, Petitioner's conclusory allegations and bald assertions of prejudice are insufficient to support a petition for a writ of habeas corpus. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990); *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983).

The Director appropriately noted that the Supreme Court has emphasized "that the reviewing court must consider all the evidence - the good and bad - when evaluating prejudice." *Wong v. Belmontes*, 558 U.S. 15, 26 (2009) (citing *Strickland*, 466 U.S. at 695-96). A showing of prejudice in the context of mitigation requires a petitioner "to establish 'a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing,' and 'that had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned a different sentence.'" *Id.* at 20 (citing *Wiggins*, 539 U.S. at 535, 536). "[I]t is necessary to consider *all* relevant evidence that the jury would have had before it if [trial counsel] had pursued a different path - not just the mitigation evidence [trial counsel] could have

presented, but also the [aggravating evidence] that almost certainly would have come with it." *Id.* (citing *Strickland*, 466 U.S. at 695-96) (emphasis in original).

In the present case, Petitioner goes no further than to assert that if counsel had followed through and found the DSS information then the outcome of the punishment phase of the trial would have been different. He did not weigh all the relevant evidence that the jury would have had before it, both good and bad. The state habeas court, on the other hand, discussed all of the evidence, both good and bad, in finding that the potential mitigation evidence was weak and that it was also highly prejudicial. Petitioner has not shown prejudice in the manner required by the Supreme Court in *Strickland*, *Wiggins* and *Wong*. He certainly failed to show that had the jury been confronted with this mitigating evidence, then there is a reasonable probability that it would have returned a different verdict. Furthermore, he has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Petitioner's first sub-claim on his first ineffective assistance of counsel claim regarding the failure of counsel to discover the DSS records lacks merit.

In his second sub-claim, Petitioner alleges counsel was ineffective for failing to explore and present mitigating evidence with respect to school records establishing his hearing impairment and the impact it had upon his childhood development. Testing in kindergarten revealed that he had "a moderate high frequency hearing loss bilaterally with normal hearing through 1500-2000Hz." 2 SHCR 194. He acknowledged that counsel filed an affidavit during the course of the state habeas corpus proceedings. He asserted, however, that counsel's response shows that counsel was "fixated" upon his ability to hear during the pendency of the death penalty case and not upon how this impairment

during his childhood had a mitigation value. Petition at 39. He also complained that counsel passes the blame for failing to discover records of his impairment upon the State of North Carolina.

This issue was fully developed during the state habeas corpus proceedings. Counsel Miears noted that Petitioner was examined by experts and that "none of these experts who examined [Petitioner] related that he had any hearing defects or impairments." 5 SHCR 1418. He went on discuss this issue further as follows:

> In interviews with [Petitioner] he revealed that he did have an incident at a young age when a bug was removed from his ear that relieved an inability to hear some things. While this seemed an interesting story to me, at the time it did not seem to have any relevance for mitigation. Nor did it seem to relate to any hearing impairment as a child since he did not connect the event to any hearing loss. [Petitioner] did not appear to me, or anyone else involved in his defense, to have any difficulty with hearing. He could always hear what was discussed with him, and he replied appropriately.
>
> Furthermore, none of the experts who interviewed or examined him ever related any difficulty experienced by him with hearing. He simply never indicated any hearing problems ever existed. If I had ever suspected any problems [Petitioner] had with hearing, I would have had this issue explored and examined. From the information presented in his writ, I did not see any information that he currently has any hearing loss, or had any hearing loss at the time of his trial.

*Id.* at 1418-19. Miears noted that Gonzales, his mitigation specialist, obtained school records, and he did not recall learning about any hearing impairment experienced by Petitioner. *Id.* at 1419. Gonzales stated in his affidavit that family members informed him that Petitioner started experiencing hearing problems at approximately age eight. *Id.* at 1148. He added that he, in fact, requested and received school records, which do not match the records obtained by Petitioner's habeas counsel. *Id.* at 1151.

Based on the application for a writ of habeas corpus, the State's answer, the affidavits and other official court records, the state habeas court issued the following findings regarding counsel's efforts to investigate, develop and present the impact of Petitioner's hearing impairment:

> 44. [Petitioner] had minor hearing problems as a child. He failed a hearing test in kindergarten, showing "moderate to severe" hearing loss in the higher frequencies. His

problems were not treated until he was in fifth grade, when he was fitted with hearing aids. [2 SHCR 326-29].

45.     [Petitioner] informed counsel of minor hearing loss as a child, but he did not indicate that he suffered any hearing loss at the time of trial. [Petitioner's] relatives did not mention any hearing loss. None of his juvenile or prison records indicated any hearing problems. Neither counsel nor any of the experts who examined [Petitioner] noted any hearing problems. [Petitioner] did not have any difficulty hearing and consulting with counsel at the time of trial. [5 SHCR 1407 (Gore affidavit), 1418-19 (Miears affidavit)].

46.     Gonzales obtained information from family that [Petitioner] had received treatment for an ear problem. [5 SHCR 1148 (Gonzales affidavit)]. Prisoner records attached to Gonzales's Affidavit show that [Petitioner] wore hearing aids. E.g. Gonzales Affidavit, "N.C. Department of Correction Report of Medical Examination" dated 3/18/99 [5 SHCR 1319].

47.     The State provided material during discovery, specifically grand jury testimony of [Petitioner's] sister, in which she mentioned [Petitioner's] hearing issue. [5 SHCR 1117].

48.     Counsel reasonably determined that no further investigation of [Petitioner's] early hearing loss was required. "Counsel is not required to pursue every path until it bears fruit or until all hope withers." *Moore v. Johnson*, 194 F.3d 586, 616 (5th Cir. 1999) (*quoting Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980)).

49.     The result of the proceeding would not have been different had counsel presented this evidence. Testimony that [Petitioner] had minor hearing loss as a child that resolved by adulthood would have minimal mitigating value to a jury. It would be greatly outweighed by the facts of the offense and [Petitioner's] extensive criminal history. Also, presenting the testimony through any of [Petitioner's] relatives would have introduced significant prejudicial evidence.

5 SHCR 1518-19. The TCCA adopted these findings in denying Petitioner's application for a writ of habeas corpus. As before, Petitioner did not rebut the findings of fact with clear and convincing evidence. The findings of fact were reasonable based on the evidence presented to the state courts, and the conclusions of law were reasonable in light of clearly established federal law as determined by the Supreme Court. Petitioner characterizes the state court as dismissive of the issue; nonetheless, the findings and conclusions were reasonable in light of the evidence before the state court and established

law.  Petitioner failed to satisfy his burden under § 2254(d) of showing that counsel's representation on this issue was deficient or that he was prejudiced by such deficient representation.

In the third sub-claim, Petitioner alleges that trial counsel were ineffective in failing to investigate, develop and present the impact his Laotian immigration experience had on his upbringing. In the state habeas proceedings, he submitted an affidavit from his father [2 SHCR 145-157], an affidavit from his sister [2 SHCR 331-332], notes from an interview of his mother [4 SHCR 898-907], an affidavit from his brother [4 SHCR 908-915], along with a history of his family compiled by Deborah Gray, LCSW [4 SHCR 948-983].  The affidavits talk about the horror of living as poor farmers in Laos, their interaction with the Communists and life in a refugee camp.  Petitioner complains that counsel made the strategic decision not to present this evidence because it would not have been mitigating and could have been aggravating.

This issue was fully developed during the state habeas corpus proceedings.  Counsel Miears provided the following explanation as to why he did not present this issue during the sentencing phase of the trial as mitigating evidence:

> I am impressed with the information presented in the writ concerning the immigration experience of [Petitioner's] parents.  However, this was indeed information that was learned by me, and its use at trial was certainly considered.  The immigration experience of [Petitioner's] family was discussed at length with his mother, father, and sister.  This was an aspect of his life that I initially felt information could be presented which would possibly be mitigating.  As the investigation progressed, however, it became clear that, as applied to [Petitioner's] life, it was not mitigating.  It was determined by me, based upon the information then known to me, that this area could easily be seen as an aggravating factor.

> The horrible immigration experience of [Petitioner's] father and mother was just that - an experience of his father and mother.  [Petitioner] was born in the United States, and to my knowledge has never travelled outside the United States.  [Petitioner] did not have those experiences himself.  If his mother or father had been charged with a crime, it certainly would have been a factor of their background.  Indeed the argument existed that he had been rescued by his parents from that experience, but in return he had not taken advantage of this opportunity by his decision to join gangs.  This was in juxtaposition from the relatively productive lives his siblings had developed from the same parentage.

23

5 SHCR 1427-28. Co-counsel Gore likewise stated that they were concerned that Petitioner's siblings grew up in the same family environment and that they "had avoided a life of violent gang involvement and violent crimes against persons." *Id.* at 1404.

In light of the evidence, the trial court issued the following findings of fact:

36.  [Petitioner's] father, Komonh, and mother, Phong, immigrated from Laos before [Petitioner's] birth.

   a.  Komonh served in the Laotian Army, assisting the United States in the war in Southeast Asia in the late 1960s before being sent to a reeducation camp after the Communists took power in 1974. [2 SHCR 146-47].

   b.  Komonh was forced to leave his family behind, but he met Phong and her two sons, Chanh and Kominh, and they went to a refugee camp together. After Sopha (also called Monica) was born in 1979, the family immigrated to the United States. [*Id.* at 149-50].

   c.  The family had a sponsor in the United States that provided them a place to live, help findings a job, and money for food and clothing. The family moved in search of better work while Phong was pregnant with [Petitioner]. They moved several times when [Petitioner] was young, finally settling in Charlotte, North Carolina when [Petitioner] was five years old. [*Id.* at 150-53].

37.  Counsel was aware of [Petitioner's] parents' immigration experiences through interviews with [Petitioner] and his family but determined that it was not relevant to [Petitioner's] mitigation case.

   a.  Counsel believed that the immigration experience of [Petitioner's] parents, however terrible, would not be regarded as mitigating by a jury because it was not [Petitioner's] own experience. If anything, it could be seen as an aggravating factor because the jury could see that [Petitioner's] parents rescued him from that life and he did not take advantage of the opportunity. [5 SHCR 1427-28 (Miears affidavit)].

   b.  [Petitioner's] three older siblings were generally law-abiding. His sister Sopha had minor disciplinary problems such as sneaking out with boyfriends. His brother Kominh spent one night in jail as a teenager but never got into any other legal trouble. His eldest brother Chanh served in the Army and worked for a bank. [4 SHCR 912-15].

   c.  Counsel believed that the successes of his siblings would diminish the effectiveness of any arguments that [Petitioner's] parents' immigration

experiences were responsible for [Petitioner's] behavior. [5 SHCR 1404 (Gore affidavit), 1427-28 (Miears affidavit)].

5 SHCR 1516-17. The state habeas court added that the prospect of presenting the testimony of Petitioner's family's Laos immigration experience was made even worse because his relatives thought he deserved to die. *Id.* at 1517. The state habeas court noted that counsel, in fact, elicited testimony about the family being war refugees through Petitioner's juvenile court counselor. *Id.* at 1518. The Director persuasively argued that any additional testimony would have been cumulative. *See Motley v. Collins*, 18 F.3d 1223, 1228 (5th Cir.), *cert. denied*, 513 U.S. 960 (1994); *Lincecum v. Collins*, 958 F.3d 1271, 1280 (5th Cir.), *cert. denied*, 506 U.S. 957 (1992).

The state habeas court's conclusions of law on this issue were as follows:

41.     Counsel made a strategic decision that testimony about [Petitioner's] family's immigration experiences would not be mitigating and could be aggravating, both in itself and through other evidence that would have been introduced had [Petitioner's] family testified. [5 SHCR 1404 (Gore affidavit), 1426-27, 1429 (Miears affidavit)].

42.     Counsel's strategic decision not to present immigration testimony was reasonable, based on their investigation and experience with Collin County juries. Counsel were not deficient on this ground.

43.     [Petitioner] was not prejudiced by counsel's choice not to present immigration testimony in this case, based on its minimal mitigating potential, its potential to be considered an aggravating factor, and the harmful testimony [Petitioner's] family could have offered under cross-examination had they been called regarding this issue.

5 SHCR 1518. Once again, the TCCA adopted all of the trial court's findings and conclusions regarding Petitioner's immigration experiences. The findings of fact were reasonable based on the evidence presented to the state courts, and the conclusions of law were reasonable in light of clearly established federal law as determined by the Supreme Court.

It is specifically noted that the Supreme Court in *Strickland* explained "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable;

and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690-91. Federal courts "will not question a counsel's reasonable strategic decisions." *Bower v. Quarterman*, 497 F.3d 459, 470 (5th Cir. 2007), *cert. denied*, 553 U.S. 1006 (2008). In applying *Strickland*, the Fifth Circuit has held that "the failure to present a particular argument or evidence is presumed to have been the result of strategic choice." *Taylor v. Maggio*, 727 F.2d 341, 347-48 (5th Cir. 1984). Habeas corpus relief is unavailable if a petitioner fails to overcome the presumption that counsel made sound strategic decisions. *Del Toro v. Quarterman*, 498 F.3d 486, 491 (5th Cir. 2007), *cert. denied*, 552 U.S. 1245 (2008). Moreover, federal courts may not grant habeas corpus relief where a state court's decision that counsel made a strategic decision not to pursue or present evidence regarding an issue was not an unreasonable determination of the facts. *Wood v. Allen*, 558 U.S. 290, 304-05 (2010).

Petitioner argues that the state court's decision in characterizing counsel's action as a "strategic decision" was an unreasonable application of *Strickland*, particularly in light of light of counsel's statement he may have made all of the family members testify if he had all of the DSS records. Nonetheless, counsel was fully aware of Petitioner's family's immigration experience. He made the choice to forego presenting it based on his investigation. His decision was a reasonable strategy based on his investigation. With the benefit of hindsight, he possibly would have pursued a different strategy. Still, his trial strategy was reasonable in light of the facts known to him at the time. This particular ineffective assistance of counsel claim must be rejected for the additional reason that Petitioner has not shown harm. Overall, with respect to the Laotian immigration story ineffective assistance of counsel sub-claim, Petitioner is not entitled to relief because he has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Petitioner's fourth sub-claim under ground for relief number one relates to his first and third sub-claims. This time he specifically alleges that his attorneys were ineffective because they did not call any of his family members to testify during the punishment trial. He asserted that state habeas counsel conducted a thorough investigation of his family history and discovered facts that, if presented, would have painted a much different picture of his family and childhood that would have had a significant impact at the punishment phase. *See* Petition at 44-45. He stressed that his family was far from intact. He complained that the jury never learned from family members about the traumatizing events associated with the war in Laos.

In analyzing this sub-claim, it is noted that trial counsel Miears' affidavit repeatedly explained why he did not call family members to testify during the punishment phase of the trial. He initially provided the following explanation as to Petitioner's mother:

> Interviews with [Petitioner's] mother included discussions of her immigration experience, as well as how this may have influenced [Petitioner's] background. In the end a strategic decision was made not to call her as a witness. On the whole it was believed that putting his mother on the stand, when she would say that in her opinion he deserved the death penalty, would not be in [Petitioner's] best interest. Her knowledge of his gang involvement would work against our presentation concerning the issue of future dangerousness.

5 SHCR 1427. Miears subsequently addressed the issue again as follows:

> Evidence regarding his family background, upbringing, and schooling was investigated. Members of [Petitioner's] family including his mother, father, sister and brothers were extensively interviewed. These interviews occurred on multiple occasions at their homes in North Carolina, Arkansas, and at the time of trial in McKinney, Texas. The interviews were conducted using both a family member for an interpreter, and a Laotian speaking interpreter in McKinney, Texas. They were brought to McKinney for trial to continue their interviews and to determine if they persisted in their positions concerning the proper punishment for [Petitioner] if he was found guilty. Their attitudes did not change. While in McKinney, Texas,

during the time of trial, one of their close family members passed away in North Carolina. They all expressed a desire to leave McKinney, Texas to attend his funeral. This was after the jury returned a verdict of guilty to the offense of capital murder. They knew this would preclude them from testifying for [Petitioner]. They all left. I did not see any reason for them to stay or return since I had determined that calling them as witnesses would not be in [Petitioner's] best interest.

In addition, calling family members to testify would have allowed the State to introduce evidence concerning [Petitioner's] Asian gang history and gang affiliation. A center-point of out strategy in voir dire, and throughout trial, was to attempt to secure an answer to special issue number one that [Petitioner] was not a future danger. Gang affiliation is a strong predictor of future violence. Putting [Petitioner's] family members on the stand would have allowed the State to question those witnesses extensively about [Petitioner's] gang history. It was decided that having family members corroborate this history would be extremely counterproductive to the assertion that [Petitioner] would not be a threat to anyone in prison.

In sum, a strategic decision was made to not call or force members of his family to testify because they believed that if he committed the crime alleged he should be given the death penalty.

5 SHCR 1428-30.

Co-counsel Gore's explanation in his affidavit went even further:

Mr. Miears and I discussed many times whether to call [Petitioner's] parents and siblings to testify at his trial. We noticed a common theme emerging from our conversations with [Petitioner's] family members: they regarded [Petitioner] as ill-tempered, unruly and disrespectful of authority. Mr. Miears and I feared putting them on the stand would allow the State to elicit these opinions as well as evidence of [Petitioner's] involvement with violent gangs in the Charlotte, North Carolina area. We were also concerned that by having his siblings testify, the prosecution would be able to successfully point-out that they, despite having grown-up in the same family environment as [Petitioner], had avoided a life of violent gang involvement and violent crimes against persons. We were also concerned by what seemed to be their shared opinion that if [Petitioner] did commit capital murder then he deserved the death penalty.

5 SHCR 1404. Gore also explained that their anticipated testimony would have detracted from the testimony of prison guards and workers in North Carolina who told counsel and ultimately testified that Petitioner "was a model inmate, respectful of authority, dependable, obedient, not dangerous in prison and artistically talented." *Id.*

In light of the evidence, the trial court issued the following findings of fact:

38.    Counsel also believed that [Petitioner's] family's testimony would have introduced several negative factors.

      a.    [Petitioner's] mother explained to the defense team that it would be "very sad" if her son was executed, but that if he committed the charged offense then he deserved to die. [5 SHCR 1425-26, 1429 (Miears affidavit)]. Other relatives echoed this sentiment. [5 SHCR 1398, 1404 (Gore affidavit), 1429 (Miears affidavit)].

      b.    A mother's testimony that her son deserved to die would be extremely powerful testimony before the jury and significantly prejudicial to the defense.

      c.    [Petitioner's] relatives were also familiar with [Petitioner's] history with Asian gangs and crimes committed as a juvenile. Had they testified for the defense, they would have been susceptible to cross-examination on these issues. [5 SHCR 1398, 1403-04 (Gore affidavit),1426-29 (Miears affidavit)].

      d.    Counsel believed that a person's gang affiliation is seen by juries as a strong predictor of future dangerousness. Testimony from [Petitioner's] family on this ground would undermine counsel's primary argument, that [Petitioner] was not a future danger. [5 SHCR 1429 (Miears affidavit)].

5 SHCR 1517-18. The trial court went on to find that counsel made the strategic decision not to call Petitioner's family and that the testimony about the family's immigration experience would not have been mitigating and could have been aggravating. *Id.* at 1518. The TCCA subsequently adopted these findings and conclusions in denying the state application for a writ of habeas corpus.

The state court findings and conclusions were reasonable in light of the evidence before the state court. Counsel made a reasonable trial strategy not to call Petitioner's family members to testify. Petitioner attempts to counter the state court's findings and conclusions by arguing that his family's immigration experience should have been presented to the jury. He essentially argues that counsel should have spent more time investigating and pursuing a different trial strategy. Nonetheless, counsel fully considered using family members during the sentencing phase and concluded that their testimony would have been aggravating, as opposed to mitigating. The decision to forego presenting "double-

29

edged" evidence was a reasonable trial strategy. *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir.) (holding "that a tactical decision not to pursue and present potentially mitigating evidence on the ground that it is double-edged in nature is objectively reasonable."), *cert. denied*, 540 U.S. 968 (2003); *Boyle v. Johnson*, 93 F.3d 180, 188 (5th Cir. 1996) ("noting the heavy deference owed trial counsel when deciding as a strategical matter to forego admitting evidence of a 'double-edged nature' which might harm defendant's case"), *cert. denied*, 519 U.S. 1120 (1997); *Rodriguez v. Quarterman*, 204 F. App'x. 489, 500 (5th Cir. 2006), *cert. denied*, 549 U.S. 1350 (2007).

Overall, with respect to all facets of ground for relief number one, Petitioner has not shown that the representation provided by his attorneys was deficient nor shown that he was prejudiced by deficient representation. Furthermore, he has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Finally, he failed to overcome the "doubly" deferential standard that must be accorded to counsel with respect to ineffective assistance of counsel claims in the context of § 2254(d). *See Richter*, 131 S. Ct. at 788. Relief on claim number one should be denied.

> **Claim Number 2:** **By conceding guilt as to the issue of whether a robbery occurred in this case, trial counsel rendered ineffective assistance of counsel in violation of Petitioner's Sixth Amendment right to counsel and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.**

In ground for relief number two, Petitioner argues that his trial attorney was ineffective for conceding guilt as to the issue of whether a robbery occurred. Defense counsel told the jury in his opening statement that Petitioner entered the model home and met Sarah Walker and that "he wanted

to rob her, and it didn't go the right way, and he killed her." 21 RR 29.[3] Petitioner complains that

despite the fact that Walker's Rolex watch and ring were never recovered, trial counsel conceded that

her murder was the result of a robbery gone bad. As a consequence, no effort was made by trial

counsel during the guilt-innocence phase of the trial to refute that a robbery occurred in this case.

Petitioner stresses that the robbery was the only aggravating felony offense alleged by the State to

justify its capital murder charge. Petitioner argues that because the evidence that a robbery occurred

in this case was purely circumstantial, defense counsel's concession of guilt as to this issue amounted

to ineffective assistance of counsel. In addition to counsel's concession during the opening statement,

he also points to counsel's failure to cross-examine the State's witnesses on this issue and his closing

argument. Petition at 53-55, 59.

In response, the Director argues that the claim is unexhausted and procedurally barred.

Petitioner admits that the issue was not raised by state habeas counsel, but he argues that the issue

should be considered on the merits in light of the Supreme Court's decisions in *Martinez v. Ryan*, 132

S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).

State prisoners bringing petitions for a writ of habeas corpus are required to exhaust their state

remedies before proceeding to federal court unless "there is an absence of available State corrective

process" or "circumstances exist that render such process ineffective to protect the rights of the

applicant." 28 U.S.C. § 2254(b)(1). In order to exhaust properly, a state prisoner must "fairly present"

all of his claims to the state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971). In Texas, all claims

must be presented to and ruled upon the merits by the TCCA. *Richardson v. Procunier*, 762 F.2d 429,

432 (5th Cir. 1985). When a petition includes claims that have been exhausted along with claims that

_____

[3]"RR" refers to the Reporter's Record of the transcribed trial proceedings, preceded by the volume
and followed by page number(s).

have not been exhausted, it is called a "mixed petition," and historically federal courts in Texas have dismissed the entire petition for failure to exhaust. *See, e.g., Galtieri v. Wainwright*, 582 F.2d 348, 355 (5th Cir. 1978) (en banc).

The Director's argument that the present ground for relief is unexhausted and procedurally barred brings into play the procedural default doctrine that was announced by the Supreme Court in *Coleman v. Thompson*, 501 U.S. 722 (1991). The Court explained the doctrine as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750. As a result of *Coleman*, unexhausted claims in a mixed petition have routinely been dismissed as procedurally barred. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir.), *cert. denied*, 515 U.S. 1153 (1995). *See also Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Such unexhausted claims would be procedurally barred because if a petitioner attempted to exhaust them in state court they would be barred by Texas abuse-of-the-writ rules. *Fearance*, 56 F.3d at 642. The Fifth Circuit has held that the procedural bar contained in Tex. Code Crim. Proc. Ann art. 11.071 § 5 is an adequate state ground for finding procedural bars in light of decisions by the Texas Court of Criminal Appeals. *Ibarra v. Thaler*, 691 F.3d 677, 684-85 (5th Cir. 2012); *Balentine v. Thaler*, 626 F.3d 842, 857 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 2992 (2011). The procedural bar may be overcome by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Fearance*, 56 F.3d at 642 (citing *Coleman*, 501 U.S. at 750-51).

Until just recently, Petitioner's second ground for relief would unquestionably be foreclosed as unexhausted and procedurally barred. However, the Supreme Court opened the door slightly for

a showing of cause and prejudice to excuse the default in *Martinez* and *Trevino*. In *Martinez*, the Supreme Court answered a question left open in *Coleman*: "whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." 132 S. Ct. at 1315. These proceedings were referred to as "initial-review collateral proceedings." *Id.* The Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 1320. The Supreme Court specified that the standards of *Strickland* apply in assessing whether initial-review habeas counsel was ineffective. *Id.* at 1318.

The Supreme Court extended *Martinez* to Texas in *Trevino*. Although Texas does not preclude appellants from raising ineffective assistance of trial counsel claims on direct appeal, the Court held that the rule in *Martinez* applies because "the Texas procedural system - as a matter of its structure, design, and operation - does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 133 S. Ct. at 1921. The Court left it to the lower courts to determine on remand whether Trevino's claim of ineffective assistance of counsel was substantial and whether his initial state habeas attorney was ineffective. *Id.*

The Fifth Circuit has summarized the application of the rule announced in *Martinez* and *Trevino* as follows:

> To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [petitioner] must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

*Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2821 (2014). "Conversely, the petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Sells v. Stephens*, 536 F. App'x 483, 492 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1786 (2014). The Fifth Circuit subsequently reaffirmed this basic approach in *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir.), *cert. denied*, 135 S. Ct. 435 (2014).

In the present case, Petitioner argues that he should be permitted to proceed with his second ground for relief because of *Martinez* and *Trevino*. The Director argues that the underlying claim is wholly without merit and not "substantial." He specifically argued that Petitioner has not shown there would have been any difference in the outcome. *See Preyor*, 537 F. App'x at 422.

The heart of the claim concerns the sufficiency of the evidence of the underlying offense of robbery. This issue was fully developed on direct appeal. After discussing the *Jackson*[4] standard regarding sufficiency of the evidence claims and that direct evidence linking Petitioner to the missing evidence was not required, the TCCA rejected the insufficient evidence claim as follows:

> The evidence showed that Walker purchased a new Rolex watch the day before she was murdered. A bank surveillance video showed Walker wearing a watch and a ring at around 11:45 a.m. on the day she was murdered. She was no longer wearing the watch and ring when her body was discovered less than two hours later. Police later discovered a box and receipt for Walker's Rolex watch at her residence, but the watch itself was never found. Bank records showed that [Petitioner's] bank account was overdrawn by $82.27 on the day before Walker's murder. In his statement to police, [Petitioner] said that he had recently pawned some personal property for case and that his cell phone had been "cut off" because he "fell behind on bills and stuff." A pawn shop receipt dated July 26, 2006, confirmed [Petitioner's] statement he had pawned his Kenneth Cole watch.

> . . . [T]he evidence in the instant case was such that the jury could reasonably infer that [Petitioner] murdered Walker in the course of committing or attempting to commit robbery. The evidence, viewed in the light most favorable to the jury's verdict, was legally sufficient to support [Petitioner's] conviction.

---

[4]*Jackson v. Virginia*, 443 U.S. 307 (1979).

*Chanthakoummane v. State*, 2010 WL 1696789, at *4-5. The Director reasonably observed that Petitioner has not shown what counsel should have done that would have changed the outcome of the trial. Instead, the only thing that Petitioner even suggested was that Ranger Davidson should have been cross-examined generally about the bank surveillance video, but he did not offer any specific questions that should have been posed to the State's witness. He stressed that Petitioner's argument is primarily based on the fact that the watch and ring were not uncovered, but the failure to uncover such evidence does not undermine the circumstantial evidence of the crime as outlined by the TCCA.

The Court is of the opinion that the Director's arguments are persuasive. Assuming *arguendo* that trial counsel should not have conceded the issue of whether a robbery or attempted robbery occurred, Petitioner failed to show that the outcome of the trial would have been different "but for" counsel's deficient representation. Stated differently, he failed to show that the "[t]he likelihood of a different result [was] substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (citing *Strickland*, 466 U.S. at 693). As such, Petitioner failed to satisfy his burden of showing a substantial claim of ineffective assistance of trial counsel. Petitioner likewise failed to show that state habeas counsel was ineffective for failing to raise the issue in the state habeas corpus proceedings. The Texas Court of Criminal Appeals found that the evidence was sufficient for a jury to reasonably infer that Petitioner murdered Walker in the course of committing or attempting to commit robbery. State habeas counsel was not required to raise frivolous or futile arguments. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002), *cert. denied*, 538 U.S. 926 (2003); *Koch*, 907 F.2d at 527 (both cases concerning raising frivolous or futile motions during trial). Petitioner has not shown cause and prejudice as outlined by the Supreme Court in *Martinez* and *Trevino*. He has not overcome the procedural bar. Consequently, the second ground for relief must be rejected as unexhausted and procedurally barred.

**Claim Number 3:** **Petitioner's due process rights under the Fourteenth Amendment and his Sixth Amendment right to an impartial jury were violated when a juror committed misconduct by discussing the case with his spouse.**

In ground for relief number three, Petitioner alleges that his right to an impartial jury was violated because Juror Number Nine, Alan Schwartz, committed misconduct by talking to his wife about the trial during the course of the trial. He further alleges that the situation was made even worse because Schwartz's wife followed the trial in the media. In support of the claim, Petitioner submitted an affidavit from law student Raechel Parolisi asserting that Schwartz made the admission to Denise Santa Ana, another law student who was interviewing the jurors as part of a law school class project. *See* 4 SHCR 984-987. It is noted that Parolisi did not personally hear the alleged admission and that her statement was hearsay.

The Sixth Amendment right to a fair trial includes the right to an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (citations omitted). "[P]rivate talk, tending to reach the jury by outside influence" is constitutionally suspect because it is not subject to "full judicial protection of the defendant's right of confrontation, cross-examination, and of counsel." *Parker v. Gladden*, 385 U.S. 363, 364 (1966) (internal citations and quotation marks omitted).

The Director concedes that there can be no question that if a juror discusses the trial with someone other than his fellow jurors, such as alleged here, that such a discussion would constitute an "external influence" which can be used to impeach the verdict. *See Oliver v. Quarterman*, 541 F.3d 329, 335-36 (5th Cir. 2008) ("A juror is exposed to an external influence when the juror reads information not admitted into evidence, such as newspaper article about the case, or hears prejudicial

36

statements from others[.]"). *See also Fullwood v. Lee*, 290 F.3d 663, 676-77, 680-82 (4th Cir. 2002) (remanding for an evidentiary hearing in a habeas case when petitioner offered evidence that a juror's husband, who was "strongly pro-death penalty," influenced his wife during the trial and deliberations by "constantly telling" her that she should convict petitioner and sentence him to death). The Director argues, however, that the state habeas court reasonably found that the jury's deliberation were not tainted by any such influence.

The state habeas court fully developed the issue. An evidentiary hearing was conducted on November 10, 2010. 1 Supp. SHRR 1. All twelve jurors, Schwartz's wife, and the two law students at the center of the claim testified. Jason Schwartz testified that he did not talk about the case with his wife until the trial was over. *Id.* at 19. Jason Schwartz's wife, Theresa Schwartz, testified that her husband did not tell her anything about what happened during the trial until it was over. *Id.* at 144, 146. Former law student Raechel Parolisi repeated the same basic information contained in her affidavit. *Id.* at 112-132. Former law student Denise Santa Ana testified that she recalled Juror Schwartz talking about discussing the case with his wife, but she was under the impression that their conversations occurred only after the trial was over. *Id.* at 161.

Following the hearing, the state habeas court made the following findings on the issue:

a.   Juror Schwartz testified that he did not talk to his wife about the trial until it was over. Juror Transcript at 19. He knew that he was not allowed to read or watch any news coverage of the trial, and his wife did not communicate any outside fact to him during the trial. *Id.* at 19-21. His verdict was based solely on what he heard in the courtroom and not any other source. *Id.* at 29.

b.   The eleven other jurors testified that Juror Schwartz did not provide any information about the case that he had learned outside the courtroom or say anything that indicated he had spoken to his wife or anyone outside the courtroom about the case. Juror Transcript at 34-35 (Reed), 40-41 (Brown), 47-49 (Lambeth), 59-62 (Dick), 65-68 (Mullis), 71-74 (Nehama), 77-81 (Harris), 84-87 (Robitaile), 90-94 (Wilson), 99-102 (Drake), 105-108 (Gilchrist).

c.    Raechel Parolisi testified that she observed the trial while a law student and conducted juror interviews for a class project after the trial was over. Juror Transcript at 113. She participated on all interviews except for Juror Schwartz's. *Id.* at 116. Her partner, Denise Santa Ana, conducted Juror Schwartz's interview. *Id.* at 116-17. Parolisi testified that she believed Juror Schwartz's answers indicated juror misconduct, but Santa Ana said she did not want to get him in trouble. *Id.* at 121. Santa Ana showed Parolisi approximately a minute of the video footage of the interview but did not provide the entire tape to her. *Id.* at 121-22, 124-26.

d.    Juror Schwartz's wife, Theresa Schwartz, testified that Juror Schwartz did not tell her anything about what happened in the courtroom during the trial. Juror Transcript at 144. They did not talk about the case at all until the trial was over. *Id.* at 146.

e.    Denise Santa Ana testified that she observed the trial while a law student and conducted juror interviews for a class project after the trial was over. Juror Transcript at 157-58. She interviewed Juror Schwartz at his home. *Id.* at 159. Because Parolisi could not attend that interview, Santa Ana's boyfriend attended the interview with her and videotaped it. *Id.* at 159-61. Santa Ana transcribed the interview but did not keep a copy of the video. *Id.* at 163. Santa Ana recalled that Juror Schwartz mentioned talking about the case with his wife, but she believed that he was referring to only after the trial was over. *Id.* at 161-62, 164-65, 171, 177.

5 SHCR 1524-25. As a result of these findings, the state habeas court further found that the testimony of the jurors, Mrs. Schwartz and Santa Ana was consistent, based on personal knowledge and was credible. *Id.* at 1525. A finding was made that Parolisi's testimony was based on hearsay and that it was not credible to the extent that it contradicts the first-hand accounts of the other witnesses. *Id.* In light of the evidence, the trial court found that "[n]o credible evidence suggests that Juror Schwartz improperly communicated with his wife or any other person during trial, or that any juror was privy to any outside information or shared it with the rest of the jury." *Id.* The state habeas court thus ultimately found that Petitioner had not proven his claim by the preponderance of the evidence and that he was not entitled to relief. *Id.* The TCCA subsequently denied relief based on the trial court's findings and conclusions and its own review. *Ex parte Chanthakoummane*, 2013 WL 363124, at *1.

Petitioner argues that the state court's denial of relief was based on an unreasonable determination of the facts in light of the evidence presented during the evidentiary hearing. However,

the state court made findings of fact consistent with the evidence presented during the hearing. Such findings are presumed to be sound unless Petitioner rebuts them by "clear and convincing evidence." *Miller-El*, 545 U.S. at 240. Petitioner failed to do so. Moreover, in light of the findings of fact, the state court reasonably found that there was no juror misconduct due to outside communication. Overall, with respect to claim number three, Petitioner is not entitled to relief because he has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

**Claim Number 4:       A juror's improper consideration of Petitioner's failure to testify at trial violated his Fifth, Sixth and Fourteenth Amendment rights.**

The fourth claim is that Juror Schwartz took into consideration Petitioner's failure to testify in reaching a verdict. As with the previous claim, Petitioner's ground for relief is based on the affidavit provided by former law student Parolisi. 4 SHCR 984-87. The relevant portion of the affidavit states the following:

> Ms. Santa Ana also relayed other comments made by Mr. Schwartz, which I perceived as juror misconduct. For example, he seemed to hold the fact that [Petitioner] did not testify or apologize against him.

*Id.* at 986. Juror Schwartz's answers to a juror questionnaire were attached to the affidavit. When questioned about whether he took into consideration Petitioner's failure to testify, he stated "[t]o say that it wouldn't, would be a lie, but in my heart, I feel that if he had something to say, he should say it and he didn't say it, so there probably wasn't anything he could say that would help him. . . . But you know when you don't defend yourself, it's not a good thing, in my opinion, its not a good thing." *Id.* at 995.

The state habeas court rejected the claim and issued the following findings:

84.     [Petitioner] alleges that Juror Schwartz improperly considered the fact that he did not testify in rendering his verdict. [1 SHCR 78-79].

85.     [Petitioner's] sole evidence in support of his claim is an affidavit from Parolisi, a law student recounting another law student's description of an interview with Juror Schwartz [4 SHCR 984-87]. This evidence is inadmissible as a statement regarding the jury's deliberations and will not be considered for any purpose. Tex. R. Evid. 606(b); *see* Finding 10 [striking all juror affidavits and interviews from the record, except that they concern outside influences on the jury].

86.     Because [Petitioner] has offered no admissible evidence in support of his claim, he has not shown that any misconduct occurred.

5 SHCR 1525. The TCCA subsequently denied relief based on the trial court's findings and conclusions and its own review. *Ex parte Chanthakoummane*, 2013 WL 363124, at *1.

"The constitutional right of a defendant to choose not to testify is a fundamental tenet of our system of justice." *United States v. Johnston*, 127 F.3d 380, 399 (5th Cir. 1997), *cert. denied*, 522 U.S. 1152 (1998). On the other hand, it has been long held that a post-verdict inquiry of jury members, as live witnesses or by affidavit, is inappropriate. *See Mattox v. United States*, 146 U.S. 140, 149 (1892) ("[T]he evidence of jurors, as to motives and influences which affected their deliberations, is inadmissible either to impeach or support the verdict."); *see also Tanner v. United States*, 483 U.S. 107, 117-21 (1987) (discussing policy behind federal common law rule against admission of jury testimony to impeach verdict); *Cunningham v. United States*, 356 F.2d 454, 455 (5th Cir.) ("well-settled general rule that a juror will not be heard to impeach his own verdict."), *cert. denied*, 384 U.S. 952 (1966). In *Cunningham*, the Fifth Circuit upheld the trial court's refusal to consider an affidavit by one juror who stated that the jurors discussed the defendant's failure to testify in his own behalf.

This basic tenet that courts generally will not inquire into a jury's deliberative process is encapsulated in Rule 606(b) of both the Federal Rules of Civil Procedure and the Texas Rules of Civil

Procedure. The Fifth Circuit has accordingly found that the "post-verdict inquiry of jury members, as live witnesses or by affidavit, is inappropriate and precluded by Federal Rules of Evidence 606(b)." *Williams v. Collins*, 16 F.3d 626, 636 (5th Cir.), *cert. denied*, 512 U.S. 1289 (1994). *Williams*, like the present case, involved a Texas death row inmate challenging his conviction in a habeas corpus proceeding. In affirming the denial of habeas corpus relief, the Fifth Circuit found that the "district court did not abuse its discretion in disallowing the requested testimony." *Id.* Petitioner tries to make a distinction between Fed. R. Evid. 606(b) and Tex. R. Evid. 606(b), particularly in light of the 1998 amendment to the rule, but the Fifth Circuit rejected such arguments in *Salazar v. Dretke*, 419 F.3d 384 (5th Cir. 2005), *cert. denied*, 547 U.S. 1006 (2006). The Fifth Circuit found that both rules "bar all juror testimony concerning the juror's subjective thought processes." *Id.* at 402. The Court ultimately found that it could not say the "state habeas court's application of Texas Rule 606(b) to bar testimony by jurors concerning their internal discussion . . . was contrary to, or an unreasonable application of, clearly established law as determined by the Supreme Court." *Id.* at 403. More recently, the Fifth Circuit refused to grant a certificate of appealability with respect to a district court's rejection of a claim that jurors took into consideration a defendant's failure to testify because courts "will not inquire into the jury's deliberative process absent a showing of external influences on the jurors." *Greer v. Thaler*, 380 F. App'x 373, 382 (5th Cir. 2010) (citing *Tanner*, 483 U.S. at 120-21), *cert. denied*, 131 S. Ct. 424 (2010). In light of *Williams*, *Salazar* and *Greer,* this Court likewise cannot say that the state habeas court's rejection of the proferred evidence under Rule 606(b) was contrary to, or an unreasonable application of, clearly established law as determined by the Supreme Court. Moreover, apart from the state court findings, the Court further finds that Petitioner's claim impermissibly seeks to delve into a juror's deliberative process. Federal habeas corpus relief is unavailable on this claim.

**Claim Number 5:** **Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to challenge the admissibility of the State's gang affiliation witness.**

In claim number five, Petitioner complains that appellate counsel failed to challenge the admissibility of testimony provided by Brian Conner, his juvenile court counselor, regarding his gang affiliation. He challenged Conner's testimony on two fronts: his qualifications and the relevancy of his testimony. He stressed that the issue was properly preserved for appellate review, but his appellate attorney failed to raise the issue.

The record reveals that Conner testified during the punishment phase of the trial. 24 RR 88-177. His qualifications and background as Petitioner's juvenile counselor were initially discussed outside of the presence of the jury. *Id.* at 88-113. He testified that he had over 120 hours of gang specific training and an advance certificate for gang investigation. *Id.* at 91. He also discussed how he knew that Petitioner was a member of a gang. Petitioner's objections as to him testifying were overruled, and then the jury was brought in. *Id.* at 113. Conner then fully discussed Petitioner's gang activities before the jury.

The present ground for relief was presented as ground four in the state habeas corpus proceedings. The state habeas court fully considered the claim and issued the following findings:

89.     In ground 4, [Petitioner] claims that his appellate counsel was ineffective for failing to challenge the admissibility on appeal of Brian Conner's testimony regarding [Petitioner's] signs of gang membership. [1 SHCR 81-86]. Specifically, he claimed appellate counsel should have argued Conner was not qualified as an expert witness and his testimony was not relevant.

90.     Conner testified that he received over 120 hours of gang investigation training, had received a certificate for advanced gang investigations, and had experience investigating gangs. 24 RR 91. He explained why certain elements in a letter written by [Petitioner] demonstrated gang affiliation.

42

91.    The State established that Conner was qualified as an expert witness through his training, knowledge, and experience pursuant to Texas Rule of Evidence 702.

92.    Even if Conner was not qualified as an expert witness, his testimony was admissible as lay opinion testimony regarding "observations which do not require significant expertise to interpret and which are not based on a scientific theory." *See Osbourn v. State*, 92 S.W.3d 531 (Tex. Crim. App. 2002).

93.    Appellate counsel was not ineffective for declining to raise the issue of Conner's qualification on appeal because he would not have prevailed. *See Burger v. Kemp*, 483 U.S. 776, 784 (1987) (reasonable strategic decision to forego claim on appeal is not ineffective assistance of counsel).

94.    Defense counsel did not object at trial that the testimony was not relevant. He objected to notice and that Conner was not qualified as an expert. 24 RR 110-11.

95.    Appellate counsel was not ineffective for declining to raise the issue of relevance on appeal because it was not preserved and would have been dismissed.

96.    [Petitioner] is not entitled to relief on Ground 4.

5 SHCR 1526.

The two-prong *Strickland* test applies to claims of ineffective assistance of counsel by both trial and appellate counsel. *Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002). "On appeal, effective assistance of counsel does not mean counsel who will raise every nonfrivolous ground of appeal available." *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998) (citations omitted), *cert. denied*, 525 U.S. 1174 (1999). "Rather, it means, as it does at trial, counsel performing in a reasonably effective manner." *Id.* To demonstrate prejudice, a petitioner must "show a reasonable probability that, but for his counsel's unreasonable failure . . ., he would have prevailed on his appeal." *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001) (citations omitted). He bears the "'highly demanding and heavy burden in establishing actual prejudice,' not merely that 'the errors had some conceivable effect on the outcome of the proceeding.'" *Givens v. Cockrell*, 265 F.3d 306, 310 (5th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 394 (2000)).

In the present case, Conner established his qualifications. He had received over 120 hours of gang investigation training and had received a certificate for advanced gang investigations. He was qualified to testify as a gang expert; thus, the trial court overruled Petitioner's challenge to his testimony. 24 RR 113. The state habeas court subsequently reasonably found that he was qualified to testify. Appellate counsel's representation was not "deficient for failing to press a frivolous point." *See Vasquez v. Stephens*, ___ F. App'x ___, 2015 WL 301181, at *4 (5th Cir. Jan. 23, 2015) (citations omitted). Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Regarding the question of whether the testimony about Petitioner's gang membership was relevant, the state habeas court found that trial counsel's objection on that ground was not properly made. 5 SHCR 1526 (citing 24 RR 110-11). The Fifth Circuit has held that the "procedural-default doctrine precludes federal habeas review when the last reasoned state-court opinion addressing a claim explicitly rejects it on a state procedural ground." *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004), *cert. denied*, 543 U.S. 1124 (2005). With this in mind, the Fifth Circuit has consistently held that the Texas contemporaneous objection rule constitutes an adequate and independent ground that procedurally bars federal habeas review of a petitioner's claims. *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir.), *cert. denied*, 551 U.S. 1193 (2007); *Cardenas v. Dretke*, 405 F.3d 244, 249 (5th Cir. 2005), *cert. denied*, 548 U.S. 925 (2006); *Dowthitt v. Johnson*, 230 F.3d 733, 752 (5th Cir. 2000) ("[T]he Texas contemporaneous objection rule is strictly or regularly applied evenhandedly to the vast majority of similar claims, and is therefore an adequate procedural bar."), *cert. denied*, 532 U.S. 915

(2001). The state habeas court found that Petitioner's objection during trial to Conner's testimony was not based on relevancy; thus, it was not properly preserved for appeal. The state habeas court accordingly found that appellate counsel was not ineffective for declining to raise the issue of relevance on appeal because it was not preserved and would have been dismissed. 5 SHCR 1526. The TCCA adopted these findings in denying relief. The Fifth Circuit has characterized an appellate challenge to the admissibility of evidence that was not properly preserved as a frivolous challenge. *Givens*, 265 F.3d at 310. Consequently, "counsel acted reasonably in declining to raise an unreviewable issue." *Id.* Petitioner's appellate counsel's representation was not deficient to the extent that he failed to raise an unreviewable issue.

The Court would add that Petitioner's claim that his gang affiliation was not relevant lacks merit. Conner's testimony was presented in the context of the issue of future dangerousness. Petitioner's extensive criminal history, including his gang related activities, was relevant regarding this issue. *See Fuller v. Johnson*, 114 F.3d 491, 497-98 (5th Cir.) (finding that the defendant's membership in a racist gang was properly considered in sentencing because it went to future dangerousness in light of the evidence showing the gang's violent tendencies), *cert. denied*, 522 U.S. 963 (1997). It should be further noted that the Fifth Circuit has found that a habeas petitioner cannot show prejudice when, as in the present case, evidence of his "alleged gang membership was just one part of a larger body of evidence regarding [petitioner's] future dangerous, most of which concerned his lengthy criminal history . . ." *Garza v. Stephens*, 575 F. App'x 404, 415 (5th Cir. 2014).

Overall, with respect to the claim number five, Petitioner has not shown that his appellate counsel's representation was deficient for failing to challenge the State's gang affiliation witness. He likewise failed to show prejudice. He has not satisfied his burden of showing that his appellate counsel was ineffective on this issue. Furthermore, he has not shown, as required by 28 U.S.C. § 2254(d), that

the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Finally, he failed to overcome the doubly deferential standard that must be afforded to counsel in the context of § 2254(d). *See Richter*, 131 S. Ct. at 788. Relief must be denied on claim number five.

> **Claim Number 6: Petitioner's appellate counsel rendered ineffective of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to challenge the sufficiency of the evidence regarding Petitioner's future dangerousness.**

Claim number six is another ineffective assistance of appellate counsel claim. This time Petitioner complains that his appellate attorney failed to challenge the sufficiency of the evidence regarding his future dangerousness. He noted that his trial counsel presented several witnesses on his behalf, including prison guards who testified about his incarceration in North Carolina, a North Carolina inmate, the Director of Restoration House Ministries, and a forensic psychologist. The State, on the other hand, called a witness with respect to the victim impact on Walker's child, various law enforcement officers, Brian Conner, Petitioner's parole officer and individuals who had experiences with Petitioner. The State also called A. P. Merillat regarding inmates sentenced to life in prison without parole. Merillat testified that there had been many violent offenses committed in prison, including some by inmates on death row. 27 RR 79. In rebuttal, defense counsel called Walter Quijano, an expert in prison classification, who testified that there were sufficient administrative procedures in place in the Texas prison system to control the conduct of inmates sentenced to life without parole. 27 RR 133-61. Petitioner alleges that none of the evidence offered by the State alleged specifically that he would be dangerous while incarcerated or that he would present a future danger

if incarcerated for life. He argued that appellate counsel's failure to raise the issue on direct appeal was inexcusable neglect that amounts to ineffective assistance of counsel.

"Under Texas law, a jury may consider, but is not limited to, several factors in determining future dangerousness: the circumstances of the offense, including the defendant's state of mind; the calculated nature of the defendant's acts; forethought and deliberateness; prior criminal record, and the severity of prior crimes; the defendant's age and personal circumstances at the time of the offense; whether the defendant was acting under duress or domination of another; psychiatric evidence; and character evidence." *Duncan v. Cockrell*, 70 F. App'x 741, 747 (5th Cir.) (citing *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987)), *cert. denied*, 540 U.S. 1059 (2003). Both Petitioner and the Director focused on the *Keeton* factors in arguing whether the evidence of future dangerousness was sufficient. The Director also properly observed that the sufficiency of the evidence of future dangerousness is reviewed under *Jackson v. Virginia*. *See Ross v. State*, 133 S.W.3d 618, 621 (Tex. Crim. App. 2004).

Claim number six was presented as ground five in the state habeas corpus proceedings. The state habeas court made the following findings regarding this issue:

97.    In Ground 5, [Petitioner] complains his appellate counsel was ineffective for failing to raise a complaint that the evidence was insufficient to prove he was a future danger. [1 SHCR 88-89].

98.    The *Keeton* factors overwhelmingly support a finding of future dangerousness. *See Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

   a.    [Petitioner] acted alone. Neither the DNA evidence nor any eye witness ever suggested more than one person was involved in the murder. There was no indication that [Petitioner] was influenced or coerced by anyone into committing the offense.

   b.    The crime was calculated, premeditated, and deliberate. [Petitioner] appeared at the home of real estate agent the night before the murder and tried to get inside the house before the agent called the police. The morning of the murder,

47

[Petitioner] called another real estate agent to arrange to meet her, using an assumed name. After encountering her with her husband, [Petitioner] went to a nearby model home to commit the brutal murder of Sarah Walker. The record showed that [Petitioner] intentionally and repeatedly attempted to isolate a woman to commit the offense.

c.     [Petitioner] stabbed Sarah Walker more than thirty times, hit her in the face with a plant stand, and bit her shoulder. [Petitioner's] motive was apparently robbery, as he took a Rolex watch and a ring from the victim. The violent, close-range murder of a stranger for money further demonstrates premeditation, as well as explosive anger and danger.

d.     [Petitioner's] criminal history was extensive and fraught with violence. He committed violent assaults and thefts as a juvenile, stole cars, and once tied up two elderly women with electrical cord before stealing their car while on the run from police.

e.     [Petitioner] was twenty-five years old at the time of the murder. He was not so young that his brain was immature and still developing. Neither was he old enough that he was unlikely to be a danger in the future.

f.     [Petitioner] did not show any remorse for his crime, changing his story multiple times despite his DNA being all over the crime scene that he had merely entered the home for a drink of water.

g.     There was no psychiatric testimony indicating any mental health issues or impairments.

99.    [Petitioner's] contrary evidence - that he was not violent when he was incarcerated and that he was an artist - was not so strong that the jury could not reasonably conclude [Petitioner] would be a future danger.

100.   Because the evidence was legally sufficient to sustain the jury's finding on Special Issue 1, appellate counsel was not deficient for failing to raise it on appeal. *See Burger*, 483 U.S. at 784.

101.   [Petitioner] has not shown a reasonable probability that he would have prevailed on appeal. Accordingly, he has not shown he was prejudiced by counsel's decision not to raise the issue.

102.   [Petitioner] did not receive ineffective assistance of counsel as to Ground 5.

5 SHCR 1527-28. The TCCA subsequently denied relief based on the trial court's findings and conclusions, and its own review. *Ex parte Chanthakoummane*, 2013 WL 363124, at *1.

"When a habeas petitioner asserts that the evidence presented to the state court was insufficient to find future dangerousness, the limited question before a federal habeas court is whether the state courts' decision to reject that claim was an objectively unreasonable application of the clearly established law set out in *Jackson*." *White v. Dretke*, 126 F. App'x 173, 177 (5th Cir.), *cert. denied*, 546 U.S. 940 (2005). "Under *Jackson*, a conviction is constitutional if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (citing *Jackson*, 443 U.S. at 319). Under Texas' substantive law, "the circumstances of the charged offense may alone be sufficient to support an affirmative finding of future dangerousness." *Id.* As such, a rational jury could have answered Special Issue 1 in the present case in the affirmative based solely on the circumstances of the charged offense.

Nonetheless, the findings of the state habeas court went far beyond just the circumstances of the charged offense in discussing the *Keeton* factors. Each of the state court findings are supported by the record. In light of the evidence, appellate counsel was not deficient for failing to raise the issue on appeal. Once again, he was not required to press a frivolous point. Moreover, Petitioner has not shown prejudice. Petitioner has not satisfied his burden of showing that his appellate counsel was ineffective on this issue. Furthermore, Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Finally, he failed to overcome the doubly deferential standard that must be afforded to counsel in the context of § 2254(d). *See Richter*, 131 S. Ct. at 788. Relief must be denied on claim number six.

**Claim Number 7:    Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to challenge the admissibility of A. P. Merillat's testimony.**

In claim number seven, Petitioner alleges that his appellate counsel was ineffective for failing to challenge the testimony of A. P. Merillat. The claim was presented as ground number six in the state habeas corpus proceedings. Petitioner notes that the State presented the testimony of Merillat, an investigator with the Special Prosecution Unit, during the sentencing phase of the trial. Merillat testified about the classification system in the Texas penitentiary and the occurrence of violence in prison. 27 RR 30-31. The defense objected to his testimony because he was not properly qualified as an expert in this area and his testimony was unfairly prejudicial under Rule 403. 27 RR 59-60. The trial court overruled the defense objections, and Merillat testified that capital murder inmates who receive life without parole still have the potential to be a danger to the community. Petitioner stressed that his challenge to the admissibility of Merillat's testimony was properly preserved, but appellate counsel failed to raise the issue on appeal. In support of his claim, Petitioner cites two cases where the TCCA overturned death sentences on the basis of testimony provided by Merillat. *Velez v. State*, No. AP-76,051, 2012 WL 2130890, at *31-33 (Tex. Crim. App. 2012) (unpublished); *Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2010).

*Estrada* involved a capital murder case where the defendant was convicted on December 12, 2005. *Estrada*, 313 S.W.3d at 279. Merillat testified during the sentencing phase that, "after 10 years of G-3 status, a capital murderer who had been sentenced to life without parole could earn a lower, less restrictive, G classification status than  a G-3 status." *Id.* at 286. During deliberations, the jury sent out two notes about such testimony. *Id.* The TCCA observed that the testimony was false in light of a new 2005 TDCJ regulation, judicially noticed by the *Estrada* Court, that "unambiguously shows, 'Effective 9/1/05, offenders convicted of Capital Murder and sentenced to 'life without parole' will

50

*not* be classified to a custody less restrictive than G-3 throughout their incarceration' (it appears that before September 1, 2005, a sentenced-to-life-with-the -possibility-of-parole capital murderer could have obtained a lower and less restrictive G-3 status after ten years)." *Id.* at 287. The TCCA remanded the case for a new punishment phase with the finding that "there is a fair probability that appellant's death sentence was based upon Merillat's incorrect testimony as evidenced by the jury's notes." *Id.*

It is noted that Merillat testifying as a witness has been discussed in numerous cases decided by the TCCA, both before and after the decisions issued in *Estrada* and *Velez*. *See, e.g., Escobar v. State*, No. AP-76,571, 2013 WL 6098015, at *27-28 (Tex. Crim. App. 2013); *Ex parte Swain*, No. WR-64,437-02, 2012 WL 5452217, at *1 (Tex. Crim. App. 2012); *Martin v. State*, No. AP-76,317, 2012 WL 5358862, at *8 (Tex. Crim. App. 2012). In all, by the time this opinion was being prepared, Merillat has been discussed in seventeen decisions issued by the TCCA. In *Swain*, the TCCA observed that applicant's offense and trial occurred prior to the effective date of the regulation that was the subject of Merrillat's testimony in *Velez* and *Estrada*; thus, the holdings in those cases did not affect applicant's case. *Swain*, 2012 WL 5452217, at *1. In another case, the TCCA noted that it had upheld Merrillat's testimony as reliable and relevant to the future dangerousness issue concerning the opportunities for violence in prison society, however, it had remanded *Estrada* for a new punishment phase due to Merillat's "unintentionally inaccurate testimony concerning reclassification of capital-murder inmates." *Gobert v. State*, No. AP-76,345, 2011 WL 5881601, at *6 (Tex. Crim. App. 2011).

In the present case, Merillat was apparently familiar with the 2005 change in the TDCJ regulation by the time he testified in October 2007. He testified that if a person is convicted of capital murder and given a "life without parole sentence, he will always be G-3," while an inmate sentenced to simply a life sentence "only has to spend 10 years as a G-3 inmate before he's eligible to promote

up to G-2 or G-1." 27 RR 46-47.  In light of *Gobert*, it is clear that the TCCA was of the opinion that

Merillat was an expert although his testimony in *Estrada* was incorrect.  It is also clear that his

testimony in the present case did not repeat the same type of incorrect statement he made in *Estrada*.

With this background information established by the time the state habeas court considered

Petitioner's case, the state habeas court issued the following findings regarding Merillat's testimony

in this case:

103.    In Ground 6, [Petitioner] complains his appellate counsel was ineffective for failing to
        raise a complaint that A. P. Merillat was not qualified as an expert on prison
        classification.  [1 SHCR 90-95].

104.    A. P. Merillat testified that he was a senior investigator with the Special Prosecution
        Unit, which assists with the prosecution of crimes committed in prisons around the
        state.  27 RR 61-64.  He had testified as an expert, written articles, written books, and
        lectured, all on the topic of the inmate classification system used by the Texas
        Department of Criminal Justice.

105.    Merillat testified regarding the classification system currently used by TDCJ, including
        how prisoners are classified upon arrival and what will cause a change in classification.
        27 RR 67-73.  He also testified that there have been 148 murders and numerous other
        violent offenses in Texas prisons since 1984, including offenses against other inmates,
        guards, staff members, and visitors.  27 RR 78-81.

106.    Merillat's testimony regarding the inmate classification system described the
        application of a concrete rule and was admissible as fact testimony.

107.    Merillat's testimony regarding the possibility for violence in prison was admissible as
        fact testimony.  *See Lucero v. State*, 246 S.W.3d 86, 97 (Tex. Crim. App. 2008)
        (approving admission of similar testimony regarding inmates' opportunities for
        violence).

108.    Merillat was qualified to testify as an expert based on his nineteen years of experience
        in the SPU, as well as his writings and teachings on the subject.  *See Coble v. State*,
        330 S.W.3d 253, 287 (Tex. Crim. App. 2010) (finding Merillat's testimony admissible
        as rebuttal "educator expert" testimony).

109.    Because Merillat's testimony was admissible, an appeal on this issue would not have
        been successful.  [Petitioner] has not shown that his appellate counsel was deficient for
        failing to raise the issue, nor has he demonstrated prejudice.

110.	Merillat did not testify that [Petitioner's] classification status could improve. *Cf. Estrada v. State*, 313 S.W.3d 274, 286-87 (Tex. Crim. App. 2010) (reversing for new punishment hearing where Merillat testified incorrectly that a life-without-parole inmate could improve from G3 to G2).

111.	[Petitioner] did not receive ineffective assistance as to Ground 6.

5 SHCR 1528-29. The TCCA subsequently denied relief based on the trial court's findings and conclusions, and its own review. *Ex parte Chanthakoummane*, 2013 WL 363124, at *1.

All of the findings are based on facts contained in the record. Petitioner's appellate brief was filed on May 22, 2009. By then, the TCCA had already affirmed convictions in capital murder cases where Merillat was used by the State as an expert. *Threadgill v. State*, 146 S.W.3d 654, 670-71 (Tex. Crim. App. 2004); *Sprouse v. State*, No. AP-74,933, 2007 WL 283152, at *4-5 (Tex. Crim. App. 2007) (approving the use of Merillat as an expert); *Espada v. State*, No. AP-75,219, 2008 WL 4809235 (Tex. Crim. App. 2008) (approving the use of Merillat as an expert on classification). Moreover, as was also noted by the state habeas court, the type of testimony offered Merillat had already been approved by the TCCA in *Lucero*. By the time Petitioner's appellate counsel submitted his brief, it was abundantly clear that any complaint presented on appeal about Merillat's qualifications would have been frivolous and counsel was not required to raise frivolous claims on appeal. It is further noted that *Estrada* and *Velez* were decided after Petitioner's appellate counsel had already submitted his brief. As such, he did not have any basis for mentioning cases that had not yet been decided. Moreover, since Merillat did not repeat in this case the same type of erroneous testimony that he made in *Estrada*, Petitioner cannot show prejudice based on that type of erroneous testimony. Overall, Petitioner has not satisfied his burden of showing ineffective assistance of appellate counsel on this ground.

The Court would add that the focus of Petitioner's present claim concerns whether Merillat should have been allowed to testify under Texas law. In the course of reviewing state proceedings, a federal court does "not sit as a super state supreme court to review error under state law." *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007); *Skillern v. Estelle*, 720 F.2d 839, 852 (5th Cir. 1983), *cert. denied*, 469 U.S. 1067 (1984). The Fifth Circuit considered the propriety of another member of the SPU testifying in *Fuller v. Johnson*, 114 F.3d 491 (5th Cir. 1997). The Fifth Circuit found that the issues raised by the petitioner "are not constitutional issues but evidentiary issues, properly considered under the Texas Rules of Criminal Evidence on direct appeal. The fact that irrelevant testimony may have been admitted at trial does not rise to constitutional error. . . . The jurisdiction of this court on habeas review of a state prosecution is limited to constitutional issues under 28 U.S.C. § 2254(d)(1), as amended by the AEDPA." *Id.* at 498. In light of *Fuller*, a direct challenge to Merillat's testimony in the present petition would have been frivolous. On the other hand, Petitioner is entitled to present an indirect challenge to the admissibility of his testimony under the rubric of an ineffective assistance of counsel claim. *See Richter*, 131 S. Ct. at 788. However, as was previously explained, Petitioner's appellate attorney was not ineffective for failing to raise this issue on appeal. Furthermore, he failed to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Finally, he failed to overcome the doubly deferential standard that must be afforded to counsel in the context of § 2254(d). *See Richter*, 131 S. Ct. at 788. Relief must be denied on claim number seven.

**Claim Number 8:** **Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States**

**Constitution by failing to challenge the denial of Petitioner's motion to suppress his statement.**

**Claim Number 9:**     **Petitioner's trial counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to lodge a specific objection to the voluntariness of his *Miranda*[5] waiver during the suppression hearing.**

In claims eight and nine, Petitioner alleges that both his trial and appellate attorneys were constitutionally ineffective for failing to challenge the admissibility of his confession. The record shows that Petitioner was arrested and transported to the McKinney Police Department for questioning. 22 RR 63. Officer Joe Ellenburg placed Petitioner in an interview room and read him his *Miranda* warnings. *Id.* at 68. Officer Norton and Sergeant Riley proceeded to conduct a videotaped interrogation of Petitioner. During the interrogation, Petitioner admitted: (1) that his car broke down in front of the model home where Walker was murdered; (2) that he entered the model home to try and call for assistance; (3) that he went into the kitchen and tried to get a drink of water from the sink, but could not because the faucet did not work; (4) that he then left and did not see anyone else in the home; (5) that his blood was likely found on the sink because his hand had a cut on it that may have shed blood on the faucet; and (6) that as he left the home, a couple approached him and asked if he was "Chan Lee." *Id.* at 88-90.

Trial counsel filed a pretrial motion to suppress the statement challenging both the voluntariness of Petitioner's confession and the adequacy of the *Miranda* warning. The trial court conducted a hearing on the motion. Both Ellenburg and Norton testified. 2 RR 14-69. Each testified that (1) Petitioner understood his rights; (2) he did not appear to be under the influence of drugs or alcohol; and (3) he responded appropriately to what they were telling him. *Id.* at 20, 55. Officer

---

[5]*Miranda v. Arizona*, 384 U.S. 436 (1966).

Ellenburg described Petitioner as cooperative and "willing to talk." *Id.* at 42. Ultimately, Petitioner agreed to waive his rights and talk to the officers without consulting an attorney or having an attorney present. *Id.* at 22-23, 31; *see also id.* at 56-57 (testimony that Petitioner never asked for an attorney or attempted to stop the interview). In light of the evidence, the trial court denied the motion to suppress. *Id.* at 69.

Petitioner complains that trial counsel failed to make a specific objection at the suppression hearing to the validity of the *Miranda* warning. He admitted that counsel's line of questioning of Officer Ellenburg at the suppression hearing was sufficient to put the State on notice that he was challenging the invalidity of the *Miranda* waiver, but he complained that his attorney did not make a specific legal objection on that ground. He argues that his trial attorney was ineffective for that reason. He further alleges that his appellate attorney was ineffective for failing to raise the invalidity of his *Miranda* waiver and the involuntariness of his confession issues on appeal.

*Miranda* holds that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. The Supreme Court accordingly held that prior to custodial interrogation a suspect must be informed:

> 1) that he has the right to remain silent
> 2) that anything he says can be used against him in court
> 3) that he has the right to consult with counsel prior to questioning
> 4) that he has a right to have counsel present at the interrogation, and
> 5) that if he cannot afford an attorney, one will be appointed for him.

*Id.* at 468-70. If an individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, and/or that he wants an attorney, the interrogation must cease. *Id.* at 474. However, a suspect's invocation of either his right to remain silent or his right to counsel must be unambiguous. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010).

"*Miranda* holds that '[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.'" *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Miranda*, 384 U.S. at 444, 475). The inquiry has two dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. at 421 (internal quotations and citations omitted). "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Id.* at 422-23. It is not enough for the State to establish that *Miranda* warnings were given and that "the accused made an uncoerced statement;" "[t]he prosecution must make the additional showing that the accused understood those rights." *Berghuis*, 560 U.S. at 384 (citations omitted).

The present grounds for relief were presented as grounds seven and eight in the state habeas corpus proceedings. In light of the evidence and case law regarding *Miranda* issues, the state habeas court made the following findings:

> 112. In Ground 7, [Petitioner] complains his appellate counsel was ineffective for not arguing that his statement was inadmissible because he did not affirmatively waive his right to remain silent. [1 SHCR 97-98]. In Ground 8, he complains that his trial counsel was ineffective for not objecting specifically enough to the admission of his confession. [1 SHCR 100-01].

> 113. Mere silence is not an invocation of a defendant's waiver of his right to remain silent, and such a waiver may be inferred after a defendant receives *Miranda* warning, understands them, and responds to questioning from an officer. *Berghuis v. Thompkins*, 130 S.Ct. 2250 (2010); *Joseph v. State*, 309 S.W.3d 20 (Tex. Crim. App. 2010).

114.    [Petitioner] received *Miranda* warnings, acknowledged that he understood them, and answered every question asked by the detectives.  SX 76 (written warnings initialed by [Petitioner]); SX 77 (videotape of interrogation).  This was a valid waiver of rights under *Thompkins*.

115.    Because an objection regarding [Petitioner's] statement would not have been successful at trial or on appeal, [Petitioner] has not shown that his counsel were deficient for failing to raise the issue, nor has he demonstrated prejudice.

116.    [Petitioner] did not receive ineffective assistance of as to Grounds 7 or 8.

5 SHCR 1529.  The TCCA subsequently adopted the findings in denying Petitioner's state application for a writ of habeas corpus.  The findings and conclusions are supported by the record.  Neither trial counsel nor appellate counsel were ineffective for failing to raise a frivolous issue.  Claims eight and nine lack merit for the additional reason that Petitioner cannot show prejudice.

Claims eight and nine should also be denied because Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Finally, he failed to overcome the doubly deferential standard that must be afforded to counsel in the context of § 2254(d).  *See Richter*, 131 S. Ct. at 788.  Petitioner is not entitled to relief on claims eight and nine.

**Claim Number 10:    The refusal of the Texas courts to properly define the terms and phrases in the future dangerousness special issue was a decision contrary to, and an unreasonable application of clearly established constitutional law in that Petitioner was: (1) deemed eligible for the imposition of death as a penalty by the use of an unconstitutionally vague aggravator; and (2) Petitioner was selected for the death penalty without giving full consideration and effect to record evidence of his mitigating circumstances.**

**Claim Number 11:    Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to brief the unconstitutionality of the Texas death penalty scheme**

because it is based upon vague statutory terms and does not properly channel the jury's discretion.

**Claim Number 12:** The trial court violated the Eighth and Fourteenth Amendments to the United States Constitution by failing to instruct the jury that a "No" vote by a single jury member would result in a Life sentence instead of a death sentence despite the statutory requirement of ten votes for a "No" answer to Article 37.071 § 2(b)(1) or for a "Yes" vote to Article 37.071 § 2(e).

**Claim Number13:** Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to brief the "10-12" Texas death penalty scheme.

**Claim Number 14:** The Texas capital punishment scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because the mitigation special issue does not allocate a burden of proof.

**Claim Number 15:** Petitioner's appellate counsel rendered ineffective assistance of counsel contrary to the Sixth and Fourteenth Amendments to the United States Constitution by failing to brief that the Texas death penalty scheme does not allocate a burden of proof for mitigation special issues.

Petitioner makes three general challenges to the Texas death penalty scheme as follows: (1) the future dangerousness issue contains several vague terms and does not properly channel the jury's discretion (claims 10-11); (2) the trial court erred in failing to instruct the jury on the "10-12" Rule (claims 12-13); and (3) the Texas death penalty scheme violates the Constitution because it does not allocate a burden of proof as to the mitigation special issue. All three claims were also presented in terms of ineffective assistance of appellate counsel. For reasons stated below, the three claims and the corresponding ineffective assistance of appellate counsel claims lack merit in light of clearly established federal law.

Claim number ten concerns the future dangerousness special issue. The future dangerousness special issue is part of the Texas capital punishment scheme that has been repeatedly upheld by the Supreme Court against similar challenges. *See Johnson v. Texas*, 509 U.S. 350, 373 (1993); *Jurek v. Texas*, 428 U.S. 262 (1976); *see also Pulley v. Harris*, 465 U.S. 37, 50 n.10 (1984) (stating that

Texas' punishment issues are not impermissibly vague because they have a "common sense core of meaning"). The Fifth Circuit has likewise repeatedly rejected claims complaining that these terms were not defined. *Sprouse v. Stephens*, 748 F.3d 609, 622-23 (5th Cir.) (citing *Turner*, 481 F.3d at 300), *cert. denied*, 135 S. Ct. 477 (2014); *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (finding that the terms used in the future dangerousness special issue "have a plain meaning of sufficient content that the discretion left to the jury [is] no more than that inherent in the jury system itself"), *cert. denied*, 131 S. Ct. 1050 (2011); *Hughes v. Johnson*, 191 F.3d 607, 615-16 (5th Cir. 1999), *cert. denied*, 528 U.S. 1145 (2000); *Milton v. Procunier*, 744 F.2d 1091, 1095 (5th Cir. 1984) ("Under Texas law, these terms are sufficiently common that their definition is not required in a jury charge under the capital murder statute."), *cert. denied*, 471 U.S. 1030 (1985). With respect to his claim that the terms were so vague that they did not channel the jury's discretion, the Supreme Court has observed that a jury may be given "unbridled discretion in determining whether the death penalty may be imposed" during the punishment phase of a trial. *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994). In light of *Tuilaepa*, the Fifth Circuit has rejected failure to channel arguments raised by Texas death row inmates. *See, e.g., Turner*, 481 F.3d at 299. Petitioner's complaint that the terms used in the future dangerousness special issue were not defined lacks merit in light of clearly established federal law. Claim number ten lacks merit, and the law was clearly established on this issue by the time Petitioner's appellate counsel filed his brief. Counsel was not ineffective for failing to raise a frivolous claim; thus, claim number eleven lacks merit.

In claim number twelve, Petitioner argues that the trial court violated the Eighth and Fourteenth Amendments by failing to instruct the jury that a "No" vote by a single jury member would result in a life sentence instead of death despite the statutory requirement of 10 votes for a "No" answer to article 37.071 § 2(b)(1) or for a "Yes" vote to article 37.071 § 2(e). The Texas procedure "is

commonly known as the '10-12 Rule.'" *Blue*, 665 F.3d at 669 (citations omitted). The Fifth Circuit

has regularly rejected challenges to the 10-12 Rule. *Reed*, 739 F.3d at 779; *Blue*, 665 F.3d at 669-670;

*Druery v. Thaler*, 647 F.3d 535, 542-43 (2011), *cert. denied*, 132 S. Ct. 1550 (2012). The Fifth Circuit

provided the following explanation in rejecting such challenges:

> [Petitioner] contends that Texas's system of instructing punishment-phase jurors of the consequences of a failure to agree on a sentence violates the Eighth Amendment. Article 37.071 requires capital jurors to be instructed that they can answer "Yes" to the future dangerousness issue and "No" to the mitigation special issue only if all twelve of them agree to do so and that they can give the opposite answers only if ten or more of them agree to do so. If the jurors answer "No" to the future-dangerousness issue or "Yes" to the mitigation issue, the defendant is sentenced to life without parole. The same result obtains if the jurors fail to agree on an answer, but the statute prohibits the court and the parties from informing the jurors of the effect of their failure to agree. This is commonly known as the 10-12 Rule. . . . [Petitioner] contends that the 10-12 Rule is unconstitutional because it affirmatively misleads jurors about their role in the sentencing process. . . . However, the Supreme Court held in *Jones v. United States* that a failure to instruct the jury as to the consequences of deadlock in no way affirmatively misleads the jury about its role in the sentencing process.[6] This Court has concluded that *Jones* insulates the 10-12 Rule from constitutional attack. And it has also held that the 10-12 Rule passes constitutional muster independently of the holding announced in *Jones*. Because no clearly established federal law invalidates the 10-12 Rule or calls its constitutionality into doubt, [Petitioner] is not entitled to a COA on this issue.

*Blue*, 665 F.3d at 669-70. The Fifth Circuit has also rejected such challenges in a number of

unpublished opinions. *See, e.g., Parr v. Thaler*, 481 F. App'x 872, 878-79 (5th Cir. 2012), *cert.*

*denied*, 133 S. Ct. 842 (2013); *Greer*, 380 F. App'x at 389. Claim number twelve lacks merit in light

of clearly established federal law. Similarly, Petitioner's corresponding ineffective assistance of

appellate counsel claim lacks merit. Counsel was not ineffective for failing to raise a frivolous claim;

thus, claim number thirteen should be denied.

In claim number fourteen, Petitioner argues that the Texas capital punishment scheme violates

the Constitution because the mitigation issue does not allocate a burden of proof. This ground for

---

[6]527 U.S. 373, 381-82 (1999).

relief has likewise been rejected by the Fifth Circuit. *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir.) ("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof."), *cert. denied*, 546 U.S. 848 (2005). Since *Rowell* was decided, the Fifth Circuit has repeatedly held that claims regarding the failure to assign either party the burden of proof on the mitigation special issue are meritless. *Blue*, 665 F.3d at 668; *Druery*, 647 F.3d at 546; *Adams v. Thaler*, 421 F. App'x 322, 334 (5th Cir.), *cert. denied*, 132 S. Ct. 399 (2011); *Kerr v. Thaler*, 384 F. App'x 400, 403 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 907 (2011). *See also Avila v. Quarterman*, 560 F.3d 299, 315 (5th Cir.) (The Fifth Circuit observed that it was bound by its precedent on this issue), *cert. denied*, 558 U.S. 993 (2009). Most recently, the Fifth Circuit rejected a claim that counsel was ineffective for failing to mount a challenge regarding the burden of proof issue as it relates to mitigating evidence. *Sprouse*, 748 F.3d at 623. Claim number fourteen lacks merit in light of clearly established federal law. Similarly, Petitioner's corresponding ineffective assistance of appellate counsel claim lacks merit. Counsel was not ineffective for failing to raise a frivolous claim; thus, claim number fifteen should be denied.

In light of the established case law, the state habeas court issued the following findings in rejecting these claims:

118.    [Petitioner's] complaints have been repeatedly rejected by the Supreme Court of the United States and the Texas Court of Criminal Appeals. *See., e.g. Jurek v. Texas*, 428 U.S. 262, 275 (1976) (future dangerous issue); *Crutsinger v. State*, 206 S.W.3d 607, 613 (Tex. Crim. App. 2006) (10-12 Rule); *Dreury v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007) (burden of proof on mitigation); *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003) (probability).

119.    Counsel was not deficient for declining to raise issues on appeal that have been repeatedly rejected by the courts. *See Burger*, 483 U.S. at 784 (noting the importance of strategy in choosing which claims to advance on appeal).

120.    [Petitioner] cannot be prejudiced by appellate counsel's failure to raise these issues because, if the law later changes so that these issues have merit, he can raise them in

a subsequent writ. *Ex parte Hood*, 211 S.W.3d 767, 775-76 (Tex. Crim. App. 2007), *overruled on other grounds*, 304 S.W.3d 397 (Tex. Crim. App. 2010).

121.    [Petitioner] did not receive ineffective assistance . . .

5 SHCR 1530.  The TCCA adopted these findings in denying Petitioner's state application for a writ of habeas corpus.  Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Relief should be denied with respect to claims ten through fifteen.

**Claim Number 16:      The trial court's grossly impartial comments to the assembled jury venire praising the prosecution subjected Petitioner to cruel and unusual punishment and a deprivation of his rights to a fair trial, the presumption of innocence, and the effective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

Petitioner's final claim concerns comments made by the trial judge during the opening portions of voir dire.  Below are excerpts of the trial judge's opening remarks to the jury venire:

THE COURT:  It's my privilege to introduce you to your elected district attorney, Judge John Roach.

JUDGE ROACH:  Good morning.

THE VENIRE PANEL:  Good morning.

THE COURT:  Judge Roach is a very distinguished jurist in his own right.  Some of you probably know that not only is he serving now as your district attorney, but prior to that he was the presiding judge of the 199th District Court here in Collin County for quite a number of years.  And also I think, Judge Roach, weren't you a justice on the court of appeals in Dallas for some time?

JUDGE ROACH:  Yes, sir.

THE COURT:  So he's had a very distinguished career.  Not only that but Judge Roach raises his kids right.  They're all lawyers.  In fact, he has a daughter and a son that are both attorneys and his son just recently was elected to the 296th District Court here in Collin County

as its judge, and he took office January 1 of this year and just has really had a good time and really doing a good job in the 296th.  So we're glad to have Judge Roach up there.  But my favorite Roach that's a lawyer, Judge, is your daughter-in-law.

JUDGE ROACH:  Yes, sir, I'm sure.

THE COURT:  John Jr.'s wife Laura.  She is a delight.  I always look forward to having her in court.

Okay, sitting next to Judge Roach there is his very able first assistant, Greg Davis.

MR. DAVIS:  Good morning.

THE COURT:  Greg is a very accomplished -- excuse me, Greg.  I'll call you Mr. Davis.  I'll be a little more formal. I'm familiar with him because we've tried a lot of cases together.  In fact, we tried a murder case just about three weeks ago; wasn't it?

MR. DAVIS:  Yes, sir.

THE COURT:  You'll find that he's a very, very professional and very good prosecutor.  I always enjoy trying cases with him.

Seated to the counsel table to my left over here and now your right is Mr. Steve Miears.

MR. MIEARS:  Morning, ladies and gentlemen.

THE VENIRE PANEL:  Good morning.

THE COURT:  Mr. Miears and I have also tried cases together, and he will be lead counsel in this case, and then seated at the end of the table and assisting Mr. Miears is Mr. Keith Gore.

MR. GORE:  Good morning.

THE COURT:  A very fine young criminal defense lawyer.  In fact, Mr. Gore and Mr. Davis and I all tried that murder case together.  You did a very fine job, Keith.

5 RR 24-26.  Petitioner complains that the trial court delivered a seemingly endless shower of praise upon the prosecution team and their respective families.  He argues that these gratuitous comments by the trial court unleveled the playing field and improperly enhanced the State in the eyes of the jury.

64

Petitioner did not complain about the trial court's comments until three days after they were made. The trial court overruled the objections. On appeal, the TCCA observed that a contemporaneous objection is required by Texas Rules of Appellate Procedure 33.1. *Chanthakoummane v. State*, 2010 WL 1696789, at *11. The TCCA held that the objection was not timely in order to preserve error for appeal. *Id.*

Despite finding that Petitioner failed to preserve the error, the TCCA went on to discuss the merits of the claim as follows:

> It is common for veniremembers to be introduced to prosecutors and defense counsel during voir dire examination (although not necessarily to this degree), just as it is common to ask veniremembers if they know any of the attorneys involved in the case. Here, Judge Parker complimented both the prosecutors and defense counsel when he introduced them to the jury. And his reference to the district attorney as "Judge John Roach" did not go so far as to taint the presumption of innocence.

*Id.* In the end, however, the TCCA held that a "contemporaneous objection was required to preserve error, and [Petitioner] failed to make one." *Id.* The point of error was overruled. *Id.*

The Director argues that the claim is procedurally barred in light of the decision by the TCCA. The argument is persuasive. The Fifth Circuit has held that the "procedural-default doctrine precludes federal habeas review when the last reasoned state-court opinion addressing a claim explicitly rejects it on a state procedural ground." *Matchett*, 380 F.3d at 848. The Fifth Circuit has consistently held that the Texas contemporaneous objection rule constitutes an adequate and independent ground that procedurally bars federal habeas review of a petitioner's claims. *Turner*, 481 F.3d at 301; *Cardenas*, 405 F.3d at 249; *Dowthitt*, 230 F.3d at 752) ("[T]he Texas contemporaneous objection rule is strictly or regularly applied evenhandedly to the vast majority of similar claims, and is therefore an adequate procedural bar."). More recently, the Fifth Circuit once again observed that the "Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally

bars federal habeas review." *Doyle v. Stephens*, 535 F. App'x 391, 393 (5th Cir. 2013) (citing *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999)), *cert. denied*, 134 S. Ct. 1294 (2014). A petitioner may overcome the procedural bar by demonstrating cause for the default and actual prejudice as a result of the alleged violation of federal law, or by demonstrating that the failure to consider the claim would result in a fundamental miscarriage of justice. *Id.* (citing *Coleman*, 501 U.S. at 750).

Petitioner did not make a contemporaneous objection as required by Texas law. In the present habeas proceeding, after acknowledging that the TCCA found that the error was not preserved, Petitioner did nothing more than complain anew about the trial judge's comments. He did not make any effort to overcome the procedural bar. Stated differently, he failed to demonstrate cause for the default and actual prejudice, or that the failure to consider the claim would result in a fundamental miscarriage of justice; thus, the claim is procedurally barred.

The Court would add that the TCCA's alternative finding that "[i]t is common for veniremembers to be introduced to prosecutors and during voir dire examination (although not necessarily to this degree)" appropriately observed that the trial judge's comments exceeded the norm; nonetheless, the Court cannot say that the TCCA's ultimate conclusion that the comments "did not go so far as to taint the presumption of innocence" was unreasonable. The Court is of the opinion, and so finds, that the trial court's comments during voir dire did not "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). It is noted that a federal court may not grant relief "unless *each* ground supporting the state court decision is examined and found to be unreasonable under AEDPA." *Wetzel*, 132 S. Ct. at 1199 (emphasis in original). Petitioner has not shown that either conclusion provided by the TCCA was unreasonable. He has not shown that he is entitled to federal habeas corpus relief based on claim number sixteen.

66

## Conclusion

Having carefully considered all of Petitioner's claims, the Court is of the opinion, and so finds, that he has not shown that he is entitled to federal habeas corpus relief and his petition should be denied.

## Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a federal habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Petitioner has not yet filed a notice of appeal, the court may address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the

petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the denial of Petitioner's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). The Court thus finds that Petitioner is not entitled to a certificate of appealability as to his claims. It is accordingly

**ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED** with prejudice. It is further

**ORDERED** that a certificate of appealability is **DENIED**. It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

**So ORDERED and SIGNED this 20th day of March, 2015.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**